**Douglas B. Moylan**
**Attorney General of Guam**
**Office of the Attorney General**
Civil Division
134 W. Soledad Avenue, Suite 302
*Hagåtña*, Guam 96910 • USA
671-475-2710 (tel) • 671-477-2493 (fax)
www.guamattorneygeneral.org

**Attorneys for the Government of Guam (People of Guam)**

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF GUAM

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>vs.<br><br>GUAM VISITORS BUREAU, a Guam Public Corporation, and GEORGE CHIU, in his individual capacity as Chairman of the Board of Directors of the Board of the Guam Visitors Bureau,<br><br>Defendant. | Civil Case No.: 26-00017<br><br>**Motion to Clarify Scope of Representation and Memorandum of Law**<br><br>**(CVLR 7; 12 GCA § 9109(b))** |

The OFFICE OF THE ATTORNEY GENERAL of GUAM ("**AG**"), by and through the ATTORNEY GENERAL OF GUAM and undersigned counsel, hereby moves this Honorable Court to clarify the scope of the AG's legal representation of Defendant GUAM VISITORS BUREAU ("**GVB**") pursuant to CVLR 7 and 12 GCA § 9109(b), and as grounds states:

//

//

## I. Introduction

1. The plain language of the Organic Act of Guam, *see* 48 U.S.C. §§ 1421g(d)(1), *et seq.*, and territorial statutes promulgated thereunder, *see* 5 GCA § 6103(a), 12 GCA § 9102, and 12 GCA § 9109(b), grants the AG the authority to represent Defendant GVB in this litigation. 12 GCA § 9109(b) mandates this representation. On information and belief, the AG has consulted with Defendant GVB as to the means by which Defendant GVB's objectives are to be pursued. These authorities empower the AG to direct strategy.

2. 48 U.S.C. § 1421g(d)(1) designates the Attorney General to act as the "Chief Legal Officer of the Government of Guam." *See* 48 U.S.C. §§ 1421g(d)(1), *et seq*. The Attorney General heads the Office of the Attorney General which represents the Government of Guam. The 1950 Organic Act of Guam, *see* 48 U.S.C. § 1421, *et seq*., assigns the Attorney General of Guam the broad power to act on behalf of the Government of Guam.

3. Plaintiff Jane Doe has sued Defendant GVB alleging several causes of action.

4. The Guam Legislature created Defendant GVB and expressly defines it as "a public corporation… The corporation shall be a non-stock, non-profit membership corporation to be governed in accordance with the applicable general corporation laws of the Territory of Guam, except as provided otherwise by this Article." *See* 12 GCA § 9102.

5. On reasonably objective grounds after careful study, the AG opines that the Government of Guam includes Defendant GVB. *See* 5 GCA § 6103(a) ("Government of Guam shall include all agencies, departments, instrumentalities, public corporations, and all other entities of the government, no matter how designated, and whether or not such agencies may sue or be sued in their own name."). 12 GCA § 9109(b) states, in pertinent part, that: "… The Attorney General shall represent the Bureau in litigation in which the Bureau is interested,

provided that the Attorney General may deputize or designate the attorney for the Bureau as a Special Assistant Attorney General for this purpose…." *Id.*

6. The Organic Act constrains the Guam Legislature from limiting the broad scope of authority granted to the Attorney General and, by extension, to the AG. *See* 48 U.S.C. § 1423a (Guam's legislative power extends only to subjects "not inconsistent with" the Organic Act and "the laws of the United States applicable to Guam."); *McCulloch v. Maryland.* 17 U.S. (4 Wheat.) 316, 436 (1819) (States may not "retard, impede, burden, or in any manner control" the operation of constitutional laws enacted by Congress); *National Bank v. County of Yankton*, 101 U.S. 129, 133 (1880) (holding that Congress may abrogate territorial legislation, legislate directly for a territory, and make a territorial act valid or void.). *People of Guam v. Guerrero*, 290 F.3d 1210, 1214, 1217 (9th Cir. 2002) directly holds that Guam remains subject to Congress's plenary power; Congress may legislate directly for Guam or establish a government subject to congressional control, and Guam is a federal instrumentality enjoying only the authority conferred by Congress.

7. Although in complete agreement as to Defendant GVB's objectives as to the outcome of this litigation, as expressed by Defendant GVB's President and CEO, Regine Biscoe Lee, and Board Chair, Goerge Chiu, in their corporate capacities, in consultation with the AG, the AG and Defendant GVB differ as to the scope of the legal representation:

(A) Who represents Defendant GVB in this litigation;

(B) Whether Defendant GVB may direct the Attorney General to designate the appointment of outside counsel who will be under Defendant GVB's direct control;

(C) Whether Defendant GVB officials are "clients" who may exert direct control over the AG's legal decisions on strategy, direction and ultimately settlement authority, or

whether the Congressionally-created Attorney General of Guam exercises its independent judgment to decide the means by which to pursue Defendant GVB's objectives.

8. The AG notified Defendant GVB's President/CEO and its Board Chair that it would be compelled to file this motion if Defendant GVB did not agree that the AG controls this litigation (just as the AG controls criminal cases), because of the specific language Congress selected in creating and empowering the Organic Act position of Attorney General of Guam. Congress and the Guam Legislature in its statute appear aligned on this issue of once litigation is initiated, that Defendant GVB does not have the authority to select a private counsel of its choosing, and to direct that counsel (by virtue that it must use the Congressionally-created AG) to litigate on behalf of the corporation.

9. Accordingly, we respectfully request that this Honorable Court hear and decide this motion ***before*** deciding the concurrently filed Motion to Dismiss that the AG drafted because Defendant GVB sought to file a different Motion to Dismiss. The currently filed motion to dismiss contains legal argument and authority reflecting the AG's mental impressions as to the best course of action to achieve Defendant GVB's aligned objectives. If the Court finds that the AG does not control this litigation, the AG requests a reasonable amount of time to file responsive pleadings.

## II. The U.S. Congress Created the Position of Attorney General of Guam as Chief Legal Officer of the Government, Patterned After Illinois Law and Interpretative Authority

The Attorney General of Guam was elevated, created and empowered by the U.S. Congress in 1998, specifically in passing,

> **(d)(1) Attorney General of Guam.** The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam. At such time as the Office of the Attorney General of Guam

> shall next become vacant, the Attorney General of Guam shall be appointed by the Governor of Guam with the advice and consent of the legislature, and shall serve at the pleasure of the Governor of Guam.

48 U.S.C. § 1421g(d)(1). The U.S. Congress decided to intervene into Guam's existing territorial (local) laws that were in existence in 1998 that the Guam Legislature already created and empowered the Office of Attorney General.

The U.S. Congress' Attorney General of Guam provision creating and empowering the position as the Government of Guam's "*Chief Legal Officer*," was adopted from Illinois' Constitution. *See* Attached Legislative Report for 48 U.S.C. § 1421g(d)(1) amendments to Organic Act of Guam. (**Exhibit A**). Notably, Guam Compiler of Laws and Acting Attorney General of Guam, the late Charles Troutman urged the U.S. Congress to use Illinois' "*Chief Legal Officer of the Government of Guam*" language, which the U.S. Congress ultimately adopted in 48 U.S.C. § 1421g(d)(1). *See* Attached Legislative Report for 48 U.S.C. § 1421g(d)(1) amendments to Organic Act of Guam (pp. 72 & 240 of Report).

In Illinois the Attorney General is the "*Chief Legal Officer*" and the AG controls the course of representation, not officers or agencies. *Newberg, Inc. v. The Illinois State Toll Highway Authority*, 98 Ill.2d 58, 456 N.E.2d 50 (1983). Like in other States, the Chief Legal Officers (AGs) have the exclusive right and power under their constitutions and statutes to represent state agencies in court. *Hill v. Texas Water Quality Bd.*, 568 S.W.2d 738 (1978); *State v. Warren*, 180 So.2d 293, 299 (Miss. 1965) ("… He had authority to institute proceedings to abate public nuisances, affecting public safety and convenience, to control and manage all litigation on behalf of the state, and to intervene in all actions which were of concern to the general public.").

Guam is a U.S. Territory and not a State, and is more under Congressional authority and control than States, being identified under the U.S. Constitution's Properties Clause. *Note* U.S. Const. art. IV, § 3, cl.2. In this case, Congress gave to the Attorney General the duty to be the Chief Legal Officer for the Government of Guam, to handle the prosecution and defense of criminal and civil cases. 48 U.S.C. §§ 1421g(d)(1) and 1421c. The Attorney General was not to be the private counsel for officers of various departments, agencies or instrumentalities of the Government of Guam to further their individual legal policies and objectives. In fact, the Attorney General of Guam was elected by the People of Guam, as allowed by Congress granting the Legislature of Guam the ability to choose to allow the People to directly choose their attorney. 48 U.S.C. § 1421g(d)(2), 5 GCA § 30101(a).

The Attorney General has the right to control litigation against interest of private autonomous agency counsel's trying to represent the government entity and arises from Constitutional power, Chief Legal Officer of Mississippi, regardless of Board's desire to use outside private counsel. *Wade v. Mississippi Cooperative Extension Service*, 392 F.Supp. 229 (N. D. Miss. 1975). Here, the Legislature of Guam provided that the Attorney General of Guam represent Defendant GVB in this litigation. 12 GCA § 9109(b). The more difficult question is whether Congress by passing the 1998 Amendment when other AG laws existed in local law, intended that the democratically-elected Attorney General of Guam control all litigation decisions, including ultimately settlement of that litigation case, when Congress used the language "the Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam"? 48 U.S.C. § 1421g(d)(1). On remand of proceeding involving joint venture's complaint, based upon State Toll Highway Authority's resolution, not approved by Attorney General, approving settlement with venture concerning Authority's alleged breach of contract with

venture, Authority or Attorney General could assert by an appropriate responsive pleading any lawful basis which may exist by reason of which settlement should not be carried out, including both matters relating to form and constitutionality of settlement and any matter, such as fraud, which would require Attorney General to exercise his authority as director of State's legal affairs. *Newberg-Krug-Brighton v. Illinois State Toll Highway Authority*, 380 N.E.2d 1029 (Ill. 1978).

Conversely, to allow private government officials to control the independence of an elected (or appointed) Attorney General of Guam removes the significance of why Congress intervened in 1998 to elevate, create and empower the Attorney General position to make it of a Constitutional (Organic Act) prominence in the structure of government. There would be no difference between the AG before 1998 and the Attorney General after the 1998 Congressional intervention into the Office if one were to interpret government officials like a private client to direct the AG to follow that client's direction.

The AG would be no different than a private counsel doing the bidding of their private client. However, the Attorney General being the Protector of the Public Interest imparts into that position to make decisions in the public good, and to be directly accountable to the People of Guam to make legal decisions, including decisions on prosecutions and settlements in litigation based upon that person's wise judgment. Further, unlike government officials that run agencies like Defendant GVB, the Attorney General is directly accountable to the People of Guam vis-à-vis the election process every 4 years. Defendant GVB officials are not directly accountable to the People of Guam. Nor are the elected officials the Government of Guam but officials placed in a management position of that organization. The People of Guam own the Government of Guam and have been empowered by Congress to select their attorney to make

decisions on their behalf. Every 4 years a slate of attorneys run for the position of Attorney General on campaign platforms seeking the People of Guam to vote for them to serve as the Attorney General who would be the Chief Legal Officer for their Government of Guam.

The U.S. Congress' action by passing 48 U.S.C. § 1421g(d)(1) despite existing local laws elevated the position of Attorney General of Guam such that the Legislature of Guam could not eliminate the position, reduce the powers associated with the language "Chief Legal Officer of the Government of Guam," redefine what is included as part of the "Government of Guam," nor reduce the powers and duties associated with such special language. This language has extensive interpretative history in many States, but in Guam more so because it is held to limiting principles including the Supremacy Clause and Federalism.

The bedrock federalism case is *McCulloch v. Maryland*. 17 U.S. (4 Wheat.) 316, 436 (1819) (*States may not "retard, impede, burden, or in any manner control" the operation of constitutional laws enacted by Congress*). Although *National Bank v. County of Yankton*, 101 U.S. 129 (1880), is not an "Insular Case," it was cited by *De Lima* and *Downs* for the legal proposition that the U.S. Congress has full and complete legislative authority over territorial governments. *See De Lima v. Bidwell*, 182 U.S. 1 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901). This decision holds that the U.S. Congress may abrogate territorial legislation, legislate directly for a territory, and make a territorial act valid or void. *Yankton*, 101 U.S. at 133.

*People of Guam v. Guerrero*, 290 F.3d 1210, 1214, 1217 (9th Cir. 2002) directly holds that Guam remains subject to Congress's plenary power, the U.S. Congress may legislate directly for Guam or establish a government subject to congressional control, and Guam is a federal instrumentality enjoying only the authority conferred by Congress. Likewise, *Puerto*

*Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 130 (2016) held that federal bankruptcy law preempted Puerto Rico's conflicting territorial legislation.

Furthermore, Guam's 1950 Organic Act expressly states the proposition directly: Guam's legislative power extends only to subjects "not inconsistent with" the Organic Act and "the laws of the United States applicable to Guam." 48 U.S.C. § 1423a. *Guerrero* is probably the cleanest Guam and Ninth Circuit authority. *Guerrero* cites *Balzac* and *Dorr* in discussing Guam's status as an unincorporated territory, which are "Insular Cases." *Guerrero*, 290 F.3d at 1214. It provides insight into why Congress' mandate that the Attorney General of Guam be the Chief Legal Officer for the Government of Guam, and that no other attorney, especially ones not chosen by the People of Guam have a right to direct legal policy and legal decisions once litigation is initiated before the Courts.

## III. Conclusion

Based upon the foregoing, the Office of the Attorney General of Guam by and through the Attorney General of Guam requests clarification in this litigation providing that Congress intended that the Attorney General of Guam:

(A) Represent Defendant GVB (Government of Guam) in this litigation; and

(B) Directly controls legal decisions on strategy, direction and ultimately settlement decision on behalf of Defendant GVB (Government of Guam), without interference as to the legal direction that officials at Defendant GVB may provide.

//

//

//

//

**Respectfully submitted** this 24th day of August, 2026.

**OFFICE OF THE ATTORNEY GENERAL**
Douglas B. Moylan, Attorney General of Guam

/s/ Eric S. Wojcik
**ERIC S. WOJCIK**
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system that will send notification of such filing to the following:

RAZZANO WALSH & TORRES, P.C.
service@rwtguam.com
Joseph C. Razzano
Joshua D. Walsh
Pan American Building
139 Murray Blvd. Suite 100
Hagåtña, Guam 96910
Office: (671) 473-1117
Fax: (671) 477-4826
jrazzano@rwtguam.com
jdwalsh@rwtguam.com

**Respectfully submitted** this 24th day of August, 2026.

**OFFICE OF THE ATTORNEY GENERAL**
Douglas B. Moylan, Attorney General of Guam

/s/ Eric S. Wojcik
**ERIC S. WOJCIK**
Assistant Attorney General

# Exhibit A

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# HEARING ON H.R. 100, H.R. 2370, AND S. 210

# HEARING

BEFORE THE

## COMMITTEE ON RESOURCES
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTH CONGRESS

FIRST SESSION

ON

**H.R. 100**

**GUAM COMMONWEALTH ACT, TO ESTABLISH THE COMMONWEALTH OF GUAM, AND FOR OTHER PURPOSES**

**H.R. 2370**

**GUAM JUDICIAL EMPOWERMENT ACT OF 1997, TO AMEND THE ORGANIC ACT OF GUAM FOR THE PURPOSES OF CLARIFYING THE LOCAL JUDICIAL STRUCTURE AND THE OFFICE OF ATTORNEY GENERAL**

**S. 210**

**TO AMEND THE ORGANIC ACT OF GUAM, THE REVISED ORGANIC ACT OF THE VIRGIN ISLANDS, AND THE COMPACT OF FREE ASSOCIATION ACT, AND FOR OTHER PURPOSES**

OCTOBER 29, 1997, WASHINGTON, DC.

**Serial No. 105–78**

Printed for the use of the Committee on Resources

COMMITTEE ON RESOURCES

DON YOUNG, Alaska, *Chairman*

W.J. (BILLY) TAUZIN, Louisiana
JAMES V. HANSEN, Utah
JIM SAXTON, New Jersey
ELTON GALLEGLY, California
JOHN J. DUNCAN, JR., Tennessee
JOEL HEFLEY, Colorado
JOHN T. DOOLITTLE, California
WAYNE T. GILCHREST, Maryland
KEN CALVERT, California
RICHARD W. POMBO, California
BARBARA CUBIN, Wyoming
HELEN CHENOWETH, Idaho
LINDA SMITH, Washington
GEORGE P. RADANOVICH, California
WALTER B. JONES, JR., North Carolina
WILLIAM M. (MAC) THORNBERRY, Texas
JOHN SHADEGG, Arizona
JOHN E. ENSIGN, Nevada
ROBERT F. SMITH, Oregon
CHRIS CANNON, Utah
KEVIN BRADY, Texas
JOHN PETERSON, Pennsylvania
RICK HILL, Montana
BOB SCHAFFER, Colorado
JIM GIBBONS, Nevada
MICHAEL D. CRAPO, Idaho

GEORGE MILLER, California
EDWARD J. MARKEY, Massachusetts
NICK J. RAHALL II, West Virginia
BRUCE F. VENTO, Minnesota
DALE E. KILDEE, Michigan
PETER A. DEFAZIO, Oregon
ENI F.H. FALEOMAVAEGA, American Samoa
NEIL ABERCROMBIE, Hawaii
SOLOMON P. ORTIZ, Texas
OWEN B. PICKETT, Virginia
FRANK PALLONE, JR., New Jersey
CALVIN M. DOOLEY, California
CARLOS A. ROMERO-BARCELÓ, Puerto Rico
MAURICE D. HINCHEY, New York
ROBERT A. UNDERWOOD, Guam
SAM FARR, California
PATRICK J. KENNEDY, Rhode Island
ADAM SMITH, Washington
WILLIAM D. DELAHUNT, Massachusetts
CHRIS JOHN, Louisiana
DONNA CHRISTIAN-GREEN, Virgin Islands
RON KIND, Wisconsin
LLOYD DOGGETT, Texas

LLOYD A. JONES, *Chief of Staff*
ELIZABETH MEGGINSON, *Chief Counsel*
CHRISTINE KENNEDY, *Chief Clerk/Administrator*
JOHN LAWRENCE, *Democratic Staff Director*
T.E. MANASE MANSUR, *Republican Professional Staff*
MARIE J. HOWARD-FABRIZIO, *Democratic Professional Staff*

## CONTENTS


| | Page |
|---|---|
| Hearing held October 29, 1997 | 1 |
| Statement of Members: | |
| Abercrombie, Hon. Neil, a Representative in Congress from the State of Hawaii, prepared statement of | 10 |
| Akaka, Hon. Daniel K., a Senator in Congress from the State of Hawaii | 7 |
| Becerra, Hon. Xavier, a Representative in Congress from the State of California | 10 |
| Prepared statement of | 11 |
| Christian-Green, Hon. Donna M., a Representative in Congress from the State of Virgin Islands, prepared statement of | 37 |
| Faleomavaega, Hon. Eni F.H., a Delegate in Congress from the Territory of American Samoa, prepared statement of | 36 |
| Hill, Hon. Rick, a Representative in Congress from the State of Montana, prepared statement of | 100 |
| Inouye, Hon. Daniel K., a Senator in Congress from the State of Hawaii, prepared statement of | 39 |
| Kennedy, Hon. Patrick J., a Representative in Congress from the State of Rhode Island, prepared statement of | 39 |
| Mink, Hon. Patsy T., a Representative in Congress from the State of Hawaii | 8 |
| Prepared statement of | 9 |
| Ortiz, Hon. Solomon P., a Representative in Congress from the State of Texas, prepared statement of | 37 |
| Smith, Hon. Robert F. (Bob), a Representative in Congress from the State of Oregon, prepared statement of | 40 |
| Underwood, Robert A., a Representative in Congress from the Territory of Guam | 2 |
| Prepared statement of | 3 |
| Young, Hon. Don, a Representative in Congress from the State of Alaska, prepared statement of | 20 |
| Letter to President Clinton | 20 |
| President Clinton's answering letter | 23 |
| Statement of Witnesses: | |
| Ada, Hon. Joseph F., former Governor of Guam | 45 |
| Prepared statement of | 169 |
| Ada, Thomas C., Senator, and Guerrero, Lou Leon, Senator, 24th Guam legislature, prepared statement of | 257 |
| Apuron, Anthony S., Archbishop, Archdiocese of Agana | 89 |
| Prepared statement of | 331 |
| Arriola, Joaquin C. Jr., President, Guam Bar Association, prepared statement of | 238 |
| Barrett-Anderson, Hon. Elizabeth, a Senator from Guam, prepared statement of | 347 |
| Blaz, Hon. Anthony, Vice Speaker, Guam Legislature | 63 |
| Prepared statement of | 187 |
| Blaz, Hon. Ben, former Delegate, U.S. House of Representatives | 12 |
| Prepared statement of | 13 |
| Calvo, Hon. Paul M., former Governor of Guam | 43 |
| Prepared statement of | 138 |
| College of the Marshall Islands and Palau Community College, prepared statement of | 309 |
| Cristobal, Hope A., Organization of People for Indigenous Rights | 86 |
| Doss, Darrell O., prepared statement of | 99 |
| Draft Guam Commonwealth Act, Sections A through D | 407 |




Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 14 of 542

| | Page |
|---|---|
| Statement of Witnesses—Continued | |
| Filipino-American President's Club of Guam, prepared statement of | 304 |
| Forbes, Hon. Mark, Senate Majority Leader and Chairman, Senate Committee on Federal Affairs, Guam Legislature | 65 |
| Prepared statement of | 192 |
| Garamendi, Hon. John R., Deputy Secretary, U.S. Department of the Interior | 23 |
| Prepared statement of | 104 |
| Guam Chamber of Commerce, prepared statement of | 288 |
| Guam Commission on Self-Determination, prepared statement of | 370 |
| Guerrero, Hon. Carlotta Leon, Senator, Guam Legislature, prepared statement of | 258 |
| Prepared statement of | 396 |
| Additional material submitted for the record by | 98 |
| Guevara, Jose, Vice President, Filipino Community of Guam | 90 |
| Gutierrez, Hon. Carl T.C., Governor of Guam | 41 |
| Prepared statement of | 147 |
| Additional material submitted for the record by | 381 |
| Howard, Chris Perez, Chairman, Organization of People for Indigenous Rights | 87 |
| Prepared statement of | 319 |
| Lamorena, Hon. Alberto C., III, Presiding Judge, Superior Court of Guam | 71 |
| Prepared statement of | 221 |
| Lujan, Pilar C., prepared statement of | 233 |
| McDonald, Hon. Paul M., Mayor, President, Mayor's Council of Guam, prepared statement of | 176 |
| Moses, Susan J., President, College of Micronesia–FSM, prepared statement of | 84 |
| Nicolas, Frank C. San, Tamuning, Guam, prepared statement of | 344 |
| Organization of People for Indigenous Rights, prepared statement of | 313 |
| Pangelinan, Hon. Ben, Senate Minority Leader, Guam Legislature | 67 |
| Prepared statement of | 199 |
| Quinata, Debtralynne K., Nasion Chamoru | 91 |
| Prepared statement of | 333 |
| Quinene, Frederick R., GMF, Guam, prepared statement of | 299 |
| Rivera, Ron, prepared statement of | 98 |
| Siguenza, Hon. Peter, Chief Justice, Supreme Court of Guam | 69 |
| Prepared statement of | 100 |
| Additional material submitted for the record by | 211 |
| Staymen, Allen, Director, Office of Insular Affairs, U.S. Department of the Interior | 32 |
| Prepared statement of | 134 |
| Troutman, Charles H., Attorney General of Guam (Acting), prepared statement of | 240 |
| Tydingco-Gatewood, Hon. Frances M., Judge, Superior Court of Guam, prepared statement of | 236 |
| Additional material submitted for the record by | 526 |
| Unpingco, Hon. Antonio R., Speaker, Twenty-Fourth Guam Legislature, prepared statement of | 389 |
| Additional material submitted: | |
| Title 48, United States Code Annotated | 102 |

# HEARING ON: H.R. 100, GUAM COMMONWEALTH ACT, TO ESTABLISH THE COMMONWEALTH OF GUAM, AND FOR OTHER PURPOSES

# H.R. 2370, GUAM JUDICIAL EMPOWERMENT ACT OF 1997, TO AMEND THE ORGANIC ACT OF GUAM FOR THE PURPOSES OF CLARIFYING THE LOCAL JUDICIAL STRUCTURE AND THE OFFICE OF ATTORNEY GENERAL

# S. 210, TO AMEND THE ORGANIC ACT OF GUAM, THE REVISED ORGANIC ACT OF THE VIRGIN ISLANDS, AND THE COMPACT OF FREE ASSOCIATION ACT, AND FOR OTHER PURPOSES

---

**WEDNESDAY, OCTOBER 29, 1997**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON RESOURCES,
*Washington, DC.*

The committee met, pursuant to notice, at 10:04 a.m., in room 1324, Longworth House Office Building, Hon. Rick Hill presiding.

Mr. HILL. [presiding] The Committee on Resources will come to order.

The Committee is meeting today to hear testimony on legislation affecting the insular areas, including measures providing for increased self-government for Guam. The pending legislation being considered today includes H.R. 100, the Guam Commonwealth Act, H.R. 2370, the Guam Judicial Empowerment Act, and S. 210, the Omnibus Territories Act.

Under Rule 4(g) of the Committee rules, any oral opening statements at hearings are limited to the Chairman and the Ranking Minority Member. This will allow us to hear from our witnesses sooner and help members keep to their schedules. Therefore, if other members have statements, they can be included in the hearing record under unanimous consent.

It is a pleasure today to welcome the distinguished witnesses for today's hearings on certain measures affecting some of our United States territories and the separate, sovereign freely associated States. These issues affecting U.S. Nationals and citizens in the territories, as well as residents of the Pacific freely associated re-



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 16 of 542

publics, are part of the unique and important jurisdiction of the Committee on Resources for the insular areas. That is why Chairman Young scheduled these hearings on matters which could provide for increased local self-governance for the people of the insular areas.

Let me thank the witnesses from the distant Pacific islands for agreeing to appear before the committee. You've traveled thousands of miles to testify, and your efforts are appreciated. You are providing a substantial set of information for the committee record. Your statements have been provided for review by all of the committee members and will be available for all of those in the Congress, as well, who are not members of the committee or are not here today.

One of the primary purposes of this hearing is to assist the insular areas, including Guam, in advancing toward greater local self-government. The statements by the witnesses today will help Congress in evaluating the merits of the proposals contained in S. 210, the omnibus territories act, H.R. 2370, the Guam Judicial Act, and H.R. 100, the Guam Commonwealth Act.

I will now recognize the ranking member for an opening statement.

**STATEMENT OF ROBERT A. UNDERWOOD, A REPRESENTATIVE IN CONGRESS FROM THE TERRITORY OF GUAM**

Mr. UNDERWOOD. Thank you, Mr. Chairman. I'd like to welcome everyone to the committee, and I appreciate, certainly, the appearance of not only a very large delegation from Guam, but also three members of the body.

Mr. Chairman, today is a momentous day for the people of Guam after a long and sometimes erratic journey. The proposal of the people of Guam for a new Commonwealth agreement has come back to the committee where its disposition will ultimately be determined.

I will leave it up to the many fine speakers today, most especially the elected leadership of Guam, to explain the details of the proposal and the trials and tribulations the proposal has endured since its ratification by the people of Guam in 1987.

The proposal in its current numbering in the 105th Congress is H.R. 100, in commemoration of the fact that next year marks the centennial of the raising of the American flag over Guam. When that flag was raised in 1898, it was raised over a few Spanish nationals and the indigenous people of Guam. Since that time, the people of Guam have endured U.S. military rule, a cruel Japanese occupation, the taking of large tracts of land, and the violation of many of the democratic principles we hold dear.

But the people of Guam have also prospered in spite of the obstacles, they have learned the lessons of American democracy even if they could not fully implement them, and have enjoyed much political progress. The people of Guam are ready to go to the next stage in their political development. There is no more appropriate place in Washington where these issues and those challenges should be fully explored than in this committee room. There is no other location in Washington which displays the flags of the insular areas as a critical part of the room.

The Resources Committee alone has the responsibility to deal with insular issues. The people of Guam come to this committee as partners in the democratic experiment we call America. They appeal to you as arbiters of their fate. The message will be that the people of Guam want Commonwealth, and that they are frustrated by the lack of clarity in the process. Some messages will be strong, some will be strident, and some won't even be in support of H.R. 100, but all messages are being delivered to the right location—the Resources Committee of the House.

Many of us are familiar with various quotations which are on the walls and ceilings of the Capitol Building. My favorite is from William Henry Harrison, who said in his Presidential inaugural address on March 4, 1841 that, quote, "The only legitimate right to govern is an express grant of power from the governed."—unquote. We all know that this is not the case with the territories, and maybe President Harrison knew something of this experience. As the elected representative of the Northwest Territory, he was the first territorial delegate to be elected President. So it can happen for even territorial delegates, Mr. Chairman.

Mr. Chairman, I commend you for your leadership in holding this hearing this morning, and I thank the members of the committee for their attention. And on behalf of the people of Guam, [speaking in Chamorro] "Dangkolo na si Yu'os ma'ase."

[The prepared statement of Mr. Underwood follows:]

STATEMENT OF HON. ROBERT UNDERWOOD, A DELEGATE IN CONGRESS FROM THE TERRITORY OF GUAM, ON H.R. 100

Mr. Chairman, today is a momentous day for the people of Guam. After a long and sometimes erratic journey, the proposal of the people of Guam for a new, Commonwealth agreement with the United States has come back to the Committee where its disposition will be ultimately determined.

I will leave it up to the many speakers today, most especially the elected leadership of Guam, to explain the details of this proposal and the trials and tribulations the proposal has endured since its ratification by the people of Guam in 1987.

The proposal in its current numbering in the 105th Congress is H.R. 100—in commemoration of the fact that next year marks the Centennial of the raising of the American flag over Guam. When that flag was raised in 1898, it was raised over a few Spanish nationals and the indigenous people of Guam, the Chamorros.

Since that time, the people of Guam have endured U.S. military rule, a cruel Japanese occupation, the taking of large tracts of land under military courts and the violation of many of the democratic principles we hold dear. But the people of Guam have also prospered despite obstacles, learned the lessons of American democracy even as they could not fully implement them and enjoyed much political progress. In 1898, not too many could have imagined that the people of Guam would have the vibrant democracy in gubernatorial and legislative elections that are now a regular feature of life.

The people of Guam are ready to go to the next stage in their political development. Cognizant of the fact that the ultimate decision for full integration as a state or separate sovereignty may be a little distant, the people of Guam have crafted an innovative approach to the implementation of democracy in a small territory on the other side of the international dateline. The proposal admittedly raises many Constitutional issues and challenges us to think counter intuitively about the relationship between the territories and the Federal Government.

But there is no more appropriate place in Washington where these issues and these challenges should be fully explored than this Committee room. There is no other location on Capitol Hill which displays the flags of the insular areas as a central part of the room. The Resources Committee alone has a responsibility to deal with insular issues. The people of Guam come to this Committee as partners in the democratic experiment we call America. They appeal to you as the arbiters of their fate. The message will be that the people of Guam want Commonwealth, but that they are frustrated by the lack of clarity in the process. Some messages

will be strong, some will be strident and some won't even be supportive of H.R. 100, but all messages are being delivered to the right location—the Resources Committee of the House.

Many of us are familiar with various quotations which are on the walls and the ceilings of the Capitol Building. My favorite was from William Henry Harrison, who said in his Presidential inaugural address on March 4, 1841, that "the only legitimate right to govern is an express grant of power from the governed." We all know that this is not the case with the territories. Maybe President Harrison knew something of this experience. As the elected representative of the Northwest Territory, he was the first territorial delegate to be elected President.

Mr. Chairman, I commend you for your leadership in holding this hearing this morning. I thank the other members of the Committee for their attention and on behalf of the people of Guam—Dangkulo na si Yu'os ma'ase.

---

STATEMENT OF HON. ROBERT UNDERWOOD, A DELEGATE IN CONGRESS FROM THE TERRITORY OF GUAM, ON H.R. 2370

Mr. Chairman, I am pleased that H.R 2370 is being heard by the full Committee this morning. H.R 2370, the Guam Judicial Empowerment Act will do much to correct current defects in the Organic Act of Guam relative to the Judicial Branch of the Government of Guam. As you know, the Organic Act of Guam afforded Guam a certain degree of local self-government. Over the years, the Act was amended to provide the people of Guam with an elected Governor, has improved other systems of local self-government, and has made accommodations for an elected Board of Education.

My legislation is consistent with this development. It seeks to affirm that the Supreme Court of Guam is the head of a unified judiciary. It confirms that the Supreme Court has authority over the administration of the Court System, including the subordinate courts of Guam. But most of all, it ensures that the judiciary is separate and co-equal to the other branches of our government. It affords the Judiciary the same Organic Act status given the Legislative and executive branches. It is necessary to pass this bill, to remove the possibility of political influence over the judiciary. Currently, the local law which created the Supreme Court can be repealed by the local legislative process. It is unconscionable that there remains an opportunity to influence Court decisions and so it is imperative that we invest integrity in the Guam judiciary.

The legislation brings the Guam Courts to a level that is standard with the other states and territories. It establishes a framework that is consistent with the powers of the other branches of Guam's government and does much to empower our people.

There is wide public support for this legislation. The Guam Bar Association, which is a non-profit organization that represents all attorneys licensed in Guam, has endorsed this section and has submitted an official statement. The legislation is also endorsed by Charles Trouhnan, the Guam Compiler of Laws and the Acting Attorney General; the Honorable Judge Frances Tydingco-Gatewood of the Superior Court of Guam; and the Honorable Pilar C. Lujan, former Guam Senator and sponsor of the law that established the Supreme Court of Guam.

The second part of my bill seeks to empower the Guam Legislature to provide the people of Guam with an elected Attorney General. Mr. Chairman, several months ago, my office conducted a questionnaire on this issue. Although the questionnaire is only a measure of public opinion on this matter, my office received nearly four thousand responses. Of those responses, 32 percent were in favor of language that would mandate an Elected Attorney General, 37 percent were in favor of language that would authorize the Guam Legislature to create an Elected Attorney General, and 24 percent were in favor of continuing the current system, an appointed Attorney General.

I firmly believe that the decision to provide the island with an Elected Attorney General should be made in Agana rather than in Washington. I do not support mandating an Elected Attorney General and I believe that this language will directly empower the people of Guam.

I am pleased that the Administration is in support of this legislation. I hope that the Committee will take expedient action on this critical measure. I look forward to working with you to advance the legislation and I thank my dear colleagues, Congressmen George Miller and Neil Abercrombie for agreeing to be original co-sponsors of the legislation. I encourage my other colleagues to do the same.

---

STATEMENT OF HON. ROBERT UNDERWOOD, A DELEGATE IN CONGRESS FROM THE TERRITORY OF GUAM, ON S. 210

Mr. Chairman, Section 4 of S. 210 addresses the issue of the return of excess lands to Guam. I introduced similar legislation in the 104th Congress and again in the current Congress. Senator Murkowski, the Chairman of the Senate oversight committee for the territories, also included a Guam land return provision in the Omnibus Territories legislation which nearly passed the Senate last year. Both my bill and Senator Murkowski's bill are significant in that, for the first time ever, Congress will extend authority to the Government of Guam to have the right of first refusal of any real property declared excess by the Federal Government.

The Guam land return provision of S. 210 is important also in that it establishes a reasonable process for dealing with excess lands now and in the future. The lands taken were used to promote national security interests during and after World War II. Now that the cold war is over and the military has been downsizing in the past several years, there has been an assumption in Guam that the lands declared excess to military needs would be returned to Guam.

The passage of this provision of S. 210 is necessary in order to change current law governing the disposal of excess lands. Current law allows other Federal agencies to take any available excess lands in the Federal Government's inventory. This is nothing more than a repeat of the post World War II takings engaged in by the U.S. military. S. 210 would avoid this continuing injustice by putting Guam ahead of any Federal agency for acquiring these excess lands.

In previous hearings on land issues and in numerous meetings which I have had with military officials in Guam and in Washington, the military clearly stated that they are not in the business of being landlords once they declare lands excess to their defense needs. Once the declaration of excess is made, the title should transfer directly to Guam not to a Federal agency.

Mr. Chairman, I want to emphasize two major concerns I have with the land provision in the Senate-passed version of S. 210.

Firstly, I strongly oppose the condition of transfer which requires that Guam pay fair market value for excess lands for other than public purposes. Neither my bill, nor the original version of S. 210, impose the payment of fair market value. Given the historical takings of land in Guam and the fact that real property is scarce in a small island such as ours, the people of Guam oppose the payment of fair market value. Requiring Guam to pay for the lands today ignores the historical land takings. At the time of the land takings, the island of Guam was under a military justice system. The civilian community was at a marked disadvantage and many of the land transactions were suspect. To continue to promote fair market value reflects a myopic view of the land takings on Guam and does not take into account the cultural values associated with the ownership of land.

When the Committee takes up this legislation, I will work to delete or amend the fair market provision. If this provision is not changed in committee or on the House floor, I will oppose the land return provisions of S. 210.

Secondly, I urge the Committee to clarify the definition of public benefit use. The legislative history for the return of excess lands to Guam should reflect that once title transfers to the Government of Guam, Guam makes the decision as to the appropriate public benefit use of the land. Such a decision may permit the consideration of local customs and local needs. Currently, S. 210 points to the statutory definition of public purpose found in Section 203 of the Federal Property Act and to other public benefit uses provided under the Guam Excess Lands Act (Public Law 103-339). What is not clear in the proposed legislation is what types of actions the Government of Guam can undertake to provide the resettlement of the local people who were displaced by the earlier Federal takings of land. We need to clarify whether the Chamorro Land Trust Commission can be the recipient of the returned excess lands and whether the commission can devise a resettlement program for original landowners which can adequately address the inequities of the original land takings.

The decision on what constitutes public benefit uses of the returned lands is properly the responsibility of the Government of Guam. Guam has local needs based upon local customs and values. This will provide Guam with the flexibility to devise a number of acceptable uses which will benefit the people of Guam. This also will put the original landowners' concerns among the mix of how Guam implements its land policies and its land use plan.

Mr. Chairman, the people of Guam must strongly object to the exemptions called for in Section 4, subsection (d)(l). This section deals with lands currently leased to the Coast Guard from the U.S. Navy, as well as lands they have identified for expansion. Over the past four years our people have endured the pain of a downsizing

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 20 of 542

military complex. It never occurred to many in Guam that the military would ever reduce its presence in the area. However, the Base Alignment and Reuse Committee (BRAC) ruling required the Navy to re-align its activities to become more efficient. Try as we could to save the only U.S. Naval shipyard in the western Pacific, SRF Guam was slated for closure.

Today, the fruits of a cooperative effort between Guam's Local Reuse Authority (LRA) and the Navy has resulted in the shipyard's conversion to a privately run facility. Over the course of several months, LRA and Naval officials worked in close cooperation to develop a reuse plan which would meet the needs of both entities. Both parties were quite aware of the regulations governing each step in the process as outlined in BRAC law. BRAC law was created by the Congress as a means by which needs assessment reviews of existing military bases could be conducted without political influence. Both Navy and the LRA continue to work within this framework.

Part of the process in planning for the reuse of BRAC properties required the Navy to provide for Federal Screening which notifies other Federal entities of the Navy's intention to declare lands excess. This was in fact completed with no responses. It was not until well after the expiration of the screening process that the Coast Guard indicated its wish to acquire additional properties. With this knowledge, the LRA contacted the Coast Guard in writing with a proposal to enter into a long-term lease agreement at *no cost* for all the properties that the Coast Guard currently occupies as well as any additional properties they need, but apparently that has not satisfied them. Ownership of the property seems to be the only rationale for the Coast Guard's pursuit of a change in law calling for the exemption from the Federal screening process.

It is our view that the provision be denied. The issue is not whether the Coast Guard is deserving of the property. The issue boils down to whether they should be exempted from the provisions of law with which every community facing a base closure must comply. From Guam's perspective, the Navy made great efforts to become more efficient. Victor Wharf was declared excess and Federal screening took place with no expression of interest from any quarter. The Coast Guard has decided, after the fact, to acquire land and they come before Congress now with special interest legislation. This isn't right. It also opens Congress' door to similar legislation by other Federal agencies who have also missed the boat. The Government of Guam fully intends to cooperate with the Coast Guard; there is written documentation that bears this out. But Mr. Chairman, the Government of Guam feels that the long term needs of the Coast Guard would be better served if Guam retains ownership of the properties in question and grants the Coast Guard a long-term, no-cost lease.

Mr. Chairman, on S. 210's provision regarding compact-impact reporting, there is general agreement that the current procedure governing the preparation and submission of the report of adverse impact as a result of the Compacts of Free Associations has been extremely problematic for all the insular territories. This amendment would now shift the responsibility for the preparation of the report of adverse impact, from the Administration to the Governor's of any Territory; Commonwealth and the State of Hawaii. The proposal identifies the Department of Interior as the agency responsible for filing the report with Congress to include comments from the administration. The Department of Interior would be responsible for funding, either directly or through their technical assistance mechanism, a census of Micronesians no greater than five (5) years from each decennial United States census or every fifteen (15) years, at a cost of not more than $300,000 in any year.

Mr. Chairman, the people register their objection to the proposal as currently written. Shifting the burden for the preparation of the report from the Department of Interior would be acceptable if it included the provision that would mandate that the report be filed with the appropriate authorizing and appropriating committee in Congress with a recommended level of funding. This amendment fails to identify a mechanism where impacted jurisdictions would petition for the financial reimbursement of any adverse impact. The mere filing of the report without identifying the appropriate committee in Congress to accept and dispose of the report findings leaves much to assumption. Furthermore, given the long interval between census taking (30 years); limiting funding for the census to no more than $300,000 may be too restrictive in that it is hard to project economic forces that may adversely affect the Department of Interior's ability to perform the census.

Finally Mr. Chairman, I would like to announce my intention to seek a transfer of title of property currently held jointly by the U.S. Department of Education and the Guam Community College. I will pursue this in the form of an amendment to S. 210. The property in question was deemed excessed by the Department of Defense years ago. Title was granted to both the U.S. Department of Education and the Guam Community College for a new campus. Although Guam Community Col-

lege continues to plan construction for this new campus, it currently does not have the financial resources to begin immediate construction. As a result, the U.S. Department of Education has given the Guam Community College several options. The U.S. Department of Education has suggested that Guam Community College give up joint title of the property or be assessed rental fees. It is important that the property is safeguarded for the future use of the Guam Community College and that may be accomplished by a clear transfer of title.

Mr. Chairman, thank you for your consideration and your willingness to engage Guam in these matters. I appreciate your disposition concerning Federal lands and hope that the legislation will be properly amended.

Mr. HILL. I thank the gentleman. I will now introduce our first panel of witnesses: Senator Daniel Akaka, Congresswoman Patsy Mink, former Delegate Ben Blaz, and when he arrives, Congressman Xavier Becerra.

I'd like to remind the witnesses that under our committee rules they must limit their oral statements to 5 minutes, but their entire statements will appear in the record. We'll also allow the entire panel to testify before questioning the witnesses.

The Chair will now recognize Senator Akaka to testify.

## STATEMENT OF THE HONORABLE DANIEL K. AKAKA, A UNITED STATES SENATOR FROM THE STATE OF HAWAII

Senator AKAKA. Thank you very much, Chairman Hill, and I thank the members of the committee for holding this hearing. I am delighted to be here this morning to add my voice to this bill.

I also want to welcome our friends from Guam, The Honorable Carl Gutierrez, Governor of Guam; also, The Honorable Joseph Ada, former Governor; The Honorable Paul Calvo, also a former Governor; The Honorable—of course, good friend up there—Robert Underwood, the congressional delegate, and The Honorable Ben Blaz, the former congressional delegate, and many others from Guam, those for and those who are probably against this bill. It's great to have all the voices here this morning.

Mr. Chairman, I'm here to urge the members of this committee to support Guam's efforts to improve its political relationship with the Federal Government by seeking Commonwealth status. I come here as a fellow Pacific islander and someone who cares deeply about the political future of the island of Guam and the people of Guam.

Much has been said over the last decade about unresolved provisions in the Guam Commonwealth Act, yet, little has been said about the contributions and sacrifices that the people of Guam have made to this country and to the need for the Federal Government to be honest about Guam's political future. It is incumbent upon the Congress to deal frankly with the people of Guam and let them know where things stand and what can and cannot be done at this point in time.

The people of Guam should not be held hostage by changing U.S. negotiators under different administrations. While the Clinton administration has made progress on Guam Commonwealth negotiations, discussions on political status should be conducted in a more timely fashion. It is notable that Guam is represented today by several Republican and Democratic leaders, including present and past Governors and delegates. Such bipartisanship on an issue should be commended.

It should also send a signal to the Federal Government that the people of Guam are united, united in their quest for Commonwealth status. As this nation commemorates the 100th anniversary of the U.S. acquisition of Guam next year, it would be fitting if we provide the people of Guam with a better process to pursue Commonwealth negotiations. I look forward to working with you and other Members of Congress to move this process forward.

Lastly, Mr. Chairman, I would also like to add my support for provisions in S. 210, of which I am a co-sponsor, which provide for the transfer of Federal excess lands in Guam. Congressman Underwood and Governor Gutierrez have done a tremendous job advocating for the transfer of Federal excess lands to the people of Guam. With one-third of Guam controlled by the Defense Department, I think that its people have more than shouldered their burden as part of national security in the Asia-Pacific region.

But fair is fair. Guam is just a little over 200 square miles in size. It is 30 miles long and 9 miles wide. It is high time that the Federal Government provide the Government of Guam with the flexibility to utilize lands that are no longer needed for national security purposes. I have visited Guam numerous times since World War II. Most recently, I visited the island last year with Senator Murkowski. I'm impressed with the level of political and economic development which has allowed the local government to be less dependent on Federal assistance, while providing greater economic opportunities for its people. This is what our country is all about.

I encourage members of this committee to visit Guam and find out for yourselves how Federal policies affect this Pacific territory. You will find a proud and industrious people, and will come to better understand the frustration that they face with the Federal Government.

Thank you, Mr. Chairman, for this opportunity to provide support to Guam's pursuit of Commonwealth status and for the Federal excess land provisions in S. 210. Thank you very much, Mr. Chairman.

Mr. HILL. I thank you, Senator Akaka. The Chair now recognizes Congresswoman Mink.

**STATEMENT OF HON. PATSY T. MINK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF HAWAII**

Mrs. MINK. Thank you very much, Mr. Chairman, and members of the subcommittee. I'm pleased to be here today to lend my support to the consideration of H.R. 100, the Guam Commonwealth Act, sponsored by my dear friend and colleague, Congressman Robert Underwood, who serves as Vice Chair of the Asian-Pacific Congressional Caucus.

The right of self-determination is among the most sacred rights in our country, itself founded upon the principles of freedom and liberty. The Guam Commonwealth Act seeks to implement a decision by the people of Guam to pursue a greater self-determination through a new Commonwealth status with the United States.

Over a decade ago, the people of Guam voted in a referendum to seek Commonwealth status, and since 1988 Guam's delegates to the U.S. Congress have introduced legislation to implement this decision. However, a final resolution to their request has not been ac-

complished. Many have worked on this effort—Mr. Underwood's predecessor, both the Bush and Clinton administrations—but Guam's question of Commonwealth status remains unresolved.

I understand that this is not an easy task. The issues raised in this effort are not simple, and a final agreement between the United States and Guam will have lasting effects, not only for the people of Guam, but for the United States as a whole and the other territories and entities which continue to associate themselves with the United States.

This is precisely why this issue should be deliberated in the Congress. We have the responsibility to consider this proposal brought forth by the people of Guam, assess its impact, not only on Guam, but the entire United States, and, finally, come to a conclusion on Guam's pursuit for a Commonwealth status.

The final implementation document of Guam's Commonwealth status must reflect Guam's desire for greater self-determination and self-governance, balanced with their desire to remain a part of the United States, including all the rights and responsibilities that go along with this relationship.

Mr. Chairman, and members of the committee, you have a challenging task ahead, and I urge you to move forward in this deliberation on H.R. 100 and work toward the implementation of the wishes of the people of Guam. Thank you very much.

I apologize, Mr. Chairman, and members of the committee, that I need to leave, as I am serving as a ranking member on another committee matter before Education and the Workforce, but thank you for the opportunity to testify this morning.

[The prepared statement of Mrs. Mink follows:]

STATEMENT OF HON. PATSY T. MINK, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF HAWAII

Mr. Chair, and Members of the Subcommittee, I am here today to lend my support to the consideration of H.R. 100, the Guam Commonwealth Act, sponsored by my dear friend and colleague, Congressman Robert Underwood.

The right to self-determination is among the most sacred rights in our country—itself founded upon the principles of freedom and liberty. The Guam Commonwealth Act seeks to implement a decision by the people of Guam to pursue greater self-determination through a new Commonwealth status with the United States.

Over a decade ago the people of Guam voted in a referendum to seek Commonwealth Status and since 1988 Guam's Delegate to the U.S. Congress has introduced legislation to implement this decision. However, a final resolution to their request has not been accomplished. Many have worked on this effort—Mr. Underwood's predecessor, both the Bush and Clinton Administrations—but Guam's question of Commonwealth status remains.

I understand this is not an easy task. The issues raised in this effort are not simple and a final agreement between the United States and Guam will have lasting effects not only for the people of Guam, but for the United States as a whole, and the other Territories and entities which continue to associate themselves with the United States.

This is precisely why this issue should be deliberated in the Congress. We have the responsibility to consider this proposal brought forth by the people of Guam, assess its impact not only on Guam but on the entire United States, and finally come to a conclusion on Guam's pursuit for Commonwealth status.

The final implementation document of Guam's Commonwealth Status must reflect Guam's desire for greater self-determination and self-governance, balanced with their desire to remain a part of the United States, including all of the rights and responsibilities that go along with this relationship.

Mr. Chair and Members of the Committee, you have a challenging task ahead. I urge you to move forward on your deliberations on H.R. 100 and work toward the implementation of Guam's Commonwealth Status. Thank you.

Mr. HILL. I thank you very much for that testimony, Congresswoman Mink. I now note that——

Mr. ABERCROMBIE. Mr. Chairman, Mr. Chairman. May I submit a statement for the record?

Mr. HILL. Without objection.

Mr. ABERCROMBIE. Thank you.

[The prepared statement of Mr. Abercrombie follows:]

STATEMENT OF HON. NEIL ABERCROMBIE, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF HAWAII

Mr. Chairman, thank you for the opportunity to submit my views on Guam Commonwealth. Let me first commend you for holding a hearing on H.R. 100, the Guam Commonwealth Act. H.R. 100 is representative of the political aspirations of many people on Guam, my Pacific neighbors. It is my hope that the Committee will seriously engage the political leadership of Guam in considering the question of Commonwealth status.

It is my understanding that the Guam Commission on Self Determination has been involved in discussions with both the Bush and Clinton Administrations on Guam Commonwealth. I look forward to hearing the position of the Clinton Administration on Guam Commonwealth, but I am most interested in receiving testimony from Guam's people. It is my observation that the Guam Commonwealth question has always been a bipartisan issue. That aspect is important for us to reflect upon as we review the Commonwealth proposal today.

Mr. Chairman, the people of Guam have long expressed an unwavering commitment and loyalty to the United States. As we approach the centennial anniversary of the Spanish American War, we must also reflect on the long road that the people of Guam have tried to secure and advance self-government in their island home. No better example can be made of the need for self-government than the other pieces of legislation that the Committee will be hearing. Both the Guam Judicial Empowerment Act, which I have co-sponsored, and the Guam Land Return provision of S.210, deal with issues that are the consequence of Guam's current territorial status.

Those of us who have the Constitutional authority to establish policies over the territories must take our responsibilities seriously. We must engage the political leadership of Guam and pursue a positive resolution to the issues they have raised. We must review the current system in place and acknowledge the need for clarity and change in the Federal-territorial relationship. The aspirations of the people of Guam should establish a foundation for the Committee's consideration and I am pleased that we are here today to initiate that process.

Mr. HILL. I now note that Congressman Becerra is here, and I will recognize Congressman Becerra.

## STATEMENT OF HON. XAVIER BECERRA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA

Mr. BECERRA. Thank you, Mr. Chairman, and thank you to all the members of the committee. Let me first state that I, too, am a supporter of H.R. 100, the Guam Commonwealth Act, and I want to thank the gentleman from Guam, Congressman Robert Underwood, for his diligent efforts on behalf of the people of Guam.

Mr. Chairman, it is my privilege to come before you and the full Committee on Resources to support Guam's quest for Commonwealth status. As you know, next year marks the centennial anniversary of Guam becoming an American territory, and it is a most appropriate opportunity for the Congress to consider legislation that seeks to improve the political relationship between the Federal Government and Guam.

It has been 15 years since the people of Guam set out on a course to obtain Commonwealth status, yet the people of Guam continue to be statutory U.S. citizens and cannot vote for the President of the United States. This situation certainly is unfair and unneces-

sary—and Congress must recognize the importance of this issue—and I hope that the committee will work closely with the leadership of Guam to make Commonwealth for Guam a reality. Our Constitution charges Congress with matters relating to the territories, and I believe that it is our responsibility to consider the will of the people of Guam and work toward Guam Commonwealth status.

Since 1990, the leadership of Guam has been engaged in serious discussions with both the Bush and Clinton administrations regarding the island's political status movement. It is now time for Congress to obtain an appraisal of this work and to act accordingly. We have to remind ourselves that every significant change in Federal policy is rooted here in the House of the people. We must be engaged and willing to consider taking bold steps that are of mutual benefit to the United States and the people of Guam.

Having been colonized by Spain more than 200 years ago, it is clear that the Chamorro people share a close cultural affinity with many of the people of America—citizens of America—who are of Latino descent. It is for these reasons that I take particular interest in the issues affecting Guam. As a Member of Congress of Latino descent, I will watch this process closely and will be willing to work and participate meaningfully in the positive resolution for Guam's quest for Commonwealth status.

I look to the leadership of this committee, and Congressman Bob Underwood, to work on this issue, and I hope that a sincere effort will be made to accommodate Guam and its noble people.

Mr. Chairman, with that, I will submit my statement. Thank you.

[The prepared statement of Mr. Becerra follows:]

STATEMENT OF HON. XAVIER BECERRA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA

Mr. Chairman, it is my personal privilege to come before you and the full Committee on Resources to support Guam's quest for Commonwealth status. As you know, next year marks the centennial anniversary of Guam becoming an American territory and it is a most appropriate opportunity for the Congress to consider legislation that seeks to improve the political relationship between the Federal Government and Guam. It has been fifteen years since the people of Guam set on a course to obtain Commonwealth status. Yet, the people of Guam continue to be statutory U.S. Citizens and cannot vote for the President of the United States. This situation is unfair and unecessary. The Congress must recognize the importance of this issue, and I hope that the Committee will work closely with the leadership of Guam to make Commonwealth for Guam a reality.

Our Constitution charges Congress with matters relating to the territories and I believe that it is our responsibility to consider the will of the people of Guam and work toward Guam Commonwealth status. Since 1990, the leadership of Guam has been engaged in serious discussions with both the Bush and Clinton Administrations regarding the Island's political status movement. It is now time for Congress to get an appraisal of this work and to act accordingly. We have to remind ourselves that every significant change in Federal policy is rooted here in the House of the people. We must be engaged and willing to consider taking bold steps that are of mutual benefit to the United States and the people of Guam.

Having been colonized by Spain for more than two hundred years, the Chamorro people share a close cultural affinity with Latino people. It is for these reasons that I take particular interest in the issues affecting Guam. As a Latino member, I will watch this process closely and will be willing to participate meaningfully in the positive resolution of Guam's quest for Commonwealth Status. I look to the leadership of the Committee and Congressman Bob Underwood to work on this issue and I hope that a sincere effort will be be made to accommodate Guam.

Mr. HILL. I thank you, Congressman Becerra, and I would now like to recognize former Delegate Ben Blaz.

**STATEMENT OF THE HONORABLE BEN BLAZ, FORMER DELEGATE, U.S. HOUSE OF REPRESENTATIVES**

Mr. BEN BLAZ. Mr. Chairman, Mr. Miller, and members of the committee. First let me thank you for giving me the opportunity to testify on behalf of H.R. 100.

I must say that the view from the beachhead down here is a bit different from the pompous head up there. The configuration here does look like part of a coliseum, and you wonder why the witnesses from time-to-time feel like gladiators—the Caesars sit up there. But there's something interesting about this particular setting. The banner behind you, Mr. Chairman, is star-spangled, and the supporting colors around it include my beloved Guam. We're in friendly territory, and I feel very comfortable, thank you.

A hundred years ago, when Henry Glass, Captain Henry Glass of the Navy, sailed into Guam, after a couple of days he probably sent this message: "Guam captured. Spanish prisoners under control, but the natives keep asking me what their status is." It is likely that the response came back rather tersely and probably stated: "Political status is not your domain. Proceed to Manila. Join Admiral Dewey." And you know the rest of the story.

But whether or not political status was the domain of the Navy for the ensuing 50 years, it dominated Guam. So much so, Mr. Chairman, that when I graduated from Notre Dame and was commissioned an officer and I wanted to go home and strut my uniform and medals before my village friends, I couldn't go because I did not have the proper security clearance. Following that, we were transferred to the Department of the Interior and there, often, we felt like wards, and often the administrators acted like wardens.

We're now 100 years into this situation. What I'd like to point out is that in areas where the people of Guam have control in what they do, they have done exceedingly well. When we speak about self-determination, we instantly associate political self-determination, but gone unnoticed, and to the credit of the people of Guam, they have done exceedingly well in trying to preserve their identity, their culture, and their language, and they have kept themselves from being a mere footnote in history. They have attained cultural self-determination.

And despite the plethora of regulations and instructions and laws that were written for other places at other times, they have managed to succeed and attain a very significant measure of economic self-determination, but the one thing that is needed to solidify the foundation is beyond the capability of the people of Guam themselves, and that is political self-determination.

I know we have limited time, and earlier today Congressman Underwood gave us the 2-minute warning without any timeouts. So it's kind of difficult, quite frankly, to cover 100 years in 100 seconds. So I'll take more than 100 seconds and say to you that in this body, which uses from time-to-time the logic, or de-logic, that this cannot be done, because it will set precedence—if you can't set precedence in the House of Representatives, there ain't no place on earth where you can set precedence. If you can take—I don't have

any quotations from legislature to show the legislative intent as to why we're in this situation.

So let me just end my presentation by getting a quotation from a Founding Father, and here's the quotation: "I am not an advocate for frequent changes in laws and constitutions, but laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times. We might as well require a man to wear still the coat which fitted him as a boy, as civilized society to remain ever under the regimen of their barbarous ancestors."

In closing, Mr. Chairman, I just want to say that what Guam is asking, it has been asking not since 1987, but in every decade of this century. A hundred years is a long time to wait in line. Thank you, sir.

[The prepared statement of Mr. Ben Blaz follows:]

STATEMENT OF BEN BLAZ, GUAM, FORMER DELEGATE FROM GUAM

Mr. Chairman and Members of the Committee: I thank you for the opportunity to testify in support of H.R. 100, the Commonwealth Act for Guam.

I am Ben Blaz. I am a Chamorro, a native son of Guam. I am now retired from Public Service, having served 30 years in the Marine Corps and 8 years in the House of Representatives as the Delegate from Guam (1985-1993). I will be seventy years old in a few months, on the 100th anniversary of the incident that triggered the Spanish-American War in 1898. Although it lasted less than 4 months, its impact is felt to this day by both Spain and the United States and, most especially, by the entities that were ceded to the United States as prizes of the war.

It has been a while since I have been in this room. Were I to send a message back in the manner that I used to do in my days as a soldier of the sea, it would read something like this:

> Landing successful. No hostile fire. Advise all units that there is wide open terrain in immediate front which is elevated at other end. Be further advised that the center pole flies the stars and stripes of our country surrounded by flags of supporting units including the flag of Guam. Friendly forces now in sight; link-up imminent. Advise all units to move smartly.

About a century ago, the U.S.S. Maine, anchored in Havana Harbor, was blown up under mysterious circumstances. The incident gave birth to the war cry, *Remember the Maine, To Hell With Spain.* About 4 months later, Captain Henry Glass, in command of the U.S.S. Charleston, received orders to sail to Guam, capture it, and report back when that has been accomplished.

On the morning of June 22, 1898, Captain Glass most likely sent a message along these lines: *Mission accomplished. Guam captured; enemy soldiers under my control. What am I to do with the thousands of native Chamorros who are inquiring about their status?* The response was probably: *Civil Administration is not a matter of your concern. Proceed to Manila Bay. Report to Commodore George Dewey for duty in connection with the Philippines campaign.*

In the ensuing 50 years, Guam had a rocky relationship with U.S. military governance. In 1950, it was placed under the cognizance of the Secretary of Interior where it has remained for almost half a century. In those 100 years, Guam has indeed enjoyed the benevolence of the United States in terms of financial assistance. At the same time, however, the people of Guam have become increasingly frustrated by the benign neglect of its persistent quest for a well defined, participatory policy, with respect to its relationship with the Mother Country.

The bill before Congress today has been characterized as something relatively new but the history books reveal otherwise. They are replete with references of attempts by the local population in every decade of this century to improve our relationship with our country. I recall vividly a letter I received from my father while I was a student at Notre Dame in 1950. He was greatly troubled by the modified version of American citizenship that was envisioned in the Organic Act. He argued, and rather strongly, that the Organic Act for Guam, if enacted, would lock in law a sta-

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 28 of 542

tus that he said would make us Associate Americans, or, as he stated it another way, Americans with an asterisk. He was adamant in his belief that he would rather not be a citizen at all than be a half hearted one. He feared that it would take another fifty years to change that status, if at all, once it is etched in the stone tabloids of Public Law. His stance on the issue did not endear him to his contemporaries who had campaigned so fervently for U.S. citizenship. He went to his grave with his sentiment unaltered. In time, his reservations proved eerily prophetic.

Significantly, the sitting Governor of Guam and the two former Governors who will testify today, are all grandchildren of men who were very active at the turn of the century in their efforts to rid Guam of the designation, *possession,* and all that the term implies, and bring about a closer relationship with America. While the designation was modified at mid-century to *unincorporated territory,* the meaning has remained unchanged: Guam is not an integral part of the United States.

This fact was made very clear to me during the 8 years I served in the House of Representatives. I was listed as a Member of Congress but I was not considered one of its Members. Although there was an attempt in recent years to elevate the status of the five Delegates to the Congress by giving them the right to cast a vote on the floor, that, too, had an asterisk with an exclamation point indicating that when their votes counted in the outcome, they are voided. In other words, when they counted, they didn't.

But we have been included repeatedly in the areas that really count. In the most dear, the most precious, and the most basic of all tests to one's loyalty to one's country, our people have been present and accounted for in every war in which our country has fought in this century. I have traced with my own fingers the seventy names on the Vietnam Wall of the Guamanians who were killed in action in that conflict, a number notable for its size with respect to the population from which they came. My father's generation was given to saying that we are equal in war, but not in peace. When viewed from the perspective of casualties in war on a per-capita basis, the proportion is not in our favor. We cannot even claim equality in war.

While the term Self-Determination has more or less been taken to mean political Self-Determination, there are two other areas in this category that have gone essentially unnoticed. The first of these has been the conscious effort of my people, the Chamorros of Guam, to preserve their language and their culture as a distinct people on the face of the good earth. This insures that we do not end up as a footnote in the history books as an extinct people. In this area we have succeeded in achieving *Cultural Self-Determination.*

Similarly, Guam has attained a significant measure of economic self sufficiency while gingerly picking its way through a plethora of inhibiting laws and regulations, many of which were written for other places at other times.

Nevertheless, Guam has managed to get closer and closer to achieving another milestone—*Economic Self-Determination.*

The enduring quest for the part that would give us a solid foundation upon which to build as we prepare to enter the 21st century, is one that is beyond the capability of the people of Guam to accomplish by themselves—*Political Self Determination.* On the particulars of the bill before the Committee today, and, in deference to their respective offices, I yield to the leadership—our distinguished Governor, Carl Gutierrez, and my esteemed successor, Congressman Robert Underwood.

Earlier this month, I had the privilege of escorting 50 veterans celebrating the 46th anniversary of our commissioning as Second Lieutenants in the Marine Corps. No one in the group had ever been to the House floor and few had ever visited the Capitol but all indicated a desire to do so and to say a prayer in silence in the House of the People. When we reached the floor, the group gave thanks for being spared our lives and expressed appreciation for the privilege of serving the United States in the field of battle. I stood in awe of my aging comrades whose sense of love and devotion to America was strengthened, not weakened, by the passing years.

It was a precious moment that tugged the heart and wet the eyes. As I watched these old warriors look about the House chamber with great pride and admiration, I lamented the fact that I could not share the moment with my former colleagues. It was a very inspiring and reassuring scene to witness on the House floor. We have often heard the question, how did we happen to have a wonderful country such as this? The answer is that we have great citizens such as these. And among them are the people of Guam.

Understandably, the U.S. Constitution was specifically designed to apply to the States of the Union. Provisions were made to insure uniform application of laws to all states and to territories that are embryonic states. Imbued with the notion of preserving the Union at all costs, there prevailed a kind of circle-the-wagons syndrome in the early days of the nation punctuated by pronouncements that the United States was not interested in aggrandizing itself with land acquisitions abroad.

That feeling was not shared by many influential people who wanted to acquire strategically located islands in the Atlantic and the Pacific for use as forward bases to protect the homeland in North America. The Spanish-American War provided America the opportunity to make the acquisitions it needed and, as a consequence, acquired Cuba and Puerto Rico in the Atlantic and the Philippines and Guam in the Pacific.

Cuba and the Philippines left the family a long time ago. Significantly, the citizens of both places continue to comprise a very large proportion of the immigrants to the United States. Similarly, Puerto Ricans and Guamanians also migrate to the U.S. mainland but they arrive as American citizens, having acquired them through collective naturalization decades earlier. These resettlements from Guam and Puerto Rico come about primarily in pursuit of opportunities and services not available in their home islands. For the longest time, many people believe that many of the benefits that they do not receive in their island communities was due to prejudice against island people. This, of course, is not an accurate view. Were, say, Members of the Natural Resources Committee to establish residency on Guam, they, too, would no longer enjoy some of the rights and privileges that they received as residents of States of the Union.

The plenary powers of the Congress have been upheld over the years in the way that it "administers" the off-shore territories. Unfortunately, because the Uniformity Clause does not apply to the flag territories, it has resulted in an aggravating lack of uniformity in the application of U.S. laws and regulations that often defy reason and logic. The U.S. Supreme Court has consistently upheld Congressional actions in the past and can be expected to continue to do so in the future. A paraphrasing of a passage in the Bible aptly describes the existing condition: *Congress giveth, Congress taketh away.*

What Guam seeks is an arrangement whereby its relationship with the United States is based on a mutually agreed document that is fair to both entities and without prejudice to either. For those who feel that the status quo is sufficient and are riveted to making no changes, the words of one of the greatest of America's early leaders seem particularly appropo:

*I am not an advocate for frequent changes in laws and constitutions but laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times. We might as well require a man to wear still the coat which fitted him when a boy as civilized society to remain ever under the regimen of their barbarous ancestors.*

The author of these words once prompted President Kennedy to tell a group of American Nobel Prize winners who were being honored at a White House dinner that there had not been such a collection of genius gathered under its roof since Thomas Jefferson dined there alone. We take great pains today to insure accuracy of entries in the record of colloquies and verbatim accounts of debates to establish clearly legislative intent behind various pieces of legislation.

(Not Available.) very accurate indications of their thoughts as they pondered nation-building. Even in the days of the American Revolution, Jefferson foresaw the need for changes in laws and institutions to go hand in hand with the human mind as new discoveries are made and we become more enlightened.

You are likely to hear today a cacophony of voices from the witnesses but I urge you not to misread their meaning. Multiple layers of disappointment, discouragement, and frustration have been building up for many years over the issue of Guam's relationship with America. What have been very difficult to fathom are the contradictions and disparities in the way we do things at the national level.

For a nation that has won the respect and envy of peoples everywhere for its willingness to commit its resources, human and material, to fight in foreign lands in the name of freedom and democracy on short notice, it reverts to glacial speed in its handling of affairs of its own citizens. For a nation that is widely acclaimed internationally for welcoming immigrants to its shores, it struggles trying to accommodate those under the American flag who live in the land of their own nativity: Indians, Eskimos, Hawaiians, Samoans, Chamorros. For a nation that reserves huge acreage of land on islands for the day when birds return, it does little to eliminate the snake that eats the eggs which come first. For a nation that devotes so much money and energy for the protection of fishes and birds, it has a bureau for the Indians and drawers for other Native Americans. It is against this background that one can begin to appreciate the tone and tenor in which the witnesses present their arguments in behalf of a different relationship with the United States.

Guam has both the fortune and misfortune of being located where it is—13 degrees North, and 144 degrees East. Because of that happenstance, Ferdinand

Magellan's ships with its emaciated and diseased crewmen had the good fortune of drifting into Guam on the waves of the Equatorial Current in 1521. Unfortunately, over the centuries since, Guam has found itself in harm's way as nations fight for possession of it because of its importance as an anchorage and refueling station for ships from elsewhere headed somewhere.

Mother Nature has not been very kind to Guam either. Located as it is in the typhoon belt, it receives more than its share of typhoons and, occasionally, earthquakes to rearrange a few buildings. Like the legendary Phoenix of Greek mythology, however, Guam rises from the ashes and starts all over again and it now appears we are on the good fortune cycle.

Guam's very location geographically, which has been its damnation in a manner of speaking, has become its blessing. As the whole world sharpens its focus on the Pacific and Asia as we enter the 21st Century, Guam finds itself no longer a doormat, but a turnstile, to the Asian mainland. The visit to America this week by President Jiang Zemin of China punctuates the enormous significance of a cooperative relationship between our nation and China. A prosperous and stable Guam under the U.S. flag would serve the best interests of the United States and the people of Guam.

Extending the symbolism of good fortune into the future, Guam is virtually perfectly located in the world to bring about a monumental reality. Its location along the equatorial line with a constant sea surface temperature of around 80 degrees in the proximity of the deepest deep in the world, makes it the ideal location to harness the sun's energy via the sea. With unlimited supply of sea water and tropical sun, and the technology to do this economically, an alternate source of energy which is environmentally pure is staring at us from Guam.

Guam has been referred to as a ward of the U.S. in years past. And those who have had jurisdiction over the island have acted as wardens. But that was yesterday. It is now tomorrow. And, as Mr. Jefferson so eloquently stated, "as new discoveries are made, new truths are discovered and manners and opinions change, with the change of circumstances, institutions must advance also to keep pace with the times."

Over the years, we have heard a thousand nays. What Guam hopes to hear today are a few ayes. I urge you to find a way to say yes to Guam's plea for a closer relationship with the United States. That is what the people of Guam opted for in a plebescite a few years ago. If the Congress has the power to extend the provisions of the U.S. Constitution selectively to say no, the question then becomes, could the Congress use the same argument to say yes? I think it could.

It's time. A hundred years is a long wait in line.

Mr. HILL. I thank the gentleman, and I thank the panel for their testimony, and I want to remind members that committee Rule 3(c) imposes a 5-minute limit on questions.

The Chair also wants to inform members that Deputy Secretary Garamendi has to leave shortly to catch an airplane, so let me first see if there are any questions on the majority side.

Mr. TAUZIN. Mr. Chairman, I'm Billy Tauzin from Louisiana. I have to chair a hearing in just a couple of minutes in another very important committee, the Commerce Committee, but I came specifically to let the people of Guam know—and particularly the three living Governors who are here who have traveled so far to be at this hearing—of the fine work that Congressman Underwood is doing on behalf of the pursuit of Commonwealth status for the people of Guam.

You should know that he has not only helped convene this hearing and organize this very important learning experience for all of us in Congress, but he has personally visited with each one of us in our offices to educate us on the issues and to bring us into full appreciation of the wishes and aspirations of the people of Guam.

I want to commend our colleague Robert Underwood for the great work he is doing, and beg his indulgence to the fact that I must go chair another hearing, but that we will evaluate carefully, the written testimony that we have before us. And I want to thank him

on behalf of our committee, and those of us who have to make important decisions like this, for his great efforts at educating us and preparing us for the decisions we make on the future status of Guam.

Robert, a job well done, and I commend you for this hearing, sir.

Mr. HILL. I thank you, and any questions from the majority?

Mr. ABERCROMBIE. Mr. Chairman, I just wanted to pay a special welcome to Ben Blaz. I just think it's terrific to see him again. His contributions here in the Congress over the years are well recognized by those of us who had the privilege of knowing him, serving with him, and learning from him. And I particularly appreciate both the content and the passion and the history behind his comments today.

Mr. HILL. I thank the gentleman. Any other questions from the minority?

Mr. FALEOMAVAEGA. Mr. Chairman, I, too, would like to say a few words, and especially to welcome our good friend, Congressman Becerra, for his presence, and also a very distinguished former colleague of this committee and a Member of this body, former Congressman Ben Blaz, as Neil had stated earlier, for his presence.

If there's anything that I would like to pay a special tribute to, to former Congressman Blaz, it is a statement that pretty well applies not only to the good citizens of Guam, but certainly to all our Pacific Islands community. And I've quoted this statement by Congressman Blaz because I think it's so apropos, even in our hearing today, and I would like to restate it again as a reminder to my colleagues in the committee.

And Congressman Blaz said, as far as Pacific Islanders are concerned and as something for members of this committee and Members of this body to consider seriously, he said, "You know, it's a funny thing about Pacific Islanders, the fact that we're U.S. citizens, we owe allegiance to the United States. We are equal in war, but not in peace."

And I think the consideration of H.R. 100 personifies exactly what Congressman Blaz has said over the years. And the fact that we fight and die in all wars in defense of this great Nation, yet we see some 175,000 U.S. citizens living in the territory of Guam being denied the very essence of what American democracy is all about.

Now Mr. Chairman, I don't know if the members of our committee realize, this is since 1982 that the people of Guam voted by more than 75 percent in favor of a Commonwealth status relationship with the United States. And then, 15 years ago—15 years ago—this took place in that referendum. Eight years ago—eight years ago—we held a hearing on this very same issue.

And Mr. Chairman, I have your copy of some 100 pages that were written by former Secretary of the Interior, Mannie Lujan, a former Member of this Congress, dated August 1, 1989, containing the memorandum of the very essence of all of the provisions of the things we're discussing today. Eight years ago—and now we're here today and we have not even moved an inch.

This is not a Democratic or a Republican issue, Mr. Chairman. This is not an issue between liberals and Democrats. This goes to the very heart and soul of what American democracy is all about, and I commend my good friend, the gentleman from Guam, for pur-

suing this, as much as for what Congressman Blaz had tried 8 years ago—that we still have not paid attention. We just don't seem to get it.

And we're at the height of condemning and doing all that we can—talking about human rights violations and Jiang Zemin's current visit here in Washington—and yet we're denying this very fundamental right to our own citizens—to our own citizens—who don't vote for the President and who are willing to die and fight for the defense of our nation.

So those are just a couple of my observations at the hearing. And I'd like to say, Mr. Chairman, I'm very happy with the Republican majority. We're killing two birds with one stone—H.R. 100 and Senate bill 210—and I think it's fantastic, and I commend the chairman of our committee, Mr. Young, for taking these two pieces of legislation both in hand and hope that we'll get it out of here. I sincerely hope that we'll even mark up these two pieces of legislation after the hearing, as has been the practice of our majority friends. I think this is the best way to do legislation.

[Laughter.]

Mr. FALEOMAVAEGA. But I want to commend the chairman of the committee for bringing these two pieces of legislation that are not only important to our friends from Guam, but certainly important for the other insular areas. And I want to thank you, Mr. Chairman, and look forward to hearing from our members, both of those from the administration, and also the good people and the leaders of Guam. Thank you.

Mr. HILL. I thank the gentleman. If there are no further questions, then I would like——

Mr. ROMERO-BARCELÓ. Mr. Chairman, I'd like to have——

Mr. HILL. The gentleman is recognized. I would just remind the gentleman that the Deputy Secretary does have to leave here shortly for an airplane, if we want to hear his testimony.

Mr. ROMERO-BARCELÓ. All right, I will be short, brief. I just wanted to greet our friends here and our colleague, Xavier Becerra, and former Member, Ben Blaz—I've never served with him, but I've heard very good things about him—and thank you for being here with us today.

And as being from the Commonwealth of Puerto Rico, I understand all the frustrations that you have in Guam and that all the other territories have. We are still also striving for our right to vote, our right to representation, and I'm sure that our chairman, Mr. Young, also remembers the frustrations when Alaska was not a State, and so did our previous two persons who testified, Senator Akaka and Congresswoman Patsy Mink, who also remember when Hawaii was not a State, and there were territories.

And sometimes we're asked whether we are U.S. citizens. When I was a Governor of Puerto Rico, I remember I made a recommendation to the Agency for International Development for someone to be appointed who met all the requirements for the person that they were looking for for the position, and I got back a letter from the director of the Agency thanking me for my interest and saying that it was a very highly qualified person, and that he probably would have appointed him had it not been for the fact

that he could only appoint U.S. citizens. So, this is from the head of an agency; this is a continuous frustration that we do have.

And right now, when Congress has approved health care insurance for all children of America, all the statements that were made during all the hearings and publicly by everyone involved with the bill that was passed on health care insurance for the children of America—it said for all the children of America. But in the final moments, when the bill was adopted, in the negotiations between the Congress and the President, it turned out that Puerto Rico and the territories were given a different treatment, and we were not given equal participation. So there's even discrimination against the children in something like health care. When some things like that happen, something has to be done.

So, this is why I'm very glad that we're here today, and I commend my colleague, Bob Underwood, for the job that he has done. There are so many issues that are similar to those of Puerto Rico. Some of the things I see that Guam wants, we're rejecting in Puerto Rico—some of us are, some are accepting it.

But it's a very, very intricate issue, and it's very complicated, but there is one overriding concern. And that is that, as U.S. citizens, in this day and age, our Nation and our President and our Congress cannot go about bragging about this example of democracy throughout the world because we are remiss. There are millions of citizens, including 3.8 million in Puerto Rico who are U.S. citizens, who are disenfranchised, and that has to be solved.

So, I think these hearings are very, very important, and I'm glad to be here and have the opportunity to be a member of this committee and participate in this hearing. Thank you very much for your presence here.

Ms. CHRISTIAN-GREEN. Mr. Chairman, could I just—I would be very brief.

Chairman YOUNG. Mr. Chairman?

Mr. HILL. I thank the gentleman. I would like to recognize the Chairman of the committee.

ChairmanYOUNG. Mr. Chairman, I would encourage the people in the back of the room, if you would like to immediately come up here and fill these chairs up so the ones in the hall can come in. Let's do some movement here. I want those people in the hall up here—out by the door. Come on in; move it up. Fill these seats so that now those in the hall can come in. After all, as Mr. Farr says, they've been flying 18 hours. As long as you're not press, now—I'm not talking about press.

[Laughter.]

All right. You didn't fly 18 hours—no, she's from Guam. Now, those out in the hall, come on in, as many as you can.

Mr. HILL. I thank the chairman. If there are no further questions for this panel, I could excuse this panel, and we could ask Mr. Garamendi to move forward. And as soon as the room calms down, we can begin with his testimony.

Chairman YOUNG. There are still some seats up here, if there's anybody out in the hall. You can act like you're Congress people for a short period of time.

Mr. UNDERWOOD. Can we mark this up and vote now, and include these people?

[Laughter.]

Mr. MILLER. I think he's got a majority here.

Chairman YOUNG. But we've got the gavel.

Mr. HILL. The Chair would remind members that Deputy Secretary Garamendi has to leave shortly, and so he's going to offer his testimony, and then Mr. Staymen will be staying on to answer questions.

Mr. Chairman?

Chairman YOUNG. I'd just like to—because I have another Transportation Committee to go to—I want to compliment Mr. Underwood and other members of the committee for their interest in this legislation. It is my hope that we will have a group in Guam in February, and hope that everybody recognizes we'll have a better understanding—and also, hopefully, to American Samoa. And I want to congratulate all of you who came this far on this very historical and very important time of the hearing on Guam, and I do thank you. And for the record, I'd like to submit my written testimony.

[The prepared statement of Mr. Young follows:]

STATEMENT OF HON. DON YOUNG, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ALASKA

As Chairman of the Committee in the U.S. House of Representatives with jurisdiction over insular affairs affecting the U.S. territories and the freely associated states, I consider increasing self-governance in the insular areas to be one of the top priorities of the Committee on Resources. During this and the prior Congresses, the Committee has devoted considerable effort to advance self-government in the insular areas, and in particular, the most populous American territory in the Caribbean, Puerto Rico. The Committee has been formally petitioned in three successive Congresses by the Puerto Rico Legislature for action to establish in Federal law a process to resolve Puerto Rico's ultimate political status.

It is significant to note that the people of Puerto Rico have enjoyed local self-government under a constitution since initially authorized and then amended and approved by Congress in 1952. Puerto Rico has operated under its constitution, wherein they named their new government the Commonwealth of Puerto Rico, for over 45 years without being required to ask Congress for approval to changes to its constitutional government. Now, this Committee recently approved legislation defining in Federal law a process to advance toward a final political status.

At the end of last year, I wrote to Present Clinton about certain areas of concern regarding Guam Commonwealth. In my letter of December 11, 1996, I explained that Guam already has the authority to enact a "Commonwealth of Guam" structure for local constitutional self government, which Congress authorized in 1976. As that communication is relevant to the legislation before the Committee, I am submitting a copy of the President's reply and my letter.

The Guam Legislature recently enacted an important resolution which is also related to the above communication and the current legislation before the Committee. Guam Legislature Resolution No. 85 enacted September 15, 1997, (copy included) requested that the 105th Congress modify existing Federal law

> *"To confirm that the adoption of a Constitution establishing local government shall not preclude or prejudice the further exercise in the future by the people of Guam of the right of self-determination regarding the ultimate political status of Guam."*

It is significant to point out that a number of provisions in legislation being considered today which require changes to the Organic Act of Guam, would not require action by Congress if Guam were to in fact enact a constitution as already authorized in Federal law. Congress' 1976 authorization for constitutional government for Guam and the United States Virgin Islands is codified in Title 48 of the United States Code Annotated, Chapter 12, Historical and Statutory Notes (see attached).

In response to Guam Resolution No. 85, Congress would amend the existing authorization for a Guam constitution to qualify in Federal law that the people of Guam would not prejudice or preclude their further right to self-determination. In addition, Congress could specifically state that Guam is authorized to develop a

Commonwealth of Guam constitution for local self government. It appears that judicial decisions since enactment of the original authorization by Congress may now require a separate Federal law approving the draft constitution, rather than just a 60 day review period.

Increasing self-governance in the territories is a political evolutionary process that culminates when the area becomes fully self-governing, either as a separate sovereign outside of United States sovereignty with separate nationality and citizenship, or as an incorporated part of the United States. Over this century, for those territories or trust territories which haven't sought and attained separate sovereignty, this advancement in self-government has occurred to varying degrees in the territories to include some, and in the cases of the most politically developed, all of the following: extension of U.S. citizenship, application of the U.S. Constitution, inclusion in the U.S. customs territory and free trade agreements, establishment of a republican form of government with three functioning local branches of government, the authorization and establishment of local constitutional government, direct election of Governor, election of a representative in Congress, as well as the inclusion in U.S. defense, monetary, fiscal, postal, and telecommunication spheres. As each territory has its own set of economic, political, and social characteristics, it is up to each area to determine the pace and direction of its self-governance.

I believe this hearing has the potential to assist the insular areas, including Guam, in advancing toward greater local self-government. The statements by the witnesses today, including Senate and House colleagues, the Administration, and leaders from Guam and the freely associated states, will help Congress to objectively consider the diverse measures in the three bills before the Committee today, S. 210, the Omnibus Territories Act, H.R. 2370, the Guam Judicial Empowerment Act, and H.R. 100, the Guam Commonwealth Act.

---

LETTER TO PRESIDENT CLINTON BY HON. DON YOUNG

DON YOUNG, COMMITTEE ON RESOURCES,
WASHINGTON, DC,
*December 11, 1996*

The Honorable WILLIAM JEFFERSON CLINTON,
*President of the United States,*
*1600 Pennsylvania Avenue, NW,*
*Washington, DC 20500*

Dear Mr. President:

I recently have seen press reports and reviewed public statements by local officials in the U.S. territory of Guam regarding current political status consultations between the Deputy Secretary of the Interior and representatives of the territorial government's "Commission on Self Determination." I am quite familiar with the saga of Guam's quest for a new political status. and some real concerns arise from the information we are receiving.

For most of the last decade Congress and the executive branch have passed the buck back and-forth without responding to Guam's proposal for a "Commonwealth of Guam" in a manner that suggests a legally sound, politically feasible and intellectually honest alternative approach to achieving local self-government and defining options for resolving the status question. At this stage in the process, the only thing worse than further dithering would be to make commitments on behalf of the Federal Government that can't be kept.

I remain optimistic that the U.S. and Guam can define and jointly implement a process to establish constitutional self-government. In addition, if Congress, the Administration and the territorial government are serious about the decolonization of Guam as contemplated by Article 73 of the U.N. Charter, 1997 can be the year that we start down that path by defining a legitimate self-determination process based on legally valid options for ultimately ending unincorporated status in favor of full self-government.

Of course, under Public Law 94-584 Guam has had the ability since 1976 to establish a "Commonwealth of Guam" structure of local constitutional self-government to replace the present territorial administration under the 1950 Organic Act. I voted in favor of Public Law 94-584 with the expectation that the institution of local constitutional self-government would provide the mechanism to address and resolve issues that have arisen such as the rights of Guam's indigenous Chamorro people, return of excess military land, immigration policy, and, of course, Guam's ultimate political status.

Instead, Guam elected to link commencement of local constitutional self-government over its internal affairs to a proposed comprehensive government-to-govern-

ment political status pact which contained Federal law and territorial policy reforms that Congress may or may not ever approve. When presented with that expansive proposal the then majority in Congress told Guam's leaders to go work out the issues with the Executive. Predictably, the departments and agencies of the Federal Government grudgingly agreed to review what Guam was proposing, while correctly insisting all along that Congress would have to make the difficult policy and legal determinations.

The delays, frustration and difficulty that Guam has experienced in seeking a competently formulated and constructive response from the Federal Government is due in part to the fact that determination of the disposition of the unincorporated territories is an authority and responsibility expressly assigned in the first instance to Congress under the territorial clause of the Constitution (article IV, section 3, clause 2). Thus, history demonstrates that more than any other factor the degree of consultation and coordination between the executive branch and Congress on status measures within the scope of the territorial clause makes the difference between getting it done right, getting it done the hard way, or not getting it done at all.

For example, the last time a President of the United States transmitted to Congress a major new territorial status proposal it was the free association agreement for the Pacific islands trust territory in 1984. The primary criticism of the Reagan Administration by leaders in Congress at the time—including me—was inadequate consultation with Congress before commitments were made by executive branch negotiators on behalf of the Federal Government.

After more than twenty hearings before five committees in Congress and years of truly tortuous debate, the framework political status legislation for the Pacific trust territories was approved. More than thirty five pages of statutory amendments and reservations were added by Congress to the status agreements. The entire process was gratuitously destructive in many resects, due in part to provisions agreed to by the Federal negotiators without consulting Congress. The people of the islands and the Fedem1 government paid a high price for doing it the hard way, and it almost didn't get done at all.

On January 31, 1995—in the first month of the 104th Congress—the Chairman of the Subcommittee on Native American and Insular Affairs, Mr. Gallegly, tried to send a clear signal regarding political status to the Administration, Guam, Puerto Rico, and all the unincorporated territories by candidly stating that "... until a territory gains distinct sovereignty within or without the Constitution, the Congress cannot be bound by an unalterable bilateral pact of mutual consent." Yet, there reportedly is an agreement in the works under which the political, legal and economic relationship to be defined under the proposed "Guam Commonwealth Act" (GCA) could not be altered by a future Congress without the "mutual consent" of Guam.

Since the GCA would be a Federal statute, a future Congress can not be bound to a political status relationship with an unincorporated territory as contemplated by the GCA. The "solution" apparently arrived at in the Guam discussions is to create ambiguity about the nature of the mutual consent clause. Thus, instead of an enforceable right of consent, Guam reportedly is prepared to accept a provision which admits of unenforceability. This may have some symbolic political value, but in the end it only underscores the disenfranchisement and lack of equal participation or real consent in the Federal political process for U.S. citizens in an unincorporated territory such as Guam.

It is time for both Federal and territorial officials to stop bashing "the bureaucrats" for the lack of a political status agreement with Guam. We should be glad there are executive branch civil servants who will not bow to political pressure and sign off on status proposals that do not withstand scrutiny. An agreement that will unravel as soon as the ink dries, or another proposal that simply gathers dust, has no real value for the U.S. or Guam. Those of us elected to get results for the people we serve need to take responsibility for doing more than "coming to closure" with Guam in form but not substance. If we believe we can pretend to have a real agreement and then walk away or wash our hands of it, we are really just setting up the people of Guam for another episode of disappointment.

We may have disagreement on some issues, but the Federal Government must never risk making a mockery of the decolonization process. We would do just that by attempting to make less-than-equal citizenship and permanent disenfranchisement seem more tolerable through the legal and political fiction of "mutual consent." Also, I question whether the U.S. would be fulfilling its obligations to the Chamorro people by agreeing to a provision which seems to reduce the legacy of the native inhabitants of Guam to the possibility of their participation in what appears to amount to little more than a straw poll. The people of Guam deserve better, and we can do better.

Thus, I stand ready to work with your Administration to develop a strategy for success in this matter, rather than continuing tactics of grid-lock and blame-shifting we have seen in the past. This Committee and its staff would be pleased to work with those responsible for the Administration's status consultations with Guam to ensure that this time we get it done right.

Sincerely yours,

DON YOUNG,
*Chairman.*

ANSWER TO MR. YOUNG'S LETTER FROM PRESIDENT CLINTON

Dear Mr. Chairman:

I read your letter regarding Guam's commonwealth status with great interest, and I share many of the positions you expressed in your well-reasoned analysis.

Recentaly, I met with the Governor of Guam to discuss the pace and direction of the negotiations. We agreed on the need to move quickly to resolve several key questions involving the territory's political status. As you point out in your letter, the issues are complex and sensitive. I am aware of Guam's aspirations for self-government. At the same time, we must satisfy Federal concerns at the policy, legislative and constitutional levels.

I am prepared to provide sustained attention from the Executive Branch to these negotiations. A successful outcome requires coordination among many agencies and extensive consultations with Congress. I look toward to working with you and your colleagues in the coming months as we move the Guam issue toward a conclusion that will be satisfactory to all involved.

Sincerely,

BILL CLINTON,
*President*

Mr. HILL. Thank you, Mr. Chairman. We now will hear from the administration, represented by the Deputy Secretary of the Department of the Interior, John Garamendi.

Mr. Garamendi.

**STATEMENT OF THE HONORABLE JOHN R. GARAMENDI, DEPUTY SECRETARY, U.S. DEPARTMENT OF THE INTERIOR**

Mr. GARAMENDI. Mr. Chairman, members of the committee, I commend you for holding today's hearing on the Guam Commonwealth. It's an historic and auspicious time to do it; 1997 marks the 10th anniversary of when the people of Guam voted to send the original Commonwealth Draft Act to Congress. Next year also marks the centennial of the Treaty of Paris, when the United States obtained Guam from Spain in 1898. The issue of Guam's political status represents an important piece of unfinished business that sorely needs resolution.

So where are we today after these many years? First, the process followed by the three special representatives, myself being the third, in this administration, attempted to be creative and flexible in the executive branch consideration of the fundamental Guam Commonwealth issues. I've tried different formulations and approaches to reach compromises that could be supported by Guam and proposed to the administration.

Final administration positions, however, are based on a consensus process among the different constituent interests that make up the Federal Government. They are also governed by constitutional, policy, and legislative constraints. While I may believe that my views are appropriate, and I suppose I may be the only one that has that view about their own ideas, even though I might believe they're appropriate, they do not necessarily constitute the adminis-

tration's position unless the entire executive branch endorses them and those policies meet constitutional and other tests.

The second point: While there remain areas of disagreements, years of discussion between the administration and Guam have resulted in significant progress and numerous areas of Federal agreement and support. Although we are unable to support everything that Guam has originally proposed, there are a number of areas where we are supportive of the proposals that are responsive to the legitimate desires of the Guam people for greater self-government, for increased input into the Federal policymaking process, and for the application of Federal policies in a way that respect the uniqueness of Guam.

Now these areas include the following: support for a Federal policy commitment to not unilaterally change the fundamental relationships between Guam and the United States; supporting the creation of a commission with significant representation and input by Guam to review and provide recommendations on the appropriate application of Federal policies to the island. Third, supporting an invitation for the people of Guam to express their desire for Guam's ultimate political status, supporting the amendment of appropriate provisions of the U.S. Immigration and Nationality Act to accommodate Guam's desire to limit the rate of permanent immigration to the islands, and to provide additional flexibility to address Guam's permanent labor needs. And, finally, supporting within certain parameters the right of first refusal for Guam to obtain Federal excess lands on the island.

Finally, it should be noted that the executive branch has grappled with the original Guam Commonwealth bill for the better part of a decade, through the change of several administrations, both in Guam and in Washington. The general positions resulting from Federal review of the original bill have remained relatively consistent. The Guam Commonwealth Draft Act, as originally approved by Guam in 1987, cannot be supported by the Federal Government.

Among the key concepts we cannot support are the following. First, legally binding the Congress or the executive branch to seek the consent of the Commonwealth Government before modifying the act creating the Commonwealth, or before applying any future Federal law, regulation, or policy to Guam. Second, providing for a legally binding Government-sponsored or endorsed vote on the ultimate political status of Guam in which only one group can participate to the exclusion of other U.S. citizen residents of Guam.

Thirdly, transferring the Federal control over the adoption and enforcement of immigration and labor policies to the Commonwealth Government of Guam, and, finally, creating a joint commission under Guam's control, which would have the authority to issue final determinations on the application of Federal policies to Guam and to determine military lands to be transferred to the Commonwealth Government.

In conclusion, we believe that much has come from the negotiations to date. These can be further refined and profitably achieved with continued and sustained effort and attention—not just by Guam and the executive branch, but also by Congress.

Therefore, our first recommendation of options to pursue is to encourage Congress to join in the Guam status deliberations to help

formulate a comprehensive Commonwealth legislation that is mutually agreeable to all parties. Participation by Congress, which is constitutionally vested with plenary powers over territorial matters, would add significant momentum in bringing this matter to a closure. On June 20, 1998, the centennial of the raising of the American flag on Guam occurs. This would be a good deadline to complete work on a substitute Guam Commonwealth bill.

A second alternative would be to pursue individual Federal policy changes that Guam has proposed, which are supportable by the administration, many of which are not inherent in the definition of the island's constitutional status. We could do this through discrete and separate legislation, perhaps having individual bills for each issue considered, such as the application of Federal immigration, labor, transportation, trade, and tax policies to the islands.

The administration is willing to pursue either of these alternatives. I thank you for the opportunity to testify, and I'll try to answer whatever questions you may have.

[The prepared statement of Mr. Garamendi may be found at end of hearing.]

Mr. HILL. I thank the witness for his testimony. The chairman will now recognize members for any questions they may wish to ask the witness. I will submit questions for the record, recognizing that you're on a tight schedule, and I will now recognize Mr. Miller.

Mr. MILLER. I would yield to Mr. Underwood. Thank you, Mr. Secretary, for your statement.

Mr. HILL. Mr. Underwood.

Mr. UNDERWOOD. Well, thank you, Mr. Secretary, for your statement, and I read it briefly this morning. And I want to say that at least we're at the point in which a clear decision is being reached as to how far the administration is going to go.

Obviously, I want you to know that I think that it is very clearly the sentiment of the people of Guam that without consideration of Chamorro self-determination, we will not ever have any kind of political status change which will be meaningful for Guam. I want to stress that this is a core principle of our commonwealth legislation and I've noticed that you've touched on that in an unsupportive way.

But I just want to ask you, on one page of your testimony you lend a great deal of hope for further discussion, and I certainly appreciate that. However, on the second page you de-limit some of the proposals and the advances that you've indicated have existed. In terms of mutual consent, your statement says that you are willing to support a Federal policy commitment not to unilaterally change the fundamental relationship between Guam and the U.S., and in the second part you say that you are against legally binding the Congress or the executive branch to seek the consent of the Commonwealth Government before modifying the act creating Guam Commonwealth. It seems to me that you're willing to say that you are willing to make a promise, but just don't hold us to that promise. Is that a fair characterization of your position?

Mr. GARAMENDI. Let me put it in my words. There should be a policy, and this administration believes that a policy should be put in place that the Commonwealth Act should not be changed without mutual agreement. However, to place that into the law creates

very serious constitutional and legal problems that the administration believes cannot be overcome. Therefore, as an example, since the original Organic Act for Guam, which I believe was in the 1950's, there has not been a change that has not been mutually acceptable. So, I would say the policy has been long-established, but the legal issue is quite clear from the point of view of the administration legal lawyers.

Mr. UNDERWOOD. OK. The second question I have—and I know you're running a tight schedule, Mr. Secretary—pertains to the issue of the final political status, the self-determination issue. You indicate that the administration is willing to support an invitation for the Guamanian people to express their desire for Guam's ultimate political status, but that you reject the notion that there can be provided for a legally binding, Government-sponsored or endorsed vote on the ultimate political status of Guam.

The question I have is that under—unless I'm not seeing something that you may wish to say—is that under either scenario, there is no legally binding, self-determination vote for Guam possible, because even in the more expansive statement in which you indicate that the administration is willing to support an invitation for the Guamanian people, you did not put that it would be legally binding, Government-sponsored, or endorsed; yet you're quite willing to limit those possibilities for the exercise of Chamorro self-determination, but you're not quite willing to expand and make a full commitment on the exercise of any future political status vote by all the people who are currently on Guam. And what that means is that, basically, it seems to me, is that it's a denial of the exercise of self-determination all the way around, either for the Chamorro or all people who are currently on Guam.

Mr. GARAMENDI. I don't believe that to be the case. If there is a Government-sponsored election that includes all of the legal residents who are eligible vote, then I believe that that would have great weight. Obviously, the ultimate disposition of the status of Guam resides in this building—or in these buildings. It resides with Congress, as stated by the Constitution. And so that issue is, I think, very clear.

Equally clear are the concerns that the administration has about sponsoring a vote in which only a subgroup of people who are legal residents and eligible to vote, could vote. I would like to be certain that we provide you with written testimony, some of which is already in my statement—of the long, written statement—on this matter, and if further clarification is desired by the committee, we would be happy to respond in writing. I don't want to confuse the issue with a potential misstatement by myself.

Let me take advantage of what appears to be just a few more seconds to state one more thing that is very obvious to me, and that is the enormous energy, intellectual capacity, and determination that has been applied to the months of negotiations in which I have been engaged in and applied by yourself, Mr. Underwood, and by the Governor of Guam, Mr. Gutierrez. The two of you have been extraordinary, both in your determination to push this issue forward and in the intellectual depth to which you have taken this matter. You have taught me a great deal; I have learned a great deal, and I have great respect for both of you.

Mr. UNDERWOOD. Well, I appreciate those very kind words, and I would be less than candid if I didn't say that the Federal bureaucracy matched this intellect and this energy going in the opposite direction, perhaps with greater success—apparently.

Mr. GARAMENDI. I'll let you——

Mr. UNDERWOOD. But I certainly have some questions for the record. I just want to reiterate again that the issue of Chamorro self-determination, the indigenous people of Guam who were the people that were colonized in the case of Guam, will never go away until it's fully resolved in one way or another. And one way or another, that exercise will occur.

I have to reiterate my strong concern about the manner in which the administration has taken this position, but I will say that you have left the door open, and I'm happy that there is the door open now. You may just have to be careful that there are going to be hundreds of people running through that door.

Mr. GARAMENDI. Well——

Mr. UNDERWOOD. Thank you.

Mr. HILL. I thank the gentleman. I would remind members of the committee that Mr. Garamendi does have to leave for an airplane, and I would remind all members that they can submit questions for the record.

Mr. Abercrombie.

Mr. ABERCROMBIE. Yes, thank you very much. Mr. Garamendi, I appreciate that you're going to have to leave shortly, but I think there are some questions here with regard to Commonwealth that should be on the record now, and folks should hear it as quickly as possible.

There are parallels to the difficulties in Puerto Rico here. I'm glad this hearing is being held today because I think it points out how you cannot write a definition of Commonwealth to suit yourself, and I think this is one of the problems that is not fully understood in Puerto Rico. I agree with you, I believe, if I understand you correctly. Legally binding the Congress or the executive branch to seek the consent of the Commonwealth Government—that's one of the objections you have, right?

Mr. GARAMENDI. One of the serious problems we have is——

Mr. ABERCROMBIE. Yes. You cannot—the Congress is never going to acquiesce to allowing someone else to determine whether or not they want to acquiesce or concede to what the United States wants it to do if they, in fact, are citizens and going to have a relationship in a Commonwealth, right?

Mr. GARAMENDI. That is a fundamental issue.

Mr. ABERCROMBIE. It's not only an issue of policy, but it's probably one of constitutionality, is it not?

Mr. GARAMENDI. That is the assertion of this administration. It is a constitutional issue, and it's one that is very difficult to overcome.

Mr. ABERCROMBIE. So if 100, if H.R. 100 addressed that issue and eliminated that, that would eliminate one of the problems, right?

Mr. GARAMENDI. That is correct. If the——

Mr. ABERCROMBIE. OK, thank you. You don't have to expand. You can expand later, but I realize you're short of time. But the

short answer is that that is a stumbling block; if that's removed, then it makes the objections much less high in profile, right?

Mr. GARAMENDI. That is correct.

Mr. ABERCROMBIE. OK, again; then the second thing—on providing for the vote with the Chamorro people. Having come from a State and having served in a legislature which consciously put forward a constitutional amendment allowing Hawaiians to vote and excluding people who were not Hawaiians to vote, with everybody voting to do that—in other words, I was in a legislature that voted to do that. I consciously excluded myself from being able to vote for trustees of the Office of Hawaiian Affairs in recognition of the fact that the indigenous people of Hawaii deserved an opportunity to resolve all the issues—social, cultural, economic, et cetera. And we are not only surviving, but I think this process is going to work through.

If we can construe in H.R. 100 something where that does take place, because my information is that virtually all of the people there before 1950 have some Chamorro origin. Now there might be some who don't. I don't know—1,000 or 2,000, whatever it is—they'd be in the same category as I am. Maybe they're Haoles—I don't know—which is a Hawaiian word for—has come to mean—it usually meant strangers; it's now come to mean Caucasians, generally preceded by a couple of colorful Angle-Saxon adjectives—[Laughter.] But there's no great harm done; we can work on it. If an acceptable formula could be worked out there—because Mr. Underwood is quite correct; the issue has to be resolved—might you find yourself more amenable on that issue?

Mr. GARAMENDI. We attempted to find a way of resolving this in a non-Governmental-sponsored vote, and that's what I had proposed.

Mr. ABERCROMBIE. Well, just for today's hearing, Mr. Garamendi, and for Mr. Chairman, I do recommend that we maybe take a look at the history of the establishment of the Office of Hawaiian Affairs in Hawaii as a possible—not necessarily a model, but at least a method that was arrived at which apparently has been able to achieve constitutional authority; it hasn't been challenged. And maybe we could do some modification of that and find it applicable here.

Mr. GARAMENDI. One of the fundamental points in my testimony is that this administration believes it is wise and a fruitful policy to continue discussions with the people of Guam through their elected representatives and those who they choose to represent them in these matters. Certainly the issue you raised could be considered. There are very serious constitutional issues surrounding this particular issue, and we would be happy to share with the committee the views of the constitutional lawyers in the Department of Justice on these matters, including the issue—the proposal that you made.

Mr. ABERCROMBIE. Thank you; I appreciate that. I'm just presenting for you, Mr. Chairman, that I don't think this is necessarily insurmountable if people of good faith and good will work at it.

Finally, Mr. Garamendi, I think I agree with the positions here about transferring control of the adoption and enforcement of immigration and labor policies and the application of Federal policies.

If the Commonwealth takes place, my position would be, and I presume your position and I presume the constitutional position would be—and I'm almost certain that the Congress would have this—if you're going to have Commonwealth status, then all Federal laws are going to be applicable. You're not going to pick and choose, especially where labor laws and the rest are at issue. That's what the Marianas are going to find out real quick, that you don't start claiming U.S. citizenship and then say, not necessarily for those we don't like or those we want to exploit.

Mr. GARAMENDI. The position that we have is that there are unique circumstances in Guam, as in States, and those circumstances may require or suggest that a law be modified to deal with the uniqueness of those circumstances. We think that's appropriate——

Mr. ABERCROMBIE. That's fine.

Mr. GARAMENDI. [continuing] and it's certainly up to Congress; you do it all the time.

Mr. ABERCROMBIE. Sure.

Mr. GARAMENDI. And that, we think, is an appropriate way to go. With regard to labor issues, there is an extensive discussion of this in my written testimony. If you have further questions, I'd be happy to try to answer them.

Mr. ABERCROMBIE. Yes, I did read through that, and I appreciate that. But as a general rule, your position is is that Federal law is applicable—period.

Mr. GARAMENDI. To the extent that Congress desires it to be, yes.

Mr. ABERCROMBIE. OK; thank you very much. I might say then, in conclusion, Mr. Chairman, that I think it's laid out fairly clearly here as to what we have to do and where we have to go, and I would say, in the end, that it has to be very, very clear to the people of Guam, just as I think it is being made clear to the people of Puerto Rico, that Commonwealth does not mean you get to act like an independent nation when it suits you, and then claim all the full rights and privileges of U.S. citizenship when it suits you.

Mr. HILL. I thank the gentleman. The gentleman's time has expired. I would recognize Ms. Smith.

Mrs. LINDA SMITH. Thank you, Mr. Chairman. Has this witness been sworn in? Have these witnesses been sworn in?

Mr. HILL. No, they have not.

Mrs. LINDA SMITH. Could you do that?

Mr. GARAMENDI. Mr. Chairman, I'm certainly happy to do that. I assume that every statement I make is taken to be accurate and truthful to the extent I know it, and subject to all the rules of this Congress whenever I speak here.

Mr. HILL. If the gentlelady—Mr. Garamendi does have to leave, and——

Mrs. LINDA SMITH. OK. I think his statement, if that would be taken down for the record, would be fine.

I guess what I'm wanting to ask about is to the Secretary—the questions. I have been very disturbed at the Guam Governor's statement that money helped grease the skids for the change in policy with Guam. It is a problem that has troubled me, and often there was implication that money did pass for policy with Guam.

So I would like to ask you just three questions, and just a yes or no is fine.

Were you at any time contacted by Don Fowler or anyone else at the Democrat National Committee on Guam Commonwealth issues, and if so, how and when?

Mr. GARAMENDI. Your question goes to the Guam Commonwealth issues and the specifics of the negotiations.

Mrs. LINDA SMITH. Yes. Were you contacted by Don Fowler from the Democrat National Committee on Guam Commonwealth issues?

Mr. GARAMENDI. I would prefer to give you a written reply to that question so as to be quite accurate. My process in this was over a 2-year period, and I want to be accurate in my statement so I will provide you with a written reply.

[The information referred to follows:]

Mrs. LINDA SMITH. OK; then I will give you others. Did you at any time during your tenure as negotiator discuss with anyone or correspond with anyone about the impact of Guam Commonwealth decisions on the Presidential campaign?

Mr. GARAMENDI. No.

Mrs. LINDA SMITH. Did you at any time during your tenure as negotiator discuss or correspond about political contributions with anyone, including but not limited to the Governor of Guam, anyone from the Guam Commission on Self-Determination, or their lobbying firm, Brady or Berliner?

Mr. GARAMENDI. If your question goes to the issue of whether I was involved in any solicitation of contributions or had any role in any contributions that were made, the answer is no. If the question is broader—did I ever talk to anybody about contributions?—there were newspaper articles about that, and I certainly discussed those newspaper articles with my staff.

Mrs. LINDA SMITH. Would you put that in writing, also, and the connection to your position and how you separate your position from those particular discussions? There is a great amount of concern with this administration and the money flowing for foreign policy, and so I am concerned about this. And it makes it very difficult to look at any decision in light of this. Thank you.

[The information referred to follows:]

Mr. PETERSON. [presiding] Any other members wish to question? Mr. Kildee.

Mr. KILDEE. Just one question; I know you have to leave. Aside from the status of Guam as a whole, what is the administration's position on a special status for the Chamorro people, similar to the sovereignty and territorial integrity of federally recognized Indian tribes on the mainland?

Mr. GARAMENDI. We have not explored that issue, and at this point there is no policy about that.

Mr. KILDEE. So you would have no—you're not on record of having any objection to, say, the Chamorro people having sovereignty similar to that of the 500——

Mr. GARAMENDI. I do not want you to misconstrue my answer. My answer was, we have not considered that and we have no position.

Mr. KILDEE. But you have not rejected it, either.

Mr. GARAMENDI. We have no position either for or against it. We have not considered that issue.

Mr. KILDEE. Could you comment on that type of status, where the Chamorro people would have a sovereignty and a territorial integrity similar to the over 500 sovereign tribes on the mainland?

Mr. GARAMENDI. I would defer my comments and present them to you in writing. This is a complex issue on the mainland and certainly would be even more so in one of our territories, a Pacific Island territory.

Mr. KILDEE. It's not that complex.

Mr. GARAMENDI. It would deserve a written response and a thoughtful response, which I'm not prepared to give you today.

Mr. KILDEE. It's not really that complex on the mainland. It dates back to 1789 and our Constitution, and dates back to 1832 when Justice John Marshall said that the natives on the continent were sovereign nations. And so it's long in our history, and the Constitution itself recognizes three sovereignties. It talks about foreign nations, the States, and Indian tribes, and then John Marshall, in his famous 1832 decision, clearly outlined the real sovereignty of the Native American tribes in the mainland.

Mr. GARAMENDI. Your understanding of American history on this matter is obvious. This is a complex issue. Guam is considerably different in its history and in its acquisition than other parts of America, and certainly different and came substantially after Mr. Marshall's statement on these matters. As it applies, I am uncertain. It would be inappropriate for me to give you a response other than what I have said, which is it is complex; it deserves a full analysis, and I will present you with an analysis in writing from this administration.

[The information referred to follows:]

Mr. KILDEE. I really would suggest, in the meantime, before you prepare the answer, to read Worcester v. Georgia and John Marshall's decision because it has some very profound statements on sovereignty, and that was issued by John Marshall—Worcester v. Georgia—in August 1832.

Mr. GARAMENDI. I would happy to receive from you your thoughts, in writing or otherwise on this matter, and your obvious legal analysis which you have done.

Mr. KILDEE. Thank you very much. Thank you, Mr. Chairman.

Mr. GARAMENDI. Thank you.

Ms. CHRISTIAN-GREEN. Mr. Chairman?

Mr. GARAMENDI. Mr. Chairman, I really must leave.

Mr. PETERSON. [presiding] You must leave—OK; we'll excuse Mr. Garamendi.

Mr. GARAMENDI. I'm about to really mess up California water policy if I miss this airplane.

Mr. PETERSON. OK; please feel free to leave.

Mr. Underwood.

Mr. UNDERWOOD. Thank you very much, Mr. Garamendi, and I'm sorry that we've delayed you more, but I just wanted a rejoinder to the point made by Mr. Kildee. This doesn't involve you directly. The issue of——

Mr. GARAMENDI. May I take leave?

Mr. PETERSON. Yes; go, go.

Mr. UNDERWOOD. I think the issue of the Chamorros becoming a tribe in the sense that Native American tribes have sought tribal sovereignty is best resolved through the issue of Chamorro self-determination, and that's really an issue which is a core part of the draft Commonwealth Act. And I would certainly invite every person who is here representing Guam, all of them are Chamorros themselves except for maybe two or three, to put that question into their testimony, whether they really are seeking this status or not.

I must confess that this is a red herring issue. The issue of how the Chamorro people see themselves is rather clear. It is embodied in this Act. People want to get on with the exercise of Chamorro self-determination. I have never heard of any reputable person from Guam stand up and say that the Chamorro people are seeking tribal status and seeking any kind of reservation on the island of Guam. We see the exercise of Chamorro self-determination as indistinguishable between the Chamorro people and the island of Guam.

Thank you.

Mr. PETERSON. Thank you. At this time we will call upon Allen Staymen, Director, Office of Insular Affairs, U.S. Department of the Interior, to share with us his testimony.

**STATEMENT OF ALLEN STAYMEN, DIRECTOR, OFFICE OF INSULAR AFFAIRS, U.S. DEPARTMENT OF THE INTERIOR**

Mr. STAYMEN. Thank you very much, Mr. Chairman. I ask that my statement on S. 210 and H.R. 2370, the other two bills on the agenda today, be made a part of the record, and I will quickly summarize.

Mr. PETERSON. Without objection.

Mr. STAYMEN. Except for sections 7 and 10, the administration supports enactment of S. 210. My written statement details several technical and clarifying amendments to the bill, and I would like to highlight those which are most significant.

On section 1, regarding food assistance to the communities affected by the U.S. nuclear weapons testing program in the Marshall Islands, we believe additional language is needed to deal with the procedural constraints of determining baseline population estimates for these communities and obtaining additional appropriations.

On section 4, regarding excess lands on Guam, the administration seeks modifications to resolve several concerns. First, changes to ensure that those Federal agencies that have been legitimately using DOD lands for the 2-year period prior to the time the land is declared excess will be able to continue those uses. Second, that the definition of refuge be clarified to read, quote, "overlay component of the refuge", close quote, because refuge lands, per se, are not subject to administrative transfer or the Federal Property Act.

Third, that the phrase at the end of subsection (c) that states, quote, "to the extent that the Federal Government holds title to such lands", close quote, be deleted. This phrase is misleading. Obviously, if the Federal Government does not own land, it cannot be accessed or subject to the provisions of this bill.

Fourth, the definition of public purpose needs to be clarified. It might be argued that by referencing the public benefit definition of

the 1994 Guam Excess Lands Act, with its congressional review of a Guam lands use plan, there is a possibility that subsequent transfers of lands to private parties could be found to be within the definition of public purpose. We recommend that the definition of public benefit, incorporated by reference to the 1994 Act, include only those purposes specifically enumerated in that Act.

Fifth, we would like to clarify that any conservation protections on excess land would remain in effect pending congressional action pursuant to subparagraph (d)(3)(E). This is a concern, because the agreements between the Fish and Wildlife Service and the Department of Defense automatically terminate upon transfer of the land to any other party. We do not believe it was the intent to have these conservation protections lapse as the result of the transitional transfer of lands to the GSA. This amendment is essential to maintain the status quo with respect to conservation protections until either the Government of Guam and the Fish and Wildlife Service have reached an agreement on its future disposition, or the Congress Acts.

The administration has no objection to H.R. 2370, but we do have clarifying amendments detailed in my written statement. I'm pleased to respond to any questions you have on these two bills.

Mr. PETERSON. Yes, Mr. Staymen. First, there are a number of provisions in S. 210 affecting the freely associated States, including the majors, to help those communities affected by U.S. nuclear testing. The U.S. established trust funds for their radiological clean-up of nuclear materials on affected islands, which involves the Department of the Interior. Since the people of these and affected islands must remove the nuclear contaminants in order to be able to safely resettle, where would you recommend the radioactive materials be stored?

Mr. STAYMEN. In fact, Mr. Chairman, most of the scientific research that has been done on the resettlement of those islands suggests that the material does not have to be removed. The problem is not so much direct exposure from people living on those islands; it's the dose which they would get from eating the food grown on that island. Research has shown that if the islands are treated with normal potassium fertilizer, that the plants will not absorb the radioactive elements in nearly the proportion that they would without such treatment, so that the dose which a person gets subsequent to a fertilizer application is on the order of one-tenth of what they would get before. In other words, there could be a 90 percent reduction in the effective dose to individuals without any removal of soil.

Nevertheless, some of the islands have prudently decided to do a limited scrape in those areas where housing would be built and children would be playing. And my understanding is, those soils are anticipated to be used in construction for things like bridges and breakwaters where they will essentially be out of the way from regular use.

But the levels of radioactive materials and the dose that currently exists on those islands—I think it's fair to say-it's right on the fence on whether or not it is a health concern or not. But it's prudent that they do the scrape, and it's prudent that they do the potassium treatment.

Mr. PETERSON. Any other questions? Mr. Underwood. Oh—Mr. Faleomavaega.

Mr. FALEOMAVAEGA. Thank you, Mr. Chairman. Mr. Staymen, I assume you're going to be answering questions concerning Mr. Garamendi's earlier statements. Or are you just going to be responding to——

Mr. STAYMEN. That's right; I'm just authorized on these two bills.

Mr. FALEOMAVAEGA. All right. I do have a couple of questions on the earlier statements that Mr. Garamendi made concerning H.R. 100. He mentioned there were some constitutional problems affecting the relationship between Guam and the United States, and I wanted to ask you—this may be an exercise in futility, but I think there are some problems that I have with his statement about constitutional issues here.

As you know, under the United Nations there is a category called non-Self-Governing Territories, and you're also aware of the fact that Guam, the Virgin Islands, and American Samoa are listed under that classification as non-Self-Governing Territories. Now, on the other hand, the word "territories" under provisions of the Federal Constitution provides for the plenary authority that Congress has over territories. But there are several classifications of territories, and let me share with you a couple of them.

Guam, Puerto Rico, Virgin Islands, and American Samoa are all unincorporated territories. Now American Samoa is the only territory that is both unincorporated and unorganized. Now my understanding is that territories are such that not all the provisions of the Federal Constitution apply to these certain classifications given to territories. Now we all know that territories that have now become States were all incorporated territories, at least according to the insular cases the Supreme Court has held on that, that eventually they would become States. Well, none of these territories, I don't think, has any chance—with the exception of my friend from Puerto Rico—on the question of Statehood.

My question on the constitutional issues is that where does it say that there's a conflict in the Constitution, given the fact that Guam is under this classification as a non-Self-Governing Territory, where not all of the provisions of the Federal Constitution apply?

Mr. STAYMEN. I will have to take your question back for Mr. Garamendi to answer in writing, Mr. Congressman.

Mr. FALEOMAVAEGA. Now, if I'm correct in listening to Mr. Garamendi's reasoning, it is that the territorial clause of the Federal Constitution applies absolutely to Guam, the Virgin Islands, and American Samoa. Am I correct in that?

Mr. STAYMEN. That's my understanding of the administration's position, yes.

Mr. FALEOMAVAEGA. OK. And if this is so, then why are we listed under the United Nations classification as a non-Self-Governing Territory? Well, anyway I——

Mr. STAYMEN. The actions of the United Nations don't necessarily have to be coordinated with the actions of the U.S. Federal Government. I think the dilemma is that all of us here and all of you there have to swear to uphold the provisions of the U.S. Constitution.

Mr. FALEOMAVAEGA. The dilemma is that the right of self-determination is the issue that is still pending among these non-self-governing territories.

Mr. STAYMEN. Again, I'll have to take your questions back and have Mr. Garamendi in writing.

Mr. FALEOMAVAEGA. I would appreciate a clarification of that issue.

Mr. STAYMEN. Certainly.

Mr. FALEOMAVAEGA. On your testimony on Senate bill 210, can you explain a little more about section 8 of the bill that provides the current responsibility of the President to report to Congress on the impact of the Compact of Free Association? Are we having any problems with the compact provisions? What is this for?

Mr. STAYMEN. The reason for this is that under the terms of the compact, the administration has to submit a report to Congress annually with respect to the impact which the compacts have had on the U.S. territories and on Hawaii. The procedure for developing and submitting those reports has been, I think it's fair to say, very contentious and difficult. The administration has to develop information about the impact of Micronesians in the islands, and necessarily must go into the islands and conduct censuses and develop data. It's been very difficult to obtain that data.

We generally believe that the islands themselves are in a much better position to evaluate and report on what the impact of Micronesians coming into the community is than is the Department of the Interior back here in Washington. Our hope is to work closely with them and continue to financially support—and if necessary with Federal technical assistance—support them in developing that information, then we would pass that on to Congress.

Mr. FALEOMAVAEGA. And I don't want to put you in a situation where you have to say something on behalf of Mr. Garamendi, but I just wanted to know about—where are we in our current negotiations with the Commission on Guam, as far as H.R. 100 is concerned? Are we about 10 percent into the process? I said earlier that we haven't even moved an inch, and correct me if I'm wrong in my humble opinion of where we are right now, but are we about 30 percent complete in our current negotiations with the leaders of Guam? Can you——

Mr. STAYMEN. I'm sorry; again, I'm going to have to refer to him.

Mr. FALEOMAVAEGA. OK.

Mr. STAYMEN. I'm not a part of that process.

Mr. FALEOMAVAEGA. You mentioned there were two sections in Senate bill 210 that the administration does not support?

Mr. STAYMEN. Right; those are the two sections——

Mr. FALEOMAVAEGA. Which sections are those, again?

Mr. STAYMEN. I believe it's 7 and 10, which establish two Presidential commissions, one with respect to the Virgin Islands, one with respect to Samoa, to study their future economic development. The administration supports the notion that we should have studies and that both Samoa and the Virgin Islands are confronted with serious economic development challenges, but we think that can be done through existing authorizations, and the Presidential commission is not the appropriate institution.

Mr. FALEOMAVAEGA. I know we discussed the issue on this earlier, Mr. Staymen, saying that the administration does not like a proliferation of Presidential commissions, but it's OK to have a Presidential commission on the study of gaming—gambling, but when it comes to territories, the administration does not feel that we should have the same status in looking into the serious, serious economic issues facing both the Virgin Islands and American Samoa.

Mr. STAYMEN. That's correct.

Mr. FALEOMAVAEGA. Thank you, Mr. Chairman, and I'd like to ask unanimous consent, Mr. Chairman, for my statement to made part of the record.

Mr. PETERSON. Without objection.

Mr. FALEOMAVAEGA. Thank you.

[The prepared statement of Mr. Faleomavaega follows:]

STATEMENT OF HON. ENI F.H. FALEOMAVAEGA, A DELEGATE IN CONGRESS FROM THE TERRITORY OF AMERICAN SAMOA

Mr. Chairman:

Thank you for calling this hearing on three bills which will have a direct impact on our U.S. territories. Before I begin my testimony, I want to welcome our distinguished guests to the hearing room today. To Senator Akaka and my colleagues in the House, I say thank you for taking the time to testify this morning. To Deputy Secretary Garamendi, I understand that you have a plane to catch this morning, and I appreciate your willingness to appear before us today given the time constraints.

To those who have travelled for days to get here from Guam, I welcome you to Washington, DC. I know it is expensive to come here and I appreciate the commitment in time you have made to testify today. I wish we could provide more time for each of you to speak, but with 20 witnesses scheduled to testify this will be a lengthy hearing, and I trust you understand our reasons for limiting the time afforded each person to testify.

Mr. Chairman, I do not want to use a lot of our time with a statement this morning. We are considering three bills which together address many of the pending problems in our territories. Perhaps the most controversial of the legislation is H.R. 100, the Guam Commonwealth Act.

I commend my friends in Guam who have been working on their political self-development. Like the people of Puerto Rico, trying to define a new relationship with the United States is a difficult and time-consuming undertaking. In Puerto Rico, the key topic of discussion is which of three statuses to choose. Guam appears to be moving toward that discussion also, and while I am a co-sponsor of H.R. 100 and support many of its provisions, I also know there are many controversial provisions which will need to be addressed before this bill can move forward.

The Guam Judicial Empowerment Act, H.R. 2379 is almost a technical correction, and I hope we can incorporate that provision into legislation containing portions of S. 210 which fall within the Committee's jurisdiction, and move them all forward early next year.

S. 210 contains a provision to create a Presidential Commission to assist with the economic development of American Samoa. As I am sure Deputy Secretary Garamendi is aware, I have been exploring alternatives with officials of the Department of the Interior to move this project forward, and I hope the Department remains committed to providing this assistance.

Thank you again, Mr. Chairman. I look forward to hearing the testimony this morning.

Mr. PETERSON. Any further questions for Mr. Staymen? Mr. Underwood.

Mr. UNDERWOOD. I know we discussed this earlier, Mr. Staymen. I have a number of questions that I'd like to ask for the record for S. 210, and I would like to ask you to stay, but I really want to get an opportunity for the three Governors to speak. Right now it's 2:20 in the morning on Guam, and the first panel from Guam are

actually the people that certainly the committee is most interested, I think, in hearing, as well as the people back home. So, I would request that you stay and we could bring you back up and ask some questions.

Mr. STAYMEN. That's fine by me, Congressman.

Mr. UNDERWOOD. Thank you.

Mr. PETERSON. We thank the gentleman. Any other further questions for Mr. Staymen?

Mr. ORTIZ. Mr. Chairman?

Mr. PETERSON. Yes.

Mr. ORTIZ. I would like to include my statement for the record with unanimous consent.

Mr. PETERSON. Without objection.

[The prepared statement of Mr. Ortiz follows:]

STATEMENT OF HON. SOLOMON P. ORTIZ, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF TEXAS

I want to thank Chairman Young and Ranking Member Miller for holding this hearing today on legislation to establish the Commonwealth of Guam.

This is a significant step in the process for Congressional review of Guam Commonwealth, and I want to commend my friend from Guam, Congressman Robert Underwood, for his work in bringing this legislation before us today.

It is obvious that the people of Guam and their political leadership remain committed to pursuing Guam Commonwealth status.

After years of work, they endorsed Commonwealth in 1982, and the Draft Guam Commonwealth Act in 1987. Since then, they have been in negotiations with the United States to change their political status.

This is a step which will have an absolute impact on their relationship with the Federal Government. The people of Guam should be commended for their committment to what has been a long and demanding process.

I am looking forward to hearing the perspectives of our participants and their accounting of the progress toward Commonwealth.

It is important to assert Congressional oversight of this process and resolve the issue of Guam's history, as well as it's future.

Thank you Mr. Chairman.

Ms. CHRISTIAN-GREEN. Mr. Chairman? Mr. Chairman?

Mr. PETERSON. Donna.

Ms. CHRISTIAN-GREEN. I'd also ask that my statement be included for the record.

Mr. PETERSON. Without objection.

[The prepared statement of Ms. Christian-Green follows:]

STATEMENT OF HON. DONNA M. CHRISTIAN-GREEN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF VIRGIN ISLANDS

Thank you Mr. Chairman for the opportunity to make these opening remarks.

Mr. Chairman and my colleagues, this is a day for all Americans to be proud. More than 10 years after overwhelmingly voting to become a U.S. Commonwealth, the people of Guam are finally getting a hearing on what blueprint they have chosen for their future relationship with the United States.

Let us join then in celebration of this first step of self-determination and pledge to continue to support their efforts to see the completion of this process before the 100 anniversary of the Guam joining the American family.

I want to welcome my fellow islanders from Guam who, by your numbers and presence here today after traveling from so far away, demonstrates your strong support for your Guam Commonwealth Act.

I thank you for your commitment and say that I will do all I can, as a member of this Committee, to support you in getting the Guam Commonwealth Act enacted into law.

I am pleased to see that three of Guam's Governors have joined together in a bipartisan show of support for their island's future political status to be here today. Welcome Governors. We are pleased to have you with us today.

I am also very pleased to welcome my colleagues from the House and the Senate, along with the former Representative from Guam, a previous long time member of this Committee, the Honorable Ben Blaz.

Mr. Chairman, the people of Guam have been a territory of the United States since 1898. They have been seeking to become a U.S. Commonwealth for almost 10 years. In my view, this has been more than enough time for this body and the Administration to have come to some agreement in getting this process completed.

To my colleagues and the representatives from the Administration who may be concerned about our ability to grant Guam control over immigration, input into the application of Federal laws, or the authority to enter into international agreements, I say don't let your concerns prevent you from doing what is right. I believe we have a responsibility to do all that we can to provide Guam these articles of respectful political rights and full self government.

Nothing less than these rights should be afforded to Guam or any of the other insular areas should they choose to remain part of the U.S. family—like Guam has—without the opportunity for statehood.

In conclusion Mr. Chairman, I want to say a few words about the third bill that is on the agenda of today's hearing, S. 210.

S. 210, as it came to the House from the Senate, contains four provisions pertaining to my district, the U.S. Virgin Islands. Because of their urgency importance to the economy of the V.I., two of the provisions were added on to another bill which I hope will very shortly be signed into law by the President. The remaining two Virgin Islands provisions in the bill do not currently enjoy the level of support that makes their consideration in order at this time.

I want to once again thank Chairman Young and Ranking Member Miller for their assistance in moving the two economic provisions of S. 210 that are so very important to the Virgin Islands.

While S. 210 encompasses almost all of the U.S. Insular Areas, this hearing and this day belongs to the people of Guam and their quest for Commonwealth.

Mr. Chairman the Congress is empowered under the U.S. Constitution to make all decisions on the future political status of the U.S. territories. To this end, the people of Guam have made their choice. We should respect Guam's decision and exercise our constitutional authority to make their choice a reality as expeditiously as possible.

It is time that we act. The people of Guam deserve no less.

Mr. PETERSON. We thank you, and we'll call upon you a little later then.

Mr. STAYMEN. Thank you.

Mr. PETERSON. Before we bring the next panel up, I'd like to recognize former Delegate, Ron DeLugo, from the Virgin Islands. We welcome you here today. If you could stand so you could be recognized.

[Applause.]

We are very thankful you could come, and we hear you were subcommittee chair prior and did a fine job.

At this time I will call upon Mr. Underwood, the Delegate from Guam, to introduce our next panel of very esteemed witnesses.

Mr. UNDERWOOD. I thank you, Mr. Chairman, and before I do that I would certainly like to add my own words of welcome to Congressman DeLugo. For the time that he was here, he certainly helped me a lot in terms of understanding the operations of this committee, and has always been a long and steadfast friend of Guam. And we certainly appreciate his interest, his continuing interest, and continuing leadership on issues pertaining to the insular areas.

I also have and would like to add a statement from Senator Inouye and Representative Patrick Kennedy, and also Bob Smith. They've asked me if I could enter their statements into the record on behalf of this legislation.

Mr. PETERSON. Without objection.

[The prepared statement of Senator Inouye follows:]

STATEMENT OF HON. DANIEL K. INOUYE, A SENATOR IN CONGRESS FROM THE STATE OF HAWAII

I appreciate this opportunity to share my thoughts with you on H.R. 100 and the very important issue of Guam's interest in achieving commonwealth Status. The people of Guam have stated their desire and goal, and it is my hope that the Congress and the Executive branch can work with Guam's representatives to achieve that goal.

The relationship between Guam and the United States is one that stretches back nearly 100 years. During this period, we have witnessed two world wars and several regional conflicts. The United States as a whole and Guam in particular experienced tremendous losses during these periods. However, together, we have always been able to endure difficult times and overcome adversity. Through our shared experiences, Guam and the United States have forged an important relationship based on trust and mutual cooperation. Like any longstanding relationship, periodically changes must be made to ensure the health of both of both parties involved. It is the prospect of political change that brings us here today.

Naturally, the political status of one's homeland is an area of concern and importance. In 1987, after years of deliberation and public discussion, the people of Guam, in two separate plebiscites, voted in favor of making Guam a commonwealth of the United States. In February 1988, this document, the Guam Commonwealth Act, was submitted to Congress for consideration and has been introduced in four consecutive Congresses since—the 100th through the 104th.

The 1987 plebiscites have made clear the preference of the Guamanian people that Guam become a commonwealth of the United States. However, the fact that here in the 105th Congress we are once again considering the political status of Guam illustrates the difficulty and complexity of the issues involved. While self-determination is the right of all people, greater union with the United States requires greater adherence to our Constitution. It is at this juncture that there have been disagreements between the Administration, both past and present, and the terms of commonwealth as stipulated by the Guam Commonwealth Act. While some of these issues are still unresolved, I am hopeful that continued discussion between the people of Guam and the U.S. Government will produce a mutually agreeable settlement.

The Guamanian people have overwhelmingly voted in favor of a greater union with the United States. It is a great compliment and honor to America that the people of Guam would desire their future to be inseparably tied to our own. I am confident that the Federal Government and the government of Guam will continue to move forward and resolve any differences that prevent Guam from becoming a commonwealth of the United States. Let us continue to build on the foundations of trust and cooperation that have already been established and move forward into the future.

[The prepared statement of Mr. Kennedy follows:]

STATEMENT OF HON. PATRICK J. KENNEDY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF RHODE ISLAND

Mr. Chairman,

I want to thank you for holding this important hearing to determine the political status of Guam.

I want to welcome Governor Gutierrez and all the witnesses from Guam who have travelled a long way to be here with us. To me your participation sent this government a signal that the people of Guam are serious about resolving their political status.

For 100 years the people of Guam have been a part of United States. Its citizens have shared in our times of national triumph and struggle.

During the World War II the people of Guam endured the atrocities of military occupation and many people still bear those scars today. Despite their pain, the people of Guam heroically assisted the Marines in retaking the Island and once again raising the flag of Democracy within its borders.

Today, Guam is asking to continue the process of determining its permanent political status. They have waited long enough and it is high time our government got down to the business of letting this process go forward.

To be sure, Guam's political status as an unincorporated territory is in Congressman Underwood's terms "unsatisfactory." Clearly, the current situation leaves the Island's inhabitants disfranchised and in political limbo.

I recognize that there is a complicated history with regard to the Island's political status. I hope that some of the most common questions can be answered here. But

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 54 of 542

let me say that I firmly believe that it is the responsibility of this Congress to act decisively on this issue.

We must help facilitate a process by which the people of Guam can exercise their right to self-determination. And in my opinion self-determination begins with the Islands historical inhabitants.

The future of the Chamorro people depends upon the United States to take a leadership role in solving the Island's political status. They have sacrificed much so that the United States may defend human rights abroad.

We should not forget that it was from Guam that B-52 strikes against Iraq were launched in 1996 and it was Guam that took in the Kurdish refugees of the Persian Gulf.

Let us act decisively and set about a process that is mutually beneficial to both the United States and Guam.

Let us commit ourselves to a process that ensures the freedom's of our nation, and also respects the proud history of the Island.

Thank you Mr. Chairman for your leadership and I am looking forward to working with you as we continue this critical process.

[The prepared statement of Mr. Bob Smith follows:]

STATEMENT OF HON. ROBERT F. (BOB) SMITH, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF OREGON

Mr. Chairman, I would like to commend the gentleman from Guam, Representative Underwood, for his excellent work on behalf of the people of Guam for bringing before this Committee H.R. 100, H.R. 2370, and S. 270.

I am aware that H.R. 100, the "Guam Commonwealth Act," is particularly important to the people of Guam in order to resolve their political status. Guam has been working diligently for the past decade to negotiate first with the Bush Administration and most recently the Clinton Administration on an agreeable commonwealth status. To date, these efforts have not been fruitful. This hearing will serve the critical role of allowing all of the issues to be brought out in the open for members of the Committee to evaluate for themselves. This is all the more critical because it is ultimately this Committee's and Congress' responsibility, working with Guam's elected representatives, to decide Guam's future.

Mr. Chairman, I thank you for holding this important hearing and I would again like to commend Representative Underwood for his work on behalf of the people of Guam.

Mr. UNDERWOOD. At this time it gives me very great pleasure to introduce the three Governors of Guam, the three living Governors of Guam. Guam has only had the opportunity to select their chief executive since 1970, and it's been pretty much an even split since that time—I think maybe three Republicans and two Democrats—but I'm very proud to see that both parties are represented here this morning.

We have with us former Governor Paul Calvo, who was chief executive for one term; former Governor Joseph Ada, who was chief executive for two consecutive terms, and we have the incumbent, The Honorable Carl T.C. Gutierrez. As it is pretty much common in Guam, I can say with some assurance that I'm related to two of these gentlemen, one very closely, actually, and the other on both my mother's and my father's side.

As to Governor Calvo, I don't know if we're related, but you're older than me, and you probably know that we are somewhere along the line. But certainly it is with great pleasure that I introduce these three gentlemen—distinguished gentlemen—to the committee, and I'll leave it to you to call the first witness. Thank you.

Mr. PETERSON. I thank the gentleman from Guam. At this time, we'll call upon Governor Gutierrez for his statement.

**STATEMENT OF THE HONORABLE CARL T.C. GUTIERREZ, GOVERNOR OF GUAM**

Governor GUTIERREZ. Thank you very much, Mr. Chairman, and Buenas dias to the members of this Committee on Resources.

Thank you for holding this hearing on H.R. 100, the Guam Commonwealth Act. I say on behalf of the people of Guam and as chairman of the Commission on Self-Determination, I am very honored to present testimony in support of democracy and defense of human dignity, and in defiance of the continued colonial status of Guam by the United States.

The Guam Commonwealth Act embodies the political hopes and aspirations of the people of Guam. We are here to end the 19th century colonialism and to create a 21st century partnership between Guam and the United States of America. We wholeheartedly embrace the principles of democracy, upon which this great Nation was founded. They mirror Chamorro principles of family and community, which lie at the heart of our island way of life. Given the history of this Nation, I cannot imagine anyone, anyone in this room, defending colonialism. This great country, founded to end colonialism, can never justify the continued colonial rule of Guam.

As events around the world constantly remind us, Mr. Chairman, once a people have tasted freedom there is no turning back. For us it is not a question of whether colonialism will end; it is simply a matter of when and how it will come to an end. The people of Guam, by virtue of our relationship with the United States over the past 100 years, have been able to witness, but not experience, true democracy.

Democracy has been so close. It is taught, it is illustrated, and held up as the ideal. Yet, representative democracy does not exist in the Guam-United States relationship. We are frustrated, and we are losing patience. How much longer will we, American citizens, be denied our rights? As we approach a century under the American flag, we are asking, when will the colonized people of Guam be granted the right of self-determination? And the time to act is now, Mr. Chairman.

Today, we bring Commonwealth quest to you because Congress has the plenary power and responsibility under the Constitution to resolve this issue. We can work together now to forge a democratic partnership worthy of this great Nation, but if we delay, the spirit of cooperation may fade and a collaborative opportunity may be lost. The Commission on Self-Determination has submitted detailed analysis of the provisions of H.R. 100 and our assessment of the 8 years of frustrating discussions with the executive branch preceding this morning's hearing.

In my brief before you today, I would like to focus on the core issues and the core principles on which we can build a mutually respectful partnership. And let me start, Mr. Chairman, with an issue that I know is of concern to you and most of the members of this panel, one where I hope we will be able to find common ground—and I am speaking of mutual consent.

I am pleased that our panel this morning includes former Governor Ada, who was instrumental in negotiations on mutual consent with former Special Representative, Mr. Heyman. They concluded an agreement on new language which affirms that our fu-

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 56 of 542

ture relationship cannot be altered without our mutual consent. It is essential that any Commonwealth Act adopted by Congress include a mutual consent provision.

A second core principle, undoubtedly the most misunderstood provision of the Draft Commonwealth Act, is Chamorro self-determination. It is the inalienable right of the indigenous people of Guam to a process of de-colonization in accordance with international standards, standards that the United States has agreed to. This is a right which all the voters of Guam, Chamorro and non-Chamorro alike, have endorsed through a plebiscite. It is a process which will be defined in the Guam constitution, which itself would be brought before all the people of Guam, and, subsequently, brought before this Congress.

Mr. Chairman, I am confident that under your leadership we can uphold the principles of self-determination.

The third principle, which gives the people of Guam meaningful participation in the Federal Government—today our participation is non-existent and it is wrong. There is no way that Washington can understand the impact of laws and regulations on an island community 10,000 miles away, notwithstanding the heroic efforts of our Delegate Underwood. Short of giving us a vote in Congress, there simply must be a process to give us meaningful participation in which the way laws are written that govern the lives of the people of Guam, 10,000 miles away. And we have proposed a joint commission, and that has been detailed in my testimonies given earlier.

You know, Mr. Chairman, Guam serves as a strategic military location. That's what it was founded for; that was what it was taken for. We need to be able to move away from that and focus our attention to Guam being the economic strategic location, being the natural economic bridge between Asia and the West. And I say to you that some of those laws that constrain our economy—despite those constraints—we have built an economy, almost $3.5 billion of gross domestic product, bringing in 1.5 million tourists a year with only 150,000 people. And we did this with all the constraints—and I liken it to building an economy with a pair of pliers and a screwdriver.

This Commonwealth Act will provide us the power tools to not only sustain and grow our economy, but could be a major contributor to the United States of America. And we ask you to consider that as we move forward, because we want to be that bridge. It's very important that we get brought in to the national economic strategy, not just for the military strategy and national security interests. We can be a participant, and I say to you, Mr. Chairman, that Guam desires to be a part of the United States. We love—and we are patriotic.

I know that time is very short. It took me 18 hours to get here and 5 minutes to say what I want to say, and it's running short. But I'll continue to turn the page, and I hope some of your questions will give me an opportunity to expand a little bit more on why we, as a people, need to have some meaningful participation. Because for 100 years we have been very patient, as the Chamorro way dictates, as our way of life dictates, but we cannot move on to the 21st century.

And if you want to consider and continue to defend colonialism, then the people of Guam will have to get back to the drawing board and reconsider whether we, in fact, are going to be continually held to a standard that someone else sets for us. We want to be part of the United States of America continually, but, please, include us in the representative democracy that you so espouse.

And I just say that this morning our Archbishop celebrated mass, and he called on the Holy Spirit to come and descend upon this great Nation here in Washington, DC so that you could be enlightened to be able to do what was right for the people of Guam. Thank you very much.

[The prepared statement of Governor Gutierrez may be found at end of hearing.]

Mr. PETERSON. I would like to thank the Governor of Guam for his fine comments and his impassioned testimony.

Now we will call upon the former Governor, Mr. Calvo.

**STATEMENT OF THE HONORABLE PAUL M. CALVO, FORMER GOVERNOR OF GUAM**

Governor CALVO. Mr. Chairman, I am here to testify in full support of the enactment of the U.S. Commonwealth status for Guam.

On February 13, 1917, Captain Roy Smith, the naval Governor of Guam, appointed 34 island leaders to an advisory council whose staff was to consider and recommend measures for the improvement of the island and the welfare of its inhabitants.

Mr. PETERSON. Could the gentleman speak a little more directly into the mike? Thank you very much, and I'm sorry for interrupting you.

Governor CALVO. Though its purpose was strictly to recommend to the Governor, it was given the title of the First Guam Congress. My grandfather, Tomas Anderson Calvo, was a member of that body. In his opening address, he enunciated the aspirations of the people of Guam. It has been 80 years since my grandfather asked if Guam would be accepted as a full-fledged member of the American family.

I come before you today respectful of the power which the Congress of the United States wields, and mindful of how you, the Membership of this esteemed body, are capable of answering a question that has lingered over three generations of my family history. Is America willing to accept Guam as an equal member of the American family? If the answer is yes, than I can predict a bright future for Guam and the Marianas, as well as for the strategic interests of the United States.

My prediction, Mr. Chairman and members of this committee, is not some far-fetched pipe dream. The Asian Pacific countries are the largest trading partners of the United States. It is obvious that America's future lies to the west of San Francisco's Golden Gate. America's future lies even west of Pearl Harbor. An America that remains engaged in Asia and the western Pacific will be a strong and prosperous America, well into the 21st century.

One only has to look at the economic miracle that has taken place in Guam over the past 30 years to see the exciting possibilities of an American economic strategic interest. It was President John F. Kennedy who lifted Guam's close military security status

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 58 of 542

in 1960. The gross island product at that time was $50 million. Guam's economy relied heavily on public sector employment and huge military spending and Federal subsidies.

That all changed once Guam was opened to the world. Investment from Asia, most particularly from Japan, flowed in. Guam's gross island product in 1996 was over $3 billion. The island prospered despite a 30 percent reduction of military forces in 1994. The island prospered despite hostile and unilateral Federal Government action, which led to the demise of Guam's watch and garment manufacturing industries of the 1980's. Our island has prospered despite recent devastating typhoons and earthquakes. Our island will continue to prosper because we are a part of America and we are a part of Asia, the two most dynamic regions of the world.

I dream of an America who will recognize and act upon the cries of its second-class citizens in the western Pacific. I dream of a day when those second-class citizens will finally be allowed to full incorporation into the American family. I dream of a day when Guam and the Marianas will be America's economic jewel in the Pacific and America's physical link to Asia.

As a former Governor, I have had the opportunity to read Haley Barbour's "Agenda for America," which outlines the viewpoints on the future direction of the United States. The book envisions a more secure and strong America that bases itself on a strategy of peace through strength. It premises that American foreign policy would rest on three principles of peace through strength. First, its political leadership; second, economic strength, and, third, its military power. It is my firm belief that a fully incorporated Guam and Marianas would strengthen the foundation of these three principles of foreign policy.

I will close by declaring my unwavering loyalty and allegiance to the United States, but I must, in all good conscience, respectfully caution this fine body that the patience and the good will that has been so clearly demonstrated by so many generations of our people is not infinite. There is indeed a frustration growing amongst our people. Positive steps need to be taken and, frankly, ladies and gentlemen, the time to take this important and needed step is now. You have the power to take those steps.

For generation after generation, proud Chamorros and all other American citizens of Guam have proudly sung the national anthem, recited and proudly believed in the Pledge of Allegiance, and in every war America has fought since the turn of the century bled and died for our Nation. We have demonstrated repeatedly that we love and will die for our country. We want, we need, and clearly by historical record, we have earned the right to be accepted in full by the United States of America.

I ask you ladies and gentlemen, once and for all, is America finally ready to accept us? Thank you, and [speaking in Chamorro] "Si Yu'os ma'ase."

[The prepared statement of Governor Calvo may be found at end of hearing.]

Mr. PETERSON. I would like to thank the former Governor Calvo for his fine comments, and now we'll call upon Governor Ada. And I would urge all the witnesses to speak closely to the mike; they're not real sensitive.

**STATEMENT OF THE HONORABLE JOSEPH F. ADA, FORMER GOVERNOR OF GUAM**

Governor ADA. Mr. Chairman, and members of this august body, this document is the creation of our people in plebiscite. This document was approved by the majority of Guam voters, and especially by the Chamorros in Guam.

The document that is H.R. 100 is already an historic document, regardless of what happens to it, for the simple fact, Mr. Chairman, we have before us the only democratically expressed view on the political status of Guam that has ever existed in the 300 years that Guam and the Chamorro people have been administered by Governments other than ours. This document is the only expression of the democratic voice of our people that exists with respect to political status, the only one. For that reason alone, it must be treated with respect as you deliberate on the fate of that expression.

Today you are hearing from Guam—Democrats and Republicans. All of us, whether Democrats or Republicans, as Governors and Guam legislature, have fought for self-determination for the Chamorro people and self-government for Guam, because in Guam there is no Republican position or Democrat position on Commonwealth, because on this issue we are united.

I spent 8 years fighting for this Act as Governor. We brought this Act to an earlier Congress, and they insisted that we first begin discussions with the executive branch. That we did. We spoke to the task forces in both the Bush and Clinton administrations. At first, these discussions with the administration were extremely difficult. In the beginning, the Bush task force tried to claim that we were already self-governing, even though every Federal court decisionmakes it clear we are not.

Just because we can elect a legislature and a Governor, as you know Guam only is permitted to do these things by delegation of Congress, Congressional authority in the Organic Act. This Congress has the authority, tomorrow, to throw our legislature out of office, nullify all local laws, to replace the Governor of Guam with the Commander of Naval Forces Marianas or Presidential appointees or naval officers, as indeed was done in the past.

As one Federal court put it, "Guam has less self-government than Boulder, Colorado." It does not matter if Guam writes a constitution if that constitution is subject to congressional amendment or approval, or if that constitution does nothing to address the imbalance between Federal and local authorities.

What we seek in this Commonwealth is increased actual self-government for the people of Guam. We seek recognition of the fact that the Chamorro people have never been granted an exercise of their self-determination and recognition of their process to give the Chamorro people the opportunity to exercise that right.

Under Commonwealth, although Congress would retain very significant powers over Guam, very specific authorities would be vested in the Government of the Commonwealth. These powers would be permanently vested in the Commonwealth, not delegated and subject to revision. This is critical. That is why in the past I have referred to mutual consent as the heart of this act. Without mutual consent, this act just becomes another Organic Act.

When I left office, we were working closely with the Clinton administration, as we had with the Bush administration. Through their representative we signed agreements in which the administration agreed to mutual consent over the act. Unfortunately, in the Bush administration, signed agreements were reneged upon, and now it seems in this administration agreements reached with Mr. Heyman and his successor, Mr. Garamendi, are also being reneged upon. We have trusted in the administration, and Mr. Chairman, our trust has been betrayed.

Mr. Chairman, with all due respect for my language, Mr. Garamendi has just massacred the heart and soul of our people, their dreams and aspirations. He has been dishonest in his statement. Mr. Chairman, we shall continue to fight. I am sure that what I say today—that the Federal immigration in Guam will refuse my entry into my homeland.

We look to this Congress to restore our faith in the process. Our experience is the strongest proof of why mutual consent is so necessary. After all, if executive branch representatives and task forces are constantly changing their minds and betraying agreements, how can we relay on somebody's simple word? We need certainty, and only mutual consent can provide that certainty.

Self-government—given the limited self-government we seek at this time—is only possible if Congress partially disposes of its plenary powers under the Territorial Clause. In our view, there is no doubt Congress has the power to do this under the plenary powers granted by the Territorial Clause, and the people of Guam deserve to have this done.

There are many ways that Commonwealth benefits Guam, but perhaps the greatest benefit we receive is the least tangible justice. In peace and war, Chamorros have been loyal friends of America. We have been alongside you in many wars. We have supported you, given of our land, our blood, our lives, and nobody can deny that. If any people have earned the consideration of this Government, I can say without fear and contradiction, it is the Chamorro people. I hope the reward for loyalty is just respect. I hope that after 300 years you will do what the Spanish never did, and what so far this Federal Government has not done. We hope you will do what is right for the Chamorro people, for the people of Guam, for America.

And last, Mr. Chairman, I resent the fact that Mr. Garamendi does not believe in our people to exercise self-determination. It is an insult to say that our people cannot distinguish between right and wrong. We are people just like you. We are people like people in America and in every other country, and those people are fortunate to have self-determination. And we have been robbed of that self-determination for over 300 years, and we're still the victim of discrimination.

Mr. Chairman, I ask this august body to take a handle on this process because we cannot trust the administration anymore. For over 8 years they have said, "Let's do this; trust us—and trust us and trust us." And yet as we turn around, and at the end of every administration, they have reneged on all of the agreements that we have signed, too. That is not justice. I beg of this august body to take handle of this and achieve for the people of Guam the same

dream that this American country is noted for in helping countries achieve their democratic process.

Thank you very much, Mr. Chairman.

[The prepared statement of Governor Ada may be found at end of hearing.]

Mr. PETERSON. I'd like to thank Governor Ada for his fine, impassioned testimony, and the other two Governors for their testimony.

At this time, we will open it to questions. Does the gentleman from Tennessee, Mr. Duncan, have a question?

Mr. DUNCAN. Well, Mr. Chairman, no; I don't have any questions. I just would say I thank the witnesses for coming this great distance and taking such time to get here, and I certainly can understand why they would desire more self-government. I did read this description of the bill that says, "U.S. income taxes will generally not apply to Guam, yet Guam will receive the full State level of Federal assistance and programs." And I wonder if there might be some way we could get that to apply to the citizens of Tennessee, also.

[Laughter.]

But I am very favorable toward what they're requesting. That's all I would say at this time.

Mr. PETERSON. Mr. Farr, from California.

Mr. FARR. Well, thank you, Mr. Chairman. I want to welcome everyone to Washington, and to my Chamorro friends, Hafa Adai.

I want to tell this committee something. I served in the California State legislature, and in 1992 I had the opportunity to lead a group of State legislators from the Western United States to Guam for a legislative conference. That experience opened my eyes. It opened my eyes to the fact that so few people who live on the mainland even know where Guam is or how far away it is. In fact, you can't get there from here. You can't get from Washington to Guam. You can't get from the west coast to Guam without going through Hawaii or some other place offshore. It is so far away that most people on this side of the globe don't get there.

What I was struck by is what an incredible island it is, a beautiful place that obviously generates its income from tourism and the pride of the Chamorroan people. It's an incredibly rich culture, and it's a very diversified island. In fact, I would submit that that island is more diversified than any congressional district, and there are only 135,000 people on the island. The island's economy is in the region.

Everything done there, though, is dependent on Washington, DC. Why does Washington want to be so possessive, so paternal about a place that most of the bureaucrats have never even visited? And yet those bureaucrats are in control of the ambient air quality of Guam. People don't even know about prevailing winds; the wind blows all the time. Anything that goes up gets blown away, and yet you have bureaucrats out there checking the ambient air quality, trying to do things on wetlands in Guam. It's a small island, and yet we put all that bureaucratic legislation on top of them.

I mean, if you are in Guam and you sit there and try to understand why this country has been so possessive of an island, not allowing people to have self-determination, I think you begin to echo

what the Chamorro people are saying, which is, “Let my people go.” Congress, let this bill go. Move it through Congress; put the pressure on the President to make sure that they deal with this island to give people some self-determination. That is the American way.

Thank you, Mr. Chairman.

Mr. PETERSON. Mr. Cannon?

Mr. CANNON. Thank you, yes. I would like to ask one question just to give the panel an opportunity to dispute a little more on the issue.

First of all, I was thinking that maybe many of the States would like to join in Mr. Farr’s sentiments and get rid of many of these federally imposed laws. In fact, you could come over on this side if you’d like, Mr. Farr. We’d love that.

Mr. FARR. Well, you have State’s rights, and they don’t have State’s rights; that’s what they’re asking for.

Mr. CANNON. That’s right. On the other hand, this august body is often difficult to work with, and then if we’re not able to pass the Guam Commonwealth Act, what are the three of you thinking are the next steps for Guam? When I say “not pass,” I mean in this session or the next session. It may take us a while to move that forward. What do you think are the next steps for Guam?

Governor GUTIERREZ. Well, I think the process at this particular time, as the door was opened by this administration, is to have a tri-partite negotiation process between the people of Guam, as mandated by H.R. 100, this administration, and this Congress, who has this plenary power to make that final decision. What we have been going through in an exercise of futility is the fact that we have to come back and negotiate with this Congress again. We have made a lot of progress.

I think the core principles as embodied in H.R. 100, as the people of Guam have voted on it, need to be brought to a closure. The opening of this administration to say that if we put this tri-partite negotiation together, that we should look at June 20, 1998 as the drop-off date that we should come to some kind of a resolution to this 100-year quest by the Chamorro people, it’s only right, Congressman, that if all else fails with this Congress, the people of Guam then will decide that; and I would not want to second-guess what the people of Guam would do.

I am the chairman of the Commission on Self-Determination, present Governor, and I’m carrying the mandate of the people of Guam to this Commonwealth Act, and I can only speak to that at this particular time.

Mr. CANNON. Do the other members of the panel want to address that at all?

Governor CALVO. I am the oldest of the Governors here, so I have been removed from politics, but I can tell you that not only are our aspirations, Mr. Chairman, good for us, but I think it is a good investment, a very good investment for this Congress to consider giving us what we’re asking. And the reason I say this is because we just had a situation where what happens in Hong Kong affected the whole Nation, the whole globe. And I think that you have an opportunity to have a presence—not just a colony, but a presence—U.S. soil.

And you know, I know that we have been coming to the Congress here, and we're saying, "Hey, practice what you preach." You tell China what happened in Tiananmem Square was wrong. You know, you tell third-rate countries that, "Hey, you should treat your citizens—remember civil rights and civil liberties." That is nice, but I'm sure that everybody asks, "What's in it for us?" And I say you are against us because we are thousands of miles away, and although we are Americans by virtue of your act, you can take it away from us at any time.

But if you were to—the trading partners of the United States, which are Korea, Japan, China, New Zealand, Australia, and Taiwan, they comprise about 46 percent of all the global production. And they say that in China, by the year 2010 or 2015, it is going to surpass the United States. I think that it's not just good for you to consider what's good for us, but it is good investment for the United States.

And even though I'm not involved in the process that Governor Gutierrez is involved in, being the chairman, I think that besides asking the question of what is good for us, the people of Guam, ask what's good for the United States. Because this is where the action is—so pass it.

Governor ADA. Mr. Chairman? May I also respond?

Mr. PETERSON. Mr. Ada wants to answer.

Governor ADA. Mr. Chairman, I've been in politics for 24 years, and I've often come to Congress to testify before the Ways and Means Committee. And I always remember Congressman Yates looking at me, testifying before him on budgetary matters, and he would always say to me, "Mr. Speaker, why don't you go back home and develop your economic potential, and do something back home to generate revenues for your people?" And I looked up to him, Mr. Chairman, and in my own mind I wanted to tell him, "Mr. Chairman, you have tied our hands for so many years that we cannot move ahead economically."

This is the reason why, Mr. Chairman, that we are embarking on this Commonwealth, because we want some economic liberty where we have very limited resources in Guam, and we cannot in any way move ahead and take advantage of the creativeness of our local people to go into ventures without having the Federal Government coming in and tying our hands.

The Governor here mentioned prosperous garment factories in the 1970's, prosperous watch factories in the 1970's; hundreds and hundreds of our local people were gainfully employed. But through the efforts of the people in the US, the garment industry people and the watch industry people—the lobbies—who had influenced the administration to kill the industry that we had in Guam that we had been exporting—approximately $100 million worth of garments and watches into the United States—and at the same period of time other countries, like Hong Kong, Taiwan, and Japan, have been exporting into the United States $6 billion worth of garments and watches, compared to the $100 million worth of garments and watches from Guam, and this as a result of the lobbies killing and robbing our people of their livelihood.

These are the kinds of things that we want to prevent in this Act, and this Act will help. If you look into this Act, Mr. Chairman,

and members of this august body, you will find that it will mutually benefit all of us because it will give our people that opportunity to achieve their dreams and aspirations, to be innovative and creative, and at the same time be less reliant on the Federal Government coffer. And we have done that so far, even with the fact of the Federal constraints imposed upon us. We have accomplished what other people can't believe that we have so far, for many years.

But we are looking for the next generation. It is our duty and obligation to provide the economic environment for the next generation, because we just can't work for this generation. And that's what this Commonwealth is all about, Mr. Chairman.

Mr. ABERCROMBIE. Mr. Chairman—would the gentleman yield on that last answer?

Mr. CANNON. Yes.

Mr. ABERCROMBIE. I want to make absolutely sure—Governor Gutierrez has presented a much different approach, Mr. Ada. Are you telling me that this Commonwealth bill is an opportunity for you to have labor that will not meet standards, like minimum wage and health and environmental standards? And that you want to have Guam considered as if it was China and the rest, which I oppose?

Governor ADA. Mr. Congressman, I am glad you asked that question, and I challenge each member of this august body——

Mr. ABERCROMBIE. Just a moment, Mr. Ada—you're not going to challenge me to anything. I can tell you that right now. You're not going to run for office on my time.

Governor ADA. I'm trying to respond to your question, Mr. Chairman.

Mr. ABERCROMBIE. I just want a simple answer. I do not read H.R. 100 in the manner in which you have just described it, and Governor Gutierrez's approach seems much more likely to succeed. Now if I understand you correctly, if I understand what you're stating here, you have a different interpretation of H.R. 100 than I do.

Governor ADA. No, sir. The reason why I said that I challenge each member—not to be disrespectful, Mr. Congressman. You have been misled by the administration in so many ways. In the end, it guarantees that Guam would not implement any law that is lesser of the U.S. labor law. We should not implement any law that would also be contrary to wages, and so forth. We will uphold the labor law, and the only thing that we can do is do even better than what is in the Federal labor law. So we do honor and respect the labor laws, as well as where wages are concerned, and it's for that reason, Mr. Congressman. I'm sorry if I tried to imply that you haven't read the act. I understand that that's another matter, but it's been so often misrepresented.

Mr. PETERSON. I feel called upon here to call a recess for 15 minutes where members will be free to go vote, and then we'll be right back. So this will give those of you sitting a chance to stand and stretch and take a breath of fresh air, and we'll be back shortly.

[Recess.]

Mr. PETERSON. Ready to go back to work? If we can find our Governors, we'll proceed.

Governor GUTIERREZ. I'm here, Mr. Chairman.

Mr. PETERSON. If everybody could take a seat, we'll get started. We have a lot of territory to cover yet—that slipped out.

[Laughter.]

Mr. PETERSON. We're going to get started now, if I could have your attention.

I will call on the gentleman from American Samoa, Mr. Faleomavaega.

Mr. FALEOMAVAEGA. Thank you, Mr. Chairman. That's all right—you've just slaughtered my name, but I know you mean well.

Mr. Chairman, I would be remiss if I do not also offer my personal welcome to the three distinguished Governors whom I've had the privilege of knowing personally: Governor Gutierrez and Governor Calvo when I was formerly a staff member of this committee—ages ago—and my good friend, Governor Ada, for their presence. And I also welcome my good friend, Ron DeLugo, who is former chairman of the Subcommittee on Territories, who is here with us.

Mr. PETERSON. Would the gentleman yield? We need more quiet in the room. If you need conversations, I guess whisper or go outside. We really do need your attention.

The gentleman may proceed.

Mr. FALEOMAVAEGA. Thank you, Mr. Chairman. I had hoped that my good friend from Hawaii, Congressman Abercrombie, would be here because there were some questions and issues that he raised that we wanted, not only for purposes of clarification, but as well as for his edification and understanding of the problems with the insular areas, separate and apart from the history of Hawaii when it became a territory, an incorporated territory, and then eventually became a State.

But I would like to thank the three Governors for their profound statements, and I just wish that more members of our committee would be here so they could receive a little sense of education about what happens out there and the problems that we're faced with when issues such as this come before the committee for consideration.

I would like to ask Governor Gutierrez, as chairman of Guam's Commission on Commonwealth, I made an earlier statement to Mr. Garamendi that, in my humble opinion, for the past 8 years we have not moved one inch since the proposed Commonwealth Act, and the fact that the people of Guam have voted, have given their consent, that this is what they want.

Do you think, Governor Gutierrez, that we have a problem here with the process? You know, we all know that it took over 10 years, I think, for the Federated States of Micronesia to negotiate their Compact of Free Association until finally it was approved by the Congress. I believe, also, that your cousins in the northern Mariana Islands also took several years before their covenant relationship with the Congress was also approved, so I'm having a little problem here with whether it is the process that is the problem, or is it because of the substance?

It was almost like the document has already been approved by the people and the voters of Guam, and it seems to me that this kind of locks in everybody. It's either a take-it-or-leave-it basis for

the negotiators to go in there. Is there any sense of flexibility in the process, like the way the Compact of Free Association was negotiated? You know, it was a give-and-take; it took over 10 years to do this. Now, 15 years later, after the voters of Guam opted for Commonwealth, your own sense of definition of what Commonwealth is—because it's not like Puerto Rico's Commonwealth; it's not like Pennsylvania's Commonwealth status. So I am in a quandary as to, is it the process that we're having a problem with?

My own sense, my feel right now of the situation, is that we have a document in place, the people of Guam voted on it. How will it be possible, then, for the members of the administration, or even the Congress, to have any sense of negotiation or flexibility if, in fact, the compact is already written in stone, so to speak, by the people of Guam? Do you see the problem I'm having?

Governor GUTIERREZ. OK.

Mr. FALEOMAVAEGA. And I would please welcome your suggestion.

Governor GUTIERREZ. Thank you very much, Congressman, and let me say that the problem is a little bit of both, I think—the substance and the process. And the fact that we're not blameless in this situation either; the people of Guam are not blameless in this. And, certainly, the Congress, when they sent us to the administration in 1989, it was a mistake—without themselves weighing in.

The difference between the freely associated States and the CNMI, at the time that they had negotiators, you had Ambassadors doing it. They were not U.S. citizens. Now when you look at Guam, you've put us in this United States citizens mold, and, suddenly you tell us that "You're a United States citizen. You have no right to negotiate with your own Government." And this is where the problem lies.

Now as we move forward, we have to take who's got the power and the authority to make things happen, and it's Congress. And if Congress does not weigh in at the outset, you're going to continually see this process dragged on for the next millennium. And so the suggestion as we spoke with this administration—and you heard it from Mr. Garamendi; it was not without my knowledge—is that we continue to open the door, but have a tri-partite negotiating theme and a deadline set—and I suggested the date June 20, 1998, the 100th year of the raising of the U.S. flag over Guam.

If you put that in the process to move forward, then you would see the substance and the process actually work. It won't work now. But the testimony—I'm a forever optimist, Mr. Congressman, and people take potshots at Mr. Garamendi for his statements. I've been dealing with the gentleman for over almost 2 years. I know what he feels in his heart. I think his inner-being knows that he despises colonies. I know I spoke with President Clinton. His inner-being despises colonies.

It's trying to break through this mold and this box of constitutionality, which we ought not to be thinking in. We ought to step out of this box and start to realize that to be able to bring a people such as Guam, with a unique history, to move forward in a relationship that gives some dignity to the island and its people, you've got to step out of the box. And if you continually stay within these

constitutional questions, we will never come to any resolution of the problem.

And we say to you, Congressman, that for 100 years you have inculcated in our minds, if not ingrained in our minds, true representative democracy and the system that makes this Nation great and that makes it work. And if you don't allow us to come forth and get a unique relationship—because you're telling us that Statehood is out of the question; you won't give us the two senators and a representative that can vote; so, therefore you have to give us some unique representation here. And the process as we have envisioned it with this administration is to put together a mechanism such as a Federal commission in which Guam has input—not veto power, but input into the way the laws are made that govern our lives.

Mr. Farr has been out there, but I would say that 99 percent of the Congressmen and Senators have never been to Guam, but they continually make legislation that impacts my life adversely without their knowledge. And I don't think they like or have to do that if you had a commission come in to say, "Wait a minute, Senators. If you allow this bill to pass, it might hurt Guam." Now if they don't want to take that advice, then Guam is going to be negatively impacted. But it requires that this commission have some high-level people in it, appointed by the President of the United States.

Now this is our representation in Congress, and it doesn't have a veto power, but it has some meaning. Because if you don't give us the Senators and the Congressmen, obviously, then, we have to devise a unique relationship, and that's all we're asking for. We want to be continually a part of the United States. It's part of me. My very first memory—my very first memory, walking out of that concentration camp at 3-years-old, was that G.I. walking me out and carrying me—that smiling face. So you cannot take away from me that America is great. Anybody that says Americans are no good has a fight with me.

But I say, also, in the truest sense of democracy, that you have to do something with how this Government was founded in the first place and to embrace all that are US citizens. You can't leave us out there, out there 10,000 miles away to fend for ourselves, because we are America in Asia and you have to understand it from that perspective.

Our economy is Asian economy, and if you continue to have those Federal laws bind us from moving forward, growing our economy, then you will see that there's tension building, and then you will see that there's not going to be harmony with the relationship with the United States.

And the people that we face daily is the US military out there. We still want to be able to do that, but for God's sake, make sure that the people of Guam get more of their internal self-governance. That's all we ask.

Mr. FALEOMAVAEGA. Governor Gutierrez, within the matter of 7 or 8 months, you will have reached 100 years. Whether we're going to celebrate it, or whether we're going to do something else to commemorate the 100th year of the relationship existing between Guam and the United States—and I want to ask for your best opinion—what are we going to celebrate next year?

Governor GUTIERREZ. Well, if Congress says,"Yes; we'll go on the tri-partite negotiations," I think we would celebrate a renewed relationship that moves us into the 21st century, that the people of Guam would allow for bringing to a closure, as Congressman Underwood said, the right to self-determination of its people. And I say to you: Not to worry, Congressman. You have taught us well in American democracy, and I don't know why anyone would worry how the people of Guam would choose if you give them that opportunity.

Mr. FALEOMAVAEGA. I'm sorry, I didn't mean to—Governor Calvo, Governor Ada?

Governor CALVO. I was just going to say that Governor Gutierrez covered the subject very well, but I'd just like to put a more practical prospectus into the situation. We are American citizens, a possession of the United States, which is quite different than the northern Marianas and the rest of the islands. And in fact, during World War II, we were the only island that was with the allies. And so you have a situation—and also, we're the island that has the military presence.

It reminds me of when I was young; you know, when you are courting your girlfriend, you are very nice and you promise her heaven on earth, but once you get married, some people look at their wives as their possession. And so in that way, I feel that Guam is a spouse of the United States. And they say, "Hey, stay at home and do exactly what I say. Don't do what I preach out there, just do what I say." And I know it's kind of hilarious, Mr. Chairman, but that is the difference between Guam, the northern Marianas, and the rest of Micronesia. We are a possession. We are a colony.

And, of course, somebody was mentioning—the gentleman, I think, from Connecticut—the Congressman from Connecticut—that why should you be so possessive when all we're asking is to be like you over here. Thank you.

Mr. FALEOMAVAEGA. Governor Ada.

Governor ADA. Thank you, Congressman. I just would like to ask this august body to issue a directive in some form to the administration to carry this process if this is your wish, or take handle of this process yourselves. I have experienced the frustration of having to sit across from the task force of the two previous administrations and have come to an agreement on major issues, such as consultation with the military on various matters, such as the immigration laws, such as the trade policies; and the most important part, the part that everybody has said is unconstitutional, is the mutual consent provision. We had come to an agreement.

Michael Heyman, a noted law professor, chancellor of Berkeley University, was the Clerk of the Supreme Court during the 1960's—he had drafted the proposition and submitted it to the administration that mutual consent is do-able. We have worked on this issue for many years, and we have researched every constitutional issue with respect to mutual consent, and to this date, every time we have reached an agreement and at the end of every administration, the major concessions, the major agreements that we have signed were reneged. It happened again during the Clinton-

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 69 of 542

administration. I mean, there is absolutely no trust, and then they come before Congress and mislead the Members of Congress.

A question was asked here earlier about the fact that under the Commonwealth that we are proposing to have slave laborers if we do have a garment industry in Guam. That is not the case. Congress has been misled. We, in the Commonwealth, if you've read the Commonwealth, we protect the integrity, and rightfully so, of the laws passed by the United States with respect to labor and wages, and we will not do anything less than to uphold that law or to strengthen the law to protect laborers.

These are the types of things, Congressman, that bother me, and there must be some kind of direction that you receive the appropriate recommendation. If they do disagree, let it be so, and let Congress handle that matter themselves, but not to disagree under the guises that it is unconstitutional, because there is nothing unconstitutional in the section of the Commonwealth of Guam.

It has been researched very well, and to use that argument is to deceive not only the people of Guam. It would be an insult that we don't know what we're doing, but it would be more of an insult to Members of Congress to tell them this is the case where it is not the case, and this is all we're asking, Congressman.

Mr. FALEOMAVAEGA. Thank you, Governor Ada. Mr. Chairman, my time is up, and for a matter of observation, I want to also mention to Governor Ada that California has higher labor standard laws than the Federal Government, and I think that's what you were trying to explain about the fact that Guam will enact or pass laws—if not the same standards as the Federal, or even better.

Governor ADA. That's right.

Mr. FALEOMAVAEGA. So I appreciate your clarification on that. Thank you, Mr. Chairman.

Mr. PETERSON. I recognize the gentleman from Guam, Mr. Underwood.

Mr. UNDERWOOD. Thank you, Mr. Chairman, and I sure appreciate the testimony of the three Governors, certainly the practical approach of Governor Gutierrez and the impassioned pleas of Governor Ada, and the fact that Governor Calvo has encapsulated that this agreement is not just good for Guam; it's good for the United States, are legitimate parts of the enterprise which comprise the Commonwealth Act. These three approaches are all very strongly felt, and these are all ways of viewing the proposal which will help us perhaps bridge the gap and move us in the direction of passage.

I noticed, Governor Calvo, that you mentioned that this is somewhat like after marriage and after you slip on the ring. Some people would not compare our relationship as one of marriage, but rather one of being a kept woman; more like, if I give you an apartment, would you just keep quiet? And that if we just give you so many Federal programs, would you just keep your issues about self-determination and increased autonomy and power to yourselves?

I also just wanted to touch briefly on the issue of the interchange between Mr. Abercrombie and Governor Ada, and I clarified with Mr. Abercrombie that Guam is not at all seeking the kind of things that he may think, that what we really had in that situation was

that as an industry started to take off on Guam, lobbyists were able to switch the quotas on us and destroy the industry.

And it wasn't because we had standards that were less than those that existed in the 50 States; indeed, all the existing standards on Guam are comparable to the 50 States, and, indeed, we have the full application of minimum wage. In fact, at times, Guam's minimum wage has actually been ahead of the Federal minimum wage, so there's no issue about wages, and certainly there's none of the problems that are associated with labor standards.

There are two questions I would like to ask. Since all of you have been chief executives, and one the incumbent, and I know, Governor Calvo, you were the very first chairperson of the Commission on Self-Determination. The first question I'd like to ask is, is this business about being a tribe. Have any of you ever heard a reputable call or has anyone ever expressed to any of you any interest in the Chamorro people of Guam becoming a federally recognized tribe for purposes of exercising sovereignty?

Governor ADA. No.

Governor CALVO. No.

Mr. UNDERWOOD. Governor Gutierrez?

Governor GUTIERREZ. I'm sorry; I wasn't paying attention.

[Laughter.]

Mr. UNDERWOOD. Oh, you're filling out your tribal enrollment sheet, are you?

[Laughter.]

Governor GUTIERREZ. I'll see if I can pass some notes up to someone.

Mr. UNDERWOOD. The question is, In your capacity as chairman of the Commission on Self-Determination, have you ever heard a reputable call for the acquisition of tribal status for the Chamorro people in order to exercise sovereignty?

Governor GUTIERREZ. I've heard of it.

Mr. UNDERWOOD. But do you consider it a reputable proposal?

Governor GUTIERREZ. Not from the people of Guam, themselves, but a few corners.

Mr. UNDERWOOD. Basically from people that aren't even from Guam.

Governor GUTIERREZ. Well, they're trying to get some people from Guam to see it their way, but the people of Guam and its leadership have generally not moved forward in that direction.

Mr. UNDERWOOD. OK, thank you; then the one remaining issue that I'd like to solicit your comments from: we've noticed that in the representation by Mr. Garamendi of the Clinton administration's position on this, full local control of immigration has been rejected as a cornerstone of the Clinton administration's position, but they did concede that there was some possibility for making some kind of Guam-specific immigration policy, either in terms of providing relief for temporary workers or, perhaps, for limiting the impact of permanent immigration. And I wanted just a brief statement from each one of you, whether you see some room for maneuvering in that statement, or is that, in the current parlance of the day, non-negotiable?

Governor GUTIERREZ. Well, let me answer first. I see some room for bringing this thing to a—as I envision the principle of immigration control as proposed in H.R. 100, that is to be able to limit the number of people on Guam, particularly because of the size of the island and, you know, the finite resources that we have to sustain a big population in Guam. And the fact that the United States, through this administration's willing to be able to try to uphold that principle, whether we control it or not, is at least a step forward in the way that the Congress in the past has continually made national immigration policies stick to Guam.

So, I think there's room for us to continue. As I said, Congressman, I may be an eternal optimist, but we've got to be able to look at the good things that this administration has just said here instead of jumping all over them and saying that they betrayed us. I'm not trying to take issue with Governor Ada, but I look at it on a different point, and I think it's a call for all three of us to get together. And I heard his pronouncements on the various principles that we are trying to get in H.R. 100, and I think we can get that. We're looking for the mechanism to make it happen, and we ought to continue to let that door open, and let's get moving on.

Mr. UNDERWOOD. Governor Calvo—on the immigration.

Governor CALVO. Yes; I think the fact that our island mass is so small and that we've already got 150,000 people there, that we should have control on immigration. And not so much to exploit—and I think the implication was to bring in cheap labor—but we need control so that we will not be overpopulated.

And one of things that our Congressman is constantly working for is the question of compact impact. Here's a situation where we are spending more than you gentlemen are reimbursing us, and so it's these types of problems that need our input—in immigration, especially.

Mr. UNDERWOOD. Thank you. Governor Ada?

Governor ADA. I think it's a step in the right direction, and I just hope that he is pretty much honest about it.

Mr. UNDERWOOD. OK. Well, I appreciate those comments. There's always a tendency sometimes to characterize the H.R. 100—which is being heard in its entirety as it was passed 10 years ago—as something akin to Biblical revelation; this is not Biblical revelation. It is a piece of legislation, and it is a proposal, and there are some core principles in there that we will not shrink from, and I think those of us who have been involved in the process have identified those principles very clearly and forthrightly.

But, certainly, even in the discussion of immigration, there's obviously some room for discussing some alternative approach which takes into account the principles and the issues which we have identified, and at the same time avoids some of the problems, and, frankly, political considerations which are in the environment.

Mr. Chairman, I ask unanimous consent to submit a resolution and statement from the President of the Mayor's Council of Guam in support of the Commonwealth Act.

Mr. PETERSON. Without objection.

Mr. UNDERWOOD. Thank you.

[The statement of the president of the Mayor's Council of Guam may be found at end of hearing.]

Mr. PETERSON. Ms. Green.

Ms. CHRISTIAN-GREEN. Thank you, Mr. Chairman. I know that my full statement has been entered for the record, but as a fellow American citizen from one of the territories and having a stake in seeing that the integrity of this process is maintained, that the people of Guam exercise their right to self-determination, I really must express my unqualified support for H.R. 100, the Guam Commonwealth Act, and my extreme pleasure that today, after 10 years, the people of Guam are finally getting this hearing on their choice of Commonwealth as their vehicle for self-determination.

And I wanted to add my word of welcome to our colleagues who have testified and to the two former Governors, and Governor Gutierrez, and especially I wanted to add a word of welcome to the many Guamanians who have traveled that long distance to their Nation's capital to be here today to demonstrate their strong support for the Guam Commonwealth Act.

I want to also welcome my predecessor and friend, Ron DeLugo, if he's still here, and to join my other colleagues in commending Congressman Underwood for his determination, his faithfulness, and his hard work in bringing us to this day.

We, on behalf of the people of the Virgin Islands, we pledge our unwavering support in seeing this process through to a successful completion by the 100th anniversary of Guam's becoming part of the American family. This Congress has the power, and it has the authority to do so. And as Governor Gutierrez said, the time is now for us to act.

And many of my specific questions have been answered, but Governor Gutierrez, as you ended your opening statement you said that there might have been other things that you would like to elaborate on, and I'd like to just give you the opportunity to do that, if you wanted to, with the remainder of my time.

Governor GUTIERREZ. Thank you for that opening, Delegate from the Virgin Islands; Donna, thank you.

What I meant was that—you know, the time that you sit up here, as little as it gets, sometimes does not give you the opportunity to say what you want, and what I meant was that I hope that during this period of questioning and answering that we might be able to elaborate more. I have done a lot of that in the very principles that we have envisioned in H.R. 100, and I would like just the opportunity to answer any questions. And thank you for that.

Ms. CHRISTIAN-GREEN. Thank you. I don't have any specific questions at this point.

Mr. PETERSON. OK; thank you. Would the three Governors answer the following question—their views on an elected attorney general. Do you want to start, Governor?

Governor GUTIERREZ. Well, that's fine with me. The situation you've got to look at in Guam—you know there's a position in the Guam legislature now called the Surihanu. The Surihanu is an arm of the legislature to investigate, much as like you have with the GAO. Now they're trying to pass a bill that would make that an elective office within an elective office.

Guam is very small. You can—and I'm sure the people of Guam will accept the election of an attorney general. The problem that we see in the future is that everything in Guam, eventually, would

be so political that I just don't know whether it would work. But whatever the wishes are of the people of Guam, I would abide with. I think it might work. It's going to take time to transition.

I was hoping that it would be placed in a constitution for Guam, written after the Commonwealth Act, so that the people of Guam can really get a Government of its own, instead of this piecemeal legislation coming through the Congress of the United States.

Mr. PETERSON. Mr. Calvo?

Governor CALVO. I think the intent of having an elected attorney general, Mr. Chairman, is to remove it from the sphere of politics and trying, frankly speaking, to remove it out of the control of the Governor. I am not so sure, though, that the cure is better than the disease, because for somebody to be running for attorney general, he will be going out and soliciting votes. That probably will be a more direct political movement than to have been appointed by the administration and sanctioned by the legislature.

I think that I can't foresee how it would turn out, but, you know, the democratic process is election, so maybe trying it out would be the proof of the pudding is in the tasting, but that is my view, Mr. Chairman.

Mr. PETERSON. Mr. Ada.

Governor ADA. Mr. Chairman, I feel that the attorney general, normally an advisor to the Governor on legalistic matters—I am not too strong insofar as having an elected attorney general. However, I am much stronger in supporting an elected prosecutor. I think that that would be a better remedy to separating the function of the attorney general as advisor to the Governor, and the prosecutor as prosecuting cases, so that there shouldn't be any semblance or perception of any political interference.

Mr. FALEOMAVAEGA. Would the chairman yield?

Mr. PETERSON. I'd like to just comment, and then I'll turn to Mr. Faleomavaega.

In Pennsylvania, when we switched from an appointed to an elected—of course, the Governors appointed their chief counsel, but the role of approving contracts was done by the attorney general, who was elected, and in most cases they agreed with the Governor, but not always. There were times when there was disagreement—it was a more independent person—and he sort of becomes the chief legal officer of our State of Pennsylvania, or Commonwealth of Pennsylvania.

Mr. Faleomavaega?

Mr. FALEOMAVAEGA. It's a matter of observation, Mr. Chairman. I just wanted to say that even at the Federal level we still can't decide whether we should elect the Attorney General—or the problems that we're having right now, with all kinds of investigations going on, and to appoint an independent counsel—so whether it be at the State or Federal level, it cuts both ways. It's a matter of preference, I suppose. Some States elect their attorneys general and others don't; but it's an interesting question to the territories. It's a mixed bag; it can go either way.

But I wanted to ask a question—am I?

Mr. PETERSON. Sure; please proceed.

Mr. FALEOMAVAEGA. Two minutes. I'm still a little confused here. We've got the proposed Commonwealth Act. The administration is

having some very serious problems with it, and I'm trying to find out what should the Congress then do if there's an impasse here? Obviously, they do have some very serious problems with the proposed provisions. Now the ideal situation would be that the administration signs off on it and says, "We agree in principle that this is what we like with the compact." So then it comes to the Congress for approval or for whatever changes that need to be made.

Do you prefer the current process, Governor Gutierrez—and all of the three, because all of you have served as chairmen of the Commission on Commonwealth—or is there a better way of doing it? I'm still asking about the process. I don't think it's so much the substance that I'm concerned about.

I have a little positive reaction from Governor Gutierrez, because I get the impression that you think the current process is working, and please correct me if I'm wrong, because there seem to be some difference of opinions here. The current process is not working, and should we here in the committee, right now, have a solution for the problem to solve it, rather than continue on for another year, another 2 years, and then we have another hearing 8 years down the line and we still haven't moved an inch.

Governor GUTIERREZ. Well, the solution would be that just you and I negotiate and leave the administration out.

[Laughter.]

Governor GUTIERREZ.But if this Congress listens to the testimony of this administration, then obviously the best method would be for all three of us to get together. Now, mind you that I'm the chairman of this Commission, and I'm supposed to testify strictly on H.R. 100, but what I heard from this administration and a few of the members of this committee is that it "ain't going to fly." I have to bring that back to the people of Guam and tell them that what they voted on ain't going to fly, and that we need to be able to, as you said, come down with some negotiating wiggle-room to make this thing work.

And I think that the people of Guam will decide in the next few months what they would like to do. If they're so adamant as to say it's all or nothing, then we don't see anything happening by June 20, 1998. I would hope that I can ask the people of Guam to say give us an opportunity—the Commission on Self-Determination, the leadership, our Congressmen—to work in a better method than we have over the last 8 years, and that's to negotiate with all three—I mean the Congress and this administration. And I think if we set a deadline for ourselves, we might be able to see some progress come to fruition.

Mr. FALEOMAVAEGA. Governor, 8 years ago we held a hearing, and my good friend Ben Blaz can attest to this, and chairman Ron DeLugo. We held the hearing in Hawaii, in fact. The first thing and the first impression that most members would have—in the substance now—we're talking substance of the bill.

Governor GUTIERREZ. Right.

Mr. FALEOMAVAEGA. There would be what is known as a concurrent referral. When you talk about trade issues it goes to Ways and Means. When you talk about taxes, it goes to the Ways and Means Committee. When you talk about transportation, it goes to the

Committee on Infrastructure. When you talk about resources, strictly on territorial issues, it's this committee.

The danger that I saw 8 years ago, in my humble opinion, was the fact that this bill was going to be referred to several committees because of jurisdictional problems, because of the issues that are involved. And when you talk about EEZ with foreign issues, foreign relations, it goes to the International Relations Committee. And when you have a bill that is going to be referred to six different committees, with six different substantive issues, it's almost to say that's the death knell of any proposed bill. And, I say this in all honesty and with a sincere desire, just as we tried when my good friend Ben Blaz, 8 years ago—how can we get this thing moving in such a way that Congress and the respective committee system, in such a way, that they could be cooperative in working toward resolving the issues that the substantive part of the bill provides? That's the problem that I see and I've talked to some of our colleagues on the committee, and this is the bottom line. Governor, in all due respect, this is the problem that we face right now with the proposed legislation.

Governor GUTIERREZ. Right. I wish 8 years ago you would have told us no on all those provisions so that we would have done something different instead of telling us to go to the Administration and talk about it and that's what happened.

Governor ADA. Mr. Congressman, may I add to that question? As earlier I did mention that I hoped that this august body will issue some kind of mandate, and that, of course, would be up to you, to the Administration telling them and perhaps giving them a deadline that this act must be resolved one way or another in the Administration side. I just want to say that we have visited practically all of the section of the Commonwealth Act with the Administration. We have signed off to many of the sections and subsections and so forth. We have taken care of the most difficult of the Act; the mutual consent provision, immigration, trade and commerce, consultation on military matters. There are only a few that's leftover. The one issue that the Administration continued to say no is the Jones Act. That's the only one issue that they refuse to even listen or find a solution to the problem. If you have taken and asked of them, rather, to give you all those information and just to go through those things, you wouldn't know that there are solution to all of these issues and those solution are mutually beneficial to all of us, both America and Guam. The only problem that we're having here is that, at the end of every Administration, the entire thing would be reneged or parts of it would be reneged and then they come before Congress and would tell Congress otherwise. All I'm asking is that this Congress would just tell them to sit down, go through this thing, give us what you have at the end of this period, and you handle—and you take it from there. And I do understand, Congressman, that it would take more than 1 year for this august body to entertain the Act because of the nature of this august body. It may take 1, 2 or 3 years. I think that that ought to be a consideration and that's all we're asking, Congressman.

Mr. FALEOMAVAEGA. Thank you, Governor. I didn't—Mr. Chairman, my time is up but I would like to say for the record that this

is the first time that I have heard that you only have one remaining problem in the negotiations——

Governor ADA. Not one remaining. The most important part—the most difficult part—there's other area that are not that difficult to overcome.

Mr. FALEOMAVAEGA. Well, it's my——

Governor ADA. I think, in terms of——

Mr. FALEOMAVAEGA. I'm sorry, my time is up.

Governor ADA. I'm sorry.

Mr. FALEOMAVAEGA. It was my sincere hope, Mr. Chairman, that Mr. Garamendi will provide the committee with a status report on how the negotiations have been for the past 4 years. Al, can that be done, Mr. Staymen? Can we make this as a request, Mr. Chairman, that we get a status report from the Administration of the status of the negotiations with the Commission of the Commonwealth? Just to kind of give us and update where exactly we are? At least from what I hear from the Governors, it is ongoing, it is in progress and I'm very happy to hear this. Mr. Chairman?

Mr. PETERSON. I believe Mr. Staymen shook his head yes.

Mr. FALEOMAVAEGA. Thank you. Thank you, Al.

Mr. PETERSON. One final question for this panel, Mr. Underwood.

Mr. UNDERWOOD. Thank you, Mr. Chairman. I appreciate the comments of my good friend from American Samoa. I must state for the record, however, that the problems with the document, and this is a complicated document of 12 articles and I think both Governor Gutierrez and Governor Ada, who have been more directly involved with the negotiations, have sustained the position that the critical arguments are not within the jurisdiction of other committees. They're within the jurisdiction of this committee and so that's really a call for whether this committee wants to take up the challenge of helping to broker this process or not. And I think that's the status of where we are at this time. I would reiterate my concern that I feel that, you know, to use a well-worn football analogy, it's fourth down and there's quite a number of yards to go. The Administration has apparently decided to punt, rather than throw the Hail Mary pass. Despite the fact that many of us went to Mass this morning to ask for spiritual guidance, the Administration decided to kick the ball.

I just want to make a final comment, Mr. Chairman, on the Attorney General's position. My legislation calls for the legislature, in conjunction with the Governor, to decide whether an elected Attorney General will be in Guam. It's always interesting to ask Governors what they think about an elected Attorney General and I did notice that, unless Governor Calvo is planning a miraculous comeback, he's the only Governor who's not likely to be Governor again and he's the one that's the most favorable to my legislation.

Governor CALVO. Thank you.

Mr. PETERSON. I would like to thank the panel. I would like to thank the members for their good questions. We will excuse the panel to——

Governor GUTIERREZ. Mr. Chairman, just quickly——

Mr. PETERSON. Sure.

Governor GUTIERREZ. I was not able to go through my whole testimony. Could I submit it for the record?

Mr. PETERSON. Absolutely. Without objection.

Governor GUTIERREZ. Thank you. Thank you very much.

Mr. PETERSON. Any questions for the panel can be submitted to the record, too. We'll share them with you. We thank you very much.

The next panel will be the Honorable Anthony Blaz, Vice-Speaker, Guam Legislature; the Honorable Mark Forbes, Senate Majority Leader and Chairman, Senate Committee on Federal Affairs, Guam Legislature; the Honorable Ben Pangelinan, Senate Minority Leader, Guam Legislature; the Honorable Elizabeth Barrett-Anderson, Chairperson, Senate Committee on Judiciary, Guam Legislature; the Honorable Peter Siguenza, Chief Justice, Supreme Court of Guam; the Honorable Alberto C. Lamorena, III, Presiding Judge, Superior Court of Guam.

I'm told that all panelists are here except the Honorable Ms. Barrett-Anderson, so we will then proceed and we will call upon the Honorable Anthony Blaz, Vice-Speaker of the Guam Legislature. Please be——

**STATEMENT OF THE HONORABLE ANTHONY BLAZ, VICE SPEAKER, GUAM LEGISLATURE**

Mr. BLAZ. Thank you, Mr. Chairman. Honorable members of this committee, I am Anthony C. Blaz, Vice-Speaker of the 24th Guam Legislature and Chairman of the Committee on Finance and Taxation. I am also a member of the Commission on Self-Determination.

As our Governors past and present have indicated, Commonwealth is supported by both political parties in Guam. Republican Governor Calvo appointed the first Commission on Self-Determination. Democrat Governor Bordallo's Commission completed the first draft of this act. He was followed by Governor Ada, a Republican, who amended the act, conducted a plebi scite with the people of Guam on every provision of the act and, upon its passage, presented the act to my uncle, the former Guam Republican Congressman, Ben Blaz, who first introduced this act on the Hill. Governor Ada conducted discussions with the Bush Administration and the early years of the Clinton Administration. Today, Democrat Governor Gutierrez heads the Commission, fighting hard in continued discussions with the Clinton Administration and, along with our esteemed Democrat Congressman, Robert Underwood, has brought this act before Congress today.

Every Guam legislature in recent times, whether the majority has been Democrat, as it has in the past, or Republican, as it is today, has endorsed the provisions of this act. All of Guam's municipal mayors, whether Republican or Democrat, have endorsed this act. The reason why this act has near-universal bipartisan support from Guam's elected leaders, past and present, is simple; this act and only this act has been endorsed and ratified by the people of Guam in plebi scite. The voters of Guam have approved every provision of this act, provision by provision. No other act, no other status option has been approved by our people, even when they had the opportunity to do so. And, given the option of voting for independence, they rejected it. Given the option of voting for statehood,

they rejected it. Given the opportunity to pass a constitution, our people overwhelmingly rejected it.

We believe that the vote of our people is sacred and, as an elected representatives of our people, we are morally bound to heed their call. This act is their call and that is a fact. When other options are discussed, they are merely opinions. Although this act is a bipartisan effort, as a life-long Republican, I feel I must give the Republican view of Commonwealth to clarify any misunderstanding.

The official view of the Republican Party of Guam is support for commonwealth status for Guam. It has been in our party platform. In fact, support of Commonwealth status for Guam has been part of the National Republican platform for at least the past two times and, in fairness to my Democratic friends, I must point out that support for Commonwealth is a feature of both the local and national Democratic Party platforms.

As a Republican, not just locally but nationally, I find it very easy to be enthusiastic about Commonwealth because it's good national, Republican legislation, too. The Republican Party believes in limiting the power of the Federal Government over people in general and local communities, in particular. That's what Commonwealth does. As Republicans, we believe in empowering local communities to solve their problems themselves and that's what Commonwealth status will do for Guam. As Republicans, we believe in promoting economic growth as a means of enriching the lives of people and reducing the burden of Federal taxation and spending and that's what Commonwealth does. In so many ways, Commonwealth for Guam ties directly into many primary Republican plans and we hope, in time, that our national Republican leaders will come to appreciate this and liberate the creative energies of our people by granting us self-government and the autonomy to do what we can do for ourselves. And don't get me wrong, this is good Democratic legislation, too, worthy of the same bipartisan support nationally that Commonwealth receives at home. It is unfortunate that, based on testimony we have heard today, the Clinton Administration is unwilling at this time to give the dreams and aspirations of our people the support they deserve. And, that's not entirely surprising. In the years that we've been discussing Commonwealth with the executive branch, we have been involved in endless discussions with low-level bureaucrats and cutoff from true policymakers. We expect bureaucracy to resist change. It always does. We expect bureaucracy to preserve the status quo and the prerogatives of big government. It always will. It is unfortunate that, at an executive level, Commonwealth remains largely hostage to this eternal bureaucracy.

But this Congress, Republicans and Democrats alike, have successfully waged battle against running Federal bureaucracy in a host of areas. This Congress has successfully begun the reform of the bloated welfare bureaucracy. It has streamlined spending, and will deliver us, in short order, a balanced budget. It is tackling tax reform. Mr. Chairman and members of the committee, we humbly ask you to run interference for us with this bureaucracy that is frustrating us on this issue. We do not expect you to endorse this act as a result of this one hearing, of course not. This is the first

time we have come before you in this manner. But we ask you to work with us and discuss the many provisions of this act in the months to come. We gave the Administration years and, surely, we can give you the benefit of reasonable time, as well. We ask that you withhold hasty judgment and engage in meaningful deliberations. If we deal on this issue in good faith, I am certain that both sides will be reasonable. Let us do the work that needs to be done but, unfortunately, the executive branch seems to be dropping the ball on. Surely the express will of our people deserves a fair and full hearing, discussion and deliberation at the very least. I am confident that this Congress will work with us and I look forward to the process as a Republican, as a Chamorro, as an American. Thank you and [speaking in Chamorro] "si yu'os ma'ase," Mr. Chairman.

[The prepared statement of Mr. Blaz may be found at end of hearing.]

Mr. PETERSON. Next, we'll call on the Honorable Mark Forbes, Senate Majority Leader.

**STATEMENT OF THE HONORABLE MARK FORBES, SENATE MAJORITY LEADER AND CHAIRMAN, SENATE COMMITTEE ON FEDERAL AFFAIRS, GUAM LEGISLATURE**

Mr. FORBES. Thank you very much, Mr. Chairman. In the interest of keeping within the 5 minute deadline imposed and having taken a look at my written testimony, I'm going to extemporize and attempt to summarize it as best as I can. I also need to take the opportunity, Mr. Chairman, to respond partially to some of the testimony that was presented earlier.

I was disappointed in the National Administration's testimony, especially one particular portion of it. There was a statement that was made by the Administration representative that, if I understood it correctly, said that, although he might have certain feelings and opinions about Guam's Commonwealth Act in particular and our goals in general, that until, if I understood him correctly, virtually every single person in the executive branch signed off on this, this could not be executive branch policy. And I'm thoroughly confused because I had thought that the process that we were engaged in with the Administration was a process we were having these discussions with a designated negotiator, for lack of a better term, who had been entrusted with a certain degree of franchise. And, to have heard today that, basically, we have to go and convince every single entity in the executive branch on every provision in Commonwealth just presents an impossible task. And I'm glad that we're having this hearing because I think that, you know, although we are obviously going to continue to engage in reasonable discourse and discussion with whoever is interested in maintaining that degree of discussion, it's critical that we start dealing with this on a congressional level. It's important that we talk to folks who have some real policymaking authority here, who can actually do what needs to be done and I think that, at this juncture, it's critical that we understand why we have to come before Congress. Delegate Faleomavaega asked the question earlier. He made a—and I apologize if I didn't hear you precisely, but I believe the question ran along the lines of, since we've already presented this in

plebi scite to the people of Guam and since they have already approved in plebi scite every single provision, is there really any possibility of movement and discussion? What is there for the House to do? And, my response is that there's everything for the House to do. That's the whole reason why we're here. Guam can have innumerable votes, the people of Guam can vote time and time again, and, although it is very meaningful for those of us who represent the people of Guam, legally it's meaningless because we are a non-self-governing territory and our people do not have the personal sovereignty enjoyed by other Americans that gives meaning to their act of voting. The question what is there for Congress do to, is everything. That's what the plenary powers of Congress under the Territorial clause mean. Beyond that, Congress has, at least in our view, a clear obligation under the Treaty of Paris to deal specifically with the issue not only of the disposal and the disposition of the territory of Guam, but, as it is stated very clearly in the Treaty of Paris, determining the civil rights and the political status of the native inhabitants of those territories ceded by Spain. The Treaty is a treaty, entered into freely by the United States, ratified by the U.S. Senate and the specific delegation, in that Treaty, of a responsibility to Congress not only to dispose of the territory of Guam, as it would any territory under the Territorial clause, but to specifically determine the civil rights and the political status of the native inhabitants is a very weighty responsibility. And, in fact, there is no other body, no body that exists, in U.S. law that can deal with this issue other than Congress.

I feel that, having heard the Administration's testimony this morning, that they've kind of missed the boat. What we're looking for fundamentally here, and there is no time to go far beyond the fundamentals, is for the establishment of some degree of self-government for a non-self-governing people. How we see that as being possible is by a partial disposal of the plenary authority that Congress has over the people and the territory of Guam under the Territorial clause. We believe that this is doable. We believe it can be done. We believe that there is sufficient court precedent to speak to the powers that Congress has to do this and we believe there are many creative ways that this can be done which, hopefully, we will discuss in the months to come.

One final note. There have been some comments made by the Administration and by others that the other, very important goal in our quest here, acquiring a recognition of the right of self-determination for Chamorros, is in violation of equal protection clause of the Constitution. Rather than get into a broad discussion of that, I would just like to, again, remind the committee of what it says in the Treaty of Paris. Congress is to determine the civil rights and the political status of the native inhabitants of the territory ceded by Spain. I think that is something Congress can do, as well. Thank you very much.

[The prepared statement of Honorable Mark Forbes may be found at end of hearing.]

Mr. PETERSON. For the record, I'd like to share that the Chair will ask the Administration to share with the committee the process they used that didn't seem to please very many people, make

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 81 of 542

very many friends, or make very much progress, we'll ask them to explain to us that process that was utilized.

Mr. FORBES. Thank you very much.

Mr. PETERSON. What their goals and hopes were. At this time, I will introduce the Honorable Ben Pangelinan, Senate Minority Leader.

## STATEMENT OF THE HONORABLE BEN PANGELINAN, SENATE MINORITY LEADER, GUAM LEGISLATURE

Mr. PANGELINAN. Thank you very much, Mr. Chairman. Mr. Chairman, at the opening of the hearing, a question was asked, where are we at, at this process? Clearly, Mr. Chairman, we are not where we want to be, we are not where we should be, and we are not where we ought to be, and that is the purpose of our presence here this morning, to resolve this dilemma.

Honorable chairman and members of the committee, it is with the highest honor that I appear before you and my greatest privilege to do so, as an elected representative of the people of Guam. I am the Minority Leader of the 24th Guam legislature. To prepare for this hearing, I logged onto the committee homepage and immediately opened the "Hot Issues before the Committee" page, hoping that H.R. 100 would appear. It did not. Today, we appear before this honorable committee seeking to generate the heat requisite to place the Guam Commonwealth Act on the "Hot Issues" page of this committee and this Congress. Today, we fan the embers kept alive by our honorable Nation, which, for nearly a century, guarded the glowing cinders of democracy and liberty in Guam and ignited the fire of liberty in our people who aspire to be America's bastion of democracy in the Pacific. We bare our souls, hoping that you recognize the torch of liberty that is emblazoned in our hearts that we are now willing and able to become full partners as America's living paradigm of democracy and commitment to liberty and freedom for all her people.

Today, we seek to denude the arguments that cloak the hope and promise contained in H.R. 100 which sustained the Chamorro people for decades. Some of you may ask why and under what authority should Congress recognize the political rights, give life to a Commonwealth, and give birth to a new political entity within America, by and for the people of Guam. While some argue that what we seek is not within the framework of our constitution, we believe otherwise. Congress' authority over the disposition of the territory of Guam is irrefutable. Equally unimpeachable is its authority to do so within the broad framework of our petition, H.R. 100. Open the door, the right door, and we will walk through that door. Open the wrong door, and we will turn away.

We fully realize that, absent full integration into the union as a State, Guam will forever be limited to an unequal status within America. We must then apply the words—the words of the great Justice of the Supreme Court, Felix Frankfurter, "there is no greater inequality than the equal treatment of unequals." When Congress treats Guam equally to the States, it treats Guam unequally, for we are not equal with the States. Vested in Congress is the power and the authority to determine the political status of Guam, to grant political rights to the people of Guam, unequal from those

granted to the residents of the States, and to establish the Commonwealth of Guam that is unequal from that of any State.

Mr. Chairman, at the April 1997 hearing on H.R. 856, the U.S.-Puerto Rico Status Act, Chairman Young expressed sadness upon learning of the loss of Donna Pilar Barbosa Rosario, the daughter of the official historian of Puerto Rico, who, in a personal note, wrote to the chairman the morning after the 1996 hearing on H.R. 856. She wrote, “God help us that Pilar Barbosa could live more than 3 years to see what all this results in. So help me God—it’s now or never.”

Today, I bear the same sadness for Guam who has lost someone of equal importance in our quest for Commonwealth, Tun Pedro Perez, a most respected leader, who at the 1989 Hawaii hearing on Guam’s Commonwealth, urged Congress to act on this same Commonwealth. He cried out against the attitude of “Manana, manana,” our political relationship with America, come back “manana.” He pleaded, no more “mananas,” for this old man may not live to see another “manana.” Sadly, 3 years after the 1989 hearings, like Donna Pilar, Tun Petro saw his final “manana” before he could see what all of this results in for Guam.

Honorable chairman and distinguished committee members, nothing is more difficult than not being able to see ahead. For to live without being able to see ahead is to live without hope and a people without hope shall surely perish. Mr. Chairman, now is definitely the time to act to see what all this results in so we can see ahead, so we can restore hope. With a full realization that we will not finish in this Congress, let us act today for action on H.R. 100 gives the Chamorro people the ability to see ahead. It renews hope and promise for our people and, with hope and promise renewed, we know that we, the indigenous people of Guam will not perish. At the start of the Commonwealth, some debated whether we should dare embark on our quest, our journey of hope and promise. To all who dared to start this journey, Tun Pedro and those who are no longer with us on this earth, we vow that we shall not dare to stop the journey that you dared to start until we fulfill the hope and deliver the promise made to our people.

Also, Mr. Chairman, I would like at this time to declare my support for H.R. 2370 and also, Mr. Chairman, to raise the issue of an amendment to the Organic Act with reference to the quorum of the legislature in which local action has resulted in the need to amend the Organic Act to reflect that a quorum consists of a majority of its members and that no bill shall pass and become law unless it shall have been passed at a meeting in which a quorum is present and by the affirmative vote of a majority of its members. I’d like to also ask the Committee Chair to accept my written comments for the record. Thank you, [speaking in Chamorro] “si yu’os ma’ase,” Mr. Chairman.

[The prepared statement of Mr. Pangelinan may be found at end of hearing.]

Mr. UNDERWOOD. [presiding] OK. All your statement will entered into the record. I now call upon the Honorable Peter C. Siguenza, Chief Justice of the Supreme Court of Guam.

**STATEMENT OF THE HONORABLE PETER SIGUENZA, CHIEF JUSTICE, SUPREME COURT OF GUAM**

Justice SIGUENZA. Thank you very much, Mr. Chairman, Congressman Robert Underwood, and the other distinguished members of the House Committee on Resources. It's a pleasure to be here to speak. It is an honor, indeed. I'm here today as the Chief Justice of Guam. My rotating term expires in about a year and a half from now, at which time we Justices will elect a new Chief. And so, at my first, and hopefully final, appearance before you I want to stress the importance of the critical matter which is before us today.

In simple terms, House Resolution 2370 would place the judiciary of Guam on an equal footing with its two coordinate branches of government. As you will note, the inherent powers of both the Executive and legislative branches are clearly delineated within the Organic Act. Only the structure of the Judiciary lacks this kind of clarity. Ironically, the original local legislation which created the Supreme Court distinctly outlined the Court's authority, clearly placing administrative and appellate jurisdiction within the Court. In this sense, H.R. 2370 undeniably reflects the will of the people. Virtually every provision within the Judicial Empowerment Act before you today mirrors the 10-year drafting process with culminated in the passage of the bill in 1992. It is significant to point out that no effort was made to alter the bill for the next 3 years. The legislation sat intact and untouched for nearly 4 years, that is, up until the ceding of the Court in April 1996. At that time, on the eve of the confirmation hearings of the Justices, efforts were undertaken to alter the legislation and curtail the authority of the Court. In effect, what had taken a decade to build was summarily undone within 3 months. In fact, since the Court's inception, there have been no fewer than 4 legislative attempts to undermine the Court's administrative authority and, even as recently as last month, a successful legislative bid to limit this Court's legal jurisdiction.

Let me briefly share with you the chronology of this Court. In 1973, the Guam Public Law 1285 was enacted, envisioning a judiciary with a local supreme court at the helm. 1974, the first Supreme Court of Guam is established. 1977, the U.S. Supreme Court strikes down Guam's Supreme Court. 1977, that same year, Guam convenes a constitutional convention. The foundation is laid to establish a supreme court as the judicial and administrative head of the Judiciary. This draft Constitution is submitted and approved by the U.S. Congress. 1984, the Omnibus Territories Act amende the Organic Act to allow for the creation of a supreme court. 1993, the Frank Lujan Memorial Court Reorganization Act is signed into law after its 1992 passage in the 21st legislature. The bill is patterned after the 1973 local legislation, the 1977 draft constitution, and provisions from various state constitutions. The legislation calls for a supreme court of Guam which "will handle all those matters customarily handled by state supreme courts, such as court rules and court administration. Thus, administrative functions of the courts, formerly lying either with the Judicial Council or the District Court of Guam, are placed with the Supreme Court of Guam."

Then, in 1995 in November, myself, Justice Janet T. Weeks and Justice Menessa G. Lujan are nominated to the Supreme Court. Also, in 1996 in March, hours after the Justices of the Supreme Court are confirmed the 23rd Guam legislature passes bill 404, which removes certain inherent powers from the Supreme Court. A second bill, bill 494, aims to strip the supervisory jurisdiction of the Supreme Court over all lower courts. That bill is debated but tabled by the Legislative Committee on the Judiciary. Eight months later, in December on 1996, the legislature attaches the contents of the shelved bill 494 as a midnight rider to bill 776. The legislation passes and is vetoed by the Governor. An override attempt fails by only a slim margin. In short, this is the problem faced by the Supreme Court of Guam and why we seek to have this Court established within the Organic Act. Permit me the luxury of overstating the obvious when I say that a judiciary or any branch of government cannot function independently if another branch can modify or strip it of its powers at will.

The bill before this distinguished panel will ensure that, like the inherent power of the Executive and legislative branches, the corresponding authority of the third branch cannot be tampered with on whim. There are those who espouse the view that the Judicial Council of Guam is the policymaker for the Judiciary. Allow me now to let the record speak for this court when I say that in the 10 years it took lawmakers to craft and fine-tune the bill that created the Supreme Court of Guam, the notion of a judicial council as the administrative arm of the Judiciary was explored and subsequently rejected in that role. The Frank Lujan Memorial Court Reorganization Act, which created the Supreme Court, explicitly envisioned an advisory role for the Judicial Council. And, since that time, the will of the people is not changed. A recent survey conducted on Guam by your colleague and our delegate, Congressman Underwood, in addition to a poll conducted by the Guam Bar Association, along with numerous media editorials, have each independently and resoundingly confirmed the original legislative concept of the Supreme Court as the judiciary administrative helm. This isn't a structure without precedent. The Judicial Empowerment Act would not only restore the initial intent of local legislation, creating the Court, but would also confer upon it the same inherent authority exercised by judiciaries in the 50 States and other U.S. jurisdictions.

In closing, I leave you with the words of Alexander Hamilton, who noted over 200 years ago, "the Judiciary is beyond comparison the weakest of the three departments of power. All possible care is requisite to enable it to defend itself against their attacks." Thank you, Mr. Chairman. I have brought with me copies of the judicial sections from the respective constitutions of every State and U.S. jurisdiction, should any of you wish to view them. It has been a pleasure and I thank you for your time and your attention.

[The prepared statement of Honorable Peter C. Siguenza may be found at end of hearing.]

Mr. UNDERWOOD. Thank you, Justice Siguenza. Your entire statement will be read into the record. At this time, I'd also like to recognize the presence of Justice Janet Weeks from the Guam Supreme Court who is with us here. At this time, I'll call upon the

Honorable Alberto C. Lamorena, III, Presiding Judge, Superior Court of Guam and former Guam Senator.

## STATEMENT OF THE HONORABLE ALBERTO C. LAMORENA, III, PRESIDING JUDGE, SUPERIOR COURT OF GUAM

Judge LAMORENA. Good afternoon and [speaking in Chamorro] "Hafa Adai." Thank you very much for the opportunity, Mr. Chairman and members of the committee, to appear the committee on Resources. I have submitted my written testimony earlier and I would like to recognize the presence of Judge Manibusan, Joaquin Manibusan, Superior Court Judge, who is also submitted written testimony. I have incorporated his written testimony and mine in my oral testimony.

I come before you representing the Superior Court of Guam Judges who oppose H.R. 2370 and, individually, as a member of the Commission on Self-Determination, in support of H.R. 100, the Guam Commonwealth Act. We, as Superior Court Judges, oppose H.R. 2370 because H.R. 2370 is unprecedented in that Congress has always left the internal organizational structure of a court system to the individual states or territories, whether through local law or local constitution. H.R. 2370, if passed, would certainly run contrary to the goal of increased self-government for the states and territories as long as that goal is consistent with the United States's Constitution. In Calder v. Bull, the U.S. Supreme Court recognized that the power to establish the internal structure of a state's courts is at the very heart of a state's sovereign powers. The same principle should be applied in the case of the Judicial Branch of the Government of Guam. For Congress to dictate the internal structure of Guam's Judiciary denies the people of Guam the rights afforded other states and territories. Will Congress next dictate Guam's internal structure for our legislature and for our executive branch? This is a dangerous precedence and is definitely a step toward more Federal control and less self-government for our people of Guam. This is totally contrary to the principle of federalism abdicated by many Members of Congress.

Under the Organic Act of 1950, Guam has had limited self-government. Today, American citizens in Guam aspire to a greater degree of self-government. If Congress shares the goal of self-government for Guam, then Congress must reject H.R. 2370. If passed, H.R. 2370 would have repealed existing Guam law and micro-managed the affairs of the Judicial Branch of government. This means that whenever there is any change needed, we must return to Congress where Guam has no voting representatives to seek the desired change. The internal structure of the Judicial Branch is a local matter. When our Congressman, Antonia Won Pat and Congress passed the enabling legislation creating the Supreme Court of Guam, it left up to the Guam legislature to establish laws to set up the internal structure of the Judicial Branch. Our Guam legislature has already established the structure and the authority of the Judicial Branch. Does it not seem both logical and necessary that proposed changes to the structure of such a system should be determined by our local legislature elected by the people of Guam? As U.S. citizens on Guam, we simply are asking to control our local government. No Federal interest is at stake when self-government

over Guam's internal affairs is exercised in matters not otherwise governed by the U.S. Constitution. I respectfully request that this honored committee table H.R. 2370 and, for the reasons cited, I hope it passes H.R. 100, the Guam Commonwealth Act.

The people of Guam have the inherent to set up our governmental internal organization. Guam's control over its own judiciary goes to the very soul of its quest for self-government. Guam wants a fundamental restructuring of its relationship with the United States, not merely a commonwealth title without commonwealth reality. We are seeking a change in Guam's political status whereby we have the right of self-government, all the branches of the government, including the courts. In conclusion, it will serve the national interests for Congress to acknowledge a sovereignty in matters relating to local issues. H.R. 2370 provides less, rather than more, self-government. As U.S. citizens, self-government for our people, by our people, and of our people must be our ultimate goal. In addition to my testimony, I incorporate the following testimony: the Honorable Joaquin Manibusan, Superior Court of Guam, Judge. Our testimonies have also been endorsed by Honorable Katherine Maramen and the Honorable Steven Unpinqco, colleague, Judges, of the Superior Court of Guam, who together comprise four of the five Superior Court Judges on the island. Thank you and [speaking in Chamorro] "si yu'os ma'ase."

[The prepared statement of Judge Lamorena, III may be found at end of hearing.]

Mr. UNDERWOOD. I thank you, Judge Lamorena, for your comments on my legislation.

[Laughter.]

Judge LAMORENA. On both legislations.

Mr. UNDERWOOD. On both of them. Thank you very much. I also would like, for the record, to enter statements by: former Senator Pilar Lujan, who was author of the Supreme Court of Guam legislation; the comments of Judge Frances Tydingco-Gatewood who supports the legislation as a Superior Court Judge; the statement by the Guam Bar Association, which is in support of the legislation; and Charles Troutman who is the compiler of laws and current Acting Attorney General who is also in support of H.R. 2370. All of those statements will be made part of the record.

[The prepared statement of Ms. Lujan may be found at end of hearing.]

[The prepared statement of Judge Tydingco-Gatewood may be found at end of hearing.]

[The prepared statement of the Guam Bar Association may be found at end of hearing.]

[The prepared statement of Charles Troutman may be found at end of hearing.]

Mr. UNDERWOOD. If Mr. Staymen is here, at the conclusion of some questions—I would like to re-impanel you and ask you some questions relative to S. 210. I just wanted to remind you of my earlier request.

The statements relative to the issue of Commonwealth and H.R. 100, and I would like to ask the three Senators this question. It is the same question I asked of the Governors. Have any of you ever heard of the—or formally support the idea, perhaps, of making

the Chamorro people a tribe in the manner of which the Native Americans are recognized in order for the exercise of Chamorro sovereignty?

Mr. BLAZ. Well, in Guam, we hear of many rumors, some very distasteful, some very good things. I don't—in talking about what has been the will of the people, as the Governors had alluded to earlier, there's been only one plebi scite even talking about the status that we seek, which is the Commonwealth status. As to the desire of the Chamorro people to become some tribe, I—we don't support it and, if it's a rumor, I think we should just dismiss it as such.

Mr. UNDERWOOD. Thank you, Senator.

Mr. FORBES. It's fascinating. I had to fly 10,000 miles to hear that I wanted to be part of a tribe. To the best of my knowledge, there's absolutely no discussion within the 200 square miles of Guam that goes beyond two folks or three. It surely has not been in the mainstream media about the possibility of somehow having Congress—I can't imagine how you would do it, to tell you the truth, but, through whatever mechanism, decide that a people that were acquired as the result of a treaty ending a war with Spain in 1898 suddenly become indigenous Native Americans, I don't understand how that could happen. But this is not a hot topic in Guam, I have to let you know.

And I do have to say one more thing, too, and I say this at some risk, because I understand there's significant money involved here. I am—and again, this is all information that I received here. I understand that a tribe of California mission Indians is really——

Mr. UNDERWOOD. It could be that they are missionary Indians.

Mr. FORBES. Whatever. Is really big behind this and we have had one experience with them. About 9 months ago, actually about a year ago now, during the course of our last election, we had several initiatives on the ballot. One initiative was an attempt to legalize casino gambling in the territory of Guam. This group, apparently, bankrolled the pro-casino gambling side to a significant degree, at least according to public reports, and took a very visible role in the public relations campaign promoting that. For your information, the people of Guam overwhelmingly and resoundingly, and I presume that includes the majority of Chamorros, rejected the legalization of casinos in the territory of Guam. It was a massacre and we thought that was the end of that. Suddenly, there's a suggestion that Guam become a tribe and I don't know, maybe it's just me. There's a part of me that's thinking, gee, what would happen if we really did create a Chamorro tribe? Does that mean we'd have to have a Chamorro tribal reservation? What would the reservation consist of? What would it be? 500 acres somewhere on the territory of Guam? If we did that, could you then build a casino on that property regardless of the expressed vote of the people of Guam to reject casino gambling? I don't know. I'm not saying that's behind it. I'm not saying that's the idea, but suddenly, it all kind of, you know, just came to me. I'm suffering from sleep deprivation, folks, I just got off a plane, so, maybe that's what's happening. But that is my reaction. But to the specific question, is this a topic of great debate in Guam, no.

Mr. UNDERWOOD. Well, you're clairvoyant as well as a representative of the people.

Mr. PANGELINAN. Thank you——

Mr. UNDERWOOD. Senator?

Mr. PANGELINAN. Thank you very much, Congressman, for the question. The only legitimate exercise for the expression of self-determination for the people of Guam have been through the plebi scite process and the only legitimate groups that have participated in the process continue to participate in the process and appear before you in this hall to express an opinion on the Commonwealth Act. Any other representations outside of this process, I believe, is not legitimate and should not merit the consideration of this committee absent a presentation to the people of Guam for whatever status they want to incur.

The missionary Indians visited my office with the local representative and, if the intent of the establishment of a Chamorro tribe is for the expressed authority to enter into a activity that the people of Guam have rejected, I believe the people of Guam deserve to know the truth behind these motivations and absent that, I just believe that it is not a legitimate representation of the desires of the people of Guam.

Mr. UNDERWOOD. OK. If I could also just followup with a brief question of the three Senators. We've discussed a couple of permutations on this issue of self-determination and the development of the Commonwealth process. Some have suggested that we go ahead and develop a constitution first and then we proceed to exercise the Commonwealth. So, I want to get your sentiments on that issue, and also the issue of whether Congress has a role in delegating its authority or disposing of its authority under the Territorial clause and perhaps you can answer that. Mr. Forbes, since you're Chairman of the Federal Territorial Relations, perhaps you can respond to this issue.

Mr. FORBES. Thank you very much, Mr. Chairman. My view and I suspect this is the view of most of us, to engage in a constitutional process prior to a status change is somewhat meaningless. Again, it all stems from the fact that we are a non-self-governing territory. We're non-self-governing. Under the current statutes that exist that authorize a local drafting of the constitution, the constitution would have to be drafted within some fairly narrow parameters, then it would be sent to Congress and Congress would have the ability to amend, to revise, ultimately, to approve. Unless there is, first, a status change, then a constitutional process in Guam simply reduces us to a drafting subcommittee for a piece of congressional legislation. And I'm not saying that facetiously. I believe Guam has to have a constitution at some point, don't get me wrong. The Commonwealth Act is very specific and it says that Guam will draft a constitution but it will draft a constitution subsequent to a change in political statute that empowers and authorizes the people of Guam to exercise, and I use this word carefully, some sovereignty in doing this. I don't mean sovereignty in the sense of an independent nation, I mean sovereignty in the sense that every other person in this room, with the exception of those of us who come from Guam, enjoys. We have no inherent under U.S. law right to exist. Our government has no inherent right to

exist as the governments of most territories do not, and, until, to get to the delegation issue, until there is a disposal of some of the plenary authority that Congress holds and an investiture of some of that power in the people of Guam, anything we do is kind of spinning our wheels. We need to have that investiture and when that investiture and when the people of Guam are acting as sovereign citizens in the same manner that other Americans get to act as sovereign citizens in drafting their constitution, when the votes of the people of Guam are meaningful outside of the confines of our borders and have meaning that carries to Washington, D.C. and to the United States of America, then I am entirely in favor of a constitution. But, until then, I don't know that it would really serve a useful purpose other than to eat some time up.

The issue of delegation is a very important one. Congress already delegates authority to the government of Guam. The very existence of the government of Guam is a delegation of congressional authority. But, it is revokable. It is utterly and absolutely revokable. If Congress chose to, tomorrow, you know, God forbid and I'm certain this would not be the case, but if it chose to, tomorrow, notwithstanding the fact that Senator Pangelinan, myself and Vice-Speaker Blaz were elected by the people of Guam, we could be removed from office, the legislature could be abolished, the Governor could be replaced by the Commander Naval Forces Marianas who would rule by fiat and decree. Those powers exist in Congress. Congress can do that. So long as authority is simply delegated, that will always be the case. It is critical, it is absolutely critical, that the status change be coupled with a partial disposal of those authorities. We believe that it can be done. We believe that, under the Territorial clause, Congress disposes of property all the time. And we think that if there is a serious effort to take a look at this issue, on a broad basis, and not deal with it in such a cursory manner, as the executive branch apparently did, the executive branch who seems to think there are limits to congressional authority, that our view will be justified. And we believe that it is critical that we understand that, fundamentally, there is no purpose to talking about Commonwealth if it does not involve at least a partial disposal of the plenary powers of Congress to the people of Guam.

Mr. UNDERWOOD. Thank you, Senator. Senator Mr. Pangelinan? Or, excuse me. Senator Blaz?

Mr. BLAZ. As to the constitutional question, it's the cart before the horse, Congressman, and I think that Senator Forbes said very eloquently put it. I think that we need to dispose of the situation regarding our political status. First, that question needs to be addressed and answered and resolved before we engage in the process of forming a constitution.

Mr. UNDERWOOD. Thank you.

Mr. PANGELINAN. Thank you very much, Mr. Chairman. Mr. Chairman, the attempt to place a constitution before the people of Guam prior to the resolution of the political status of the people of Guam is an attempt to move the train away from the platform without the Chamorro people on board. And it cannot happen, it shall not happen, and I will not let it happen.

Any kind of resolution with regards to internal self-government for the territory of Guam must first resolve the issue of Chamorro

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 90 of 542

self-determination. It's as simple as that. It is what the people of Guam desire, it is what they voted for. It is concurred with by those people who have voted on the Commonwealth Act, and have said they will give up the right to vote on Chamorro self-determination. They have disenfranchised themselves in recognition of the inherent right of self-determination for the native inhabitants of Guam. We ask that the Congress recognize this, that the people out there have extended and expressed and exercised their constitutional right to a vote, and in the expression of that constitutional right they have chosen to recognize the inherent and inalienable right of self-determination for Chamorros only in resolving the political status of Guam. Thank you.

Mr. UNDERWOOD. Thank you very much and, before I yield to Mr. Faleomavaega, I'd just like to let the two gentleman from the third branch of government know that the primary intent of the legislation 2370 is simply to rectify what is an apparent imbalance in the way that the three branches of government are dealt with. Well, I never went to law school. I did go to some school and in those, I always heard that the three branches of government were supposed to remain separate and co-equal. Now, obviously, in the real world, that somehow gets muddled up and one of the ways that we resolve that is to make sure that the third branch of government takes on the characteristics of an original court of jurisdiction or an Organic Act court, in our case, or take on the trappings of a constitutional court. I recognize the amount of emotion that is involved in the survey which I conducted regarding the elected Attorney General and a couple of other matters before the people of Guam which were subject to Organic Act changes. This was the one that attracted the most attention and was the one that was closest in the outcome of my survey. I certainly don't mean to demean anyone in—who takes another position as my good friend, Judge Lamorena, and I mean that because we were classmates and good friends. I don't mean any disrespect to the Superior Court at all. And, with that, do you have any questions?

Mr. FALEOMAVAEGA. Thank you, Mr. Chairman. I wanted to ask Senator Forbes and I appreciate your raising the issue of the—concerning the Treaty of Paris because this goes, again, to the very fundamental issue that I had tried earlier just to understand exactly, not only the current status of Guam as a territory, how this relates to provisions of the Federal Constitution, and what this means for the Commonwealth Act under H.R. 100. Before asking this question, I would like to note, for the record, I don't know whether it was by fate or by some circumstance but it was just yesterday, by express mail, I received a pamphlet that was sent to me by the Cabazon tribe from California. And I want to express my [speaking in Chamorro] "si yu'os ma'ase" to the good residents and the leaders of Guam for receiving the tribal leaders and the members of the Cabazon tribe when they visited Guam. I am just simply reiterating what I've read of this that was just received yesterday in my office and I kept querying why the gentleman from Guam keeps asking this question about being a tribe. You know, there are 12 tribes of Israel, so the book says and they were very blessed. But I just wanted to raise the question because it does tie into the whole question of treaty rights, sovereignty issues, the

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 91 of 542

right of self-determination, and where does this put Guam in the middle of all these legal terms. The first thing I wanted to raise is that Guam was a byproduct of war and we all live and breathe as a matter of history. Guam was annexed by the United States and, under the provisions of the Treaty of Paris, Senator Forbes, and maybe you can enlighten the members of the committee and for the record, does this mean that the native inhabitants of Guam still had inherent rights of the characterization of being a sovereign people? Still, despite being under or annexed by the United States?

Mr. FORBES. In terms of the reading that I have done, with respect to the Treaty of Paris and the Treaty of Paris, incidentally, has been referenced in certain court decisions having to do with the establishment of the unincorporated territorial status, but the reading that I have done is that the Treaty of Paris basically, in addition to transferring physical possession and sovereignty over those territories that are ceded by Spain to the United States, specifically the Island of Guam, the Island of Puerto Rico, and all the islands that constitute the Philippine Islands at the time of the Treaty, it also transfers—the United States accepted certain responsibilities. Now, what those responsibilities are, although the Treaty is a treaty between Spain and the United States of America, they accept responsibilities for the inhabitants. In this Treaty, they say that they shall determine, and actually, it's much more specific than that, it says Congress shall determine what civil rights the natives, and this is an important point, the natives shall have and, you know, forgive us for freely translating native of Guam into Chamorro, since anybody who was here at the time the Treaty of Paris was concluded, anybody that was in Guam was Chamorro, so, I don't know who they could have been referring to, other than Chamorros, that the civil rights and the political status of the natives of the territory ceded, such as Guam, shall be determined by Congress. Now, to us, that seems a very significant point because under the broad Territorial clause powers that were in existence since the Constitution was established, Congress shall make all needful rules and regulations with respect to the disposal or administration of territories, but here in this Treaty, we have a very specific charge leveled upon Congress, that Congress actually took upon itself voluntarily, to assume responsibility for the people themselves.

Does the Treaty of Paris confer upon Chamorros and, in particular, a certain residual sovereignty? I don't know of that argument can be made. It's very clear to me that Spain is ceding to the United States territory that Spain feels it owns and is ceding to the United States the responsibility to care for Spanish subjects. But, does it definitely place a charge upon Congress to resolve these questions? I think it does. And even more important, I think it opens the door to a way to solve this apparent dilemma that people seem to feel about how can you have an exercise of self-determination just for Chamorros? Well, if Congress has accepted, in the Treaty of Paris, the charge that it will determine the civil rights of the native inhabitants, i.e. the Chamorros in Guam, that, to me, gives Congress very broad powers to determine what those rights are. And, in the past, that broad power has been used by previous Congresses to determine, well, how little rights can we give them,

you know, what can we get away with in terms of denying certain rights? But, the word determine to me is not a minimalist term. It can—it means you can give the Chamorro this many rights or that many rights or as many rights as you want, including the right to exercise self-determination. And, as far as the equal protection clause, we've already had court decisions in the CNMI that have upheld provisions in the constitution of the CNMI that restrict the ownership of property, specifically to Chamorros and Carolinians of CNMI descent and the courts determined there, very clearly, that, notwithstanding the equal rights provisions of the Constitution, that Congress, under the Territorial clause, could pass legislation and, through their endorsement of the CNMI constitution had passed legislation allowing for this apparently discriminatory, although we believe not discriminatory at all, practice to exist. So, we think the Treaty of Paris is a very powerful weapon for arming Congress with the power to resolve these issues favorably and we feel, again, not to pick on the Administration, that the Administration is less than creative in examining this and was quite audacious in attempting to say that you, the Congress, didn't have powers that so clearly you have. There is no limitation on what Congress can do when it comes to territories, and, in this case, what is can do when it comes to resolving the rights of natives in those territories.

Mr. FALEOMAVAEGA. I just wanted to make this observation, Senator Forbes, for the record that as you are probably well aware, that under the Federal Constitution there are two distinct groupings whereby the Congress has direct authority to deal with. Those are the Indian tribes and the Treaty rights pertaining to the Native American Indian tribes, and the territories. And you've just quoted, quite eloquently, that specific provision about the Territorial clause which groups all of us, the rest of us, where territories—but, as I've cited earlier to Mr. Staymen, the problem is that we are the only territories that are placed under this listing that the United Nations has. Indian tribes do not have that in the United Nations. We have it. The Virgin Islands, American Samoa and Guam has that specific listing. And because of our listing as a non-self-governing territory, it also means that not all the provisions of the Federal Constitution applies to the three territories, so—which adds another problem. To say that we're all Americans but in substance, we do not have all the same rights and privileges as other Americans. So, I just want to—and, by the way, historically, too, Congress has never been consistent in its dealings with the territories.

Mr. FORBES. That's clearly the case.

Mr. FALEOMAVAEGA. And I'm just adding more to the problem but I just wanted to share that with you and I sincerely hope that maybe the provisions of the Treaty of Paris will enlighten some of our friends downtown to see that there is a way to resolve this dilemma that we're all faced with constantly.

The counting process, as stated earlier by Mr. Garamendi, when this plebiscite took place in 1982, was it just a plebiscite among the Chamorros in their self-determination or did it include all the non-Chamorros as well?

Mr. FORBES. It was island-wide. All registered voters.

Mr. PANGELINAN. It was all registered voters of the territory.

Mr. FALEOMAVAEGA. Then, why is the Administration making such a big thing about non-Chamorros and Chamorros participating in the process?

Mr. PANGELINAN. It seeks to disenfranchise Chamorros. Well, it enfranchises everybody else. And for me, that is—you cannot reconcile those two positions. The Administration is saying that we cannot, as a Federal policy, disenfranchise those people living on Guam because they happen not to be Chamorros, but we can disenfranchise Chamorros and it's an OK Federal policy. It's doublespeak and it just cannot carry, I think, not only in terms of the Constitution, but I think it—morally, they cannot carry forward that argument.

Mr. UNDERWOOD. And just for the sake of the record, I know my time's up, when the plebiscite took place in 1982, with the vote of 75 percent plus, this voting result included both Chamorros and non-Chamorros, am I correct?

Mr. FORBES. Yes, it did.

Mr. UNDERWOOD. OK.

Mr. PANGELINAN. And the non-Chamorros voted in that to include a recognition of a Chamorro-only vote on self-determination.

Mr. FORBES. Incidentally, not to consume time you don't have, Congressman, I think this committee should look very strongly at the implications of statements that were made by the State Department at the U.N. and apparently in the testimony today about how the Administration seems to suddenly believe that, yes, there is a right of self-determination but that everyone in Guam should vote on it. I thought the Civil War was fought on the basis of ensuring the nullification could not occur and that States could not secede. If someone can leave California, show up in Guam or American Samoa, register to vote in 24 hours, and suddenly acquire a right of self-determination that he or she did not have 24 hours before when they were in California, the implication to me is that this Administration has turned 100 years of history on its head and has suddenly decided that Californians have the right to secede from the United States of America. It makes no sense.

Mr. FALEOMAVAEGA. Senator Forbes, I know my time is up and I want to say that your observation, you hit it right on the head of the nail. The District of Columbia is a classic example of how Congress has exercised its absolute authority. There's supposed to be an elected mayor, there's supposed to be an elected city council. Now they have an appointed board of Governors controlling all the affairs of the District of Columbia whereby some 600,000 American citizens reside. Thank you, Mr. Chairman. I know my time is up.

Mr. UNDERWOOD. Thank you. Mr. Mansur, would you like to raise a point?

Mr. MANSUR. Yes, thank you, Mr. Underwood. Chairman Young has really been fully committed to working supporting self-determination and I think that's evidenced by a number of things that he's done, particularly the past years, all the effort he's been putting into resolving the Puerto Rico statue issue and it's interesting. The fundamental premise of the Puerto Rico Status bill, the United States Puerto Rico Political Status Act, is based on mutual consent because you have three stages and you don't move ahead until you

have approval by the people of Puerto Rico. At the same time, the chairman has made it very clear that he has a real concern for anybody who wants to try and assert that somehow Congress could be legally bound to mutual consent, as opposed to a policy or basically a framework.

The other thing that is really critical in this process which has been mentioned today and which I know the chairman also feels very strongly about are those who state that Congress' constitutional authority under the Territorial clause can be disposed of. In particular, I just wanted to point out with regards to Senator Forbes' statement and I have the fortunate opportunity to know the Senator for many, many years now. But you mentioned in your statement about an unnamed district court case establishing that Puerto Rico is outside of the Territorial clause. Now, that was a Puerto Rico district court decision which they were basing on some of the legislative history about a compact in Puerto Rico authorizing their local constitutional government. Subsequent to that, the Supreme Court did determine in Harris v. Rosario that Puerto Rico is, in fact, subject to the Territorial clause. Furthermore, you also cite correctly the Supreme Court case that says Puerto Rico, like a state, is an autonomous political entity sovereign over matters not ruled by the Constitution and that was PDP v. Rodriguez. However, in that case, the court was referring to the authority that Congress had provided to Puerto Rico for a local constitutional government. And so, it was in the framework of that internal self-government that they had—they were characterized with those powers. Recently, a three-judge appellate court decision, in United States v. Sanchez, said in spite of Puerto Rico having this local constitutional government, and now for almost 45 years, in fact, it's now over 45 years, that Congress, if it so chose to, could, in fact, go in and completely reorganize the government and change it completely. Congress hasn't chose to do that. In fact, if you think about it, even though there is not a legally binding mutual consent, they basically have abided by that principle for 45 years, which is a pretty strong statement in itself. The problem, and the only reason I'm raising this at this time, Senator, is it seems when these kinds of statements are raised here in this kind of forum where we're trying to hammer out what is possible and what isn't, doesn't that bring about confusion in Guam about what is possible?

Mr. FORBES. Actually, in my statement, Mr. Mansur, I said that the Puerto Rican situation was confusing. I said that you seemed to have courts doing maybe this way and then maybe that way on the Puerto Rican issue and, in the statement, Puerto Rico is not mentioned as an example of the ability of the Congress to dispose of property under the Territorial clause. Rather, it was thrown in there to say, you know, some courts are even thinking you might have done it in Puerto Rico. Personally, I believe Puerto Rico is an unincorporated territory and I've said that anytime anybody's bothered to ask me. But, I'm saying that you have some degree of confusion that apparently arises, as best as I can tell, from the vague nature of the legislation in 1952 which seemed to establish a compact but then really didn't transfer any specific powers to Puerto Rico. So, you can have a court simultaneously saying, well, you're no longer really a territory but since Congress didn't give you any

power, you still have to be treated like one. And, I think that one of the reasons why, in our draft legislation, we have attempted, and when I say our I mean Guam's, we have attempted to be more specific about what powers we would like to see disposed of is precisely to avoid ever being in a situation like Puerto Rico is where you might have some authorities who say you're non-territorial, you have other authorities who I personally agree with that say they are territorial and a lot of that confusion stems from vague language, like using the term commonwealth but not attaching anything specifically to it, using the term compact but not having any real terms attached to it. That's why those statements were raised.

We believe that the power that Congress has to partially dispose of doesn't stem from anything having to do with the situation with Puerto Rico. We believe, and again this is thinking outside the box, Congress disposes of territory all the time. Congress has been leasing property, partially, you know, leasing mineral rights but retaining title, and you may say that that's title. But where are the territorial clauses that make a distinction between governmental powers and title? It doesn't.

Mr. UNDERWOOD. OK. Thank you, Senator Forbes. I would offer the observation that I wish the committee had as much expertise on Guam as it apparently does on Puerto Rico.

[Laughter.]

Mr. UNDERWOOD. And that inevitably all these issues always resurface and I want to reiterate the point, I think, that has been made by the three Senators and particularly by the statements by Senator Forbes. One of the things that Guam has judiciously done in this instance is to carefully articulate in specific terms what it wants in order to avoid any of the lack of clarity which has led to interminable court cases in the case of Puerto Rico's own situation and that, in fact, such things as land alienation, there's a very specific authority which has been given in the case of the northern Marianas. And many of the items that we're asking for in this Commonwealth approach that kind of disposal of authority. So, it is possible. In some instances, it's a case of political will. In some instances, perhaps, it's the case of some of our larger insular areas affecting the business that is at hand. But, I'm certainly glad that there has been this extended discussion both from this panel as well as the first panel on the situation that is unique to Guam and the circumstances which are unique to Guam and the legal basis for many of the issues which we forwarded under the Commonwealth Act.

I thank the panel very much. I'd like to call Mr. Staymen just for some brief questions on S. 210, please. Mr. Staymen, on the bill S. 210 and this is for the record. On the bill S. 210, there's a provision in there which was inserted in the most recent version. It wasn't in the past 104th Congress version which we were trying to work at a late date. There's a provision in there on paying fair market value if the land goes to any private owner. I want it clearly established on the record that I am opposed to such a provision and will work hard to strike it if it ever happens. But I do want to ask four questions.

Basically, Mr. Staymen, on page 4 of your statement, you recommended that the refuge—that the statement—we have a provision in there in S. 210 which says that if there's going to be any shift in the amount of acreage which the Fish and Wildlife currently has on Guam, that there is a mechanism established by which both Guam and the Fish and Wildlife Service engage in discussions and, failing any agreement, that the matter be disposed of in Congress. The headquarters property of the Fish and Wildlife Service numbers some 300-plus acres and we figure that this was a useful compromise since we may not ever reach any agreement. But in your testimony, you want to expand that to include the overlay component of the Guam National Wildlife Refuge. Wouldn't the effect of your amendment exempt the entire refuge overlay from the impact of Guam being first in line for land? And this would affect approximately 23,274 acres of land, lands which the DOD agencies hold onto. And you know, Guam is a very small place. Twenty-three thousand acres is a lot of land and it really takes the stuffings out of the whole notion of Guam being first in line.

Mr. STAYMEN. That's not the intent. The intent was to try to clarify the definition which talks about refuge and the purpose of the bill is to transfer those refuge lands but refuge lands, per se, are not subject to transfer by administrative action. And we wanted to clarify that the lands addressed by this bill are the overlay lands. The intent is that they would be, the 23,000 acres you speak of, would be subject to transfer. So, I think we agree that the intent of the bill is to provide Guam with an opportunity to obtain ownership of those overlay lands. But by saying the word "refuge," you are suggesting that the lands up at Ritidian Point, the 772 acres, could be transferred. They cannot except by act of Congress. They couldn't be affected by this administrative procedure.

Mr. UNDERWOOD. Well, I'm not sure that I understand the intricacies of your answer. Are you saying that——

Mr. STAYMEN. I'm not trying to evade this——

Mr. UNDERWOOD. Are you saying that if your proposed amendment is accepted in the context of this legislation, that that land, this 23,000 acres in the wildlife refuge, would still be subject to the right of first refusal for the Government of Guam?

Mr. STAYMEN. It would be subject to the second track of our two-track proposal. The two tracks are land that's not a part of the overlay. Guam would have the right of first refusal and have 180 days to essentially exercise that right. The other land falls into the second track which is GovGuam, and Fish and Wildlife takes 180 days to attempt to reach an agreement on the conditions of transfer. And, if they do, that's done. If they don't, it kicks over to Congress.

Mr. UNDERWOOD. OK, I think I got that. On the other item, on page 4 of your written statement, you state that the administration wants to exempt those lands that are under lease by DOD to another Federal agency. S. 210 states that those lands which are leased prior to May 1 would be exempt from transfer but those properties leased after that date would be covered by the legislation. If you had—wouldn't your amendment encourage Federal

agencies to enter into lease agreements so as to exempt those properties from being transferred to the Government of Guam?

Mr. STAYMEN. We don't believe so. We believe that having the 2-year window, in other words, they would have to be on an active lease, using the land for 2 years, is a reasonable test for whether that agency really needs the land. We don't want people rushing in and unfairly using this land if they don't really need to. What the current bill does is frees agencies. Essentially, if they haven't been using it before that date, they couldn't develop an interest. We have to remember that this——

Mr. UNDERWOOD. I think that's the whole intent.

Mr. STAYMEN. Well, let me just finish to say that this whole bill is perspective. There is, at this time, no specific land excess. This provision may be around 10, 15, 20 years, you know, for a lot longer than that and it's we don't think reasonable to tell Federal agencies that 10 years from now, if they develop a legitimate interest in getting a permit from DOD to use land on Guam, that they should be precluded, then, from continuing that use should the land become excessed.

Mr. UNDERWOOD. On page 6 of your statement, you recommend that public purpose shall not include any transfers to private individuals. I want you to know that we've all gone over the story of the historical context of how lands were originally taken and I'm certainly interested in trying to find a way to resolve the situation regarding lands which includes the original landowners. I also, in your statement on submerged lands, you indicate in your statement that there has been no contention over the submerged lands. And I want to point out to you that I'm going to enter correspondence into the record from the Government of Guam which has indicated serious contention over submerged lands, going back 5 years.

[The information referred to may be found at end of hearing.]

Mr. UNDERWOOD. Are you saying that you are not familiar with any contention over the ownership of submerged lands?

Mr. STAYMEN. The scope of my statement was relatively limited regarding those excess lands adjacent to Ritidian. My understanding—yes, there is contention about other submerged lands but, in the case of submerged lands which were made excess, that Guam, in fact, did not ask for those lands. They had the right under the current Federal Property Act to claim ownership of the submerged lands which were excessed. For one reason or another, they did not claim that. So, I was only referring to that relatively limited amount of submerged lands adjacent to Ritidian Point which were declared excess by GSA and has since reverted back to the Navy, but I might just add that if Guam is interested in them and asks the Navy, they may be willing to re-excess them.

Mr. UNDERWOOD. Well, I would say for the record that that was done so quickly there wasn't enough time to indicate our contention on that.

Thank you. I just wanted an opportunity to clarify those points with you. Thank you, Mr. Staymen.

Mr. STAYMEN. Thank you very much.

Mr. UNDERWOOD. OK, I'd like to call up the final panel. Panel III: Susan Moses, president of the College of Micronesia; Chris Perez Howard, Organization of People for Indigenous Rights; Hope

Cristobal, Organization of People for Indigenous Rights; The Most Reverend Anthony Apuron, archbishop of the archdiocese of Agana; Jose Guevara, vice president of the Filipino Community of Guam; and Debbie Quinata of Nasion Chamoru.

OK, before we begin, I'd like to enter a number of other statements into the record that have been given to me. Statements by: Senator Tom Ada, and Senator Lou Leon Guerrero of Guam; Senator Carlotta Leon Guerrero of Guam; student Neil Weare of Oceanview High School; statement of the Guam Chamber of Commerce; and a statement by Frederick Quinene; statement by—I wish they would sign it at the beginning—statement by several members of the Filipino President's Club of Guam; and that's it for now.

[The prepared statement of Mr. Ada may be found at end of hearing.]

[The prepared statement of Ms. Leon Guerrero, a Senator from Guam, may be found at end of hearing.]

[The prepared statement of Ms. Guerrero may be found at end of hearing.]

[The prepared statement of Mr. Weare may be found at end of hearing.]

[The prepared statement of the Guam Chamber of Commerce may be found at end of hearing.]

[The prepared statement of Mr. Quinene may be found at end of hearing.]

[The prepared statement of members of the Filipino President's Club may be found at end of hearing.]

Mr. UNDERWOOD.

All right, we'll begin with Susan Moses. And, I know that it's very late in the day and we've been at this now for four-and-a-half hours, and, I know, Susan Moses, that you've been enthralled about the whole situation regarding Guam and probably learned more than you ever care to know. So, with that, the president of the Community College of Micronesia.

**STATEMENT OF SUSAN J. MOSES, PRESIDENT, COLLEGE OF MICRONESIA–FSM**

Ms. MOSES. Thank you very much. It has been an interesting day.

And, before beginning, I would like to state that the testimony that I am about to make is being made not only on behalf of the College of Micronesia-FSM, as it's president, but also on behalf of President Alfred Capelle of the College of the Marshall Islands, and interim President Mario Katosang, who is interim president of Palau Community College, who are with us in the gallery today.

Mr. Chairman, and members of the committee, we wish to thank you for providing the opportunity for the presidents of Palau Community College, the College of the Marshall Islands, and the College of Micronesia-FSM to clarify our collective position regarding S. 210 relative to land grant status for our colleges. We will now summarize our written statement which has been submitted for the record.

Prior to 1993, Palau Community College, the College of the Marshall Islands, and the College of Micronesia-FSM, were all part of

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 99 of 542

one system; that being the College of Micronesia. This system was governed by a board of regents through a treaty among the nations of the Republic of Palau, the Republic of the Marshall Islands, and the Federated States of Micronesia. In 1993, each of the three colleges of the COM system became autonomous institutions under separate governing boards in all areas except those related to administration of the land grant programs.

Because COM was designated by U.S. Congress in section 506(a) of the Education Amendments of 1972, as the land grant institution for the trust territory of the Pacific islands, a Congressional amendment is now required to allow each of the Micronesian colleges to administer the land grant programs. This legislative action would, in effect, eliminate one of the last vestiges of the trust territory administration.

Efforts have been undertaken since 1993, for each of the colleges in the COM system to be designated land grant colleges. The COM Board of Regents is fully supportive of these efforts.

We are grateful for the support of Senators Murkowski and Akaka, and the Senate Committee on Energy and Natural Resources for the inclusion of section 3, territorial land grant colleges, in S. 210.

The colleges were supportive of the measure in its original form. However, there is a provision in the final form that is of great concern to us. Section 3(c) of S. 210 stipulates that the current level of funding would remain the same and be divided among the three colleges. This provision would put each of our three colleges at a clear disadvantage compared to similar-sized land grant colleges in the region—such as Northern Marianas College and American Samoa Community College—as it would require the Micronesian colleges to provide full land grant services and programs with only one-third of the funding.

Each of the Micronesian colleges aspires to assume responsibility for all extension and research functions in the areas of agriculture, and mariculture for their respective governments. Full implementation of the land grant programs would build the capacity of each of the colleges to provide these services and thus contribute substantially to each nation's efforts to build the human resource capacity in support of the economic development efforts that the Compacts of Free Association aspire to.

Section 3 of S. 210, would severely limit the capability of our colleges to deliver land grant programs and services. We the presidents of the three Micronesian colleges hereby solicit your favorable consideration to amending S. 210 through the deletion of section 3(c). If such amendment is not deemed possible at this time, then we respectively request that section 3 be deleted from S. 210 in its entirety.

Mr. Chairman, once again we thank you and the committee members for taking time to consider our concerns. We sincerely appreciate the support that the U.S. Congress has provided our colleges over the years and we pledge to continue to implement programs supported by Congress with integrity and excellence.

Thank you very much.

[The prepared statement of Ms. Moses may be found at end of hearing.]

Mr. UNDERWOOD. Thank you very much, President Moses.
Former Senator Hope Cristobal?

**STATEMENT OF HOPE A. CRISTOBAL, ORGANIZATION OF PEOPLE FOR INDIGENOUS RIGHTS**

Ms. CRISTOBAL. [speaking in Chamorro] "Suzumaci. Buenas dias," Mr. Chairman, Congressman Robert Underwood, and members of the House Resources Committee.

[Speaking in Chamorro] "Guahosi a" Hope Critobal. I am the official representative of the Organization of People for Indigenous Rights. Mr. Chairman, I was here in 1985, some years ago with then Governor Radallio, on a similar hearing. And, I am here today, again, representing the Organization of People for Indigenous Rights with a statement on title I, section 102.

One of the primary purposes of the Organization is to protect and to promote the Chamorro people's inherent right of self-determination. We firmly believe that only the Chamorro people in Guam have the right to alter Guam's status from a non-self-governing territory, to one consider to be having a full measure of self-government. We recognize that a part of the discussion of H.R. 100 is a discussion about the right of a people to maximize their existence in their homeland. It's about the right of a people to determine their political destiny as a people, and it is about a right—our right—of self respect and dignity, as a people. And that people, Mr. Chairman, is the native people of Guam—the Chamorro people.

In our efforts—in our organization's effort—to ensure the recognition of our people's inherent and inalienable right, we participated in the commission on self determination meetings, and we are heartened by the inclusion of title I, section 102 in the act. And, we support, in principle, this provision of the act. It recognizes as a cardinal principle of self determination, that in the case of Guam, the pursuit of an ultimate political status is legitimately, morally, and legally, the sole quest of the Chamorro people. We do not, however, recognize H.R. 100 as a self determination or a decolonizing document. We consider it an interim Federal territorial relations document.

For over 100 years now, Mr. Chairman, our people have been frustrated, awaiting the political status process that would restore our dignity as a people to be self governing, and to exercise our right of self determination.

Our Chamorro people are frustrated because we live the negative effects of the unilateral immigration policies of the United States on our small Pacific island. This, and all these, effectively diminishes our social, economic, and political development.

We request that a timetable be set in H.R. 100 for the exercise of Chamorro self determination to coincide with the intent of the local public law 23–147, and act to create the Commission on Decolonization for the implementation and the exercise of Chamorro self determination. Aside from this, our Organization fully supports all other Chamorro rights provisions in title I, as well as section 701, Guam Immigration Authority under title VII.

Next year marks 100 years of colonialism under the flag of the United States. The U.S. Congress in accepting its role in a

decolonization process for the Chamorro people, must take seriously our people's quest to be fully self governing and to determine the ultimate political destiny of our homeland. It has a responsibility to assist the Chamorro people and must not continue to allow the courts to determine the kind of relationship that our people will have with the United States. Our people deserve more than just a mild sway of justice, Mr. Chairman.

We await the serious and open discussions and the decision by Congress of H.R. 100, but we must make it emphatically clear that as you look at title I section 102, that it is in keeping with the provisions of the United Nations charter article 73 that political status chains be specifically related to the people who are a historically and a non-self governing people. This cannot be interpreted in any reasonable fashion as meaning any other people than the Chamorros. It is time that the United States live up to the provision. The Chamorro people's inherent right of self determination— It's time the United States live up to its responsibilities by recognizing legally, in a accordance with its own constitutional provisions, the Chamorran people's inherent right of self determination, and we ask that Congress approve title I section 102 as it stands.

Mr. Chairman, we believe that the essential meaning of the United States Constitution is to promote and protect and defend the dignity and the integrity of people.

There is a saying in Chamorro, Mr. Chairman, [speaking in Chamorro] "I taotao ni'ha sedi na uma gacha', ha miresi na uma gacha'ya uma figes." Mr. Chairman, our people have been a strong and a spiritual people. We derive our spirit on Chamorro from God, our families, and the sustenance of our homeland. We will fight that our pride, our self respect, our dignity, will not be sacrificed with the removal of the Chamorro rights provisions in H.R. 100, lest we be crushed. Our people deserve nothing less. Long live the Chamorro people. [speaking in Chamorro] "Biba Chamoru."

"Si Yu'os ma'ase," Mr. Chairman.

[The prepared statement of Ms. Cristobal may be found at end of hearing.]

Mr. PETERSON. [presiding] I'd like to thank the lady.

The next witness we will call will be Chris Howard.

**STATEMENT OF CHRIS PEREZ HOWARD, CHAIRMAN, ORGANIZATION OF PEOPLE FOR INDIGENOUS RIGHTS**

Mr. HOWARD. Thank you, Mr. Chairman.

I am Chris Perez Howard, chairman of the Organization of People for Indigenous Rights. I sincerely thank you on behalf of our organization for the opportunity to present testimony on H.R. 100, a bill to establish the Commonwealth of Guam.

Before I begin, I would like to state for the record, that our organization is not here in support of the Commonwealth Act. We are here to support the rights and concerns of the indigenous people of Guam—the Chamorro people.

Mr. Chairman, the Chamorro people's relationship with the U.S. Congress goes back to the year 1898, when Spain ceded Guam to the United States and gave Congress the right to determine the civil rights and political status of the native inhabitants. Since then, Congress has held this right to make these decisions.

Mr. Chairman, we believe that this hearing is based upon the relationship that the U.S. Congress has had with the Chamorro people since 1898. Although they have, in various documents, been referred to by names such as native inhabitants, people of Guam, Chamorros, Guamanians, inhabitants of Guam, and nationals of the United States, they are the people whom you promised the right to self determination. They are the people for whom you wrote the Organic Act for Guam. And, they are the people whom you should be addressing.

From the beginning, OPIR has not supported the draft Commonwealth Act. We do not support it because commonwealth is not a status determined by the Chamorro people, nor is the draft act written and adopted by them. It is a U.S. citizen document. It infringes on the rights of the Chamorro people, especially in regards to others determining their inherent sovereignty.

In the past, however, OPIR has supported the provisions concerning Chamorro right to self determination and Guam's control of immigration. Now, we think it may be pointless to even discuss these issues in the Commonwealth Act before Congress. We feel this way because immigration controlled by Guam has been blasted in the media and in reports by U.S. Government agencies, and the frontal assault and behind-the-back attempts by the United States to deny the Chamorro people the right to self determination in the United Nations.

For your information, attached is a transcript of the U.S. statement before the U.S. Special Political and Decolonization Committee a few weeks ago. As an example of this kind of information given as factual by the United States, is this declaration: "The United States is a Nation in which all persons are provided equal treatment under the law." This statement, Mr. Chairman, is a blatant attempt to influence the U.N. committee at the expense of the Chamorro people. Mr. Chairman, as you are well aware, we do not vote for the President of the United States. Not all of the U.S. Constitution applies to us. And we do not have a voting Member in Congress. Something smells at the United Nations and reflects badly on the moral character of America. With that U.S. statement at the United Nations, how can we now expect Congress to do what is right?

In closing, aside from the reason our organization gave for opposing the draft Commonwealth Act, we consider the status of commonwealth as another colonial status. If Congress truly wants to solve the political status problems of its territories, it should embrace decolonization and not just a political status change.

Thank you. [speaking in Chamorro] "Si yu'os ma'ase," Mr. Chairman.

[The prepared statement of Mr. Howard may be found at end of hearing.]

Mr. PETERSON. I'd like to thank the gentleman.

And next, we'll call upon the Most Reverend Anthony S. Apuron, Archbishop of the Archdiocese of Agana.

**STATEMENT OF ANTHONY S. APURON, ARCHBISHOP, ARCHDIOCESE OF AGANA**

Rev. APURON. Thank you very much, Mr. Chairman, and members of this committee.

I'm deeply honored by your gracious invitation to appear before this committee of the U.S. House of Representatives today. It is a rare privilege, indeed. I come as a spiritual leader of Guam to bear witness to the voices in the hearts of the Chamorro people crying out for justice and a resolution of our quest for political determination.

You, as a body, have the ultimate power and authority in the Nation to bring about the justice we seek. I urge you to act with a moral conscience. We the people of Guam deserve nothing less. As loyal and patriotic American citizens, we seek the American promise of justice for all.

We as a people have been blessed with many benefits stemming from our intimate relationship with the United States. In 1898, we have progressed tremendously—or since 1898, we have progressed tremendously. We were freed from an occupying force during World War II. In the subsequent decades, our quality of life as an island community has substantially improved.

Concomitant with these benefits we have more than adequately contributed our share to the greatness of this Nation. Our people have always come forward fearlessly and generously, even shedding their very blood with great sacrifices to the family, in demonstrating their loyalty and patriotism in military service. Our sons and daughters have been among those who fought for World War II, the Korean war, the Vietnam war, and desert storm—all conflicts not of our own choosing. In the quest for National security and world peace, our resources, especially our most precious and limited land and water resources, were exploited and continue to be deemed vital to American presence in the Pacific theater.

We have willingly paid the price exacted by the American promise of freedom and justice for its citizens. What we ask now, Mr. Chairman, is that for that promise to be delivered in its entirety and in all its glory, namely the granting of Guam's Commonwealth Act.

The Chamorro people of Guam have given 100 percent to this Nation. The lives lost in the various conflicts for peace are testimony enough to this fact. As we move toward the next millennium, I want to emphasize the unique opportunity this august body faces, and the power it ultimately holds, to redress the grievances and injustices we have suffered and continue to suffer as a colonized people—an unincorporated jurisdiction, and an insular possession, or whatever the status of Guam may be called—all terms unacceptable, incongruit, and unconscionable with great promise of freedom, liberty, and justice for all which this great Nation, since its founding, has echoed and re-echoed throughout the world.

As this country has challenged other nations to uphold democratic principles on moral and human rights grounds, so we as a Chamorro people appeal to those very principles on moral and human rights grounds.

In sacred scripture the hypocrite was condemned by Jesus for professing one set of beliefs and acting otherwise. Could it not be

considered hypocritical to exact the very blood and the lives of our people in service of this great Nation we call, quote "America" unquote, while at the same time perpetuating second-class citizenship through the colonial status we are currently subjected to? How much more, Mr. Chairman, must we give in order to receive what this great Nation promises? Is it just too much to ask that the reversal of this status begin with a congressional passage of the Guam Commonwealth Act which embodies the political process by which Chamorros will achieve self determination? The passage of the Guam Commonwealth Act would be a major step in the right direction. We believe that justice, freedom, truth, and liberty will all be enhanced by such action of yours. And will not America be the greater for that?

I humbly pray then that this great Nation under God, indivisible, with liberty and justice for all, and under your leadership, Mr. Chairman, will be able to uphold these ideals with truth and wisdom and right judgment and as you vote on the Guam Commonwealth Act.

[Speaking in Chamorro] "Dangkolo na si Yu'os ma'ase." Thank you.

[The prepared statement of Rev. Apuron may be found at end of hearing.]

Mr. PETERSON. I'd like to thank the reverend for his testimony.

Next we will introduce Jose Guevera, vice president of the Filipino Community of Guam.

**STATEMENT OF JOSE GUEVARA, VICE PRESIDENT, FILIPINO COMMUNITY OF GUAM**

Mr. GUEVARA. Thank you, Mr. Chairman.

Mr. Chairman, members of this committee, I am Jose Guevara, a resident of Guam and vice president of the Filipino Community of Guam. I am proud to say, Mr. Chairman, that about 30 percent of Guam's population today is of Filipino origin or decent and the Filipino community is an integral part of the wonderful island of Guam.

The Guam Commonwealth Act is a matter of considerable interest to the Filipino community of Guam. For those of us who have permanently made Guam our home, as opposed to those who eventually move to other parts of the United States, the issues raised in the Commonwealth Act cause us to come to terms with our history as Filipinos and our status as Americans.

Given the history of the political relations between our mother country, the Philippines, and our adopted home, the United States, Filipino-Americans understand the difficulties of colonial relationships. Our history as a Filipino also illustrates, like the American's experience itself, that colonialism is not a legitimate form of government.

There is a natural affinity amongst Filipinos to appreciate and understand the Commonwealth Act's proposal to establish an autonomous and internally self-governing entity called the Commonwealth of Guam. For those of us who make Guam our home, self government for us has even more meaning. The various ways in which the Commonwealth Act provides for the devolution of powers from the Congress to the people of Guam, will have an inescapable

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 105 of 542

impact to our economic potential—the stable economic patterns, the enactment of laws that make sense for our Guam, and maximization of our economic role in the Asian-Pacific region. These things will be done with no threat to the U.S. military needs.

Commonwealth is clearly not independence, which our mother country fought for, negotiated, and achieved. Nor is commonwealth Statehood as is being pursued by Puerto Rico. For three entities taken by the U.S. during the Spanish-American war of 1898, the Philippines was encouraged to pursue independence. Puerto Rico is now being encouraged to pursue Statehood, and Guam is being offered neither.

Recognizing this, the people of Guam have sought a middle road of autonomous commonwealth status on the road of decolonization. Because of Guam's uniqueness, and because no one is suggesting Guam should be a State, we believe special dispensation is necessary.

That's all, Mr. Chairman. And, thank you for giving us the opportunity to be heard.

[The prepared statement of Mr. Guevara may be found at end of hearing.]

Mr. PETERSON. I'm pleased to thank the gentleman for his testimony.

At this time we'll call on Debby Quinata, Nation of Chamoru.

**STATEMENT OF DEBTRALYNNE K. QUINATA, NASION CHAMORU**

Ms. QUINATA. [Speaking in Chamorro] "Hafa adai." Greetings, Mr. Chairman, and distinguished members of the Committee on Resources.

My name is Debtralynne Quinata. I am a citizen of Guam, and I am Chamorro. I am here today on behalf of the Nation to testify in opposition to the Guam Commonwealth Act.

First, we would like to state for the record that we construe House Resolution 100 not a true exercise of Chamorro self determination, but merely a petition by U.S. citizens residing on Guam in 1987 to amend the present Organic Act of Guam.

Secondly, we oppose H.R. 100 because short of a true exercise of Chamorro self determination, this bill, under article 1 section 101, proposes to surrender our sovereignty. Sovereignty to all free nations of the world, which includes our native brothers and sisters of the Americas, is an inherent and sacred right that they would do anything in their power to protect and defend.

If Congress intends to accept that the Federal Government should have total sovereignty over Chamorros, not withstanding recognized treaty obligations and U.N. mandate, than we fear that this may have devastating repercussions. This act may also set a precedent over treatment and consideration of treaties and policies signed between Native Americans and the Federal Government.

The Chamorro Nation, therefore, will not play a part in opening the door that may jeopardize or extinguish the sovereignty of our native brothers and sisters simply because the government of Guam, with the consent of the Federal Government, chooses to unilaterally compromise our sovereignty.

Thirdly, the Chamorro Nation opposes H.R. 100 for the mere reason that even non-Chamorros were permitted to vote in political status elections in which the commonwealth status was selected. This is a clear violation of the Treaty of Paris, article 73 of the U.N. charter, and U.N. resolution 1514 and 1541 pertaining to the process of decolonization of colonial countries wherein they recognize the inalienable rights of Chamorro's self determination. The fact Chamorros have not been given the opportunity to exercise their right to self determination does not justify the government of Guam, a Federal instrumentality, having non-Chamorros vote on any political, social, or economic issue directly affecting the native Chamorros. This, we believe, is a grave injustice. And, although Chamorros now represent a minority, it does not give any government the right to preempt our existence. The Chamorro Nation vows never to remain silent on this issue until true exercise of Chamorro self determination is realized. Nor will we ever accept the idea of giving non-natives the absolute power and right to seize and hold our sovereignty and at their whim dictate our lives as indigenous people.

Self determination or decolonization is neither an individual or citizen right. It is the right of a distinct group of people—the Chamorros—whom have a historical relationship with the United States. Therefore, it would be totally absurd to have U.S. military personnel who are stationed on Guam, foreigners who have been naturalized, and U.S. citizens from the States, voting on any interim petition that would require a political status change. Even within the political framework of the United States, U.S. citizens residing adjacent to reservations do not have the right to vote and pass policies affecting Native Americans.

Lastly, we Chamorros for many years have been placed under the auspices of the Department of Interior. This is an agency that has jurisdiction over Federal properties and animals. Today, we would like to proclaim that Chamorros are neither property nor animal.

In recent years we have seen this agency, with the blessing of the Federal Government, advocate and pass more laws to protect endangered species and the environment than laws to protect the indigenous people of Guam. In fact, in the 99 years of U.S. rule, laws were instead imposed to undermine our existence as a people; such as executive orders which prohibited the speaking of our language, the outlawing of many of our traditions, and the taking of our lands. One can only conclude that these acts are nothing more than a systematic process of genocide. Excuse me.

Members of Congress, December 1998, will mark 100 years of U.S. rule, and the Chamorros have yet to exercise their right to self determination. Our people have lived in the Marianas for over 4,000 years—a peace-loving people living in harmony with our neighbors and our surrounding environment. We Chamorros, like many other native peoples throughout the world, have committed no sin toward humanity. Our question, therefore, is pure: what in God's name have we done to deserve such mistreatment?

Rather than pursuing Commonwealth of Guam, we ask that you support Guam's public law 23–130 which establishes the Chamorro registry, and public law 23–147 establishing the Commission on

Decolonization for the implementation and exercise of Chamorroan self determination.

For these reasons we rely on your knowledge, compassion, and wisdom to put an end to these injustices. To right the wrong, and to free a people. It is only fair, just, and the right thing to do.

[Speaking in Chamorro] "Si Yu'os ma'ase."

[The prepared statement of Ms. Quinata may be found at end of hearing.]

Mr. PETERSON. I would like to thank the lady and all the panel members.

Do we have any questions for the panel?

The gentleman from Samoa.

Mr. FALEOMAVAEGA. Thank you, Mr. Chairman.

It's a lot better than Somalia, as I've been given that. Thank you, nevertheless.

I would like to certainly welcome Mrs. Moses before the committee. It has been my privilege over the years to know very well the Governor Resio Moses—I think, now, Senator? Am I correct Mrs. Moses? Please do convey to him my personal regards and hope all is well in Palau.

Can I ask you Mrs. Moses, was there an original understanding between you and Senator Akaka and Murkowski about the wording about the language with reference to the three colleges of Micronesia? What was your understanding?

Ms. MOSES. Thank you very much.

Yes, we received copies of the original legislation that was first considered, and it did not contain section 3(c). Section 3(c) was added as a result of administration testimony to the measure.

Mr. FALEOMAVAEGA. OK. Was the original language that the Senate had provided for the three separate entities, to function as three separate entities?

Ms. MOSES. The original language that the Senators drafted for this issue was acceptable to all three colleges. It had sections—it only had two sections: sections (a) and (b).

Mr. FALEOMAVAEGA. As I recall, originally, when the College of Micronesia, when the endowment was set aside for the College of Micronesia, at that time there was only one College of Micronesia. Am I correct?

Ms. MOSES. That's correct.

Mr. FALEOMAVAEGA. And in the process now, you have Palau and the Marshalls also having a separate community college, is that it?

Ms. MOSES. That's right.

Mr. FALEOMAVAEGA. And how is it functioning right now with this endowment? Do all the proceeds go directly to the College of Micronesia?

Ms. MOSES. No, the endowment is—The College of Micronesia still exists only for land grant purposes. We named ourselves the College of Micronesia-FSM—we're the former Community College of Micronesia. So the endowment for the land grant has been separate all along, and the proceeds from the investment of the endowment go to support residential instructional programs at all three colleges as well as provide some matching funds for the land grant programs.

Mr. FALEOMAVAEGA. And in the process, as we were making amendments to the Federal statute, both colleges in Marshals and Palau, have they also gained land grant status?

Ms. MOSES. No. That's what we're seeking today.

Mr. FALEOMAVAEGA. So, basically they don't have land grant status, but the College of Micronesia-FSM has land grant status?

Ms. MOSES. No, I'm sorry, that's incorrect. The College of Micronesia, which is a college that was comprised of Palau and the Community College of Micronesia in the FSM, and the Marshalls is the college that has land grant status in the statute. That college does not—that college has been disbanded, essentially, for everything except land grant programs. And the reason for that is that in the statute, the College of Micronesia is designated as the land grant college for the former trust territory of the Pacific islands.

Mr. FALEOMAVAEGA. I understand that. So, basically, the administration does not support the idea of giving land grant status to both the colleges of the Marshalls and Palau. This is basically the problem?

Ms. MOSES. And College of Micronesia-FSM, because we don't have land grant status either. The College of Micronesia does. They're not the same.

Mr. FALEOMAVAEGA. No, I understand that. But, I'm just trying to get to the original purpose of the act which was to grant land grant status to the College of Micronesia, in its original form, with the $3 million endowment——

Ms. MOSES. That's correct.

Mr. FALEOMAVAEGA. [continuing] interest drawn from there for use as you suggested earlier. So, the current law, as it now states, you still have the College of Micronesia-FSM, but without the land grant status because of the change of the Government?

Ms. MOSES. That's correct.

Mr. FALEOMAVAEGA. Oh. OK. And so this is basically the problem that we're faced with.

Ms. MOSES. Yes.

Mr. FALEOMAVAEGA. All right. Thank you, Mrs. Moses.

I was interested in the testimonies stated earlier by Mr. Howard and Ms. Quinata and your non-support of the proposed Commonwealth Act. You're taking this basically with the idea that as an indigenous people you don't want in any way to be associated with the United States? You want to be completely independent? Is that——

Mr. HOWARD. No; it's that we're against the process as it now stands. We don't advocate any political status. It's the process.

Mr. FALEOMAVAEGA. OK. All right.

Ms. Quinata?

Ms. QUINATA. I'd like to also—just for a little bit more clarification is that, again, we are not advocating any particular status, but I do not believe that the commonwealth status is not a status at all that is in the political framework other than an interim status. And that, above and beyond that, we have not done—we don't have a true vote. We don't have the—we have not protected the indigenous people of Guam. We've allowed everybody to become involved in that particular process.

Mr. FALEOMAVAEGA. You did not support the process because non-Chamorros also participated in the process?

Ms. QUINATA. Yes, sir.

Mr. FALEOMAVAEGA. OK.

Thank you, Mr. Chairman.

Mr. PETERSON. Any further questions for the panel?

Mr. Underwood? Or, Ms. Green? Mr. Underwood?

Mr. UNDERWOOD. Thank you very much. And, President Moses, please also relay my greetings to Resio and I'd also like to recognize and welcome Alfred Cappelle, my colleague for a long time—and "Yokwe yok"—long time. In language issues out in Micronesia, and to Mario Katosang, "ali" to you and to all my friends in Palau.

I don't have any questions. I just want to make some observations and also note that we are now coming upon 6 o'clock in the morning tomorrow in Guam, and actually, even though this particular panel might have felt all along that they would have been slighted, they're probably more people listening to this panel than there were to the earlier panel, so maybe the timing of it is very good. Along with feeding the chickens, they were listening to this panel as people on Guam wake up.

The issues that are before us are long and complicated and weighty. And, I can't help but reflect upon the meaning of this exercise and the meaning of the people who have participated in this exercise, including Ron Rivera, and myself, and Hope Cristobal, and Chris Howard, and Debby Quinata, the Archbishop; all of us have been intertwined in our lives in very curious and interesting ways; former Congressman Ben Blaz, Governor Gutierrez. There is a lot of energy. And there is a lot of energy in the room. And, there's a lot of energy, it reflects accurately, I think, the energy of the people of Guam.

I made a special effort, and I'm glad to acknowledge the agreement of the committee to make sure that the panel that is now before actually had a chance to speak. We wanted to make sure that people who may be opposed to H.R. 100, and there are some, be allowed the opportunity to state their concerns and state the origins of their concerns.

But, as we look upon this morning in Guam, and we've been at this hearing now for some 5 hours, I feel very strongly that it's been a very successful hearing, not because, necessarily, it moved the legislation in—my good friend from American Samoa's—terms, maybe 1 inch, but it certainly has increased our understanding, both, not only of the obstacles ahead of us, but certainly the understanding of the people of Guam, what they have before them, and what brought them to this point.

I asked the chairman if I could just say a few remarks in Chamorro, and I will:

[Speaks in Chamorro.]

Mr. UNDERWOOD. I want to express my gratitude to the formerly English-only Committee on Resources for this opportunity.

[Laughter.]

Mr. PETERSON. I thank the gentleman.

I would like to thank the witnesses for their valuable testimony and for the distance that you came—all of those that are here that have come from such a great distance.

For the Members: I have no doubt that the Members after today, will be far more knowledgeable on this issue and have a clearer understanding. The members of the committee may have some additional questions for the witnesses. We will ask you to respond in writing. The hearing record will be held open for these responses as well as any other statements by Members for 2 weeks.

And, we have high hopes that the administration will be inspired by this hearing and will follow through in a timely manner on providing the committee with numerous updating of references or changes identified in their testimony for this proposal. And, hopefully, they will seriously engage in appropriate process to bring a conclusion to this issue that has been out there for a long time. We urge them to take it seriously and to work at it. We think they can bring it home if they choose to, and we would urge them to get busy and start the dialog and the exchange that is so vitally necessary.

Mr. FALEOMAVAEGA. Would the gentleman yield?

Mr. PETERSON. Yes.

Mr. FALEOMAVAEGA. I would be remiss if I did not also express my deepest appreciation to you, Mr. Chairman, and the majority party for allowing this hearing to take place in the first place. And, I would also like to congratulate my good friend and colleague from Guam, Dr. Underwood—Congressman Underwood—for such an outstanding job that he has done in bringing out the issues affecting the good citizens and the people of Guam.

We go through this exercise, Mr. Chairman, over the years, and always trying to figure where the—sometimes we're not even on the map, sometimes we're not even on the radar screen. It's always been one of my basic criticisms is that the territories never seem to get the proper attention that they should get from the Members as well as from this institution. But I think today's hearing bears quite well what we've accomplished, not only the legislation affecting the good people of Guam, but certainly the Senate Bill 210, that also has some things in it that affects other territories. And, I sincerely hope that with the proper amendments that I will be offering at the appropriate time we will resolve the concerns that Mrs. Moses had raised earlier, and that other provisions of Senate Bill 210 that will be helpful to the other insular areas.

And with that, Mr. Chairman, I want to thank you for your patience, thank the good leaders of the people of Guam, and as they say in Samoa, "In sus ma'ase."

[Laughter.]

Mr. UNDERWOOD. Yes, I would like to——

Mr. PETERSON. I would yield to the gentleman from Guam.

Mr. UNDERWOOD. I would also like to take this opportunity to thank you, Mr. Chairman, for your diligence in this effort as well as all the Members who did take some time to come before the committee.

I also want to enter into the record the statements of Frank San Nicholas, Ron Rivera, and Darrell Doss, who is standing here before us. And, I want to recognize that Mr. Doss, has a very special relationship to Guam, along with many other men of his age and participated in the liberation of Guam from the hands of the Japanese, and I wanted a chance to recognize Mr. Doss.

[The prepared statement of Mr. San Nicholas may be found at end of hearing.]

[The prepared statement of Mr. Rivera may be found at end of hearing.]

[The prepared statement of Mr. Doss may be found at end of hearing.]

Mr. PETERSON. The Chair thanks the gentleman.

Again, I would like to thank all of you for participating, for the fine job you did, and how well prepared you were.

Adios. There is no further business.

Adjourned.

[Whereupon, at 3:12 p.m., the committee was adjourned subject to the call of the Chair.]

[Additional material submitted for the record follows.]

STATEMENT OF JOSE GUEVARA, VICE PRESIDENT, THE FILIPINO COMMUNITY OF GUAM

Mr. Chairman and Members of the Resources Committee,

I am Jose Guevara, Vice President of the Filipino Community of Guam, representing some 60 Filipino-American organizations. I am proud to say, Mr. Chairman, that about 30 percent of Guam's population today is of Filipino origin or descent and the Filipino community is an integral part of the wonderful island of Guam.

The Guam Commonwealth Act is a matter of considerable interest to the Filipino Community of Guam. For those of us who have permanently made Guam our home—as opposed to those who eventually move to other parts of the United States—the issues raised in the Commonwealth Act cause us to come to terms with our history as Filipinos and our status as Americans.

Given the history of the political relations between our mother country, the Philippines, and our adopted home, the United States, Filipino Americans understand the difficulties of colonial relationships. Our history as Filipinos also illustrates, like the American experience itself, that colonialism is not a legitimate form of government.

There is a natural affinity amongst Filipinos to appreciate and understand the Commonwealth Act's proposal to establish an autonomous and internally self-governing entity called the "Commonwealth of Guam." For those of us who make Guam our home, self-government for us has even more meaning. The various ways in which the Commonwealth Act provides for the devolution of powers from the Congress to the people of Guam, will have an inescapable impact to our economic potential, stable economic patterns, the enactment of laws that make sense for Guam and the maximization of our economic role in the Asia-Pacific region. These things would be done with no threat to the U.S. military's needs.

Commonwealth is clearly not independence which our mother country fought for, negotiated and achieved. Nor is "Commonwealth" Statehood as is being pursued by Puerto Rico. One of the three (3) entities taken by the U.S. during the Spanish-American War of 1898, the Philippines was encouraged to pursue independence, Puerto Rico is now being encouraged to pursue Statehood, and Guam is being offered neither. Recognizing this, the people of Guam have sought a middle road off an autonomous Commonwealth status on the road to decolonization. Because of Guam's uniqueness—and because no one is suggesting Guam should be a State—we believe a special dispensation is necessary.

---

STATEMENT OF RON RIVERA

Mr. Chairman and Members of the Committee on Resources:

I am honored to submit this statement in support of H.R. 100, the Guam Commonwealth Act as a Chamorro, as a concerned citizen . . . and a father who has great hopes for the future of his children and grandchildren, a future rooted in their homeland of Guam.

The draft Guam Commonwealth Act embodies a process for the decolonization of Guam. This is the heart of the Commonwealth Act, and it is what makes this Act both unique and acceptable to the Chamorro people. Decolonization is not something that can not be watered down or compromised—no matter what legislative language is finally agreed upon, the process of decolonization must be explicit and it must meet international standards.

We, the Chamorro people who have been colonized by military conquest, cannot risk our future self-determination in a bill that is equivocal on this point. We hope that Congress agrees with us on the absolute necessity to approach this issue with sensitivity and clarity. While there may be some new approaches to the legislative language, it must meet the basic criteria of the decolonization process that the United States has accepted in international definitions applied to other colonies.

There are fundamental principles that must be contained in an interim Commonwealth status in order for true decolonization to occur. First, a decolonization process must be initiated by a legitimate process of Chamorro self determination. Second, Guam must be granted control of immigration. Third, the Commonwealth Act must contain a mutual consent provision. These fundamental principles must be included in whatever Commonwealth Act Congress adopts.

The United States has a moral problem in justifying its continued colonial administration of Guam. The people of Guam have proposed, in the Guam Commonwealth Act, a political solution to this moral problem that meets their fundamental concerns and is consistent with international standards. The Guam proposal lays out quite clearly a solution that resolves Guam's colonial status. As a political solution, we are willing to engage the political processes of the U.S. government, such as this

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 113 of 542

Congress, but what we are not willing to do is allow these political processes to dictate solutions that are weighted only to Federal concerns.

Guam has been on its quest for Commonwealth for over 10 years. A political solution along the lines that we propose is within the realm of reality if only Congress and the President would exercise the will and courage to resolve Guam's status. This courage means an acceptance of the stark reality of Guam's present colonial status, and a determination to work with Guam on a solution. The people of Guam have shown our own political will in this process, and we have shown the courage to challenge the colonial status quo.

We seek the common ground with the U.S. on many contentious issues, and we seek a new relationship that is suited for our island. We have offered political solutions that are neither radical nor unrealistic. We seek to break down barriers that separate us from other Americans. If these barriers were physical, it may be easier to understand. If we had a Brandenburg gate, a Berlin Wall, or a Demilitarized zone, perhaps then we would be able to point to the barriers. Instead, we have Supreme Court opinions and Federal laws that create institutional barriers to freedom.

The U.S. Constitution, revered worldwide as a crucible of freedom and justice, is wielded against territories as a tool of repression. This is not how things ought to be. We are here to challenge old thinking, to change the colonial relationship, and to tear down the barriers to our freedom.

---

STATEMENT OF DARRELL O. DOSS

It is an honor to be here today to represent all the veterans who fought to free Guam from enemy occupation 53 years ago. The 7,000 marines, soldiers, sailors, airmen and Coast Guard who were killed or wounded in action during the battle that raged for three weeks in the summer of 1944 are joined today by the living World War II veterans in calling on Congress to grant a new status to Guam.

At the time of our battle in 1944, we were honored to be called "the liberators" by our fellow Americans, the Chamorros of Guam. But did we really liberate Guam? It is sad to say that we did not. To this day, our fellow Americans in the western Pacific are one of the last colonies in the world. However, you, as Members of Congress, have the power to accomplish today that which we were unable to—to liberate Guam and grant the people of Guam the same freedom of self government as we have in our fifty states.

Guam has been a possession of the United States since 1898, with the exception of 31 months when they suffered under the cruel treatment of our then enemy. During that period, they were enslaved, tortured and executed. Of the 20,000 Guamanians at that time, over 1,500 died during the harsh occupation. Yet the people of Guam never lost faith with America. Even though it meant beatings, torture and even death for many of them, they never abandoned America. They helped feed, shelter, and hide George Tweed, the single surviving American sailor who hid out during the Japanese occupation. To them, this sailor was a symbol of the country they loved—America.

Guam fist applied for American citizenship in 1902, but it wasn't granted until 48 years later in 1950. In 1936, B.J. Bordallo and Francisco Leon Guerrero came to our nation's capitol to again ask for citizenship. Mr. Leon Guerrero stated "the people of Guam know but one 'ism' and that is Americanism." That statement is as true today as it was 61 years ago.

Because of Guam's loyalty to America, they have the highest per capita enlistments in our military services than any state in the Union. During the Vietnam War, (not a conflict), they had the highest per capita casualties than of any of our states.

I wish time would permit me to tell the story of a few of these brave people and what they endured because of their love for the United States, a love which I feel has not been returned in the policies of our government. I would tell you the stories of Beatrice Emsley, Antonio and Josefa Artero, Father Duenas (the martyred catholic priest, who was beheaded), B.J. Bordallo, the mother of Guam's current First Lady (Geri Gutierrez), Francisco Leon Guerrero, Mrs. Agueda Johnston, Joaquin Limtiaco and the eight Merizo co-liberators. I am sure that some of you would have tears in your eyes, just as we liberators had tears in our eyes when we liberated the concentration camps. These are the people I am asking you to support and allow them to have a closer and more democratic relationship with America. Is that too much to ask? For the people of Guam and we veterans of World War II, I hope you can find it in your heart to do what is right and give justice to our fellow Americans on Guam.

We call the United States the land of liberty with freedom and justice for all. It saddens me to know that this is not true because of the way we treat our fellow citizens on the island of Guam. There is no doubt that some of America's most loyal and patriotic citizens are from Guam. They have remained staunchly faithful to the United States, even though we treat them as less than our equals. It is time that justice be done.

At this time I ask you to please vote for true justice on this very important issue and let's make the United States truly the land of liberty with freedom and justice for all, including Guam.

As time marches on, we who fought to free Guam shall be gone from this earth. So on behalf of all the veterans of the Guam campaign, I plead with you to cast a "yea" vote, to grant these people their wish to become a commonwealth of the United States. In doing so, the members of this Congress shall share the honor we have as "Liberators of Guam." Your vote can accomplish that which we, 75,000 strong, and backed with massive military arms, were apparently unable to do in 1944.

---

STATEMENT OF HON. RICK HILL, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MONTANA

It is a real pleasure to welcome the distinguished witnesses for today's hearing on certain measures affecting some of our United States territories and the separate sovereign freely associated states.

These issues affecting U.S. nationals and citizens in the territories as well as residents of the Pacific freely associated republics are part of the unique and important jurisdiction of the Committee on Resources for the insular areas.

That is why Chairman Young scheduled this hearing on matters which could provide for increased local self governance for the people of the insular areas.

Let me thank the witnesses from the distant Pacific islands for aggreeing to appear before the Committee.

You have traveled thousands of miles to testify, and your efforts are appreciated.

You are providing a substantial set of information for the Committee record.

Your statements have been provided for review by all of the Committee Members and will be available for all those in the Congress as well who are not Members of the Committee or here today.

One of the primary purposes of this hearing is to assist the insular areas, including Guam, in advancing toward greater local self-government.

The statements by the witnesses today will help Congress in evaluating the merits of the proposals contained in S. 210, the Omnibus Territories Act, H.R. 2370, the Guam Judicial Empowerment Act, and H.R. 100, the Guam Commonwealth Act.

---

STATEMENT OF HON. PETER C. SIGUENZA, CHIEF JUSTICE OF GUAM

Good morning/afternoon Chairman Don Young, Congressman Robert Underwood and other distinguished members of the House Committee on Resources. Thank you for allowing me to have the opportunity to speak. It is indeed an honor.

I am here today as the Chief Justice of Guam. My rotating term expires in about a year and a half from now—at which time we justices will elect a new chief. And so—in my first and final appearance before you—I want to stress the importance of the critical matter which is before us today.

In simple terms, H.R. 2370 would place the Judiciary of Guam on an equal footing with its two coordinate branches of government. As you will note, the inherent powers of both the executive and legislative branches are clearly delineated within the Organic Act. Only the structure of the judiciary lacks this kind of clarity.

Ironically, the original local legislation which created the Supreme Court distinctly outlined the Court's authority—clearly placing administrative and appellate jurisdiction with the Court.

In this sense, H.R. 2370 undeniably reflects the will of the people. Virtually every provision within the judicial Empowerment Act before you today mirrors the 10 year drafting process which culminated in the passage of the bill in 1992.

It is significant to point out that no effort was made to alter the bill for the next three years. The legislation sat intact and untouched for nearly four years—that is, up until the seating of the Court in April of 1996.

At that time, on the eve of the confirmation hearings of the justices—efforts were undertaken to alter the legislation and curtail the authority of the Court. In effect, what had taken a decade to build was summarily undone within three months.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 115 of 542

In fact, since the Court's inception—there have been no fewer than four legislative attempts to undermine the Court's administrative authority and—even as recently as last month—a successful legislative bid to limit this Court's legal jurisdiction.

Let me briefly share with you the chronology of this Court:

1973—Guam Public Law 12-85 is enacted, envisioning a judiciary with a local supreme court at the helm.

1974—The first Supreme Court of Guam is established.

1977—The U.S. Supreme Court strikes down Guam's Supreme Court.

1997—That same year, Guam convenes a constitutional convention. The foundation is laid to establish a Supreme Court as the judicial and administrative head of the judiciary. This draft constitution is submitted and approved by the U.S. Congress.

1984—The Omnibus Territories Act amends the Organic Act to allow for the creation of a Supreme Court.

1993—The Frank G. Lujan Memorial Court Reorganization Act is signed into law after its 1992 passage in the 21st legislature. The bill is patterned after the 1973 local legislation, 1977 draft constitution and provisions from various state constitutions.

The legislation calls for a Supreme Court of Guam which will "handle all those matters customarily handled by state supreme courts . . . [handle] court rules and court administration. *Thus, administrative functions of the courts, formerly lying either with the Judicial Council or the District Court of Guam, are placed with the Supreme Court of Guam.*

1995—In November, myself, Janet Healy Weeks and Monessa G. Lujan are nominated to the Supreme Court.

1996—In March, hours after the justices of the Supreme Court are confirmed, the 23rd Guam legislature passes bill 404 which removes certain inherent powers from the Supreme Court. A second bill, bill 494, aims to strip the supervisory jurisdiction of the Supreme Court over all lower courts. That bill is debated, but tabled by the legislative committee on the Judiciary.

1996—Eight months later in December, the legislature attaches the contents the shelved bill 494 as a "midnight" rider to bill 776. The legislation passes and is vetoed by the Governor. An override attempt fails by only a slim margin.

In short—this is the problem faced by the Supreme Court of Guam, and why we seek to have this court established within the Organic Act. Permit me the luxury of overstating the obvious when I say that a Judiciary—or any branch of government—cannot function independently if another branch can modify or strip it of its powers at will. The bill before this distinguished panel will ensure that like the inherent power of the executive and legislative branches—the corresponding authority of the third branch cannot be tampered with on whim.

There are those who espouse the view that the Judicial Council of Guam is the policymaker for the judiciary. Allow me to let the record speak for this court when I say that in the eight years it took lawmakers to craft and fine-tune the bill that created the Supreme Court of Guam—the notion of a judicial council as the administrative arm of the judiciary was explored and subsequently rejected in that role. The Frank G. Lujan Memorial Court Reorganization Act which created the court explicitly envisioned an advisory role for the council.

And since that time, the will of the people has not changed. A recent survey conducted on Guam by your colleague and our delegate, Congressman Robert Underwood—in addition to a poll conducted by the Guam Bar Association—along with numerous media editorials—have each independently and resoundingly confirmed the original legislative concept of the Supreme Court at the administrative helm of the judiciary.

This is not a structure without precedent. The Judicial Empowerment Act would not only restore the initial intent of local legislation creating the court, but would also confer upon it the same inherent authority exercised by judiciaries in the fifty states and other U.S. jurisdictions.

In closing, I leave you with the words of Alexander Hamilton who noted over 200 years ago—"the judiciary is beyond comparison the weakest of the three departments of power—all possible care is requisite to enable it to defend itself against their attacks."

Thank you Mr. Chairman, Congressman Underwood and other distinguished members of this panel for your time and attention.

(I have brought with me copies of the judicial sections from the respective constitutions of every state and U.S. jurisdiction should any of you wish to view them.)

# TITLE 48
# UNITED STATES
# CODE
# ANNOTATED

***<u>1976 CONGRESSIONAL AUTHORIZATION FOR A CONSTITUTION FOR GUAM</u>***

## CHAPTER 12
## Historical and Statutory Notes prior to Section 1541

### HISTORICAL AND STATUTORY NOTES

**Constitutions' for Virgin Islands and Guam: Establishment; Congressional Authorization**

Pub.L. 94-584, Oct. 21, 1976, 90 Stat. 2899, as amended by Pub.L. 96-597, Title V, § 501, Dec. 24, 1980, 94 Stat. 3479, provided:

"**[Section 1. Authorization to organize governments]** That the Congress, recognizing the basic democratic principle of government by the consent of the governed, authorizes the peoples of the Virgin Islands and of Guam, respectively, to organize governments pursuant to constitutions of their own adoption as provided in this Act.

"**Sec. 2. [Constitutional conventions and draft provisions]** (a) The Legislatures of the Virgin Islands and Guam, respectively, are authorized to call constitutional conventions to draft, within the existing territorial-Federal relationship, constitutions for the local self-government of the people of the Virgin Islands and Guam.

"(b) Such constitutions shall—

"(1) recognize, and be consistent with, the sovereignty of the United States over the Virgin Islands and Guam, respectively, and the supremacy of the provisions of the Constitution, treaties, and laws of the United States applicable to the Virgin Islands and Guam, respectively, including, but not limited to, those provisions of the Organic Act [section 1405 et seq. of this title] and Revised Organic Act of the Virgin Islands [this chapter] and the Organic Act of Guam [section 1421 et seq. of this title] which do not relate to local self-government.

"(2) provide for a republican form of government, consisting of three branches: executive, legislative, and judicial;

"(3) contain a bill of rights;

"(4) deal with the subject matter of those provisions of the Revised Organic Act of the Virgin Islands of 1954, as amended, and the Organic Act of Guam, as amended, respectively, which relate to local self-government;

"(5) with reference to Guam, provide that the voting franchise may be vested only in residents of Guam who are citizens of the United States;

"(6) provide for a system of local courts consistent with the provisions of the Revised Organic Act of the Virgin Islands, as amended; and

"(7) provide for the establishment of a system of local courts the provisions of which shall become effective no sooner than upon the enactment of legislation regulating the relationship between the local courts of Guam with the Federal judicial system.

"**Sec. 3. [Selection and qualification of members]** The members of such constitutional conventions shall be chosen as provided by the laws of the Virgin Islands and Guam, respectively (enacted after the date of enactment of this Act) [Oct. 21, 1976]: *Provided, however*, That no person shall be eligible to be a member of the constitutional conventions, unless he is a citizen of the United States and qualified to vote in the Virgin Islands and Guam, respectively.

"**Sec. 4. [Submittal of proposed constitutions to governors and President]** The conventions shall submit to the Governor of the Virgin Islands a proposed constitution for the Virgin Islands and to the Governor of Guam a proposed constitution for Guam which shall comply with the requirements set forth in section 2(b) above. Such constitutions shall be submitted to the President of the United States by the Governors of the Virgin Islands and Guam.

"**Sec. 5. [Transmittal to Congress and submittal to voters]** Within sixty calendar days after the respective date on which he has received each constitution, the President shall transmit such constitution together with his comments to the Congress. The constitution, in each case, shall be deemed to have been approved by the Congress within sixty legislative days (not interrupted by an adjournment sine die of the Congress) after its submission by the President, unless prior to that date the Congress has approved the constitution, or modified or amended it, in whole or in part, by joint resolution. As so approved or modified, the constitutions shall be submitted to the qualified voters of the Virgin Islands and Guam, respectively, for acceptance or rejection through islandwide referendums to be conducted as provided under the laws of the Virgin Islands and Guam, respectively, (enacted after the date of enactment of this Act) [Oct. 21, 1976]. Upon approval by not less than a majority of the voters (counting only the affirmative or negative votes) participating in such referendums, the constitutions shall become effective in accordance with their terms."

**Resolution No. 85 (LS)**
**As amended on the floor.**

**Introduced by:**
**E. Barrett-Anderson**
**T. C. Ada**
**F. B. Aguon, Jr.**

| | |
|---|---|
| **A. C. Blaz** | **A. C. Lamorena, V** |
| **J. M.S. Brown** | **C. A. Leon Guerrero** |
| **Felix P. Camacho** | **L. Leon Guerrero** |
| **Francisco P. Camacho** | **V. C. Pangelinan** |
| **M. C. Charfauros** | **J. C. Salas** |
| **E. J. Cruz** | **A. L.G. Santos** |
| **W. B.S.M. Flores** | **F. E. Santos** |
| **Mark Forbes** | **A. R. Unpingco** |
| **L. F. Kasperbauer** | **J. Won Pat-Borja** |

**Relative to requesting the 105th Congress to amend the Organic Act by adding a new Section 6, to confirm that the adoption of a Constitution establishing local government shall not preclude or prejudice the further exercise in the future by the people of Guam of the right of self-determination regarding the ultimate political status of Guam.**

BE IT RESOLVED BY THE LEGISLATURE OF THE TERRITORY OF GUAM:

WHEREAS, in 1976 the United States Congress enabled the people of Guam, pursuant to P.L. No. 95-584, to organize a government under a constitution of our own adoption, which upon approval by Congress and the people of Guam, would provide for local government over the internal affairs of our Island; and

WHEREAS, when the current government of Guam structure for territorial government was established under the 1950 Organic Act, it was welcomed by the people of Guam as progress toward greater local government, but it was instituted without the consent of the people of Guam through a democratic act of self-determination or participation in the Federal lawmaking process on the basis of equal citizenship or equal representation; and

WHEREAS, the 1977 Constitution of Guam, drafted pursuant to Federal and local statutes, was approved by Congress but was not approved by the people of Guam in the 1979 referendum; and

WHEREAS, the process of establishment of internal local government under a local constitution was suspended after linkage was created between the draft constitution and the political status process; and

WHEREAS, in light of representation and speculations inconsistent with the foregoing from 1979 to the present, it is essential for Congress to confirm its original and continued intention and expectation that authorization and approval of local constitutional government in Guam would not preclude or be prejudicial to the exercise of the right to self-determination, as part of the process through which ultimate political status of the territory of Guam is to be determined; now therefore, be it

RESOLVED, by the Guam Legislature, on behalf of the people of Guam, request the One Hundred and Fifth Congress of the United States to amend Public Law No. 94-585, Oct. 21, 1976, 90 Stat. 2899, as amended by Public Law No. 96-597, Title V, Sec. 501, Dec. 24, 1980, 94 Stat. 3479, by adding a new Section 6 to read as follows:

> "Section 6. Establishment of local constitutional local government pursuant to this Act shall not preclude or prejudice the further exercise in the future by the people of Guam or the Virgin Islands of the right of self-determination regarding the ultimate political status of either territory."

and be it further

RESOLVED, that the Speaker certifies to, and the Legislative Secretary attests, the adoption hereof and that copies thereafter be transmitted to: the President of the United States of America; to the President Pro Tempore, United States Senate; to the Majority Leader, United States Senate; to the Minority Leader, United States Senate; to the Chairman of the Committee of Energy and Natural Resources, United States Senate; to the Speaker, U.S. House of Representatives; to the Majority Leader, U.S. House of Representatives; to the Minority Leader, U.S. House of Representatives; to the Chairman of the Committee on Resources, U.S. House of Representatives; to the Resident Commissioner of Puerto Rico, U.S. House of Representatives; to the Virgin Islands Delegate to Washington, U.S. House of Representatives; to the Guam Delegate to Washington, U.S. House of Representatives; to the President of the Mayor's Council; and to the Honorable Carl T.C. Gutierrez, Governor of Guam.

DULY AND REGULARLY ADOPTED ON THE 15TH DAY OF SEPTEMBER, 1997.

**Testimony of Interior Deputy Secretary John Garamendi**
**The Administration's Special Representative for Guam Commonwealth**
October 29, 1997

Mr. Chairman, members of the Committee, I commend you for holding today's hearing on H.R. 100, the Guam Commonwealth Draft Act. Today's hearing provides an historic opportunity for Congress and the Administration to provide clarity on the response of the United States to Guam's proposal. As you know, the last hearings on this matter were conducted in 1989. At that time, officials identified numerous problems with the bill as drafted. The former chairman of the subcommittee on territorial and international affairs requested that Federal agencies try to work out a more viable bill for addressing Guam's underlying concerns with the territory's leaders.

Eight years later, Guam and the Administration are provided an opportunity to report to Congress. This is an auspicious time to do it -- 1997 marks the tenth anniversary of when the people of Guam voted to send the Guam Commonwealth Draft Act to Congress. In addition, next year also marks the centennial of the end of the Spanish American War in 1898, when the United States obtained Guam from Spain. The issue of Guam's political status represents an important piece of "unfinished business" that sorely needs resolution.

So where are we with respect to Guam's quest for Commonwealth in 1997?

Briefly, the Administration has had several years of very positive and productive discussions with Guam. We have come a long way toward a fuller appreciation of Guam's aspirations for Commonwealth. Furthermore, the Administration has made significant progress in clarifying the legal and policy parameters of what we are able to recommend under a Federal framework. I believe we have reached an understanding on an outline of Commonwealth legislation that would conform to Federal parameters, while achieving legitimate aspirations for greater self-government within the U.S. political family. In order to bring final resolution to America's consideration of Guam Commonwealth, the Administration invites Congress to build on the progress of the past eight years by working closely with Guam and the Administration to prepare a final formulation of mutually acceptable legislation.

Before providing the details of the current status, I would like to provide a brief history of Guam Commonwealth. Governor Gutierrez and Congressman Underwood can provide a fuller and more eloquent description of this history than I. For purposes of my testimony, however, I will begin only from two decades ago.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 119 of 542

**HISTORY**

In 1976, Congress approved an Executive Branch agreement to make the Northern Mariana Islands, a chain of islands just north of Guam, a Commonwealth under the sovereignty of the United States. Prior to becoming a U.S. Commonwealth, the Northern Mariana Islands were a part of the Pacific islands trust territory that the United States administered under an arrangement with the United Nations. The Covenant which established the Commonwealth of the Northern Mariana Islands (CNMI), granted Guam's neighbor to the north several of Guam's unfulfilled objectives for changes in federal policy as it applied to Guam. Among these were a pledge not to unilaterally alter fundamental provisions of the Covenant and limits on immigration.

At about the same time, Congress authorized Guam to draft a constitution "within the existing federal-territorial relationship." As the 1980's began, the Executive Branch also entered into agreements with the other trust territory islands. In contrast to the Covenant which created the CNMI, the Compact of Free Association, which created the Federated States of Micronesia (FSM) and the Republic of the Marshall Islands (RMI), recognized the separate sovereignty of these other islands and provided for full self-government in all matters excepting those affecting military security. The Compact also granted programmatic and other economic assistance as well as rights for their citizens and products to freely enter the U.S.

In January 1982, the people of Guam, observing the developments in these neighboring islands, held plebiscites to choose among political statuses. The choices provided at that time were Independence, Free Association, Incorporated Territory, (i.e., one that is part of the United States to which Federal laws fully apply) Status Quo (Unincorporated Territory), Commonwealth, and Statehood. Commonwealth and Statehood garnered the most votes in the first plebescite. A second plebescite was held to decide between these two options. In the run-off, the people of Guam overwhelmingly selected Commonwealth by 73%, over Statehood with 26%.

Guam's leaders initially sought Executive Branch negotiations similar in structure to those which created the CNMI, the FSM and the RMI. Leaders of Congress, including this committee, suggested instead that submitting legislation would be more appropriate for a U.S. territory, especially one like Guam which had a representative in Congress. This perspective was influenced by Congressional differences with the Executive Branch negotiators of the Micronesia compacts, differences which led to substantial changes in the Compacts and delays in their approval by Congress.

In 1983, a Guam delegation representing all three branches of Guam's government met in Albuquerque, New Mexico, with a Congressional delegation and representatives of the Executive Branch. The Albuquerque meeting focused on strategies to structure and obtain Commonwealth legislation for Guam. Among other things, it was recognized that Guam's desire for Commonwealth comprised two broad areas. One area consisted of purely political status issues,



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 120 of 542

which pertained to the fundamental structure of the relationship between the United States and Guam. The other area dealt with economic and social issues, which revolved around Federal policies that Guam perceived were limitations on its potential development as well as funding in some federal programs. The parties agreed that Guam would prepare draft legislation for informal Federal review on the basic political relationship and on more transitory economic issues. The intent was to work out general agreements which would facilitate formal Federal actions.

In 1986, the Guam Commission on Self-Determination (CSD) completed work on a Guam Commonwealth Draft Act, which combined the economic and program issues of the day with more fundamental elements of the proposed Commonwealth relationship. While there were preliminary Federal comments on the Draft Act, the negotiations, which were earlier anticipated as a way to obtain general agreement between Guam and the U.S., did not occur. Instead, Guam officials sought popular approval of the slightly-modified draft, ignoring cautions from this committee that doing so would limit their ability to make the changes that would be necessary to obtain Federal concurrence.

In an August 1987 plebescite, the people of Guam approved all titles of the Draft Act, except for Article I (Chamorro Self-Determination) and Article VII (Immigration). These titles were revised and submitted for a second plebiscite in November 1987 in which both articles were approved.

The bill has been introduced in its original form, without any revisions, in each Congress since 1988.

In August 1989, a Federal Interagency Task Force issued a 103-page report on the Draft Act. The 1989 Report opposed most of the Draft Act's provisions on constitutional, legal, administrative and policy grounds.

In December 1989, the House Subcommittee on Territorial and International Affairs, held hearings on the Draft Act in Honolulu. Due to the numerous disagreements between Guam and the Federal agencies on the Draft Act, the chairman of the subcommittee requested that a Federal Interagency Task Force try to reach agreement with the Guam Commission on Self-Determination on provisions that could be enacted. Three years of extensive discussions then ensued between representatives of the Executive Branch and representatives of Guam. These discussions culminated in informal agreement on many issues.

In the waning days of the Bush presidency in January 1993, the Administration issued a second report on Guam Commonwealth Draft Act. It varied from several of the understandings that the Task force had reached with Guam because of objections raised during final Bush Administration clearance. The 1993 Report was similar in content to the 1989 Report, but offered additional suggestions for language that would address Federal concerns. Guam reacted strongly against the 1993 Report, alleging that key portions of the 1993 Report were issued

without notice to Guam and that the Bush Administration reneged on several agreements reached in the informal discussions with the Task Force.

**CLINTON ADMINISTRATION**

When the current Administration took office, the Guam Commonwealth issue had not been resolved to the satisfaction of Guam. From Guam's perspective, a large part of the problem lay with the interagency process. Guam believed that the previous interagency task forces lacked sufficient attention from policy-level Federal officials. Without such high-level attention, Guam believed that the Executive Branch response to its Commonwealth proposal would largely be dictated by narrow agency concerns.

President Clinton was elected having pledged to try to work out a mutually-acceptable Commonwealth bill with Guam and with Congress. In response to Guam's views, this Administration decided to have a Special Representative who could negotiate on behalf of the entire Administration and who could engage policy-level officials at all the agencies. Rather than approaching Guam Commonwealth issues through the programmatic lenses of particular Federal agencies, the Administration's Special Representative would try to take a "big picture" approach to dealing with the myriad issues in the Draft Act. This new approach envisioned the formulation of Commonwealth proposals that would be responsive to Guam's unique circumstances, while also being cognizant of Federal requirements. From the start, the new approach emphasized a very close and collaborative working relationship between representatives of Guam and the Administration's Special Representative. The objective was for each side to negotiate a mutually agreeable compromise on key Commonwealth issues. Once a preliminary agreement was reached, each side would then try to persuade its own constituent groups on the merits of the compromise. If the constituent groups of each side ratified the compromise agreements, the next step was for the parties to draft legislation implementing the agreements for submittal to Congress. Such legislation, theoretically, would have had the support of Guam and the Administration.

The first Special Representative for Guam Commonwealth was I. Michael Heyman, Counselor to the Secretary of the Interior. He reached an agreement with then Governor Ada of Guam on the most fundamental provision of the legislation -- mutual consent. It said that, to the extent constitutionally permissible, no provision of the bill once enacted could be unilaterally changed by the federal government. Mr. Heyman resigned his position in February 1995.

In August 1995, the White House announced the appointment of Stanley Roth as the second Special Representative for Guam Commonwealth. Roth, who was also the Director of the NSC's Asian Affairs office at the time, left government service in December 1995.

In January 1996, I took over negotiating responsibilities. My goal was a definitive U.S. response to the Commonwealth proposal. I sought an agreement that could be endorsed by the Administration and Guam which would maximize the amount of local self-government under

U.S. sovereignty while protecting fundamental U.S. interests in the island. In order to move the process to closure, I sought Guam's agreement on two key points.

First, I emphasized the need for us to move away from the original language of the Draft Act. As highlighted by the previous two Federal Interagency Task Force reports, the original language of the Draft Act had posed many problems. Rather than working from the original language, I believed that more progress could be made if the Guam representatives and myself could first agree on fundamental concepts that underlay the Guam Commonwealth proposal. If agreement on concepts could be reached, we could then work on legislative language to implement the concepts in a way that could balance Guam's legitimate aspirations and fundamental Federal interests in Guam.

Secondly, I proposed that we should focus our efforts on the primary "deal-breaker" issues, rather than all of the issues subsumed in the original Draft Act. By focusing on the "deal-breaker" issues, we could bring sustained attention and resources to bear on resolving the most contentious issues in the Commonwealth discussions. It was my hope that once the "deal-breaker" issues were resolved, the Administration position regarding fundamental Guam Commonwealth policies would be developed and the remaining issues could then be resolved in a more expeditious manner. A corollary to this second point was that, to the maximum extent possible, we should not revisit or re-open any issues comprising a previous agreement between Guam and prior Federal positions, which both sides still found acceptable.

With these points in mind, I undertook an aggressive series of meetings and negotiations with Guam Representatives and federal officials throughout 1996, with the bulk of these meetings occurring between June and August 1996. There were dozens of meetings held in which I or my staff were personally involved. The great majority of meetings occurred in Washington, D.C., with some occurring in Guam during my visit there last year, one occurring in San Francisco and one with myself and the Governor in Salt Lake City. A broad range of issues was discussed, debated and negotiated among the parties during this time period. A large number of proposals were drafted, exchanged, refined and further modified. The work during this time could be characterized as a brainstorming "work in process" with issues often shifting in status, priority and importance.

The main thrust of these discussions, as outlined previously, was for the negotiating parties -- primarily myself and the Guam representatives -- to reach informal agreement in principle on the fundamental concepts and then to draft legislative language that would implement those concepts. In keeping with the new approach set at the beginning of this Administration, I then planned to work with agencies and others in the Administration to formally agree to the preliminary compromises I had worked out with Guam. The representatives for Guam, on their part, would do the same with their constituent groups.

Between November 1996 and February 1997, I made a series of recommendations to the White House. The key recommendations included proposals on mutual consent, Chamorro self-

determination, a joint commission, immigration, labor and Federal excess lands. These comprised the fundamental "deal-breaker" issues that Guam had identified as its highest priorities, and were therefore also the ones which we had spent the most time trying to resolve. These preliminary proposals represented compromises that, in my opinion at the time, struck an appropriate balance between Guam's aspirations and the protection of fundamental U.S. interests in Guam. While the previous Special Representatives and I worked with various agency officials in crafting these preliminary proposals, it is important to note that these did not have the formal approval of those agencies, or of the Administration generally. At the time these preliminary proposals were submitted, I had planned to work closely with White House staff to formally clear these proposals with the affected agencies.

The process stalled at this point, however, because of concerns of other federal agencies and members of this committee. In response to your concern, Mr. Chairman, the President committed to an approach that would seek agency and congressional comments on the latest proposals and ensure that federal concerns at the policy, legislative and constitutional levels were satisfied. At the same time, he wanted us to continue to creatively address Guam's objectives in an expeditious manner.

**CURRENT STATUS**

The Administration's plans for implementing this approach were short-circuited somewhat by the call for this hearing. In order to respond to it in the short period provided, we were not able to conduct the congressional consultations that we had planned but concentrated, instead, on agency consideration of my major recommendations along with other provisions of the bill. The Administration's position on the various Guam Commonwealth issues is attached to the text of my testimony as Exhibit A. These comprise formally cleared positions which were prepared specifically for this hearing. Because of the relatively short notice of this hearing and the large number of issues contained in H.R. 100, they are not as fully developed as would have otherwise been the case had the process originally envisioned been completed. Nevertheless, the comments presented represent the formal views of this Administration.

Without going into too much detail, some general observations can be made regarding the Administration's position on the Guam Commonwealth bill as proposed.

First, the process followed by the Special Representatives in this Administration attempted to push the envelope of Executive Branch consideration of fundamental Guam Commonwealth issues in creative and flexible ways. During my term, especially, I have tried different formulations and approaches to reach compromises that could be supported by Guam and proposed to this Administration. Final Administration positions, however, are based on a consensus process among the different constituent interests that make up the Federal government. They are also governed by constitutional, policy, and legislative constraints. While I may believe that my own views are appropriate solutions to Guam's situation, they do not



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 124 of 542

constitute the Administration's position unless the Executive Branch as a whole endorses them and they meet constitutional and other tests.

Second, while there remain areas of disagreement, the years of discussions between the Administration and Guam have also resulted in significant progress and numerous areas of Federal agreement and support. The negotiations have clarified the questions, concerns and positions of Guam and the Executive Branch; they have resulted in creative and pragmatic approaches toward mutually agreeable compromises; and they have laid out a clear outline of potential legislation that would enhance self-government for Guam and improve the overall relationship between Guam and the United States. Although we are unable to support everything that Guam has originally proposed, there are a number of areas where we are supportive of proposals that are responsive to the legitimate desires of Guam's people for greater self-government, for increased input into the Federal policy-making process and for the application of Federal policies in ways that respect the uniqueness of Guam. These areas include the following:

- supporting a Federal policy commitment not to unilaterally change the fundamental relationship between Guam and the U.S.;

- supporting the creation of a commission, with significant representation and input by Guam, to review and provide recommendations on the appropriate application of Federal policies to the island;

- supporting an invitation for the Guamanian people to express their desire for Guam's ultimate political status;

- supporting the amendment of appropriate provisions of the U.S. Immigration and Nationality Act to accommodate Guam's desire to limit the rate of permanent immigration to the island and to provide additional flexibility to address Guam's permanent labor needs; and

- supporting, within certain parameters, a right of first refusal for Guam to obtain federal excess lands on the island.

These measures constitute noteworthy improvements to the status quo and comprise further enhancement of Guam's status within the American political family. If we compare Guam's status now, with its status when the U.S. first "acquired" Guam in 1898, history demonstrates a gradual and steady trend toward greater and greater local self-government and enhanced standing within the Federal framework. These include, among other things, Guam's step-by-step acquisition of more and more characteristics of a state or local government: the acquisition of U.S. citizenship by virtue of birth on the island; the authority to locally elect a legislature; the authority to locally elect a Governor; the authority to locally elect and send a representative to Congress; and the authority to adopt a local Constitution for Guam. At the same time, the Executive Branch and Congress over the years have expressly recognized Guam's

unique geography, culture, economy and other characteristics which militate against the strict and uniform application of national policies to the island. Thus, there are currently a variety of special Federal policies and programs that are available to Guam (but not the 50 states) which benefit the island, such as: Federal tax cover over to the Guam treasury; Guam-only visa waivers; exceptions to the Federal excess property act; providing fisheries management fees under the Magnuson Act; special waivers under the Clean Air Act; special funding for technical assistance, capital improvement projects and maintenance of infrastructure; and duty free treatment of certain goods. When viewed from this historical and policy perspective, the Administration's positions on a variety of Commonwealth proposals reflect continued Federal support of greater self-government for Guam in ways that enhance and are sensitive to its unique status within the Federal constitutional structure.

Finally, it should be noted that the Executive Branch has grappled with the original Guam Commonwealth bill for the better part of a decade and through the change of several administrations, both in Guam and in Washington. The general positions resulting from Federal review of the original bill have remained relatively consistent -- the Guam Commonwealth Draft Act, as originally approved by Guam in 1987, cannot be supported by the Federal government. In some key areas, our objections go beyond just the specific proposals of the original bill. They go to the substance and merits of the fundamental concepts that are contained in the original Draft Act, as explained by Guam's representatives. Among the key concepts we cannot support are the following:

- o legally binding the Congress or the Executive Branch to seek the consent of the Commonwealth government before modifying the act creating Guam Commonwealth, or before applying any future Federal law, regulation or policy to Guam;

- o providing for a legally binding, government-sponsored or endorsed vote on ultimate political status of Guam, in which only the indigenous Chamorro people may participate to the exclusion of other U.S. citizen residents of Guam;

- o transferring Federal control over the adoption and enforcement of immigration and labor policies to the Commonwealth government; and

- o creating a joint commission under Guam's control which would have the authority to issue final determinations on the application of Federal policies to Guam, or to determine military lands to be transferred to the Commonwealth government.

In the original Draft Act, Guam has proposed achieving these goals while remaining part of the American political family and obtaining the maximum benefits of a political status affiliated with the United States. As reflected in the prior two interagency task force reports and in the attached comments, the Administration has indicated how far it is able to accommodate the original proposals within the Federal framework. Notwithstanding almost ten years of good faith

efforts and sincere intentions on both sides, we have been unable to find constitutional and otherwise appropriate ways of bridging the gap between the full extent of what Guam has originally proposed and what the Executive Branch is able to support under the American flag. Much of the authority that Guam had proposed be ceded to it under the Draft Act is appropriate to sovereignty and should require sovereignty. Other proposals probably would require assuming greater responsibilities as a member of the U.S. family.

**CONCLUSION AND RECOMMENDATION**

We believe that much has come out of the negotiations to date that can be further refined and profitably achieved with continued and sustained effort and attention, not just by Guam and the Executive Branch, but also by Congress. Therefore, our first recommended option is to invite Congress to join in the Guam status deliberations to help formulate comprehensive Commonwealth legislation that is mutually agreeable to all parties. Participation by Congress, which is constitutionally vested with plenary powers over territorial matters, would add significant momentum in bringing this matter to closure. Congress might want to consider using June 20, 1998 -- the centennial of the raising of the American flag on Guam -- as a deadline to complete work on a substitute Guam Commonwealth bill. This would be a powerful statement that America remains committed to supporting and respecting the people of Guam and their aspirations for greater self-government within the Federal framework.

A second alternative, which may, but does not necessarily have to be, exclusive of the first, would be to pursue Federal policy changes that Guam has proposed which are supportable by the Administration, many of which are not inherent in the definition of the island's constitutional status. We could do this through discrete and separate legislation, perhaps having individual bills for each issue considered. To a certain extent, Guam has already embarked on this approach on its own -- it has recently achieved Federal policy changes in the disposition of certain Federal excess lands on the island, the integration of Guam into the nation's domestic rate setting structure, and the cover-over of fisheries management fees to the island. The Administration is willing to support and proactively engage Guam and Congress in the development of separate bills that would address issues such as the application of particular Federal immigration, labor, transportation, trade and tax policies to the island.

The Administration would be willing to pursue either of these alternatives. Thank you for this opportunity to testify. I will gladly answer any questions that you may have.

## Exhibit A

**Summary of Administration Comments On**
**Guam Commonwealth Draft Act, H.R. 100**
**October 29, 1997**

### PREAMBLE

Summary of Provision. The preamble describes the motives of "the people of the United States" in embracing the establishment of the Commonwealth, making reference to U.S. "obligations" under the Treaty of Paris, the UN Charter, and the principle of self-determination. It also describes the motives of "the people of Guam," who seek greater self-government "in concert" with the U.S.

> Current Position. The Administration would support this provision if it were revised to replace the word "obligations" with the phrase "purposes and principles" of the UN Charter and Treaty of Paris, qualify the term "self-determination" to mean as provided in the Guam Commonwealth Act and specify that the Commonwealth would be within the American political system.

### TITLE I - POLITICAL RELATIONSHIP

**Section 101(a) - Creation of Commonwealth Government**

Summary of Provision. Creates the Commonwealth of Guam and identifies the supreme laws of the island.

> Current Position. The Administration would support this provision if modified by language to clarify that the Commonwealth of Guam will remain "under the sovereignty of the United States".

**Section 101(b) - Self-Government and Guam Constitution**

Summary of Provision. Guam shall have "full" self-government and be able to adopt a Constitution that would have to be consistent with the sovereignty of the U.S., provide for a republican form of government, provide for 3 branches of government, and contain a bill of rights.

> Current Position. The Administration would support this provision if it were modified to include Congressional approval of the Commonwealth Constitution, based on prior precedent, and the need to insure Guam's compliance with the elements required to be

**Exhibit A**

included in the Constitution pursuant to Section 101(b). As to the modifier "full" for self-government, we object because the term creates ambiguity, particularly when other modifiers of the term elsewhere in the legislation differ. Our concern is based on prior experience, which suggests that omission of the term "full" could be used in later litigation to diminish the authority of the United States We also would recommend deleting reference to the Commonwealth Act, since it would be covered by the reference to "laws of the United States" and deleting reference to the Guam Constitution, as it seems more appropriate for the Guam Constitution (when adopted) to define its place in relation to other Commonwealth laws.

**Section 101(c) Commonwealth Power to Sue and Be Sued**

Summary of Provision. The Government of the Commonwealth shall have the power to sue in its own name and be sued for breach of contract and tort.

Current Position. The Administration would support this provision if modified to add the words "evidenced by enacted law."

**Section 101(d) Public Education System/Inherent Powers**

Summary of Provision. Refers to the Commonwealth's power to establish, maintain and operate a public educational system.

Current Position. The Administration does not object.

**Section 102. Chamorro Self-Determination and U.S. Citizenship.**

**Subsection 102(a) - Chamorro Self-Determination.**

Summary of Provision. Congress recognizes the inalienable right of self-determination by indigenous Chamorros, who are defined as those born on Guam before August 1, 1950, and their descendants. The act of self-determination shall be provided in Guam's Constitution.

Current Position. The Special Representative has preliminarily proposed to revise this provision to state that "Congress hereby requests the Chamorros provide an expression of their desire for the Commonwealth of Guam's future political status." This language sought to clarify that the "expression of desire" to be taken by Chamorros would be non-binding and non-governmental in nature. Nevertheless, there remain concerns in the

**Exhibit A**

Administration that the provision may be implemented in a manner that violates the protection of voting rights under the Fifteenth Amendment and the doctrine of equal protection pursuant to the Due Process Clause of the Fifth Amendment and the Equal Protection Clause of the Fourteenth Amendment. Any expression of political desire by the Chamorro people must be without any sponsorship by either the Federal government or the Commonwealth government and not under auspices of either government.

**Section 102(b). Voting to Ratify Commonwealth.**

Summary of Provision. The subsection provides that "notwithstanding the provisions of" section 102(a), no qualified voter will be deprived of the right to participate in a local referendum to ratify the Commonwealth Act.

Current Position. There are concerns because this subsection references section 102(a) and implies an endorsement of the Chamorro-only vote. An amendment to section 102(a) Chamorro Self-Determination, as recommended above, would remove Federal concerns regarding section 102(b).

**Section 102(c) Federal Programs For Chamorros**

Summary of Provision. Requires new Federally-funded programs and authorizes the Commonwealth to promote programs targeted toward the enhancement of economic, social and educational opportunities for Chamorros and to protect their language and culture.

Current Position. The responsibility imposed upon the United States should not be mandatory. Furthermore, under Adarand Construction v. Pena, 515 U.S. 200 (1995), any benefit provided exclusively to the Chamorro people would likely be subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment, and thus would need to be narrowly tailored to serve a compelling government interest. Finally, any new training programs should be coordinated with existing workforce development programs.

**Section 102(d) Continued Eligibility Under Existing Programs**

Summary of Provision. Provides that new programs under 102(c) will not affect eligibility of all minorities under existing programs.

Current Position. The Administration supports this provision.

**Exhibit A**

**Section 102(e) No Impairment of U.S. Citizenship Rights**

Summary of Provision. Confirms that the Act and the Constitution of Guam do not impair U.S. citizenship or the rights of legally admitted permanent residents.

Current Position. This subsection can be eliminated as unnecessary.

**Section 102(f) Chamorro Land Trust**

Summary of Provision. Requires the Government of Guam to establish a Chamorro Land Trust for the benefit of indigenous Chamorros, comprised of lands returned to Guam by the U.S. Authorizes return or lease of lands to original owners.

Current Position. There are strong concerns that this subsection may be race-based and subject to constitutional infirmity based on the Adarand and Croson decisions of the Supreme Court. Section 102(f) is also inconsistent with the Administration position on Section 4, of S.210, the proposed Guam Excess Lands Act.

**Section 102(g) Residency Requirements**

Summary of Provision. Provides that the Commonwealth Constitution shall establish reasonable residency requirements for voting and elective office.

Current Position. The Administration would support this provision if it is amended to specify "bona fide" residency and not permit durational requirements which could be longer than the Supreme Court has found to be the maximum permitted by the Constitution.

**Section 103. Mutual Consent**

Summary of Provision. Provides that the United States will not modify the Guam Commonwealth Act unless it has the consent of the Government of the Commonwealth of Guam. (There is also a "mutual consent" principle in Section 202).

Current Position. The first Special Representative attempted to strike a compromise by proposing that Guam and Congress agree to mutual consent "to the extent constitutionally permissible." The Administration, however, has strong reservations regarding this proposal because of the firm legal conviction that a mutual consent *statute* cannot preclude the plenary *constitutional* authority of Congress to enact laws regarding a United

**Exhibit A**

States territory. Therefore, it is our considered view that the proposed mutual consent language cannot preclude a future Congress from unilaterally modifying or repealing the Guam Commonwealth Act. Hence, we are concerned that inclusion of the recommended provision -- even with the "to the extent constitutionally permissible" proviso -- risks misleading the people of Guam and others regarding the legal force of the Federal commitment not to modify the Guam Commonwealth Act without the consent of the people of Guam. For this reason, if the proposal is to be used, it is essential that it be made clear to all concerned that the provision is not enforceable. In any event, the Administration is supportive of a statement that the Federal government is committed, as a matter of sound policy and principle, not to alter Guam's Commonwealth status without the consent of the people of Guam. Finally, any mutual consent policy should not go beyond provisions that establish the basic political relationship between Guam and the United States and should not reach ancillary matters (e.g. tax) that the Federal government should be free to alter.

**TITLE II - APPLICABILITY OF FEDERAL LAW**

**Section 201. Applicability of the United States Constitution.**

Summary of Provision. In addition to particular provisions of the U.S. Constitution that already apply to Guam, Section 201 provides for the application to the Commonwealth of additional Constitutional provisions: Article IV, section 2, clause 2; Article IV, section 4; the Tenth Amendment; and the first sentence of the Fourteenth Amendment.

Current Position. The Administration would support this provision with amendments to specifically set forth all provisions of the Constitution that will apply in Guam after enactment of the Commonwealth Act, including reference to the territorial clause, but deletion of references to the Tenth Amendment and to the first sentence of the 14th Amendment. As a non-state area under the sovereignty of the United States, Guam, even as a Commonwealth, would remain subject to the Territory Clause of the Constitution (Article IV, Section 3, Clause 2) and thus subject to the plenary legislative power of Congress. Any attempt to extend the Tenth Amendment to Guam would thus not be consistent with the Territory Clause.

**Section 202. Effect of Federal Law (Mutual Consent)**

Summary of Provision. The section provides that no Federal law, rule, or regulation passed after the date of enactment will apply to Guam unless Guam consents.

Current Position. The Administration recommends deletion of this provision because it is



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 132 of 542

**Exhibit A**

inconsistent with United States sovereignty over Guam and also contrary to Congress's plenary powers over territories under the Territorial Clause. There are also a number of administrative and jurisdictional concerns regarding the possibility that two sets of potentially conflicting federal standards would need to be enforced: one for Guam and one for the rest of the United States if Guam objected to policies uniformly applied elsewhere.

**Section 203. Joint Commission.**

Summary of Provision. Four Guam and three federal officials would form a commission, funded by the U.S., to conduct regular consultations and negotiations with U.S. on all matters affecting the relationship between Guam and the U.S.; to recommend modification of federal laws; and (via last sentence of Sec. 1002) to declare federal property excess.

Current Position: The Special Representative had proposed a Joint Commission under Federal control comprised of 3 federal officials and 2 Guam officials which would have three functions: (i) be a forum for regular consultations between the U.S. and Guam; (ii) be an advisory body to recommend modifications in the application of selected federal laws to Guam; and (iii) be a decision-making body in determining the application of selected federal regulations to Guam.

While the Administration supports the concept of providing Guamanian officials with a formal mechanism to advise and consider Federal laws and policies regarding Guam, the structure and function of the Joint Commission raises constitutional concerns. In addition, the Administration objects, as a matter of policy, to granting the Commission ultimate decision-making authority to suspend or modify federal policies, whether by statute or regulation, to Guam. Furthermore, a grant of authority to suspend any or all federal regulations is not a technical or trivial matter. The proposal provides the Joint Commission with review power over all manner of federal rules and regulations, even where the subject matter of such regulations is not within the substantive expertise of the members of the Joint Commission. This provision would effectively allow the Joint Commission -- made up of only a handful of U.S. officials and Guamanian officials -- to supplant the knowledge and expertise of entire agencies on particular issues.

The Administration believes that various agencies with knowledge and expertise on a particular subject, after proper consultation and advisement by the Joint Commission, should continue to be vested with ultimate authority to enact and apply Federal regulations to Guam. The Administration does not object to a consultative forum between Guam and the Federal government and would support the creation of a Commission in which Guam would have input and representation and which could

**Exhibit A**

provide recommendations to Federal agencies regarding the application of Federal policies to Guam. Such a Commission should include representation for the Federal agency or agencies with jurisdiction over the issues being addressed. If such a Commission were created with Guam members and U.S. members, we recommend that each government bear the expense of the Commission's work through a mutually agreeable cost-share agreement.

**Section 204. Delegation of Authority.**

Summary of Provision: Congress would authorize the President or his designee to delegate to Governor of Guam total or partial performance of functions now vested in administrative agencies in the Federal Government.

Current Position: We recommend that the propósed provision clarify that, if the President elects to delegate authority to the Governor of Guam, the Governor of Guam would not thereby become a federal official. Rather, he would remain a Guamanian official and thus need not be appointed in conformity with the Appointments Clause. In implementing such a designation, there are concerns regarding the application of Federal conflict of interest statutes to Guamanian officials.

**TITLE III - FOREIGN AFFAIRS AND DEFENSE**

**Section 301. U.S. Authority for Foreign Affairs and Defense.**

Summary of Provision. The U.S. would have responsibility and authority for foreign affairs and defense that affect the Commonwealth of Guam.

Current Position. The Administration would support this provision if the word "complete" is inserted before "responsibility." The Administration believes that defense and foreign affairs authority is constitutionally lodged in the Federal government and that in the international arena a country must speak with one voice. The CNMI Commonwealth Covenant states that the U.S. has "complete responsibility and authority" for these functions. If the word is omitted in Guam's provision, which is otherwise the same as the CNMI's, the implication could arise that a lessening or limitation of U.S. defense and foreign affairs authority was intended. This should be avoided by the addition of the word "complete" before "responsibility" in the first line of the revised provision.

**Exhibit A**

**Section 302. Consultation with Guam.**

Summary of Provision. Subsection (a): The U.S. will consult with Guam before signing treaties or agreements which affect Guam; (b) no military security zones or foreign military personnel on the island without Guam's approval (except in case of war) and no new U.S. bases without consultation with Guam; (c) no increases/decreases in DOD activities without consultation with Guam.

Current Position. The appropriate Federal agencies, primarily State and Defense, usually consult with Guam officials, consistent with national security interests, before taking actions that could impact the island. But some consultations and certainly the approval requirements which Guam seeks would seriously hamper the U.S. ability to respond to international crises. As drafted, subsection (a) is overly broad and not consistent with the constitutional scheme for Federal responsibility over foreign affairs. In regard to foreign affairs consultations, several concerns were raised: (a) in view of the hundreds of international agreements that the Executive Branch concludes each year, a requirement for "prior consultations" with Guam would cripple the ability of the U.S. to negotiate timely and effective international agreements; (b) since the Constitution gives the President the sole authority to negotiate treaties and sole power to make Executive Agreements, it follows that Congress lacks the authority to compel the Executive Branch to consult with Guam. Consequently, in lieu of a "prior consultation" requirement, language is recommended that would provide sympathetic U.S. consideration of Guam's views on international matters directly affecting Guam and provide opportunities for effective presentation of such views to an extent comparable to opportunities provided to any other Commonwealth, territory or possession. (Similar to Section 904(a) of the CNMI Covenant.) In regard to defense consultations, the U.S. cannot agree to the "security zone" and "foreign personnel" provisions requiring Guam's approval, but is willing to agree to required consultation, consistent with national security, with Guam on the foreign personnel issue. In this regard, it is recommended that such consultations not be applicable in time of war or national emergency, and be further limited to consultations regarding the stationing of foreign military personnel, the establishing of military bases and the significant increase or decrease of U.S. military personnel on Guam.

**Section 303. U.S. Consular and Trade Offices:**

Summary of Provision: 303(a)(1) The U.S. will help Guam set up offices in U.S. and abroad; 303(a)(2) U.S. will help Guam become a member of or participant in regional and other international organizations (including South Pacific Forum and Asian Development Bank). Guam shall be free to accept financial and technical assistance from these organizations, enter

**Exhibit A**

agreements with members of these groups and other sovereign states, relating to trade and tax questions; 303(b) U.S. will obtain from foreign countries favorable treatment for exports from Guam.

Current Position. Section 303 (a)(1): Consular offices would not be needed if the Federal Government can reach a compromise agreement on the immigration provision that leaves control and authority with the U.S.. The U.S. was ready to assist Guam to set up offices abroad to promote tourism, economic, and cultural interests. These target areas should be specified in the provision. The Administration position recognizes that Guam can enter certain types of agreements of a non-governmental or commercial character or which do not entail the creation of binding rights or obligations but merely set forth agreed understandings or procedures.

Section 303(a)(2): While the U.S. will continue to assist Guam in joining regional organizations for which Guam is qualified, the U.S. cannot force organizations whose rules limit membership to sovereign states to accept Guam. The rules of the South Pacific Forum and Asian Development Bank - of which Guam wishes to be a member - currently restrict membership to nations that are responsible for their foreign affairs. The U.S. supports Guam's participation in appropriate international groups, and will consider requests on a case-by-case basis. The federal position recognizes that Guam can enter certain types of international agreements of a non-governmental, commercial, or cultural character. But a grant of independent authority to Guam to conclude tax and trade treaties with sovereign states is incompatible with the Constitutional authority of the federal government, and could create confusion as to the U.S. guaranteeing that its constituent parts comply with U.S. treaty obligations.

Section 303(b): The Administration would support the provision if it is amended to provide that the U.S. will, as appropriate, help Guam gain favorable treatment for its exports from foreign states under various trade preference programs on a case-by-case basis.

**Section 304. Nuclear, Chemical, and Other Toxic Wastes.**

Summary of Provision. (a) U.S. shall not use Guam land or surrounding water for storage or dumping of nuclear waste; (b) U.S. shall make safe for human habitation all DOD chemical waste dump sites on Guam and shall not store hazardous chemicals on Guam or in its surrounding waters; (c) U.S. shall compensate, as the District Court of Guam decides, anyone injured by nuclear, chemical, or other hazardous material stored, used, or disposed of by U.S. agencies on Guam or in its waters.

**Exhibit A**

Current Position. The objectives of this section are largely achievable through the application of existing U.S. statutory and regulatory requirements as well as international agreements the U.S. has concluded. There are objections to the language of the original provision because it is ambiguous, contradictory, unspecific, and generally does not conform to existing environmental standards constrained in laws such as CERCLA and RCRA. The term "clean up," for example, is undefined and should refer to the authority under which the cleanup will take place. There are also particular concerns regarding the uncertain effect of this broad language on the management of radioactive material on naval vessels and on the temporary storage of routinely generated radioactive wastes at hospitals from medical procedures using radio pharmaceuticals. Finally, the Federal Tort Claims Act provides adequate protection. Thus, the Administration recommends deletion of this section.

**TITLE IV - COURTS**

*Vote: The Administration is presenting a position on H.R. 2370, the "Guam Judicial Empowerment Act of 1997." Among other things, H.R. 2370 would amend the Organic Act of Guam by establishing the local court system of Guam, including the local appellate court known as the Supreme Court of Guam, as a co-equal branch of the Government of Guam and permitting the election or appointment of the Attorney General of Guam. The Administration has no objection to H.R. 2370, if it is modified as proposed by the Administration's testimony.*

**Section 401. Judicial Relationship of Guam to the U.S.**

Summary of Provision. Judicial relations between Guam courts and U.S. courts with respect to appeals, certiorari, removal of causes, the issuance of writs of habeas corpus, and other matters and proceedings shall be governed by U.S. laws establishing the relationship between Federal courts and State courts.

Current Position. The Administration would support this provision if decisions of the highest court of Guam are reviewed by the Ninth Circuit Court of Appeals for a specific period of time, as in current law; however, the Administration would support reducing the currently authorized 15 year review period to a shorter period.

**Section 402. Jurisdiction of the District Court.**

Summary of Provision. Guam's District Court shall have the jurisdiction of a district court of the United States, including, but not limited to, the diversity jurisdiction provided for in section 1332 of title 28, United States Code, and that of a bankruptcy court of the United States.

**Exhibit A**

Current Position. The Administration supports this provision, if amended to delete subsection (a), which "continued" the District Court, and further modified to add "and any additional special jurisdiction given it by Congress." The reason for this is that it might become necessary or desirable, to confer on the Guam District Court jurisdiction over claims against the U.S. that arise exclusively on Guam -- e.g. claims stemming from federal land acquisition on Guam after World War II.

**Section 403. Applicable District Court Rules.**

Summary of Provision. Federal rules of practice and procedure are applicable to the Guam District Court.

Current Position. The Administration would support this provision if it is clarified that there are provisions of the Federal Rules where designation of the U.S. Attorney may need to be retained, even if the action concerns local Guam law -- e.g. Rule 4(I) regarding service on the U.S. Attorney in cases where the United States is a defendant.

**Section 404. District Court Judge, U.S. Attorney, Marshal.**

Summary of Provision. The President shall appoint a judge for District Court of Guam for a 10-year term, as well as the U.S. Attorney and U.S. Marshal.

Current Position. The Administration would support this provision, with minor updating of references.

**TITLE V - TRADE**

**Section 501. Guam-United States Free Trade Area**

Summary of Provision. Guam remains outside U.S. customs territory and proposes the creation of a free trade area with the United States in which all "products of Guam would enter the U.S. customs territory duty and quota free. The bill define "product of Guam" as articles containing at least 30 percent value added in Guam. The U.S. would not impose any duties or quotas or other restrictions on products of Guam or treat them as originating in any other country. The Governor of Guam only would certify what constituted a product of Guam for purposes of export to U.S. customs territory.

Current Position: With the subsequent passage of North American Free Trade Agreement,

**Exhibit A**

Guam informally proposed amendments to Section 501 which sought to update the provision and achieve the following objectives: (a) Guam wants to control imports/exports restrictions vis-a-vis foreign countries; (b) Guam wants to be treated as if it is a state and part of the U.S. customs territory through a reciprocal free trade arrangement; (c) Guam wanted trade laws that would encourage the development and diversification of its economy, which would be also beneficial for the U.S. by reducing the amount of federal subsidies to Guam; and (d) Guam wanted certainty in the application of trade laws, due to past experiences with sudden amendments to Headnote 3(a) that undermined Guam's watch and sweater industries. The Administration supports the continuance of Guam remaining outside the U.S. customs territory. We are reviewing and considering these trade proposals further with Guam.

## TITLE VI - TAXATION

**Section 601. Mirror Image Tax.**

Summary of Provision. The bill would permit Guam to enact a local income tax to replace the income tax provisions of the Internal Revenue Code (IRC) of 1986 which serves as a "mirror image" income tax on Guam.

Current Position: Under the authority of the 1986 Tax Reform Act, an implementation agreement was negotiated and signed in 1989, but its effective date was postponed. The principal reason for the postponement was to coordinate the agreement with the larger Commonwealth Act legislation. Representatives of Guam have met with Treasury Department representatives to develop acceptable tax delinkage provisions and a revised implementation agreement. At the present time, the result of those negotiations, a set of draft legislative provisions that would supersede all of Title VI, is under review at the Treasury Department.

## TITLE VII - IMMIGRATION

**Section 701. Guam Immigration Authority.**

Summary of Provision. This section states that the recent influx of substantial numbers of immigrants from Asia and the Pacific has severely strained Guam's infrastructure. In order to limit the number of immigrants to Guam, Congress grants the Commonwealth of Guam the authority to control entry of all aliens into the island. Federal immigration law will apply for a 2-

**Exhibit A**

year transition period after Commonwealth is enacted. Thereafter, locally-enacted immigration laws will apply. Among other things, local authority over immigration shall not impair the free movement of U.S. citizens between Guam and the U.S., shall not include naturalization of aliens for U.S. citizenship, and shall not make Guam a port of entry into the U.S. for permanent resident aliens for purposes of calculating duration of physical presence in U.S. prior to naturalization.

Current Position. The Administration is sensitive to Guam's legitimate concerns regarding the impact of uncontrolled immigration to Guam on the island's infrastructure and the necessity to attract adequate numbers of workers to fill vacancies in Guam's growing economy. In trying to balance Guam's desire for local immigration control with Federal concerns regarding the possible duplication of labor and immigration problems occurring in the CNMI, the Special Representative made a preliminary proposal as follows:

> The United States would transfer control to the local government after an appropriate transition period during which adequate safeguards are developed and instituted to protect immigrants and to enforce applicable labor and immigration laws. Before any transition from federal to local control can be considered, the U.S. Attorney General must review and approve: (a) a draft Guam immigration code passed by the local legislature and approved by the Governor of Guam; (b) a detailed program for ensuring effective enforcement of immigration and related labor laws; and (c) a reasonable time frame for implementing such plan. Furthermore, the Guam immigration plan would need to be consistent with all existing international obligations of the United States. There would also be specific content requirements for the draft Guam immigration code and a process by which the Attorney General approves, disapproves, modifies or revokes local immigration authority.

Although it recognizes Guam's unique geographic, economic, cultural and historical situation, the Administration does not support either the original provision or the Special Representative's proposal for the following reasons: (a) an area like Guam would lack the basic infrastructure and intelligence information to ensure adequate enforcement of immigration laws consistent with the interests of the United States; (b) granting Guam control over immigration could have serious security implications; (c) ceding control could create potential conflicts with the United State's international obligations regarding, among other things, treatment of refugees, nonrefoulement, and migration of professionals under the General Agreement on Trade and Services and the North American Free Trade Agreement; (d) Guam's stated intention to use temporary unskilled workers to fill permanent jobs runs contrary to longstanding U.S. immigration policies and national values regarding the use of permanent and enfranchised workers for permanent positions; and (e) granting Guam immigration control would set an unwise

**Exhibit A**

precedent for other U.S. insular areas and runs contrary to the current Administration policy of establishing a Federal immigration framework for the CNMI.

Nevertheless, the Administration is sensitive to Guam's legitimate concerns regarding the impact of uncontrolled immigration and the potential shortage of labor on the island. The Administration is prepared to discuss with Guam ways to address these concerns within the context of the existing Federal immigration framework. Specifically, the Administration is willing to discuss with Guam a proposal under which the United States would limit the number of persons who may be admitted initially as lawful permanent residents on the basis of an approved family-sponsored immigrant visa preference petition at any Port of Entry in Guam. Under this proposal, the INS, upon the request of the Governor of Guam and after consultation with the appropriate Federal agencies, could adjust this number annually. With respect to the issue of labor shortages, the Administration is willing to consider a proposal under which the United States Government would set aside a limited number of unused employment-based immigrant visa numbers which could be used to fill permanent positions in Guam requiring unskilled workers. The Administration adheres to the position, however, that temporary workers should not be allowed to fill positions that are permanent in nature.

**Section 702. Guam-Only Visa.**

Summary of Provision. Section would authorize U.S. consular officials to issue non-immigrant visas for travel only to Guam to encourage foreign investment and tourism.

Current Position. The existing Guam Visa Waiver Program addresses the tourist promotion aspect of this provision. It waives the visa requirement for visitors from selected countries coming solely to Guam for a period not exceeding 15 days for business or pleasure. Countries that have qualified for this program include: Australia, Brunei, Darussalm, Burma, Indonesia, Japan, Malaysia, Nauru, New Zealand, Papua New Guinea, the Republic of Korea, Singapore, the Solomon Islands, the United Kingdom, Vanuatu, Western Samoa and Taiwan. With respect to the foreign investment aspect of Section 702, the Administration is willing to discuss with Guam the development of a provision that would allow foreign investors to come to Guam direct and develop businesses in which they have invested a substantial amount of capital.

**Exhibit A**

**TITLE VIII - LABOR**

**Section 801. Federal Employment.**

Summary of Provision. Provides a preference in Federal employment in Guam to residents of Guam possessing requisite standards of age, health, character, education, knowledge and experience.

Current Position. The Administration would support if the provision is modified as follows: (a) that the preference applies only to new Federal employees hired in Guam (not transfers of existing federal employees from off-island); (b) that the term "qualifications" is substituted for "age" and other standards because of Federal prohibition on age discrimination; (c) that Federal anti-discrimination laws in employment continue to apply in Guam; (d) that the preference for veterans and spouses of military personnel continues to apply and takes priority over the preference to residents of Guam provided for in the section; and (e) a subsection is added providing a remedy in Federal court for persons claiming to be aggrieved.

**Section 802. Guam Labor Laws.**

Summary of Provision. Authorizes the Guam Commonwealth Government to enact and enforce labor laws to replace existing Federal labor laws. All applicable Federal laws which regulate employment on Guam will remain in effect until replaced by local laws.

Current Position. In discussions with the Special Representative, Guam indicated its willingness to go forward with a previous informal agreement. (1993 Task Force Report, Attachment 26). Because of this and his belief that the prior agreement adequately safeguarded Federal interests, the Special Representative proposed for Administration approval the agreement outlined in the 1993 Task Force Report. In regard to the problems occurring in the CNMI, the Special Representative indicated that each insular area should be considered on its own merits and that the labor problems in the CNMI should be seen from the perspective of avoiding similar problems in Guam by formulating and enforcing adequate safeguards, rather than denying Guam the opportunity to enact its own labor policies. There are, however, strong Federal objections to this proposal, including: (a) that the proposal constitutes an inappropriate, over broad delegation of authority to the Secretary of Labor and heads of other Federal Departments and agencies; (b) the term "laws regulating employment" has never been adequately defined or delimited, and could potentially apply to over 180 Federal labor laws governing such areas as child labor, minimum wages, welfare benefit plans, occupational safety and health, mine safety and health, prevailing wages, civil rights, unemployment

**Exhibit A**

insurance, workers' compensation and labor-management standards, which are administered by the Department of Labor as well as other agencies such as the National Labor Relations Board and the Equal Employment Opportunity Commission; (c) there is potential ambiguity and overlap between the proposal and the functions of the Joint Commission discussed in Section 203; (d) the indeterminate scope and breadth of the proposal introduces great potential for confusion and litigation; (e) Guam's adherence to labor standards should also meet international labor standards that the U.S. has espoused and not affect U.S. responsibility in the conduct of foreign affairs. The Administration nevertheless remains willing to consider the application or enforcement of particular Federal laws specifically identified by Guam on a statute-by-statute basis.

**TITLE IX - TRANSPORTATION AND TELECOMMUNICATIONS**

**Section 901. Maritime Shipping (Jones Act).**

Summary of Provision. This section would allow (1) the use of certain foreign-built vessels in Guam's waters and in the EEZ surrounding Guam; (2) a limited exemption for Guam from the Jones Act for shipping fish; (3) a periodic review of Federal coastwise laws in order to determine the desirability of continuing their application to Guam based solely on whether they are in Guam's economic interests and a requirement that the Federal government ensure adequate service to Guam as long as these laws apply.

Current Position. The Administration opposes this section.

**Section 902(a). Airlines.**

Summary of Provision. Authorizes the Governor of Guam to sponsor any qualified air carrier to serve Guam. Exempts Guam from all bilateral treaties between the U.S. and foreign countries with regard to scheduling, technical specifications of aircraft and charter passenger flights to or from Guam that originate in foreign countries.

Current Position. The Administration would support a provision to increase Guam's role in the process of determining air service that directly impacts the island, but otherwise does not support this provision.

**Exhibit A**

**Section 902(b). Essential Air Service.**

Summary of Provision. Continues Guam as an "eligible point" for essential air service.

Current Position. The Administration supports this provision with recommendations to conform the language to a recent recodification of title 49, United States Code: (a) the term "eligible point" should changed to read "eligible place"; and (b) the public law citation should changed to 49 U.S.C. 41731.

**Section 902(c). Domestic Air Routes.**

Summary of Provision. Requires domestic air carriers to obtain the concurrence of the Governor of Guam on applications for new, additional, or changed routes to Guam, in addition to complying with any other Federal requirement.

Current Position. The Administration would support this provision if amended to require prior notice, rather than concurrence.

**Section 903. Telecommunications.**

Summary of Provision. Defines Guam as a "domestic" point for purposes of setting telecommunication rates by the Federal Communications Commission.

Current Position. Section 903 has been superseded. Through administrative procedures before the FCC, Guam has been incorporated into the North American Numbering Plan effective July 1997 and into domestic rate integration effective August 1997.

**TITLE X -- LAND, NATURAL RESOURCES AND UTILITIES**

**Section 1001(a) Eminent Domain Power By Guam.**

Summary of Provision. Commonwealth Government shall have power of eminent domain over all property within Commonwealth consistent with Guam Constitution.

Current Position. The Administration would support this provision if amended to clarify that Guam's eminent domain power should not extend to federal landholding in Guam.

**Exhibit A**

**Section 1001(b) Control over Exclusive Economic Zone (EEZ).**

Summary of Provision. Confers on Commonwealth Government jurisdiction over all resources in the 200-mile EEZ, including rights to determine the conditions and terms of pollution control, marine scientific research, management, exploration and exploitation.

Current Position. The Administration would support a principle to enable Guam to benefit economically from the exploitation of the EEZ, but it has serious concerns about giving Guam the general authority to enact, administer and enforce its own laws within the EEZ. There are numerous federal laws and regulations as well as international treaties and agreements that apply to all domestic EEZ's, and that often require a uniform or coordinated approach. Section 1001(b) would create insurmountable problems of coordination, enforcement and regulation by federal agencies currently charged with management of the EEZ. There is also concern that the confusion stemming from inconsistencies between Guam laws and federal/international provisions would weaken the present regulatory structure. Finally, there is concern that the provision has no mechanism to ensure that Guam laws would be consistent with existing federal/international laws. Nevertheless, Guam and the Federal government have had a successful working partnership in the fisheries management of the EEZ in cooperation with and under the auspices and structure of the Western Pacific Regional Fishery Management Council. Guam already has the authority to develop its own EEZ management and conservation regime with respect to its vessels, consistent with federal law. In addition, the Administration sought and, on October 11, 1996, obtained amendments to the Magnuson-Stevens Fishery Conservation Act. This granted authorization to cover over revenues collected for foreign fishing under Pacific Insular Area fishery agreements. Federal jurisdiction is expressly asserted over the U.S. EEZ surrounding Guam.

**Sections 1001(c) and (d) Federal Eminent Domain Power**

Summary of Provision. Section 1001(c) states that during times of peace, the only way the federal government can acquire land on Guam is by voluntary means through negotiation with landowners. Acquisitions would occur only after authorized by Congress and if appropriated funds are available. Section 1001(d) states that during times of war, federal eminent domain power can be exercised, but only in compliance with the applicable provisions of U.S. and Guam Constitutions and laws.

Current Position. The Administration supports federal land acquisitions by voluntary means unless it becomes impracticable, in which case the U.S. would use its eminent domain powers to further national interests, whether or not there is a formal declaration of war.

**Exhibit A**

**Section 1001(e), (f) and 1002. Return of Excess Federal Land.**

Summary of Provision. Section 1001(e) exempts Guam from the application of any Federal regulations pertaining to the transfer of excess lands and authorizes the transfer of future excess lands to Guam without conditions, limitations or reversion clauses. Section 1001(f) lifts all restrictions imposed on excess lands previously transferred to Guam. Section 1002 mandates that all federal lands on Guam "not necessary for direct and continuous operational, logistical, or security use" shall be transferred as excess real property to the Commonwealth Government. Such lands would be transferred at no cost to Guam, or at the fair market value of such lands when originally acquired by the federal government. Final determination as to what federal lands are excess shall be made by the Joint Commission (a body consisting of federal and Guam representatives, the majority of whom represent Guam interests -- see Section 203).

Current Position. The Administration is presenting a position on the disposition of federal excess lands in Guam in regard to section 4 of S.210. The Administration is supportive of giving the Government of Guam a "right of first refusal" to obtain Federal lands declared excess in Guam, subject to certain conditions that are outlined in the Administration's position on section 4 of S.210. To the extent that the Administration's proposal is adopted and enacted by Congress, it has been understood by the Federal government and acknowledged by Guam that such excess land proposal would substitute for any provision in the Guam Commonwealth Draft Act, H.R. 100, which covers the same, similar or overlapping subject matter.

**Section 1003. Access to Federal Property.**

Summary of Provision. (a) Recreational, historical and archaeological sites on federal property shall be open to public use so long as military security is not compromised. (b) Except as prevented by military security requirements, easements for public access through federal property shall be granted to Guam when such easements constitute the only practicable means access. (c)The Joint Commission shall determine which recreational facilities and what easements over Federal property should be available to the public.

Current Position. We cannot support vesting exclusive authority in a Joint Commission controlled by Guam representatives to make decisions regarding access to federal property because: (a) there is no mechanism to prevent the Commission from ignoring a base commander's stated needs for military security, safety and operational requirements; and (b) determination of public easements and access on federal property can only be

**Exhibit A**

exercised by U.S. officials appointed pursuant to the Appointments Clause of the Constitution. Section 1003 generally presents an unworkable and undue interference on military operations, base security, and military obligations under historic and archaeological preservation laws. Furthermore, the subject matter of Section 1003(b), granting access through property subject to military or Federal civil authority, is the subject of current litigation for which the United States is seeking a mutually satisfactory resolution.

**Section 1004. Transfer of Federal Utilities to Guam.**

Summary of Provision. Within 90 days of the passage of the Commonwealth Act, all right, title and interest to federally-owned utilities would be transferred to the Commonwealth Government, except those part of the systems used solely for federal purposes.

Current Position. The Administration would support this provision if it were amended to provide that the transfer of federal water, power and sewer utilities would be made subject to the terms of separate agreements being negotiated between the U.S. and Guam. Exceptions from transfer include portions of utilities which are located within federal property and systems necessary for mission-critical military purposes. Once the utilities are transferred, the utility rates charged by Guam to the U.S. must be cost-based and applied on a non-discriminatory basis.

**TITLE XI -- UNITED STATES FINANCIAL ASSISTANCE**

**Section 1101. Transfer of Taxes and Fees.**

Summary of Provision. There will be paid into the Treasury of Guam various Federal revenues derived from Guam, including Federal income taxes derived from Guam, the proceeds of taxes collected on Guam products shipped to the United States or the U.S. insular areas, the proceeds of any other taxes levied by Congress on the inhabitants of Guam, and quarantine passport, immigration and naturalization fees collected on Guam.

Current Position. The Administration would support this provision if it were amended to provide that all taxes and fees transferred to Guam shall be "expended for the benefit and government of Guam" and to provide for an advance payment based on an estimate provided by Guam, which would then be followed by an adjustment, upward or downward as appropriate, the following year, if the actual revenues did not match the estimate.

## Exhibit A

**Section 1102. Equal Finance for Guam Citizens With States.**

Summary of Provision. U.S. laws providing Federal benefits and financial assistance with general application to the several States shall be applicable to Guam, including the Supplementary Security Income program. The formula for granting assistance to Guam and its residents shall be the same used with the several states and their residents.

Current Position. The Administration recommends deletion of this provision as being overly broad, vague, costly and difficult to administer.

**Section 1104. Annual Federal Payment.**

Summary of Provision. This provides for annual payment to Guam, based on the pattern of the Federal payment to the District of Columbia that is provided in the District of Columbia Home Rule Act of 1973.

Current Position. This section should be deleted. Under section 30 and 31 of the current Guam Organic Act, as these programs are continued by Title VI and Section 1101 of the Guam Commonwealth Draft Act, the Commonwealth of Guam would be receiving substantial Federal fiscal benefits not accorded to the District of Columbia. These tax provisions represent so material a distinction that the treatment of Guam and the District of Columbia must differ.

**Section 1105. Transition Assistance.**

Summary of Provision. This would provide three forms of "transition assistance" from the U.S. to the Commonwealth of Guam: (a) Federal financing of the costs of "institutional change" connected with Guam's assumption of Commonwealth status; (b) Federal appropriations "to implement a long-term capital improvement program"; and (c) Federally funded revolving fund to establish an Economic Development Fund to "assist the financing the private sector needs of Guam . . . and to develop the economic resources needed to meet the responsibilities of local self-government."

Current Position. This section should be deleted.

**TITLE XII – TECHNICAL AMENDMENTS AND INTERPRETATIONS**

*Note: Since Guam has previously indicated a desire to re-write this entire title, the Administration withholds comment at this time.*

**STATEMENT OF ALLEN P. STAYMAN, DIRECTOR, OFFICE OF INSULAR AFFAIRS, DEPARTMENT OF THE INTERIOR, BEFORE THE HOUSE COMMITTEE ON RESOURCES, REGARDING S. 210 AND H.R. 2370, OCTOBER 29, 1997**

Mr. Chairman and members of the House Committee on Resources, I am pleased to be here today to discuss the provisions of S. 210, as passed by the Senate. Additionally, I have comments on H.R. 2370.

**S. 210**

S. 210 contains eleven provisions designed to address a number of island issues. The Administration substantially supports S.210 as passed by the Senate, but there are several concerns that require correction during further congressional consideration to ensure full Administration support.

**Marshall Islands Agricultural and Food Programs.** Section 1 of the bill would amend section 103(h)(2) of Public Law 99-239, dealing with the United States Department of Agriculture surplus food program in the Marshall Islands. It would authorize extension of the program for an additional five years and ensure that the program's benefits are distributed on the basis of population.

As you are aware, the United States' nuclear testing program was conducted at Enewetak and Bikini Atolls from 1946 to 1958. One of the tests significantly affected the atolls of Rongelap and Utirik, also. Because of the special responsibilities of the United States for the welfare of the peoples of the four atolls, Public Law 99-239 called for continuation of the food and agricultural programs for five years, until 1991; they were later extended through October 20, 1996. This extension, for a third five-year period, would ensure that the United States continues to provide excess commodities to the peoples of these atolls through October 20, 2001.

We discussed this reauthorization provision during the hearing in June 1996. While the Senate took action on this Enewetak provision, the House did not. Since that time, the situation has become much more pressing. The specific authorization ceased on October 20, 1996. The Department of Agriculture is funding the food distribution for a temporary period of time under a general authorization.

We note, however, that section 1 contains an additional provision to amend section 103(h)(2)(B) by adding at the end the following language: "The President shall ensure

that the amount of commodities provided under these programs reflects the changes in the population that have occurred since the effective date of the Compact."

There are two concerns with this language, the availability of data for a baseline population count, and the fact that increased commodity support would require increased appropriations. While we do not object in principle to the amendment, we believe the language should be changed to read as follows: "Subject to the availability of appropriations and of baseline population data, the President shall ensure that . . ."

The Administration strongly **supports** the extension provided by section 1 with our recommended amendment, and early action by the Congress.

**Amendment to the Organic Act of Guam.** Section 2 of S. 210 deals with the transfer of the authority of the Governor of Guam, or the Lieutenant Governor, when either is absent. It would amend section 8 of the Organic Act of Guam (48 U.S.C. 1422b) to construe the term "temporary absence" so as to not include physical absence from the territory while on official government business.

When the Organic Act of Guam was enacted, transportation and communications were far more limited than today. Therefore, it was necessary for a governor, or the lieutenant governor, when traveling, to delegate authority. Today, however, with instant, world-wide communications, an elected official can fully execute the duties of office even while not physically present in the territory. In light of today's technology, the proposed amendment is appropriate.

The Administration **supports** enactment of section 2.

**Territorial Land Grant Colleges—Technical Amendment.** Section 3 is intended to give separate land grant status to the College of Micronesia's three successor colleges, the College of the Marshall Islands, the College of Micronesia—FSM, and the Palau Community College, as desired in the freely associated states (FAS). The Boards of Regents of all four institutions have endorsed the separate land grant status. Section 3 of the bill substantially comports with draft language provided earlier by the Department.

We believe section 3 has substantial programmatic and funding implications for the United States Department of Agriculture (USDA) in its administration of land-grant programs. By virtue of the language in section 1361c of Public Law 96-374, the Trust Territory of the Pacific Islands received certain Smith-Lever Act and Hatch Act funds in like manner to the United States Virgin Islands and Guam. Accordingly, section 3c of the bill would give such

funds to the Trust Territory's three successor freely associated states, but, as drafted initially in the Senate, it would have created two additional recipients of funds. In order to avoid creating two new shares and disturbing the current allocation of Smith-Lever and Hatch Act funds, the Administration recommended to the Senate draft legislative language dividing the Trust Territory share into three equal portions. The Senate considered and adopted the proposed language, and it is reflected in the bill.

The Administration has **no objection** to the enactment of section 3 as amended.

**Guam Lands.** Section 4, with some exceptions, would provide Guam with the right of first refusal on all Federal excess lands on Guam outside the wildlife refuge overlay of military land. Section 4 would not apply to land transferred among the military services, land transferred from the Department of Defense to the Coast Guard, land transferred pursuant to a base closure law, and under certain circumstances to land transferred from a managing Federal agency to the occupying Federal agency. Section 4 was substantially amended during Senate consideration to adopt in most respects recommendations of the Administration. However, there remain several important concerns that require further amendment.

The Administration approves generally of this two-track approach embodied in section 4 of the bill, with modifications.

Guam is a small island, approximately 30 miles long, seven miles wide, and 220 square miles in area. About one-third of the island, or 44,800 acres, is owned by the United States and administered by a military department. In addition to the military, the United States Fish and Wildlife Service administers a wildlife refuge of about 772 acres at Ritidian Point (401 acres of which are submerged). In addition, the Fish and Wildlife Service has responsibility for an overlay refuge of 22,502 acres on lands administered by the military.

It is often asserted that landowners on Guam whose lands were acquired by the United States after World War II had the understanding that their lands would be returned once such lands were no longer needed for military purposes. Such individuals usually asserted that they relied on such representations in lieu of greater efforts to receive what they believed to be adequate compensation for their property. In enacting the Guam Land Claims legislation, 48 U.S.C. 1424c, in 1977, Congress was mindful of such claims and sought to provide a remedy by affording an opportunity to seek additional compensation for the leasehold and fee takings. Settlement of these claims resulted in payments in excess of $40 million. Nevertheless, there continues to be strong community reaction when excess military lands are transferred to another Federal agency instead of to Guam. This issue continues to create tension in Federal-Guam relations.

The Congress and the Administration recognized this unique situation on Guam when, four years ago, the Federal government authorized the transfer of some 3,200 acres of former military land to Guam in Public Law 103-339. Section 4 of S. 210 would continue this general policy of returning excess Federal land, not within the 23,274 acres being used for refuge purposes, to Guam. The bill provides for negotiations and agreement between Guam and the United States Fish and Wildlife Service (Service) on lands within the Guam National Wildlife Refuge (Refuge). The Congress, itself, may determine the disposition of lands that may become excess in the wildlife refuge overlay in the event the Service and Guam cannot agree on the disposition of the lands. With congressional scrutiny, consideration may be given to meeting the Federal government's habitat conservation and endangered species protection responsibilities while recognizing the concerns of Guam. The Administration agrees generally with the approach embodied in section 4 of S. 210. To ensure proper implementation of section 4, and for the Administration to fully support section 4, the following corrections must be made.

(1) We recommend striking the phrase "under a lease entered into prior to May 1, 1997" from section 4(b)(3)(E), and striking the phrase "and which was occupying such property prior to May 1, 1997" from section 4(d)(2).

We would ensure the ability of those Federal agencies that have been legitimately using Department of Defense (DOD) property to continue to protect those permitted uses, if the agency has been permitted to use the property for two years prior to the time the land is declared excess. The current bill will protect only those permits in effect prior to May 1, 1997. This may not protect even some current permits, and will likely prevent the issuance of any future permits by DOD. We believe the two-year provision will adequately protect Guam from having a rush of applications for new permits from Federal agencies when lands are declared excess by DOD.

Additionally, as a technical matter in section 4(b)(3)(E), Federal agencies cannot "lease" property to each other. Rather, they grant permits or implement use agreements. Consequently, all references to leases and leasehold interests should be changed. We recommend replacing "leased by" with "the subject of a permit, occupancy agreement, or similar arrangement to", and " leasehold interests" with "permits, occupancy agreements or similar arrangements".

(2) With regard to section 4(c)(4), we recommend inclusion of "overlay component" in the term being defined, and striking the phrase "to the extent that the Federal government holds title to such lands". This definition section would thus read:

> (4) The term "overlay component of the Guam National Wildlife Refuge" means those lands (including submerged lands) within the refuge, as depicted

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 152 of 542

> in figures 3 and 7 of the "Final Environmental Assessment for the Proposed Guam National Wildlife Refuge, Territory of Guam, July 1993", which are under the primary jurisdiction of the Department of Defense as of the date of enactment of this Act.

The words "overlay component" need to be added because the process contemplated in the bill should not apply to the refuge itself; wildlife refuges are not subject to the Property Act and would require an act of Congress for transfer. Additionally, there should be conforming amendments in subsections (d)(3) and (e): "Guam National Wildlife Refuge" should be changed to read "overlay component of the Guam National Wildlife Refuge".

The language regarding title was added by the Senate Committee to the Administration's proposed bill. This qualification of the definition of the Guam National Wildlife Refuge (Refuge) suggests that the United States may not hold title to all the land within the Refuge. This language is unnecessary and may have potential for creating confusion, mistaken expectations, and prejudice in ongoing litigation.

The stated justification provided by the Senate Committee for Energy and Natural Resources for the insertion of the language does not recognize the full implication of the language and appears to be based upon a misunderstanding of the underlying facts. The Committee believed that there remains some dispute as to whether those submerged lands are in fact owned by the Federal government.

We believe that title to both the Guam National Wildlife Refuge and the overlay clearly rests with the Federal government. In the Environmental Assessment, the Service identified for refuge purposes the submerged lands in two locations out to the 30-meter isobath. When the Navy subsequently excessed certain submerged lands at Ritidian Point, those lands out to the 30-meter isobath were transferred to the Service. The remainder of the submerged lands there, out to the three-mile limit, were declared surplus. No one, not even the Government of Guam, requested those lands, which were recently transferred by GSA back to the Navy. The remainder of the submerged lands within the refuge continue to be under the jurisdiction of the Navy and are part of the overlay portion of the refuge. As of today there is no question regarding ownership of those submerged lands.

Because S. 210 applies only to excess property of the United States, it is not necessary to specifically state that the legislation applies only to land owned by the United States. The United States cannot excess land it does not own. Besides being unnecessary, inclusion of this language has some potential for prejudicing the United States' position in pending litigation in Government of Guam v. United States.

(3) The manner in which Guam implemented the Guam Excess Lands Act creates some ambiguity regarding the meaning of the term "public purpose" in section 4(c)(5) of S. 210. It might be argued that the reference to the Guam Excess Lands Act, with its congressional review process of the Guam land use plan, may allow land transferred to Guam for a "public" purpose to be re-transferred to "private" individuals within the meaning of "public benefit." Although we believe that, in the end, such a construction cannot withstand scrutiny, we suggest clarifying that the reference to the Guam Excess Lands Act is not intended to bring transfers to "private" individuals within the meaning of "public benefit." Such a clarification might be accomplished by simply providing that the "public benefits" incorporated by reference to the Guam Excess Lands Act include only those expressly enumerated in that Act.

(4) At the end of section 4(d)(3)(C), insert after "General Services Administration" the following:

> "; provided, that the Fish and Wildlife Service shall retain secondary jurisdiction over any said property after such transfer, and the property shall remain within the National Wildlife Refuge System pending congressional action pursuant to subparagraph (E)."

The Administration proposal for dealing with Federal lands located within the overlay component of the Guam National Wildlife Refuge that may become excess would have resolved their status within a two-year period after the time the military determined that the land was excess. The bill as passed by the Senate has no deadline for a decision and authorizes the military departments to transfer control over the lands to GSA.

However, the agreements between the Fish and Wildlife Service and the military departments which established the refuge on military lands specifically provide that the agreements terminate upon transfer of the land to any other party. Accordingly, upon transfer to GSA, the secondary jurisdiction over these lands currently maintained by the Service would end, and the lands would be removed from the National Wildlife Refuge System.

It should be noted that the Guam National Refuge is the result of a process initiated by the Government of Guam, not the Fish and Wildlife Service. In August 1987 and again in March 1988, the Governor of Guam formally requested the Service to propose Critical Habitat for the endangered bird species of the island. In May 1988, the Guam Legislature passed Resolution 339, which supported the Governor's request, and asked the Service to designate Critical Habitat on Guam on an emergency basis. Service responded on June 14, 1991, by officially proposing Critical Habitat for the bird species.

The proposed Critical Habitat covered 24,562 acres and included private land, Government of Guam land, and land actively used by the military. After the proposal was issued, the Government of Guam reversed its position and opposed the designation of Critical Habitat. The Service again sought to be responsive to the wishes of the Government of Guam by withdrawing the proposed designation. The withdrawal was then challenged in the Federal courts by the Sierra Club Legal Defense Fund, acting on behalf of the National Audubon Society and other conservation organizations.

The refuge including the overlay, which is comprised of Federal lands only, was created to settle the litigation. It avoids inclusion of private and Government of Guam lands within designated Critical Habitat and allows the military to utilize their lands for national defense purposes without the restrictions that would exist if those lands were designated as Critical Habitat.

If any significant portion of the refuge were to be turned over to Guam without adequate conservation restrictions, the plaintiffs in the litigation would undoubtedly reactivate the suit. This could lead to a critical habitat designation impacting private property, Government of Guam land and land actively utilized by the military.

The amendment is essential to avoid the automatic removal of the lands from the Refuge System and reactivation of the lawsuit by maintaining the status quo with respect to any military lands within the refuge that might be declared excess, until the Government of Guam and the Service resolve the matter or the Congress acts.

Of course, the Administration expects that enactment of section 4 of S. 210 (with the above amendments) would settle the matter of disposition of Federal lands on Guam, and that this subject would not be revisited in the discussions of Commonwealth status.

The Administration **supports** enactment of section 4 if it is amended to comport with our recommendations.

**Clarification of Allotment for Territories.** Section 5 would give single state treatment to American Samoa and to the Northern Mariana Islands with regard to funding Office of Justice Assistance programs. At present, the two insular areas share a state-share of funding, while the other insular areas of Guam, the Virgin Islands, and Puerto Rico each receive a full state share. Section 5 would ensure that American Samoa and the Northern Mariana Islands receive the same state-like treatment as their sister territories.

The Administration **supports** the enactment of section 5.

**Amendments to the Revised Organic Act of the Virgin Islands.** Subsection (a) of section 6 of S. 210 deals with the transfer of the authority of the Governor and Lieutenant Governor of the Virgin Islands when either is absent from the Virgin Islands. It would amend the Revised Organic Act (48 U.S.C. 1595) to construe the term "temporary absence" so as to not include the Governor's physical absence from the territory while on official government business. This amendment is identical to that provided in section 2 with respect to the Organic Act of Guam, and the same rationale applies.

When the Revised Organic Act was enacted, transportation and communications were far more limited than today. Therefore, it was necessary for a governor, when traveling, to delegate authority to the lieutenant governor. Today, however, with instant, world-wide communications, an elected official can fully execute the duties of office even while not physically present in the territory. In light of today's technology, the proposed amendment is appropriate.

The Administration **supports** enactment of subsection (a) of section 6.

Subsections (b) and (c) of section 6 deal with the bonding authority of the Virgin Islands when its bonds are secured by the cover over of Federal excise taxes on rum. The provisions would allow the Virgin Islands to issue parity debt, rather than priority debt. Current law gives greater protection to earlier issuances of debt over later issuances, with the result that later debt is subject to increased interest and fees. We understand that most local jurisdictions issue parity debt instruments. The bonding provisions of section 6 would place the Virgin Islands on a footing similar to other communities.

The Administration has **no objection** to the enactment of subsections (b) and (c) of section 6. Subsection (d) concerning short term borrowing was added during Senate consideration with the assistance of the Administration, and we have no objection to it.

For your information, at the request of the Senate, subsections (b), (c), and (d) appear in the conference report on the Interior appropriations bill (H.R. 2107) in section 124. As of yesterday, the conference report had passed both houses of the Congress, but had not yet been received by the President for signing.

**Commissions on the Economic Futures of the Virgin Islands and American Samoa.** Sections 7 and 10 of S. 210 would establish separate six-member commissions to evaluate economic options for the futures of the Virgin Islands and American Samoa. The Virgin Islands need to be prepared for possible competition in tourism and other industries from elsewhere in the Caribbean region. In the case of American Samoa, the concern is that, under Public Law 104-188, the ten-year phase-out of Internal Revenue Code section 936 will undermine the viability of the territory's economy, which is based on tuna canning.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 156 of 542

The Administration supports the objective of sections 7 and 10, which is to analyze and plan for the future economic needs of the Virgin Islands and American Samoa. The thrust of Administration policy on good government is generally against the creation of new commissions, and accordingly, we cannot support these sections.

We believe these objectives can be achieved within existing authorities. We suggest, as an alternative, that interested members of Congress, the Governors of the territories, and we sit down together to consider other viable alternative options for meeting the objectives of sections 7 and 10.

**Impact of the Compacts Reports.** Section 8 deals with reports on the impact of the compacts of free association. Currently, the Department of the Interior is charged with submitting to the Congress reports on the impact of the compacts of free association on the United States territories and Hawaii. The territories and Hawaii generate many of the statistics upon which the report is based. Thus, the Department of the Interior relies on the islands for statistical information. Sometimes it is difficult to obtain the necessary information. Other times the territories disapprove of the positions taken by the Department. Often there are disagreements on statistical methodology. In addition, the Department has no direct responsibility with regard to Hawaiian affairs. The report procedure is contentious and inefficient.

Accordingly, we recommend making the submission of the impact of the compacts reports optional for concerned governors of the territories or the State of Hawaii, and shifting report preparation from the President to the respective governor. As potential recipients of impact funds, the territories and Hawaii are in the best position to estimate the impacts within their respective jurisdictions. The Department of the Interior would receive the reports and would forward any such reports to the Congress with the views of the Department. Under such a scenario, each party would be satisfied that its position was fairly presented, and the Congress would receive all relevant information on which to base a decision.

The Administration **supports** inclusion in S. 210 of section 8, the provision for improving the impact of the compacts reporting process. This provision reflects an amendment requested by the Administration in the Senate.

An additional provision in section 8 would require the Secretary of the Interior to provide for a census of Micronesians at intervals no less than 5 years from the completion of each United States decennial census. No more than $300,000 could be spent on this provision in any one year. The Department has no objection to this provision. We now provide assistance to Micronesians for such a census, and this provision is not inconsistent with such ongoing work.

**Eligibility for Housing Assistance.** Section 9 of S. 210 would grant eligibility for section 8 and other housing assistance to citizens of the freely associated states living in the United States or its territories. Under the compacts of free association, citizens of the freely associated states (FAS) have the right to live and work in the United States and its territories, and may participate in those Federal programs for which they are eligible. With respect to section 8, at the inception of the compacts, and for ten years thereafter, FAS citizens in the United States participated in section 8 housing. In 1995, however, FAS citizens were declared ineligible. This ineligibility resulted from restrictions imposed on HUD's provision of assistance to aliens by section 214 of the House and Community Development Act of 1980, as amended, and as implemented by HUD's final rule, which became effective on June 19, 1995. This event solved a problem in Guam, where FAS citizens were often placed at the head of the line of those waiting for housing. Section 9 of S. 210 would grant eligibility for the section 8 housing program and certain other programs administered by HUD to FAS citizens, although they would not be given priority for housing over United States citizens in Guam or the Northern Mariana Islands.

The Administration believes this to be a fair remedy for a difficult situation, and **supports** enactment of section 9.

**Federal Program Coordination and Bikini.** Section 11 was added during Senate consideration and makes three changes in existing law. Two were requested by the Administration, subsections (a) and (b).

With respect to subsection (a), current law calls for the stationing of one professional staff person from the Department of the Interior in each of the freely associated states (FAS) of the Marshall Islands, the Federated States of Micronesia, and Palau. In 1995, the Department of the Interior streamlined its structure for addressing insular issues, including the elimination of two of these three Federal program coordinator positions in the FAS. The Department plans to employ one staff person who would be stationed at the United States Embassy in the Federated States of Micronesia and travel to the Marshall Islands and Palau as needed. Subsection (a) would allow this change.

Subsection (b), also requested by the Administration, clarifies that the grant consolidation provisions of Public Law 95-134 apply to each of the freely associated states as they did under the Trusteeship.

Subsection (c) increases the limit on expenditures by Bikini for projects on Kili and Ejit from $2 million per year to $2.5 million and indexes the amount to inflation. We recommend the addition of the following clause in subsection (c) after the words "Secretary of Labor," insert "Provided further, that total annual expenditures from the Bikini Resettlement Trust Fund for nonresettlement projects remain at or below annual earnings of the Fund." The

Department believes that such a caveat is necessary to protect the fund and to maintain the incentive for Bikinians to ultimately resettle the Bikini atoll.

For your information, at the request of the Senate, this provision for increasing expenditures is included in the conference report on the Interior appropriations bill (H.R. 2107) in section 117; it does not include the Department's recommended proviso limiting annual spending to the annual earnings of the Fund. As of yesterday, the conference report had passed both houses of the Congress, but had not yet been received by the President for signing.

The Administration **supports** inclusion of the provisions on Federal programs personnel and grant consolidation in S. 210. The Administration also **supports** enactment of subsection (c) **with** our recommended **amendment**.

**H.R. 2370**

H.R. 2370, which would be cited as the "Guam Judicial Empowerment Act of 1997," would establish the local court system of Guam, including the local appellate court known as the Supreme Court of Guam, as a co-equal branch of the Government of Guam in the Organic Act of Guam, and would permit the election of the Attorney General of Guam.

Under existing provisions of the Organic Act of Guam, the Legislature of Guam created the Supreme Court of Guam. Officials in Guam believe that the Supreme Court's stature would be enhanced if the court were formally established as the third branch of the Government of Guam in the Organic Act of Guam, itself. Section 2 of H.R. 2370 would include in the Organic Act of Guam express language that the Supreme Court of Guam is the highest court of Guam and specify its jurisdiction.

While the Administration has no objection to the overall concept of section 2, we recommend the adoption of some clarifying amendments. On page 2, in lines 9 through 12, the language on its face is not clear as to whether the Supreme Court of Guam would be authorized to **establish** the Superior Court and other local courts, or **establish divisions** of the Superior Court and other local courts. From the fact that the Superior Court already exists, we deduce that the creation of divisions within these courts is what is intended. The Administration, therefore, recommends that the words "divisions of" be inserted before "the Superior Court of Guam," and also before "other local courts of Guam."

The language appearing on page 3, in lines 3 through 6, regarding the appellate jurisdiction of the Guam Supreme Court, could be clarified by striking reference to the District Court of Guam. The Administration recommends that the provision read:

> "(2) have jurisdiction to hear appeals over any cause in Guam decided by the Superior Court of Guam or other courts established under the laws of Guam;

On page 4, in lines 3 and 4, the Chief Justice would appear to be required to preside over all sessions of the Supreme Court of Guam. If divisions or panels are created as contemplated on page 2, in lines 9 through 12, it may be counter-productive or difficult for the Chief Justice to preside over them all. Consideration should be given to some limited delegation of duty.

The language in section 2 regarding the Supreme Court of Guam is careful in all instances, except one, not to encroach on the authority of the District Court of Guam. Existing law in subsection (b) of section 22A of the Organic Act of Guam (48 U.S.C. 1424-1) states:

> The legislature may vest in the local courts jurisdiction over all causes in Guam over which any court established by the Constitution and laws of the United States does not have exclusive jurisdiction. Such jurisdiction shall be subject to the exclusive **or concurrent jurisdiction** conferred on the District Court of Guam by section 22 of this Act. (bold added)

In the rewriting of section 22A (48 U.S.C. 1424-1) in H.R. 2370, reference to "concurrent jurisdiction" of the District Court of Guam was omitted. I recommend that H.R. 2370 be amended on page 5, in lines 1 and 2, by striking the words "as the laws of Guam provide.", and inserting the following language:

> over all causes in Guam as the laws of Guam provide, except that such jurisdiction shall be subject to the exclusive or concurrent jurisdiction conferred on the District Court of Guam under section 22 of this Act (48 U.S.C. 1424).

This amendment would assure that the existing relationship between Federal and local courts is not disturbed. In all other respects, drafters of H.R. 2370 appear to have been careful not to affect the jurisdiction of the Federal courts.

With our recommended amendments, the Administration has **no objection** to the enactment of section 2 of H.R. 2370.

Section 3 of H.R. 2370 would allow the appointment or election of the Attorney General of Guam to be decided by the Government of Guam. When the issue of electing the Attorney General was raised earlier, the Administration urged that the decision on appointment or election should be made by the local government. Section 2 comports with that position.

I suggest, however, that in section 3, consideration be given to two amendments. In the alternative for **appointment** of the Attorney General, on page 6 in lines 14 through 16, the Attorney General would not step down until the legislature has advised and consented to the appointment of his or her successor. Although it is customary for an appointed Attorney General serve at the pleasure of the Governor, the legislature could force the retention of an appointed Attorney General by withholding its consent for a successor. In order not to abridge the normal powers of a Governor, I recommend that the words "for a term ending when a successor is appointed and qualified;" be stricken, and that the words "to serve at the pleasure of the Governor;" be inserted.

In the alternative for an **elected** Attorney General, on page 6 in line 20, I recommend that the words "Office of" be stricken. This recommendation would clarify that the reference to removal applies to the person, rather than the office. If local legislation is developed for the election of the Attorney General, the Guam Legislature may wish to consider the manner in which the vacated post would be filled.

On page 6, in line 5, the reference should be to 48 U.S.C. 1421(g).

The Administration has **no objection** to the concept of local choice in appointing or electing the Attorney General of Guam as contemplated in section 3 of H.R. 2370.

Statement of The Honorable Carl T.C. Gutierrez, Governor of Guam
October 29, 1997

***Buenas Dias***...Mr. Chairman and Members of the Committee on Resources...**thank you** for holding this hearing today on H.R. 100...the Guam Commonwealth Act.

On behalf of the People of Guam, and as Chairman of the Guam Commission on Self-Determination...I am honored to present our testimony in **support** of democracy...in **defense** of human dignity...and in **defiance** of the continued **colonial** ~~subjugation~~ STATUS of Guam by the United States.

---

The Guam Commonwealth Act embodies the political **hopes** and **aspirations** of the People of Guam.

**We are here...to end 19th century colonialism...and...to create ...a 21st century partnership** between Guam and the United States.

**We...wholeheartedly embrace** the principles of **democracy...upon which...this great nation...was founded.**

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 162 of 542

They mirror **Chamorro principles** of **family** and...of **community**...which lie...at the **heart** of our island way of life.

---

Given the history of this nation...I can **not imagine...anyone...anyone** in these hallowed halls...**defending**...colonialism.

This great country...founded to **end** colonialism...can **never** justify continued colonial rule over Guam.

As events around the world **constantly** remind us...once a people have tasted freedom, there is no turning back.

**For us**...it is not a question of **whether** colonialism will end.

It is simply a matter **of when...and how**...it will come to an end. The people of Guam...by virtue of our relationship with the United States over the past 100 years...have been able to **witness**...but **not experience...true democracy**.

Democracy has been **so close**...it is taught...illustrated...and held up as the ideal.

Yet...representative democracy **does not exist** in the Guam-U.S. relationship.

---

We are frustrated and we are losing patience.

How much longer will we...American citizens...be **denied** our rights?

As we approach a century under the American flag...we are asking, "When will the **colonized** people of Guam be **granted** the **right** to self-determination?"

**The time... to act .... is now!**

---

Today...we bring our Commonwealth quest to you...because **Congress** has the **plenary authority** and **responsibility**...under the Constitution...to **resolve** our status.

We can work together **now**...to forge a democratic partnership worthy of this great nation.

**But**...if we delay...the spirit of cooperation may fade...and a collaborative opportunity may be lost.

---

The Commission on Self-Determination has submitted detailed analysis of the provisions of H.R. 100 and our assessment of the 8 years of frustrating discussions with the Executive Branch preceeding this morning's hearing.

In my brief time before you today...I would like to focus on the **core principles** upon which we can build...a **mutually respectful partnership**.

---

Let me start...Mr. Chairman...with an issue that I know is of **concern** to you...one where I hope we will be able to find common ground.

I am speaking of **mutual consent.**

I am pleased that our panel this morning includes former Governor Ada...who was instrumental in negotiations...on mutual consent...with former Special Representative Heyman.

They concluded an agreement...on new language...which **affirms**...that our future relationship...**cannot be altered**...without...our mutual consent.

It is **essential**...that **any** Commonwealth Act...adopted by Congress... **include** a mutual consent provision.

---

A second core principle...undoubtedly...the most **misunderstood** provision of the draft Guam Commonwealth Act is **Chamorro self-determination.**

It is the **inalienable right** of the **indigenous** people of Guam...to a **process of decolonization**...in accordance with international standards...**standards** the U.S. has agreed to.

This is a **right** which **all** the voters of Guam...**Chamorro** and **non-Chamorro** alike... have **endorsed**... through a plebescite. It is a **process**...which will be **defined**...in a **Guam Constitution**...which **itself**...would be brought...before **all** the people of Guam... and subsequently be brought to Congress for **your** ratification.

Mr. Chairman...I am **confident**...that under **your leadership**, we can uphold the principle of Chamorro Self-Determination.

---

The third core principle...gives the people of Guam...**meaningful participation** in the federal government. **Today**...**our participation** is non existent.

And this is **wrong!**

There is **no way**...that Washington can **understand**...the impact of laws and regulations on an island community 10,000 miles away... notwithstanding the heroic efforts of our delegate, Mr. Underwood.

Short of giving us a vote in Congress...there simply **must be** a process...to give us **meaningful participation** in the **decisions** that affect our lives.

This is the essence of democracy.

We have proposed...a Joint Commission...to accomplish this objective.

---

Guam serves strategic military and national security interests.

Guam **needs** to be brought into the national economic strategy.

We are...America in Asia!

As the global economy continues to shift to the Asia-Pacific Rim...Guam is the natural economic bridge for the U.S.

Despite federal laws that constrain our economic development...we have built an economy of almost **3.5 billion dollars!**



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 168 of 542

We did **this**...with a pair of **plyers**...**and a screwdriver!**

**Commonwealth**...will provide us...with the **power tools** to **grow**...and **sustain** an economy and...**become** a major contributor to U.S. economic interests.

---

Mr. Chairman...as you know...**immigration** is also of **critical importance** to the people of Guam.

We **desire**...an immigration policy...applicable to the **unique** needs of Guam.

We **trust**...this Committee...will make the appropriate distinctions...and **recognize**...that the people of Guam have a **long-standing commitment** to federal labor standards and minimum wages.

We would like to **work** with Congress and the Executive Branch to tailor immigration policy to meet Guam's unique needs.

---

There can be **no comprehensive** resolution of Guam's **political status**...that does not address...Guam's land issues.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 169 of 542

Let us not mince words.

**Land**...that was taken from Chamorros for defense purposes...and **no longer needed** by the military... for real defense purposes...**must** be returned.

Mr. Chairman...we **Chamorros** refer to ourselves as **"Taotao Tano"**..."the **people**...of the **land"**.

**Our land**...is intrinsically tied to our soul...the core of our being.

Our determination to regain our land...is **not** a political battle with the Fish & Wildlife Service...it is a **spiritual quest** to **preserve...** the essence of our **identity** as Chamorros.

---

For the past eight years...at Congress' direction...we have attempted to work with the Executive Branch in moving beyond the colonial status quo.

**Today...we have heard the official position of the Clinton Administration.**



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 170 of 542

Obviously...this position falls **far** short of what we have been seeking...colonialism is still **very much alive**...in the minds of...**too many bureaucrats**...**throughout** the federal government.

They **just don't** get it!

They **refuse**...to think outside of the box.

We aren't talking about the band-aid approach to political status... we're talking about a **fundamental transformation** in the relationship!

I believe...it is **now time**...for Congress...to join a tri-partite effort...with the Administration and Guam's Commission on Self-Determination...to come to closure on our draft Commonwealth Act.

Let's see how far we can build on the incremental approach that the Executive Branch has advanced.

---

The **power** to make these changes is **in your hands**.

**Already**...your active involvement has borne fruit.

For without this hearing, it is unclear...when the Administration...would have ever put forward its position.

What the people of Guam want **now**....is a definitive response from the Congress.

The people of Guam **need to know** whether Commonwealth...**as we have envisioned it**...is acceptable.

**Tell us!**

Let us know where **you** stand.

We deserve **nothing less!**

The people of Guam can then make their own choices...after...you have made yours.

---

We can only hope that this hearing will be followed by swift action.

On June 20, 1898, the American flag was first raised on our island.

TESTIMONY OF:

HONORABLE PAUL M. CALVO
GOVERNOR OF GUAM
(1978 - 1982)

IN SUPPORT OF
U.S. COMMONWEALTH STATUS FOR GUAM

WASHINGTON D.C.
October 1997

## INTRODUCTION

I am Paul M. Calvo, a former Governor of Guam, presently in private business as President and Chairman of the Board for Calvo Enterprises, Inc., a closed family corporation, comprised of 10 subsidiaries. At last count, we employed close to fourteen hundred (1,400) of Guam's people. With the welfare of our employees and all the members of their families prominent in my mind, and on behalf of all the people of Guam which I represented as Governor and Congressman in the twenty some odd years I was in public service, I have traveled to be present before you today to testify in full support of enactment of United States Commonwealth status for our island.

On February 3, 1917, Captain Roy Smith, the Naval Governor of Guam, appointed 34 island leaders to an advisory council whose task was to "consider and recommend measures for the improvement of the island and the welfare of its inhabitants." Though its purpose was strictly to make recommendations to the Governor; it was given the title of the First Guam Congress.

My grandfather, Tomas Anderson Calvo, was a member of that body. In his opening address, he enunciated the aspirations of the people of Guam. To quote from my grandfather: "the Chamorro people only desire, not their independence, but the reform of their lawful rights as citizens of a free and independent nation and that their government be adjusted to the principle established by the immortal Washington, liberator of the great nation that now rules our destinies on this island." He further added, "our

ideals are realized by the giving of that which by right should be granted, that is to say, THE DEFINING OF THE STATUS OF THE CHAMORRO PEOPLE, IN A WORD, THAT WE MAY KNOW WHETHER WE ARE TO BE MEMBERS OF THE AMERICAN PEOPLE, OR THEIR SERVITORS."

It has been over eighty years since my grandfather voiced the desires of the people of Guam to the military government. It has been over eighty years since my grandfather asked if Guam would be accepted as a full fledged member of the American family.

I come before you today respectful of the power which the Congress of the United States wields and mindful of how you the membership of this esteemed body are capable of answering a question that has lingered over three generations of my family's history.

Is America willing to accept Guam as an equal member of the American family? If the answer is *yes*, then I can predict a bright future for Guam and the Marianas Islands as well as for the strategic interests of the United States.

My prediction is not some farfetched pipe dream. The Asian Pacific Rim countries are the largest trading partners of the United States. The gross domestic products (GDP) for the U.S., Japan, China, Korea, Australia, Taiwan, and New Zealand generate a combined total of $14.4 trillion dollars or 46% of total global production. These seven economies represent 1.685 billion people, nearly a third of the world's total. It is estimated that China's economy will over take that of the United States to become the world's largest sometime between 2010 to 2020.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 176 of 542

It is obvious that America's future lies to the west of San Francisco's Golden Gate. America's future lies even west of Pearl Harbor. An America that remains engaged with Asia and the Western Pacific will be a strong and prosperous America well into the 21st century.

One only has to look at the economic miracle that has taken place in Guam over the past thirty years to see the exciting possibilities for American economic strategic interests. It was President John F. Kennedy who lifted Guam's closed military security status in 1960. The gross island product (GIP) at the time was $50 million dollars. Guam's economy relied heavily on public sector employment and huge military spending and federal subsidies. Guam was an economic basket case that depended on federal support in order to survive.

That all changed once Guam was opened to the world. Investment from Asia, most particularly from Japan, flowed in. The Asians saw a tropical paradise. They saw opportunity because of our island's close proximity to Asia. They saw a stable environment for investment because of the island's attachment to America. Tropical beauty blended with Asian proximity and American stability added to a formula for success. Guam's gross island product in 1996 was over $3 billion dollars. The island prospered despite a 30% reduction in military forces since 1994. The island prospered despite hostile and unilateral federal government action which led to the demise of Guam's watch and garment manufacturing industries in the 1980's. Our island has prospered despite recent devastating typhoons and earthquakes. We are the western Pacific's version of the Energizer Bunny. We go on and on and on. Our island will continue to prosper because

we are a part of America and we are a part of Asia: the two most dynamic regions of the world.

I dream of a day when America will recognize and act upon the cries of its second class citizens in the western pacific... I dream of a day when those second class citizens will finally be allowed full incorporation into the American family... I dream of a day when Guam and the Marianas will be America's economic jewel in the Pacific and America's physical link to Asia... I dream of an America in the 21st century that has no need for a British type Hong Kong colony. It will have no need because America itself will be a part of Asia. The 600 mile long Marianas archipelago will not be a non-self governing colony, but rather true American soil in the heart of Asia-Pacific.

As a former Governor, I have had the opportunity to read Haley Barbour's, 'Agenda for America', which outlines the

viewpoint on the future direction of the United States. The book envisions a more secure and strong America that bases itself on a strategy of peace through strength. It premises that American foreign policy would rest on three principles of peace through strength: the 1st) Political Leadership--the United States must be prepared to exercise leadership across the full spectrum of international relations. The US must exercise leadership in order to protect its vital interests. The 2nd) Economic Strength--the U.S. has the most prosperous and technologically advanced economy in the world. This pre-eminence must be maintained. The 3rd) Military Power--the United States must provide the resources necessary to protect its territory and its interests.

It is my firm belief that a fully incorporated Guam and Marianas would strengthen the foundation of these three principles of foreign policy. In order to provide effective

political leadership, there must be a legitimate basis or foundation for the actions to be taken. An incorporated Marianas would be the legitimacy America would require in order to exercise political leadership in matters which affect the region. American soil is a part of this region. On the matter of economic strength; economists have predicted that the Asian Pacific Region will be the pre-eminent economic bloc in the 21st century. The synergistic possibilities for an American commonwealth or state in Asia are tremendous. The Marianas could provide a conduit for American economic interests in Asia in the 21st century. Lastly, on the principle of military power; a stable American community in Asia would provide a reliable platform for military operations in this strategically important region of the world.

I will close by declaring my unwavering loyalty and allegiance to the United States...but I must, in all good conscience, respectfully caution this fine body that the patience and goodwill that has been so clearly demonstrated by so many generations of our people is not infinite. There is indeed a frustration growing amongst our people. Positive steps need to be taken, and frankly ladies and gentlemen, the time to take these important and needed steps is NOW! YOU have the power to take those steps. For generation after generation, proud Chamorros and all other American citizens of Guam have proudly sung the national anthem, recited and proudly believed in the Pledge of Allegiance, and in every war America has fought since the turn of this century bled and died for our Nation. We have demonstrated repeatedly that we love and will die for our country! We WANT....we NEED..... and clearly by historical record, WE HAVE EARNED THE

RIGHT TO BE ACCEPTED--IN-FULL--BY THE UNITED STATES OF AMERICA!

I ASK YOU DIRECTLY LADIES AND GENTLEMEN, ONCE AND FOR ALL, IS AMERICA FINALLY READY TO ACCEPT US?

Thank you and Si Yuus Ma'ase.

TESTIMONY OF THE HONORABLE JOSPEH F. ADA
FORMER GOVERNOR OF GUAM
TO THE COMMITTEE ON RESOURCES
ON H.R. 100

Chairman Young and members of the Committee, thank you for this opportunity to testify on H.R. 100, the Guam Commonwealth Act.

For eight years, as Governor of Guam, I worked on this Act. Upon assuming office in January of 1987, I established a Commission on Self-Determination. We took the draft that had been written by the Commission established by my predecessor, the late Governor Ricardo J. Bordallo. We made some changes, conducted public education and held a plebiscite in Guam on the Act. The document that is H.R. 100 is already a historic document, regardless of what happens to it, for that simple fact. Mr. Chairman, what we have before us is the ONLY democratically expressed view on the political status of Guam that has ever existed in the three hundred years that Guam and the Chamorro people have been administered by governments other than their own. It represents the ONLY opportunity that the Chamorro people have had to say what they believe should exist with respect to the manner in which they are governed. This document is the only expression of the democratic voice of our people that exists ... the only one. For that reason alone, it must be treated with respect as you deliberate on the fate of that expression.

I should, at this juncture, apprise you of the fact that I was the Republican Governor of Guam for eight years. My predecessor, who worked on the draft, was a Democrat. His predecessor, who established the first Commission on Self-Determination, the Honorable Paul M. Calvo who is with us today, is a Republican. Our current Governor, the Honorable Carl T.C. Gutierrez, is a Democrat. All of us, whether Democrat or Republican, have fought for the same thing, self-determination for the Chamorro people and self-government for Guam, because for us all, these are non-partisan issues. These causes transcend party politics in Guam and even in the heat of bitter local partisan contests, in the middle of hard-fought campaigns and even when we disagree over more mundane matters, it has been our practice and our creed to stand together when it comes to fighting for the rights of our people.

The eight years I spent fighting for this Act as Governor was an educational experience. I learned much that reinforced my gut instincts with respect to the inadequacies and injustice of the current manner in which we are governed, as well as the justice and the need for a change. We brought this Act to an earlier Congress, and they insisted that we first begin discussions with the executive branch. That we did. We spoke to task forces in both the Bush and Clinton Administrations. I would like to tell you that these were always pleasant and fruitful, but that would not be accurate. Oh to be sure we made progress on a number of issues, including some very fundamental ones. As an example, we have had at various times, administration agreement on the mutual consent provision specific to the contents of the Act. There were other agreements reached with the Bush Administration task force, but almost all of them were reneged upon in the lame-duck period following President Clinton's first election. Upon President Clinton's election, a

new task force was formed and a specific negotiator for the federal government was appointed ... a new and welcome development. Mr. Hayman, the negotiator at that time also concluded an agreement with us on mutual consent. I am uncertain what eventually came of these and other agreements, especially in light of several changes among the players.

But one thing became very apparent over the course of our discussions with various administrations. Generally, people who represented policy-makers, or politicians if you prefer, tended to be more cooperative and more imaginative in dealing with us. Those members of these task-forces who were representative of the bureaucracy, were not. The bureaucrats, career people all, could not understand the fundamental nature of what we are seeking, which is change. They continuously attempted to re-define our quest in terms of administrative improvements, which they could control, as opposed to fundamental change and the development of self-governance, which would diminish their control. When they could not address a grievance through such tactics, they tried to argue that no grievance existed.

For example, in the early Bush administration task-force, an attempt was made by bureaucrats to state that under the status quo, Guam was already self-governing since we elect a legislature and a governor. This was of course a ridiculous proposition. Guam only is permitted to do these things by delegation of congressional authority in the Organic Act. Delegation mind you, not disposal of authority. This congress has the authority, tomorrow if it chose, to throw our legislature out of office and nullify all local laws. Congress has the power to replace the Governor of Guam with the Commander Naval Forces Marianas if it chose to. Guam could once again be ruled by presidential appointees or naval officers, as indeed we were in the past.

No, as one federal court put it, "Guam marches clearly to the beat of a federal drummer" or as another federal court stated "the government of Guam is an instrumentality of the federal government", or as yet another federal judge stated "Guam has less self-government than Boulder, Colorado."

What the bureaucrats failed to see, or refused to see, is that Guam does not suffer from a lack of "forms" for self-government, it does not suffer from a lack of institutions that seem like self-government .... Rather it suffers from a lack of actual self-government. It matters little how many elected officials we have, if the actions of those officials are all subject to veto or revision, if the very powers of those elected institutions are subject to unilateral change at any time, or if the very existence of those elected institutions can be unilaterally revoked. It matters not at all if Guam writes a constitution, if that constitution is subject to congressional amendment, revision or approval or if that constitution does nothing to address the imbalance between federal and local authorities. It doesn't matter what powers are delegated to the people of Guam, it only matters what power is vested intrinsically in the people of Guam. Any form of self-government the people of Guam can receive is not something that can be delegated. It must be irrevocably vested in the people.

The bureaucrats did not, could not or would not understand this. They kept talking about fast-track systems and local constitutions and other mechanisms that dealt with form ... not substance.

I once asked a bureaucrat from justice why the United States had placed Guam on the list on self-governing territories if he honestly believed we were self-governing. He blamed people at State. That was a common theme in those talks to. It was frequently "some other bureaucracy's fault".

One of the most fascinating statements I ever read was in a Bush administration task force report which said that although they recognized that Chamorros had an unrealized right to self-determination, they didn't know what could be done about it. If ever there was a confession regarding the lack of imagination in a bureaucracy, that was it. What they were saying was that they recognized that an injustice had been done, they just couldn't do anything about it.

Well, we know what to do about it.

And to do it, we need you.

I am very hopeful that this Congress will demonstrate the understanding and the imagination that the bureaucracy lacks.

I am hopeful that you will assist us in achieving a measure of self-government and self-determination for the Chamorro people.

Because that is what we want. What we seek in this Commonwealth is increased actual self-government for the people of Guam. We seek recognition of the fact that the Chamorro people have never been granted an exercise of their right to self-determination and recognition of a process to give the Chamorro people the opportunity to exercise that right.

How will Commonwealth for Guam achieve a measure of self-government for Guam? By limiting, at least in a small way the plenary power that Congress has over Guam, such power existing due to the Treaty of Paris and the territorial clause of the Constitution. Under Commonwealth, although Congress would retain very significant powers over Guam, certain very specific authorities would be vested in the government of the Commonwealth. These powers would be permanently vested in the Commonwealth, not delegated and subject to revision. This is critical.

This permanent investiture of authority in the Commonwealth through the mutual consent provisions in the Act. That is why, in the past, I have referred to mutual consent as the heart of the Act. Without mutual consent, this Act just becomes another Organic Act. It is only by binding the unilateral and plenary power of the federal government over Guam in some way that we can achieve even the limited self-government we seek.

Consider if you will that notwithstanding the personal brilliance of Congressman Underwood and his predecessors, Congressman Blaz and Won Pat, none of them ever had a vote in this august body. Our delegate cannot vote, because our delegate is simply that – a delegate. We in Guam have no voting representation at any level in the federal government. We can't. We accept and recognize that. But as no involvement of our people is required or even permissible in constituting the federal government, and as the federal government has plenary authority over us, we are thus ruled by a government that is not ours. The government we can elect, the government of Guam, has no intrinsic right to exist, no intrinsic rights at all. It has no sovereign powers whatever. Thus, our people alone among Americans except for our brothers and sisters in non-self governing territories, have no personal sovereignty. This is an intolerable situation, especially on the eve of the Twenty-first Century.

How can this be resolved? Can it be resolved by simply "incorporating" Guam? No. All incorporation does is permanize our non-self governing status and the lack of personal sovereignty of our people. Incorporation does not in any way contribute to Guam's development of self-government, because it in no way changes the distribution of authority between the people of Guam and the federal government. Incorporated, the only government our people elect would remain without any intrinsic authority to exist. Incorporation is no solution.

Can it be resolved by Guam adopting a constitution? No. Guam already has the authority to draft a constitution under federal statute. In fact, Guam did draft a constitution prior to embarking on its quest to change its political status. That constitution was overwhelmingly rejected by the people of Guam in plebiscite, precisely because absent a change in political status occurring first, no Guam constitution can address issues of the federal-territorial relationship. You cannot empower either the people of Guam or the government of our people through a local constitution when under the current status the federal government holds all power. No one can give what one does not have. We cannot, in a constitution, address issues such as immigration control, control over our land and sea resources, self-determination or a host of issues in which, currently, the federal government holds all the cards. Indeed, since a Guam constitution (absent the establishment of partial self-government for Guam) would require Congressional approval and be subject to Congressional amendment, the questions arises whether such a constitution would be a constitution at all, or whether the people of Guam would simply be serving as Congress' drafting subcommittee for a new Organic Act. Unless preceded by a change in political status, a local constitution would do nothing to increase self-government for Guam. The people of Guam understood this well enough to overwhelmingly reject the previous constitutional attempt.

This can only be achieved by a change of status. Self-government, even the limited self-government we seek at this time, is only possible if Congress partially disposes of its plenary powers under the Territorial Clause. There is no other way.

We believe that Congress' broad powers under the Territorial Clause make this partial disposal feasible. Now let us discuss why it is desirable.

Guam stands to benefit greatly from this change.

Under the terms of this Act, Guam would establish control of its own exclusive economic zone. Resources that may become available in time, our limited fisheries, metal deposits on or in our sea floors, all of these things could be developed for the benefit of our own people. Surely, there is nothing wrong with that. Surely, the federal government, possessing as it does access to vast mineral, petroleum, forest and other natural resources could not possibly begrudge Guam the few meager natural resources that may, in time, be useful to us. No I cannot imagine this to be this case. How could local control of our own resources be objectionable. Indeed, other administering powers have already implemented similar regimes with their dependent areas. The British and New Zealand have established protocols with dependent areas under which dependent areas control and benefit from the resources in their own EEZs, why would America do less?

Under the terms of the Act, limitations would be placed on the federal government's ability to acquire additional real property in Guam through condemnation. What's wrong with that? The federal government already owns one third of Guam as it is, what circumstances could require more? Even at the height of the Viet Nam War, thousands of acres of federal property in Guam lay idle, property that we desperately need to continue our quest for absolute economic self-sufficiency.

Under the terms of this Act, trade policy between Guam and the United States would be fixed and no longer subject to change at a moments notice. What's wrong with that? We have already had the experience on more than one occasion of having trade laws, and even regulations, abruptly changed on us, destroying Guam industries in their early stages. Sometimes the true miracle is that we have been able to build a private economy in Guam at all, given the restrictions of federal law and the uncertainty of the rules as we proceed. We need some sense of certainty, some sense that the rules are not subject to change on a whim.

Under this Act, Guam would control its own immigration policy. What is wrong with that? Under current federal control, Guam's population is growing through the roof, primarily as result of rapid immigration. Since I first presented this Act to President Reagan, twelve thousand people have naturalized in Guam. Thousands more have acquired green card status. Some ten thousand residents of freely associated states have moved to Guam. And we have control over none of this. Because of our proximity to Asia, Guam is a destination of choice. I have no objection to immigration to Guam per se. Many immigrants to Guam have made important contributions to our development. But surely there is room to exercise some degree of control over this. Remember, we are only a community of 130,000 people. Immigration that is essentially without control causes our population growth to be faster than any State of the Unions. Giving Guam control over its own immigration policy would not endanger the U.S. in any way. Guam is four thousand miles from Hawaii, the nearest state. You can only get there by air, and although I am a citizen, I had to show my passport to get on a plane to come to this hearing. Guam is already outside the customs zone of the United States.

Under this Act, Guam would have control over air routes into Guam. This is critical. Guam's lifeblood is tourism. To have bi-lateral negotiations between the federal government and Guam tourism markets hold up the development of additional air routes into Guam is a dangerous, strangling practice. Indeed, although I promised myself I would stay non-partisan on this issue, I must say that as a Republican I find it even easier to be enthusiastic about Commonwealth, because Commonwealth falls on the right said of so many Republican issues. Reducing the role of the federal government? That's Commonwealth. Giving local communities the autonomy to deal with their own problems? That's Commonwealth. Promoting economic growth? That's Commonwealth. Eliminating needless federal bureaucracy and red tape? That's Commonwealth.

There are many ways that Commonwealth benefits Guam, but perhaps the greatest benefit we receive is the least tangible. Justice.

Three hundred years ago, the Spanish established their first permanent settlement in Guam. What followed was twenty years of intermittent warfare during which disease, battle and famine decimated our population and reduced a self-governing people of over 100,000 to several thousand who had lost much, including that most precious possession of all – freedom. Almost 100 years ago, an American warship, the U.S.S. Charleston, sailed into Apra Harbor on its way to join Admiral Dewey at the Battle of Manila Bay during the Spanish-American War. While in Guam, it picked up and carried away the Spanish government there. At the conclusion of that war, the Treaty of Paris gave Guam to the United States. Mind you, nobody asked the people of Guam what they thought about it. Nobody had sought our opinion for two hundred years. At that time there were about 20,000 of us. Under the Treaty of Paris, the federal government was specifically responsible for determining the political rights of the native people of Guam, the Chamorro people. For the next fifty years, that meant no rights at all. We ruled by a naval captain, assigned to command Guam as one would a ship. How did the people of Guam respond to this? With loyalty and affection. Although we were not permitted to be more tan cooks and stewards, large numbers of Chamorros joined the armed services, before World War II. When war with Japan came, Guam was immediately captured. No provisions had been made for its defense. But still the Chamorros were friendly and loyal. The Japanese tried to win us over. But Chamorros remained friendly to American interests, even managing to hide the one surviving American sailor in Guam for the entire duration of the occupation. Chamorros suffered for that. Chamorros were tortured. Many were beheaded by the Japanese, who knew that an American was still at large. But nobody talked. Nobody turned him in. And when the Marines hit the beach in Guam, George Tweed was alive and well and he returned to his home in the U.S. After the War, the military condemned most of the prime land in Guam, displacing most of our people from their homes and farms. They paid peanuts for it. The response of our people? Chamorros remained friendly and loyal. Thousands of our men and women served in the military. More Chamorros died in Viet Nam per capita than from any American mainland community.

What, in the end, is the reward for loyalty? I hope it is not to have our dreams derided. I hope it is not to have our aspirations belittled. If any people have earned the consideration of this government, I can say without fear of contradiction, it is the Chamorro people.

I hope the reward for loyalty ... is respect. I hope that after three hundred years, you will do what the Spanish never did, and what so far, the federal government has not done.

Ask us what we think.

That's all self-determination is. It's giving the Chamorro people, the only people living in Guam when the Spanish came, the only people living in Guam when the Treaty of Paris was imposed on us, the chance to decide for themselves. For ourselves.

How can you do less than this? This nation, which has defended self-determination throughout the world, this Nation from which the concepts for both the League of Nations and the United Nations sprang, this Nation which is synonymous with democracy, liberty and freedom ... how can it do less than give the same consideration to a people you have controlled for almost one hundred years, people who literally are in your back yard?

And here we come to why Commonwealth for Guam is good for America. I could say that by giving Guam a chance to develop a better economy, you help relieve requirements for federal expenditures in Guam, but in truth, Guam is no means the largest recipient of federal largesse. In many ways, it is among the smallest. I could say that be helping Guam to prosper, you help to build a showcase for the American Way in our part of the world, but we all know you have many other matters before you that may seem to you more pressing, however important these matters are to us.

Commonwealth for Guam is good thing for the federal government to do, mainly because it is the right thing to do.

And if history teaches us anything, it is that America never goes wrong, when it does what is right.

Let us do what is right.

**MAYORS' COUNCIL OF GUAM**
*Kumisión Mahot Guåhan*
P.O. Box 786 Agana, Guam 96932

**SUPPORT FOR GUAM'S "COMMONWEALTH ACT"**

We the signatories, current Mayors and Vice Mayors of Guam, support the content and basic intent of the Mayors' Council of Guam resolution number #89-04 adopted December 6, 1989 (see attached). Guam's plight for closer political ties with the United States of America is resoundingly expressed in the body of this document. We are therefore soliciting your support for the passage of Guam's "Commonwealth Act" as adopted through plepiscite by the people of Guam.

(Attachment: Signature List)
PLPSCITE:FC/. N:10-22-97

THE RICARDO J. BORDALLO GOVERNOR'S COMPLEX
Office: (671) 472-6940, 477-8461 • Fax: (671) 477-8777

MAYORS' SIGNATURE LIST

RE: Plep.scite

| DISTRICT | NAME | SIGNATURE |
|---|---|---|
| AGANA | FELIX P. UNGACTA | |
| AGANA HEIGHTS | PAUL M. McDONALD | |
| AGAT | JOHNNY M. REYES<br>JESUS B. CHACO | |
| ASAN-MAINA | VICENTE L. SAN NICOLAS | |
| BARRIGADA | RAYMOND S. LAGUANA<br>VICENTE L. LEON GUERRERO | |
| CHALAN PAGO-ORDOT | ROSSANA D. SAN MIGUEL | |
| DEDEDO | JOSE A. RIVERA<br>DORIS S. PALACIOS | |
| INARAJAN | JESSE L.G. PEREZ | |
| MANGILAO | NONITO C. BLAS | |
| MERIZO | IGNACIO S. CRUZ | |
| MONGMONG-TOTO-MAITE | ANDREW C. VILLAGOMEZ | |
| PITI | ISABEL S. HAGGARD | |
| SANTA RITA | JOSEPH C. WESLEY | |
| SINAJANA | DANIEL E. SABLAN<br>ROKE B. BLAS | |
| TALOFOFO | VICENTE S. TAITAGUE | |
| TAMUNING-TUMON | LUIS S.M. HERRERO<br>CONCEPCION B. DUENAS | |
| UMATAC | JESUS A. AQUININGOC | |
| YIGO | ROBERT S. LIZAMA | |
| YONA | VICENTE C. BERNARDO | |

(Attachment)
SIGLIST:AGN:1 /22/97

MAYORS' COUNCIL OF GUAM
AGANA, GUAM 96910

RESOLUTION NO. 89-04

SPONSORED BY: ______________________
MAYORS' COUNCIL OF GUAM

RELATIVE TO EXPRESSING THE FULL SUPPORT OF THE MAYORS' COUNCIL OF GUAM AND EACH INDIVIDUAL MAYOR AND VICE MAYOR FOR THE GUAM COMMONWEALTH ACT AND URGING THE MOST EXPEDITIOUS CONSIDERATION AND PASSAGE OF HR 98.

BE IT RESOLVED BY THE MAYORS' COUNCIL OF GUAM:

**WHEREAS**, the people of the Territory of Guam, in a plebiscite, have democratically expressed their desire for a fundamental change in their political relationship between Guam and the United States, from that of an unincorporated territory to a Commonwealth status; and

**WHEREAS**, the people of the Territory of Guam, in two subsequent plebiscites, have approved the fundamental provisions of the Guam Commonwealth Act, such provisions containing the prescription by which the political relationship between Guam and the United States shall be governed and conducted; and

**WHEREAS**, Guam's Delegate to the House of Representatives, the Honorable Ben G. Blaz, has introduced the Guam Commonwealth Act as HR 98, and has secured the co-sponsorship of over one-third of his colleagues in the House of Representatives; and

**WHEREAS**, the United States of America, champion of democracy and bastion of human rights, did, in fact, promise the right of self-determination to the people of Guam in the peace treaty which caused the ceding of Guam to the United State by the Spanish Crown; and

**WHEREAS**, the United States of America, in its greatness as the champion of the rights of all human beings to the freedom of choice, did, in fact, commit itself to the extension of self-determination to all people who have heretofore never been permitted that sacred freedom of choice to a political statu and relationship which would, in their best estimate, secur the blessings of democracy for themselves and their prosp rity; and

**WHEREAS**, the Mayors and Vice Mayors of Guam, in the performance and accomplishment of their daily responsibilities withi the villages and municipalities of the Territory, are in the unique and best position to determine the feelings and attitudes of their constituents in regards to the critical issue of the Commonwealth efforts and the issue of self-determination for the Chamorros; and

**WHEREAS**, the Mayors' Council of Guam, through the

in particular, those provisions which call for sel:-determination for the Chamorros:

**NOW, THEREFORE, BE IT RESOLVED:**

**THAT,** Mayors and Vice Mayors of Guam, in concert and ass mbly, do hereby exclaim with great enthusiasm, the support of :he people of Guam for HR 98, the Guam Commonwealth Act; and be it further resolved

**THAT,** the Mayors' Council of Guam call upon and entreats the United States, through its Congress, to fulfill its promise of self-determination for the Chamorros, as expressed in the Tre ty of Peace between Spain and the United States, signed on )ecember 10, 1898, in the city of Paris and its commitment to self-determination for all peoples expressed in its sig ature of the Charter of the United Nations; and be it fur her resolved

**THAT,** the President of the Mayors' Council and its Sec etary attest to and certify the adoption hereof and that cop es thereof be thereafter transmitted to the Honorable Ron De Lugo, Chairman of the House Sub-Committee on Insular and International Affairs, the Honorable J. Bennett Johnston, Cha rman of the Senate Committee on Energy and Natural Res urces and to the Honorable Joseph F. Ada, Governor of Gua i and Chairman of the Guam Commission on Self-Determination on :he occasion of the initial hearings on HR 98 to be held in Ionolulu, Hawaii on December 11 and 12, 1989.

**DULY ADOPTED AT ITS REGULARLY SCHEDULED MEETING ON THIS 6TH DAY OF DECEMBER, 1989.**

| | |
|---|---|
| [signature] | Isabel S. Haggard |
| **RAY IOND S. LAGUANA** | **ISABEL S. HAGGARD** |
| **PRE IDENT** | **SECRETARY** |
| **MAY RS' COUNCIL OF GUAM** | **MAYORS' COUNCIL OF GUAM** |

AGANA
FELIX F. UNGACTA

AGANA HEIGHTS
FRANK M. PORTUSACH

AGAT
ANTONIO C. BABAUTA

ASAN-MAINA
VICENTE I. SAN NICOLAS

BARRIGADA
RAYMOND S. LAGUANA

CHALAN PAGO-ORDOT
VICENTE S. SAN NICOLAS

DEDEDO
JOSE A. RIVERA

INARAJAN
JUAN C. CRUZ

MANGILAO
NONITO C. BLAS

MERIZO
IGNACIO S. CRUZ

VICE MAYORS

(OFF-ISLAND)
AGAT
JOHN A. QUIDACHAY

BARRIGADA
JESSIE B. PALICAN

MONGMONG-TOTO-MAITE
ANTONIO D. MATERNE

PITI
ISABEL S. HAGGARD

SANTA RITA
GREGORIO M. BORJA

SINAJANA
FRANCISCO N. LIZAMA

TALOFOFO
TITO A. MANTANONA

TAMUNING
ALFREDO C. DUNGCA

UMATAC
ALBERT T. TOPASNA

YIGO
JOHN F. BLAS

YONA
VICENTE C. BERNARDO

SINAJANA
DANIEL E. SABLAN

TAMUNING
TERESITA C. BORJA

DEDEDO
DORIS P. FERREIRA

(OFF-ISLAND)
CHIEF EXECUTIVE OFFICER
ENRIQUE S.M. AFLAGUE

instr ment of this resolution, by virtue of their signatures appen ed hereto, do, in fact, express the support of th grassroots, the people, of Guam for HR 98 and the full provi ions of the Guam Commonwealth Act, inclusive of and

**OPENING REMARKS OF MAYOR PAUL M. McDONALD, PRESIDENT OF THE MAYORS' COUNCIL OF GUAM BEFORE THE HOUSE RESOURCES COMMITTEE, U.S. HOUSE OF REPRESENTATIVES, OCTOBER 29, 1997.**

CHAIRMAN DON YOUNG AND MEMBERS OF THE COMMITTEE, MY NAME IS PAUL M. McDONALD. ON BEHALF OF THE POPULARLY ELECTED MAYORS AND VICE- MAYORS OF THE 19 MUNICIPALITIES OF GUAM, I AM PLEASED TO BRING YOU A VERY WARM *HAFA ADAI*. THANK YOU FOR ALLOWING ME A FEW MINUTES OF YOUR VERY PRECIOUS TIME TO PRESENT THE MAYORS' COUNCIL'S RESOLUTION ON THE PROPOSED GUAM COMMONWEALTH ACT. MY INTRODUCTORY REMARKS IS TO SUPPORT AND REINFORCE THE COUNCIL'S RESOLUTION. I SHALL BE BRIEF.

THE GUAM COMMONWEALTH INITIATIVES BEFORE YOU TODAY STARTED OVER A DECADE AGO. BUT THE YEARNINGS AND CLAMOR FOR A MORE DIGNIFIED AND ENLIGHTENED POLITICAL STATUS PRECEDED TODAY'S COMMONWEALTH DEBATES BY SEVERAL DECADES. THE SPANISH - AMERICAN WAR WAS FOUGHT OSTENSIBLY TO EXTEND AMERICAN RIGHTS TO THE BENIGHTED SPANISH COLONIAL POSSESSIONS. ALTHOUGH NO FORMAL COMMITMENT WAS MADE TO INCORPORATE THESE POSSESSIONS WITHIN THE AMERICAN POLITICAL SYSTEM, THERE WAS AN IMPLIED PROMISE IN THE 1898 TREATY OF PEACE FOR THE CONGRESS TO DETERMINE THE POLITICAL STATUS OF THE INHABITANTS OF THE TERRITORIES CEDED TO THE UNITED STATES. THE REALITY WAS THAT THE INHABITANTS OF GUAM WERE NEVER CONSULTED ABOUT THEIR PREFERRED STATUS WHICH MAKES THE PROTOCOL WITH SPAIN SOMEWHAT ARBITRARY. NOTWITHSTANDING THE IMPERIALISM OF THE WILLIAM McKINLEY ADMINISTRATION, AND SUBSEQUENT TERRITORIAL ADMINISTRATIONS, THE CONGRESS NOW HAS THE SPLENDID OPPORTUNITY TO UPHOLD THE SEMINAL REASONS FOR THE WAR BY GRANTING AMERICANS IN THE TERRITORIES THE DIGNITY AND

EQUALITY THEY EARNED THROUGH THEIR DEMONSTRATED LOYALTY TO THIS COUNTRY.

BUT IN ALL HONESTY, I MUST REPORT TO YOU THAT A GROWING NUMBER OF OUR YOUNG PEOPLE WHO FOUGHT IN AMERICA'S WARS FEEL THEY HAVE BEEN REJECTED, A FEELING OF NOT BEING WELCOME INTO THE NATIONAL FAMILY AND THEIR SACRIFICES ON BEHALF OF THE NATION HAVE NOT BEEN APPRECIATED. AND IF I MAY BORROW FROM SIR WINSTON: HOW MUCH MORE DO THEY HAVE TO GIVE TO RECEIVE SO LITTLE FOR THE SO FEW? THE SNAIL PACE OF GUAM'S QUEST FOR MORE LOCAL AUTONOMY ONLY SERVE TO FUEL THEIR DISILLUSIONMENT.

MR. CHAIRMAN, WHAT WE ON GUAM ARE ASKING THIS BODY IS FOR A STATUS THAT LEVELS THE PLAYING FIELDS. IT'S IRONIC THAT WE CONTINUE TO ENDURE THE INDIGNITY OF SECOND CLASS AMERICAN CITIZENSHIP UNDER THE AUSPICES OF THE GREATEST DEMOCRATIC COUNTRY OF THE WORLD. IT IS ALSO PATENTLY UNFAIR THAT OTHER AMERICANS HAVE THE INHERENT RIGHTS TO CHOOSE THEIR REPRESENTATIVES TO MAKE LAWS, EXTEND ECONOMIC AND SOCIAL BENEFITS TO THEM, BUT THESE SAME PRIVILEGES ARE DENIED TO AMERICANS WHO CHOOSE TO LIVE AND RAISE THEIR FAMILIES ON GUAM.

MR. CHAIRMAN, FOREIGN STUDENTS OF AMERICAN GOVERNMENT WILL FIND IT INCREDULOUS THAT IN THE RECENT PAST THOUSANDS OF AMERICANS HAVE BEEN PLACED IN HARMS WAY ON ORDERS OF SUPERIORS THEY DID NOT ELECT. AND TO THIS VERY DAY ARE OBLIGED TO OBEY LAWS NOT OF THEIR OWN MAKING BUT BY POLITICAL LEADERS THEY HAVE NEITHER SEEN NOR CHOSEN. THESE UNEVEN TREATMENTS CANNOT BE JUSTIFIED ON THE BASIS OF GEOGRAPHY OR (TO BORROW FROM *THE WASHINGTON POST*) BY "IMPERIAL ACCIDENTS" OR BECAUSE EXTENDING THESE RIGHTS AND BENEFITS ENTAIL ADDITIONAL COST.

GUAM UNDER THE ORGANIC ACT IS DEFINED AS AN UNINCORPORATED TERRITORY OF THE UNITED STATES. THE EVIL OF THIS STATUS IS THAT IT

TREATS THE ISLAND'S RESIDENTS AS IF THEY ARE "CHILDREN OF A LESSER GOD" AND CLASSIFIES THEM IN A LESSER POLITICAL/SOCIAL CLASS FOR NO OTHER REASON THAN THE FACT THAT THEY SPEAK ENGLISH WITH A DIFFERENT ACCENT!

FINALLY, MR. CHAIRMAN, THERE ARE CRITICS AND " NAY SAYERS" IN THIS TOWN WHO THINK THAT THE APPROVAL OF THE GUAM COMMONWEALTH BILL WILL SETUP A DISTINCT POLITICAL ENTITY SEPARATE AND APART FROM THE CONSTITUTIONAL FRAMEWORK OF THE UNITED STATES. I CAN ASSURE YOU THAT WE ON GUAM ARE NOT SEEKING TO SECEDE FROM THE UNION! WE ARE NOT INTERESTED IN INDEPENDENCE, AND THE NATION'S STRATEGIC INTERESTS REMAIN AS EVER SECURE AND UNDISTURBED ON GUAM. STATEHOOD IS ALSO NOT A REALISTIC POLITICAL GOAL FOR US AT THIS TIME.

WHAT WE ARE SEEKING FROM YOUR COMMITTEE AND THIS CONGRESS IS FOR AN ACCORD THAT WILL ACCORD US THE EQUALITY ENJOYED BY ALL AMERICANS EVERYWHERE, PLUS THE ABILITY TO BECOME ECONOMICALLY MORE SELF-RELIANT AND THE FREEDOM TO ASSERT OUR CULTURAL SELF-PRESERVATION.

WITHIN THE UNIVERSAL POWERS OF THE CONGRESS OVER TERRITORIAL ISSUES, THERE 'S A WHOLE CONSTELLATION OF STATUS OPTIONS, (BETWEEN STATEHOOD AND INDEPENDENCE) THAT THIS BODY CAN ENACT FOR GUAM, IF IT SO CHOOSES. GRANTED SOME MAY REQUIRE CONSTITUTIONAL AMENDMENTS OTHERS MERE DELEGATION OF CONGRESSIONAL AUTHORITY. OUR PETITION TO CHANGE OUR POLITICAL STATUS IS NOT BASED ON OUR HOSTILITY TOWARD THE NATION'S DEMOCRATIC SYSTEM OF GOVERNMENT. BUT AS ONE WRITER TO THE *PACIFIC DAILY NEWS* RECENTLY WROTE: "PUSHING DEMOCRACY ABROAD IS NOT ONLY GOOD AMERICAN FOREIGN POLICY BUT AS AMERICANS WE SHOULD ALL INSIST THAT IT'S IMPLEMENTATION AND PRACTICE SHOULD START WHERE AMERICA'S DAY BEGINS." *SI YUUS MAASE*

**I RESPECTFULLY REQUEST THAT THE MAYORS' COUNCIL'S RESOLUTION TOGETHER WITH MY INTRODUCTORY REMARKS BE MADE A PART OF YOUR COMMITTEE'S RECORD. I'LL BE HAPPY TO ENTERTAIN ANY QUESTIONS YOU MAY HAVE FOR ME.**

**-30-**

***STATEMENT OF SENATOR ANTHONY C. BLAZ***
***VICE SPEAKER, 24TH GUAM LEGISLATURE***
***BEFORE THE***
***COMMITTEE ON RESOURCES***
***U S HOUSE OF REPRESENTATIVE***
***FOR PASSAGE OF HR 100***
***GUAM COMMONWEALTH ACT***
***OCTOBER 29, 1997***

Chairman Young, Members of the Committee, I am Anthony C. Blaz, Vice Speaker of the 24th Guam Legislature, testifying on behalf of Speaker Antonio R. Unpingco and the Guam Legislature

Guam, before March 5, 1521, was a "free" island community inhabited for over 7,000 years by indigenous Chamorro whose origin is still being debated among anthropologists and historians. Guam was a colony of Spain from 1521 until 1898 when the Spanish/American war ended and Spain ceded Guam to the U. S. Government. Next year will culminate 100 years of U. S. Government administration of Guam as an "Unincorporated Territory".

Historically, when anyone makes reference to Guam, usually the first thing that comes to mind is a "military installation island" in the Western Pacific.

The details of the story of Guam can be easily presented just as readily as it can be twisted and told out of or in a different context away from meaningful facts. A strategic description is worth mentioning. Guam, ***by air***, is about three hours from Japan; three and a half hours from South Korea; four hours from Taiwan; five hours from Hong Kong; four hours from the Philippines; and five and a half hours from Beijing.

Guam, ***by air***, however, is eight hours from Honolulu; twelve hours from California and sixteen hours from Washington, D. C.

From this description, one can easily conclude that Guam is more Asian/Pacific than American, notwithstanding that it is the western-most ***possession*** of the U. S. Government, the farthest removed, and



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 202 of 542

strategically, it is, today, a vibrant and dynamic gateway to the Asia/Pacific region.

Except for a very brief period when Guam was occupied by Japanese military forces responsible for some of the most atrocious war crimes ever committed and later liberated by the American armed forces, the U. S. Government ***ruled*** Guam and its people.

As in WW II, Guam's sons were called to defend the United States and were asked to make the supreme sacrifice by giving their lives, the highest number per capita compared to any similar community in the United States, in defense of their country during the 1950 "police action" in Korea and the undeclared war in Vietnam, a decade later.

Whenever there is a military need, Guam continued to play a critical strategic military role in the protection of the national security interest of the United States.

Also, when the U. S. Government needed to contain its cost and in its effort to downsize the military, the United States reached all the way across the Pacific and touch Guam, creating a long lasting aberration in the limited economy Guam was enjoying, forcing Guam to be innovative and creative by demanding the return of excess land unused by the military and converting a negative incident into the economic success currently happening today.

These facts are being articulated here because they support the reasons why the U. S. Government ***must*** grant the status of Commonwealth to Guam as a matter of protecting its national interest in this region under mutually beneficial terms.

The Asia/Pacific region, since the beginning of the 1990s, has demonstrated economic growth, stability, development and continued enhancement with no end in sight, even surpassing the traditional international trade the United States have enjoyed through its Atlantic borders since the Industrial Revolution era.

While the international trade within the Atlantic region and throughout Europe is still very significant, its growth and expansion, with the eminent inauguration of a consolidated trade union in Europe, has leveled off. The United States needs to expand its global market to protect its national security interest.

It may sound strange that the global market and international trade opportunities are being discussed in support of the interest of United States' national security.

However, if one examines the necessary components for an independent nation to become a "world super power" or, better yet, what caused the decline of the United Soviet Socialist Republic (USSR), one cannot miss the most important component; ***continued economic health***. The economic health of a nation determines that nation's capabilities in becoming and sustaining a world super power position.

The economic factors important for a continued economic health of any nation include the ability to, with as little as possible restraint or barriers, create and accumulate capital; the unrestrained freedom of the private, non-governmental, sector to pursue an entrepreneurial based economy; unrestricted flow of money; abundance of raw materials and unlimited highly motivated and trained human resources; stable governmental policies and laws; unrestricted market access; dismantling of governmental barriers, tariff and quota; and, a government that is of laws rather than of man where legal recourse is understandable, practical, tested and certain.

The United States is the only world super power.

To continue, she must protect, enhance and anchor herself permanently and securely within the Asia/Pacific region where much of the economic activity is to be centered in the next millenium.

Guam, because of its location, loyalty and patriotism will strategically always be of great military and economic value to the United States.

After all of these have been said and done, obvious questions arise:

***'What does the national interest of the United States have to do with granting Guam its Commonwealth political status?***

***And, how are these arguments about the national interest of the United States relevant to Guam's Commonwealth political status?***

Imagine the United States having a continued physical presence in this region through a commonwealth relationship with Guam. The U. S. Government will not only have a world super power presence that is secured and entrenched in the continental boundaries of the United States, but also a physical presence in Asia and the Western Pacific.

It may be argued that the Unites States can do whatever it pleases without Guam. After all, what is being a world super power if one cannot command international influence and respect?

While this is a matter of fact today, it is not guaranteed for the future nor can the United States take its world super power position for granted.

A majority of global economists predicted that the gross national product of the People's Republic of China, with over 2 billion population, would equal the gross national product of the United States within the next fifty years. This nation alone will support a massive market never experienced by any other nation on earth, with a level of affluence that will be second only to those truly industrialized nations like the United States and Japan. The European Common Market will not compare nor be able to compete with the single market in China.

Imagine the United States having as its westernmost landmass, the island of Guam, U. S. A., with its laws, courts, government, currency and economy, again, right in the middle of this region. Picture the United States here on this island, a major player and initiator, developer and beneficiary of all of the economic benefits to come. Visualize a world super power among the other tigers within this region. Imagine how better and easier it would be if the United States is physically situated right in the middle of all of these economic activities.

Imagine the United States safely, secured and permanently entrenched in this region through its commonwealth relationship with Guam.

While our generation may not be able to witness much of the next century at the turn of the millenium, our children and grand children will be around to witness and participate in the possible consolidation and reconstitution of a regional state among the island nations within the entire Micronesia to form the next state of the United States of America.

Is this far fetched?

Perhaps to you and me and my generation but, definitely not to my children and grandchildren.

Just imagine the limitless possibilities a Micronesian regional state of the United States of America can create!

I sincerely hope that I have done justice to my kids and Guam's future generations in our quest for Commonwealth. I look forward to continuing and advancing our very important dialogue in further hearings early next year in Guam, U. S. A, where America's day begin.

**TESTIMONY OF SENATOR MARK FORBES**
**MAJORITY LEADER AND CHAIRMAN OF**
**THE COMMITTEE ON RULES, GOVERNMENT REFORM AND FEDERAL AFFAIRS, 24TH GUAM LEGISLATURE**
**ON H.R. 100, THE GUAM COMMONWEALTH ACT.**

Chairman Young and members of the Committee, thank you very much.

By definition, anything we do to resolve the political status dilemna that faces small, non self governing territories like Guam, is going to be unprecedented. By that, I do not mean to say that precedents don't exist, especially in an international sense, for solving the problem that the administration of places like Guam poses for the federal government. I mean only to say that in the near century that the federal government assumed possession of these areas, very little thought has been given in the federal government to the existential problem it created for itself when it chose to acquire these areas, and then stretched prevailing constitutional notions to allow for their acquisition. In the absence of clear thinking bad decisions were made. The challenge before us to avoid being trapped by those bad decisions. The challenge before us is to think creatively, and not expediently. The challenge before us is to avoid "custom", especially custom which – to misquote Shakespeare – is best honored in the breach than the observance – and instead think outside the box.

Guam is a non-self governing territory. Non-self government for Guam began with the Treaty of Paris, the principle signatories of which were Spain and the United States of America. In that treaty, the United States Government explicitly states that it will determine the civil rights and the political status of the native inhabitants of Guam – the unnamed – and yet clearly indicated Chamorro people. Note that in this Treaty, ratified by the Senate, it is Congress that will determine the rights and status of the Chamorro. Not the Constitution. The importance of this distinction was made clear several years later during the so-called Insular cases before the Supreme Court which established the existence, previously unrecognized, of "unincorporated territories" in the American system. As is well known, prior to the insular cases, it was commonly assumed that all territory acquired by the United States would eventually be admitted to the Union as a State.. In the insular cases, the Supreme Court stated that territory could be acquired which the United States never intended to incorporate into the Union as a full and equal State. Under this new regime, the homeland of millions of Filipinos could be expropriated for American use without an implicit recognition that one day the Philippines would be a state, and without the application of the Constitution to Filipinos, as was in fact the case. This status applied then and still applies to Guam and its native inhabitants, the Chamorro.

In Rasmussen v. United States, the Court relates the status of places like Guam clearly to the Treaty of Paris and distinguishes the relationship so established from other acquisitions of territory by treaty, such as the acquisition of Alaska. The Court said:
"If the treaty-making power could incorporate territory into the United States without Congressional action, it is apparent that the treaty with Spain, ceding the Philippines [and

Guam] to the united States carefully refrained from so doing; for it is expressly provided that (article 9) 'the civil rights and the political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress.'"

Later, with respect to Alaska, the Court said:

"The treaty concerning Alaska, instead of exhibiting, as did the treaty respecting the Philippine Islands, the determination to reserve the question of the status of the acquired territory for ulterior action by Congress, manifested a contrary intention, since it is therein expressly declared, in article 3, that:
'The inhabitants of the ceded territory ... shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and shall be maintained and protected in the free enjoyment of their liberty, property and religion.'"

The Court concludes that it was clearly the intent of the United States to incorporate Alaska in the same manner it incorporated territory acquired from Mexico in the Mexican War, whereas this is expressly no the intent with the Treaty of Paris.

Therefore Guam is a territory, but distinct from other traditional territories in that no path to statehood exists and that the civil rights of Chamorros and the political status is to be determined exclusively by Congress.

Guam's status as an 'unincorporated territory' was modified somewhat in 1946 by treaty. The United Nations Charter, Article 73, created a new category into which the United States placed Guam and from which it has never been withdrawn. This new category is the "non-self governing territory". By treaty is established the concept of "self-determination", by which the peoples of a territory are promised the right to determine their political status. This new regime was confirmed by the United States in 1992 through the International Covenant on Human Rights.

What Guam is seeking is to change the territorial regime once more and acquire for our people an inherent right of self-government. It is insufficient that we be 'given' a government that administers Guam using powers delegated to it by Congress. That is in fact the status. What we seek is for our government to have inherent powers, for our people to have inherent powers, for Guam to exist as a political entity in its own right and for our people to enjoy for themselves a degree of the personal sovereignty that is the right of other American citizens.

In order to accomplish this, we ask Congress to dispose of certain powers of government over Guam and the people of Guam, not all.

Can Congress do this, and if so, how?

Congress has disposed of territory many times in its history. Since the earliest times, Congress has been able to, under the Territorial Clause, dispose of less than all of the ownership rights to land that it owns. It has transferred mineral rights, for example.

Many times Congress has transferred title of territory (here meaning land) to persons, states or territories. While disposal of property may not seem the same as disposal of sovereignty, the Territorial Clause makes no such distinction. Congress has in fact disposed of sovereignty under the Territorial Clause many times as well. In one case, that of the Philippines, it was a full and complete disposal of authority and power. Congress granted the Philippines complete independence. In most cases, the disposal was partial. The territories were admitted into the Union as States. How is this a partial disposal? Consider: all areas that were once territory of the United States fell under the plenary authority of Congress. They were not self-governing. Under the Territorial Clause, Congress made all needful rules and regulations for them. Upon admission as States, these territories acquired a measure of self-government, as powers the federal government is not granted through the Constitution are reserved to the States. But Congress did not lose all power over these territories. As states, Congress and the federal government retained certain powers of government over these areas, even though they no longer fell under the Territorial Clause. In once sense, partial disposal of territories has been the rule in American history, not the exception.

Since Guam is not seeking to, or ever likely to, become a State, are there mechanisms other than Statehood which will allow for a partial disposal of Congressional powers? Put differently, is it possible for one Congress to bind future Congresses with respect to these matters?

On the subject, a plurality of the Supreme Court wrote in 1996 that:
"...although we have recognized that "a general law ... may be repealed, amended or disregarded by the legislature that enacted it" and "is not binding upon any subsequent legislature," on this side of the Atlantic the principle has always lived in some tension with the Constitutionally created potential for a legislature, under certain circumstances, to place effective limits on its successors, or to authorize executive action resulting in such a limitation."

If no limits are possible, then what is a treaty? If no action is binding, how can the government enter into any contract? How could it procure services or material if no contract is binding? Clearly there are circumstances where one Congress does bind future Congresses, or limits their freedom of action. If it can be done in those circumstances, why not in order to address the specific relief Guam seeks?

While it has not yet explicitly happened, is there anything that truly prevents Congress from disposing of some of its governmental powers under the Territorial Clause, but not all? We can find no prohibition against this.

Indeed, depending on what court you listen to, it may have already happened. The Customs Court in 1970 in Nestle v. United States said that no such disposal had occurred in the case of Puerto Rico, referring to the legislative history of the Puerto Rican compact for justification, the District Court in Puerto Rico has reached a different conclusion, applying the National Labor relations Act to Puerto Rico as it applies to states, not territories and saying:

"...Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in [the 'territorial clause']. From July 25, 1952, in which the Commonwealth of Puerto Rico was born, Puerto Rico ceased being governed by the unilateral will of Congress; now it is being governed by the express, though generic, consent of the people, through a compact with Congress. Whatever authority was to be exercised over Puerto Rico by the federal government would emanate thereon, not from Article IV of the Constitution, but from the Compact itself, voluntarily and freely entered into by the people of Puerto Rico; a compact which cannot be unilaterally revoked by Congress or by the people of Puerto Rico."

The Supreme Court has held that Puerto Rico "like a state, is an autonomous political entity, ' sovereign over matters not ruled by the Constitution.'"

To the extent that there is confusion over such powers as Puerto Rico may have, they seem to stem from the vagueness of the compact, as opposed to any inherent inability on Congress' part to dispose of territory through a compact. This is why our Act strives to be specific about what powers Congress will dispose of what will be retained.

The United States limits its sovereignty every time it ratifies a treaty. No legal reason exists why Congress cannot limit its power over territories by giving some of those powers to territories themselves, indeed, it would be less of a limitation than a treaty with a foreign power since the United States retains overall sovereignty over Guam.

Congress has the authority to do what Guam seeks. It can dispose of some of its governmental powers over Guam and invest the people of Guam with a right of self-government, and the manner we suggest Congress do this, while perhaps unprecedented, is the only way we know this can be done.

If we don't do what Guam suggests in this Commonwealth Act, what are the alternatives?

1. The Status Quo.

This is unacceptable. Guam cannot forever remain non-self governing, as we are, as all courts have said we are, and as we shall forever be as a territory. No self-respecting people could accept as their ultimate fate a status that affords them no ability to govern themselves. Guam cannot forever be an instrumentality of the federal government. Colonialism was an unacceptable fate for the founders of this nation. How can it be any less unacceptable for us? We need resolution, one way or another.

2. Incorporation.

What would be the point? Incorporation would simply make perpetual our non-self governing status. No territory, incorporated or otherwise, has ever been self-governing. This alternative is simply making the status quo last forever. Incorporation without statehood is institutionalized colonialism.

3. Statehood.

Whose offering? No government official has ever offered statehood to Guam. In fact, every government issued report, Congressional or Executive, has ruled statehood out as an option for Guam. It seems to be the persistent federal view that 130,000 people living on an island of 200 sq. miles located almost ten thousand miles from Washington D.C. cannot constitute a state. To be fair, the voters of Guam themselves have rejected statehood in previous plebiscites and it can be argued that statehood for Guam would be an economic disaster, for Guam and the United States.

4. Becoming a county of another state.

This is a real non-starter. Imagine asking the people of Mobile to leave Alabama and become part of New York State. For a million reasons, this option is no option.

5. Guam federating with Micronesia??? Or other territories and forming a state.

This option has actually been suggested by a few -- a very small few. It is only seriously offered by people who know little about Guam or Micronesia. First, the freely associated states of Micronesia are independent nations, with their own delegations to the U.N. Secondly. The economic and cultural differences between Guam and Micronesia are legion. This suggestion borders on science fiction.

6. Independence

Guam isn't asking for it. Nor, we assume, would an independent Guam be in the best interests of the United States. We enjoy our close association with America. We just don't understand why in our case the price of that association has to be a complete lack of self-government.

7. Free association

See independence.

In summation, we believe that the partial disposal of Congressional authority outlined in the Guam Commonwealth Act is the only viable alternative available to us if we are to have any degree of self-government restored to the people of Guam. It is practical and within the powers of Congress. Although this is yet to be explicitly done in American territorial history, it is not forbidden by the Constitution. Indeed, if Congress were to look briefly beyond the narrow parameters of American experience with the administration of non-self governing territories, it would see creative examples of such devolution and the establishment of home-rule and other limited transfers of power to dependent areas. The British have been doing it for years, most recently in the case of Scotland.

One final point. There are those who have objected to the provisions in Commonwealth that relate to a Chamorro act of self-determination. Some see this as unconstitutional; a violation of the equal protection provisions of the Constitution. We disagree. Once again, as stated in the Treaty of Paris, Congress shall determine the civil rights and political status of the inhabitants of Guam. Congress alone. The native inhabitants of Guam at the time of the Treaty are clearly the Chamorro people. In determining the civil rights of the Chamorro, Congress may find among those rights a right to self-determination, indeed must if the United States is to live up to its treaty obligations with respect to the United Nations. Congress cannot find that settlers in Guam have a similar right. Has someone who moved from California two weeks ago have a right to self-determination? Did that person have such a right in California? Clearly not, unless one believes California has the right to secede from the Union. If it dies, what was the Civil War about? It only makes sense that Chamorros in Guam have an unrealized right of self-determination, stemming from the reality of our history and American obligations under treaty.

Would granting Chamorros self-determination violate anyone else's rights? Courts have found that in territorial clause circumstances, the equal protection clause does not necessarily apply. That is how laws in the CNMI restricting land ownership to Northern Marianas Chamorros and Carolinians have been upheld.

There are also those who object to Guam acquiring control of immigration. They believe we will use such authority to allow cheap labor into Guam and set up sweater factories similar to those that exist in the CNMI. Nothing could be further from the truth. Guam wants immigration control not to increase immigration into Guam, but to restrict it. When I was a child growing up in Guam, Chamorros were an overwhelming majority in Guam. In the last twenty years, we have become a numerical plurality, although we remain a slight voting majority. We have no desire to go the way of the native hawaiians. Immigration has brought good things to Guam, and immigrants have made many positive contributions to Guam, but you can have too much of a good thing. Our intention is to slow down population growth in Guam by a control, not a stoppage, of the rate of immigration.

And with respect to the cheap labor issue, I have recently authored a law, enacted just last month, that makes it illegal in Guam to employ alien labor in any export-driven manufacturing enterprise. No factories similar to those that exist in the CNMI are permitted under this law.

When I was a little boy, I watched cowboy movies and rooted when John Wayne shot the Indians, as all little boys did in those days. I got a little older and realized that the story of westward expansion wasn't quite like what happened in John Wayne movies. I learned that the price of westward expansion was the displacement and death of literally millions of Native Americans. I saw better movies, like Jimmy Stewart in Cheyenne Autumn, and Soldier Blue. I felt bad, and new that at the root of our nation's growth, there was a terrible injustice done to the indigenous people of this continent. There is no doubt that the United States has been a real force for good in the world, and the world

**would be worse place had this nation never been founded. I firmly believe this. And even as a boy, I knew there was no way to turn back the hands of time two hundred years and redress all that was wrong. But some wrongs can be redressed. Some injustices can be made right. There is still time.**

**There is no doubt that when the United States acquired the Chamorro people as a spoil of war, somebody should have asked us what we wanted. That would have been the decent thing to do. It would have been right. It would have been just. We're still here. We can still be asked. We can still be given the right to determine our own destiny. This injustice can be redressed.**

**Let's do what is right and just. I know we still have a lot of work to do on this bill. We know this is just the start of a process. But if we work together, I know together, we will do what is right.**

**STATEMENT FOR THE RECORD**

**vicente (ben) c. pangelinan**
**MINORITY LEADER, TWENTY-FOURTH GUAM LEGISLATURE**

**HOUSE RESOURCES COMMITTEE**
**(105th CONGRESS)**

**HEARING ON**

**H.R. 100 GUAM COMMONWEALTH ACT,**

**H.R. 2370 THE GUAM JUDICIAL EMPOWERMENT ACT OF 1997**

**S. 210 OMNIBUS TERRITORIES ACT**

**OCTOBER 29, 1997**

Honorable Chairperson and members of the Committee on Resources, as a member of the 24th Guam Legislature and as its Minority Leader, I would like to extend a warm Håfa Adai and a Dångkolo na Si Yu'os Ma'åse' for this opportunity to present testimonies on measures pertinent to Guam.

## PART 1: H.R. 100 "GUAM COMMONWEALTH ACT"

I appear before you not to provide trite theoretical arguments and justifications for our quest for Commonwealth and self-determination that you have already heard during various stages of your tenure --the United Nations' resolute and virtuous commitment to decolonization and self-determination, the professed collective will of the indigenous people of Guam, the Chamorros, whose distinct place in history is underplayed-- or to refute the controversial argument that mutual consent is unconstitutional. Rather, I wish to enlighten the members of the Committee and the public of the possibilities, what is realistically in line for the Chamorro people. Because today, with this hearing, I believe that our quest has taken another monumental stride toward realization of a century-old dream of sovereignty.

Over the last 100 years, the people of Guam, under the majestic banner of the American flag, undoubtedly have enjoyed the affluence and the protection by a political and military superpower afforded to us by the United States. Success, however, did not come by so easily. The political and economic development of the unincorporated territory of Guam, in its present journey toward self-determination, has undergone a series of laborious processes to come to this moment of time. Notwithstanding the plenary powers of Congress over Guam, we have, through incremental snippets, succeeded in achieving our current level of political maturity. As a secondary entity, we have been and still are often forgotten during the decision-making process and in its

resultant policies. Changes to even the most minute details of our limited self-governance must be effected by Congress under the organic act. Thus what is deemed of utmost interest and importance to our people often is neglected and put on the backburner for other political exigencies and for expediency. And the national economic policies promulgated to benefit all Americans, have not effectively permeated to the geographically isolated island in the Western Pacific called Guam.

Our achievements, how modest it may seem, are results of a tedious processes of persistent urging and lobbying by our dedicated leaders over a prolonged period of time. Considering that Guam is but a speck on the global map, the compilation of these incremental successes, however slight they may seem to our fellow Americans in the continent, is therefore a giant step for the people of Guam.

As adeptly put forth by George Bernard Shaw: "The reasonable man adapts himself to the world: the unreasonable one persists in trying to adapt the world to himself. Therefore all progress depends upon the unreasonable man." Without being unreasonable to a degree, Guam, as a conveniently negligible islet on the periphery of our nation, may not have attained any of the gains that we have today. Important aspect of all these is that, such achievements, however unreasonable they may have been, were realistic.

On that premise, as a precarious creature of the Congress, our island and our people have not enjoyed, nor will we be ever granted, the full benefits normally and rightfully entitled to every American citizen. We discern that local self-governance, bound by its unincorporated territorial status, is subject to the supremacy of Federal law as applied to Guam by Congress in the exercise of its powers under the Constitution. And the only realistic way to extend permanent equality in the application of the Constitution and laws of the United States to Guam is through our admission to statehood under Article IV of the Constitution. Until such time that we achieve full integration, we must recognize that any other status we agree to will not give the people of Guam equal standing and protection under the Constitution.

Given this limitation, we must apply the words of the great Justice of the U. S. Supreme Court Felix Frankfurter "..... there is no greater inequality than the equal treatment of unequals". Without full integration as a state, Guam and its people will forever be unequal to our fellow greater American citizens, therefore, you can not treat us equally without resulting in inequality. It is well within the power of Congress to treat Guam differently and thus unequally from the states, set up a different and thus unequal relationship between the federal government and Guam and the states of our union. You have the authority to grant us a Commonwealth status that is different and thus unequal from statehood, because yes we are different and unequal from the states.

By offering the following analogy, allow me to briefly examine the founding of our nation. Aside from the manifest reasons predicated on morality for the Declaration of Independence--the pursuit of liberty and the formation of a national identity -for many American Revolutionary leaders, extrication from the British crown meant market

freedom, liberation from the royal economic regulation and domination, fundamental and irreconcilable differences, with competing interests. For them, the revolution was a means to survival amidst unrelenting interests of the English, ultimately leading to the creation of a new nation.

Unlike this historical example, Guam is not attempting to break away from its hegemony. Rather we wish to enhance and clearly define the special political relationship between the respective governments of the United States and Guam which will take us into the next millennium. Extended autonomy for Guam, both politically and economically, would better satisfy the vested interests of both governments and their populace. The liberalization of Guam will provide an opportunity to expand its market, free from the current constraints. It is ironic that the greatest democracy the history has experienced, continues to deny that same franchise to the minuscule territory that's afloat in the Pacific, to exercise its authority to complete the decolonization process consistent with the principle of self-determination, toward a permanent and full self-governing status.

It is our objective to achieve greater self-reliance, to lessen the burden on the taxpayers of this nation, however minute the effect it will result. Furthermore, it will serve as a reaffirmation to our global neighbors of the United States commitment to remain at the forefront of upholding the inherent rights of the indigenous peoples to sovereignty and self-determination. We are entering a new frontier. Because no historical models for decolonization exist in the American context, we are at a vantage point to contrive one. The centennial of the fall of one colonial authority and the rise of another in the island of Guam is upon us. Let us not renounce this opportunity to write history.

To those who oppose Chamorro inalienable right to self-determination, I offer you the following for your reflection.

America, as we know, is a land of the immigrants, founded by immigrants, and sustained by their incessant influx. Immigrants who came in search of American Dream literally built America and rendered the collective dream a reality.

Just as the success of America was predicated on the continuous influx of new settlers who have reinforced our ever-evolving labor force, we are appreciative that our prosperity was brought forth by the diverse groups of people that have now call Guam home. And we realize that they contributed tremendously to the building of our society. Thus, we value our diversity and our plurality. During the course of this historical evolution, however, we must maintain our identity, our heritage.

Culture and social organization are of paramount importance to a people's autonomy and integrity. Often, imperial regimes attempt, consciously or unwittingly, either to destroy the cultures of colonized people, or when it is more convenient, to exploit them, constraining, transforming, or destroying original values, orientations, and ways of life, through the imposition of new institutions and new ways of thought on the natives. Guam, throughout its history, has undergone such experiences.

The present Guam community depicts a pluralistic culture. The same policy--open immigration based on a national quota--that seems to have enhanced the prosperity of Guam, has resulted in the gradual deterioration of our identity. The demographics of Guam, whose area and resources are severely limited, has been extensively altered by its general immigration policies, and we became host to more and more people in pursuit of liberty and economic prosperity. Chamorros have in effect become a numerical minority, weakening the collective integrity of the Chamorros and our possibilities for cultural and political self-determination. Such forced disruption should not be a justification for denying the inherent political self-determination by the Chamorro people.

Yes, history cannot be turned back, however their legacies can and should be rectified. The survival of one culture is at stake. Fundamental to correcting the colonial legacies of the past requires the belief in the following: Destiny of our island must be selected and implemented by the people who at that time were subject to imperialistic abuses and cultural denigration --the indigenous people of that territory, in this case, the Chamorros.

One hundred years ago, we were arbitrarily and unilaterally brought into the American family as less than equals. Approximately a half century later, we were granted the American citizenship so envied by the rest of the world. Through Chamorro self-determination, we wish to frame our own destiny, a right which we have been denied for the past four hundred and seventy-six years.

The fundamental issue here is historical. The Chamorro people have never been given a choice to become part of American society, nor to what degree. From one colonial power to another, we were conquered, forced to adjust to the foreign customs and political systems of the hegemony of the time, as control over Guam was directly transferred or arbitrarily sold. Immigrants to Guam, on the other hand, had a choice to come here. Contrary to what the honorable former president Ronald Reagan asserted -- that all Americans are descendants of such immigrants-- there exist in the fringes of the American sovereignty, peoples who have undertaken different paths, those who have been colonized contrary to self will --the indigenous peoples such as the Chamorros.

The voters of Guam, including the non-indigenous peoples, have endorsed, through the overwhelming passage of the 1987 Commonwealth Act, the inherent right of the Chamorro people to determine for themselves the future political status of our homeland. Firm belief of these peoples in the judgment of the indigenous peoples to safeguard the island and to sustain the prosperity of all its inhabitants, has made possible such an outcome. Members of our diverse ethnic communities, through personal experiences, highly value and understand the desires of a native people to independently ascertain their future and the future of their children. These new inhabitants of Guam can attest to the import of self-determination and self-government embrace our right to exercise the same as they have in the Philippines, Japan, South Korea, India, and much more. They understand our desire to live harmoniously in a

stable milieu, unencumbered by the predicament that our self-governance is not subject to the whims of Washington whose geopolitical distance with Agana cannot be altered nor overcome, even with today's rapidly advancing technological changes. The invalidated allegation that the Commonwealth Act is undemocratic, and that the Chamorro people seek to politically and economically disenfranchise the non-indigenous residents of Guam is just that, an allegation without substance and historical understanding.

With the continued passage of time and the delay in granting our people the inherent right to self-determination, greater injustices will be imposed on us. We must come to an understanding and consensus that Guam is qualitatively different from the rest of America. And from that understanding must come the realization that our present conditions are consequences of apathies past and disregard in the colossal framework and psyche of the American polity.

What we seek are greater economic independence, greater self-sufficiency. Commonwealth will be only an euphemism to silence the progressive segment of our community, if the essential provisions of the Act are deleted or significantly modified contrary to the professed wishes of the people of Guam. Through a completely cathartic process, we wish to overcome once and for all the continued delays in the exercise of our self-determination, the imposition of federal laws that thwart our economic development, and the general uncertainty and the instability attributable to our prolonged status as an unincorporated territory.

The sooner we resolve the status of Guam and its indigenous people, the sooner we will embark on a stable path. As an individual, it is both expedient and beneficial to adapt himself to the world. Understanding reality, and to ensure the progress of the Chamorro culture and particularly, the welfare its future generations, however, we must undertake the more arduous path of being unreasonable. A same sadness is with me today.

Mr. Chairman at the April 19,1997 hearing on H.R. 856, the U.S.-Puerto Rico Status Act you expressed sadness on hearing of the loss of Dona Pilar Barbosa Rosario, who in a personal note to you on March 24, 1996, the morning after the hearing on HR 856 in San Juan, wrote: " God help us that Pilar Barbosa could live three more years to see what this results in. So help me God-It's now or never."

On December 11, 1989, Tun Pedro Perez, one of Guam's most respected Senator, at the Guam Commonwealth hearings urged Congress to act on the same Commonwealth Act before Congress today. He recounted the history of assurances received from the United Sates that we come back "manana, manana, manana." He pleaded with the Committee to act then, for he did not have too many mananas left in his life. I am sadden to say that there are no more "mananas" for Tun Pedro Pedro Perez. In August of 1991, three years after the first hearing, his final manana came and he left this good earth.

At the beginning of our quest for Commonwealth, some debated whether we should dare to embark on this quest, a journey of hope and promise. To those who dared to start this journey, including Tun Pedro and all who are no longer with us on this earth, but continue to guide us from the heavens, today we vow, that we shall not dare to stop the journey that you dared to start.

Honorable Chairman and members of this distinguished body, nothing is more difficult than not being able to see ahead, not being unable to have hopes. W e can and have endured physical sufferings, but we realize that human beings perish when they no longer have hope. Now definitely is the time to act and restore hope. We realize that we will not finish in this Congress or the next ten Congresses, but today, let us begin, for action today by this Congress on H.R. 100 gives the people of Guam the ability to see ahead. It renews hope and promise for our people. It will make all the physical sufferings that we have endured worthwhile, for with hope and promised renewed, we know that the people of Guam shall not perish.

## PART 2: H.R. 2370 "THE GUAM JUDICIAL EMPOWERMENT ACT OF 1997"

The people of Guam, whose self-government is hindered by the lack of clarity on our political status, have strived to enhance our self-government through whatever means possible within the binding scope of the Congress that has plenary powers over our affairs. Notwithstanding these impediments, we have succeeded in gaining some ground. We have been able achieve, among others, an elected Legislature in the early 50's, elected Governor and Delegate to the Congress in the 70's, and most recently, the appointment of our own Supreme Court Justices. All have been results of a tedious process of persistent urging and lobbying by our dedicated leaders over a prolonged period of time. H.R. 2370, if passed, will be hailed as another milestone in our limited self-government. It will result in a sound foundation of the third branch of government, the courts.

When the Thirteen colonies declared independence from the Great Britain, the leaders of the Revolution discerned the need to establish an institutional mechanism in the newly-founded nation that would permanently protect the people from the emergence of an autocratic individual or a regime that they so despised and just extricated themselves from. To that end, the architects of the U.S. Constitution carefully constructed a democratic structure of government comprised of three branches- the legislative, the executive and the judicial branches- with each holding an exclusive authority in the life process of any given policy. This doctrine of Separation of Powers, a basic benchmark and fundamental precept of our nation, laid the foundation for a perpetuation of a democratic system of government that we currently enjoy and cherish.

Defining feature of this is the system of checks and balances that would ensure the sanctity and the distinct integrity of the three branches that were created. Under this system, each one of the three branches has, and does practically exercise, its authority to

ensure the fair and orderly operations of the others. The legitimate practice and preservation of this doctrine requires the understanding of and conformance to the fine equilibrium that exists between the two notions by the three branches. When that equilibrium is breached, the foundation of our system of government is imperiled. The predicament that we encounter today in our territory infringes upon breaking that balance.

The judicial branch of Guam, like its two other counterparts that have experienced a series of political evolution and growth, also has undergone a major reformation process to attain its present maturity. Its growth, however, has been comparatively sluggish.

The Supreme Court of Guam, however, after a laborious process that lasted 21 years, has just been realized through a local mandate, and is administering all functions of the judicial branch. The Supreme Court of Guam has embarked on a noble task to enhance the efficiency and the effectiveness of our judicial system. Through its inclusion in the Organic Act, the foundation of the Supreme Court's place in our government will be accorded the same protection from erosion emanating from the rage of politics that the Executive and Legislative branch enjoy.

I further wish to convey the unequivocal desire of the people of Guam to elect their Attorney General. This expression of their desire has been reiterated and embodied in the resolutions overwhelmingly passed by both the Twenty-Third and the Twenty-Fourth Guam Legislature. The direct selection by the will of the people of Guam of the Attorney General is right, just, and prudent for the people of Guam to have an independent Attorney General, unfettered by incessant political intervention from a single individual.

The need and the will of the people of Guam for an Attorney General accountable solely to the public is overwhelmingly evident. During recently held hearings, extremely grave concerns have emerged leading to the questioning of whether the hand-picked Attorney General of Guam is sufficiently independent from political interference by the Governor. Under subpoena, as most employees and members of the public alike were hesitant to testify in the fear of reprisal, many, including current and former prosecutors and prominent private attorneys, informed the members of the Legislature that there exist extensive political interference, selective prosecution, poor management and sloppy performance at the Office.

Since the Governor does currently appoint the Attorney General, the office of the Attorney General may be subject to the unwanted, unfair, and vindictive influence of the Governor's office. Although the Attorney General may argue otherwise, and does so indeed, the preponderance of the evidence and testimony to the contrary is staggering. At the Judiciary hearing, under sworn testimony, witnesses attested that without justifiable evidence, cases are often thrown out, or sometimes invidiously created. It has become inherently cleared that the appointed Attorney General is not capable of isolating himself or herself from political interference.

Surely, you must agree with me that we must not permit the power of the law as exercised by an appointed Attorney General to chill the basic tenets of democracy that allow the leaders and citizens of our community to debate and discuss issues that affect our lives without the fear of retribution and revenge.

The Governor should not and must not violate the independence of the Attorney General's office. It is fundamental to the underpinning of our democratic process of openness and fair play that the Attorney General not be used as an apparatus of the head of the executive branch, for the power of the law is too great and pervasive to be used as a political tool of a single person. We have seen what happens when a single person controls the law instead of serving the people. History is replete with individuals who have fulfilled their temptations although unwise and hurtful, simply because they have the power to do so. We have seen it with Napoleon, Hitler, Stalin and Marcos.

An elected Attorney General does not mean the absence of politics from the selection process, but rather that the politics and the selection process are directly controlled by the people via the ballot box. I believe that the electorate of Guam are equipped, responsible and mature enough to exercise this power in deciding their own attorney general.

Across our nation, forty-three of the fifty states have vested this power over the selection of their attorneys general directly with the voters, while, of the remaining seven states, Tennessee's is appointed by the State Supreme Court, Maine's is selected by the Legislature. The rest, which includes Alaska, Hawaii, Wyoming, New Jersey, New Hampshire and all of the flag territories and the District of Columbia, Attorney Generals are appointed by their respective Governors. It is worth noting that those states and all of the territories where internal self-government is a recent phenomena have not relegated the power to determine the attorneys general to their electorates. Guam and its voters are prepared to break out of this pack.

Any significant political change within our territory requires an act of Congress. It is a tedious task that nonetheless must be abided by at this juncture of our journey toward self-determination. H.R. 2370 is another measure to effect piecemeal change to the Organic Act of Guam, to enhance our self-government.

Thus I seek a clear language that grants the people of Guam the right to elect our attorney general, so that we will have removed another obstacle to our self-governance and once again reaffirm our high level of political maturity. It is this task which requires your immediate attention.

**PART 3 S.210: "OMNIBUS TERRITORIES ACT OF 1997"**

Section 2, which seeks to amend section 8 of the Organic Act of Guam (48 U.S.C. 1422b) by adding at the end thereof the following new subsection:

> "(e) An absence from Guam of the Governor or the Lieutenant Governor, while on official business, shall not be a 'temporary absence' for the purposes of this section."

Although recent technological advances have made it possible for an elected leader of a jurisdiction to effectively communicate with his home base from any given place and time, the extension of the powers of the Governor while off-island is neither desirable nor practicable. As reiterated numerous times by my colleagues and other leaders of Guam, our physical detachment from the continental United States requires special stipulations for proper local self-governance.

Realistically, most official trips taken by the Governor require a full day return flight to Guam. In the event of a natural catastrophe however, the Governor's ability to return immediately to personally direct the recovery efforts becomes severely hindered. The few ports of entry may be damaged, rendering his return impractical. During such crisis situations, the requirement of immediate authorization to provide necessary disaster relief is vital. Even if it is feasible that the Governor returns to the island within a day, that would result in his gross negligence of official businesses of Guam for which he had traveled, notwithstanding the local predicament which, once again, will be aptly and adequately managed by the Lieutenant Governor.

It is my firm belief that historically, each lieutenant governor of this territory has gracefully performed his or her tasks in the event of the absence of the governor. And presumably, fundamental philosophical and political convictions of the two individuals should parallel. If the inference is that the highest elected official of this government cannot trust his lieutenant, whom he has selected as his running mate, to render judicious decisions in acting capacity then, perhaps, we are faced with an acute dilemma--that an unqualified individual is occupying the second highest government position in the territory.

I wholly disagree with and reject this implication on the premise that that is an indictment on the ability of the citizenry to elect a qualified leader.

The Congress, for political expediency that suited the needs of that era, through the Organic Act of Guam, created the most powerful governor in the United States in the early 1950's. Granting further authority to the Governor contradicts the legitimate trend to decentralize the powers of individual officials. Our political maturity would render such an extension of authority needless.

Current authority effectively eliminates the need for that office: any individual who occupies the seat will be just another high-priced government official with limited duties befitting a lesser employee of the government. Moreover, extension of additional authority to the already broad powers of our Governor would result in an undesirable

situation whereby unnamed deputies of the executive head may improperly render crucial decisions on behalf of the people of Guam. By no means should the Governor be allowed to delegate this solemn duty to aides and staff assistants within his office, whose accountability to the people of Guam is not assured.

This is another issue that should be determined by the people of Guam. And the people have expressed an overwhelming opposition to this provision during an informal survey conducted by the Guam Delegate to Congress, Mr. Robert Underwood. Thus far, the people have not experienced any inconvenience nor suffered from any decisions made by a Lieutenant Governor acting on behalf of the Governor. To effect the change requires further justification.

Thus, I once again implore the distinguished body to delete section 2 of S. 210 as referred to the House.

Sec. 4. OPPORTUNITY FOR THE GOVERNMENT OF GUAM TO ACQUIRE EXCESS REAL PROPERTY IN GUAM

Mr. Chairman, I wish to express my opposition to Section 4 (b) Conditions of transfer of which requires that land transferred to the Government of Guam for other than a public purpose shall be for consideration equal to the fair market value.

When the federal government took the lands from the people of Guam, they acquired these properties at artificially depressed prices and conditions in which the local people were without the benefit of representation in the disposition of their lands. Given the conditions under which these lands were acquired, it would be perpetuating the initial injustice perpetrated upon the people to have to repurchase their land at today's inflated values. Therefore, Mr. Chairman, I ask the Committee to delete this section of the bill before presenting the bill before the full body.

Sec. 8 COMPACT IMPACT REPORTS.

On this matter Mr. Chairman, I once again object. The transfer of the responsibility and the financial obligation that follows this responsibility from the federal government to the state of Hawaii and the territories and commonwealth is another unfunded federal mandate that we have to bear the burden. The decision to allow the citizens of the freely associated states unrestricted entry to the states, territories and commonwealths of the nation was done without consultation and consideration to the impact upon us. With demonstrated and proven evidence of the social and economic impact of this federal policy by us, the federal government now seeks to further aggravate the situation by relieving itself of the responsibility to account for this impact.

Without continued responsibility for the accounting for this federal policy, we will be once again left holding the bag for a decision which excluded our legitimate concern in the first place. I implore the Committee to reject this section of the bill.

Finally, I seek the to amend Section 1422 of Title 48 of United States Code as follows:

"**§ 1422. Governor and Lieutenant Governor; term of office; qualifications; powers and duties; annual report to Congress.** The executive power of Guam shall be vested in an executive officer whose official title shall be the "Governor of Guam". The Governor of Guam, together with the Lieutenant Governor, shall be elected by a majority of the votes cast by the people who are qualified to vote for the members of the Legislature of Guam. The Governor and Lieutenant Governor shall be chosen jointly, by the casting by each voter of a single vote applicable to both offices. If no candidates receive a majority of the votes cast in any election, on the fourteenth day thereafter a runoff election shall be held between the candidates for Governor and Lieutenant Governor receiving the highest and second highest number of votes cast. The first election for Governor and Lieutenant Governor shall be held on November 3, 1970. Thereafter, beginning with the year 1974, the Governor and Lieutenant Governor shall be elected every four years at the general election. The Governor and Lieutenant Governor shall hold office for a term of four years and until their successors are elected and qualified.

No person who has been elected Governor for two full successive terms shall again be eligible to hold that office until one full term has intervened.

The term of the elected Governor and Lieutenant Governor shall commence on the first Monday of January following the date of election.

No person shall be eligible for election to the office of Governor or Lieutenant Governor unless he is an eligible voter and has been for five consecutive years immediately preceding the election a citizen of the United States and a bona fide resident of Guam and will be, at the time of taking office, at least thirty years of age. The Governor shall maintain his official residence in Guam during his incumbency.

No person shall be eligible to hold the office of Governor or Lieutenant Governor if he or she has been convicted of a felony or of a crime involving moral turpitude and has not received a pardon restoring his civil rights.

The Governor shall have general supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of the government of Guam. He may grant pardons and reprieves and remit fines and forfeitures for offenses against local laws. He may veto any legislation as provided in this chapter. He shall appoint, and may remove, all officers and employees of the executive branch of the government of Guam, except as otherwise provided in this or any other Act of Congress, or under the laws of Guam, and shall commission all officers that he may be authorized to appoint. He shall be responsible for the faithful execution of the laws of Guam and the laws of the United States applicable in Guam. Whenever it becomes necessary, in case of disaster, invasion, insurrection, or rebellion, or imminent danger thereof, or to prevent or suppress lawless violence, he may summon the posse comitatus or call out the militia or request assistance of the senior military or naval commander of the Armed Forces of the United States in Guam, which may be given at the discretion of such commander if not disruptive of, or

inconsistent with, his Federal responsibilities. He may, in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, proclaim the island, insofar as it is under the jurisdiction of the government of Guam, to be under martial law. The members of the legislature shall meet forthwith on their own initiative and may, by a two-thirds vote, revoke such proclamation.

The Governor shall prepare, publish, and submit to the Congress and the Secretary of the Interior a comprehensive annual financial report in conformance with the standards of the National Council on Governmental Accounting within one hundred and twenty days after the close of the fiscal year. The comprehensive annual financial report shall include statistical data as set forth in the standards of the National Council on Governmental Accounting relating to the physical, economic, social, and political characteristics of the government, and any other information required by the Congress. The Governor shall transmit the comprehensive annual financial report to the Inspector General of the Department of the Interior who shall audit it and report his findings to the Congress. The Governor shall also make such other reports at such other times as may be required by the Congress or under applicable Federal law. He shall also submit to the Congress, the Secretary of the Interior, and the cognizant Federal auditors a written statement of actions taken or contemplated on Federal audit recommendations within sixty days after the issuance date of the audit report. He shall have the power to issue executive orders and regulations not in conflict with any applicable law. He may recommend bills to the legislature and give expression to his views on any matter before that body.

There is hereby established the office of Lieutenant Governor of Guam. The Lieutenant Governor shall have such executive powers and perform such duties as may be assigned to him by the Governor or prescribed by this chapter or under the laws of Guam."

48 U.S.C. §1423f, part of the Organic Act of Guam, provides that "[n]o person shall sit in the legislature who... has been convicted of a felony or of a crime involving moral turpitude and has not received a pardon restoring his civil rights". However, the same Act does not prohibit a convicted felon from assuming the highest seat in the Territory, the Governor of Guam.

Mr. Chairman, it would be against the interest of the people and the island of Guam to empower a felonious individual to govern and render decisions on their behalf, where presently, the only recourse under the law for removal of a criminal Governor or Lieutenant Governor requires the tedious and overwhelming process of referendum;

Therefore, I seek your assistance to preclude those with felony convictions from seeking or maintaining the posts of Governor and Lieutenant Governor of Guam. Same provision, I believe, should apply to the post of elected attorney general.

# TESTIMONY
# BY
# THE HONORABLE PETER C. SIGUENZA
# CHIEF JUSTICE OF GUAM
# BEFORE THE
# COMMITTEE ON RESOURCES
# U.S. HOUSE OF REPRESENTATIVES
# ON
# "THE JUDICIAL EMPOWERMENT ACT"

**Wednesday, October 29, 1997**
**Washington, D.C.**

Good Morning Congressman Don Young, Congressman Robert Underwood and other distinguished members of the House Committee on Resources. I would like to thank you for the opportunity to provide written testimony in full support of H.R. 2370, the Guam Judicial Empowerment Act of 1997. It is indeed an honor.

I sit before you today as the Chief Justice of Guam and head of Guam's Judiciary. It is not often I am given the opportunity to address legislation which will so closely affect the operations of a branch of government universally expected to be independent and apolitical. If it were up to me partisan politics would have no place in our island's Judiciary.

In other U.S. jurisdictions, the existence of a state Supreme court preceded the creation of trial courts. However, on Guam, the Supreme Court was established a little over a year and a half ago -- some forty years after the operation of the trial courts. Thus, we did not have the benefit of the establishment of a unified judiciary. It has been a slow evolution, but one not due to lack of an effort on the part of those on Guam. You may recall that an early effort to establish a court of last resort on Guam in 1974 was later ruled invalid by the U.S. Supreme Court. The Court found that no provision existed within the Organic Act of Guam authorizing the transfer of appellate jurisdiction from the local Federal District Court to the newly created Guam Supreme Court.

Equal to the other two branches of Guam's government, the island's judicial structure must be set forth in the Organic Act and not established by local law. "The Judicial Empowerment Act" will complete the tripartite structure of government and the relationship between the three co-equal branches. To leave the judiciary definable by potentially shifting local political tides is contrary to the republican form of government which embodies such fundamental principles as the separation of powers doctrine and system of checks and balances. Passage of HR 2370 would solidify the Judiciary's structure to ensure its status as a separate and coordinate branch of government and define the Supreme Court's authority as the

head of that branch.

A review of various state constitutions, model constitutions prepared by the American Bar Association, and the Legislative Drafting Research Fund of Columbia University, illustrates the fact that the judiciaries of state governments are properly defined in the state constitutions. Guam history has also shown that the court system must be structurally defined within the Organic Act. To fail to do so would likely leave the Judiciary vulnerable to the branch which created it.

Allow me to clarify. In a commentary published in the Guam Pacific Daily News on January 5, 1997, Senator Elizabeth Barrett-Anderson, the Chairperson of the Judiciary Committee for the 24th Guam Legislature, addressed the concern about Guam having a Judicial branch susceptible and disparate to the other branches. She acknowledged the absurd notion that the Legislature might have the power to eliminate the Territory's highest court, and wrote:

> *"There is a real danger in allowing one branch to determine the existence of another. The most fundamental of all constitutional principles is the creation of three separate, yet co-equal branches of government".*

Senator Barrett-Anderson's commentary reveals a critical flaw in our governmental structure which the U.S. Congress alone is capable of correcting. The basic structure of the Judiciary must be set in concrete, not sand, so that it can withstand the erosion that might otherwise flow from the shifting political tides.

We are all aware that the three branches of government are functionally separated for the very purpose of each acting as a check and balance to the others. Every child who has played the game "jun, kin, po" or "rock, scissors, paper" understands the most fundamental aspect of the tripartite system of government. However, without a defined structure set forth in the Organic Act of Guam, and one left susceptible to local legislation, the

Guam Legislature can always make our "rock" small enough to be broken by their "scissors." The ability to dictate the existence of a coordinate branch takes the balance out of the system of "checks and balances." Instead of "separate and co-equal, the Judiciary would be "separate and subservient."

The record thus far compels the conclusion that "The Judicial Empowerment Act" is necessary to protect it from intrusions by the coordinate branches.

In 1973, Guam Public Law 12-85, titled the Court Reorganization Act, was passed into law. The 1973 Act envisioned a Judiciary with a local Supreme Court at the helm, though that mission was unfulfilled, as previously mentioned.

In 1977, Guam held a Constitutional Convention to develop and propose a constitution for Guam. The Constitution was signed by thirty-two delegates elected by the voters of Guam. That Constitution was subsequently approved by the President of the United States and Congress, but eventually rejected by the people of Guam in a referendum. In that constitution, the provisions relating to the judiciary were formulated by Delegate Frank G. Lujan and provided for a Supreme Court of Guam as the judicial and administrative head of the Judiciary. Virtually all of the provisions contained in the draft constitution of Guam are reflected in "The Judicial Empowerment Act."

Because Public Law 12-85 was ineffective in establishing a Supreme Court and the Constitution was rejected by the voters of Guam, Congress was asked to amend the Organic Act to provide for a Supreme Court.

The creation of an appellate court was eventually authorized by the Omnibus Territories Act of 1984. In that act, Congress envisioned an appellate court which would exercise sufficient institutional traditions and which would be akin to the supreme courts in the several states. However,

the Omnibus Territories Act lacked specific provisions regarding the substantial shape and structure of this court and the Judiciary of Guam, instead leaving its definition to the Legislative and Executive branches. This point is especially important because it brings the Judiciary into sharp contrast with the other two branches. The duties and functions of the Executive and Legislative Branches are clearly defined in the Organic Act. The Governor is given the authority to organize the executive branch. The Legislature is also given the power to organize itself.

While the amendments to the Organic Act bestowed appellate jurisdiction in an appellate court created by law, the Organic Act did not explicitly set forth those powers which are traditionally inherent in a court vested with appellate jurisdiction. Passage of HR 2370 would correspondingly place the Guam Judiciary within the Organic Act.

In 1993, after over 8 years of discussion, internal debate, and public hearings, the Judiciary was reorganized with the passage of the Frank G. Lujan Memorial Court Reorganization Act. The 1993 Court Reorganization Act was patterned after the 1973 Act and the draft Constitution provisions. The intent of the legislation was to *"create not only a Supreme Court of Guam for appeals and review, but to create a judicial system with the Supreme Court at its head. Therefore, the Supreme Court of Guam will handle all those matters customarily handled by state supreme courts, including attorney admission and discipline, court rules and court administration. Thus, administrative functions of the courts, formerly lying either with the Judicial Council or the District Court of Guam, are placed with the Supreme Court of Guam."* In short, the statute put Guam on a par with other jurisdictions in the United States in making its highest court the repository of judicial authority. Such local legislation initially gave the Guam Supreme Court the tools necessary to develop "sufficient institutional traditions."

The Supreme Court of Guam was re-established by the laws of Guam and the current panel was sworn into office on April 26, 1996. I have been the

Chief Justice of Guam for a little over a year and a half, and my term will expire in another year and a half. During that time, I have heard some people say that since the Legislature created the Supreme Court of Guam, then the Legislature, if it does not agree with the court's rulings, can simply eliminate it. In view of the fact that the basic structure of the court system is set forth statutorily, it is subject to constant change and modification by the legislative branch. There is some question as to the extent of protection afforded the Judiciary by the separation of powers doctrine. Without question, the Legislature could not establish a Supreme Court designating the Governor or Speaker of the Legislature as the Chief Justice. But could the Legislature otherwise diminish the authority of the Supreme Court such that the independence of the judiciary is threatened? This question has since been answered in the affirmative.

It is significant that no effort to substantially alter the Frank G. Lujan Memorial Court Reorganization Act was made between its adoption in January of 1993 and the appointment of justices approximately three years later. It bears mentioning that only after the justices were appointed amendments aimed at altering the unified structure of the Judiciary began to appear. In the brief tenure of our existence, the Supreme Court has faced no fewer than three concerted legislative attempts to undermine its authority to administer the Judicial Branch.

We have also had a case removed from our jurisdiction by local legislation. A few days before the Supreme Court was scheduled to hear oral arguments regarding a request by the Legislature for a declaratory judgment, the same Legislature then enacted a bill permitting it to strip jurisdiction over that matter from this court. Both our administrative and judicial authority remain in doubt given the fluid nature of local politics and the absence of Organic Act backbone.

For example, the Supreme Court of Guam currently has a statutory basis for exercising supervisory jurisdiction. See, 7 GCA § 3107(b). Whether the Supreme Court also possesses inherent supervisory jurisdiction

stemming from the appellate jurisdiction conferred by the Organic Act remains to be seen. The extent of such jurisdiction was challenged and debated during the 23[rd] Guam Legislature's consideration and eventual rejection of Bill No. 494 and Bill No. 404, both of which attempted to eliminate the supervisory jurisdiction of the Supreme Court over matters of judicial administration.

Implicit in the attempt to limit the Supreme Court's supervisory authority is the recognition that such powers currently exist and reside in that court. The 23[rd] Guam Legislature made a final attempt with the passage of Bill No. 776 which was passed by the Guam Legislature, the effect of which was to limit the supervisory jurisdiction of the Supreme Court. Bill No. 776 was vetoed by the Governor and the Legislature failed to override the veto by a very thin margin. Thus, contrary to the doctrine of the separation of powers and enabled by the statutory structure of the Supreme Court, a decision regarding the powers of the Judiciary was determined by the Legislative and Executive branches.

"The Judicial Empowerment Act" presents the most expedient and effective way to correct the fundamental flaw in the Organic Act which leaves the Supreme Court open to the threat of institutional death at the hands of the body which gave it life. A Judiciary cannot function independently if another branch can modify or strip it of its powers at will. It is a precept so basic to the concept of American Democracy that every state in the Union recognizes the dual doctrines of the separation of powers and checks and balance.

History reveals that the people of Guam have had the benefit of over twenty years to debate and fine-tune the details of a Judiciary for Guam. During that time, Guam has had its first high court dismantled by the U.S. Supreme Court. It then had a constitutional convention endorsed by Congress, which approved a Judiciary, almost identical to that contained within "The Judicial Empowerment Act of 1997." When Congress authorized the creation of an appellate court for Guam in 1984, the Guam

Legislature worked on several drafts and changes which culminated in the Frank G. Lujan Memorial Court Reorganization Act of 1993. Throughout the twenty-plus year period, several principles were consistently approved and endorsed by various Guam Legislators and policymakers. These principles are reflected in "The Judicial Empowerment Act."
The ideas contained in "The Judicial Empowerment Act" are far from novel. The proposal strives to give Guam what just about every other state and territory possesses. It specifically provides for a unified court system with the Supreme Court at its head having (a) supervisory jurisdiction and administrative supervision over the Judiciary, (b) rule-making authority to govern the practice and procedures of the territorial courts and the administration of the judiciary, (c) exclusive governance of the local bar and (d) original and appellate jurisdiction as the legislature may determine, i.e. what types of decisions will be appealable.

"The Judicial Empowerment Act" mirrors the state of the Judiciary in just about every state and territory. Fifty-two states and territories have as the head of the judicial branch, either the Chief Justice of the highest court or the highest court of the jurisdiction. For example, Mr. Chairman, in your great state, the Alaska Constitution provides: " The chief justice of the Supreme Court shall be the administrative head of all courts. . . . The chief justice shall, with the approval of the Supreme Court, appoint an administrative director to serve at the pleasure of the Supreme Court and to supervise the administrative operations of the judicial system." Attached as an exhibit is a chart which sets forth the constitutional or statutory authority for the Chief Justice's administrative authority.

Some may propose that a judicial council be designated the administrative head of the judiciary. These proponents may argue that a Judicial Council provides the greatest amount of input from appellate and trial court judges. Proponents of that measure claim that a Judicial Council, even one consisting of members from the executive and legislative branches, would fairly represent a broad range of interests. But I submit to you that so long as a Judicial Council exists in which it exercises supervisory authority over

the Supreme Court, the ability that same court to operate in an impartial and judicious manner while reviewing cases of the trial courts would be potentially compromised by concerns over administrative retaliation.

Guam has historically had a Judicial Council. Before the creation of the Supreme Court, a Judicial Council administered the trial courts of Guam. I do not disagree that the Judicial Council has a role in the administration of justice. As is provided in the Frank G. Lujan Memorial Court Reorganization Act, the Judicial Council serves as an advisory body to the Supreme Court. In the draft constitution of 1977, the Judicial Council was conceived as an advisory body to the Supreme Court.

The Supreme Court recognizes and appreciates that role of the Judicial Council. However, I believe that the proponents of a judiciary headed by a Judicial Council would be hard pressed to find jurisdictions where the Judicial Council, consisting of representatives from the executive and legislative branches, sets the administrative policy. In states such as California and Utah, the Judicial Councils are presided over by the Chief Justice. Moreover, in both states, the Chief Justice remains the administrative head of the judiciary. However, in sharp contrast with California and Utah, Guam's Judicial Council is chaired, not by the Chief Justice of Guam, but by the presiding judge of the trial court. The presiding judge was elected to that position with the votes of the Attorney General of Guam and the Legislature's Chair of the Judiciary Committee.

Finally, the people of Guam have continuously rejected the idea that such a council serve as the administrative head of the Judiciary. The 1973 Court Reorganization Act, the Constitutional Convention of 1977, and the Frank G. Lujan Memorial Court Reorganization Act of 1993 have all rejected the notion of a Judicial Council as head of the Judiciary. Each of those pieces of legislation recognized that the Judicial Council's role as purely advisory. Towards this end the Supreme Court has created a Judicial Conference of Guam which meets quarterly to discuss improvements to the court system. All justices and judges of Guam are members and have an

input into developing reforms in the administration of justice. The Judicial Conference also affords the Guam Bar Association the opportunity to voice their own concerns. Numerous reforms have been initiated by the Judicial Conference of Guam.

In closing, I respectfully urge the passage of this measure without amendment to the provisions contained therein. The people of Guam deserve a Judiciary equal in stature to the Legislative and Executive Branches of Guam. As Alexander Hamilton noted in the Federalist Papers over 200 years ago, "the judiciary is beyond comparison the weakest of the three departments of power . . . all possible care is requisite to enable it to defend itself against their attacks."

Thank you very much Mr. Chairman and members of the Committee.

**Superior Court of Guam**
**Judicial Center**
**120 West O'Brien Drive**
**Agana, Guam 96910**
**Telephone: (671) 475-3410/3500**
**Fax: (671) 477-1852**

**Hon. Alberto C. Lamorena III**
**Presiding Judge**

**Testimony on HR 2370 & Guam Commonwealth Act**
**Congressional Committee on Resources**
**Presiding Judge Alberto C. Lamorena, III, Superior Court of Guam**
**Washington D.C. October 29, 1997**

THANK YOU FOR THE OPPORTUNITY TO SPEAK BEFORE THE CONGRESSIONAL COMMITTEE ON RESOURCES. I COME BEFORE YOU REPRESENTING THE SUPERIOR COURT OF GUAM JUDGES WHO OPPOSE H.R. 2370 AND INDIVIDUALLY IN SUPPORT OF THE GUAM COMMONWEALTH ACT.

THIS CONGRESS HAS SOUGHT TO ENHANCE AND PROTECT THE RIGHTS OF STATE AND LOCAL GOVERNMENTS AGAINST INCREASED FEDERAL CONTROL – RECOGNIZING THE ROLE THAT LOCAL AND STATE GOVERNMENT'S MUST PLAY IN SERVING THE AMERICAN PEOPLE – NAMELY ALLOWING CITIZENS WITHIN THE VARIOUS LOCALITIES TO GOVERN THEMSELVES DIRECTLY AND MAKE DECISIONS ON NON-FEDERAL ISSUES AND CONCERNS. THE BELIEF THAT LOCAL ISSUES ARE BEST ADDRESSED BY LOCAL GOVERNMENTS AND THAT THE FEDERAL GOVERNMENT IS TOO BIG, TOO DISTANT AND TOO REMOVED, IS A PART OF THE GREAT LEGACY OF THIS GENERATION OF AMERICAN LEADERSHIP. THE RESPECT AND DEFERENCE TO ALLOW STATES AND LOCAL GOVERNMENTS TO GOVERN THEMSELVES IS NOT ONLY IN THE NATION'S BEST INTERESTS BUT SPEAKS TO THE VERY FOUNDATION OF FREEDOM AND DEMOCRACY.

IT IS FOR THESE REASON, AND THOSE RAISED IN SUPERIOR COURT JUDGE MANIBUSAN'S TESTIMONY, THAT I OPPOSE HR 2370. THROUGHOUT THE HISTORY OF OUR NATION, THE CONGRESS OF THE UNITED STATES HAS LEFT THE FORMATION OF THE INTERNAL ORGANIZATIONAL STRUCTURE OF A COURT SYSTEM TO THE INDIVIDUAL STATES OR TERRITORIES – WHETHER THROUGH LAW OR CONSTITUTION. HR 2370 IS UNPRECEDENTED IN THAT AFTER CONGRESS HAS AUTHORIZED FORMATION OF A SUPREME COURT IN GUAM – IT NOW SEEKS TO ALTER THE INTERNAL STRUCTURE OF AN ENTIRE JUDICIARY DESPITE THE FACT THAT GUAM LAW HAS ALREADY ESTABLISHED ONE. THIS IS MOST DEFINITELY AN ISSUE THAT BELONGS IN THE HANDS OF THE LOCAL COMMUNITY.

MANY LAWS BY CONGRESS HAS TREATED GUAM AS A STATE FOR PURPOSES OF SAID STATUTE. GUAM'S SUPREME COURT HAS THE POWERS OF A STATE SUPREME COURT – WITH A 15 YEAR REVIEW PERIOD. HR 2370, IF PASSED BY CONGRESS, WOULD ALMOST CERTAINLY RUN AFOUL OF THE SPIRIT OF THE TENTH AMENDMENT TO THE UNITED STATES CONSTITUTION. AS THE UNITED STATES SUPREME COURT HAS RECOGNIZED, THE POWER TO ESTABLISH THE INTERNAL STRUCTURE OF A STATE'S COURTS IS AT THE HEART OF A STATES SOVEREIGN POWERS. QUOTING THE U.S. SUPREME COURT'S DECISION IN CALDER V. BULL (1798); "THE ESTABLISHING OF COURTS OF JUSTICE, THE APPOINTMENT OF JUDGES, AND THE MAKING OF REGULATIONS FOR THE ADMINISTRATION OF JUSTICE, WITHIN EACH STATE, ACCORDING TO ITS LAWS, ON ALL SUBJECTS NOT ENTRUSTED TO THE FEDERAL GOVERNMENT, APPEARS TO ME TO BE THE PECULIAR AND EXCLUSIVE PROVINCE, AND DUTY OF THE

STATE LEGISLATURE" (END QUOTE).

IN CREATING THE SUPREME COURT, GUAM'S LEGISLATURE RE-AFFIRMED THE EXISTENCE OF THE JUDICIAL COUNCIL , A POLICY-MAKING BODY IN EXISTENCE SINCE 1950. AS IN MANY COURT JURISDICTIONS IN THE UNITED STATES, THE ADMINISTRATION OF THE COURT SYSTEM IS DELEGATED TO A JUDICIAL COUNCIL. ON GUAM, THE COUNCIL IS MADE UP OF REPRESENTATIVES FROM BOTH THE SUPREME AND SUPERIOR COURTS OF GUAM, THE ATTORNEY GENERAL OF GUAM AND THE CHAIRPERSON OF THE LEGISLATURE'S COMMITTEE ON JUDICIARY.

IN CALIFORNIA, A JUDICIAL COUNCIL MADE UP OF MEMBERS OF THE DIFFERENT COURTS, THE STATE LEGISLATURE AND THE COMMUNITY OVERSEES THE ADMINISTRATION OF THEIR COURTS, SETTING POLICIES FOR A COURT SYSTEM THAT HANDLES ONE OF THE LARGEST CASELOADS IN THE NATION. LIKE-WISE IN UTAH. IN FACT, HERE IN OUR NATIONS CAPITOL, THE DISTRICT OF COLUMBIA SEPARATES THE ADMINISTRATION OF THE APPEALS AND TRIAL COURTS WITH A DELIBERATE BODY CALLED THE JOINT COMMITTEE ON JUDICIAL ADMINISTRATION IN D.C., OVERSEEING THE ADMINISTRATION.

ON GUAM, THE JUSTICES AND JUDGES ARE APPOINTED BY A GOVERNOR, CONFIRMED BY A LEGISLATURE. WE BELIEVE THAT THE SUPERIOR COURT IS MOST ABLE TO DETERMINE WHAT IS BEST IN THE ADMINISTRATION OF IT'S OWN AFFAIRS. THE SUPERIOR COURT SHOULD BE RESPONSIBLE FOR HIRING,

PROMOTING, ASSIGNING AND ADMINISTERING ITS OWN PERSONNEL AND REQUESTING ITS OWN BUDGET.

WE ARE ADVOCATES OF A JUDICIAL COUNCIL CONCEPT. THIS CREATES A CHECK AND BALANCE BETWEEN A TRIAL COURT WHOSE CASELOAD IS 400 TIMES THAT OF AN APPEALS COURT, AND A SUPREME COURT WHICH MAY BE REMOVED FROM LIVING WITH THE ADMINISTRATIVE RESOURCES THEY WOULD UNILATERALLY BESTOW UPON GUAM'S TRIAL COURTS.

CONSERVATIVE AND LIBERAL STATES, SMALL AND LARGE JURISDICTIONS, UTILIZE JUDICIAL COUNCILS TO OVERSEE THE ADMINISTRATION OF THEIR COURTS. WHETHER THIS IS BEST FOR GUAM OR NOT IS A DECISION THAT SHOULD BE MADE BY THE PEOPLE OF GUAM. WE SHOULD NOT BE APPEALING TO CONGRESS ON ISSUES OF HOW GUAM'S COURTS ARE ADMINISTERED BUT TO GUAM'S LOCAL ELECTED LEADERS.

THE ORGANIC ACT OF GUAM CITES THAT SELF-DETERMINATION IS AMONG THE CHIEF PRINCIPLES OF THE ACT. IN THE REPORT OF THE SENATE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS (SENATE REPORT 2109) IT STATED AND I QUOTE: "THIS BILL IS REPORTED IN THE BELIEF THAT THE TIME HAS COME FOR THE CONGRESS TO PASS AN ORGANIC ACT PERMITTING THE PEOPLE OF GUAM TO GOVERN THEMSELVES... IT ESTABLISHES DEMOCRATIC LOCAL GOVERNMENT FOR THE ISLAND AND GUARANTEES HUMAN FREEDOM UNDER THE AUTHORITY OF CONGRESS RATHER THAN THE EXECUTIVE BRANCH.... A BILL OF RIGHTS IS

PROVIDED; A REPRESENTATIVE LOCAL GOVERNMENT IN THE AMERICAN TRADITION; *AN INDEPENDENT JUDICIARY CREATED, ADMINISTERING A SYSTEM OF LAW BASED ON LOCAL NEEDS AND LOCAL TRADITIONS*, ALL WITHIN AMERICAN FRAMEWORK OF FUNDAMENTAL FAIRNESS AND EQUALITY; AND THE SCOPE OF EXECUTIVE AUTHORITY IS DEFINED AND LIMITED." (END QUOTE). FOR CONGRESS TO PROVIDE FOR AN INTERNAL STRUCTURE OF THE GUAM JUDICIARY GOES AGAINST THE VERY HEART OF THIS PRINCIPLE. THE GUAM LEGISLATURE HAS ALREADY CREATED A STRUCTURE.

I RESPECTFULLY REQUEST THAT THIS HONORED COMMITTEE TABLE H.R. 2370 AND FOR THE REASON CITED I HOPE IT PASSES THE GUAM COMMONWEALTH ACT. THE PEOPLE OF GUAM HAVE THE INHERENT RIGHT TO SET UP THE INTERNAL AND EXTERNAL ORGANIZATION OF OUR GOVERNMENT REFLECTING THE LAWS OF THIS NATION BASED ON OUR LOCAL NEEDS AND RESOURCES. PASSING LAWS TO GOVERN OURSELVES IN A MANNER WE SEE BEST SUITED FOR OUR PEOPLE IS THE BASIS OF ALL DEMOCRACY AND THE FOUNDATION OF FREEDOM OF CHOICE WHICH THIS NATIONS FERVENTLY PROTECTS FOR THE WORLD. WHETHER A JUDICIAL COUNCIL PREVAILS OR NOT ON GUAM, THE CHOICE AND DECISION – AS IN ALL OTHER STATES AND COUNTRIES OF DEMOCRACY – BELONGS RIGHTFULLY TO THE PEOPLE THAT COURT SYSTEM SERVES.

GUAM'S CONTROL OVER ITS OWN JUDICIARY GOES TO THE VERY HEART OF ITS QUEST FOR SELF GOVERNMENT. GUAM WANTS A FUNDAMENTAL RESTRUCTURING OF ITS RELATIONSHIP WITH THE UNITED STATES, NOT MERELY

A COMMONWEALTH TITLE WITHOUT COMMONWEALTH REALITY. WE ARE SEEKING A CHANGE IN GUAM'S POLITICAL STATUS WHEREBY WE HAVE A RIGHT OF SELF GOVERNMENT IN ALL THE BRANCHES OF GOVERNMENT, INCLUDING THE COURTS. THIS IS WHY WE SEEK TO CREATE THE COURTS AS AN INTEGRAL PART OF THE CONSTITUTION OF GUAM. SELF GOVERNMENT SHOULD APPLY TO ALL OF THE GOVERNMENT OF GUAM, NOT JUST TO ONE OR TWO BRANCHES OF IT.

IN ADDITION TO MY TESTIMONY I AM INCORPORATING THE FOLLOWING TESTIMONY OF THE HON. JOAQUIN MANIBUSAN, SUPERIOR COURT OF GUAM JUDGE. BOTH OF OUR TESTIMONIES HAVE BEEN ENDORSED BY THE HON. KATHERINE MARAMAN AND THE HON. STEVE UNPINGCO , COLLEAGUE JUDGES OF THE SUPERIOR COURT OF GUAM -- WHO TOGETHER WITH MYSELF AND JUDGE MANIBUSAN CONSTITUTE THE MAJORITY OF THE JUDGES OF THE SUPERIOR COURT OF GUAM. THANK YOU AND SI YU'OS MA'ASE.

Superior Court of Guam
JudicialCenter
120 West O'Brien Drive
Agaña, Guam 96910

Chamber of
Hon. Joaquin V.E. Manibusan, Jr.
Judge, Superior Court of Guam

Tel: (671) 475-3502
(671) 475-3130
Fax: (671) 477-1500

**Testimony on HR 2370**
**Congressional Committee on Resources**
**Hon. Judge Joaquin V. E. Manibusan, Superior Court of Guam**
**Washington D.C. October 29, 1997**

I WOULD LIKE TO TAKE THIS OPPORTUNITY TO THANK THE COMMITTEE FOR GIVING MYSELF AND THE OTHER REPRESENTATIVES FROM GUAM THE OPPORTUNITY TO SPEAK BEFORE YOU. I, ALONG WITH PRESIDING JUDGE ALBERTO LAMORENA, HAVE COME TO SPEAK IN OPPOSITION TO H.R. 2370 WHICH PROPOSES TO "ORGANIZE" THE INTERNAL COURT SYSTEM OF GUAM.

I THINK THAT THE TERMINOLOGY USED IS MISLEADING IN THAT WHAT H.R. 2370 SEEKS TO DO IS NOT ORGANIZE GUAM'S COURT SYSTEM, BUT RATHER, IT SEEKS CHANGE THE EXISTING ORGANIZATION AND TO PLACE THE ADMINISTRATIVE CONTROL OVER THE COURTS OF GUAM WITH THE SUPREME COURT OF GUAM. IT IS OUR BELIEF THAT THIS PROPOSED BILL WOULD NOT ONLY UNDERMINE AND REPEAL EXISTING GUAM LAW, BUT IT WOULD UNDERTAKE TO IMPLEMENT IMPORTANT DECISIONS AND POLICIES FOR GUAM AND ITS JUDICIAL SYSTEM; AND SUCH DECISION MAKING SHOULD BE LEFT TO THE PEOPLE OF GUAM AND ITS LOCAL LAW MAKERS.

ONE MAIN CONCERN WITH H.R. 2370 IS THAT ITS PASSAGE WOULD DO MUCH

MORE THAN PLACE ADMINISTRATIVE CONTROL OVER THE COURTS OF GUAM WITH THE SUPREME COURT OF GUAM. IF H.R. 2370 PASSES, IT WILL REPEAL A WEALTH OF EXISTING GUAM LAW. GUAM CURRENTLY HAS A SYSTEM MUCH LIKE THAT FOUND IN CALIFORNIA. WE HAVE A JUDICIAL COUNCIL WHICH IS MADE UP OF JUDGES AND JUSTICES AS WELL AS THE ATTORNEY GENERAL OF GUAM AND THE CHAIRPERSON OF GUAM'S LEGISLATURE'S COMMITTEE ON THE JUDICIARY. THE PURPOSE AND FUNCTION OF THE JUDICIAL COUNCIL IS TO HANDLE ADMINISTRATION OF THE COURTS, AND THE POWERS, DUTIES, AND RESPONSIBILITIES OF THE JUDICIAL COUNCIL ARE CAREFULLY AND SPECIFICALLY DELINEATED BY LAW.

TO EXEMPLIFY THIS FACT, THERE ARE CURRENTLY CONTAINED IN THE GUAM CODE ANNOTATED THE SAME NUMBER OF SPECIFIC STATUTES WHICH ADDRESS THE POWERS AND DUTIES OF THE JUDICIAL COUNCIL AS THERE ARE STATUTES DELINEATING THE DUTIES AND POWERS OF THE SUPREME COURT OF GUAM. PURSUANT TO VARIOUS OF GUAM'S STATUTES WHICH ARE SET FORTH IN THE GUAM CODE ANNOTATED, THE JUDICIAL COUNCIL IS THE BODY WHICH IS RESPONSIBLE FOR ADMINISTERING THE UNIFIED PAY SCHEDULE FOR THE JUDICIARY; FOR ADOPTING PERSONNEL RULES FOR THE JUDICIAL BRANCH; FOR ADDRESSING EMPLOYEE GRIEVANCES AND APPEALS; FOR CONDUCTING SALARY REVIEWS OF THE JUDGES AND JUSTICES OF THE COURTS; FOR PROMULGATING ITS OWN RULES FOR CONDUCT AND OPERATION; FOR ADDRESSING CHARGES OF MISCONDUCT AGAINST ANY JUDGE OR JUSTICE; FOR RECOMMENDING POLICIES TO THE COURT AND THE LEGISLATURE REGARDING THE ADMINISTRATION OF THE JUDICIAL SYSTEM; FOR ADDRESSING THE REMOVAL OF

ANY JUDGE OR JUSTICE AND FOR OVERSEEING THE JUDICIAL BUILDING FUND. THIS RECITATION IS MADE SIMPLY TO CONVEY JUST A PORTION OF THE SPECIFIC LAWS WHICH WILL BE REPEALED IF H.R. 2370 IS PASSED. IT IS EVIDENT THAT THE JUDICIAL COUNCIL WAS THE ADMINISTRATIVE BODY WHICH WAS INTENDED TO AND EMPOWERED TO ADMINISTER GUAM'S JUDICIAL SYSTEM. H.R. 2370 DISREGARDS AND RENDERS MEANINGLESS CURRENT LAW IN GUAM AS WELL AS RENDERS MEANINGLESS THE EXISTENCE OF GUAM'S JUDICIAL COUNCIL.

IN CITING TO THE FOREGOING LAWS, I WISH TO MAKE IT CLEAR THAT BY ENACTING H.R. 2370, SUBSTANTIAL PORTIONS OF THE GUAM CODE ANNOTATED WILL BE REPEALED. ANY CURRENT REFERENCE TO THE JUDICIAL COUNCIL CONTAINED IN THE GUAM CODE ANNOTATED WOULD BE RENDERED MEANINGLESS, WHICH IS CERTAINLY CONTRARY TO THE INTENT OF THE GUAM LEGISLATURE IN DRAFTING THESE LAWS. IT IS OUR OPINION THAT GUAM'S OWN LEGISLATURE AS WELL AS ITS PEOPLE, ARE IN A BETTER POSITION TO MAKE THESE IMPORTANT DECISIONS REGARDING THE ADMINISTRATION OF GUAM'S COURT SYSTEM. IN MAKING THESE STATEMENTS, I WISH TO CONVEY NO DISRESPECT TO THE COMMITTEE, HOWEVER WE ARE SIMPLY OF THE BELIEF THAT DECISIONS REGARDING THE ADMINISTRATION OF GUAM'S JUDICIAL SYSTEM, DECISIONS WHICH WE WILL HAVE TO LIVE WITH EVERY DAY, ARE BETTER LEFT TO BE MADE ON A LOCAL LEVEL.

I ALSO FEEL THAT IT IS IMPORTANT FOR THE COMMITTEE TO UNDERSTAND THAT IT IS NOT THE SUPREME COURT THAT WE ARE OPPOSED TO, NOR DO WE WISH

TO QUESTION THEIR AUTHORITY TO HANDLE APPELLATE MATTERS. WE ARE SIMPLY OPPOSED TO THE ADMINISTRATIVE CONTROL OF THE COURT SYSTEMS LYING WITH ONE BODY, WHERE THERE WILL BE NO CHECKS OR BALANCES ON THAT ADMINISTRATIVE AUTHORITY, AND WHERE WE, THE NON-SUPREME COURT MEMBERS OF THE JUDICIAL COUNCIL, WILL HAVE NO MEANINGFUL INPUT INTO HOW OUR COURTS, OUR EMPLOYEES, AND OUR DAY TO DAY AFFAIRS ARE MANAGED. THE TYPE OF ADMINISTRATIVE CONTROL THAT WILL BE EXERCISED BY THE SUPREME COURT IF H.R. 2370 PASSES WILL NOT ALLOW US TO EXERCISE ANY DISCRETION WITH REGARDS TO HIRING OF EMPLOYEES AND OTHER PERSONNEL MATTERS, MANAGING OUR CASE LOADS, OR ANY OTHER ADMINISTRATIVE MATTERS. IT IS OUR BELIEF THAT AS JUDGES OF THE SUPERIOR COURT OF GUAM, WE ARE IN THE BEST POSITION TO MAKE SUCH DECISIONS AND THROUGH THE NOW EXISTING JUDICIAL COUNCIL, WE HAVE A MECHANISM THROUGH WHICH OUR CONCERNS MAY BE HEARD, ADDRESSED AND ACTED UPON. IF H.R. 2370 IS PASSED, WE, THE SUPERIOR COURT OF GUAM, AS WELL AS THE JUDICIAL COUNCIL, WILL LOSE THIS ABILITY TO SPEAK IN REGARDS TO THE DAY TO DAY FUNCTIONING OF OUR COURTS, AND THESE ARE THE MATTERS WHICH AFFECT US MOST DIRECTLY.

IT IS CONTRARY TO LOGIC TO PLACE DECISIONS REGARDING THE DAY TO DAY ADMINISTRATION OF THE SUPERIOR COURT OF GUAM WITH AN OUTSIDE ENTITY OR WITH ANOTHER COURT, AND FURTHER CONTRARY TO LOGIC TO PRECLUDE REPRESENTATIVES OF THE SUPERIOR COURT FROM HAVING ANY INPUT INTO THEIR OWN DAY TO DAY ADMINISTRATION. IT IS ALSO CONTRARY TO LAW. THE JUDICIAL COUNCIL WAS CREATED AND HAS EXISTED SINCE THE INCEPTION OF

GUAM'S FIRST SUPREME COURT FOR THE VERY PURPOSE OF ADMINISTERING GUAM'S JUDICIAL SYSTEM. WE SIMPLY ASK THAT ANY DECISIONS REGARDING THIS SYSTEM OF ADMINISTRATION, WHICH HAS EXISTED ALMOST AS LONG AS GUAM'S COURT SYSTEM, BE LEFT TO THE PEOPLE OF GUAM.

IN CLOSING, I RESPECTFULLY REQUEST THAT THE CONCERNS ADDRESSED BY MYSELF, AS WELL AS PRESIDING JUDGE ALBERTO LAMORENA, BE CAREFULLY CONSIDERED. THE PASSING OF H.R. 2370 WILL ENACT GREAT CHANGES IN GUAM'S COURT STRUCTURE AND IT WILL ALSO REPEAL A WEALTH OF EXISTING GUAM LAW. THE LAW MAKERS OF GUAM, BASED UPON THEIR KNOWLEDGE OF LOCAL CUSTOMS, TRADITIONS AND POLITICS, DETERMINED LONG AGO THAT THE ADMINISTRATION OF GUAM'S COURT SYSTEM SHOULD BE LEFT TO A JUDICIAL COUNCIL. IT IS MY STRONG FEELING THAT ANY DECISIONS REGARDING THE JUDICIAL COUNCIL'S FORCE, EFFECT AND CONTINUED EXISTENCE SHOULD BE LEFT TO THOSE WHO ARE BEST EQUIPPED TO MAKE SUCH DECISIONS; THE LOCAL LAW MAKERS AND THE PEOPLE OF GUAM. THANK YOU FOR YOUR ATTENTION.

JUDGE JOAQUIN V. E. MANIBUSAN, JR.

We the undersign Judges of the Superior Court of Guam endorse and support the Congressional Testimonies on HR 2370 of Presiding Judge Alberto C. Lamorena, III and Judge Joaquin V.E. Manibusan, Jr presented to the U.S. Congressional Committee on Resources on October 29, 1997 in Washington D.C.

Hon. Alberto C. Lamorena, III
Presiding Judge, Superior Court of Guam

Hon. Katherine Maraman
Judge, Superior Court of Guam

Hon. Joaquin V.E. Manibusan, Jr.
Judge, Superior Court of Guam

Hon. Steve Unpingco
Judge, Superior Court of Guam

TESTIMONY

OF

***PILAR C. LUJAN***

September 18, 1997

Chairman Don Young, Congressman Underwood and members of the Committee on Resources. I would like to thank you for the opportunity to testify in support of H.R. 2370, the Guam Judicial Empowerment Act of 1997. The time has come for the Judiciary of Guam to be elevated to an Organic Act status co-equal to the Executive and Legislative Branches of Guam. H.R. 2370 is designed to accomplish such a goal.

I was a senator elected to the 17th through 22nd Guam Legislatures during which time I served as the Chairperson of the Committee on the Judiciary. I am intimately aware of the issues which confront the Guam Judiciary as a result of their statutory structure and I am qualified to urge for the establishment within the Organic Act of a truly independent and co-equal Judicial branch of government.

The history of the Supreme Court of Guam is short but worth noting. In 1974 the 12th Guam Legislature established the first Supreme Court of Guam. The Supreme Court of Guam was struck down by the U.S. Supreme Court in *Territory of Guam v. Olsen*, 431 U.S. 195 (1977). In *Olsen* the Supreme Court held that the Organic Act did not authorize the transfer of appellate jurisdiction from the appellate division of the District Court of Guam to a locally established appellate court. In response to *Olsen*, Congress amended the Organic Act of Guam to permit the creation of an appellate court. The Omnibus Territories Act of 1984 authorized the Guam Legislature to create an appellate court and provided that once such a court is established, appellate jurisdiction would transfer from the appellate division of the District Court of Guam to the newly established appellate court. However, the Omnibus Territories Act of 1984 failed to provide a structure for the Judiciary impervious to the whims and fancies of a temperamental Legislature.

In 1982 I sponsored legislation re-establishing the Supreme Court of Guam as the highest appellate court of Guam and the head of the Judicial Branch. Over the years modifications were made to the original bill after numerous public hearings and testimony. In 1993, after over ten years of discussion, debate and public hearings, the bill creating the Supreme Court of Guam and reorganizing the Judiciary was enacted into law. The Act is popularly referred to as the Frank G. Lujan Memorial Court Reorganization Act and became law in January of 1993. The purpose of the Frank G. Lujan Memorial Court Reorganization Act was clear, it was to "create not only a Supreme Court of Guam for appeals and review,

but to create a judicial system with the Supreme Court at its head." The 21st Guam Legislature intended that the Supreme Court, as the highest local court, be vested with those powers traditionally held and exercised by the highest court of a jurisdiction.

In November of 1995 several prominent judges and attorneys were nominated by Governor Carl T.C. Guitterez to sit as Justices of the Supreme Court of Guam. On April 21, 1996 Peter C. Siguenza, Janet Healy Weeks and Monessa G. Lujan were sworn in as Justices and Joaquin C. Arriola, Jose I. Leon Guerrero and Eduardo A. Calvo were sworn in as Associate Justices Part-Time to the Supreme Court of Guam. Legislative efforts to undermine the authority of the Supreme Court as the head of the Judiciary of Guam began in earnest after the nomination of the current Justices of the Supreme Court. In the spring of 1996 while the nominated Justices were being considered by the 23rd Guam Legislature I testified in opposition to Bill 494. Bill 494 would have removed the Supreme Court's supervisory authority over the Superior Court. Fortunately, that measure failed. Unfortunately, others have not. Bill 404 introduced into the 23rd Guam Legislature was enacted into law as P.L. 23-86. P.L. 23-86 removed the Supreme Court's authority over personnel matters within the Judiciary and created two parallel court systems. P.L. 23-86 was an overt act by the Legislature to hamper the Supreme Court of Guam's administrative control of the Judiciary.

The 23rd Guam Legislature attempted once again to strip the Supreme Court of its supervisory authority over all lower courts. Bill 776 was considered by the 23rd Guam Legislature. The Bill was the budget bill for the 1997 fiscal year. Bill 776 was amended on the floor to limit the jurisdiction of the Supreme Court over the lower courts. The bill was passed by the Legislature, but vetoed by the Governor. The Legislature failed to override the veto. If Bill 776 had passed the Supreme Court would not be the head of the Judicial Branch. They would merely have been an appellate division of the Superior Court.

The incidents noted above highlight the need for the Judiciary of Guam to have the same Organic Act origin as is provided the Executive and Legislative Branches. H.R. 2370 is akin to the Elective Governor's Act of 1968 which set forth the structure of a locally elected Governor and Lieutenant Governor. The Elective Governor's Act did not merely authorize the Guam Legislature to statutorily provide for an elected governor. It went further and assured an independent but co-equal Executive Branch by establishing the framework for the entire Executive Branch. H.R. 2370 will do the same thing for the Judiciary. Without the same permanence afforded the two co-equal branches of government the Judiciary of Guam will never be a separate and co-equal branch of government but will remain beholden to its creator, the Legislature.

The Guam Judicial Empowerment Act of 1997 is necessary to create a truly independent and co-equal Judiciary. The bill is based principally on the Frank G. Lujan

Memorial Court Reorganization Act (P.L. 21-147) as it existed before the Guam Legislature began dismantling the Supreme Court's authority over the Judiciary. P.L. 21-147 was the product of numerous hearings, committee debate and hours of debate. It reflects the will of the people of Guam. H.R. 2370 insulates the Judiciary by providing an infrastructure which the Legislature cannot erode. It gives the people of Guam a judiciary similar to one which exists in just about every other State and Territory of the United States. As a former legislator I can respect the Legislature's desire to maintain the authority to pass local laws, but as a citizen I must insist that some matters should be above and beyond the idiosyncracies of local legislators.

The People of Guam deserve an independent Judiciary, headed by a Supreme Court which exercises those powers traditionally exercised by the highest court of the land. The People of Guam deserve a Judiciary beholden to no one but Lady Justice. Please consider immediate passage of this measure. Thank you for the opportunity to testify.

Respectfully yours,

*Pilar C. Lujan*

Superior Court of Guam
Judicial Center
120 West O'Brien Drive
Agana, Guam 96910
Telephone: (671) 475-3323 • Fax. (671) 477-1500

Chambers of
Frances Tydingco-Gatewood
Judge

October 24,1997

HONORABLE CHAIRMAN DON YOUNG
RESOURCES COMMITTEE
C/O HONORABLE CONGRESSMAN ROBERT UNDERWOOD
424 CANNON HOB
WASHINGTON, D.C. 20515-5301

SUBJECT: WRITTEN TESTIMONY RE H.R.2370 - THE GUAM JUDICIAL EMPOWERMENT ACT OF 1997

DEAR CHAIRMAN YOUNG AND MEMBERS OF THE RESOURCES COMMITTEE:

Through many years of public service I have come to value and appreciate the importance of an independent judiciary to a free and democratic society. My experience covers a broad range of activities including: most recently, three years as a trial judge in the Superior Court of Guam and a designated Guam federal district court judge, and prior to that, Guam's Chief Prosecutor for a period of four years, and six years as an assistant prosecuting attorney with either the Jackson County, Missouri Prosecutor's Office or the Guam Prosecution Division of the Attorney General's Office. I would like to emphasize the profound importance of H.R. 2370 in ensuring the independence and integrity of Guam's judiciary. The specific provisions contained in the bill are essential to protecting our courts from erosive acts on the part of other branches of government, and to insure that Guam's government remains accountable under law.

Moreover, the establishment of the Supreme Court of Guam must be grounded in the Organic Act of Guam. While some individuals may suggest that the structuring of Guam's Judiciary should be left to local legislation, this is not feasible now or in the foreseeable future. The superstructure of Guam's judiciary must be defined on a level that is NOT subject to being diluted or diminished through the acts of Guam's legislature or the authority of Guam's Governor, regardless of who the incumbent officials may be in those two branches.

The Supreme Court of Guam does not exist in a vacuum. It is the head of Guam's Judiciary, a co-equal branch of Guam's government as mandated by 48 U.S.C. §1421a. While this provision reflects the fundamental design of American federalism, the template was not extended to Guam without careful consideration. In fact, the legislative history of the 1950 Organic Act of Guam indicates that the Senate version of the proposal, S.1892, was amended in committee to provide for greater separation of powers across Guam's government. 1950 United States Code Congressional Service 2844. To suggest that Guam's

Legislature and Governor should be permitted to define the structure and powers of the Judiciary would reflect an understanding of government that is uninformed to say the least. The principle of separating governmental powers through a system of checks and balances is so much accepted that it has become a conceptual cliche. But it has become so because it is based on common sense and hundreds of years of experience.

In Federalist Paper No. 47, which has been attributed to James Madison, the author notes the following about the objectionable nature of a system of government that "exposes essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts": "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than that on which this objection is founded." ALEXANDER HAMILTON, JAMES MADISON & JOHN JAY, THE FEDERALIST PAPERS, New American Library (1962), p. 301.

The Chairperson of Guam's Legislative Committee having jurisdiction over the Judiciary, Sen. Elizabeth Barrett-Anderson, has stated that in the absence of an Organic or Constitutional provision empowering Guam's Supreme Court that it could be written out of existence by an act of the Guam Legislature. No branch of government should be able to define the structure and authority of a co-equal branch, much less determine its ongoing existence.

Guam does not have a Constitution at this time and there are no indications that such is imminent. In the absence of an Organic Act provision specifically establishing the Supreme Court of Guam as the head of Guam's judiciary and guaranteeing its survival and vitality, that body remains institutionally vulnerable to ongoing threats to its existence, from the other branches of government and from within the judiciary as well. This is not a climate that supports the judicial independence and integrity that will sustain, in the long run, the advancement of Guam's own society.

In the brief history of the Supreme Court, there have been repeated efforts to emasculate it. Since the appointment of its first Justices, a number of bills have been introduced that reduced its authority and jurisdiction. Several have passed, including one that prevented the Supreme Court of Guam from determining whether the Guam Legislature has been acting in violation of 48 U.S.C. §1423b, the Organic Act provision which dictates how many legislators are necessary to enact local law. These efforts have not been limited to forces outside the judicial branch. During the past thirteen years of government service I have observed the destructive and demoralizing effects of the Organic Act's omission of specific definition of Guam's judiciary.

In closing, I would note that H.R. 2370 is essential remedial legislation and should be enacted without amendment with all deliberate speed. I am certain that if this legislation is passed by Congress, our judiciary would finally be insulated from political influence.

Very truly yours,

Frances M. Tydingco-Gatewood
Judge, Superior Court of Guam

**GUAM BAR ASSOCIATION**
259 Martyr Street, Suite 201
Agaña, Guam 96910

October 24, 1997

HONORABLE DON YOUNG
Member of Congress
Chairman, Committee on Resources
1324 Longworth House Office Building
Washington, D.C. 20515

**Re: H.R. 2370 - Supreme Court of Guam/Elected Attorney General**

Dear Chairman Young and Members of Congress:

My name is Joaquin C. Arriola, Jr. and I am the President of the Guam Bar Association, a public body corporate comprising of all of Guam's lawyers. There are currently 274 active ("GBA") members of Guam's integrated bar. I am pleased to provide this written testimony on behalf of the GBA in support of House Resolution No. 2370, which affirms the authority of the Supreme Court of Guam and provides for an elected Attorney General through amendments to the Organic Act of Guam.

The GBA standing committee on legislation conducted a survey of our membership on H.R. 2370, as well as local legislation relative to an elected public prosecutor. H.R. 2370 obtained formidable support from the GBA by a nearly three to one ratio. Most bar members believe it is imperative that the Supreme Court of Guam's authority be defined and affirmed in the Organic Act. Because the Supreme Court of Guam is presently a creature of local legislation, it is not immune from the political whims of the Guam Legislature. Since the Court was formed just a few years ago, the Legislature has attempted on several occasions, and succeeded on at least one occasion, in changing the Supreme Court's jurisdiction and authority. In order to ensure stability, equality and self-governance in Guam's third branch of government, it is necessary for Guam's Organic Act to define supreme and paramount authority of the island's Supreme Court. The present state of the laws on Guam, which allows the local legislature the power to change the function and jurisdiction of the Supreme Court at any time for any reason, is contrary to the fundamental democratic concept of separate but equal branches of government. H.R. 2370 ensures the stability of Guam's Supreme Court. The members of the Guam Bar ardently support the resolution as it relates to defining the authority of the Supreme Court of Guam.

Page 2

HONORABLE DON YOUNG
Re: H.R. 2370 - Supreme Court of Guam/Elected Attorney General
October 24, 1997

H.R. 2370 also provides for an elected attorney general of Guam. While there is support for an elected attorney general among GBA members, a number of them have expressed concerns that H.R. 2370 does not adequately established such a position. As with the current Supreme Court of Guam enabling legislation, H.R. 2370 gives the Guam Legislature the authority to determine the parameters of an elected attorney general. GBA members oppose this method of electing an attorney general, which, like the Supreme Court, can be changed at any time for any reason. In order to provide for an elected attorney general, the parameters of such an elected office should be defined in an Organic Act amendment. It is noteworthy that pending local legislation to provide for an elected public prosecutor was opposed by the GBA by a nearly three to one margin. This is consistent with GBA opposition to the provisions of H.R. 2370 which allows the Guam Legislature to determine the parameters of an elected attorney general.

As lawyers, we are intimately familiar with our courts and our attorney general's office, Guam's largest law firm. Representing clients from all walks of life, from the foreign corporation based in Delaware to the indigent minor in need of protection from abuse, we represent the pulse of our island community. On behalf of the lawyers of Guam, the Guam Bar Association expresses its support for H.R. 2370 and we thank you for the opportunity to present our views and opinions to members of Congress.

Very truly yours,

JOAQUIN C. ARRIOLA, JR.

BOARD OF GOVERNORS

PRESIDENT Joaquin C. Arriola, Jr.
VICE-PRESIDENT David Link
SECRETARY-TREASURER Sinforoso Tolentino
MEMBERS-AT-LARGE Harold Parker Amy Brothers

DEPARTMENT OF LAW

JT / RAH

Carl T.C. Gutierrez
Maga'lahi
Governor

Madeleine Z. Bordallo
Tiñente Gubetnadora
Lt. Governor

Ufisinan Hinirát Abugao
Tiritorian Guåhan

Office of the Attorney General
Government of Guam

Charles H. Troutman
Hinirát Abugao Ákto
Attorney General (Acting)

Gus F. Diaz
Ahkidi Sigundo Hinirát Abugao
Chief Deputy Attorney General

October 20, 1997

RECEIVED

Honorable Don Young
Chairman
Committee on Resources
U.S. House of Representatives
2331 Rayburn House Office Building
Washington, DC 20515-0201

Dear Mr. Chairman.

Thank yeo. for holding hearings on H.R. 2370, "A Bill to amend the Organic Act of Guam for the purpose of clarifying the local judicial structure and the Office of the Attorney General." A Bill such as this is sorely needed on Guam and will finally create a genuine three-branch form of government for Guam. I would appreciate it if you would enter this testimony into the record of the Hearing.

TESTIMONY OF

CHARLES H. TROUTMAN
ACTING ATTORNEY GENERAL OF GUAM

IN FAVOR OF H.R. 2370

Mr. Chairman and members of the Committee on Resources,

Perhaps it may seem strange to be testifying on an amendment to the Organic Act at the same hearing as we are testifying for a Bill which would completely replace that Act. I believe that Congress should pass both Bills. but with changes. To be realistic. a Guam constitution is several years in the future. The federal law authorizing a Guam Constitutional convention now has a sufficient number of problems so that trying to use it to create a constitution is not a practical possibility. In the past Congress has amended the Organic Act to supposedly permit the people of Guam to do one thing or another. but. since 1984, the effects have been definitely mixed. The amendment regarding the educational system has caused lawsuits and is still the subject of much confusion simply because it is so vague and unclear, especially when dealing with such an important subject. Likewise, and contrary to the provisions of most state constitutions. reference to creating a "public prosecutor" continues to cause severe doubts as to whether that position can be elected, or must be appointed, and what can be the true scope of that office. The amendment permitting the creation of the Supreme Court has been partially successful. in that we have a Supreme Court of Guam now, and it has issued its first decisions -- very good ones, by the way.

Judicial Center Building, 120 West O'Brien Drive, Suite 2-200E, Agana, Guam 96910

But still Guam does not have a true government consisting of three branches of local government. The very existence of all of our local courts are subject to the will of the Legislature. Indeed, one person in 1977, now nominated to be a part-time Justice of the Supreme Court advocated the abolition of the entire local court system, relying instead on a federal District Court of Guam having multiple judges. Fundamentally, the structure of the courts has not changed since 1977. They are still not a separate, fundamental branch of the government. Further, the District Court of Guam remains, even in HR 2370, the court of general jurisdiction for Guam, whatever that now means -- -- just one more ambiguity that we do not need.

A similar problem exists with respect to the Attorney General. Most of the states have created the Attorney General as a constitutional officer. We now feel that the people of Guam should have that opportunity as well. The Attorney General is patterned after that of the United States Attorney General, appointed by the Governor with the consent of the Legislature. The term of office is indefinite, at the will of the Governor.

Because Guam needs the stability of a firm three-branch system of government, I believe these issues should be addressed forthrightly now. The Congress should not, as it did in the past amendments, make them vague in the extreme, with the explanation that the Congress did not wish to dictate how the people of Guam are to conduct its government. As long as we have an Organic Act, Congress does dictate, and the people require a better system as soon as possible.

I first testified on the need for a "constitutional" judiciary back in late 1976 when the late Delegate from Guam, Antonio Won Pat, had introduced a bill creating and establishing a Supreme Court for Guam. That Bill died in committee largely because the U.S. Supreme Court was considering the ability of Guam to create its own Supreme Court under the Organic Act as it then existed. Further hearings were held on Guam by the Pacific Territories Committee of the Administrative Office of the U.S. Courts. Those hearings resulted, in 1984, in the current Organic Act provisions permitting the Legislature to create an "appellate court" locally. That court was created and began operations in the middle of 1996. It has issued about a dozen decisions since then.

Since the Guam Supreme Court's creation, there has been skirmishing between it and the superior Court of Guam, and the Legislature, over whether the Supreme Court will really be the highest court of the Territory. For so long, the local courts consisted only of the Superior Court of Guam that giving up power is a very hard thing to do. Further the past history of the Superior Court and the Legislature will show that there is a need to make "constitutional" such things as the powers of the courts, their respective jurisdictions and, perhaps, terms of office.

I do have some concerns with Bill HR 2370. First, Section 2 appears ambiguous. What is intended by making the District Court of Guam, now a federal court with no local appellate functions, part of a "unified judicial system" of Guam? Does this imply some form of review by the District Court over the court system of Guam? Does this section imply that the District Court judge has some form of management power over the Guam courts?. I sincerely hope not. Congress already has imposed a fifteen-year period of review of the Supreme Court's decisions

by the Ninth Circuit (by certiorari), though no such review has yet been sought by any party.. Rather. I believe that the District Court should be made more like an Article III court rather than part of the Guam judiciary system. Just what does this section mean?

Actually, I would like to see the United States constitutional standard for federal judges applied to the District Court of Guam. If this method of appointment is so important to the American system, why are the U.S. citizens of Guam not entitled to a similar federal judiciary rather than one which is appointed and reappointed every 10 years?

There seems to be one missing piece to this Bill -- no mention of a term or qualifications for the Supreme Court or Superior Court justices and judges. This is one area where the Legislature has, in the past, acted to insure the appointment of judges it desired. On one occasion, a law was passed extending the terms of all the judges so that one judge would not have to go through re-appointment by the then-Governor -- thus insuring his continuation in office. On a more recent occasion, the Legislature lowered the age and practice qualifications for the Superior Court so that a younger attorney could be appointed to a vacancy in the Superior Court. It is here that I believe more protection is needed rather than in some of the details contained in the present Bill.

Nevertheless, I support the provisions of this Bill concerning the Guam courts. I would urge your consideration of those items I have mentioned and make the necessary changes to this measure.

Concerning Section 3 of HR 2370 -- affecting the position of Attorney General, I support Congressional action on this subject, but the present proposal is seriously deficient. I served as Attorney General from 1975 through 1977, and for extended periods as Acting Attorney General in 1987 and again presently. I have worked in the Attorney General's Office of Guam since 1970 with about two years out in private practice. There have been great changes in the Office during the past 27 years, but one thing remains the same -- the Attorney General is appointed, as is the United States Attorney General, to serve at the pleasure of the chief executive. This has hindered the development of the Office, but in general not because of improper interference by the Governor, any Governor, but because the Office has been unable to develop a vision of its own. I have been told by some state Attorneys General that they could not serve under such conditions.

In addition, the present Organic Act provides only that a "public prosecutor" may be created by the Legislature and that the Legislature may by law regulate that officer's "removal". There is no mention of how that officer is to e appointed. This has caused considerable confusion and controversy as the Legislature has tried to create an elected position, which I do not believe is presently permitted. Likewise, the Legislature has tried, but not yet passed, a bill which would make the Attorney General, now having both criminal and civil responsibility, the "Public Prosecutor", and then be an elected official.

Right now, I express no preference for an appointed or elected Attorney General, so long as the position is defined as "constitutional" (in the Organic Act) and the overall duties and functions provided in the Organic Act, much as is found in the Constitution of the State of Illinois. Thus,

I believe that three amendments are required to Section 3 of this Bill in order to make a serious difference in the Attorney General's functions:

> First, repeal the reference in the Organic Act to the "public prosecutor". This office has never been created and the ambiguities in the present law will only be compounded if it is permitted to stand alongside the amendments proposed here. If it is desirable to keep a reference to a "public prosecutor" in the Organic Act, then it should be mentioned in Section 3 of this Bill, but only in such a way so as not to subordinate the Attorney General in that position's overall duties as Chief legal officer of Guam. The Public Prosecutor could contain similar provisions as are given to the Attorney General, permitting the Legislature to create and appointed or elective office. The point is, we do not need two "Attorney General" positions for Guam.
>
> Second, On page 6, lines 24-25, the duties of the Attorney General should be changed by deleting item (d)(2) and adding the following below subsection (d) so that it is of equal standing and not subordinate to subsection (d):
>
> "The Attorney General shall be the chief legal officer of the territory of Guam and shall have such other duties and such compensation as the Legislature may provide by law."
>
> Third, a provision needs to be made to insure the viability of the office by providing some stability of the term. This is actually far more important than the method by which the Attorney General is to be selected. Therefore, I strongly urge another amendment, probably just following my second suggestion, which would read:
>
> "Whether the Attorney General be appointed, as provided in subsection (d)(1)(A), or elected, as provided in subjection (d)(1)(B), the term and method of removal of the Attorney General shall be the same as is provided for an elected Attorney General."

These last amendments would provide what is really needed by the Attorney General -- a basic statement of duties and a term that was not at the pleasure of any official. Of course, the Legislature could provide for vacancies as it does now. I believe that my amendments will do more for the Office than will a mere providing for Legislative choice of appointment or election. I recognize that the people of Guam seem not to be decided upon the method of choosing the Attorney General. This does not matter that much. What does matter, is that the Attorney General have the independence once he or she is in office, to accomplish the duties of the Office and to develop that office to the degree it deserves.

While Section 3 clears up one glaring ambiguity in the present Organic Act, it does little to address the real, substantive problems of the Attorney General. I urge this Committee to amend Section 3 of H.R. 2370 to address the concerns I have with regard to the Office of Attorney General on Guam.

Thank you for your kind attention.

Charles H. Troutman
CHARLES H. TROUTMAN
Attorney General of Guam (Acting)

# PARTIAL DISPOSAL UNDER THE TERRITORIAL CLAUSE
## A More Permanent Status for Territories

by Charles H. Troutman
Compiler of Laws
Guam Counsel - CSD
Territory of Guam
July 12, 1996

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property of the belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States or of any particular State.
> U.S. Constitution, Art. IV, sec. 3, cl. 2.

## I
## Introduction

The first American territorial policy predates the Constitution. In 1795 the Congress under the Confederation adopted the "Northwest Ordinance"which both governed the unsettled areas between the Alleghenies, the Ohio River and [1]the Mississippi River and set territorial policy that lasted until the acquisition of the former Spanish territories in the Spanish American War (1898). Then the United States altered that policy and in doing so created a new type of territory.

Until 1898, it was assumed that all territories were on the road to statehood. After the Civil War, there was no more possibility of secession. Then, the United States, by treaty, created, and the Supreme Court confirmed, the status of what it called "unincorporated territories".[2] Indeed, the *Insular Cases* based their new category on the

---

[1] This paper was first written in 1989 just prior to the Congressional hearings on the Commonwealth held in Honolulu. It had its origins, however, in the first draft of the Commonwealth Draft even before that draft was presented to Governor Bordallo at the beginning of his second term as Governor.

[2] See *Report of the Legal Status of the Territory and the Inhabitants Acquired by the United States during the War with Spain,* . . . ., Charles E. Magoon, 56th Cong. 1st Sess., Doc. No. 231, March 20, 1900. This document explained to the Secretary of War the legal powers of the United States over its new territorial acquisitions before the *Insular Cases*. The author justified the Treaty of Paris without hinting of a new, separate status.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 260 of 542

very wording of the Treaty of Paris, contrasting the treatment of the "native inhabitants" of the new territories with the rights given and promised to the inhabitants of all other territories then held, except for Hawaii.[3] These former Spanish possessions were the first where the ultimate "disposal", independence, was a realistic possibility and where statehood was definitely not promised. The Philippine Islands were disposed of by being granted independence in 1946.

This new creature, the unincorporated territory, was again changed by treaty in 1946. The United Nations Charter, Article 73, created a new regime, into which the

---

[3] *Rassmussen v. United States*, 197 U.S. 516, 25 S.Ct. 514. About the test for incorporation or unincorporation by treaty, the Court said:

> Concerning the test to be applied to determine whether in a particular case acquired territory has been incorporated into and forms a part of the United States, we do not deem it necessary to review the general subject, again contenting ourselves by quoting a brief passage from the opinion in Dorr v. United States, summing up the reasons which controlled in determining that the Philippine Islands were not incorporated, viz. (p. 143, 195 U. S., p. 810, 24 Sup. Ct. Rep. 49 L. ed. 128):
>
> 'If the treaty-making power could incorporate territory into the United States **516 without congressional action, it is apparent that the treaty with Spain, ceding the Philippines to the United States, carefully refrained from so doing; for it is expressly provided that (article 9) 'the civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.' In this language it is clear that it was the intention of the framers of the treaty to reserve to Congress, so far as it could be constitutionally done, a free hand in dealing with these newly acquired possessions.
>
> The treaty concerning Alaska, instead of exhibiting, as did the treaty respecting the Philippine Islands, the determination to reserve the question of the status of the acquired territory for ulterior action by Congress, manifested a contrary intention, since it is therein expressly declared, in article 3, that:
>
> 'The inhabitants of the ceded territory . . . shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and shall be maintained and protected in the free enjoyment of their liberty, property and religion.' [15 Stat. at L. 542.]
>
> This declaration, although somewhat changed in phraseology, is the equivalent, as pointed out in Downes v. Bidwell, of the formula, employed from the beginning to express the purpose to incorporate acquired territory into the United States,--especially in the absence of other provisions showing an intention to the contrary. And it was doubtless this fact conjoined with the subsequent legislation of Congress which led to the following statement concerning Alaska made in the opinion of three, if not four, of the judges who concurred in the judgment of affirmance in Downes v. Bidwell (p. 335, L. ed. p. 1125, Sup. Ct. Rep. p. 805):
>
> 'Without referring in detail to the acquisition from Russia of Alaska, it suffices to say that treaty also contained provisions for incorporation, and was acted upon exactly in accord with the practical construction applied in the case of the acquisition from Mexico, as just stated.',

At pp. *520, *522.

United States placed Guam, and from which it has never been officially withdrawn. This new regime is the "non-self-governing territory". Part of this new regime is the concept of "self-determination", by which the peoples of that territory are promised the right to determine their future political status. This new regime was confirmed by the United States in 1992.[4]

Once again the nature of the territorial regime was changed, and confirmed by the courts[5], as to one jurisdiction, the Commonwealth of the Northern Mariana Islands. Guam is seeking to change the territorial regime once more, to insure that its people have an inherent right of self government, not merely administering a government using powers delegated by Congress, with all that the courts have put into that status.[6]

To accomplish this, Guam is proposing that Congress "dispose of" certain of its powers of government to the people and government of Guam. For this to work, there are to questions that must be answered. First, is there a constitutional power to permit Congress to make this disposition? And, by what means can this be accomplished?

**II**
**Theory of Disposal**

Just this last week, the Supreme Court discussed the power of Congress to limit the sovereignty of the United States. While the case did not deal with territories, Justice Souter examined the history of the doctrine of limiting sovereign powers, and notably refused to rule upon the basic issue.[7] However, in describing the principle, as it applies in the United States, the plurality of the Court did say:

> Hence, although we have recognized that "a general law ... may be repealed, amended or disregarded by the legislature which enacted it," and

---

[4] International Covenant on Human Rights.

[5] One strong confirmation of the principle came in *U.S. ex rel. Richards v. Guerrero*, 4 F.3d 749, (9th Cir. 1993) where the court stated, at p. 754:

> At the outset, we emphasize that "the authority of the United States towards the CNMI arises solely under the Covenant." Hillblom v. United States, 896 F.2d 426, 429 (9th Cir. 1990). The Covenant has created a "unique" relationship between the United States and the CNMI, and its provisions alone define the boundaries of those relations. Commonwealth of the Northern Mariana Islands v. Atalig, 723 F.2d 682, 687 (9th Cir. 1984). For this reason, we find unpersuasive the Inspector General's reliance on the Territorial Clause, U.S. Const. art. IV, s 3, cl. 2, as support for enforcement of the federal audit.

[6] *People v. Okada*, 694 F.2d 565 (1982) Guam was compared to the Alaska Railway Corp. (a federal corporation). The court also said that Guam has less autonomy than the city of Boulder, Colorado.

[7] *U.S. v. Winstar Corp.*, — S.Ct. —, 1996 WL 359767 (U.S.)), July 1, 1996.

"is not binding upon any subsequent legislature," Manigault v. Springs, 199 U.S. 473, 487, 26 S.Ct. 127, 50 L.Ed. 274 (1905), [FN19] on this side of the Atlantic the principle has always lived in some tension with the constitutionally created potential for a legislature, under certain circumstances, to place effective limits on its successors, or to authorize executive action resulting in such a limitation.[8]

Thus, the first question is to determine if there is constitutional authority for Congress to grant to Guam the sort of self government is seeks.

All of the case law interpreting this clause of the Constitution with respect to the territories of the United States have dwelt solely on the meaning of the terms "make all needful Rules and Regulations respecting the Territory of" the United States. This is not surprising, since all of what were "incorporated territories", and before all that the non-state areas of the continental United States plus Alaska, were always intended to become states of the Union. In doing so, the courts have emphasized that no sovereignty rests with the territories, that all powers they exercise are done so by the will of Congress alone, and that if Congress has not given a power to a territory, it does not possess it. No residual powers reside in the Territory. This lack of residual powers stems from Congress' "plenary" powers over the territories. Congress may always revoke the powers of the territories through this overriding plenary power.[9]

Guam seeks a new status within the sovereignty of the United States. Guam wants to be recognized as a political entity in itself, even though its limited sovereignty will differ from the sovereignty of a state, and will have no voting representation in Congress. As such Guam will have recognized powers inherent in itself. The powers will be those which are given to Guam by Congress in the Commonwealth Bill. However, unlike the powers given Guam under the Organic Act, which are merely delegated powers that can be changed or taken away at the will of Congress, these powers under the Commonwealth will belong to Guam by virtue of the grant of these powers to Guam by the

---

[8] *Winstar*, at p. *17.

[9] *People v Olsen*, [1977, US] 431 U.S. 195, 97 S.Ct. 1774. Organic Act does not permit the Guam Legislature to create its own Supreme Court. Statutory, not constitutional, analysis used.

*People v. Okada*, 715 F.2d 1347 (C.A.9 1983). Unlike states, because Guam has no inherent sovereignty, only the Congress may determine whether or not the Government of Guam may appeal criminal cases to the Ninth Circuit.

*Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285 (C.A.9 1985). "Commerce clause" limitations do not apply to Guam because it is not a state and because Congress has full power to regulate commerce in and through the territories through the "territorial clause" of the Constitution.

language (Mutual Consent to the Act) and intent (Disposal) both in the Act. As a result, these powers will belong to Guam. The concept is similar to the states giving a limited degree of their sovereignty to the United States government upon the formation of the United States, and effectively, upon admission of the later states. Likewise, Congress has "disposed of" its powers of local government to a jurisdiction when that jurisdiction becomes a state. In both cases, at least since the civil war, such transfer of sovereignty has been regarded as irrevocable. A similar degree of permanence would accrue to Guam under the Commonwealth Act, at least until Chamorro self determination has been expressed and acted upon.

As we have seen, this cannot occur under existing court doctrines using existing language in Guam's, or other, organic acts, nor is it totally clear in existing Commonwealth relationships. Short of a constitutional amendment, it seems to this author that the only means of achieving this permanency of status and sovereignty is for the United States to dispose of some of its powers under the "territorial clause" to the people of Guam, so that, truly, government on Guam is founded upon the consent of the governed.

Congress, in the past, has disposed of territory in many and varied ways. When disposing of territories as governmental units, the U.S. has disposed of its plenary power either by granting independence, as with the Philippines[10], or by granting statehood[11]. In both cases, the disposal of territory was the total disposal of all that could be disposed under the circumstances. In the case of the Philippines, that was everything relating to or inherent in sovereignty. In the case of granting statehood, the U.S. disposed of all of the sovereignty over the new state not given up by the states through the United States Constitution.

---

[10] On the granting of Philippine independence, 22 U.S.C.A. §1393:

> On the 4th day of July immediately following the expiration of a period of ten years from the date of the inauguration of the [commonwealth] government provided for in this Act, the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands, including . . . ., and on behalf of the United states, shall recognize the independence of the Philippine Islands as a separate and self-governing nation acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force.

[11] The Supreme Court has recognized that, when a Territory becomes a state, Congress loses the right to legislate for it in a plenary manner. State of *Oklahoma v. AT&SF Railway Co.*, (No. 13, Original) 31 S.Ct. 434, 220 U.S. 227, (1910). The regulation of intra-state rail rates, while a matter for Congressional legislation while Oklahoma was a territory, became a matter of solely state concern once Oklahoma had become a state.

The United States has disposed of territory, both partially and completely, in other ways. From the earliest times of the republic, the United States, under this "territorial" clause of the Constitution, has been able to "dispose of" less than all of its ownership rights over land that it owns. However, the type of disposal, sovereignty or property, has no distinction in the Constitution. The Territorial Clause makes no distinction between disposal, rules and regulations affecting property and persons and their political destiny. The first such disposal which was challenged to the U.S. Supreme Court was a lease of mineral rights.[12] Many times, the United States has transferred title of territory, here meaning "land" or "property" to other persons or states or territories.[13]

While it has not yet happened, I cannot see anything to forbid Congress from "disposing of" certain of its governmental powers, but less than all held under the "territorial clause" to the people of a territory. The government of Puerto Rico has argued that the "compact" by which Puerto Rico became a commonwealth acted to create "a sui generis political entity which is no longer a territory or a possession of the United States per force of the exercise by Congress of its constitutional right to dispose of its territories, ..."[14] The *Nestle* court concluded, however, that no such disposal had taken place as a matter of statutory construction, referring to the legislative history of the Puerto Rican "compact" as justification for this decision..[15]

---

[12] In *United States v. Gratiot*, 10 L.Ed. 573 (1840), the Court held, against the challenge that to "dispose of" property was an all or nothing power which could not "include letting or leasing" (at p. 578-9):

> "And again, . . . , in speaking of the cession of Florida under the treaty with Spain, he [the Chief Justice] says that Florida, until she shall become a State, continues to the a territory of the United States government, by that clause in the Constitution which empowers Congress to make all needful rules and regulations respecting the territory or other property of the United States. If such are the powers of Congress over the lands belonging to the United States, the words "dispose of," cannot receive the construction contended for at the bar -- that they vest in Congress the power only to sell, and not to lease such lands. The disposal must be left to the discretion of Congress."

[13] Unconditional transfer of property was supposed to be made to the Government of Guam pursuant to 48 U.S.C.A. 1421f(a). (Organic Act, §28(a)).

Title to submerged lands, with conditions and numerous exclusions, was transferred to Guam by 48 U.S.C.A. §1705.

"Title" to certain lands at Cabras Island, Guam was transferred to the Government of Guam, but under the condition that most of the income from any leases or improvements be returned to the United States by PubL. 96-418, §818(b)(2) -- the infamous "Brooks Amendment".

[14] Nestle Products Corp. v. United States, 64 Cust.Ct. 158, C.D. 3976, 310 F.Supp. 792, 796 U.S. Customs Court, 1970).)

[15] The *Nestle* court stated, with respect to "disposal" at p. 796:

> Although undoubtedly the "compact" realized greater local autonomy for the people of Puerto Rico in the relationship existing between Puerto Rico and the United States, we fully agree with defendant that Puerto Rico did not achieve independence from United States control and protec-

Later decisions seem to have reached an opposite opinion. The District Court of Puerto Rico has applied the National Labor Relations Act to Puerto Rico as it applies to states, not territories:

> Since the very beginning of the acquisition of Puerto Rico by the United States in 1898, when the Spanish regime over the island gave way to the American regime, and up to July 25, 1952, Puerto Rico was a Territory or a colony governed by the United States under a system of delegated powers to local authorities. Both during the two years of military government of the island and during the life of its two organic acts [FN4] approved by Congress to provide for its internal government, there was no doubt that Puerto Rico was governed by the United States under the authority granted to it by Article IV of the Constitution. . . . Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in [the "territorial clause"]. From July 25, 1952, in which the Commonwealth of Puerto Rico was born, Puerto Rico ceased being governed by the unilateral will of Congress; now it is being governed by the express, though generic, consent of the people, through a compact with Congress. Whatever authority was to be exercised over Puerto Rico by the Federal government would emanate thereon, not from Article IV of the Constitution, but from the compact itself, voluntarily and freely entered into by the people of Puerto Rico, even without an express recognition of its sovereignty, and the Congress; a compact which cannot be unilaterally revoked by Congress or by the people of Puerto Rico. (footnote on binding nature of compacts omitted) (emphasis added)[16]

The Supreme Court has held that Puerto Rico "like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution.'" *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 2199 72 L.Ed.2d 628 (1982) quoting *Mora v. Meijas*, 115 F.Supp. 610 (D.P.R.1953). The only problem with these statements is that the courts, while making these grand statements, with only one exception, have ruled against whatever special consideration was being sought by the parties asserting such claims.[17] The real lesson to be learned is that, while the status sought by Guam is

---

tion by virtue of the "compact", . . .

[16] *Hodgson v. Union de Empleados de los Supermercados Pueblos*, 371 F.Supp. 56), 58-59, (D.C.P.R. 1974). The U.S. Court of Appeals for the First Circuit has followed *Hodgson* and two other cases similar to it in *U.S. v. Quinones*, 758 F.2d 40 (1985). The other two cases referred to for a history of the Puerto Rican "compact" are *Figueroa v. People of Puerto Rico*, 232 F.2d 615 (1st Cir.1956); *United States v. Perez*, 465 F.Supp. 1284 (D.P.R.1979).

[17] The only exception is Hodgson, where that court dismissed the claims for federal intervention under the National Labor Relations Act in a purely local Puerto Rican matter.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 266 of 542

not constitutionally impermissible, Congress must state such a policy of disposition clearly, or the courts will not find any such disposition or disposal.

The United States limits its sovereignty every time it ratifies a treaty. Therefore, there is no legal reason why Congress cannot limit its power over territories by giving away some of those powers to the territories themselves. Indeed, this latter limitation would be less of a limitation than involves foreign treaties, since Guam will remain subject to the overall sovereignty of the United States.[18] Nationally or internationally, Congress has the power to partially dispose of its rights of property or sovereignty over "territories" of the United States.

As free association has been defined in the United States context, it means that there are two independent states dealing with each other as such, but that both create a very close association with each other such that the laws of one (the United States) will apply in part in ways such laws cannot apply over completely sovereign nations. Certain powers, such as the power of denial of the area to foreign powers in defense matters, has been delegated to one party by the other (by, say, the FSM to the United States) and the United States has extended a number of benefits to the Federated States of Micronesia not granted to other nations. Yet neither citizen is a citizen of the other state.

The Commonwealth would not be this form of relationship with the United States. Rather, Guam seeks to remain under the sovereignty of the United States, but having powers and a status suitable to its situation, even though this means non-state-like treatment in certain areas.

In my view, the United States Constitution limits states in the exercise of their sovereignty in two basic areas:

1. By those provisions restricting the states from taking action against their own citizens, -- such as most of the Bill of Rights as now interpreted, the 13th, 14th, and 15th Amendments and the Voting Amendments;

2. Those provisions which are necessary to bind the members of the union together as a full political and economic nation -- the "commerce clause", uniform customs treatment, regulating coinage of money, "privileges and immunities" which cannot be denied citizens of one state in another state, making war, making international agreements, and conducting diplomacy.

---

[18] In **The Law of Territorial Waters and Maritime Jurisdiction**, by Philip C. Jessup (Jennings & Co., N.Y., 1927, reprint 1970), the author states, in his Introduction:

> Most treaties, though entered into by an act of sovereign will, constitute a limitation on sovereignty. To urge the contrary is to deny the obligatory force of treaties. At page xxxiv.

As early as *Dred Scott v. Sanford,* 19 How. 393, 15 L. ed. 691, the Supreme Court has held that there were certain constitutional rights which Congress could not take away just because a person lived in a territory. If Congress cannot alter those rights, which now include the right of due process, it is logical that it cannot "dispose of" a right of action which it does not possess. However, there is no reason why Congress cannot dispose of those powers it does exercise over territories.

Guam is seeking from the United States those powers which are not essential to the United States overall sovereignty of Guam, and which are powers Congress can dispose of, in order that Guam may develop in its own location in the western Pacific. Since Guam is not to be within the federal union, politically or commercially[19], there is no legal reason why Congress cannot dispose of certain powers to Guam which states cannot have by reason of their union. Since the U.S. conquest, Guam has had its own customs zone and, when it so desired, its own customs duties. The Ninth Circuit has said that the "commerce clause", does not apply to Guam[20], since Congress has whatever powers it wants in this area through the "Territorial Clause". As long as Guam remains outside of the United States economic union, there is no reason why Guam cannot exercise powers denied to states because of the states' position within the economic union so long as those powers are not inherently contradictory to United States sovereignty over Guam.

Since the Supreme Court has made it clear that Congress may delegate considerable power to a territory so long as it retains the ultimate powers[21], and since it is this ultimate "plenary" power which has been used by the courts to deny the Guam any inherent right of self government[22], mere delegation of power will not suffice.

---

[19] "Guam is appurtenant to the United States and belongs to the United States but is not a part of the United States." (H.R. Rep. No. 11365, 81st Cong., 1st Sess. (1949))

[20] See *Sakamoto v. Duty Free Shoppers, Inc.*, 764 F.2d 1285, (9th Cir.1985), cert. denied, 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986).

[21] Of course, these cases were developed with respect to incorporated territories which the United States had no intention of giving up. At the time of these cases, statehood was assured for the territories involved and all have since achieved it.

[22] As an organized political division, the territory possesses only the powers which Congress had conferred, and hence the territorial legislature could not provide for escheat unless such provision was within the granted authority.

. . . . .

This manifestly was not a grant of the property of the United States, but it was an authority which extended to "all rightful subjects" of legislation save as it was limited by the essential requirement of conformity to the Constitution and laws of the United States and by restrictions imposed.

Rather, "disposal" of such powers to Guam is the only way by which Guam can achieve what it intends by the term "commonwealth".

## II
## What Must be Done to Achieve Disposal

The Supreme Court, in *Winstar*, has again made it clear what Congress must do if the issue of any transfer or "disposal" of sovereignty is to take place. Again Justice Souter stated:

> We found, however, that the treaty said nothing about conveying the Government's navigational easement, see id., at 706, which we saw as an aspect of sovereignty. This, we said, could be " 'surrendered [only] in unmistakable terms,' " id., at 707 (quoting Bowen, supra, at 52), if indeed it could be waived at all.[23]

Indeed, absent the specific power to dispose in the "territorial clause", it is arguable that Congress could not dispose of territory, at least in its political aspects. The Supreme Court has held, in the case of *Afroyim v. Rusk*, that the Fourteenth Amendment authorizes naturalization but, there is nothing in the Constitution which would permit a removal of that citizenship.[24] But in Guam's case, "disposal" is clearly a power given to Congress.

It may be that Puerto Rico has achieved the status Guam is seeking through Commonwealth by the mere fact of being a commonwealth with its own constitution. However, pending legislation in Congress, along with the original history of the creation of Puerto Rico's commonwealth, indicate that no major change of status occurred. That seems to be the judicial trend, but the Supreme Court has never defined just what a "commonwealth" is. In Guam's case, I am certain that the courts will not go in that direction without an "unmistakable" statement from Congress. Unlike Puerto Rico's "compact", where discussions of status change, or lack thereof, were left to inconclusive debates on the floor of Congress, the Congress, in law, has stated clearly that a

---

*Christianson v. County of King*, 239 U.S. 356, 36 S.Ct. 114, 117 (1915).

This Court also has held that Congress may delegate to local legislative bodies broad jurisdiction over Territories provided Congress retains, as it does here, ample power to revise, alter and revoke the local legislation.
*United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 297 (1955).

23 *Winstar*, at p. 20.

24 *Afroyim v Rusk*, 387 U.S. 253, 257 (1967).



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 269 of 542

constitution of Guam, without more, will not change Guam's status. Guam can now draft a constitution within the existing territorial-Federal relationship, . . . "for the local self-government of the people of . . . Guam."[25] Guam has rejected such an exercise.

Under the court cases which have been rendered concerning Guam, Congress could amend such a constitution without notifying or requiring the consent of the people of Guam. The people of Guam would still not be ruled with the consent of the governed. We would still have no right of self government. This is the situation under our current status, and Congress has declared that it would not change. In effect, Guam would be acting only as a sub-sub-committee of Congress under that law.

Guam is seeking four things -- the right of self government under the sovereignty of the United States, a mutuality and certainty to the relationship between Guam and the United States, the right to adopt our own constitution and the solution of long-standing grievances concerning our relations with the federal government. The first three goals work together to create a political personhood for Guam, which is the true desire of the people. To be political "non-persons" is not a goal for anyone.

Short of an amendment to the Constitution, disposal of these rights to the people by Congress is the only way to forge a permanent change from our present status of unincorporated territory. In order to accomplish this act, Congress must do so "unmistakably". This is the reason for the statement of Congressional intent in the current §1201(b) of the Draft Commonwealth Act. Congress has the right to dispose of these powers. Does it have the will?

## III
## Effect on Guam

First, the direct effect on Guam will be limited to those rights that are actually disposed of to Guam. This argument is not intended to give Guam rights "by the back door". However, the disposal of rights to the people, as opposed to the delegation of rights, would overturn the basis for a number of court rulings which have gone against Guam.

For instance, if *People v. Olsen* were brought under a scheme of disposal, it is the intent of such a scheme that the court would look to the entire structure of the Com-

---

[25] Public Law 94-584, 94th Congress, 90 Stat. 2899 (1976). Amended by §501, Act of Dec. 24, 1981, P.L. 96-597 (94 Stat. 3479).

monwealth Act and ask whether, under the general intent as well as specific language, would Guam have such a power. The dissent in that case would become the majority.

The Ninth Circuit would cease to rule that "Guam marches to the beat of the federal drummer", and, when looking at the inherent nature of Guam, would be able to follow the rationale in Atalig rather than their ruling in *Okada.*[26]

The courts have never applied the Organic Act "liberally" with the intent of effectuating its overall purposes. Rather, they have assumed that Congress has the overall power and, at least in Guam's case, that Guam can have only that identity specifically given to it by Congress, with nothing else implied.

The purpose of disposal can be summarized by saying that it is to legitimate the territory of Guam, giving it a complete personality within the parameters of the Commonwealth Act. It is genuine government with the consent of the governed.

---

[26] *Atalig* held that the CNMI had enough inherent sovereignty to permit appeals by the Government to the federal court in criminal cases without special federal legislation. In *Okada*, Guam has held to have no right of self government and, unless Congress specifically authorizes such appeals, Guam has no such power.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 271 of 542

THOMAS C. ADA
SENATOR

**TESTIMONY**
**H.R. BILL No. 100**
**Commonwealth For Guam**
By
Senators Thomas .C. Ada and Lou Leon Guerrero

We are in full support of H.R. Bill No. 100, a draft Commonwealth Act. We firmly believe that H.R. Bill 100 will afford Guam greater autonomy in the economic, social, and political affairs of the people in this community, while at the same time maintaining close ties with the United States.

We urge Congress to bring closure to Guam's quest for Commonwealth. Only through the definitive action of Congress will Guam be able move forward with its quest. The people of Guam have submitted their commonwealth proposal; we simply ask that Congress take the time to act on the request. All we can do now is wait and hope for the best, trusting in the wisdom and magnanimity of Congress.

Should Congress reject the proposed Act, the leaders of Guam will reason together to find and work out a formula acceptable to the people of Guam and and the U.S. Congress. Through definitive Congressional action, the people of Guam can then find out what Congress will be willing to give, and what our people would be willing to accept. Compromise and statesmanship will be the key to success.

Thomas C. Ada
Senator
24th Guam Legislature

Lou Leon Guerrero
Senator
24th Guam Legislature

215-A Chalan Santo Papa Street • Ada's Commercial & Professional Center, Suite 108-F • Agana, Guam 96910
e-mail: tca@kuentos.guam.net • Tel: (671) 472-3436 • Fax: (671) 477-7281

**24th Guam Legislature**
**Sen. Carlotta A. Leon Guerrero**

Union Bank Building, Suite 312
194 Hernan Cortez Avenue
Agana, Guam 96910

Tel : (671) 472-[illegible] / [illegible]
Fax : (671) 477-1325
sencig@Kuentos.guam.net

Chairperson:
Committee on
Transportation,
Telecommunications and
Micronesian Affairs

**TESTIMONY OF THE HON. CARLOTTA LEON GUERRERO**
**SENATOR OF THE GUAM LEGISLATURE**
**BEFORE CHAIRMAN DON YOUNG AND THE HOUSE**
**COMMITTEE ON NATURAL RESOURCES**
**WASHINGTON, D.C.**

**OCTOBER 28, 1997**

Hafa Adai and thank you, Mr. Chairman. I am pleased to submit testimony on Bill S.210, an act to amend the Organic Act of Guam, the Revised Organic Act of the Virgin Islands, the Compact of Free Association Act, and for other purposes. I would like to discuss Section 8. Compact Impact Reports.

The Compacts are complex treaty documents outlining the relationship between the Compact nations and the United States. The drafters of these treaties were fully aware that the Compacts could adversely affect Guam's political, economic, and social well-being. Potential adverse effects on the territories include the preferential investment tax incentives in the Compact for the FAS; the trade benefits the FAS would enjoy without the burden of safety, environmental, and labor restrictions by which the territories must abide; liberal immigration benefits for citizens of the FAS; the greater control of the FAS over their 200-mile zones than that enjoyed by the territories; the fact that the FAS could receive economic assistance, such as capital improvement grants, and could enter into economic accords (such as fisheries agreements) with other nations; and the fact that the FAS can join international financial organizations that the territories cannot.

In constructing the Compacts, U.S. policy provides that if any adverse consequences do result, Congress will act sympathetically and expeditiously to redress those consequences. Since it was impossible to predict exactly what the effect of the Compacts would be on the territories, the formulators of the Compacts felt it was prudent to require an annual report from the Executive branch detailing the Compact's effect.

The reports are required by law to pay particular attention to matters relating to trade, taxation, immigration, labor laws, minimum wages, social system and infrastructure, and environmental regulation. With respect to immigration, the Immigration and Naturalization Service is to provide information on the number of persons availing themselves of the right to enter Guam. The Executive branch is to submit a proposal for remedial action to the Congress if the report determined that the Compact adversely affected the territories.

page 2
Testimony of the Hon. Carlotta Leon Guerrero
October 28, 1997

I have been very concerned about the lack of federal attention to this important issue. A report always seemed to be indefinitely "under preparation", but never forthcoming. Thus I initiated a lawsuit with the District Court of Guam to force the Executive branch to submit the required reports. On April 17, 1996 I was joined by Governor Gutierrez, the state of Hawaii, and the Commonwealth of the Northern Marianas.

During the time the lawsuit was under consideration by the Court, the Department of Interior filed two additional annual reports to the Congress, which were also submitted to the Court.

The Court submitted its final judgement after a thorough review of all the reports issued by the Department of Interior. The Court found the reports to be arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. In its summary judgement, it was the opinion of the Court that the 1996 report was a hastily compiled, last-minute report that glosses over the areas directed to be analyzed by Congress. The final judgement instructs the Executive branch to prepare a report in accordance with the law.

Bill S.210 now seeks to amend U.S. policy set by the Congress and shifts the responsibility of preparing annual reports from the Executive Branch to the Governors of the affected areas. I believe this is yet another attempt by the Administration to excuse itself from a Congressional responsibility. Mr. Chairman, I wrote to you more than a year ago to advise you of the Department of Interior's continuing failure to adhere to the mandate of Congress. I chronicled for you the many frustrations Guam has endured in trying to get the Executive branch to live up to its commitments. It is becoming increasingly clear that the Administration would rather expend its energy trying to avoid this responsibility, than carry it out.

Section 8 would allow the Executive branch to defy the spirit of a law passed by the Congress, and upheld by the Court. It is tantamount to trickery, and an insult to the people of Guam who must shoulder the burden created by the Administration's refusal to fully acknowledge the impact of the Compacts.

I believe that the federal government is in the best position to prepare a report that is essentially regional in nature, and encompasses recommendations for corrective action. I urge the Committee to reject section 8.

Thank you for this opportunity to comment.

The Office of
**Senator Carlotta A. Leon Guerrero**
Suite 215, Union Bank Building
194 Hernan Cortez Avenue
Agana, Guam 96910
Telephones: (671) 472-3416 / 8
Facsimile: (671) 477-4328
Twenty-Third Guam Legislature

Committee Memberships:
Economic-Agricultural Development & Insurance
Federal & Foreign Affairs
Chair of Governmental Operations & Micronesian Affairs
Health, Welfare & Senior Citizens
Community, Housing & Cultural Affairs
Tourism & Transportation
Youth, Labor, Parks & Recreation
Association of Pacific Island Legislatures

October 7, 1996

file

Honorable Don Young
Chairman
Committee Natural Resources
U.S. House of Representatives
Washington D.C. 20515

Dear Mr. Young,

I am writing to express my profound disappointment with the work of an office under your oversight umbrella. On September 25th the Interior Department's Office of Insular Affairs transmitted to you a copy of a report, "The Impact of the Compacts of Free Association on the United States Territories, Commonwealths and on the State of Hawaii."

U.S.PL 99-239 mandates the Federal Government to document the adverse impacts to these island entities caused by its policy allowing "unrestricted migration" out of Micronesia into the U.S., namely Guam, the Commonwealth of the Northern Marianas (CNMI) and Hawaii.

Mr. Young, I have never felt so strongly the distance between Washington D.C. and Guam as I do now. On paper and as a total stranger to you I need to convince you that the Director of O.I.A., Al Stayman, has not done his job in documenting adverse financial impacts to my government. These impacts are caused by a federal policy decision made over a decade ago, a policy that we had no voice in forming. If I were a private citizen I would beat around the bush for a page or two, but as a leader I trust that you, like me, appreciate frank talk.

For the past 10 years the Government of Guam has been trying to get the Office of Territorial and Insular Affairs, (now re-named Office of Insular Affairs) to comply with the documentation of impact clauses in PL 99-239. During this period, thousands of Micronesians have moved to our island overloading our schools, health care, public housing and welfare programs.

As you can see from the chronology of correspondence back and forth between Interior and the Government of Guam (copy enclosed), we have received vague commitments and less than stellar follow through on those commitments. The end result is the report copied to you by Al Stayman

which simply points out the obvious, that there has been adverse consequences to Guam. Stayman goes on to say in the final sentence of the report's introduction page that the job is too tough for his office to ever figure out!

"However, Guam and O I A. have not reached complete agreement on the methodology for estimating financial impact such agreement is not likely to be reached, given the complexity of the undertaking."

I filed a lawsuit in District Court last year (copy enclosed) to require O.I.A to do its job and help us figure out how best to document the impact. Even with a lack of concrete approved upon guidelines from Interior, my government has done its best to document the impacts. However, without fail, our figures are disputed by Interior and our case for implementing the financial reimbursement section of 99-239 is weakened.

My fight is not a solitary one. The governments of Guam, the CNMI and the state of Hawaii have joined me as co-plaintiffs in this suit. The next action in the case will occur later this month when the defendants must respond to our amended complaint.

My purpose in writing is to give you an opportunity to hear first-hand that Guam is suffering under this U.S. policy of un-restricted migration. I also believe that the office responsible for helping us solve the problems resulting from this policy, O.I.A., is not doing its job.

Guam has been more than a good soldier these past 98 years under the American flag. We recently endured the toughest military down-sizing cuts of any other American jurisdiction. We are currently playing host to the Kurds who were recently evacuated because of their pro-American support.

Mr. Young, I am willing to provide your office with more background information on this issue if needed.

In closing, I want to tell you that I looked you up in the Congressional Register and was impressed with the mention of "riverboat captain"... probably an interesting story there! Perhaps our paths will cross one day and I will get to hear it.

With best wishes for your continued success, I remain

Sincerely,

Carlotta Leon-Guerrero

Carlotta Leon-Guerrero

RECEIVED 8:30 MAR 07 1997 MORAN & BRONZE, P.C.

FOR FILE
FILED
DISTRICT COURT OF GUAM
MAR - 6 1997
MARY L. M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| CARLOTTA LEON GUERRERO, et al., Plaintiffs, vs. WILLIAM CLINTON, et al., Defendants. | Civil Case No. 95-00135 ORDER |

This case came before the Court on January 23, 1997, on the plaintiffs' Motion for Summary Judgment.

Factual Background:

The Compacts[1] of Free Association were adopted by the United States Congress by the Compact of Free Association Act of 1985, P.L. 99-239, 99 Stat. 1770 et seq., 48 U.S.C. §1901 et seq. Section 1904(e) of the Act is entitled, "Impact of Compact on U.S. Area." Subsection (e)(1) of the Act provides that "[i]n

[1] 48 U.S.C. §1901 et seq. adopts two Compacts of Free Association, the Compact of Free Association between the United States and the Government of the Federated States of Micronesia (48 U.S.C. §1901(a)), and the Compact of Free Association between the United States and the Government of the Marshall Islands (48 U.S.C. §1901(b)).

approving the Compact, it is not the intent of the Congress to cause any adverse consequences for the United States territories and commonwealths and the State of Hawaii." Section 1904(e)(2) requires the President of the United States to "report to the Congress with respect to the impact of the Compact on the United States territories and commonwealths and on the State of Hawaii." Subsection (e)(3) requires the President to request the views of "the Government of the state of Hawaii and the governments each of the United States territories and commonwealths,... and shall transmit the full text of any such views to the Congress as part of such reports." Under §1904(e)(1), the first report was due January 14, 1987, and on January 14 of every year thereafter.

The first report was prepared in 1989, and had not been prepared since then. This lawsuit was filed in November of 1995. On September, 1996, the Office of Insular Affairs of the Department of the Interior prepared the second-ever report. The fifteen-page report was entitled "The Impact of the Compacts of Free Association on the United States Territories and Commonwealths and on the State of Hawaii."

<u>The Motion:</u>

Plaintiffs Government of Guam, Government of the Northern Mariana Islands, and the State of Hawaii, jointly seek a decree of the Court directing the U.S. Department of the Interior to do the following:

1. On or before a date certain each year, the U.S. must report to the Congress with respect to the impact of the Compacts.[2]

2. The report shall identify any adverse consequences resulting from the Compacts and shall make corrective action to eliminate those consequences.[3]

3. The report shall pay particular attention to matters relating to trade, taxation, immigration, labor laws, minimum wages, social systems and infrastructure, and environmental regulation.[4]

4. The report shall include statistics concerning the number of persons availing themselves of the rights described in Section 141(a) of the Compact each year covered by the report.[5]

5. In preparing the reports, the U.S. shall request the views of the government of Hawaii and each of the territories and commonwealths, FSM, Marshall Islands, and Palau, and shall transmit the full text of any such views to the Congress as part of such reports.[6]

6. In addition to the matters stated in ¶s 1-4, in recognition of Congress' commitment to address any consequences adverse to the Territory of Guam, CNMI or the state of Hawaii, and Congress' authorization to appropriate funds to address those adverse consequences, the report shall address the financial impact on Guam, the CNMI and Hawaii of the compacts.[7]

7. The report shall set forth the sources of all data relied upon by the Respondents, identify the methodology and analysis

---

[2] First sentence of §1904(e)(2).

[3] Second sentence of §1904(e)(2).

[4] Third sentence of §19104(e)(2).

[5] Fourth sentence of §1904(e)(2).

[6] From text of §1904(e)(3).

[7] *See* §1904(e)(4):
"the Congress hereby declares that, if any adverse consequences to the United States territories and commonwealths or the State of Hawaii result from the implementation of the Compact of Free Association, the Congress will act sympathetically and expeditiously to redress those adverse consequences.

used in identifying the adverse consequences, and shall identify any assumptions made in reaching those conclusions.

All of the items in the Proposed Judgment come directly from the Compacts of Free Association Act of 1985, except the latter, addressed infra.

In determining whether summary judgment is appropriate, the only issue is whether the current report was a reasonable exercise of agency discretion. The review being conducted by the Court is conducted pursuant to §706 of the APA, which states,

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall --
>
> (1) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be --
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.
> (B) contrary to constitutional right, power, privilege or immunity
> (C) in excess of statutory jurisdiction, authority, or limitations or short of statutory right;
> (D) without observance of procedure required by the law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title....
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In its review, this Court may consider whether the agency action was based on a consideration of the relevant factors. Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Ins.

Co., 463 U.S. 29 (1983).

The plaintiffs jointly argue that the report is inadequate, and therefore is not in compliance with the mandate of Congress to assess the impact on the affected areas. Hawaii argues that the report fails to take Hawaii into account at all, thus abusing the mandate of Congress in preparing the report. The CNMI further argues that the report fails entirely in assessing the financial impact on the affected areas.

The U.S. cautions the court not to undertake review beyond the bounds of the case law. This Court agrees that it cannot substitute its judgment for that of the statisticians. Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir.) cert. denied 463 U.S. 953 (1976). However, this prohibition is not encroached by a finding that the September 1996 Report shows none of its sources for its sweeping comments and conclusions. This is not a substitution for judgment of statisticians -- it is an observation that the sources are not identified.

Second, the U.S. cautions that this Court cannot impose its own interpretation on a statute. The court can only determine whether the agency's interpretation of a statute is permissible, resting on a rational basis. The Court agrees with this premise. However, the 1996 Report appears to be based on no basis whatsoever except the author's subjective impressions. This cannot be said to be resting upon a rational basis.

A review of the Report indicates that it is a hastily-

compiled last-minute report which merely glosses over the areas directed to be analyzed by Congress. It makes sweeping statements without regard to data, for example: "Extrapolating [from the 1990 census] to 1996 would give about 1200 arrivals [to Hawaii] since the Compact. These numbers are probably too low and should be improved through a census of Micronesians."[8] The Court suggests that a report assessing the impact of Micronesian migration should have before it the numbers involved in that migration. "No provisions of the Compacts addressed labor laws in the freely associated state or in the U.S. insular areas. No impact of the compact on labor laws has been brought to our attention."[9] The Court questions how a report of this nature can be thorough if it does not address the kinds of jobs held by Micronesians, and any potential displacement of local or foreign workers, and does not address allegations of job discrimination against Micronesians in the affected areas. "No impact on environmental regulation resulting from the Compact has been brought to our attention by Guam or the CNMI."[10] The Court questions how a report can be thorough when it reports no environmental consequences to the impacted areas. There are families of Micronesians living on the beaches of Guam. There

---

[8] September 1996 Report p. 11.

[9] September 1996 Report page 14.

[10] September 1996 Report page 14.

are wastewater and other infrastructure issues created by the migration. Where are the sources from which OIA makes the statement that there is "no impact"?

Another example of the superficial nature of the report is found in the recommendations that OIA makes after the 15 page "cumulative" report. OIA recommends four things: (1) "initiation of a federal-insular analysis" of the impact of legislation. Does this mean preparation of a report? Isn't OIA already supposed to prepare a report? (2) limit migration to Guam; (3) limit migration to CNMI; and (4) continue support for Congressional funding. These conclusions are meaningless. OIA proposes that Guam limit migration, but Guam does not control immigration to its shores. The Immigration and Naturalization Service controls immigration on Guam. OIA argues that CNMI limit migration to its shores. The CNMI has the power to control immigration, but this suggestion belies another sensitive issue in CNMI-US relations, beyond the purview of this case. Finally, OIA recommends that it study the problem further and support funding, which is OIA's statutory duty under the law in any event.

Further evidence of the OIA's inappropriate nonchalance is found in a declaration of Allen Stayman, Deputy Assistant Secretary, Office of Territorial and International Affairs, Department of the Interior. In it, he lists the actions he has taken in keeping Congress notified of all territorial affairs.

Most communications with Congress have been oral, in the form of testimony to Congress. However, he also discusses his duties under §1904(e). Without committing to any course of action, he states that he needs to "decide how best to devote scarce resources to securing this information." He also states that he does not believe that "an annual survey or census would be an appropriate use of our limited resources," but in the next sentence, "we also plan to fund a survey of Micronesian populations in Hawaii." Though the U.S. argues that Congress has never appropriated funds for OIA to conduct an analysis of the financial impact, the Court questions what OIA's yearly budget is supposed to be spent on. Can it not accommodate the cost of OIA staff obtaining statistics from Immigration and Naturalization and from Guam Public Health and Social Services, etc? Special funding should not be required. Yet, in the next sentence, the U.S. argues that negotiations are underway to fund a study that will allow Guam to assess compact-impact.

Finally, the U.S. argues that §1904 does not impose an affirmative obligation to include a financial quantification of the impact. This defies common sense; if Congress is going to "act sympathetically and expeditiously to redress those adverse consequences" how is Congress to do so without numbers?

The Court concludes that the Report that is at issue in this lawsuit is inadequate as a matter of law. The agency action at issue in this case was not based on a consideration of the

relevant factors. Summary Judgment is GRANTED and judgment will be entered in the form proposed by the movants in this case.

SO ORDERED this 6th day of March, 1997.

JOHN S. UNPINGCO
District Judge

24th Guam Legislature
Sen. Carlotta A. Leon Guerrero

Union Bank Building, Suite 312
194 Hernan Cortez Avenue
Agana, Guam 96910

Tel.: (671) [illegible]
Fax: (671) [illegible]
[illegible]

Chairperson,
Committee on
Transportation,
Telecommunications and
Micronesian Affairs

PLEASE INCLUDE THE FOLLOWING ATTACHMENTS TO SEN. CARLOTTA LEON GUERRERO'S TESTIMONY ON BILL S.210:

1. Copy of Opposition to Motion to Dismiss, filed Nov. 15, 1996.

2. Copy of Senator's letter to the Hon. Don Young, dated Oct. 7, 1996.

3. Copy of Judge John Unpingco's Order, filed Mar. 6, 1997.

Jerry E. Hogan
LAW OFFICES OF HOGAN & BRONZE
A Professional Corporation
Suite 105F
Ada's Commercial and Professional Center
215 Chalan Santo Papa
Agana, Guam 96910
Telephone No.: (671) 472-8067
Telecopier No.: (671) 472-2957
Attorneys for Petitioner CARLOTTA LEON GUERRERO
and the GOVERNMENT OF GUAM

FILED
DISTRICT COURT OF GUAM
NOV 15 1996
MARY L. M. MORAN
CLERK OF COURT

Robert Dunlap
OFFICE OF THE ATTORNEY GENERAL
2nd Floor, Administration Building
Capitol Hill, Saipan, MP 96950
Telephone No. (670) 654-2341
Facsimile No. (670) 664-2349
Attorneys for the COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

Margery S. Bronster
Attorney General of Hawaii
DEPARTMENT OF THE ATTORNEY GENERAL
State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Telephone: (808) 586-1279
Attorneys for the STATE OF HAWAII

**IN THE DISTRICT COURT FOR THE**

**TERRITORY OF GUAM**

| | |
|---|---|
| CARLOTTA LEON GUERRERO, individually and as a Member of the Twenty-Third Guam Legislature; and, the GOVERNMENT OF THE TERRITORY OF GUAM, the GOVERNMENT OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, and the STATE OF HAWAII, | CIVIL CASE NO. CIV 95-00135 |
| Petitioners, | **PLAINTIFFS CARLOTTA LEON GUERRERO AND THE GOVERNMENT OF GUAM'S OPPOSITION TO MOTION TO DISMISS FOR FAILURE TO ESTABLISH A CASE OR CONTROVERSY** |
| vs. | |
| WILLIAM CLINTON, President | |

RECEIVED
NOV 15 1996
U.S. ATTORNEY
DISTRICT OF GUAM
BY:

96000369

| | | |
|---|---|---|
| of the United States; BRUCE BABBIT, Secretary of the Department of the Interior; and ALLEN P. STAYMAN, Director, Office of Insular Affairs, | ) | (caption continued) |
| Respondents. | ) | |

Come Now Carlotta Leon Guerrero and the Government of Guam in opposition to Respondents' (hereinafter collectively referred to as the "Federal Government") motion to dismiss for want of a case or controversy.

**ARGUMENT**

**I. THE CASE OR CONTROVERSY CLAUSE OF ARTICLE III OF THE UNITED STATES CONSTITUTION DOES NOT APPLY TO THE DISTRICT COURT OF GUAM, THEREBY PERMITTING THIS COURT GREATER DISCRETION ON ISSUES RELATED TO CASE OR CONTROVERSY.**

The Federal Government's central argument is that Carlotta Leon Guerrero and the Government of Guam have not and cannot plead a case or controversy.

The Federal Government correctly asserts that Article III of the United States Constitution limits the federal judiciary to adjudicating actual "cases or controversies." The legal principles of standing, actual injury, mootness, political question and justiciability are all derived from the case or controversy clause.

The Framers of the Constitution intended the case or controversy requirement to be a rein on the judiciary's power. It was as part of the Framer's conscious attempt to distribute power among the three branches of government. The case or

controversy limitation on judicial power sought to prevent the judiciary from becoming a super-legislature through the issuance of advisory opinions.

The case or controversy mandate of Article III, however, does not apply to the District Court of Guam because the District Court of Guam is an Article I court.

The District Court of Guam is a creature of the United Sates Congress, created pursuant to Article IV, Section 3 of the Constitution, which grants Congress plenary control over territories. See also, 48 U.S.C. Section 1424.

The principle that territorial courts are not subject to the provisions of Article III was enunciated by Chief Justice, Mr. John Marshall, in American Insurance Co. v. Canter, 7 L.Ed 242. See, Sablan v. Santos, 634 F.2d 1155 (9th Cir. 1980).

**A. Congress provides checks and balance to the District Court of Guam.**

While Article III does not apply to the District Court of Guam, this Court is subject to checks and balances. The Judge of the District Court of Guam is appointed for a term of ten years, not for life. See, 48 U.S.C. Section 1424b. Congress, therefore, may curtail the power of the District Court of Guam by refusing to re-confirm the Judge or by limiting the Court's jurisdiction by statute.

While the District Court of Guam is subject to Congressional checks and balances, it is not subject to checks and balances imposed by the case or controversy clause of Article

III. Therefore, the Federal Government's central argument is not based upon a constitutional mandate.

It is Carlotta Leon Guerrero's and the Government of Guam's position that absent a constitutional mandate this Court has greater discretion to find standing in Plaintiffs.

**B. Self-restraint: Prudent application of the case or controversy requirement.**

Notwithstanding the Constitutional requirement of the case or controversy clause, courts, as a matter of common law, generally apply case or controversy rules to determine if it is "wise to entertain" a case. Warth v. Seldin, 95 S.Ct. 2197 at 2205, 422 U.S. 490, 45 L.Ed 2d 343 (1975).

Whether it is prudent to apply common law case or controversy rules is a matter left to the sound discretion of this Court.

**II. THE PEOPLE OF THE TERRITORY OF GUAM, THROUGH THEIR REPRESENTATIVES CARLOTTA LEON GUERRERO AND THE GOVERNMENT OF GUAM, HAVE A FIFTH AMENDMENT RIGHT TO ASSERT CLAIMS AGAINST THE FEDERAL GOVERNMENT THEREBY PERMITTING A RELAXATION OF STANDING REQUIREMENTS.**

In matters affecting Constitutional issues, such as freedom of speech, the Supreme Court has approved judicial "relaxation of standing requirements." This relaxation is evident in "third party beneficiary" contexts: that is, granting standing to representatives of certain classes of people. Red Bluff Drive In v. Vance; 648 F.2d 1020 (1981); Pierce v. Society of Sisters, 45 S.Ct. 571, 208 U.S. 510, 69 L.Ed. 1070 (1925) (nuns had standing to assert constitutional rights of children to

private education); Barrons v. Jackson, 73 S.Ct. 1031, 346 U.S. 249, 97 L.Ed. 1586 (1953) (Black plaintiff has standing to invoke his race's constitutional equal protection right to non-segregated housing; In Re Quinlan, 355 A.2d 647 (1976), Cert. Denied, 97 S.Ct 319 (Father may assert daughter's right to die.)

While there does not seem to be a consistent legal principle that binds all "third party beneficiary" cases, one principle is clear: when fundamental constitution rights are raised, standing defenses are relaxed.

A. Fifth Amendment Right

The people of Guam have no voting member of Congress. The people of Guam cannot vote for President. The people of Guam have no control over or input into treaties into which the United States enters and which affect their lives. The laws passed by the Guam Legislature are subject to nullification by the United States Congress. 48 U.S.C. § 1423(i).

In United States v. Richardson, 94 S.Ct. 2940, 418 U.S. 166, 41 L.Ed. 2d 678 (1974), a United States taxpayer sued the United States regarding the legality of Congressional approval of secret appropriations to the Central Intelligence Agency. In declaring that the taxpayer did not have standing, the Court stated:

> The Constitution created a representative government with the representatives directly responsible to their constituents...that the constitution does not afford a judicial remedy does not, of course, completely disable a citizen who is not satisfied...lack of standing within the narrow confines of Article III jurisdiction does not impair the

> right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electorial process may be at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors...

Richardson, supra, at 2947-48.

When the Supreme Court decides that an issue is political, it, as in Richardson, always reminds citizens of their power to change government policy through the vote and use of the political forum to convince fellow voters to vote for change. That position of the Supreme Court is not a cop-out or facetious. The power of the Supreme Court is delicate. It is more a matter of respect and tradition, than brute power, that the political branches honor the decisions of the Supreme Court.

When, however, the Federal Government suggests at page 22 of its brief, that this Court should "not intrude" in a "controversy that is purely political" and that the issue is best "entrusted" to the political branches, the Federal Government demonstrates its isolation inside the beltway because there is no political relief for the people of Guam.

How would the Supreme Court deal with the disenfranchised citizens of Guam in this case? Certainly the Supreme Court would not invoke the Richardson rational: "take two aspirin and call your congressman in the morning." Possibly the Court would say that the United States citizens of Guam are simply historical accidents along the trail of United States

colonial conquest --- an anomaly that does not fit traditional constitutional analysis.

However, the Supreme Court may hold that when Congress imposed the Fifth Amendment (48 U.S.C. § 1421) against itself in the Organic Act, and in favor of the citizens of Guam, that such act of self-restraint compels a court to lean toward use of its judicial authority to protect the liberty interests of the disenfranchised United States citizens of Guam.

When the Framers wrote the Constitution, there was disagreement over whether to include a Bill of Rights. Many argued that the rights of citizens need not be enumerated because the constitution limited the Federal Government to express powers, none of which was intended to allow the Federal Government to limit natural rights. It was only when many dubious Colonies demanded the Bill of Rights in return for ratification of the Constitution that it was agreed that a bill of rights would be an order of business for the First Congress.

Modern folks have difficulty understanding that the Federal Government is not the creator of rights. It's like looking at an historical photographic negative; i.e., white is black and black is white because Americans tend to confuse protection of rights with creation of rights. Unquestionably, however, the Framers believed in the natural rights of man as expressed in the Magna Charta and Declaration of Independence. See, Slaughter-House Cases, 16 Wall 36, 21 L.Ed 394 (1883). In essence, it was inconceivable to the Framers that the Federal

Government could define or limit the rights of man because the rights of man arose from the "Creator's" gift of a free will which was collectively expressed in the social compact called America.

A legal definition of liberty is impossible to formulate without generalizing to the point of vagueness. The reason for this is that liberty is a collection of ideas that contain religious, philosophical, cultural and moral beliefs that are so ingrained in a people that they are not conscious of their existence until they are deprived of them. Liberty in its highest form means that one may vocally criticized the umpire of a Little League baseball game.

The Due Process Clause of the Fifth Amendment, which guarantees that the Federal Government shall not improperly deny the right to life, liberty and property, is as close to a statement of natural rights as exists. Because liberty is so difficult to define, the Supreme Court defines due process only in reaction to a violation of natural rights. Due process is violated, "when by practice or rule, the Federal Government offends principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Due Process is that which, "comports with the deepest notions of what is fair and right and just." And Due Process concerns "the very essence of a scheme of ordered liberty." Snyder v. Massachusetts, 291 U.S. 97, 105, 78 L.Ed. 674, 54 S.Ct. 330 (1934); Salesbee v. Balkcom, 339 U.S. 9, 94 L.Ed. 605, 609, 70

S.Ct. 457 (1950); Herbert v. Louisiana, 272 U.S. 312, 316, 71 L.Ed. 270, 47 .Ct. 103 (1926); and Herrera v. Collins, 122 L.Ed. 2d 203, 113 S.Ct. 853 (1993).

In addition to the Fifth Amendment, the United States entered into a treaty with the United Nations in which it promised, "to ensure...(to the people of its territories) their...economic advancement and their just treatment." Article 73(a), Charter of the United Nations

Carlotta Leon Guerrero and the Government of Guam suggest that the totality of circumstances surrounding the disenfranchised United States citizens of Guam "shocks the conscience," and grouts-in the face of what is "fair and right and just." Further, when the Federal Government by rule and procedure moves to quash the people's right to a just determination of a political issue on the merits, as here, it violates the people of Guam's liberty right to due process.

As in Richardson, infra, access to "the political forum and to the polls" is a fundamental liberty right which cannot be unjustly denied by rule or procedure, including rules on standing.

The very heart of a civil court is to provide a peaceful, rational and civilized format to resolve disputes between citizens. The alternative to civil proceedings is that the economically, militarily and politically powerful always prevail, absent armed rebellion.

As Professor Stephan Macedo said,

> The Constitution provides grounds for challenging government and recognizes that citizens have rights that no government may infringe upon. Judicial review by the courts provides a forum for reasoned argument between citizens and public official about the best interpretation of constitutional rights and powers. Judicial review by the courts expresses our commitment to treat the weakest and powerless in a justifiable manner. As such, it embodies the nation's determination to be governed by more than just force. The power of courts in this system stands for the special form of respect we pay to those...who feel victimized by public officials carrying out the law.

Macedo, The New Right v. The Constitution, Cato Institute, (1988).

B. Proposed Holding

Based on the above discussion, Carlotta Leon Guerrero and the Government of Guam request this Court to hold as follows: In civil actions raising political issues against United States entities, and in which plaintiffs are United States citizens who are not permitted to vote in Federal elections, and do not therefore have recourse to the tradition electorial process to redress their claims, the due process clause of the Fifth Amendment requires relaxation of the case or controversy standard.

III. THE GOVERNMENT OF GUAM BY AND THROUGH ITS GOVERNOR IS AN AGENT OF CONGRESS, THUS, THE GOVERNMENT OF GUAM MAY COMPEL THE ISSUANCE OF THE REPORTS AT ISSUE.

As to the applicability of the APA, the gist of the Federal Government's argument is that the Government of Guam

cannot maintain an action because the Federal Government's reporting duty under P.L. 99-239 is owed to Congress and, therefore, it is solely within congressional discretion to order the report. The Federal Government concludes that since the reporting duty is discretionary, the APA is not applicable.

As to Mandamus, the Federal Government argues that the Writ Statute itself does not create jurisdiction, and, therefore, absent another statute waiving sovereign immunity, such as the APA, the Government of Guam's action is barred.

These arguments fail because the Government of Guam is an agent of Congress whose Governor is expressly empowered to enforce Federal laws applicable in Guam.

Congress created the Government of Guam by statute. Therefore, the Government of Guam is not a sovereign government. Guam is an "instrumentality" of Congress, Sakamoto v. Duty Free, 764 F.2d 1285 (1984)

In creating the Government of Guam, Congress granted certain of its "plenary" power over the people of Guam to the Government of Guam.

Of course, Congress retained the right to abolish the Government of Guam by repealing the Organic Act. It also retained the right to nullify any law passed by the Guam Legislature.

When one delegates to another some or all of her rights and power, but retains the right to terminate said delegation of

authority, the law deems that an agency relationship has been created.

48 U.S.C. § 1422, Powers and Duties of the Governor of Guam, states in relevant part:

> "He," (a now politically incorrect pronoun referring to the Governor of Guam,)" shall be responsible for the faithful execution of the laws of Guam and the laws of the United States applicable in Guam. (Emphasis Added)

This language is totally different from the Governor's oath of office wherein he swears to faithfully support the Constitution and Federal Laws applicable to Guam.

This writer doubts that any governor of any state in the Union is charged with the responsibility of carrying-out the laws of the United States applicable to that state. Probably this unprecedented role of the Governor of Guam reflects the fact that upon adoption of the Organic Act, and for twenty years thereafter, the Governor of Guam was appointed by the President with concurrence of Congress.

In any event, Congress expressly delegated to the Governor of Guam the obligation to execute the laws of the United States applicable to Guam.

Public Law 99-239 is clearly a United States law that is applicable to Guam. Therefore it is the duty of the Governor of Guam to avail himself or herself (it is awkward being politically correct) to the judicial power of the Federal Court to insure compliance with United States law.

Carlotta Leon Guerrero and the Government of Guam assert that the Federal Government's statutory obligation to Congress under P.L. 99-239 is enforceable by the Government of Guam pursuant to Congress's delegation of its authority to the Governor of Guam to enforce the law at issue.

## IV. CONCLUSION

Carlotta Leon Guerrero and the Government of Guam realize that to ask this Court to find the Constitutional dimension requested above is a big judicial step. Heretofore, the Supreme Court has recognized the people of the territories as human beings (Insular Cases), but has not addressed a remedy for their lack of political redress against the Federal Government.

The Office of Insular and Territorial Affairs is suppose to help the people of Guam, but due to political meandering beyond this writer's grasp, has failed miserably in this instance. Here the people of Guam are forced to go to Court to make OTIA do what it is suppose to do and what it is required by law to do. What is OTIA's response? It cowers behind the flimsy partitions of standing. It throws together an eleventh hour report, and nanny-nanny poo-poos the people of Guam, telling them that it has complied, and the issue is, therefore, moot.

The honorable approach would be for OTIA to walk into this Court with a straight back, admit its failure, and announce its intention to make comprehensive impact reports, and to zealously carry them to Congress in a timely manner.

V. CARLOTTA LEON GUERRERO AND THE GOVERNMENT OF GUAM ADOPT THE ANALYSIS OF THE BRIEFS FILED BY THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS AND THE STATE OF HAWAII.

Carlotta Leon Guerrero and the Government of Guam hereby adopt and incorporate into their opposition brief by this reference, the legal analysis, case authority and argument of the Commonwealth of the Northern Mariana Islands and the State of Hawaii in their opposition to the Federal Government's Motion to Dismiss.

Dated this 15 day of November, 1996.

HOGAN & BRONZE
A Professional Corporation

By: [signature]
JERRY E. HOGAN
Attorney for Petitioner
Carlotta Leon Guerrero and the
Government of Guam

October 26, 1997

Dear Committee on Natural Resources,

My name is Neil Weare and I am a high school student from the island of Guam. I have lived the first nine years of my life in Burns, Oregon, but for the past eight years I have lived here on Guam. I would like to call to your attention an issue that is of great concern to me, but has not received much attention from Congress. The issue I speak of is Guam's quest for self-determination.

Before I begin to discuss this quest, I ask you to look back into the beginnings of the United States. The Thirteen Colonies were upset that they were under the control of a government that was centered thousands of miles away. To add insult to injury, the colonists of the New World had no direct representation in the government that controlled them. They were angry that this government was making decisions for them that were not always suited to the special needs associated with their unique location and economy. The Thirteen Colonies realized that they had the right to self-determination and issued forth the Declaration of Independence that states, in part, "Governments are instituted among Men, deriving their just powers from the consent of the governed."

Now, let me bring you back to the present. Guam is currently an unincorporated territory that is governed according to the principles established in the Organic Act of 1950. The Organic Act instituted a limited form of self-government similar to the governments established by England in the original Thirteen Colonies. Although we are generally allowed to run are own affairs, a Congress that is located over 10,000 miles away still has ultimate say. Our sole Representative to this Congress is a nonvoting member, so this is not true representation. I have committed no crime, however, when I turn eighteen, I will not be able to vote for President even though I am a United States citizen. Without even consulting Guam, Congress has passed laws such as the Jones Act that are not suited to the unique economic climate of an island that is so far removed from the United States. It was a problem very similar to this that led to the Boston Tea Party of 1773. The situation on Guam today seems strikingly familiar to one that led a disgruntled group of colonists to revolt against the most powerful government of the day.

Guam has been a colony of the United States for almost a century; Virginia, was a colony of England for 169 years. The United States Congress of 1898 temporarily declared Guam, along with the Philippines, Puerto Rico, and Saipan, an unincorporated territory with plans to determine the ultimate status at a later date. Since this time the Philippines has become an independent nation while Puerto Rico and Saipan have become Commonwealths of the United States. Guam's status, however, is still unresolved.

Recently, the United Nations recognized the right of self-determination for all people by declaring that all nations must release their colonies by the year 2000. "The

United Nations reaffirms the inalienable right of all peoples under colonial domination to self-determination... and declares that the continuation of colonialism is incompatible with the Charter of the United Nations, the Declaration and the principles of international law." Will the United States hold itself above the mandate of the United Nations and continue to hold Guam as a colony? It would indicate a tragic state of affairs in the federal government if this is allowed to happen.

When our founding father's created our great nation in 1776. I am sure they vowed that the political injustices placed upon the colonies by England would never happen in the "land of the free." I hope that I have shown you that this is exactly what the United States of America has allowed to happen here on Guam. The people who fought and died in the Revolutionary War would be horrified to see that the very ideals they died for were being corrupted by an insensitive Congress.

Thank you for your time and I would like to ask you to support Bill H.R. 100 regarding Guam's quest for self-determination.

Sincerely,

Neil Weare
P.O. Box 9605
Santa Rita, GU
96915

Phone: (671)565-9616
e-mail: weare@iftech.net

**GUAM CHAMBER OF COMMERCE**
PARTNERS IN PROGRESS

# Statement of the Guam Chamber of Commerce

HEARING
BEFORE THE
COMMITTEE ON RESOURCES
OF THE
U.S. HOUSE OF REPRESENTATIVES

H.R. 100, TO ESTABLISH THE COMMONWEALTH OF GUAM

OCTOBER 29, 1997
WASHINGTON, D.C.

173 Aspinall Avenue, Ada Plaza Center, Suite 101, Agana, Guam 96910 • P.O. Box 283, Agana, GU 96932
Tel: (671)472-6311/8001 • Fax: (671)472-6202
E-mail: gchamber@guamchamber.com.gu • http://www.guamchamber.com.gu

## I. INTRODUCTION

Mr. Chairman and Members of the Committee on Resources. I am Eloise R. Baza, President of the Guam Chamber of Commerce. On behalf of the Chamber's membership and Board of Directors, welcome this opportunity to be a part of the tradition of providing the views of the Chamber and the people of Guam relative to the pursuit of improved political relationships with the United States of America.

In 1937 and 1950, the Chamber joined our government leaders to convey to the U.S. Congress the economic advantages that closer political ties with the United States would bring to our community. The result of those efforts was the Organic Act of Guam, a relationship suitable for those times.

But times have changed. The Organic Act no longer addresses the needs of our developing island economy and our desired relationship with the United States.

The Guam Chamber of Commerce seeks your support of the people of Guam's mandate for Commonwealth status with the United States as expressed in our Guam Commonwealth Act.

We strongly endorse the Guam Commonwealth Act document because it strives to dissolve the various unnecessary barriers to needed growth in capital formation, job creation, and our ability to compete and take full advantage of the stream of trade in the Asia-Pacific Region.

## II. THE GUAM CHAMBER OF COMMERCE

Established 73 years ago in 1924, the Chamber organization continues to be a major player in the economic progress of Guam. A founder and first Associate Member of the Chamber was J. H. Underwood, the grandfather of our Washington Delegate, Congressman Robert A. Underwood.

Over 300 companies are members of the Guam Chamber of Commerce today. We represent 71% of Guam's $2.9 billion Gross Island Product. Fifty percent (50%) of our members are small businesses, 28% are Chamorro-owned companies, 15% are companies headquartered in the U.S. mainland, and 10% are owned or operated by women.

## III. THE GUAM ECONOMY -- 1920's to 1997

We provide you with an overview of the Guam economy beginning with the 1920's that summarizes the changes in our island economy. To demonstrate the significance of the economic provisions of our Guam Commonwealth Act, we also highlight how the actions and laws of the United States have needlessly disrupted our economic progress. For brevity, only a few of the growth inhibiting federal laws and regulations are mentioned.

Statement of the Guam Chamber of Commerce
U.S. House of Representatives
Committee on Resources Hearing
H.R. 100, To Establish the Commonwealth Act of Guam
October 29, 1997

PAGE 2

***In the 1920's***

The business issues at the forefront included a fire insurance education program, trade, uniform commercial usages, internal as well as external transportation infrastructure, and agriculture. In 1929, Guam's native population totaled 16,989 people. Federal appropriations for the U.S. Navy's activities in Guam was the major source of income, portions of which were spent for rent, labor and purchases of Guam products. The dollar value of imports totaled $727,758 while exports exceeded $247,000.

***the 1930's***

The prewar period focused on developing a healthy business sector for Guam under the U.S. military government. Guam exported goods such as copra and coffee to Asian markets, specifically the Philippines, Hong Kong and Shanghai.

***the 1940's***

World War II brought business activities to an explosive halt. International trade was limited to Guam's position as a military outpost. Post World War II efforts focused heavily on attaining American citizenship for Guamanians. There was not much of a civilian economy during the early postwar years. A pineapple processing and canning plant was established as a result of intensive efforts to rebuild agricultural production.

***the 1950's***

The Guam business community took an active part in seeking the elimination the U.S. Navy's security clearance requirement for entry into Guam, lobbied against U.S. military competition with local businesses, sought improvement in surface and air transportation, and encouraged the development of a tourism industry.

***the 1960's***

A devastating typhoon in 1962 initiated an economic boom that continues today. Construction activity flourished stemming from post-typhoon recovery. In 1962, the U.S. Navy security clearance was lifted, heralding the beginning of the tourism boom that can be seen today. Visitor arrivals increased from 6,600 in 1967 to 58,265 in 1969. In the late 1960's, the United States government approved single tax returns for businesses operating in Guam.

***the 1970's***

Emerging from the decade of the 1960's as the "Pacific's Growth Leader," Guam's construction activities and foreign investment continued to rise. Capital was flowing into Guam from Japan and Hong Kong and construction projects in both the civilian and military sectors were heavily represented by American companies. The visitor industry became the private sector's growth leader.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 305 of 542

Statement of the Guam Chamber of Commerce
U.S. House of Representatives
Committee on Resources Hearing
H.R. 100, To Establish the Commonwealth Act of Guam
October 29, 1997

PAGE 3

The worldwide oil crisis of 1973 to 1974 then caused foreign investment in Guam to come to a standstill. U.S. military expenditures decreased, resulting from the cessation of the Vietnam conflict, causing a decline in the construction industry and a general decrease in business activity on island.

*1974-1979 -- Frequent Changes in U.S. Customs Rulings under U.S. Headnote 3(a) Manufacturing Incentive Program*

Export-oriented light manufacturing companies participating in the Headnote 3(a) U.S. Tariff Code Program totaled eleven (11) in 1974, exporting $8.4 million worth of garment, watches and bracelets assembled in Guam, into the United States. By 1979, one (1) garment and one (1) watch manufacturer remained in business. Contributing substantially to this decline were frequent changes in U.S. Customs rulings regarding eligibility of products under Headnote 3(a). The program was enacted by the United States in the 1950's to stimulate manufacturing activity in Guam.

The adverse impact of these declines were mitigated by an unexpected boom in Guam's visitor industry in the late 1970's. In 1979, visitor arrivals totaled 264,300.

An important development during the 1970's was the disappearance of the 30% withholding tax that was assessed on "alien" corporations doing business in Guam but headquartered in the United States.

*the 1980's*

The Government of Guam eliminated the 4% Guam Gross Receipts Tax on wholesale and export sales, resulting in a 116% increase in wholesale employment between 1984 and 1989. Increases in overall private sector employment triggered by tremendous growth in Guam's visitor industry resulted in a 2.1% unemployment rate in 1989. Visitor arrivals in 1980 exceeded 300,000. By 1989, Guam's visitor count totaled 668,748.

*1984-85 -- 300 Foreign Sales Corporations Establish in Guam*

In the mid-1980's, the United States Government replaced Domestic International Sales Corporations (DISCs) with Foreign Sales Corporations (FSCs) to provide partial U.S. tax exemption to American export manufacturing companies. Of the over 3,000 FSCs that established worldwide, more than 300 incorporated in Guam. FSCs are foreign-incorporated subsidiaries of American parent corporations engaged in export transactions. The location of FSCs in Guam is a major step forward in Guam's pursuits to assume a role as a conduit for U.S. exports with markets in Asia.

Statement of the Guam Chamber of Commerce
U.S. House of Representatives
Committee on Resources Hearing
H.R. 100, To Establish the Commonwealth Act of Guam
October 29, 1997

PAGE 4

*1985 -- Guam Excluded from U.S. Department of Defense "Local" Purchase Requirements*

On December 19, 1985, the federal government enacted the FY 1986 Department of Defense Appropriations Act (Public Law 99-190) containing provisions requiring U.S. military installations to buy certain American-manufactured products from suppliers doing business within the State in which they will be resold.

Guam's distributors were told that this requirement did not apply to Guam's military installations because the federal law did not include Guam in the definition of a "State." These same distributors, however, are required to comply with U.S. OSHA laws because OSHA statutes conversely include Guam in the definition of a "State.

Prior to enactment of P.L. 99-190, U.S. military package stores were not allowed to sell certain product items at more than a 10% discount relative to the price of the products in the local community surrounding the military installation. Implemented to minimize U.S. military competition with local civilian distributors, this directive also did not apply to U.S. military package stores in Guam.

The FY 1989 total gross sales for the military commissaries in Guam amounted to $36.4 million while gross sales for the retail exchanges in Guam's military installations totaled $88.9 million.

*1985 -- U.S. Government Imposes Quotas on Products of Guam*

In 1985, the federal government opted to classify Guam a foreign jurisdiction that made country of origin rules apply here to the detriment of about 2 remaining companies participating in the U.S. Headnote 3(a) trade program.

The Textile and Apparel Trade Enforcement Act of 1985 barred Americans in Guam from trading freely with other Americans in our United States. Quotas were later imposed on Guam products manufactured under Headnote 3(a).

*1987 -- Guam Commonwealth Act Adopted by Voters of Guam*

In 1987, the people of Guam voted in favor of the Guam Commonwealth Act document.

*1990's*

The visitor industry continued to be the driving private sector force in Guam's economy. The average annual business growth rate totaled 8% in the early 1990's.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 307 of 542

Statement of the Guam Chamber of Commerce
U.S. House of Representatives
Committee on Resources Hearing
H.R. 100, To Establish the Commonwealth Act of Guam
October 29, 1997

**PAGE 5**

***1991-1993 -- USINS Inconsistent Interpretation of 1990 U.S. Immigration Reform Act***

In 1991, Guam's unemployment rate dropped to 1.9%. To address the acute labor shortage in our visitor industry, private sector employers requested that the 1990 U.S. Immigration Reform Act rules and regulations provide Guam the flexibility to hire non-U.S. citizens on a temporary basis to fill non-construction trades, only if no U.S. citizens in Guam and the various states in the U.S. mainland are willing, able, and available to fill job openings in Guam.

USINS officials in Washington, D.C. responded that Guam's request for flexibility required Congressional legislation. Soon afterwards, Guam faced inconsistent interpretations of the 1990 Immigration Reform Act's implementation rules and regulations.

An Officer in Charge of the Guam INS office would interpret that the H-2 (b) visa classification included hotel service workers. The Officer in Charge's successor would later interpret that the H-2 (b) visas did not extend to hotel workers.

***1984 -- USINS Recommends New H-2 Category for Guam***

In response to requests for the resolution of inconsistent interpretations, the Associate Commissioner for Examinations of the USINS in Washington, D.C., in 1994, expressed support for the creation of a separate H-2 category for Guam.

The creation of a new U.S. Immigration H-2 (c) visa classification for non-construction trades continues to be put forth for policy consideration as interim immigration provisions in relation to the Guam Commonwealth Act. The proposed H-2(c) classification would provide Guam the flexibility to use non-U.S. citizen workers on a temporary basis as a last resort source of employees during acute workforce shortage periods.

In 1994, Guam's annual visitor arrival count exceeded one million and has stayed at this level. Between 1991 and 1996, our hotel room inventory increased by 1,833 rooms from 5,219 to 7,052 rooms.

***1995 -- USINS Policy Causes Substantial Decline in Guam's Fisheries Transshipment Industry***

The Fisheries Transshipment Industry on Guam in 1994 infused over $140 million annually into the Guam economy in both direct and indirect spending for goods and services such as air transportation, communications, hardware goods, fresh produce, groceries and other provisions.

Statement of the Guam Chamber of Commerce
U.S. House of Representatives
Committee on Resources Hearing
H.R. 100, To Establish the Commonwealth Act of Guam
October 29, 1997

PAGE 6

A year later, a policy announcement was issued by the Officer in Charge of the Guam INS office stating that crewmen desiring to take shore leave on Guam would be required to obtain a visa. As visas were not requested previously, the policy caused a substantial decline in vessel calls at the Guam port. Longline and purse seiners scheduled to call on the Port of Guam chose to call on competing ports in our area.

Guam has not recovered from the loss of transshipment activity that took thirty (30) years to build. Industry officials today are reporting further decline in the number of longline and purse seine vessel calls related to the transitory nature of the fisheries industry.

***1990- June 1997 -- 1,740 Federal Civilian Jobs Loss from Military Downsizing***

U.S. military downsizing in Guam is a major contributor to Guam's 9% unemployment rate. In 1990, the federal employee count in Guam totaled 6,870. Today, federal employment is at a record low of 5,130 in June 1997, caused by the continuing implementation of the 1995 BRAC base realignment and closure recommendations.

Further reductions in civil service jobs can be anticipated in 1999 if the U.S. Navy decides to outsource functions to private enterprise. The Guam Chamber of Commerce is working with Guam leaders to encourage prime contractors to work with Guam businesses on a subcontracting basis.

Tourism has surpassed the U.S. military as the largest income source in Guam in addition to being the largest source of employment for island residents.

## IV. THE COMMONWEALTH ACT OF GUAM WILL UNLEASH GUAM FROM GROWTH INHIBITING FEDERAL LAWS

Guam and her economy have matured and grown immensely since the Organic Act of Guam was enacted in 1950, nearly forty years ago.

*A. Federal Barriers to Guam's Visitor Industry Growth*

Our predominantly service-oriented economy will be driven by the visitor industry for decades to come. The first two rounds of U.S. military downsizing efforts have caused an economic setback in terms of loss of Section 30 revenue to the Government of Guam and loss of employment.

U.S. Navy outsourcing initiatives potentially scheduled for implementation in 1999, will mean more reductions in Section 30

revenue and the loss of another 500 permanent civilian jobs. Guam's 9% unemployment rate today is higher than the U.S. national unemployment rate.

The Executive Branch of the Government of Guam is striving to jump start the Guam economy through accelerated growth of our tourism industry. Our hotel room inventory will be expanded sooner than initially planned.

We need the support of the Committee on Resources and the members of Congress to adopt the Guam Commonwealth Act for it will dissolve Federal barriers to our visitor industry growth plans. We also ask for your response to our requests for immediate corrective actions essential to the further expansion of our visitor industry as follows:

***1. ARTICLE 6. TAXATION***

The Organic Act of Guam or any Federal law make no provision for Guam's inclusion in the scope of tax treaties negotiated by the United States with foreign nations.

We are America in Asia yet our geographic neighbors are not able to receive the beneficial tax treatment in Guam provided by U.S. tax agreements but are able to receive these tax advantages if their investments are made in Hawaii or California.

As the 30% withholding on dividends, interest, rents and royalties must be assessed in Guam, the investment capital has focused on superior projects. The application of U.S. tax treaty rates in Guam, on the other hand, will entice investment capital for a larger number of new developments and expansion projects.

Article 6 will enable Guam to develop a comprehensive income tax code that can incorporate U.S. tax treaty rates. It also does not contain the restrictions of the 1996 U.S. Tax Simplification Act that provided Guam the authority to develop its own tax code.

We propose a two-step interim process for consideration:

1). Guam be provided the option to elect to adopt the statutory withholding rates provided in U.S. tax treaties, either through an amendment to the Organic Act of Guam or through an administrative agreement with the U.S. Treasury Department; or
2). Guam be included within the scope of all tax treaties of the United States.

***2. ARTICLE 7. IMMIGRATION***

The provisions of Article 7 will be beneficial to Guam's economic future. As stated previously, Guam's visitor industry needs flexibility to address its workforce needs. Plans for immediate growth in our hotel room inventory will occur at a pace much quicker than the local community can train to fill all positions. Standard industry ratios indicate that 1.08 direct and 1.5 indirect jobs will be created with the opening of one hotel room.

There are currently 1,382 hotel rooms under construction that will create approximately 3,565 direct and indirect jobs for our community. Labor demand will be considerably higher than this total as it does not include new employment opportunities created by projects currently in the architectural & engineering stage, investors who have yet to move beyond the speculation stage, as well as those who respond to investment marketing efforts in the coming months and years.

June 1997 employment in Guam totaled 66,190 jobs. Of this total, 18,260 are employed by the U.S. federal government and the Government of Guam. Of the 47,930 jobs in the private sector, 41% were created by Guam's visitor industry both directly and indirectly.

The expeditious creation of a new H-2(c) visa classification will provide our visitor industry with immediate flexibility. We ask that joint discussions begin shortly after today's hearing to assure there are no abuses to its use.

One area for stimulating activity in our visitor industry is the attraction of more conventions, conferences and regional meetings which will be assisted by the early removal of all U.S. visa requirements authorized by U.S. Public Law 98-454. Article 7 will provide us with a scope of authority relative to the issuance of Guam-only visas.

3. *ARTICLE 9. TRANSPORTATION AND TELECOMMUNICATIONS*

Article 9, Section 902 seeks to remove federal barriers which hold Guam back from maximizing its potential as a transportation hub in this part of the world. Guam should have the authority to sponsor qualified air service carriers to Guam. Such authority and latitude is important to the growth in the number of visitors who come to Guam by air each year. Section 902 is generally consistent with the Chamber's "Open Skies" position.

*B. Federal Barriers to Manufacturing Activity in Guam*

Throughout the 40-year period since the enactment of the U.S. Headnote 3(a) trade program, Guam has witnessed investors who

have engaged in manufacturing pursuits in Guam come and go -- not for the limitation in our natural resources, but the many trade restrictions instituted by the federal government that have effectively undermined the spirit and intent of Headnote 3(a) and have become prohibitive in the sustainment of viable manufacturing operations in Guam.

Investor interests in light manufacturing ventures in Guam under Headnote 3(a) continue to disappear once they become familiar with the federal government's past destructive treatment of products manufactured under the program.

1. *ARTICLE 5. TRADE*
   Congressional trade policy as called for Article 5 is based upon the extension of the American foundation of free enterprise to all parts of America, including Guam.

2. *ARTICLE 6. TAXATION*
   Guam must be given immediate authority to adopt U.S. treaty tax rates to attract needed investment capital for the expansion of existing as well as the start of new manufacturing enterprises. Our small manufacturing sector is made up of many varied and sundry items such as wood carving, greeting cards, boat builders, water-bottling, surfboards, paintings and shell arts.

*C. Federal Barriers to Guam's Fisheries Transshipment Industry*

1. *ARTICLE 6. TAXATION*
   Article 6 will enable Guam to incorporate U.S. tax treaty rates in our own income tax code. Guam will be able to overcome the unfair difference in treatment between foreign investment in Guam and foreign investment in the 50 States.

2. *ARTICLE 7. IMMIGRATION*
   Guam must be given the authority to establish immigration policy that would help rather than hurt fisheries transshipment ventures. Such autonomy will prevent the reoccurrence of the decline in transshipment activity caused by USINS policy in 1995.

*D. U.S. Military Must Source from Guam Companies*

Guam unquestionably will continue to be a bastion of the United States defense network in the Western Pacific. Although Defense will not be a growth area in the next five to ten years, the local base commissaries and exchanges are expected to continue operations. According to most recent published information, total retail sales for

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 312 of 542

Statement of the Guam Chamber of Commerce
U.S. House of Representatives
Committee on Resources Hearing
H.R. 100, To Establish the Commonwealth Act of Guam
October 29, 1997

PAGE 10

base commissaries in Guam amounted to $41.7 million. Retail salesfor base exchanges was $134.2 million. Our companies in Guam are capable of supplying commissary and exchange product needs. Congressional policy and directives designed to help distributors in other jurisdictions must be amended to include Guam.

IV. CONCLUSION

In order for Guam to continue to prosper and become a more viable and self-sustaining part of America, her present political status as defined by the Organic Act must change.

The Commonwealth Act reflects the desire of the people of Guam and contains the economic provisions Guam must have in order to realize her potential. The Commonwealth Act is both good for Guam and the United States.

The Chamber thanks you for this opportunity and privilege to express our support for the Commonwealth Act. We also strongly request your support and assistance in Guam's quest for Commonwealth. Thank you.

Respectfully submitted,

ELOISE R. BAZA

JT/TS/RAY

October 17, 1997

Honorable Don Young
Chairman, House Resources Committee
1324 Longworth House Office Building
U.S. House of Representatives
Washington, D.C. 20515-6201

Dear Chairman Young:

Please include these three poems that I have written in support of Guam's Quest for Commonwealth as Testimony during the House Resources Committee's hearing to be held on October 29, 1997.

Thank you.

Frederick B. Quinene
P.O. Box 25442
GMF, Guam 96921

(C)
FREDERICK B. QUINENE

**I LOVE JUSTICE**

I LOVE JUSTICE I TRULY DO.
JUSTICE SO ILLUSIVE TO ME,
THAT WHICH IS ALWAYS DENIED. THOUGH
I LIVE UNDER THE FLAG OF THE FREE.
IT'S NOT JUSTICE THAT TAKES FROM ME.
MY MIND, SOUL AND MY DIGNITY.

I LOVE JUSTICE MY GOD GIVEN RIGHT,
THE CONSTITUTION DID THIS DECREE.
HOWEVER THIS I DO NOT HAVE. THOUGH
I LIVE UNDER THE FLAG OF THE FREE.
TRUE JUSTICE WILL NOT COLONIZE.
AND KEEP OWNING MAN AS HIS PRIZE.

I LOVE JUSTICE THAT WHICH IS FAIR.
WHICH HAVE NEVER BEEN AFFORDED ME,
IT COMES CLOSE BUT NEVER ARRIVES, THOUGH
I LIVE UNDER THE FLAG OF THE FREE.
JUSTICE DOES NOT LOWER ONE'S STATION,
HE'S EQUAL TO ALL IN THE NATION.

I LOVE JUSTICE THAT WHICH IS JUST,
JUSTICE TAKES NO MAN'S DIGNITY.
A FEELING STRONG WITHIN ME. THOUGH
I LIVE UNDER THE FLAG OF THE FREE.
YES TRUE JUSTICE WILL NEVER TORMENT,
AND RULE MEN WITHOUT THEIR CONSENT.

I LOVE JUSTICE WHICH IS MY DUE.
I SHOULDN'T HAVE TO BEG NOR TO PLEA.
THOUGH IT SHOULD BE SO IT IS NOT. THOUGH
I LIVE UNDER THE FLAG OD THE FREE.
JUSTICE ALLOWS MEN NOT TO BEMOAN.
AND WILL RETURN WHAT THEY RIGHTFULLY OWN.

I LOVE JUSTICE BUT WHERE IS IT?
THE JUSTICE FOUND IN DEMOCRACY,
I GLIMPSE IT FAR AWAY NOT HERE. THOUGH
I LIVE UNDER THE FLAG OF THE FREE.
JUSTICE DOES NOT IDLY STAND.
WHEN PERSECUTION RUNS AMUCK IN THE LAND.

I LOVE JUSTICE WHICH IS THE LAW,
JUSTICE KEEPS NO ONE ON HIS KNEE.
THE SAME AS WHAT'S PRACTICED RIGHT HERE. THOUGH
I LIVE UNDER THE FLAG OF THE FREE.
JUSTICE WILL ALLOW ALL MINDS TO EXPAND,
GROW GRACEFULLY AND RULE HIS OWN LAND.

I LOVE JUSTICE BORN FROM FAIRNESS,
JUSTICE THAT PROMOTES HARMONY.
I BELIEVE THIS CAN BE POSSIBLE, FOR
I LIVE UNDER THE FLAG OF THE FREE.
TRUE JUSTICE'S LAWS DO NOT SEESAW,
SHE TREATS ALL MEN EQUAL WITHOUT FLAW.

(C)
FREDERICK B. QUINENE

IGNOMINY

AMERICA ARE YOU THE CHAMPION
OF ALL MEN WHO ARE OPPRESSED
SO WHY HAVE OUR BIGGEST PROBLEMS
TO THIS DAY HAVE STILL NOT ADDRESSED?

WHAT IRONY DOES BEFALL US
THAT THOUGH GUAM IS OF THE USA
WE ARE NOT YET FULL CITIZENS
AND STILL FEEL ALIENATED TO THIS DAY?

YES WE HAVE THE ORGANIC ACT
BUT IT IS AN ACT NOT OF OUR CHOICE
NOW WE ARE ASKING FOR COMMONWEALTH
BUT THE FEDS STILL NOT HEAR OUR VOICE.

GUAM HAS SENT A DRAFT ACT TO CONGRESS
AN ACT THAT EXPRESSED THE GUAMANIAN'S WILL
THE FEDS SAY IT'S NOT PROPER
WE PRAY IT WILL NOT BE VOLATILE

GUAM ASKS WHEN IT WILL THE GUAMANIANS
BE ALLOWED TO SET THEIR DESTINY
TO MANIFEST THEIR DEEPEST DESIRE
AND ERASE FROM THEMSELVES THEIR IGNOMINY

ARE GUAMANIANS FOREVER GOING TO BE
ONLY LACKEYS OF THE USA
FOREVER DOING WHAT THE FEDS WANT
AND NOT DOING THINGS THE GUAM WAY?

GUAM NEEDS MORE THAN MATERIAL GOODS
GUAM NEEDS FOR HER MIND TO BE FREE
GUAMANIANS NEED TO BE SHOWN MORE RESPECT
AND GIVEN TRUE EQUALITY

GRANT US, DEAR AMERICA
OUR QUEST FOR SELF-DETERMINATION
RECOGNIZE THE GUAMANIANS AS A PEOPLE
MAKE US A TRUE PART OF THE NATION

## QUEST FOR COMMONWEALTH

WHAT IS THE REAL RELATIONSHIP
OF GUAM TO THE U.S. OF A?
NO MATTER WHAT IS REALLY SAID
GUAM IS STILL A COLONY TODAY.

GUAM HAS REMAINED ALL THESE YEARS
NOTHING BUT THE SPOILS OF WAR,
HER SEEKING GREATER SELF RULE IS
NOT UNLIKE REACHING FOR A STAR

YEARS AGO CONGRESS HAD DECLARED
WHEN GUAM IS READY SHE WILL NOD,
AND GUAM WILL BE SELF GOVERNED
OR WAS THAT ONLY A FACADE?

WHERE THOSE INTENTION UNCLE SAM
ONLY "PROMISES EPHEMERAL",
FOR GRANTING GUAM SELF GOVERNMENT
ARE ONLY INTENDS FAR FROM REAL?

WILL YOUR PROMISES BECOME TRUE
OR IS IT JUST AN ANOMALY?
WILL GUAM ALWAYS BE SUBSERVIENT
AND THEIR QUEST BE ONLY FOLLY?

TO THIS DAY CONGRESS STILL REFERS
TO GUAM AS HER POSSESSION,
ISN'T IT UNCONSTITUTIONAL TO OWN
PEOPLE NO MATTER WHAT THE REASON?

PLEASE BE GENEROUS TO THIS LAND
GRANT HER PEOPLE TRUE DIGNITY.
CEASE YOUR ROLE OF MASTER TO SLAVE
IN TERMS OF UNCERTAINTY.

THE STATUS OF COMMONWEALTH WILL
REPLACE AN ACT THAT'S OUT-DATED.
FOR TRULY THE ORGANIC ACT
IS NOW NAUGHT BUT ANTIQUATED.

THE DRAFT ACT BEING SENT TO YOU
WILL SURELY BE GUAM'S GUIDE AND TOOL.
THOUGHT NOT PERFECT WE ASK OF YOU
THE CONCEPTS YOU WOULDN'T OVER-RULE.

SHOULDN'T YOU NOW UNCLE SAM
PROVE TO THE WORLD AGAIN,
FOR JUSTICE YOU'LL ALLOW ALL
THEIR TRUE DESIRE TO ATTAIN?

# FILIPINO - AMERICAN PRESIDENTS CLUB OF GUAM

152 Halsey Drive, Rt. 8 • Adelup, Guam 96922-1401
Tel: (671) 477-8190 / 1 • Fax: (671) 472-8171


## Testimony on H.R. 100, the Guam Commonwealth Draft Act


1996 - 1998 OFFICERS:

LINDA A. TOLAN
*Chairwoman*

BELLE BALAORO
*Vice-Chairwoman*

NILDA ESTAMPADOR
*Executive Secretary*

ARMANDO DOMINGUEZ
*Recording Secretary*

DICK DIAZ
*Treasurer*

JAMES ROBINSON
*Asst. Treasurer*

JOHN M. VEGA
*Auditor*

PETE LORIEGA
*Public Relations Officer*

TAFE SANA
*Peace Officer*

GLICERIO NASIS
*Peace Officer*

PAST-CHAIRMEN

VIC QUITORIANO
JOHN M. VEGA
JOSEPH LAVILLE
ROGER T. BABASA
LEO T. EDUSADA


### INCLUDE US

Mr. Chairman, Congressman Don Young, and the esteemed members of your Committee on Resources of the 105th U.S. Congress, we humbly submit our testimony to your august body and respectfully request the same to be included as part of the hearing record. We pray for you to closely consider our perspective. We realize we are not one of the lucky few officially selected to present oral testimony before you. Nevertheless, believing very strongly in the universal precepts of Democracy and having great faith in the way the United States of America practices such democratic principles, we hereby present our collective thoughts and opinions for your consideration.

***W***e, the inhabitants of Guam who are of Filipino descent, declare that we do <u>not</u> fully support the Guam Commonwealth Act as presently drafted.

We have stated this same position together with the Federation of Asian People on Guam in a resolution submitted last May to members of the U.S. Congress and to President Bill Clinton via the Department of Interior (enclosed herewith).

Let us qualify the above statement. There are many positive elements in the Guam Commonwealth Draft Act which would benefit all the inhabitants residing on Guam, as well as the future generations who will live here. Those provisions designed to benefit only a select few, to the exclusion of others here, are problematic. This is especially true if the reasoning behind its justification runs counter to the U.S. Civil Rights Act and the basic guarantees of the U.S. Constitution, -and even the Universal Declaration of Human Rights. The provisions which violate the U.S. Constitution jeopardize the provisions which could benefit all.

It is clear then that the Guam Commonwealth Draft Act as presently drafted needs to be modified in ways to make it responsive, inclusive and equitable to all the diverse inhabitants of Guam. This will assure that the benefits and wealth it promises are commonly applicable to all inhabitants with no consequences for their ancestry. It must truly reflect what it originally set out to do, to forge a closer relationship, not a contrast with, the United States of America.

The most disconcerting provision which we feel must be changed, is the one that excludes Guam's citizenry that does not identify itself as ethnic Chamorro. This excludes those with Asian, Micronesian, Caucasian, Latino or African heritage. All good and contributing citizens should be included in the promise of Commonwealth without regard to the accident of their birth.

The very word Commonwealth implies common good -something of benefit for everyone. Exclusivity based on race and where one was born, or where one's ancestors were born, or at what particular point in time one was born, is contrary to the modern, enlightened way of thinking. It is a throwback to the colonial era - an age the people of Guam, in voting for Commonwealth, intended to reject.

Apartheid is now thoroughly discredited. "Ethnocentrism" in the current draft does not reflect the diversity of Guam's population. It cannot co-exist with the American ideals of racial inclusion and harmony - no matter how much it is sugar-coated with phrases such as "self-determination" or "indigenous rights". It ignores the diversity of the people who have always inhabited Guam. It ignores the generations of children born and raised here after 1950 who, through no fault of their own, are from a wide range of ethnic backgrounds. It creates an artificial barrier between those born here before 1950 and those born here after.

The present draft neither acknowledges nor benefits the Asian minorities living on Guam which include Filipinos, Chinese, Koreans, Japanese, Indians, Vietnamese, etc. At present, some 46% of the population identifies themselves as of Asian heritage.

America stands for the proposition that "all men are created equal" - whether they were born on Guam before 1950 or not! Pre-1950 inhabitants on Guam chose to seek and won U.S. Citizenship, thus joining the U.S. family. Once in this family, one must accept all of one's brothers and sisters and treat them fairly. That is the core of U.S. citizenry and idealism.

For any inhabitant of Guam, now or in the future, to suffer a detriment because their parents were not born here before 1950 is simply abhorrent. No child born and raised on Guam should feel the sting of non-recognition in a fundamental and foundational document such as our Commonwealth Act.

A document that reflects the real and true culture of Guam - which is inclusive of people of diverse ancestries, and which recognizes the skills, talents, devotion and dignity of all human inhabitants irrespective of race, color or creed, is a document that makes winners of everyone.

<u>That kind of Commonwealth document we support whole-heartedly.</u>

We do not support the provision regarding local immigration control. One only has to look at the terrible experience in our neighboring islands of the CNMI. It dehumanizes people -

both the abused and the abusers. The terrible power over who can and cannot legally become a part of the community should be administered under the same basic standards of fairness which apply throughout the United States. It should not be the domain of local politicians who have a partisan stake in each member included or excluded from their constituency. And no system should be tolerated that encourages workers to live their lives working in a community they can never become a part of - no matter what their contribution or merits. America should realize the mistake it made in the CNMI. America should not make the same mistake twice.

The estimated 46% of Guam's population that are of Asian heritage comprise approximately 62,000 men, women and children out of a total population of 133,000 per the 1990 census. These inhabitants are productive members of the Guam community. Many are second and third generation Guam-born.

When those of Asian ancestry first came to Guam they brought with them their education, their skills in nation-building, their love of freedom and their belief in the American ideal of equal opportunity. Their businesses, and the businesses of their children, and their children's children, have grown and prospered. They have led the way to a vibrant and productive island economy. They have pledged their lives and fortunes together with their hosts on their adopted home.

The present population on Guam is a microcosm of the diversity found in the U.S. mainland. Racial harmony, on a social level, is more the rule on Guam rather than an exception. Those of us who moved to Guam from another country bring the fresh experiences of what it is like to live in places that are not fair, that do not function as though all were created equal. For this reason we have an increased appreciation of the freedom that is threatened by the present Commonwealth Act.

Without exception, all the people of Asian descent who live on Guam understand that our Chamorro brothers and sisters need to keep the unique culture of Guam thriving. That culture includes diversity. Together we must exercise our self-determination.

The great Chinese teacher Confucius said it well, AWhat you do not wish for yourself, do not do to others. Please Include Us.

Racial discrimination is seductive but it never gives a lasting satisfaction; it diminishes everyone's humanity and harms the whole society where it exists. Please Include Us.

The history of Guam is one that is a model of generosity, openness, inclusion and tolerance. Please Include Us.

For hundreds of years Guam has been and it still is, a crossroads for people from both the East and the West. Please Include Us.

Mutual respect, peace and harmony -working side by side, each contributing a unique perspective and ancestry, that is our strength, our future. Please Include Us.

Mr. Chairman, members of your Committee, thank you for including us by listening to what we have to say in this public hearing.

*S*o submitted this 25th day of October, 1997 before the United States Congress by the Filipino-American Presidents Club of Guam.

- Enclosure

**SIGNATORIES:**

*Federation of Asian People on Guam*
P.O. Box 8136 Tamuning, Guam, U.S.A. 96931

RESOLUTION No. 2-96

Introduced By:

John M. Vega
Resty A. Albeza
Eddie R. del Rosario

Relative to Recognizing the Visit of the Honorable John Garamendi, President Clinton's Negotiator for Commonwealth Draft Act of Guam, and to Express our Comments Against Controversial and Discriminatory Provisions of Said Act.

BE IT RESOLVED BY THE OFFICERS AND MEMBERS OF THE FEDERATION OF ASIAN PEOPLE on GUAM:

WHEREAS, We Asian-Americans appreciate the concern of the U.S. President and we welcome the presence of Honorable John Garamendi to update Guam leaders about the status of the Commonwealth Draft Act; and

WHEREAS, We Asian-Americans who have considered the United State of America as our country of adoption, abandoned our respective Asian citizenship through a solemn attestation of truth; and

WHEREAS, We pledge allegiance and loyalty to the American Flag with wholehearted belief and faith in the democratic way of life in the land of promise and freedom; and

WHEREAS, in 1988 a Federal Task Force was formed to undertake a detailed review and evaluation of the Commonwealth Draft Act of Guam; and

WHEREAS, the Federal Task Force reported the following:

1. The Preamble which is a statement of motive and aspirations of the people of Guam does not have the force and effect of law.
2. Regarding the Right of Self-Determination of the Chamorro people of Guam, it is not constitutionally permissible to confer such rights to only one part of the population of Guam.
3. Regarding local control of immigration, some of its provisions are discriminatory and would potentially create hardship to the immigrant population currently residing on Guam as well as effectively block family reunification which is a basic tenet of Federal INS.
4. The local preference provisions ("Chamorro First Policy") regarding hiring, training, promotions, etc. in Government of Guam agencies may be incompatible with the Civil Rights Act and other Federal laws.

WHEREAS, Guam is a melting pot of the Pacific and that current residents of Guam with Asian ancestry combined constitute the majority of the total population. These people have contributed immensely in nation building activities in all of the major

**STATEMENT**

**SUBMITTED JOINTLY BY**

**THE PRESIDENT OF THE COLLEGE OF THE MARSHALL ISLANDS, THE INTERIM PRESIDENT OF PALAU COMMUNITY COLEGE, AND THE PRESIDENT OF THE COLLEGE OF MICRONESIA-FSM**

**BEFORE THE**

**HOUSE RESOURCES COMMITTEE**

**U.S. HOUSE OF REPRESENTATIVES**

**ON**

**S210**

**OCTOBER 29, 1997**

Mr. Chairman and Members of the Committee,

We wish to thank you for providing the opportunity for the presidents of Palau Community College, the College of the Marshall Islands, and the College of Micronesia-FSM to clarify our collective position regarding S.210.

**Historical Summary.** Before proceeding we feel it would be helpful to provide a brief summary of the situation.

In 1978, during the period when the Micronesian region was being administered by the United States as the Trust Territory of the Pacific Islands, the Community College of Micronesia (CCM) in Pohnpei, its School of Nursing (then located in Saipan), and the Micronesian Occupational Center (MOC) in Palau formed the College of Micronesia (COM). COM was designated a land-grant college in 1981 through Section 506(a) of the Education Amendments of 1972 (Public Law 92-318, as amended; 7 U.S.C. 301 note).

The CCM School of Nursing moved from Saipan to the Marshall Islands in 1986. In 1987 a treaty was signed among the three newly independent nations of the Republic of the Marshall Islands, the Republic of Palau, and the Federated States of Micronesia affirming a desire to continue supporting COM. In 1989 the CCM School of Nursing separated from CCM to become COM-Majuro. It should be noted that each component institution of the COM system (CCM, MOC, and COM-Majuro) attained, and has since maintained, accreditation from the Western Association of Schools and Colleges.

In 1991 an agreement was signed among the governments of the Federated States of Micronesia, the Republic of Palau, and the Republic of the Marshall Islands to restructure COM to provide for more local autonomy. In 1993 each of the three colleges of the COM system became autonomous institutions under separate governing boards in all areas except those related to administration of the land-grant programs. (MOC became Palau Community College; CCM became the College of Micronesia-FSM; and COM-Majuro became the College of the Marshall Islands.) Because COM was designated by Congress as the land-grant institution for the Trust Territory of the Pacific Islands, a Congressional amendment is required to allow each of the Micronesian colleges to administer the land-grant programs.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 325 of 542

**Land-Grant Status.** Efforts have been undertaken since 1993 for each of the colleges in the COM system to be designated land-grant colleges. The COM Board of Regents is fully supportive of these efforts as demonstrated by COM Board Resolution 95-2.

**RESOLUTION 95-2**

**WHEREAS, by the Treaty Among the Governments of the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau Regarding the College of Micronesia, the College has been decentralized by the establishment of autonomous colleges for all purposes other than exercising the powers and duties of the Land Grant Program of the College of Micronesia; and;**

**WHEREAS, this decentralization has enabled the College to respond more quickly and efficiently to local conditions and needs; and**

**WHEREAS, the decentralization has now been in effect since April, 1993, and has proved to be a success; and**

**WHEREAS, the centralization of the administration of the Land Grant Program has not proven to be efficient, cost-effective, or an adequate method to respond to the individual needs of the three nations; and**

**WHEREAS, the Treaty anticipated, and made plans for, a day when each college component would obtain separate status as a Land Grant College pursuant to Title 7 of the United States Code;**

**BE IT RESOLVED**

**That the Board of Regents hereby adopts, as a policy, its support of efforts to amend section 506 of the Education Amendments of 1972, to grant the College of the Marshall Islands, the College of Micronesia-FSM, and Palau Community College, separate Land Grant status.**

**/s/ Yoichi Rengiil, Chair; Evelyn Konou, Vice Chair; and Bermin Weilbacher, Secretary/ Treasurer**

An August 24, 1996 letter to Senator Frank H. Murkowski further clarified the COM Board's position.

**August 24, 1996**

**Senator Frank H. Murkowski**
**706 Hart Senate Office Building**
**Washington, D.C. 50510**

**Dear Senator Murkowski:**

**The College of Micronesia Board of Regents (COM BOR) wishes to express its appreciation of your support and activities on its behalf as legislation is being shepherded through Congress to address new Land Grant Status for its member colleges. Honoring the dialogue that has been established with your office, the following is submitted:**

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 326 of 542

**On August 24, 1996, the COM BOR clarifies its intent in passing Resolution 95-2 addressing Land Grant Status for the College of the Marshall Islands, the College of Micronesia -FSM, and Palau Community College. The COM BOR expresses its full support of Public Law 96-374 Sec. 1361. (c) in seeking new and individual Land Grant Status for its member colleges and affirms the position that: "Any provision of any Act of Congress relating to the operation of or provision of assistance to a land grant college in the Virgin Islands or Guam shall apply to <u>new</u> <u>individual</u> land grant colleges in the Republic of the Marshall Islands, the Federated States of Micronesia and the Republic of Palau in the same manner and to the same extent." As such, the COM BOR seeks a status for its member colleges equal to that granted to the Land Grant Colleges in the Virgin Islands, Guam, American Samoa and the Commonwealth of the Northern Marianas. The COM BOR recommends amendments to legislation affecting Land Grant Status by striking out "Micronesia" and inserting in lieu thereof "the Republic of the Marshall Islands, the Federated States of Micronesia and the Republic of Palau"; and by striking out "College of Micronesia" and inserting in lieu thereof "the College of the Marshall Islands, the College of Micronesia-FSM, and Palau Community College." Such amendments are directed towards Public Law 96-374 Sec. 1361., Public Law 92-318 Sec. 506., 7 USC 326a., 48 USA 1469a. and any other such legislation now addressing Land Grant Status as conferred to the College of Micronesia.**

**Your continued help in achieving these goals to further our self-determination is greatly appreciated.**

**Sincerely,**

| | | |
|---|---|---|
| **/s/ Yoichi Rengiil** **Chair** | **Christopher Loeak** **Vice Chair** | **Bermin Weilbacher** **Secretary/Treasurer** |

**S.210.** We are grateful for the support of Senators Murkowski and Akaka and the Senate Committee on Energy and Natural Resources for the inclusion of Section 3 Territorial Land Grant Colleges in S.210. The colleges were supportive of the measure in its original form. However, there is a provision in the final form that is of great concern.

Section 3(c) of S.210 includes the following provision: "The proportion of any allocation of funds to the Trust Territory of the Pacific Islands under any Act in accordance with section 1361 (c) of Public Law 96-374 prior to the enactment of the Act shall hereafter remain the same with the amount of such funds divided as may be agreed among the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau."

This provision would put each of the three colleges at a clear disadvantage compared to similar size land-grant colleges in the region, such as Northern Marianas College and American Samoa Community College, as it would require the Micronesian colleges to provide full land-grant services and programs with only one-third of the funding.

Each of the Micronesian colleges aspires to assume responsibility for all extension and research functions in the areas of agriculture and mariculture for their respective governments. Full implementation of the land-grant programs would build the capacity of each of the colleges to provide these services.

The provision of full land-grant status to each college promises to have a significant impact on the overall quality of life for citizens of the Republic of Palau, the Republic of the Marshall Islands, and the Federated States of Micronesia through the provision of programs such as: Food Safety and Quality; Communities in Economic Transition; Sustainable Agriculture; Waste Management; Water Quality; Youth At Risk; Plight of Young Children; Decisions for Health; Agriculture; Community and Resource Development; Family Development and Resource Management; 4-H and Youth; Leadership and Volunteer Development; Natural Resources and Environmental Management; and Nutrition, Diet, and Health.

Section 3(c) of S.210 would severely limit the capability of the Micronesian colleges to deliver these programs.

The COM Board of Regents shares the presidents' concerns regarding Section 3(c). College of Micronesia Board of Regents Resolution 97-1, included in full text below, states the Board's position on this issue.

**RESOLUTION 97-1**

**WHEREAS, the College of Micronesia (COM) Board of Regents has expressed its support for legislation in the Congress of the United States which would recognize the creation of three Land Grant Colleges in each of the three Freely Associated States within Micronesia which have evolved from the original College of Micronesia following many years of diligent effort by the peoples of the three Freely Associated States and the United States, and;**

**WHEREAS, those three Colleges are now operating as the College of the Marshall Islands, the College of Micronesia-FSM, and the Palau Community College, and;**

**WHEREAS, Senate Bill S.210 as introduced in the U.S. Senate in January of 1997 provided for amending Section 506 (a) of the Education Amendments of 1972 (P.L. 92-318, as amended; 7 U.S.C. 301 note) so as to strike "the College of Micronesia", and insert the names of the three Colleges, and also provided for amending Section 1361 (c) of the Education Amendments of 1980 (P.L. 96-374, as amended; 7 U.S.C. 301 note) so as to strike "the Trust Territory of the Pacific" and insert the names of the three Freely Associate States, and;**

**WHEREAS, Senate Bill S.210 as introduced was fully supported by the COM Board of Regents, while noting the Palau Government's disagreement with dividing the endowment fund, and;**

**WHEREAS, Senate Bill S.210 has been amended from its original form to incorporate additional language as proposed by Director Allen P. Stayman of the Office of Insular Affairs, Department of Interior, so that the Bill now provides that "The proportion of any allocation of funds to the Trust Territory of the Pacific Islands under any Act in accordance with section 1361 (c) of Public Law 96-374 prior to the enactments of this Act shall hereafter remain the same with the amount of such funds divided as may be agreed among the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau," and;**

**WHEREAS, the amendment to the original version of Section 3 of Senate Bill S.210 violates the spirit of Section 105 (i)(I) of Public Law 99-239 inasmuch as the three Micronesian Land Grant Colleges as the successor to the College of Micronesia System are not being accorded "...all benefits**

**and programs available to such land grant institutions", and;**

**WHEREAS, the amendment to the original version of Senate Bill S.210 as set forth above would cause financial hardship on the new land-grant colleges in Micronesia by reason that each college will be required by law to act and do things required of the other 56 land-grant colleges but limited to only one-third of the amount of funds normally provided to land-grant institutions;**

**NOW THEREFORE, BE IT RESOLVED, that the College of Micronesia (COM) Board of Regents does not support Senate Bill S.210 in its present form, and strongly urges deletion of any language which would require that the allocation of funds under any Act in accordance with section 1361 (c) of P.L. 96-374 "remain the same."**

**AND BE IT FURTHER RESOLVED that unless such language is deleted from Senate Bill S.210, the College of Micronesia (COM) Board of Regents requests that Section 3 of Senate Bill S.210 be deleted in its entirety and that no action be taken at this time by the U.S. Senate towards the Land Grant Status of the Micronesian colleges.**

**AND BE IT FURTHER RESOLVED that no changes be made to the present law which would affect the distribution or apportionment of land grant funds in Micronesia unless and until there has been consultation with all the governments of the Freely Associated States and their respective colleges.**

**AND BE IT FURTHER RESOLVED that certified copies of this BOR resolution shall be transmitted to the Presidents of the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau.**

**/Certification of unanimous vote followed./**

We, the presidents of the three Micronesian colleges, are in full support of COM Board Resolution 97-1 and solicit your favorable consideration to amending S.210 through the deletion of Section 3(c). If such amendment is not deemed possible at this time, then we respectfully request that Section 3 be deleted from S.210 in its entirety.

Mr. Chairman,

Once again we thank you and the Committee Members for taking time to consider our concerns. We appreciate the support that the U.S. Congress has provided the Micronesian colleges over the years and pledge to continue to implement programs supported by Congress with integrity and excellence.

**OPI-R**

Organization of People for Indigenous Rights
Post Office Box 7932 ~ Tamuning, Guam 96931 ~ Mariana Islands, Chamoru Archipelago
Phone (671) 649-0087 ~ Fax (671) 632-6253 ~ Email aguarin@ite.net

October 29, 1997

The Honorable Don Young
Chairman
Committee on Resources
U. S. House of Representatives
Washington, D.C. 20515

TESTIMONY ON H.R. 100
The Draft Guam Commonwealth Act

Hafa adai Chairman Don Young, Congressman Robert Underwood, Congressman George Miller and Members of the House Resources Committee. *Buenas dias todu hamyo ginen i membros-siha gi Otganisasion i OPI-R kontodu i manaina, i mane'lu-hu yan i taotaotano Guahan. Si Yu'os ma'ase Congressman Young yan hagu lokkue Congressman Underwood pot este i finata'chong-hu guini yan i oppotunidat ni' para hu empatte hamyo ni' sentimenton-mami pot este na asunto i H.R. 100.* The Draft Guam Commonwealth Act.

*Buenas dias* to all of you from the Chamoru people of Guam. Thank you for this opportunity to present testimony on behalf of the Organization of People for Indigenous Rights. My name is Hope Alvarez Cristobal and I am the official representative for the Organization of People for Indigenous Rights of Guam.

At the outset, let me just say that for the Chamoru people, today's hearing is not just another routine exercise in Congress. We have all come some 8,000 miles away for this important and very significant day which comes at a critical juncture in our political development as a people. We recognize that the discussion on H.R. 100 is a discussion about the right of a people to maximize their existence in their homeland; it is about the right of a people to determine their political destiny as a people and it is about our self-respect and dignity as a people and that people, Mr. Chairman, is the native people of Guam, the Chamoru people.

One of the primary purposes of the Organization of People for Indigenous Rights is to protect and promote the Chamoru people's inherent right of self-determination. We firmly believe that only the Chamoru people in Guam have the right to alter Guam's status from a non-self-governing territory to one considered as having a full measure of self-government. This year, our organization reorganized in response to the stepped up efforts by the United States as well as local initiatives that would deny the Chamoru people this legal and moral right.

Mr. Chairman, after over 350 years of colonial rule under Spain, the 1898 Treaty of Peace between the United States and Spain gave the native inhabitants a chance at freedom. As a people, they had developed a way of coming together for over 4,000 years until their existence

was "discovered" and they were colonized by Europeans. The Treaty of Peace contained a provision that stated, "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress." Native inhabitants at the time were the Chamoru people and it is clear that the referenced political status is intended for them.

Following WWII, the United States, acknowledging its responsibility under the 1898 Treaty of Peace and the UN Charter, freely and voluntarily placed Guam in the United Nations system under the Declaration Regarding Non-Self-Governing Territories created by Chapter XI of the United Nations Charter. The U.S. accepted as "a sacred trust the obligation to promote to the utmost...the well being of the inhabitants of these territories". Furthermore, the U.S. agreed "to develop self-government, to assist in the progressive development of free political institutions, and to transmit regularly to the Secretary General information on the economic, social and educational conditions in these territories." In the U.N. Charter and subsequent resolutions, the United States accepted its role in decolonization and self-determination.

In the first report to the United Nations, the U.S. described the people in the following manner: *"People -- The natives of Guam are called Chamorros....."* and that, *"they continue to use the ancient Chamorro tongue."* It was clear then that it was the Chamoru people in Guam who had a dependent status and for which self-determination will be exercised.

The 1950 Guam Organic Act clearly acknowledges the seperate political existence of the Chamoru people. It had a provision which gave Chamoru people preference in government promotions and appointments and gave legitimacy to the notion of special rights for the natives of Guam. More significantly, the Organic Act, an Act passed through this very Congressional process, declared the people U.S. citizens based on (1) being native-born and (2) ancestry on Guam from before 1898. Failing this, the Organic Act amended the Nationality Act of 1940 to include a new subparagraph "Guamanian and persons of Guamanian descent." It is very clear, Mr. Chairman, that Congress passed the Organic Act on behalf of the Chamoru people, officially called, the "Guamanian" people.

For almost a century now, our Chamoru people have been frustrated awaiting the political status process that would restore their dignity as a people; to be self-governing; and to exercise their right of self-determination. Our Chamoru people are frustrated because they live the negative effects of the unilateral immigration policies of the United States on their small Pacific island. Our Chamoru people are frustrated by the control of the federal government of nearly 1/3 third of our homeland. All these effectively diminishes our social, economic and political development.

In our efforts to ensure recognition of our people's inherent, inalienable right, we participated in Guam Commission on Self-Determination meetings and are heartened by the inclusion of Title I, Section 102 in the Act and we support in principle this provision of the Act. It recognizes as a cardinal principle of self-determination that in the case of Guam, the pursuit of an ultimate political status is legitimately, morally and legally the sole quest of the Chamoru people. We do not however, recognize H.R.100 as a self-determination document.

We request that a timetable be set for the exercise of Chamorro self-determination to coincide with the implementation and exercise of Chamorro Self-Determination in Guam Public

Law 23-147, an Act to Create the Commission on Decolonization for the Implementation and Exercise of Chamorro Self-Determination. Aside from this, our organization fully supports all other Chamoru rights provisions in Title I.

By way of information, the general purpose of this commission is to ascertain the desire of the Chamorro people of Guam as to their political relationship with the United States. Once that desire is ascertained, the commission shall transmit that desire to the President and Congress of the United States and the Secretary General of the United Nations. The Governor of Guam has already appointed some of the members of this Commission and we expect it to be fully functioning by next year.

We also fully support Section 701, Guam Immigration Authority, underTitle VII.

The actions of the United States at the United Nations to de-legitimize Chamoru self-determination by confusing member nations at the United Nations as to who the people are that were promised the right of self-determination in Guam has been a source of frustration. It was not surprising that at the October 10 UN 4th Committee meeting in New York this month, the U.S. representative stated that "the United States could not endorse a process which excluded Guamanians who were not Chamorus and that the ultimate outcome of the self-determination process would depend on its ability to include all citizens in its scope." This statement is consistent with much of the informal positions of U.S. administration bureaucrats during the Guam Commonwealth talks over the years.

We have also watched local leaders try to show the ways in which decolonization and Chamoru self-determination can work within the U.S. Constitutional framework, focusing on the Territorial Clause of the Constitution. Afterall, is not the essential meaning of the U.S. Constitution to promote and protect and defend the integrity and the dignity of the people?

Mr. Chairman, we await the serious and open discussions by Congress of H.R.100. We must make it emphatically clear, however, that it is in keeping with the provisions of the United Nations Charter, Article 73, that political status change be specifically related to the people who are historically a non-self-governing people. This cannot be interpreted in any reasonable fashion as meaning any other people than the Chamorus. It is time that the United States live up to its responsibilities by recognizing legally, in accordance with its own Constitutional provisions, the Chamoru people's inherent right to self-determination and we ask that Congress approve Title I, Section 102 as it stands.

Next year marks 100 years of colonialism under the flag of the United States. The U.S. Congress in accepting its role in a decolonization process for the Chamoru people must take seriously the Chamoru people's quest to be fully self-governing and to determine the ultimate political destiny of their homeland. It has a responsibility to restore the dignity of the Chamoru people and must not continue to allow the Courts to determine the kind of relationship our people will have with the United States. Our people deserve more than just a mild sway of justice, Mr. Chairman.

There is a saying in Chamoru, *"I taotao ni' ha sedi na uma gacha', ha miresi na uma gacha' ya uma figes."* A person who allows another to step on him, deserves to be stepped on

**and be crushed. Our people have been a strong and spiritual people. We derive our "espiritun Chamoru" from God, our families and the sustenance of our homeland. Mr. Chairman, we will fight that our pride, our self-respect, our dignity will not be sacrificed in H.R.100 as they have been in the past. Our people deserve nothing less. Long live the Chamoru people!**

Si Yu'os ma'ase, Mr. Chairman for your attention to this presentation. Thank you.

**HOPE ALVAREZ CRISTOBAL**
**Ma'gas Segundario, OPI-R**

TESTIMONY
of the
ORGANIZATION OF PEOPLE FOR INDIGENOUS RIGHTS
(OPI-R)
before the
COMMITTEE ON RESOURCES, U.S. HOUSE OF
REPRESENTATIVES
October 29, 1997

Presented by CHRIS PEREZ HOWARD, Chairman, OPI-R

**TESTIMONY OF THE ORGANIZATION OF PEOPLE FOR INDIGENOUS RIGHTS (OPI-R) BEFORE THE COMMITTEE ON RESOURCES, U.S. HOUSE OF REPRESENTATIVES, OCTOBER 29, 1997**

**Presented by: Chris Perez Howard, Ma'gas (Chairman), OPI-R**

Hafa Adai, Mr. Chairman and distinguished Members of the House Committee on Resources. I am Chris Perez Howard, Chairman of the Organization of People for Indigenous Rights (OPI-R). I sincerely thank you on behalf of our organization for the opportunity to present testimony on H.R. 100 - a Bill to establish the Commonwealth of Guam.

Before I begin, I would like to state for the record that our organization is not here in support of the draft Commonwealth Act; we are here to support the rights and concerns of the Chamorro people - the indigenous people of Guam.

Mr. Chairman, the Chamorro people's relationship with the United States Congress goes back to the year 1898 when Spain ceded Guam to the United States and gave Congress the right to determine the "civil rights and political status of the native inhabitants." Since then, Congress has held this right to make these decisions.

In the aftermath of World War II, world thinking was that colonialism, in all forms and manifestations, was wrong, and that thinking led to the establishment of the United Nations in 1945. Shortly, after that, Congress ratified the United Nations Charter and the United States placed Guam on the UN list of Non-Self-Governing Territories. One purpose of the United Nations Charter is "To develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples . . . " Among the obligations the United States assumed in the Declaration Regarding Non-Self-Governing Territories is to regularly provide information to the UN Secretary-General concerning the people of Guam.

In its first report to the United Nations in 1946, the United States identified the people of Guam as the Chamorro people. In the report it also used the term Guamanian to identify the Chamorro people. (The term Guamanian was invented to distinguish the Chamorros of Guam from those of the Northern Marianas.) The report states that although the Guamanian people are conversant in English, "they continue to use the ancient Chamorro tongue." It also lists the "inhabitants of

Guam" as nationals of the United States.

Mr. Chairman, we believe that this hearing is based upon the relationship that the U.S. Congress has had with the Chamorro people since 1898. Although they have been called by a number of names - native inhabitants, people of Guam, Chamorros, Guamanians, inhabitants of Guam, and nationals of the United States - they are the people you promised the right to self-determination. They are the people for whom you wrote the Organic Act for Guam. They are the people whom you should be addressing.

From the beginning, OPI-R has not supported the draft Commonwealth Act. We do not support it because Commonwealth is not a status determined by the Chamorro people nor is the draft act written and adopted by them. It is a U.S. citizen document. It infringes on the rights of the Chamorro people, especially in regards to others determining their inherent sovereignty.

In the past, however, OPI-R has supported the provisions concerning the Chamorro right to self-determination and Guam's control of immigration. Now, we think it may be pointless to even discuss these issues in the Commonwealth Act before Congress. We feel this way because immigration control by Guam has been blasted apart in the media and in reports by U.S. government agencies, and the frontal assault and behind the back attempts by the United States to deny the Chamorro people's right to self-determination in the United Nations.

For your information, attached is a transcript of the U.S. statement before the UN Special Political and Decolonization Committee a few weeks ago. As an example of the kind of information being given as factual by the United States is this declaration: "The United States is a nation in which all persons are provided equal treatment under our law." This statement is a blatant attempt to influence the UN Committee at the expense of the Chamorro people.

Mr. Chairman, as you are well aware, we do not vote for the President of the United States, not all of the U.S. Constitution applies to us, and we do not have a voting member in Congress. Something smells at the United Nations and reflects badly on the moral character of America. How can we now expect Congress to do what is right?

In closing, aside from the reason our organization gave for opposing the draft Commonwealth Act, we consider the status of Commonwealth as another colonial

**status. If Congress truly wants to solve the political status problems of its territories, it should embrace decolonization and not just a political status change. In Guam's case, we ask that you support Guam Public Law 23-147, an act which created the Commission on Decolonization for the Exercise and Implementation of Chamorro Self-Determination. The decolonization status choices being - Independence, Free Association, or Integration (statehood).**

**Si Yu'os' Ma'ase, thank you.**

**Chris Perez Howard**
**Ma'gas, OPI-R**

**Attachments:**

> **Transcript of statement by representative of the U.S. Mission to the United Nations.**
>
> **Copy of "An Overview of the Political Status of the Chamorro (Chamoru) People."**

**Transcript of the statement made by the U.S. Mission to the United Nations before the Fourth Committee (Special Political and Decolonization Committee) October 10, 1997**

*"Mr. Chairman, the United States delegation would like to exercise the right of reply to the Guamanian speakers collectively. The United States Federal Government and the representatives of Guam share the same objective: a government on Guam chosen through a free exercise of self-determination. We differ, however, on the definition of who should be entitled to participate in such an exercise.*

*"It is the view of the United States, that the right to self-determination for the territory of Guam must be exercised by all of the people of Guam not just one portion of the population. The speakers you have heard today seem to seek to disenfranchise a majority of the population of Guam. It is hard to imagine the U.N. associating itself with an exercise in self-determination in which a majority of those to be covered by the result could not participate in the exercise based on their ethnicity.*

*"The United States is a nation in which all persons are provided equal treatment under the law. Our constitution does not allow for elections in which a portion of the population is excluded based on their ethnicity. The United States is a nation in which all persons are provided equal treatment under our law. Furthermore, we cannot endorse a process under which the rights of some groups are held to take precedence over the rights of others, again just based on ethnicity.*

*"We are aware of and sensitive to the special interests of the Chamorros. But we will not support programs or projects that exclude some Guamanians based solely on their failure to be Chamorro.*

*"On the question of lands -- the identification of surplus federal lands by the United States Government is the first step in the transfer program. We will comply with our commitment to implement this program in accordance with our national laws and regulations pertaining to the transfer of surplus federal lands.*

*"In conclusion, the United States Government is committed to working with all people of Guam towards a resolution of their current political status in keeping with the principal of self-determination. The ultimate outcome of this process, however, must be reached in accordance with the laws of the United States and the principle that self-determination must be exercised by the citizenry as a whole. Thank you very much Mr. Chairman."*

# AN OVERVIEW OF THE POLITICAL STATUS OF THE CHAMORRO (Chamoru) PEOPLE

**The People**

The Chamorro people are the indigenous people of the island chain in the Western Pacific called the Marianas. For thousands of years, before the arrival of the Spanish, these islands had been their homeland. The name "Mariana Islands" was the result of Spain's claim of ownership in 1565. The islands were named after Queen Maria Anna of Spain.

Faced with advanced weaponry and decimated with foreign diseases, the Chamorro nation was defeated by the Spanish, and Spain ruled the islands until the United States took possession during the Spanish-American war. Following the end of the war in 1898, Spain ceded Guam, the largest and southernmost island, to the United States and sold the northern islands to Germany. The island chain and its people were then divided.

In 1919, following the defeat of Germany in World War I, the northern islands were obtained by Japan as a result of a League of Nations mandate, and Guam remained a possession of the United States. World War II saw the Marianas again united when Japan invaded and occupied Guam in 1941. The United States captured the Marianas in 1944.

Throughout these events and despite all the adversities fostered by more than 400 years of colonization, the Chamorros continue to survive as a people.

**The United Nations Charter**

In 1945, following World War II, the United Nations was established as a means to maintain world peace. In the United Nations Charter, one of its stated purposes is: "To develop friendly relations among nations based on respect for the principles of equal rights and self-determination among peoples . . . " The United States adopted as a treaty the United Nations Charter, and, constitutionally it is a "supreme Law of the Land."

At the time the United Nations was established, the colonial territories and their peoples were beginning to be considered in light of world peace and human rights. The old world thinking that less powerful nations were essentially pieces of real estate to be captured, traded, given, or added by more powerful nations was being replaced by one in which people figured prominently. Ironically, however, in the United Nations the colonial division of the Marianas continued: Guam was placed on the list of Non-Self-Governing Territories and the Northern Marianas under the International Trusteeship System - the United States as the "Administering Power" of both.

Although the intentions and obligations outlined in Chapter XI (Declaration Regarding Non-Self-Governing Territories) and Chapter XII (International Trusteeship System) of the United Nations Charter are similar, the islands were still considered by their former colonial division, administered differently, and viewed as separate political entities. This division was made clear when, through

an act of self-determination and negotiations with the United States, the northern islands in 1976 became a commonwealth in political union with the United States.

Guam, on the other hand, remains a U.S. colony. The Chamorro people of Guam, made U.S. citizens by a 1950 Organic Act for Guam, in which only selected sections of the U.S. Constitution apply, were given limited self-government. Because of their colonial relationship and other contributing factors, they have yet to exercise their right to self-determination. Among those factors are: a lack of understanding of their political situation; the steady influx of non-Chamorro Americans; and the continued Americanization of their island which erodes their sense of identity as a people.

A quick reference of what foreign considerations and U.S. control have done to the Chamorro nation and its homeland, since the United Nations was established, is the 1997 World Almanac and Book of Facts. It describes the people of the Commonwealth of the Northern Mariana Islands as indigenous and primarily of Chamorro cultural extraction, and the people of Guam by ethnic distribution, of which the 1994 estimate was 47% Chamorro (Guam estimate for 1997, 42%). Considering that in 1950 Chamorros numbered 94.6% of the non-military, non-transient population of Guam, one understands the impact that the U.S. brand of colonialism and Guam's status as a non-self-governing territory has had on Guam's indigenous people.

**Colonial Interest and Control**

The unfortunate situation the Chamorro people find themselves in is because of the strategic location of their islands. Because of this, the United States intends to maintain control, especially the island of Guam, the largest island in Micronesia, where the U.S. military holds approximately one-third of the land. In fact, it has recently shown that it is willing to sacrifice the Chamorros, as a people, to keep possession of the Chamorro homeland - it has internationally made a reversal of its support for the rights of peoples. This desperate move to keep colonial control of the island of Guam, was because Chamorro voices demanding equity were being heard internationally, and, despite political changes, the Chamorro people continue to retain their rights to sovereignty. The United States reversing its position regarding peoples' rights clearly illustrates the threat the Chamorros pose as a people.

**Political Status Process**

At one time, the United States looked favorably upon a divided Chamorro nation. Yet while it was politically tying up the Chamorros of the Northern Marianas with a covenant - giving them far more self-government than Guam, such as control of immigration and land alienation - Guam began its own political status process excited by the possibility of a better deal. Before that time, the Northern Mariana Islands fared less well as a trust territory than Guam as an unincorporated territory. Guam enjoyed a more fruitful relationship. To those on Guam yearning for more self-government and the lifting of U.S. restraints that impeded the island's economic growth, Guam now was viewed in a more inferior position.

**Decolonization Process**

At that time, it would have been to the best advantage of the United States to have united Guam with the Northern Mariana Islands under Commonwealth status as negotiated by the Northern Marianas. Now, however, it appears too late - at least under the type of commonwealth the United States would have preferred. The voters of Guam, U.S. citizens - Chamorros and non-Chamorros - in 1987 approved a draft Commonwealth Act that addresses their specific needs and desires. Among its provisions is the recognition of the Chamorro people's right to self-determination. Commonwealth, as defined by the voters of Guam, would be an interim status with the future political status of the island decided by the Chamorro people.

A major impediment to the United States' political agenda, to keep possession of the island of Guam without actually decolonizing, has been its membership in the United Nations and the obligations that membership entails. Foremost among those obligations is to decolonize its non-self-governing territories. In Guam's case, decolonization begins with the exercise of self-determination by the Chamorro people.

**Rights Denied**

The United Nations is also where the United States has tried to deny the Chamorro people their inherent and inalienable right to self-determination. Among its efforts was an attempt to confuse member nations about whom the people of Guam were. We can see this in the yearly reports and statements regarding Guam by the United States to the Secretary-General of the United Nations since 1946 - another obligation by an administering power of a colony. In its first report to the United Nations, the report states that the natives of Guam are the Chamorros. Subsequently, they called the Chamorro people "Guamanians," "inhabitants of Guam," and "people of Guam." Later, when Chamorro was used in the reports, it was primarily in relation to the Chamorro language and culture. It began to appear that the people of Guam were a mixed bag, and they were the ones who had the right to self-determination. At one point it even appeared that the island had the right to self-determination.

There were also misrepresentations - some bordering on lies. For example, ten years ago the report said that more than three thousand acres were returned to Guam. As of today, they are still under the control of the United States. A more recent example: in 1995 the U.S. representative, in his statement to the U.N. General Assembly, said, "A Commission on Self-Determination was established in 1988 as the vehicle for the elected Government of Guam to use for discussing a proposal for commonwealth status with the United States federal Government. The Commission will ultimately put into effect legislatively the freely expressed wishes of the people on that matter." Rightfully, the Commission on Self-Determination has been in existence since 1980, in 1988 a draft Commonwealth Act, voted on by registered U.S. citizens, was introduced in the U.S. Congress, and the Commission on Self-Determination does not have the authority to legislate.

For thirty-six years the U.S. reports and statements went unchallenged and in its communications with the United Nations, it appeared that the United States was fulfilling its U.N. obligations as the administering power of the non-self-governing territory of Guam. It confirmed and reaffirmed their support of the rights of peoples and signed United Nations' resolutions to that effect. It also became a recognized world champion of indigenous rights - all the while playing a game of subterfuge in

the United Nations and not appraising the Chamorro people of their rights and their status under the umbrella of the United Nations.

In 1998, Guam's Chamorro people will mark 100 years as a colonized people under the flag of the United States. There will be no cause for celebration, although some Chamorros may stage an event to call attention to this American disgrace. Efforts by Guam to change its colonial status have been met with smiling resistance and behind the back assaults at the United Nations.

The United Nations has set the year 2000 as the deadline to end colonialism worldwide. As this year draws near, the United States has stepped up its efforts to solve its Chamorro problem by denying them the right to self-determination. It may succeed, unless the Chamorro people unite under their banner as a people.

### Legality regarding Chamorro self-determination by the Legal Counsel of the Commission on Self-Determination

The powers and responsibilities of the United States regarding Chamorro self-determination: Section IX of the Treaty of Peace between the United States and Spain (1898), the territorial clause of the U.S. Constitution, Chapter XI of the United Nations Charter and United Nations resolutions relating to non-self-governing territories, the Guam Organic Act, section relative to Guam in the Immigration and Nationality Act, and Part I, Article I, Paragraph 3 of the International Covenant on Civil and Political Rights.

### References and suggested reading materials:

1. The 1898 Treaty of Paris
2. The United Nations Charter
3. The 1950 U.S. Organic Act for Guam
4. Chamorro self-determination: The right of a people - I direchon i taotao. Chamorro Studies Association and Micronesian Area Research Center, Mangilao, Guam.
5. Hale'-ta Hinasso': Tinige' Put Chamorro - Insights: The Chamorro Identity. Political Status Education Coordinating Commission, Agana, Guam.
6. United Nations resolutions concerning Non-Self-Governing Territories.
7. Testimonies before committees of the United Nations by territory of Guam officials and members of non-governmental organizations since 1982.
8. Resolutions addressed to the United Nations by the Guam Legislature.
9. Draft Guam Commonwealth Act and information provided the voters of Guam.
10. United States reports to the United Nations since 1946.
11. The Case for Chamorro Rights. Dr. Wyttenbach-Santos, University of Guam.

### Terms to Understand and Remember

**Self-Determination.** Freedom of a people to determine the way in which they shall be governed and

whether or not they shall be self-governed.

**People.** A body of human beings having the same history, culture and traditions, and usually speaking the same language.

**Self -Government.** Government under the control and direction of the inhabitants of a political unit rather than by an outside authority.

**Colony.** Any territory separated from but subject to a ruling power.

*(Looking at the above definitions in regards to Guam and the United States, Guam is a non-self-governing colony of the United States, whose people, the Chamorro people, have not exercised self-determination.)*

**Commonwealth.** A political status chose by registered U.S. citizen voters in 1982 as their preference for Guam's political relationship with the United States.

**Draft Commonwealth Act.** A document written by Guam for approval by the United States and endorsed by registered U.S. citizen voters in 1987. Commonwealth, according to the Act, is to be an interim political status until the Chamorro people make a determination on Guam's ultimate political status through an act of self-determination.

*(We consider the draft Commonwealth Act an illegal document because the political status vote was not limited to the Chamorro people. We believe that any vote in a process toward decolonization should be limited to the Chamorro people.)*

**United Nations Charter.** A treaty of nations, and according to the U.S. Constitution, treaties are as supreme law of the land as the constitution itself. As a signatory to the UN and subsequent UN resolutions, the United States has treaty obligations to the Chamorro people. Paragraph two of Article VI of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made pursuance thereof: and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

**Administering Power.** A member of the United Nations identified as having administrative control over a territory. On the UN list of Non-Self-Governing Territories, the United States is the Administering Power of Guam, American Samoa and the U.S. Virgin Islands. The United States is also considered the Administering Power of Puerto Rico and the Commonwealth of the Northern Mariana Islands.

**Decolonize.** To free from colonial status - decolonization.

**Political Statuses to Decolonize.** It has been recognized by the United States and the international community that Independence, Free Association, and Integration (Statehood in Guam's case) are the status options for decolonization. Regarding Puerto Rico and the Northern Mariana Islands, although

the people in those countries chose Commonwealth status with the United States in their political status plebiscites to decolonize, the Commonwealth statuses they negotiated continued their colonial relationships. That is why the people in those countries still have the political status options of Statehood, Free Association, or Independence if they so choose. The Commonwealth document Guam has written would also continue a colonial relationship and is the reason we consider Commonwealth to be an "interim status." Underlying all this, is the question of Sovereignty.

**Sovereignty.** Freedom from external control.

**Discrimination.** The Chamorro people have the right to self-determination as have other peoples in the world. The majority of peoples have already exercised that right. To deny the Chamorro people the freedom to determine their political status through an act of self-determination or to participate in their right is to discriminate against them.

**U.S. Citizenship.** The first sentence of Article XIV of the U.S. Constitution states that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States...." The Fourteenth amendment, purposely, does not extend to Guam because we are not a part of the United States. Chamorros were made U.S. citizens by reason of the 1950 Organic Act for Guam. They do not have Constitutional citizenship. They have U.S. citizenship because of Congressional legislation.

For informational purposes, voting for a decolonization status does not mean you would lose U.S. citizenship. Even if you vote for Independence it does not mean you would lose your U.S. Citizenship. It would depend on the determination of the U.S. Congress. As an example, a bill, introduced in Congress by the House Resources Committee, regarding a Puerto Rico political status plebiscite, lists Independence as a status that would be phased in and would leave existing Puerto Ricans with U.S. citizenship (PDN, Aug. 14, 1997). Issues like citizenship are answered depending on agreements and negotiations.

**Definition of Chamorros for voting in the self-determination plebiscite.** "All inhabitants of Guam in 1898 and their direct descendants who have taken no affirmative steps to preserve or acquire foreign nationality." This definition serves as a political identification of the colonized.

**Why Status Quo and Commonwealth are not on the ballot.** Only three statuses are recognized as statuses for decolonization: (1) Independence, (2) Free Association, and (3) Integration (in Guam's case, Statehood). Status Quo and Commonwealth can be negotiated under the decolonization status of Free Association.

xxx

**CHRIS PEREZ HOWARD**
**P.O. Box 3062**
**Agana, Guam 96932**
**Telephone: ((617) 472-3342 or 477-2070**

**We believe that only the Chamorro people have the right to determine their political destiny and that of their homeland through an act of self-determination. Our statement includes an historical overview of the Chamorro people which provides the basis for their legal and moral right, and also refer to actions of the U.S. Government to deny that right.**

**ARCHBISHOP ANTHONY SABLAN APURON, OFM CAP.**
**ARCHDIOCESE OF AGANA**
**TESTIMONY ON THE GUAM COMMONWEALTH ACT**
**OCTOBER 29, 1997**
**UNITED STATES HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.**

Mr. Chair:

I am deeply honored by your gracious invitation to appear before this Committee of the United States House of Representatives today. It is a rare privilege indeed. I come as a spiritual leader of Guam to bear witness to the voices in the hearts of the Chamorro people crying out for justice and a resolution of our quest for political determination. You, as a body, have the ultimate power and authority in the Nation to bring about the justice we seek. I urge you to act with a moral conscience. We, the People of Guam, deserve nothing less. As loyal and patriotic American citizens, we seek the American promise of justice for all.

We, as a people, have been blessed with many benefits stemming from our intimate relationship with the United States. Since 1898 we have progressed tremendously. We were freed from an occupying force during World War II. In the subsequent decades our quality of life as an island community has substantially improved.

Concomitant with these benefits, we have more than adequately contributed our share to the greatness of this Nation. Our people have always come forward fearlessly and generously - even shedding their very blood - with great sacrifices to the family in demonstrating their loyalty and patriotism in military service. Our sons and daughters have been among those who fought for World War II, the Korean War, the Vietnam War and Desert Storm, all conflicts not of our own choosing. In the quest for national security and world peace, our resources - especially our most precious and limited land and water resources - were exploited and continue to be deemed vital to American presence in the Pacific Theater. We have willingly paid the price exacted by the American promise of freedom and justice for its citizens. What we ask now, Mr. Chair, is for that promise to be delivered in its entirety and in all its glory, namely, the granting of Guam's Commonwealth Act!

The Chamorro people of Guam have given 100% to this Nation. The lives lost in the various conflicts for peace are testimony enough to this fact.

As we move towards the next millennium, I want to emphasize the unique opportunity this August body faces and the power it ultimately holds to redress the grievance and injustices we have suffered and continue to suffer as a colonized people, an unincorporated jurisdiction, and an insular possession or whatever the status of Guam may be called - all terms unacceptable, incongruent, and unconscionable with the great promise of freedom, liberty, and justice for all which this great Nation, since its founding, has echoed and re-echoed throughout the world.

As this country has challenged other nations to uphold democratic principles on moral and human rights' grounds, so we, as a Chamorro people, appeal to those very principles on moral and human rights' grounds.

In Sacred Scripture, the hypocrite was condemned by Jesus for professing one set of beliefs and acting otherwise. Could it not be considered hypocritical to exact the very blood and lives of our people in service of this great Nation we call "America", while at the same time perpetuating second class citizenship through the colonial status we are constantly subjected to? How much more, Mr. Chairman, must we give in order to receive what this great Nation promises? Is it just too much to ask that the reversal of this status begin with the Congressional passage of the Guam Commonwealth Act, which embodies the political process by which Chamorros will achieve self-determination?

The passage of the Guam Commonwealth Act would be a major step in the right direction. For we believe that justice, freedom, truth, and liberty will all be enhanced by such action of yours. And will not America be greater for that?

I humbly pray that this great Nation under God, indivisible, with liberty and justice for all, and under your leadership, Mr. Chairman, will be able to uphold these ideals with truth and wisdom and right judgement as you vote on the Guam Commonwealth Act.

Dangkolo na si Yu'os ma'ase. (Thank You!)

**Presented by: Debtralynne Quinata, Maga'haga, Nasion Chamorro**

**TESTIMONY OF NASION CHAMORU BEFORE THE COMMITTEE ON RESOURCES, U.S. HOUSE OF REPRESENTATIVES, OCTOBER 29,1997**

Hafa Adai! Greetings, Mr. Chairman and Distinguished Members of the Committee on Resources. My name is Debtralynne Quinata, a citizen of I Nasion Chamoru Guahan (Chamoru Nation of Guam). I am here today on behalf of the Nation to testify in opposition to H.R. 100.

First, we would like to state for the record that we construe H.R 100 not a true exercise of Chamoru self-determination, but merely a petition by U.S. citizens residing on Guam in 1987 to amend the present Organic Act of Guam.

Secondly, we oppose H.R. 100 because short of a true exercise of Chamoru self-determination, this Bill under Article 1, Section 101, proposes to surrender our Sovereignty. Sovereignty, to all free Nations of the world, which includes our native brothers and sisters of the Americas, is an inherent and sacred right that they would do anything and everything in their power to protect and defend.

If the Congress intends to accept that the Federal Government should have total Sovereignty over Chamorus, notwithstanding recognized treaty obligations and U.N. mandate, then we fear that this may have devastating repercussions. This act may also set a precedent over the treatment and consideration of Treaties and Policies signed between Native Americans and the Federal Government. The Chamoru Nation, therefore, will not play a part in opening the door that may jeopardize or extinguish the Sovereignty of our native brothers and sisters simply because the Government of Guam, with the consent of the Federal Government, chooses to unilaterally compromise our Sovereignty!

Thirdly, the Chamoru Nation opposes H.R. 100 for the mere reason that even Non-Chamorus were permitted to vote in the political status election in which the Commonwealth status was selected. This is a clear violation of the Treaty of Paris, Article 73 of the U.N. Charter, and U.N. Resolutions 1514 and 1541 pertaining to the process of De-colonization of colonial countries wherein they recognize the inalienable right of Chamoru Self-Determination.

The fact that Chamorus have not been given the opportunity to exercise their right to Self-Determination does not justify the Government of Guam, a "Federal Instrumentality" (Supreme Court decision Ngranges vs. Sanchez), having Non-

Chamorus vote on any political, social, or economic issue directly affecting the native Chamorus. This we believe is a grave injustice and although Chamorus now represent a minority, it does not give any government the right to preempt our existence. The Chamoru Nation vows never to remain silent on this issue until true exercise of Chamoru Self-Determination is realized. Nor will we ever accept the idea of giving non-natives the absolute power and right to seize and hold our Sovereignty, and at their whim, dictate our lives as indigenous people.

Self-Determination or De-colonization is neither an individual or a citizenry right. It is a right of a distinct group of people (Chamorus) whom have had an historical relationship with the administering power (U.S.). Therefore, it would be totally absurd to have U.S. Military personnel who are stationed on Guam, Foreigners who have been naturalized, and U.S. citizens from the states voting on any interim petition that would require a political status change. Even within the political framework of the United States, U.S. citizens residing adjacent to "Reservations" do not have the right to vote and pass policies affecting Native Americans.

Lastly, we Chamorus, for many years, have been placed under the auspices of the Department of Interior. This is an agency that has jurisdiction over Federal Properties and Animals. Today, we would like to proclaim that Chamorus of Guam are neither property nor animal. In recent years we have seen this agency, with the blessing of the Federal Government, advocate and pass more laws to protect endangered species and the environment than laws to protect the indigenous people of Guam. In fact, in the 99 years of U.S. rule, laws were instead imposed to undermine our existence as a people such as "Executive Orders" which prohibited the speaking of our language, the outlawing of many of our traditions, and the taking of our lands. One can only conclude that these acts are nothing more than a systematic process of genocide.

Members of Congress, December of '98 will mark one hundred years of U.S. rule and the Chamorus have yet to exercise their right to Self-Determination. Our people have lived in the Marianas for over 4,000 years. A peace loving people living in harmony with our neighbors and our surrounding environment. We Chamorus, like many other native peoples throughout the world, have committed no sins toward humanity. Our question therefore is pure: In God's name, what have we done to deserve such mistreatment? Rather than pursing Commonwealth for Guam, we ask that you support Guam Public law 23-130, which establishes the Chamorro Registry, and Public law 23-147, establishing the Commission on Decolonization for the implementation and exercise of Chamorro Self-

**Determination.**

**For these reasons, we rely upon your knowledge, compassion and wisdom to put an end to these injustices, to right the wrong, and to free a people. It's only fair, just, and the right thing to do.**

**Thank you for your kind attention. Si Yuos Ma'ase.**

**Debtralynne Quinata**

**Attachment: Public Law 23-147**

PUBLIC LAW 23-147

TWENTY-THIRD GUAM LEGISLATURE
1996 (SECOND) Regular Session

Bill No. 765
As substituted by the author

Introduced by: H. A. Cristobal

AN ACT TO CREATE THE COMMISSION ON DECOLONIZATION FOR THE IMPLEMENTATION AND EXERCISE OF CHAMORRO SELF-DETERMINATION.

BE IT ENACTED BY THE PEOPLE OF THE TERRITORY OF GUAM:

**Section 1. Statement of Legislative Findings and Purpose.** The Legislature recognizes that all the people of the territory of Guam have democratically expressed their collective will and has recognized and approved the inalienable right of the Chamorro people to self-determination. This includes the right to ultimately decide the future political status of the territory of Guam as expressed in Section 102 (a) of the draft Commonwealth Act, as approved by the people of Guam in a plebiscite held in September 1988. Consistent with this intent, the people of Guam have petitioned the United States Congress to also recognize this inalienable right on behalf of the American people. Noting that it has been almost nine (9) years since the people of Guam have transmitted the draft Commonwealth Act to the federal government and that Section 102 (a) has been significantly changed to warrant rejection of this section of the document, the Legislature, in the interest of the will of the people of Guam, desirous to end colonial discrimination and address long-standing injustice of a people does, hereby,

establish the Commission on Decolonization for the Implementation and Exercise of Chamorro Self-Determination.

**Section 2. Definitions.**

**(a) Self-Determination.** Freedom of a people to determine the way in which they shall be governed and whether or not they shall be self-governed.

**(b) Chamorro people of Guam.** All inhabitants of Guam in 1898 and their descendants who have taken no affirmative steps to preserve or acquire foreign nationality.

**Section 3. Legal and Moral Basis.** The following documents provide and support the moral and legal basis for Chamorro Self-Determination: the 1898 Treaty of Peace between the United States and Spain; Chapter XI of the United Nations Charter; United States yearly reports to the United Nations on the Non Self-Governing Territory of Guam; 1950 Organic Act of Guam; UN Resolution 1541 (XV); UN Resolution 1514 (XV); Sec. 307 (a) of the United States Immigration and Nationality Act; Part I, Article 1, Paragraph 1 and 3 of the International Covenant on Civil and Political Rights.

**Section 4. Creation and Membership of Commission.** There is established a Commission on Decolonization for the Implementation and Exercise of Chamorro Self-Determination for the people of Guam which shall be composed of (10) members including the Chairperson. The Governor shall serve as the Chairperson of the Commission. Three (3) members of the Commission shall be appointed by the Governor, of which (2) shall be members of Chamorro rights organizations; three (3) members of the Legislature, of which one (1) shall be a member of and be selected by, the Legislature's minority, one (1) member to be the Chairperson of the

Committee on Federal and Foreign Affairs, and one (1) to be appointed by the Speaker, who may appoint self; and one (1) member of the Mayors' Council shall be appointed by the Mayors' Council; one (1) member to represent the judiciary to be appointed by the Presiding Judge; and one (1) member to represent the youth of Guam to be appointed by the Speaker of the Youth Congress from among the qualified members of the Congress or he may appoint self. The Commission shall choose a vice-chairperson from among the members of the Commission. No person shall be eligible to serve as a member of the Commission unless he or she shall be a citizen of the United States qualified to vote on Guam. Members (except for the Chairman) shall serve throughout the life of the Commission and shall elect among themselves a Vice-Chairman who shall serve as Chairman in the absence of the Governor. Vacancies in the membership shall be filled in the same manner as the original appointment.

**Section 5. Function.** The general purpose of the Commission on Decolonization is to ascertain the desire of the Chamorro people of Guam as to their future political relationship with the United States. Once the desire of the Chamorro people of Guam is ascertained, the Commission shall transmit that desire to the President and Congress of the United States and the Secretary General of the United Nations.

**Section 6. Creation of Task Forces.** The Commission shall create three (3) Task Forces. Each task force shall be composed of seven (7) members, appointed by the Commission, who are advocates for the status for which they are appointed. The three task forces are: (1) Independence Task Force; (2) Free Association Task Force; and (3) Statehood Task Force.

**Section 7. Function of Task Forces.** The three task forces shall draw upon the resources of the Commission on Decolonization, and no later than four (4) months from the date of their appointment, after conducting an extensive study, including input from the general public, each task force shall present a position paper to the Commission on its respective political status option for Guam.

**Section 8. Office and Employees of the Commission.** Considering that the majority of the activities of the Commission on Self-Determination have been fulfilled, the office and employees of the Commission on Self-Determination shall also serve as the office and employees of the Commission on Decolonization.

**Section 9. Public Information Program.** The Commission, in conjunction with the Commission's task forces shall conduct an extensive public education program, throughout the island, based on the position papers submitted by each task force.

**Section 10. Plebiscite Date and Voting Ballot.** At the next Primary election, the Guam Election Commission, or any successors to it, shall conduct a political status plebiscite at which the following question shall be asked of the Chamorro people entitled to vote:

> "In recognition of your right to self-determination, which of the following political status options do you favor?" (Mark ONLY ONE):
>
> 1. Independence ( )
> 2. Free Association ( )
> 3. Statehood ( )

**Section 11. Run-off Plebiscite.** If one political status does not receive the majority votes cast in the above plebiscite, a run-off plebiscite shall be held sixty (60) days from the date thereof between the two (2) political status options receiving the highest number of votes.

**Section 12. General Powers of the Commission.** The Commission on Decolonization shall have, and may exercise, the following general powers in carrying out the activities of the Commission :

(a) To acquire, in any lawful manner, any property real and personal, mixed, tangible or intangible - to hold, maintain, use and operate the same; and to sell, lease or otherwise dispose of the same, whenever any of the foregoing transactions are deemed necessary or appropriate to the conduct of the activities authorized by this Chapter, and on such terms as may be prescribed by the Commission.

(b) To enter and perform such contracts, cooperative agreements or other transactions with any person, firm, association, corporation or any agency and instrumentality of the government of Guam or the United States or any country, state, territory or the United Nations, or any subdivision thereof, as may be deemed necessary or appropriate to the conduct of the activities authorized on this Chapter, and on such terms as may be prescribed by the Commission.

(c) To execute all instruments necessary or appropriate in any of its functions.

(d) To appoint, without regard to the provisions of the Personnel and Compensation Laws, such officers, agents, attorneys,

consultants and employees as may be necessary for the conduct of business of the Commission; to delegate to them such powers and to prescribe for them such duties as may be deemed appropriate by the Commission; to fix and pay such compensation to them for their services as the Commission may determine, without regard to the provisions of the Personnel and Compensation Laws. In the appointment of officials and the selection of employees, agents and consultants for the Commission, no political test or qualification shall be permitted or given consideration, but all such appointments shall be given and made on the basis of merit and knowledge. The Commission shall give due consideration to residents of Guam in the selection of its officials, attorneys, agents, consultants and employees.

(e) To accept gifts or donations of services, or of property - real, personal or mixed, tangible or intangible - in aid of any of the activities authorized by this Chapter.

(f) To adopt rules and regulations governing operations of the Commission and to take such other action as may be necessary or appropriate to carry out the powers and duties herein specified or hereafter granted to or imposed upon it.

**Section 13. Commission on Self-Determination.** Nothing in this Act shall preclude the activities of the Commission on Self-Determination.

**Section 14. Repository for Commission Documents.** The Nieves Flores Memorial Library shall be the depository of all public records and materials pertaining to political status of the territory of Guam. The Commission on

Decolonization and its Office shall transfer all of its official public documents upon completion of its work to such depository.

**DEBTRALYNNE QUINATA**
**Nasion Chamoru**
**P.O. Box 1609**
**Agana, Guam 96932**

**Tel: (617) 734-8018**

**Our statement gives a number of reasons we oppose H.R. 100. The most important, is the inherent sovereignty of the Chamoru people. We also question actions by the Department of Interior and ask the Congress of the United States to support our rights as a people.**

JT/TS/KAH

October 20, 1997

Chairman Don Young and Members
House Resources Committee
1324 Longworth House Office Building
U.S. House of Representatives
Washington, D.C. 20515-6201

Dear Chairman Young & Committee Members:

Please include the attached statement that I have written in support of Guam's Quest for Commonwealth as Testimony during the House Resources Committee's hearing to be held on October 29, 1997.

Thank you.

Frank C. San Nicolas

Frank C. San Nicolas
P.O. Box 6926
Tamuning, Guam 96931

i Manana
? ma representan maolek
nanga
— i gubetnu, i senadot
i nasion Chamoru
— ännok na fi siha
mañaga

**"FONDON KORASON"**

GOING ON A CENTURY, THE INDIGENOUS PEOPLE OF GUAM, THE CHAMORROS, HAVE BEEN UNDER AMERICAN COLONIAL RULE; THEY WERE TAUGHT AMERICAN IDEALS AND BELIEFS; THEY LEARNED THE BEAUTY OF AMERICAN PRINCIPLES AND DEMOCRATIC FORM OF GOVERNMENT. AND FOR ALMOST A CENTURY, THE CHAMORRO HAS BEEN INDOCTRINATED AND LEARNED EVERYTHING—THEN SOME, THAT WAS TAUGHT.

BUT FOR THE NEARLY FULL CENTURY GONE BY, THE CHAMORRO COULD NOT, DID NOT AND WOULD NOT FULLY ENJOY THOSE TEACHINGS, BELIEFS AND IDEALS, BECAUSE THE CHAMORRO WAS NEVER ALLOWED TO FUNDAMENTALLY PRACTICE THEM DUE TO LIMITATIONS, CONDITIONS AND STIPULATIONS IMPOSED ARBITRARILY, FOR EITHER FEDERAL AND/OR MILITARY POLITICAL IDIOSYNCRASIES.

DURING THAT PERIOD, THE CHAMORRO HAD SERVED LOYALLY AND SACRIFICED FAITHFULLY IN THE INTERESTS OF BOTH "NATIONAL SECURITY" AND "DEMOCRACY", ENDURING SIGNIFICANT AND VITAL PERSONAL PROPERTY LOSES WITHOUT QUESTION, WITHOUT "DUE PROCESS", AND FOR ONLY TOKEN OR PIECEMEAL COMPENSATION. IN ADDITION AND WITHOUT QUESTION AGAIN, THAT OF GIVING THE ULTIMATE SACRIFICE OF HER SONS, CONTINUALLY AND CONSISTENTLY, DURING WAR AND PEACE.

FOR ALMOST A CENTURY, A SYSTEM OF ARROGANT, HYPOCRITICAL AND ARBITRARY RULE BY BOTH TRANSIENT MILITARY AND/OR FEDERAL LEADERS HAD BEEN UNFAIRLY AND UNJUSTLY IMPOSED ON THE CHAMORRO; SHIFTING THAT EVERSO "FAITHFUL" SERVICE—TO RUN A FOOL'S ERRAND (VIETNAM) AND SUBVERTING LOYALTY INTO DEFIANCE WITHIN AMERICA HERSELF—NOTWITHSTANDING GUAM'S SERVICE AND SACRIFICE WHICH WAS ALMOST THREE(3) TIMES THE NATIONAL AVERAGE. A CONSEQUENTIAL AND UNPRECEDENTED "AWARENESS" UNVEILED AND REVEALED A SUPPRESSION OF THOSE INVALUABLE PRINCIPLES, AS WELL AS THE SWINDLING OF THE CHAMORROS' LANDS, TO A GENERATION OF CHAMORROS OF WHOM HAD BORNE THE GREATEST AND UNEQUALED SACRIFICE DURING VIETNAM AND WHOM ARE NOW INTOLERANT FOR THE MEANS BY WHICH THEY WERE ACHIEVED.

THE CHAMORROS HAVE PAID THEIR DUES MUTUALLY; RECIPROCALLY THEY DESERVE MUTUAL RESPECT AND TREATMENT. THEY ARE PEACEFUL, LAW-ABIDING CITIZENS AND TO THAT END, SHALL AGGRESSIVELY ASSERT AND AFFIRM MORE THAN EVER THEIR RIGHTS TO BE GOVERNED BY A GOVERNMENT OF LAWS MUTUALLY CONDUCIVE TO THE GOVERNED, RATHER THAN BY LAWS BY MEN WHO ARE SEPARATED, ISOLATED, UNASSOCIATED AND SEGREGATED FROM THEM—DEEMING ONLY AN APPURTENANT RELATIONSHIP, SUBJECT TO

SEASONAL POLITICAL CHANGES AND DIFFERENCES, AS MAY OCCUR.... OR TO SELF-DETERMINATION

AS AN HEIR APPARENT TO ONE(1) SUPPRESSED AND SWINDLED CHAMORRO, I AM PROFOUNDLY ENDURING NO MORE THAT UNFAIR AND UNJUST LEGACY. I NOW DESIRE, WITH A PASSION AND COMMITMENT, TO FULLY ENJOY EITHER ALL THE "INALIENABLE" AND UNADULTERATED RIGHTS GUARANTEED TO ALL AMERICANS BY THE UNITED STATES CONSTITUTION. I WAS **BORN** ONE; TO PUT AN END TO GUAM'S COLONIALISM TO HAVE A RECOGNIZED AND **VOTING** OFFICIAL(S) REPRESENTATIVE(S) IN THE UNITED STATES CONGRESS; AND TO BE ABLE TO CAST MY VOTE WITH MY VOTE COUNTED FOR THE PRESIDENT OF THE UNITED STATES, WHILE ON GUAM. OTHERWISE, I SINCERELY REQUEST AND URGE YOU TO ACKNOWLEDGE, RESPECT AND SUPPORT THE CHAMORROS' QUEST FOR SELF-DETERMINATION AND ACT ACCORDINGLY.

AS AN CHAMORRO-AMERICAN HAVING SERVED LOYALLY AND FAITHFULLY FOR AMERICA, I FIND IN MY HEART THAT ON OR BEFORE THE YEAR 2000, I AM RESOLVED THAT SHOULD THE CHAMORROS'/GUAM'S NEEDS OR CONCERNS ARE NOT REDRESSED AND RESOLVED, AS EXPRESSED THOUGH OUR ELECTED OFFICIALS, THAT IT SHALL BE JUST CAUSE AND REASON TO PERHAPS RENOUNCE MY UNITED STATES CITIZENSHIP. COME WHAT MAY, AS A CHAMORRO, I STILL CHERISH, I WILL DEFEND AND I SHALL PROTECT WHAT HAS BEEN RIGHTFULLY OURS FROM THE START. THIS IS FOR MY ISLAND HOMELAND.

RESPECTFULLY,

Frank C. San Nicolas

FRANK C. SAN NICOLAS

"VIETNAM VETERAN FIGHTING FOR HOMELAND"

"ONLY AN ACT OF CONGRESS,
- SUPREME COURT
- OR GOD, WILL MOVE ME NOW."

TO MY SON, CHRIS

**STATEMENT OF**
**SENATOR ELIZABETH BARRETT-ANDERSON**
**CHAIRPERSON**
**COMMITTEE ON JUDICIARY, PUBLIC SAFETY AND CONSUMER PROTECTION**
**24TH GUAM LEGISLATURE**

**COMMITTEE ON RESOURCES**
**UNITED STATES HOUSE OF REPRESENTATIVES**

October 29, 1997

MR. CHAIRMAN:

I am Senator Elizabeth Barrett-Anderson, Chairperson of the Committee on Judiciary, Public Safety & Consumer Protection of the 24th Guam Legislature. This is my second appearance before the House Committee on Resources to testify on a "Guam Elected Attorney General". I appear before you today to urge your positive consideration of Resolution #186 adopted by the 24th Guam Legislature expressing opposition to the form contained under HR 2370 providing for an elected Attorney General of Guam.

Since my last testimony on July 22, 1996, the sentiment and desire of the people of Guam to elect their Attorney General has become stronger than ever. Delegate Underwood conducted an informal newspaper poll soliciting input from the general public on the issue of an elected attorney general. Of the total 3,972 responding, 2,744 (69%) favored an elected position. The poll also asked whether or not the position should be mandated by Congress, or left to the Guam Legislature to create. A slight majority of citizens favored local legislation (1467 to 1277).

Whether or not an elected attorney general should be established by Congressional mandate or left to the local legislature is a legal question. As such I strongly suggest that Congress not rely on the poll results for guidance, and that the Committee adopt a format that in its judgment will protect the amendment from legal challenges inherent in the establishment of such a powerful executive branch position.

The 24th Guam Legislature by Resolution #186 strongly advises that Congress enact an amendment that clearly, and unequivocally establishes the attorney general as a co-equal executive branch position. This is similar to most state constitutions. Any amendment short of a mandate could trigger a challenge by an incumbent Governor to determine the extent to which Congress intended the Governor's organic powers to be diminished by an elected attorney general.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 362 of 542

Page 2
Testimony before Committee on Resources
U.S. House of Representatives
Senator Elizabeth Barrett-Anderson

Any amendment establishing the elected attorney general should contain sufficient constitutional protections to guard against uncertainty in reviewing Congressional intent. HR 2370 fail to provide the protections necessary as it does not amend the executive branch of the government of Guam to include the elected attorney general as a co-equal executive position. Resolution #186 does.

The good example of understanding the "constitutional" nature of the Organic Act, and the problems inherent in not amending it properly, is in the authority granted Guam to create its appellate court. The establishment of the appellate court "...in the discretion..." of the local Legislature did not provide our appellate court the type of constitutional protection guaranteed under the doctrine of separation of powers.

In his 1st State of the Judiciary speech, Chief Justice Peter Siguenza acknowledged that while the adoption of a local constitution "...has real merit, and may in the long run provide exactly the solution, there is not enough time." The Justice's reference to a lack of time was his concern that the Guam Legislature could at anytime alter the jurisdiction of the Supreme Court of Guam. Thus, HR 2370 is proposed to correct this flaw. I support only those portions of HR 2370 which establish the Supreme Court of Guam as the highest court in our judiciary.

It burdens me to suggest that the Organic Act is Guam's constitution. Yet when we recognize that the entire structure of our local government is framed and shaped by the Organic Act of Guam we cannot escape the recognition that the Act is in the nature of a "constitutional" document, and therefore, amendments should be adopted as if we were amending Guam's constitution.

Mr. Chairman, I want to thank you for your statements of September 23, 1997 on the House floor, and as contained in House Report on HR 1460 wherein you acknowledged Resolution #85 of the 24th Guam Legislature requesting Congress to confirm that the adoption of a local constitution would not prejudice Guam's efforts towards self-determination. If I may quote from that Report you stated, "The adoption of a local constitution is a significant part of the evolution of self-government, but it does not preclude the right of further self-determination in the advance toward a final political status." (House Report 105-253, September 18, 1997) The simple point is that no matter what status we maintain, or eventually attain, a constitution is critical in the establishment of local government.

I favor adoption of a local constitution for Guam not as a substitute for political status, but in aid of political status. Our Delegate strongly opposes a pre-status constitution, as do others who confuse its adoption as an alternative to our efforts towards Commonwealth. Mr. Chair, your statements last month recognizing the importance of a Guam constitution, combined with your efforts today in hearing testimony on HR 100, the "Guam Commonwealth Act" is evidence that one need not be exclusive of the other. What a constitution can do for Guam is to reduce the need to constantly amend the Organic Act of Guam everytime something doesn't work right at home.

As long as we continue to ignore the importance of adopting a local constitution then these types of hearing are absolutely necessary in order to make structural changes to our governmental system. Therefore, Mr. Chair, on behalf of the 24th Guam Legislature I urge your positive consideration of the following resolutions to amend the Organic Act of Guam: Resolution #37 previously transmitted relative to voting and quorum requirements of the Guam Legislature; Resolution #85 transmitted separately relative to Guam's constitution; and Resolution #186 incorporated herewith into my testimony and officially transmitted today relative to requesting the 105th Congress to mandate the establishment of an elected attorney general of Guam

I thank the Committee for its attention to my testimony, and look forward to continued cooperation on this issue of a local constitution.

46-318 98 - 12

**Resolution No. 186 (LS)**

**Introduced by:**

**E. Barrett-Anderson**
**A. C. Blaz**
**J. M.S. Brown**

| | |
|---|---|
| **Felix P. Camacho** | **Francisco P. Camacho** |
| **E. J. Cruz** | **M. C. Charfauros** |
| **Mark Forbes** | **W. B.S.M. Flores** |
| **L. F. Kasperbauer** | **L. Leon Guerrero** |
| **A. C. Lamorena, V** | **V. C. Pangelinan** |
| **C. A. Leon Guerrero** | **A. L.G. Santos** |
| **J. C. Salas** | **F. E. Santos** |
| **T. C. Ada** | **A. R. Unpingco** |
| **F. B. Aguon, Jr.** | **J. Won Pat-Borja** |

**Relative to requesting the 105th Congress to amend certain Sections of the Organic Act of Guam, Title 48 United States Code, to mandate the establishment and independent election of the position of Attorney General.**

**BE IT RESOLVED BY THE TWENTY-FOURTH GUAM LEGISLATURE:**

**WHEREAS**, the Twenty-Third Guam Legislature previously adopted and transmitted to Congressman Robert Underwood Resolution No. 433 (LS), dated June 8, 1996, calling for certain amendments to the Organic Act of Guam to provide for an elected Attorney General of Guam, independent from the general supervision of the Governor; and

**WHEREAS**, Congressman Underwood has introduced a bill in the House of Representatives which, if enacted, would permit the Guam Legislature to provide by law for an elected Attorney General, but also would permit the continuance of an Attorney General appointed by the Governor of Guam; and

**WHEREAS**, during the past two (2) years the growing need for an independent Attorney General has become increasingly evident by the instability and lack of professional continuity in that office, particularly in the Prosecution Division, where some twenty-two (22) prosecutors have resigned in that two (2) year period, culminating on August 6, 1997, in the resignations of both the Attorney General and Chief Prosecutor; and

**WHEREAS**, the citizens of Guam have overwhelmingly expressed their strong desire to actively participate in the process of selecting the Attorney General, and that can be achieved only by making the office of the Attorney General an elective office whose occupant answers not to the Governor, but directly to the people; and

**WHEREAS**, the Guam Legislature further finds that the only sure way to achieve those vital objectives, while restoring public confidence in the competence and integrity of the office, is by an amendment to the Organic Act mandating an independently elected Attorney General of Guam; now therefore, be it

**RESOLVED**, by the Twenty-Fourth Guam Legislature, that the 105th Congress amend the Organic Act of Guam to provide for the creation of the position of Attorney General, and to provide that the position be selected by election by a vote of the people of Guam. To that end, the following amendments to the Organic Act of Guam are hereby requested:

**Section 1.** Section 6 of the Organic Act of Guam (48 U.S.C. 1422) is amended to read:

"§1422. *Governor; Lieutenant Governor; Attorney General: Powers, duties. The executive power of Guam shall be vested in a governor, lieutenant governor and an attorney general. The Governor of Guam, together with the Lieutenant Governor, shall be elected by a majority of the votes cast by the people* who *are qualified to vote for the members of the Legislature of Guam. The Governor and Lieutenant Governor jointly shall be chosen by the casting by each voter of a single vote applicable to both offices. If no candidate receives a majority of the votes cast in any election, on the fourteenth day thereafter a runoff election shall be held between the candidates for Governor and Lieutenant Governor shall be held on November 3, 1970. Thereafter, beginning with the year 1974, the Governor and Lieutenant Governor shall hold office for a term of four years and until their successors are elected and qualified.*

*No person who has been elected Governor for two full successive terms shall again be eligible to hold that office until one full term has intervened.*

*The term of the elected Governor and Lieutenant Governor shall commence on the first Monday in January following the date of election.*

*No person shall be eligible for election to the office of Governor, Lieutenant Governor or Attorney General unless he is an eligible voter and has been for five consecutive years immediately preceding the election a citizen of the United States and a bona fide resident of Guam and will be at the time of taking office, at least thirty years of age, has not been convicted of a felony or of a crime involving moral turpitude, and in the case of the office of the Attorney General, has been admitted to the practice of law in Guam and is an attorney in good standing at the time of his election.*

*The Governor shall have general supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of the government of Guam, with the exception of the office of the Attorney General which shall be independent from the general supervision of the Governor. He may grant pardons and reprieves and remit fines and forfeitures for offenses against local laws. He may veto any legislation as provided in this chapter, He shall appoint, and may remove, all officers and employees of the executive branch of the government of Guam, except as otherwise provided in this or any other Act of Congress, or under the laws of Guam, and shall commission all officers he may be authorized to appoint. He shall be responsible for the faithful execution of the laws of*

*Guam and the laws of the United States applicable in Guam. Whenever it becomes necessary, in case of disaster, invasion, insurrection, or rebellion, or imminent danger thereof, or to prevent or suppress lawless violence, he may summon the posse comitatus or call out the militia or request the assistance of the senior military or naval commander of the Armed Forces of the United States in Guam, which may be given at the discretion of such commander if not disruptive of, or inconsistent with, his federal responsibilities. He may, in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, proclaim the island, insofar as it is under the jurisdiction of the government of Guam, to be under martial law. The members of the Legislature shall meet forthwith on their own initiative and may, by two-thirds vote, revoke such proclamation.*

*The Governor shall prepare, publish, and submit to the Congress and the Secretary of the Interior a comprehensive annual financial report in conformance with the standards of the National Council on Governmental Accounting within one hundred and twenty days after the close of the fiscal year. The comprehensive annual financial report shall include statistical data as set forth in the standards of the National Council on Governmental Accounting relating to the physical, economic, social and political characteristics of the government, and any other information required by Congress. The Governor shall transmit the comprehensive annual financial report to the Inspector General of the Department of the Interior who shall audit it and report his findings to Congress. The Governor shall also make such other reports at such other times as may be required by the Congress or under applicable Federal law. He shall also submit to the Congress, the Secretary of the Interior, and the cognizant Federal auditors a written statement of actions taken or contemplated on Federal audit recommendations within sixty days after the issuance date of the audit report. He shall have the power to issue executive orders and regulations not in conflict with any applicable law. He may recommend bills to the Legislature and give expression to his views on any matter before that body.*

*There is hereby established the office of Lieutenant Governor of Guam. The Lieutenant Governor shall have such executive powers and perform such duties as may be assigned to him by the Governor or prescribed by this chapter of under the laws of Guam.*

*There is hereby established the office of the Attorney General to be administered by the Attorney General of Guam who shall be elected in accordance with this Section. The Attorney General shall be the chief legal officer of the government of Guam, shall be vested with common law powers and such additional powers and duties as may be prescribed under the laws of Guam, not inconsistent with this chapter. The Attorney General shall prosecute all criminal violations of Guam law, provide legal advice to the government, and represent the government in all civil cases in which the government of Guam may be interested. The Attorney General may not, while in office, engage in the private practice of law or actively engage in partisan politics or, within one year of ceasing to hold office, run for other elective office. The salary of the Attorney General shall be established by the laws of Guam."*

**Section 2.** Section 7 of the Organic Act of Guam (48 U.S.C.1422a(b)) is amended to read:

*"(b) Any Governor, Lieutenant Governor, Attorney General or member of the Legislature of Guam may be removed from office by a referendum election in which at least two-thirds of the number of persons voting for such official in the last preceding general election at which such official was elected vote in favor of a recall and in which those so voting constitute a majority of all those participating in the referendum election. The referendum election shall be initiated by the Legislature of Guam following (a) a two-thirds vote of the members of the Legislature in favor of a referendum, or (b) a petition for a referendum to the Legislature by registered voters equal in number to at least 50 per centum of the whole number of votes cast at the last general election at which such official was elected preceding the filing of the petition."*

**Section 3.** Section 8 of the Organic Act of Guam (48 U.S.C.1422b) is amended by adding at the end the following new Subsection:

*"(g)* ***Vacancy in the Office of Attorney General.*** *In case of a permanent vacancy in the office that occurs within two (2) years after the incumbent's assumption of office, the Governor of Guam shall call a special election to fill the remainder of the term of the Attorney General. In all other cases of absence or disability of the Attorney General, the vacancy shall be filled as provided by the laws of Guam."*

**Section 4.** Section 29 of the Organic Act of Guam (48 U.S.C. 1421g(c)) is amended to read:

*"(c)* ***Office of Public Auditor.*** *The government of Guam may by law establish an Office of Public Auditor. The Public Auditor may be selected and removed as provided by the laws of Guam"*; and be it further

**RESOLVED**, that the Speaker certifies to, and the Legislative Secretary attests, the adoption hereof and that copies be thereafter transmitted to Congressman Don Young, Chairman, House Committee on Resources; to Robert Underwood, Delegate to Congress; to Congressman Newt Gingrich, Speaker of the House of Representatives; to Senator Trent Lott, Senate Majority Leader; to Senator Frank Murkowski, Chairperson, Senate Energy and Natural Resources Committee; to Congressman Elton Gallegly, Chairman, House Subcommittee on Native American and Insular Affairs; and to the Honorable Carl T.C. Gutierrez, Governor of Guam.

**DULY AND REGULARLY ADOPTED ON THE 8TH DAY OF OCTOBER, 1997.**

| | |
|---|---|
| **ANTONIO R. UNPINGCO**<br>**Speaker** | **JOANNE M.S. BROWN**<br>**Senator and Legislative Secretary** |

**Resolution No. 85 (LS)**
**As amended on the floor.**

**Introduced by:**
**E. Barrett-Anderson**
**T. C. Ada**
**F. B. Aguon, Jr.**

| | |
|---|---|
| A. C. Blaz | A. C. Lamorena, V |
| J. M.S. Brown | C. A. Leon Guerrero |
| Felix P. Camacho | L. Leon Guerrero |
| Francisco P. Camacho | V. C. Pangelinan |
| M. C. Charfauros | J. C. Salas |
| E. J. Cruz | A. L.G. Santos |
| W. B.S.M. Flores | F. E. Santos |
| Mark Forbes | A. R. Unpingco |
| L. F. Kasperbauer | J. Won Pat-Borja |

GUAM LEGISLATURE
AGANA, GUAM

**Relative to requesting the 105th Congress to amend Public Law Number 94-584 by adding a new Section 6, to confirm that the adoption of a Constitution establishing local government shall not preclude or prejudice the further exercise in the future by the people of Guam of the right of self-determination regarding the ultimate political status of Guam.**

**BE IT RESOLVED BY THE LEGISLATURE OF THE TERRITORY OF GUAM:**

**WHEREAS**, in 1976 the United States Congress enabled the people of Guam, pursuant to Public Law Number 94-584, to organize a government under a constitution of our own adoption, which upon approval by Congress and the people of Guam, would provide for local government over the internal affairs of our Island; and

**WHEREAS**, when the current government of Guam structure for territorial government was established under the 1950 Organic Act, it was welcomed by the people of Guam as progress toward greater local government, but it was instituted without the consent of the people of Guam through a democratic act of self-determination or participation in the Federal lawmaking process on the basis of equal citizenship or equal representation; and

**WHEREAS**, the 1977 Constitution of Guam, drafted pursuant to Federal and local statutes, was approved by Congress but was not approved by the people of Guam in the 1979 referendum; and

**WHEREAS**, the process of establishment of internal local government under a local constitution was suspended after linkage was created between the draft constitution and the political status process; and

**WHEREAS**, in light of representation and speculations inconsistent with the foregoing from 1979 to the present, it is essential for Congress to confirm its original and continued intention and expectation that authorization and approval of local constitutional government in Guam would not preclude or be prejudicial to the exercise of the right to self-determination, as part of the process through which ultimate political status of the territory of Guam is to be determined; now therefore, be it

**RESOLVED**, by the Guam Legislature, on behalf of the people of Guam, request the One Hundred and Fifth Congress of the United States to amend Public Law Number 94-584, Oct. 21, 1976, 90 Stat. 2899, as amended by Public Law Number 96-597, Title V, Sec. 501, Dec. 24, 1980, 94 Stat. 3479, by adding a new Section 6 to read as follows:

> "**Section 6.** Establishment of local constitutional local government pursuant to this Act shall not preclude or prejudice the further exercise in the future by the people of Guam or the Virgin Islands of the right of self-determination regarding the ultimate political status of either territory."

and be it further

**RESOLVED**, that the Speaker certifies to, and the Legislative Secretary attests, the adoption hereof and that copies thereafter be transmitted to: the President of the United States of America; to the President Pro Tempore, United States Senate; to the Majority Leader, United States Senate; to the Minority Leader, United States Senate; to the Chairman of the Committee of Energy and Natural Resources, United States Senate; to the Speaker, U.S. House of Representatives; to the Majority Leader, U.S. House of Representatives; to the Minority Leader, U.S. House of Representatives; to the Chairman of the Committee on Resources, U.S. House of Representatives; to the Resident Commissioner of Puerto Rico, U.S. House of Representatives; to the Virgin Islands Delegate to Washington, U.S. House of Representatives; to the Guam Delegate to Washington, U.S. House of Representatives; to the President of the Mayor's Council; and to the Honorable Carl T.C. Gutierrez, Governor of Guam.

**DULY AND REGULARLY ADOPTED ON THE 15TH DAY OF SEPTEMBER, 1997.**

**ANTHONY C. BLAZ**
**Acting Speaker**

**JOANNE M.S. BROWN**
**Senator and Legislative Secretary**

TWENTY-FOURTH GUAM LEGISLATURE
1997 (FIRST) Regular Session

Resolution No. 37 (LS)

Introduced by:

E. Barrett-Anderson
T. C. Ada
F. B. Aguon, Jr.
A. C. Blaz
J. M.S. Brown
Felix P. Camacho
Francisco P. Camacho
M. C. Charfauros
E. J. Cruz
W. B.S.M. Flores
Mark Forbes
L. F. Kasperbauer
A. C. Lamorena, V
C. A. Leon Guerrero
L. Leon Guerrero
V. C. Pangelinan
J. C. Salas
A. L.G. Santos
F. E. Santos
A. R. Unpingco
J. WonPat-Borja

Relative to requesting the 105th Congress to amend the Organic Act relative to the requirements for quorum and passage of laws in the Territory of Guam.

**BE IT RESOLVED BY THE LEGISLATURE OF THE TERRITORY OF GUAM:**

WHEREAS, the Organic Act of Guam provides for the establishment of a unicameral legislature, composed of not more than twenty-one (21) members [ 48 USCA §1423(a) and 1423(b) ]; and

WHEREAS, the Organic Act provides that the Legislative quorum "shall consist of eleven of its members. No bill shall become a law unless it shall have been passed at a meeting, at which a quorum was present, by the affirmative vote of a majority of the members present and voting..." [ 48 USCA §1423b ], and further explicitly repeals any law of the local legislature that is inconsistent with the Act itself; and

WHEREAS, Title 2 Guam Code Annotated §2104 states that, "No bill shall be passed by the Legislature with less than eleven (11) affirmative votes," [ enacted July 24, 1968, P.L. 9-218 ], which is clearly inconsistent with provisions of the Organic Act requiring only a simple majority of an eleven (11) member quorum; and

WHEREAS, at the General Election held on November 4, 1996, the people of Guam voted by a majority percentage namely 25,125, to reduce the size of membership of the Guam Legislature from twenty-one (21) members to fifteen (15) members, effective the inauguration of the 25th Guam Legislature in January of 1999 (P.L. 23-99); and

WHEREAS, Congress should grant to the people of Guam through and by its elected representatives the power to establish an appropriate quorum for the Guam Legislature in tandem with the desire of the people of Guam to reform their local legislature; and

WHEREAS, Congress should grant to the people of Guam, through their elected representative, the determination of the required number of votes necessary to pass laws in the Territory of Guam; now therefore, be it

RESOLVED, that the Twenty-Fourth Guam Legislature, on behalf of the people of Guam, requests the 105th United States Congress to amend Title 48

USCA Section 1423b, the Organic Act of Guam, as follows: ***"Section 1423b. Selection and Qualification of members; Officers; Rules; Quorum.*** *The Legislature shall be the judge of the selection and qualification of its members. It shall choose from its members its own officers, determine its rules and procedures, not inconsistent with this chapter, and keep a journal.* [ ~~*The quorum of the legislature shall consist of eleven of its member. No bill shall become a law unless it shall have been passed at a meeting, at which a quorum was present, by the affirmative vote of a majority of the members present and voting, which vote shall be by ayes and nays*~~] *The quorum of the Legislature of Guam shall be determined by the laws of Guam. No bill shall become a law unless it shall have been passed at a meeting, at which a quorum was present, by the required number of affirmative votes of the members present and voting as provided by the laws of Guam."*; and be it further

RESOLVED, that the Speaker certfies to, and the Legislative Secretary attests the adoption hereof and that copies thereafter be transmitted to the President of the United States of America; the Majority Leader of the United States Senate; the Chairman of the Resources Committee of the House of Representatives; the Guam Delegate to Washington; the President of the Mayor's Council of Guam; and to the Honorable Carl T.C. Gutierrez, Governor of Guam.

**DULY AND REGULARLY ADOPTED THIS 3RD DAY OF MAY, 1997.**

**ANTONIO R. UNPINGCO**
**Speaker**

**JOANNE M.S. BROWN**
**Senator and Legislative Secretary**

ROBERT A. UNDERWOOD
GUAM

NATIONAL SECURITY COMMITTEE
SUBCOMMITTEES
MILITARY READINESS
MILITARY PERSONNEL
MILITARY INSTALLATIONS AND FACILITIES
RESOURCES COMMITTEE
SUBCOMMITTEE
NATIONAL PARKS AND PUBLIC LANDS

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515–5301**

WASHINGTON OFFICE:
424 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–5301
PH: (202) 225–1188
FAX: (202) 226–0341
e mail: guamtodc@hr.house.gov

GUAM OFFICE:
SUITE 107
120 FATHER DUENAS AVENUE
AGANA, GU 96910
PH: (671) 477–4272/73/74
FAX: (671) 477–2587

RECEIVED
MAY 30 1997

May 30, 1997

Honorable Elizabeth Barrett-Anderson
24th Guam Legislature
173 Aspinall Avenue, Suite 108A
Agana, Guam 96910

Dear Senator Barrett-Anderson:

Thank you for your recent letter expressing your concerns about Guam's quest for political status vis-a-vis Puerto Rico's. As you will recall from the Puerto Rico status hearings, they are on a defined track toward independence, continued commonwealth or statehood. For Guam, our option for the immediate future has been decided, our quest for commonwealth status is the path which the people of Guam have chosen.

The Guam Commonwealth Act, which the people of Guam entrusted to us, creates an improved relationship with the federal government based on mutual respect and mutual benefit. It is an interim status which moves us towards greater self government. Despite the 15 years since the initial plebiscite was held, it is still the document that represents the will of the people.

I believe that the adoption of a constitution before we achieve commonwealth would jeopardize our quest for self-determination. Therefore, I continue to oppose this proposal. Since we embarked on our journey for Guam commonwealth about 10 years ago, there has been much frustration, but this is not cause to abandon our quest.

As you know, it is not necessary to pass another law to establish a Guam Constitutional Convention. Current law authorizes us to call for a convention anytime. The issue here is not whether Guam should have a constitution in lieu of the Organic Act. The real issue is whether Guam's political status should be addressed before a constitution is adopted. In 1979, the people of Guam rejected the proposed Guam constitution. They clearly wanted Guam's decolonization and Guam's political status to be addressed adequately before we begin drafting a constitution. I believe that any constitutional process without a change in the federal territorial relationship simply creates an illusion of "self-government" and leaves many important issues unresolved.

Honorable Elizabth Barrett-Anderson
May 30, 1997
Page 2

The upcoming congressional hearing on the Guam Commonwealth Act will address Guam's concerns about immigration, commerce, foreign affairs, land issues, and the application of federal laws. Through the work of this office, the Guam Commission on Self Determination and the Administration, we have reached agreement on some of these difficult issues. I trust that the hearing will focus on a proposed federal-territorial relationship as defined by the parameters of the discussions over the past decade. I believe that the hearing process in Congress will clarify the federal response to our proposal. Submitting an alternative proposal at this time will only service to cloud the issues and allow the federal government to claim that increased autonomy has been granted.

I appreciate your contacting me about these matters and hope that you will lend your support behind the quest for commonwealth status which is just and fair for the people of Guam.

Sincerely,

Robert A. Underwood

**ROBERT A. UNDERWOOD**
**Member of Congress**

cc: Senators, 24th Guam Legislature

**STATEMENT FOR THE RECORD**

**GUAM COMMISSION ON SELF-DETERMINATION**

**HOUSE RESOURCES COMMITTEE**
**(105th CONGRESS)**

**HEARING ON H.R. 100**
**THE DRAFT GUAM COMMONWEALTH ACT**

**October 29, 1997**

The following is submitted on behalf of the Guam Commission on Self-Determination. The Commission on Self-Determination ("Commission" or "CSD") is a multi-branch, bi-partisan governmental body created by Guam law to represent the people of Guam on the question of their political relationship with the United States. Since 1984 the Commission has been the primary conduit of communications between Guam and the U.S. Congress and the U.S. Executive Branch with respect to the development of and discussion of a Commonwealth status for Guam.

**PART 1.**

**Commonwealth Status: Conceptual and Legal Framework**

Commonwealth was a status chosen by Guam voters in 1982 with draft language endorsed by Guam voters in 1987. The measure approved by Guam voters in 1987 is now H.R. 100 which is being heard by the Committee today.

Guam's approach to political rights and political status was spurred in the 1970s and 1980s by incomplete reactions by the U.S. to Guam's repeated requests changes to the relationship and by developments in the former Trust Territory of the Pacific Islands. Specifically, in the 1970s, Guam's rejection of a U.S. approved "constitutional" approach to self-government together with U.S. inaction on specific Guam-requested changes (such as limits on immigration and the loosening of economic constraints) led to the examination of political status.

Two messages consistently came through from Guam residents. First, they wanted a relationship with the United States that recognized Guam as its own political entity and not a mere appendage to the United States. Secondly, the retention of U.S. citizenship was viewed as important. The voters of Guam's 1982 selection of "Commonwealth" (in a run-off with Statehood) affirmed these two messages.

In 1983, representatives of Guam, following discussions with Congressman Manuel Lujan (R-NM) and Congressional delegate Won Pat (D-GU) met with Congressional members and staff in Albuquerque, New Mexico to discuss a "Congressional approach" to Guam's status desires. Earlier efforts by Guam representatives to engage the U.S. Executive Branch — which had

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 373 of 542

repeatedly refused to discuss status questions with Guam — had also pointed to the leadership role of the Congress particularly in view of the Constitutional powers reserved to the Congress over territories.

Notwithstanding some informal consultations with Congressional Committee leadership in 1984 and 1985, and Congressional recommendations concerning the language of a Commonwealth Act, the evolution of issues in Guam dictated that the Commonwealth Bill language be first a product of Guam's desires. Only after Guam's aspirations were formalized would the process of working with the federal government on the form of a final bill commence.

After eight years of discussions with the U.S. Executive Branch began at the direction of Congress in 1989, the Guam Commission on Self-Determination and the Guam Commonwealth Act are now before the Congress again. It is the Commission's desire to conclude discussions with the U.S. Congress on the form a bill which reflects the mutual interests of the people of Guam and the government of the United States.

Promoting Guam's Internal Self-Governance Under U.S. Sovereignty

From the beginning, we realized that the term "Commonwealth" was one of a most indefinite meaning. In the initial education process of 1981, Commonwealth was defined as a quasi-sovereign status owing allegiance to the United States which would be negotiated with the United States. The citizens of the Commonwealth would be U.S. citizens.

As we observed the early U.S. reaction to the Commonwealth of the Northern Marian Islands (CNMI), we determined that Guam's Commonwealth status should be status whereby Guam would become a recognized political entity that could not be changed at the will of the United States. The Commonwealth Act drafted by the Commission in 1985 and subsequently adopted by the people of Guam in 1987 is intended to create Guam as a separate political body which will be so recognized by the U.S. Courts. Commonwealth as defined by the people of Guam is not intended to be an entity which "marches to the beat of the federal drummer," or a an entity which is a mere appurtenance to the United States.

While many of the details of H.R. 100 will come under close review by the Committee and the Congress and in that process be subject to change, Guam is seeking several fundamental elements that underscore the Commonwealth. One of these fundamental elements is the recognition of Guam as a separate, self-governing political jurisdiction under the United States. The provision of the Guam Commonwealth Act establishing that the Guam-U.S. relationship be defined by the terms of the Act (§103, Mutual Consent) is intended to give the political jurisdiction "Commonwealth of Guam" a value and substance unto itself.

The provision for Mutual Consent in the Commonwealth Act provides that the terms of the

act itself, in its various articles and sections, may not be altered except by the consent of both the U.S. Government and the Government of the Commonwealth of Guam. In a nutshell, the provision for mutual consent makes the Commonwealth Act a binding agreement which defines the terms of the Guam-U.S. relationship.

Giving a definitive structure to a political relationship between Guam and the United States is seen as critical to Guam's stability and to the promise of self-government of U.S. citizens in Guam. While citizens in States (and the political jurisdiction of a State) have a clearly understood relationship to the federal through the Constitution, territories have only the promise of Congressional authority "to dispose of and make all needful rules and regulations."

Since it does not appear that Statehood (or full integration of Guam and its U.S. citizenry), is a realistic option in the foreseeable future, providing Guam with a measure of structured internal self-governance under U.S. sovereignty is necessary. Mutual recognition of the relationship between Guam and the United States under U.S. sovereignty would extend the promise of the American ideals of self-government to the people of Guam while providing for a stable base of military/strategic operations in the Western Pacific.

The essential reaction by the Executive Branch bureaucracy and some in Congress is that what Guam is proposing is unconstitutional if it does not acknowledge the "plenary" authority of the Congress over Guam. We are convinced, however that the U.S. Constitution, a document of freedom to most Americans, need to be interpreted to impose permanent "subject" status on Guam's people and government.

The first power over territories given to the Congress under the Territories Clause of the Constitution is to "dispose" of them. Congress has totally disposed of the Philippine Islands, a number of small "Guano Islands" claimed in the mid-1800s as well as various portions of territory on our border with Mexico caused by changes in the Rio Grande River. Early in the history of the United States, the U.S. Supreme Court held that to "dispose of" territory did not mean an all-or-nothing approach. For example, the U.S. government need not sell lands containing minerals, but could lease them or provide other conditions for their exploitation. Thus the Congress' power of disposal includes the greater power to dispose (i.e. complete disposal) as well as the lesser power (partial disposal).

The Constitution does not differentiate between Congress' treatment of "property" and "territory" under the Territories Clause. We believe that Congress could, as we have proposed, dispose of certain (but not all), rights of government to the people of Guam. Thus, when the Commonwealth of Guam enacts its own Constitution, it would be a true act of the People of Guam

creating their own internal self-government by their own consent.[1] Earlier U.S. authorized constitutional processes were overwhelmingly rejected (1979) by the Guam electorate because they failed to take into consideration structural changes in the relationship which Guam desired and found necessary. Moreover such a federal authorization for a constitution would have created an anomaly in American political development; the implementation of a constitution in a territory without a change in the relationship between the territorial entity and the federal government.

The rejected U.S.-authorized constitutional process led directly to the Guam mandated political status process. Many of the issues which Guam had requested be addressed prior to a constitutional process (e.g. economic reform matters, immigration limits, the nature of governance) have been incorporated into the Guam Commonwealth Act. While we are at a loss to explain how a constitutional process in Guam which is not accompanied by a structural change in the political relationship can result in meaningful self-government, we urge the adoption of a status for Guam which gives self-government meaning. The Guam Commonwealth Act, through the creation of a mutually binding relationship gives substance to self-governing institutions in a jurisdiction which would remain clearly under U.S. sovereignty.

By disposing of the rights of self-government to Guam as described in the Commonwealth Act, Congress would be treating Guam as a distinct political entity. Great Britain with its Commonwealth members have managed to create a number of different relationships to suit all sizes of its former colonies. We do not believe that the U.S. Constitution limits the United States of America from similar creativity.

Historically, and in the absence of express Congressional grants of authority, the courts have been the most restrictive of Guam's ability to exercise self-government. The courts have said that Guam cannot, absent specific Congressional authorization, appeal criminal cases to a federal court (where otherwise it would be constitutionally permissible for States). Guam was told it could not create a Supreme Court under the earlier provisions of the Organic Act (U.S. Sup.Ct., People v. Olsen), and in other cases we are told that we are members of no political entity except the United States -- in whose government's creation we are prohibited from participating. Thus, the extension of the grant of governmental authority to the people of Guam must be made exceptionally clear. We believe that if the process of partial disposal which we propose is not spelled out clearly enough in the current language of H.R. 100, then we work with you to accomplish this purpose.

Formal papers outlining the issue of mutual consent and discussion of attendant legal questions is attached for your consideration (Attachments A-E).

[1] This approach contrasts sharply with the existing Congressional authorization for a Guam Constitution (U.S. P.L. 94-984) which states that the Guam Constitution be adopted only "within the existing territorial-Federal relationship."

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 376 of 542

Devolution of Authority to Guam

The Guam Commonwealth Act incorporates several elements which would devolve specific and general areas of authority to Guam. These areas of authority which Guam seeks greater jurisdiction over are directly related to the efficiencies of governance being enhanced through local, rather then federal decision-making. The efficacy of devolving authority to Guam is both (1) practical in relation to Guam's unique needs with respect to self-government (and the corollary expectation that Guam will be more responsive to its local needs while Washington decisions are fundamentally disconnected with respect to local needs), and (2) necessary to establish a basis for the relationship between Guam and the U.S. government that recognizes Guam needs.

In the first instance, establishing a mechanism that gives the people of Guam meaningful participation in how future federal laws apply is an important aspect in the rational application of U.S. laws to Guam. Some reflection of the interests of the people of Guam as well as their expression of participation in how laws apply to them is a simple precept of democratic governance. It is noted, however, that addressing the nature of the continued applicability of U.S. legal standards to Guam in a new political relationship raises sensitive issues for both Guam and the United States.

In the second instance, where changes in existing U.S. legal standards are necessary to frame the continuing Guam-U.S. relationship, it is instructive to note that there is not one federal law that now applies to Guam that has been approved by or consented to by the people of Guam. Therefore, it should not be surprising that, in the process of establishing self-government for Guam, it is the view of the people of Guam that many of these federal standards need to be changed.

*A. Meaningful Participation by Guam in the Application of Future Federal Laws.*

The U.S. Constitution provides a contract between the federal government and the States and the citizens of States which establishes a process of "self-government", "sovereignty" and participation in the decision-making processes of the U.S. government. For those places under U.S. sovereignty that are not States, however, there are no such processes. Since representation in the organs of the elected U.S. government is exclusively a right of citizens of the several States[2], a provision for meaningful participation by the people of Guam in future federal laws has long been a part of the foundation of self-government under Commonwealth.

Given the clear authority of the Congress under the Constitution with respect to the making of "all needful rules and regulations respecting the Territory" of the United States, the CSD and the U.S. Executive Branch reserved their discussions on this matter. It was seen to be an area to be

[2] The right to vote for President, in the U.S. system, arises from state, not national citizenship (U.S. Constitution, Article II, §1, Clause 3). Similarly, the right of U.S. citizens to voting representation in the U.S. Congress is based on State citizenship (U.S. Constitution, Article I, Sections 2 and 3). Residents of the District of Columbia (Washington D.C.) is an exception in that a Constitutional Amendment allows them to vote for the President of the United States.

driven by discussions between the representatives of Guam and the Congress. Unquestionably, a mechanism which addresses the need for democratic interaction between the people of Guam and the U.S. Federal government with respect to the application of future federal laws needs to be arrived at. This is particularly the case in view of the fact that the option of full representation (i.e. through the federal franchise of Statehood) is not being made available by the U.S. government to the U.S. citizens in Guam.

*B. Reform in Myriad Federal Laws That Apply to Guam.*

The Commonwealth Act would change many federal laws to suit Guam's needs and to make the goals of the new federal standards fit Guam's status as a self-governing Commonwealth. Existing federal laws in the areas of immigration, trade, judicial relationship, maritime shipping, the 200 mile Exclusive Economic Zone, land return procedures and many other issues would be changed under the people of Guam's Commonwealth proposal. Accompanying most of these proposed changes in federal law is an underpinning which recognizes that the needs of a small island of 212 square miles with developing economy in the Asia/Pacific region are different than the needs of the world's most economically prosperous and diverse nation. Recognizing the needs of the local entity while maintaining essential national interests is inherent in the proposals to change federal laws in these various areas.

**i. Immigration**

The Commonwealth Act attempts to deal with the issue of immigration in such a way as to control the entry of permanent migration while continuing, under U.S. Labor standards, the appropriate use of laborers whose stay in Guam is temporary

*Permanent Migration*

Over the past two decades, U.S. immigration laws have produced dramatic demographic changes in Guam. In order to curtail alien immigration, the Act's provisions would void the island's status as a point of entry into the U.S. for the purposes of naturalization.

Examples of the unnatural and negative effects of U.S. immigration laws are:

- In 1990, over 50% of Guam's population was not born in Guam.
- In 1990, over 30% of Guam's population (or over 40,000 individuals) were non-U.S. born (nearly 300% above the 1970 percentage).
- During 1980-89, 12,511 aliens were naturalized in Guam (a 23% increase over the period 1970-79). Before 1970, only 4188 individuals had ever been naturalized in Guam. The number of aliens naturalized between 1970 and 1989 (22,116) is almost equal to Guam's entire 1940 population (22,290).

- Between 1990 and 1993, 4,582 aliens living in Guam became U.S. citizens, and another 9,500 aliens became U.S. permanent residents, confirming the reality that the island is increasingly sought out as a place simply to secure U.S. nationality and benefits.

Since the implementation of the 1965 Immigration and Nationality Act, the continuous and escalating impact of alien immigration has unnaturally increased Guam's population growth rate,[3] while diminishing significantly the social, economic, cultural and political institutions of the "native inhabitants."[4] By contrast, although the earlier waves of American immigration (1947-late 1950s) and Philippine-based, military-sponsored guest worker programs (1947-1965) had significant social and cultural impacts, few of those earlier immigrants ultimately stayed in Guam.[5] (See section on Chamorro Self-Determination for discussion of international law as it relates to non self-governing territories.)

*Temporary Immigration*:

Guam's needs for relaxing requirements surrounding temporary immigration are unique to Guam, not shared by any other U.S. state or territory. When there is job "downsizing", or an increase in job opportunities due to new industries or rapidly increasing tourism, etc., there is no ready job pool from which to draw, nor neighboring jurisdiction to which to go to find new jobs. Generally, when one loses a job in Guam, one leaves the island to find another one; when there is a job opportunity in Guam, the potential worker must travel thousands of miles to Guam to secure it.

Directly and indirectly, non-migrant guest workers has played a significant role in supporting Guam's $2 billion visitor industry; an industry which has effectively eliminated Guam's dependence on direct federal grant assistance. Like other growing economies int he Asian region, the visitor industry is a labor-intensive export sector providing a base for a pyramid-like structure of skilled, semi-skilled and unskilled jobs. Unlike the labor-intensive export-led economies in most of the

---

[3] Guam's population growth rate was 25% between 1980 and 1990 -- one of the highest in the world. Compare this extraordinarily high rate to Guam's growth rate from 1960 to 1975:

> [T]he rate of population growth on the island during the period from 1960 to 1975 was 3.0%. Between 1970 and 1975, this growth was among the highest in the world, 4.3%. Available records show that Guam's rapid population increase was largely due to in-migration. Guam Comprehensive Development Plan (1978) p. 14.

[4] Alien influence on Guam's political and cultural landscape has long been an expressed concern of Guam's leaders. See, e.g., Guam Comprehensive Development Plan (1978) pp. 13-20.

[5] See Haverlandt, R.O., *The Guamanian economic experience: The socio-economic impact of modern technology upon a developing insular region.* Mangilao, University of Guam Press (1975).

Asian Newly Industrialized Economies, even the unskilled jobs in the Guam market cannot be described as 3-D (dirty, dangerous, demanding). Although some may be characterized as "undesirable" they are relatively clean, safe and performed in an a minimally-automated environment. Never-the-less, as the export-led industry expands, labor will be required and guest labor is available in the region.

In some areas of the non-migrant guest worker sector, expanded areas of occupational availability is desired (i.e. beyond the limited H-2 construction worker category to meet certain types of projected shortages in the visitor service and agricultural sectors). In other areas where non-migrant guest workers limit career opportunities of local employees (i.e. L-1 intercompany transferees), it is possible that the programs will equally reflect local needs in the process of transfer to local control.

Under Commonwealth, U.S. labor standards would continue in effect unless otherwise provided by subsequent U.S. statute. This includes the wide range of protections for workers rights, safety and health and salaries under the prevailing wage system. These distinguishing standards, together with the relative desirability (i.e. non-3-D nature of most of the service jobs) would make Guam a very competitive economy for attracting guest workers.

The curtailing of U.S. settlement options, moreover, will allow Guam's guest worker program to assume more of the characteristic of the Asian Model of labor mobility. It should not be anticipated that the long-term residence problems experienced in European countries with guest workers from former colonies, nor the situation in the U.S., Canada and Australian where settlement options lead to guest worker overstays, would be a significant problem in Guam. Given Guam's small size and experience with overwhelming immigrant numbers, it is expected that local regulation and enforcement of violations will be vociferous.

Under the Act, the open door policy for tourists/visitors would continue.

**ii. Economic Reform**

At various levels and in different ways, the Guam Commonwealth Act would free Guam's economic potential. The new initiatives proposed under Commonwealth range from giving Guam a greater voice in regional affairs that directly relate to economic activities (as the British provided Hong Kong)[6] to providing a greater consistency in the application of federal laws that directly relate to Guam's development.

Guam has not been viewed by U.S. policy-makers or economic strategists as a place for doing business in the Asian region. From a Stateside view, Guam's role has been viewed as primarily military/strategic. Despite years of encouragement by Guam leaders (beginning with Guam's first

---

[6] See, The Heritage Foundation's 1985 report on Guam.

Chamorro Governor (1959) and increased pressure during the terms of elected Governors) for the island to serve as a stable platform for American business in Asia, a disjointed series of federal statutes and policies has undermined Guam's economic development opportunities.

The role of the military "on-the-ground" in Guam[7] -- through direct control of the island's most valuable land resources and the economy (until 1962)[8] -- helped to reinforce a view of Guam as not being a potential arena of commerce to advance either the interests of Guam or the United States. While the military's direct control over commercial policy stopped with the ending of the security clearance program, control over most of the developable land at the ports of entry (airport & seaport) enforced limitations to commercial growth.

Also posing limitations to potential growth were the plethora of diverse federal laws and policies that relate to Guam (often in conflicting ways) in the area of corporate finance, trade relations between Guam and the U.S., the U.S. view of Guam in regional transportation schemes, Guam's tax structure, and the former telecommunications standard. For example:

- Corporations in Guam, subject to U.S. imposed tax structures and requirements are also ineligible for "dividend reduction deductions" provisions of various tax treaties which would otherwise create a stimulus for capitalization;

- Guam is outside the U.S. Customs Zone but is considered a part of the United States for maritime and air transportation; except for fares, which are international;

- The U.S. government often obligates Guam to U.S. standards in international trade regimes when Guam's status as a developing economy could provide for more flexibility to advance U.S. interests in Asia and economic development in Guam;

- Guam's potential as a regional transhipment center is obstructed by U.S. cabotage requirements in the areas of air and maritime transportation;

- Guam-chartered banks, though participating in the FDIC, are considered "foreign" limiting

---

**[7] "Military control of these islands is essential as their military value far outweighs their economic value. The economic development and administration of relatively few native inhabitants should be subordinate to the real purpose for which these island are held." (Memorandum of Commander Mariana (USN) G.D. Murray to the Secretary of the Navy, November 21, 1945).**

**[8] "The continued security of Guam is a vital prerequisite to its continuance as a strategic military base. This then is also of extreme interest to the civilian population of the island since the economic development of Guam is almost exclusively dependent on national defense activities here. One of the reasons why so many millions of dollars have been expended for defense on Guam is because of the authority of the Executive Order (Security Clearance Program) makes it possible to protect the island..." (*Guam: 1958.* Services and Information Office, Commander Naval Forces Marianas Guam M.I.,; MAR-P-120 p. 8)**

their access to U.S. markets and capitalization.

These "negative" federal standards, however, not only need to be replaced but also accompanied by a progressive view of Guam's potential role in the Asia-Pacific region. Guam provides an opportunity for the United States to show both its wisdom and beneficence to the nations of Asia which are lesser developed both economically and politically.

**iii. Land Return Processes**

Although the process of land return in Guam has come under greater scrutiny in the past few years, and Congress has increasingly shown greater sensitivity to the concerns of the people of Guam, additional measures are necessary. Fundamentally, these measures relate to the manner in which property is viewed with an eye toward its return, and the loosening of limitations on its return.

With respect to the return of property, the people of Guam have called for a new process which involves the people of Guam's interests in the determination of property return. Rather than a process of federal agencies alone examining the "need" for unused and underutilized property held by the U.S. government, the Commonwealth act proposes that representatives of Guam also be involved. Incorporating Guam's views on unused property to be returned to Guam provides a more balanced view of what lands are truly excess.

A second issue which has heretofore remained unresolved in the land return process is the disposition of property once returned to Guam. A mechanism to allow original landowners to recover their lands when returned needs to be allowed for.

The economic well-being of the people of Guam has been and continues to be negatively affected by the pattern of federal land use/holdings in Guam. The level of standards of living has been adversely affected, the distributions of income and wealth have been haphazardly distorted, the structure of relative prices has been contorted to the point that many development opportunities are hampered, and even the socio-political interests of the United States itself have suffered.

The value of privately-held land in Guam in terms of civilian standards of living is roughly 20 times that of federally-held land, disregarding the fact that the higher-quality land held by the military should be producing more per square meter than the relatively inferior land held by private citizens. By keeping the generation of income and the formation of wealth in Guam below its potential, federal land-use patterns diminish the income and wealth of United States citizens in a U.S. jurisdiction under U.S. control; they diminish the wealth of the nation. By all appearances, this is simply because no one will decide how to use the land more efficiently.

The process of change in land use need not be sudden or disruptive to either the military or the civilian communities. In the short-term, those areas of land that are idle and not held for any specific planned and budgeted project should be released to civilian use without any long-term conditions being placed upon their use. Over the intermediate term, a plan for the eventual

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 382 of 542

consolidation and minimization of federal land usage in Guam should be developed (jointly with the people of Guam), and those facilities that can be moved or are scheduled for replacement should be relocated to their respective positions within the area(s) to be retained as federal land (although placing military equipment and/or facilities on leased private land should also be considered). Over the long-term, all federal facilities in Guam should be relocated on Guam so as to minimize the federal government's need to own land in Guam.

It must be noted that these processes in no way necessarily precludes federal access to and use of Guam land and its attached facilities during times of war or other emergencies. On the contrary, not only do war powers generally override simple civilian economic considerations, but the improvements to the land provided by private development would undoubtedly surpass the utility to the military during these periods of land held exclusively by and for the military.

A Process for Decolonizing Guam

The Commonwealth Act calls upon the U.S. Government to create the framework for the Chamorro people to decide on a decolonized status for their homeland, Guam. The exercise of this right of "self-determination" by the Chamorro people is included in Guam's Commonwealth request to actively involve the United States (Guam's administering Power) in the decolonization process.

The Guam Commonwealth Act creates a mechanism whereby the U.S. Congress would approve of the Constitution of the Commonwealth of Guam including a provision which recognizes the right of the Chamorro people to select an ultimate political status. The language of the Commonwealth Act characterizes "Chamorro" as persons (or descendants of persons) who were born in Guam prior to August 1, 1950. It is anticipated that the exercise of Chamorro self-determination would be a one-time vote on an ultimate political status for Guam. Guam's decolonization would result from the implementation of a status selected by the Chamorro people.

This right of "Chamorro self-determination" is understood to be an exercise of *external self-determination* or the right of a peoples under colonial rule to make a determination about their decolonized status. Under international law, the successful exercise of external self-determination is evidenced by a former colony realizing a status of independence, integration or free association.[9]

"Self-determination" is a much brandished and misrepresented phrase. The development of the law of self-determination has moved from the right of colonial peoples to a decolonized status,

[9] Each of these status options (defined in U.N. General Assembly Resolution 1541) have specific criterion to satisfy that the requirement is met. For example, under the international definition, "integration" -- vis-a-vis a case study of Guam and the U.S. -- equates to Statehood. Similarly, free association and independence have a set of stipulations to assure that *de juri* colonial controls do not continue after decolonization.

to the recognition of more complex (and still developing) acts of *internal self-determination.*[10] While *external self-determination* is a clearly understood right for "colonial peoples", *internal self-determination* (still in the process of development and definition) is almost exclusively understood to occur within an existing State.

The Treaty of Paris (1898), which ceded Guam from Spain to the U.S., established that responsibility for the "native inhabitants"[11] rested with the U.S. Congress.

Immigration, under U.S. control -- principally since the 1965 INA -- is the reason that the process of decolonization in Guam must now be defined as "Chamorro self-determination." In the decolonization processes in the Trust Territory of the Pacific Islands (TTPI), for example, the exercise of self-determination did not have to be defined in terms of the indigenous populations because there was no immigration experience that had marginalized the indigenous people. Thus, U.S. allowed immigration created the requirement to define the "self" in Guam's exercise of external self-determination.

Formal papers outlining the issue of Chamorro self-determination and discussion of attendant legal questions is attached for your consideration (Attachments E).

[10] "Internal self-determination" ranges from the rights of ethnic minorities, religious freedom to the equal rights of all people in a community.

[11] "the civil rights and political status of the native inhabitants" of the islands ceded to the United States were to be "determined by the Congress." (Article IX of the Treaty of Peace between the Empire of Spain and the Government of the United States of America.)

**PART 2.**

**Guam Commission on Self-Determination
discussions with the
United States Executive Branch 1988-1997**

**Congress' Power**

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other property belonging to the United States. (U.S. Constitution Article 4, Section 3, Clause 2)

The civil rights and political status of the native inhabitants of the islands hereby ceded to the United States shall be determined by the Congress. (Treaty of Peace between the Empire of Spain and the Government of the United States, Article IX, 1898)

**Guam's Status**

Guam is appurtenant to the United States and belongs to the United States but is not a part of the United States (H.R. No. 1365, 81st Congress., 1st Sess. 8 (1949))

Congress has granted [Guam] far fewer powers of self government than the State of Colorado has granted the City of Boulder. (*Sakamoto v. Duty Free Shoppers,* 764 F.2d 1285 [CA9, 1985]).

**International Obligations**

Member of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of those territories are paramount, and accept as a sacred trust...the well-being of the inhabitants of those territories. (United Nations Charter, Article 73)

The State Parties to the present Covenant, including those having responsibility for the administration of Non-Self-Governing and Trust Territories, shall promote the realization of the right of self-determination and shall respect that right, in conformity with the provisions of the Charter of the United Nations. (International Covenant on Civil and Political Rights, Part 1, Article 1, Section 3, ratified by the U.S. Senate on June 8, 1992)

---

**The people of Guam have recognized that the status of Guam, as represented by its station as an unincorporated territory and as expounded on in numerous judicial decisions, is untenable in today's world. Since 1982, first internally and then in various discussions with the federal**

government, the people of Guam have sought to create a new status that reflects both their desire for genuine self government while remaining under the U.S. flag. Following continued refusals by the Executive Branch to discuss status questions with Guam, in 1989, the Chair of the House Interior Subcommittee on Territorial and International Affairs requested members of the Executive Branch and of the Guam Commission on Self-Determination to discuss their differences.

Congress is endowed with specific Constitutional powers to dispose of and make all needful rules and regulations for the territories of the United States. Since the Organic Act of 1950, Congress has used its rule-making powers to legislate a civilian government and to amend that government a number of times. Since 1987 the people of Guam have requested that Congress take a further step and actually dispose of some of the powers it holds in favor of the people of Guam in order to give them a genuine form of self-government. In addition, the people of Guam are requesting that Congress make provisions for a future act of self-determination by the people of Guam, the "native inhabitants", whose status is to be determined by Congress under the Treaty of Paris (1899). The people of Guam are seeking this not as a form of independence, but as a people who are a part of the United States.

When the Chair of the House Interior Subcommittee on Territorial and International Affairs requested the U.S. Executive Branch and the Guam Commission on Self-Determination to sit down to narrow their differences, few would have thought that seven years of interaction would follow. Now, in the eighth year of discussions and negotiations with representatives of the U.S. Executive Branch (of both the Bush and Clinton Administrations), the Commission believes that the vagaries of the issues on which there has been agreement and disagreement with the Executive Branch are not likely to produce any more clarity. The value of investing new unforeseen amounts of time into a process of reaching agreement on areas long discussed and debated, is an investment already expended by Guam in the process discussions and negotiations over past seven years. The Commission believes that Congressional oversight -- and action on -- Guam's political status and decolonization is now timely and appropriate.

Congress has been endowed with specific Constitutional powers to dispose of and make all needful rules for territories of the United States. This Constitutional charge has only sparingly been used in the past century to respond to express desires of the people of Guam and their representatives on core issues in the relationship. Congresses powers to provide for the appropriate devolution of power is now requested to establish a roadmap for Guam's decolonization through the interim extension of an internally self-governing status, in partnership with U.S. national security interests.

## B. Discussions with the Executive Branch (1989-1997)

### *1. Overview*

There were two distinct phases of negotiations between the Guam Commission on Self-Determination and the Executive Branch. The first phase of negotiations was conducted by the Guam CSD and the Bush Administration Task Force on Guam (BATFoG) from January 1990 to

January 1993. The second set of negotiations was conducted between the Guam CSD and the President's Special Representative for Guam Commonwealth from November 1993 to the present.

During eight years of discussions between the Guam Commission on Self-Determination and the U.S. Executive Branch, problems with the process have emerged which constrain the overall progress on addressing the issue of importance to Guam. The greatest obstacle has been U.S. Executive Branch agency inertia and inflexibility in responding to Guam's requests for a new political relationship. The second problems has been in translating support for Guam's self-governance at the policy level into agreeable legislative proposals supported at the agency level.

At this writing, it is not likely that the negotiations will reach a successful conclusion that results in agreements on specific modifications to the original draft Act that can be mutually supported by the Guam CSD and the U.S. Administration. There is, in fact, continuing disagreement on core issues of the Commonwealth Act with no new negotiations scheduled. The Guam CSD presents this report to the Congress and the people of Gam as a way to bring clarity to the issues and to indicate the progress made despite the absence of final agreement. It is our hope that Congress will engage Guam directly to complete the task of crafting a mutually acceptable measure to create a new political agreement between Guam and the United States which recognizes Guam's rights and the mutual interests of Guam and the United States.

2. *Brief History*

Following Congressional direction for Guam's Commission and the U.S. executive branch to narrow their differences with respect to the language of Guam Commonwealth Act, the Guam CSD, on January 3, 1990 adopted guiding procedures for discussions with the Executive Branch and the Congress. This procedure provided the Commission flexibility in discussing changes in language and words of the plebiscite-endorsed "draft Guam Commonwealth Act." These changes, however, were to provide for "technical amendments in language....clarifying intent" and such alternations as necessary without changing the "substance, purpose or intent" of the Act. "The Commission shall maintain the fundamental principles as embodied in the Guam Commonwealth Act" the Commission negotiating procedures provided. Earlier, in 1989, the Commission had expressed the view that it would not negotiate with the Bush Administration Task Force on Guam (BATFoG) which refused to directly engage the Commission or to visit Guam as it prepared to make recommendations on Guam's proposal. (See Communications between CSD and BATFoG/U.S. DoI, 1989).

Between January 1990 and late 1992, the Commission on Self-Determination and the Bush Administration Task Force formally met on twelve occasions. The 22 agency Federal Task Force by-and-large represented the programmatic interests of each respective agency under existing law. Representatives of the various agencies who served on the Task Force were not functionally at the appropriate level to proffer with any confidence new policy directives of the U.S. By-and-large, however, agency representatives were not envisioning a new relationship between Guam and the United States, but rather the impact of Guam's proposal on their programs or operating procedures

within their agency. With no apparent policy direction, the agencies and their bureaucratic representatives proposed the maintenance of the *status quo* in response to Guam's call for a devolution of power in the Guam-U.S. relationship.

In the nearly three (3) years of discussions, the CSD and BATFoG entered into 38 qualified agreements, impacting some part of every Title. Although some qualified agreements were "agreements to disagree" to entire provisions (e.g. §103 Mutual Consent), other qualified agreements demonstrated the Commission's clear flexibility to meet the objectives of the Commonwealth Act (e.g. Title VII Immigration; Title VIII Labor; Title V Trade). The Commission's flexibility, however, had limits as was evident in the failure to reach any level of agreement with the BATFoG on issues central to: (1) Guam's self-governance; (2) land return; (3) decolonization; and, (4) numerous areas of economic reform.

What was largely seen by the Commission as a failed process was capped by the BATFoG's second report to the Congress (BATFoG Report II, January 19, 1993) which reneged on signed agreements in the area of Immigration, the disposition of land upon return to Guam, the Chamorro Land Trust and misrepresented the character of the final items under discussion. The Commission saw no further need to meet with the Executive Branch under a agency/bureaucratic Task Force process which did not have clear policy direction.

In a letter signed by all CSD Members on January 29, 1993, the Commission requested that President Clinton appoint to the process a representative "empowered to make changes in U.S. policies vis-a-vis its off-shore possessions" and in whom the President had "personal confidence." With a BATFoG report technically on its way to Congress, the Commission requested the President revisit the agency-level response to Guam's call for a new relationship. What Guam sought was a policy-driven review of the Guam-U.S. relationship.

The people of Guam had reason to expect a more understanding reception from the Clinton Administration. Letters of support for Guam Commonwealth from Governor Clinton (July 27, 1989 to the Governor of Guam) and Democratic Presidential candidate Clinton (July 15, 1992 letter to the Guam Delegation, Democratic National Convention), had established an understanding of Guam's concerns and there was hope that this understanding would lead to new approaches.

In February 1993, after consultations with the President, Interior Secretary Bruce Babbitt informed the Commission that a Special Representative would be appointed. Commission persistence in following up on that commitment (See Letters to Babbitt, 1993) bore witness to the November 4th appointment of Dr. Ira Michael Heyman.

After visiting Guam in December 1993 the Commission and the Special Representative began discussions in earnest. Focusing on the areas of disagreement from the CSD/BATFoG process, the Commission and Special Representative agreed to begin with the grant of authority to establish internal self-governance in Guam (Mutual Consent §103). The value of the various

provisions of the proposed Commonwealth Act were of little significance, the Commission noted, if the U.S. government reserved the power to unilaterally make changes to the Guam-U.S. relationship. The Special Representative clearly understood that if Guam did not have confidence in the U.S. commitment to the new relationship, then the specifics of the relationship were meaningless.

Special Representative Heyman's attempts to craft Executive Branch support for a provision which committed the U.S. government to a devolution of power to establish Guam's internal self-governance met with substantial internal discussion and opposition through the summer of 1994. Finally, after an exchange of Legal Memorandum between CSD Counsel and Department of Justice (Office of Legal Counsel) lawyers,[12] the Special Representative was able to get sign-off from senior Justice Department officials and all parties agreed to a provision which provided:

> The Congress acting to the extent constitutionally permissible, in the exercise of its plenary authority under Article IV, Section 3, Clause 2 of the Constitution, and the people of Guam agree that no provision of this Act or covenant may be altered, amended or repealed without the mutual consent of the government of Guam and the United States Congress.

Although Dr. Heyman would leave the position of Special Representative in early 1995 -- and two other persons would fill the position in the coming year -- Administration support of the language agreed to at Section 103 was constantly reaffirmed.[13]

Dr. Heyman's departure from the position of Special Representative, assuming responsibilities at the Smithsonian Institute, led to time consuming delays in the process of negotiations. Identifying various appropriate individuals, vetting candidates and beginning discussions assumed nearly eight months of 1995. Finally, after an exhaustive identification and vetting process, in August 1995, National Security Council Asia/Pacific Staff Director Stan Roth was appointed to the position of Special Representative. In December of the same year Mr. Roth left the U.S. Government, for personal reasons, again raising concerns that further time-consuming delays would ensue in 1996.

Once again turning to the Interior Department for assistance in filling the position to be vacated by Mr. Roth, the Commission met with the relatively new Deputy Secretary who (upon assuming office in July of 1995) had helped expedite the appointment of a replacement for Dr.

---

[12] In response to the Position of the Department of Justice Legal Memorandum of 28 July 1994, CSD Counsel showed the DoJ position to be shallow and incomplete. CSD Counsel noted (at footnote 1) that if the DoJ position were one open to private scrutiny, their poor legal ethic would likely be subject to official reprimand.

[13] Roth Letter, 15 December, 1995. Garamendi consultations with Department of Justice as reported to the CSD Chairman, April 1996

Heyman. In a move to accelerate the appointment of the Administration's third Special Representative, Mr. Garamendi (who was effectively "precleared") assumed the position informally in January 1996 and with official sanction on February 22, 1996.

Discussions with Mr. Garamendi began with his call for the Commission to advance the core issues of the Guam Commonwealth Act. In meetings with the new Special Representative in January (San Francisco) and February (Washington D.C.) the Commission and Mr. Garamendi walked through Guam's call for reform in the areas of: decolonization and Chamorro self-determination, immigration, the appropriate applicability of federal standards, economic reform (including land), and mutual consent (agreed 11.94 reaffirmed 12.95). The corollary to focusing on the core (and largely unfinished) issues was that those areas which had already been agreed to by the CSD and BATFoG and the CSD-Special Representative exchange of letters on agreed language at §103 would be reaffirmed. Special Representative Garamendi agreed that previously agreed areas should not be revisited. Mr. Garamendi and the Commission also had ambitious plans to bring discussions to a close quickly, with the summer of 1996 openly identified as the deadline for negotiations.

Through early 1996 the CSD (through its Executive Director and Washington Counsel) directly engaged the U.S. Executive Branch principally through Deputy Special Representative Mark Mulvey and to agency representatives on various occasions. This process, however, often as not, resulted in agency defense of the *status quo* and certainly a defense of the unfettered powers of agencies to make determinations in Guam's best interests. The notion that Guam's needs might be different than that of the States collectively, or the nation as a whole, was not sympathetically received in spite of the clear differences between the needs of a geographically isolated island of 150,000 people and a nation which is the nexus of international commerce and transportation.

Notwithstanding individual agency resistance (and in some cases, such as labor, agencies had diametrically opposite views) the Deputy Representative continued to push beyond the narrow agency defense of the status quo, apparently in the hopes of fashioning a compromise. While it was clear to the Commission that the U.S. Special Representative was unable to make unilateral declarations of policy, there continued to be confidence in the process as a result of his understanding of Guam's uniqueness and an apparent readiness to take to task the colonial mind set that typified agency views.

In meetings with Members of the Commission held in Washington in April and May, both agency resistance and the possibilities of fashioning a workable arrangement arose in the discussion of Chamorro self-determination. Likewise, on the issues of immigration, although differences between U.S. agencies existed, the possibility of reaching common ground appeared likely. The opening of the discussions to cover discussion of processes that provided for Guam's timely and effective input into the appropriate application of U.S. laws appeared to lend the process hopefulness. Hopefulness was indeed the mood of Special Representative Garamendi who had set the 30th of June as the targeted deadline for the completion of negotiations.

In late May, the Special Representative and Deputy Special Representative visited Guam and met again with the Commission to discuss some of the specific items that had been broached in staff discussions. The Special Representative and Members looked forward to meetings in June with an eye toward making major progress on bringing discussions with the U.S. Executive Branch to closure. But as the proposed meeting in June kept getting pushed back, it was clear that the June 30 deadline would be exceeded.

Meetings on June 26 and 27 between the Commission, Special Representative and all affected agency representatives produced an important agreement as well as signaling the return of entrenched agency views. While agreement on Chamorro self-determination was advanced[14], a view that Guam should be treated under U.S. law by federal *fiat* rather than a process which responded to Guam's unique needs was expressed by representatives of numerous agencies.

The views of the agency representatives were consistent with existing colonial policy -- that Guam's interests fall exclusively within the orbit of uniform federal decision-making, or federal decision-making that treats Guam uniquely on an *ad hoc* basis (usually in relation to federal interests). Like the BATFoG before it, these agency views did not rise above existing policy and therefore were viewed by the Commission as an unacceptable basis for a new Executive Branch policy. These views were clearly expressed to the Special Representative who requested another month to try to work through the details with the agencies.

By late July it was clear that the resistance of agencies to the proposed changes in Executive Branch policy toward Guam was bringing progress in discussions to a halt. The CSD Chairman, aware of the stalling process, met with the Special Representative (July 27, Salt Lake City, UT) to discuss the lack of movement and progress on outstanding issues. Guam's frustration with the process -- and the apparent ascendancy in the process of those responsible for administering the status quo -- led to the CSD Chairman's call for a policy-decision to be made with respect to Guam, while agreeing to continue discussions on immigration and affect of federal regulations.[15] A letter of August 15 from the CSD Chair and Guam's Congressional delegate outlining Guam's good faith participation in the process and disappointment at the failure to advance beyond colonial frameworks. A policy direction on Guam status was called for.

---

[14] While there was agreement on the language of §102, the Commission's request that an accompanying letter from the U.S. Department of State or the Special Representative, (attesting that the process in §103 was part of fulfillment of the international process of decolonization under the guidelines of U.N. General Assembly Resolution 1541) was not advanced. This matter was still unresolved in 1997 (Letter and attachment of CSD Chairman and Guam Congressional delegate to U.S. Special Representative, January 7, 1997).

[15] Deputy Special Representative Mulvey retired from the USG in early July and was informally replaced (at least for the purpose of spearheading discussion on immigration and the affect of federal regulations) by Alex Alienikoff, Executive for Programs, INS.

Shortly thereafter a meeting with White House Chief of Staff was set by Mr. Garamendi for early September. In a letter to the White House Chief of Staff the CSD Chairman requested that the meeting focus on a directive from the White House to the agencies which recognized:

> ...that Guam is not like a State or like any other territory; thus, standard federal-state and federal-territory constructs must be disregarded in order to create our new paradigm. Similarly, a general policy that federal laws and programs should have uniform application throughout the U.S. cannot control our unique relationship, and each individual agency must look beyond the narrow confines of its particular interaction with Guam toward the larger change in political status that is being forged. (Letter of the CSD Chairman to White House Chief of Staff, August 24, 1996).

The meeting in early September was canceled and not rescheduled until early October. In a brief meeting with the Chief of Staff, the CSD Chairman and Guam's Congressional delegate made presentations on their views of the need for a White House directive, but no such commitment was made. Instead, Guam was encouraged to continue to work with Mr. Garamendi on the issues of immigration and land with quiet assurances that after the national elections more focused attention could be applied to the process.

On November 14, 1996 the CSD Chairman received a letter from the U.S. Special Representative, apprizing him that unresolved issues in the discussions would be taken up with "policy level officials as early as possible" and that he would "engage the White House staff on the need to focus on Guam issues where necessary." On the status of issues at that point, Mr. Garamendi noted that: (1) there was Informal Agreement on 33 Sections; (2) Agency Follow was identified for 11 Sections; and, (3) White House Follow-Up was identified for six (6) issues. The U.S. Special Representative also noted that his efforts to complete the process had been obfuscated by:

> "federal agencies (who in) reviewing Guam Commonwealth have emphasized 'U.S. sovereignty' at the expense of (Guam's) 'self-government."

Anxious to bring the unresolved issues to closure, particularly in relation to changes in the Executive Branch which were seen as extending the period of Executive Branch review yet again, and in the absence of any evidence of Administration action on the process, the CSD Chairman arranged for a meeting with the President of the United States on December 16. The Special Representative was unavailable to attend the meeting evidently due to prior commitments.

In a meeting with the President on December 16, the Governor of Guam outlined Guam's case for autonomy and distinct treatment under the framework of a Guam Commonwealth as endorsed by the people of Guam. Guam's historically colonial treatment and the need to effectuate a decolonization process vis-a-vis Executive Branch obstinateness to the reforms Guam had

proposed was put to the President and apparently appreciated. The sense of timing in bring to closure the Administration's position was noted explicitly. The Chairman of the Guam Commission on Self-Determination was assured that the President would "think outside of the box" in a process of reviewing the proposals for reform that were before the White House and which would be reviewed in short order.

On January 3, 1997 in a follow-up meeting with the Chief of Staff, Guam's Congressional delegate, CSD Member Cristobal, Staff and Counsel discussed at length both process and position. The Chief of Staff, scheduled to resign from his position in less than 3 weeks, was committed to working through the major issues in a process beginning the following week. The CSD Chair and Congressional delegate, in addition to memorializing their respective meetings with the President and his Chief of Staff in the preceding weeks, sent a letter to the U.S. Special Representative making clear the work that remained unfinished, making clear Guam's desire to be separated from discussions of Puerto Rico and pointedly addressing the issues of immigration and labor (January 7, 1997 with Attachment).

The Commission cannot attest to whether or not meetings ever took place subsequent to the January 3 meeting with the Chief of Staff. Certainly the Guam CSD was not invited if such meetings occurred. Nor did the Commission or its representatives see or approve draft language on the unresolved issues that may have been discussed internally. On January 15, 1997, the CSD Chairman and Congressional delegate requested a meeting with the newly appointed Chief of Staff to follow-up on the matters left to be dealt with, but no response was received.

A series of stories in mid-February 1997 which were based in large part on unnamed "(senior) U.S. officials," attempted to tie campaign contributions from Guam to the surprising allegation that the Clinton Administration was in the process of, or had already, changed policies toward Guam.[16] The stories ran through two major themes (1) the Administration policy was being changed/had changed as a result of contributions by Guamanians and, (2) that Guam was corrupt and not ready for self-governance. In both instances, unnamed "U.S. officials" either misrepresented the process which had clearly not resulted in changes, (much less the changes suggested to the reporters) and/or provided a listing of "officeholders" in Guam who had been indicted on various criminal charges since the 1980s, apparently as evidence of a lack of responsibility in Guam to assume self-governance.[17]

---

[16] Prior to any publication of the allegations, CSD staff and Counsel were approached by various other media about connections between Guam campaign contributions and Mr. Garamendi's role. Almost every media representative identified the U.S. Department of Justice as their source.

[17] The list was broken down into the categories of "Governor and Staff" (3); "Directors of GovGuam Departments" (8); "Deputy Administrators and Supervisors of GovGuam Departments" (14); "Other GovGuam Employees" (7); "Miscellaneous" (3); "Vendors" (27); "Others" (11).

In mid-March, White House sources indicated that the proposed devolution of power to Guam which had been under review was in a process of being re-reviewed.[18] In the absence of any official communication with respect to the process of bringing issues to closure, and the Special Representative's counsel that activities at the White House should be addressed to the White House, the Members of the Commission wrote to the President outlining Guam's concerns (CSD Letter to the President of the United States, March 17, 1997). The Commission also advanced that a failure by the Administration to finalize the process would not hinder an initiative to shift the focus the review of the Commonwealth Act to the legislative branch of the U.S. government.

On April 7, 1997, Members of the Commission on Self-Determination met with senior officials of the Executive Branch. While reserving their position on a specific resolution of the issues, there was a loose commitment by representatives of theU.S. government to finalize their positions -- in consultation with Guam -- by the summer of 1997. Since that time, not one meeting on specific proposals has occurred between representatives of the administering Power and Guam who are responsible for status issues.

On April 8, 1997, Members of the Commission met with the members of Congress which has oversight of territorial issues. The legislative leadership committed to conduct a hearing on Guam's political status proposal during 1997 and to sponsor a visit to Guam, perhaps during 1998. Like the representatives of the Executive Branch, Congressional legislative leaders were clear in not committing themselves to a specific outcome or position, but did provide assurance that Guam's aspirations would be considered.

In a meeting in early July 1997 in anticipation of a Congressional hearing -- and in view of the Executive Branch's apparent disengagement from discussions and even regressive posture with respect to earlier positions -- the Commission on Self-Determination returned to the original language adopted by the people of Guam in 1987. The Commission had no other product to share with the people of Guam and no other agreed document to present to the Congress.

Thus after ten (10) years since the voters of Guam approved a proposed change in the political relationship with the United States, the Executive Branch has suggested that it might be close to finalizing a policy position in response to the people of Guam's proposals. As of the hearing it is unclear whether the Administrations' recommendations with be favorably inclined toward a process of decolonizing Guam, or whether -- like a previous Executive Branch administration's recommendation -- it will simply propose the maintenance of the *status quo* and piecemeal changes therein.

**Now, it is time for Congress to once again take control of the question of Guam's political future and act on it.**

[18] Washington Post, March 7, 1997 "Clinton Administration Shelves Plan for Guam Autonomy"

For more information on the position of the Guam Commission on Self-Determination on the Draft Guam Commonwealth Act please refer to the following:

**Guam Commonwealth Hearing before the Subcommittee on Insular and International Affairs of the Committee on Interior and Insular Affairs, House of Representatives, One Hundred First Congress, First Session, on H.R. 98, Guam Commonwealth Act. Hearing held in Honolulu, Hawaii December 11, 1989. Serial No. 101-78 Part I/ Part II.**

**HONORABLE CARL T.C. GUTIERREZ, GOVERNOR OF GUAM**
**STATEMENT ON S.210**
**COMMITTEE ON RESOURCES**
**OCTOBER 29, 1997**

Mr. Chairman and Members of the Committee on Resources,

Thank you for allowing me to submit this statement for the record regarding the Government of Guam's views on S.210, "an Act to amend the Organic Act of Guam, the revised Organic Act of the Virgin Islands, and the Compact of Free Association, and for other purposes."

Due to the time constraints associated with the hearing today on H.R. 100, the Guam Commonwealth Act, we have chosen to limit our oral testimony to H.R. 100 and to submit a statement for the record on S.210. I appreciate the Committee's accommodation of this arrangement. S.210 contains five provisions of interest to Guam in sections 2, 4, 5, 8 and 9.

Section 2: Amendment to the Organic Act of Guam

Section 2 of the bill would amend section 8 of the Organic Act of Guam (48 U.S.C. 1422b) and add the new subsection, "(c) An absence from Guam of the Governor or the Lieutenant Governor, while on official business, shall not be a `temporary absence' for the purposes of this section."

This amendment recognizes the technological advances that allow a Governor or Lieutenant Governor to remain in close contact with Government of Guam agencies while on official business. In fact, it is more accurate to describe this as the routine occurrence today -- the Governor and the Lieutenant Governor are in constant contact with their staff and Government of Guam agencies when on official travel.

It is also important to note that representing the people of Guam in an official capacity off-island is a significant aspect of the duties of the Governor and Lieutenant Governor.

The section 2 amendment to the Organic Act of Guam simply updates the Organic Act to conform with communication advances and acknowledges the demands of official travel. Therefore, we support this section.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 396 of 542

**Section 4: Opportunity for the Government of Guam to Acquire Excess Real Property in Guam.**

The Government of Guam, in coordination with Guam's Delegate, Congressman Robert Underwood, has generally been supportive of federal legislation that continues the progress of past Congresses in resolving Guam's land issues. We appreciate the work of Chairman Frank Murkowski, Ranking Member Dale Bumpers, Senator Daniel Akaka and the Senate Committee on Energy and Natural Resources in building on the past understandings with Guam regarding land issues.

We also note that Chairman Murkowski and Senator Akaka both visited Guam in 1996 and are familiar with the complexity of the land issues on our island. We appreciate their continued commitment to helping Guam resolve these issues.

Section 4 of S.210 continues the progress on land issues by establishing important precedents. The first significant precedent that S.210 establishes under section 4(a) is the *Government of Guam's right of first refusal for excess federal lands on Guam.*

Given the history of the land takings on Guam by the military in the years immediately after the wartime occupation and before the establishment of civil government on Guam, Congress's statement of policy in section 4(a) is an important milestone in our efforts to resolve land issues.

While S.210 carves out some exceptions to Guam's right of first refusal, we find that the policy inherent in the federal government's recognition of Guam's unique circumstances, and the need to find unique solutions for Guam, to be important policy statements to guide future Congresses and Administrations on these matters.

Subsection 4(d)(3) (A) through (E) establishes a procedure for the disposal of excess federal lands that are within the boundary of the Guam National Wildlife Refuge (as defined under section (c)(4)). The Government of Guam (GovGuam) and the U.S. Fish and Wildlife Service (USFWS) would have 180 days to negotiate an agreement regarding the disposal of parcels of land within the Wildlife Refuge (as used in this bill, the term "Wildlife Refuge" includes the Department of Defense (DoD) lands that are part of the Wildlife Refuge overlay but remain under the control of DoD).

If no agreement is reached between GovGuam and the USFWS, 4(d)(3)(E) provides that the excess land in question may not be transferred from DoD to another federal agency or out of federal ownership except pursuant to an Act of Congress specifically identifying such property.

We find that this provision is a significant precedent in leveling the playing field

**between GovGuam and the USFWS. Absent this provision, it is conceivable that the USFWS would not negotiate in good faith with GovGuam over land disposal issues, and would instead avail itself of the opportunity to acquire the disputed lands in accordance with the Federal Property Act -- S.210 effectively precludes this concern by requiring a separate Act of Congress to transfer disputed excess lands.**

**Thus, the second precedent -- that *disputed DoD excess lands may not be acquired by the U.S. Fish and Wildlife Service through administrative transfers, such transfers can occur only by Act of Congress* -- is a critical provision of S.210 to protect the interests of the people of Guam. Had this provision been law in February 1993, the USFWS would have been compelled to seek negotiated solutions with GovGuam to the endangered species issues instead of exacerbating land issues by acquiring the 371 acres at Ritidian and declaring a refuge overlay on over 20,000 acres of DoD lands. Congress is prudent in stripping the USFWS of its ability to acquire any more land on Guam without Congressional approval.**

**The third precedent of importance to the people of Guam is the clarification under subsection 4(d)(5) that lands identified for transfer under the base closure process shall be subject to the terms of subsection 4(b). This would assist GovGuam by applying the same definitions for public benefit use and no cost conveyances for all excess federal lands that are in various stages of the disposal process. It also reaffirms the federal policy that *excess lands that are returned to the people of Guam for public benefit use shall be at no cost*, regardless of which particular statutory process (special legislation or Base Closure and Realignment Act (BRAC) processes) is being utilized to expedite the return of these lands.**

**We also note that the "public purposes" definition of S.210 has been extended to apply to the excess lands which are subject to the BRAC process. In practical terms, this means that the more expansive definitions of "public purposes", first employed by Congress in Public Law 103-339, the Guam Excess Lands Act, shall also govern the public benefit uses of lands conveyed under the BRAC 93 and BRAC 95 processes.**

**GovGuam Concerns Regarding Section 4**

**Notwithstanding the progress that S.210 represents and the importance of the precedents cited above, there are concerns that must be addressed before we can give unequivocal support to S.210. Also, there are issues of interpretation that must be clarified -- if the Administration's interpretations on certain issues are accepted by Congress, then we would not support S.210. We urge Congress to address all the issues that we raise, or failing that, to table S.210 in Committee.**

**As a matter of public policy, it is the position of the Government of Guam that**

all excess federal lands no longer needed by the military must be returned to the people of Guam. Such lands ought to be returned at no cost, and with as few restrictions as possible. We view that the only legitimate restrictions on returned lanas would be those that are absolutely necessary to protect the ongoing military missions of adjacent military bases on DoD retained lands -- not those restrictions which are not-so-subtle attempts to enforce the USFWS's view of land issues on the people of Guam.

Further, we believe that only the Government of Guam can address all the issues surrounding land on Guam, and that the people of Guam, acting through their elected representatives, can make the necessary compromises on land use between those original landowners whose lands are being returned and those whose lands will never be returned. These land decisions should be made on Guam by representatives elected by the people of Guam. These principles should guide the Congress as it considers the concerns we raise in this statement regarding S.210.

Guam and the Administration made significant progress in the talks that followed the Senate hearing on S.210 earlier this year. The Senate bill reflects this progress. However, the Administration seems intent on unraveling this progress by tipping the balance in their favor. For example, they continue to insist that GovGuam's right of first refusal would not apply in the future to a parcel of land, if two years before the declaration of excess, a federal agency acquired a permit to use that parcel of land.

We strongly view this proposed Administration amendment as a poison pill on the right of first refusal. While we have accommodated their concerns regarding federal agencies currently occupying DoD lands (which are grandfathered), we are not moved by the land appetites of other federal agencies. We are most concerned about the National Park Service's apparent designs on future excess lands at Nimitz Hill. If this Administration amendment were to be accepted, we would not be able to continue to support S.210.

We take exception to the subsection regarding conditions of transfer. Subsection (b)(1) seems unnecessary and unduly restrictive given the clear policy direction of subsection (b)(2). It is not conceivable that GovGuam would acquire any excess lands except for doing so to satisfy public benefit uses. GovGuam is not a real estate broker; GovGuam is not an agent for individuals or private interests. GovGuam does comply with public policy as set by local law through our democratic processes, and such public policy recognizes the unique needs of our community. If GovGuam elected not to exercise its right of first refusal for a particular parcel, private interests may acquire that parcel through the processes in the Federal Property Act. Since S.210 does not alter the remaining processes of the Federal Property Act, we believe that (b)(1) should be struck.

We are concerned by the attempts by the Administration to narrow the definition of "public benefit use" as that term has been defined in Public Law 103-339. The Committee may recall the difficult negotiations that produced the carefully crafted language of PL 103-339, and we would note that the examples of public uses enumerated in PL 103-339 section (3)(c) are deliberately preceded by the words, "including, but not limited to". This Committee is no doubt aware that a broad construction of public benefit use was intended by Congress to give GovGuam the necessary flexibility to use these returned lands for public economic benefit as well as traditional public uses of lands. Congress was prudent in giving GovGuam this flexibility since the sector of Guam's economy attributable to the military presence has shrunk considerably as a result of BRAC 93 and BRAC 95 base closures.

We would urge the Committee to include Committee report language and floor statements when S.210 is considered by the House to ensure that the legislative history of this bill adequately reflects the legislative intent of subsection (b)(3). In our discussions with the Administration and the Senate Committee on Energy and Natural Resources, it had been our intent to accommodate the legitimate needs of the military in lands adjacent to future excess lands. We would seek assurances that this subsection would not be used as a loophole for non-military restrictions in these covenants. We are aware of the influence that the USFWS has exerted on DoD uses of its lands, and we would insist that these non-military restrictions not be included in any DoD covenants on returned lands.

We are aware of the assertion by the Administration that title to the submerged lands adjacent to the Guam National Wildlife Refuge are properly held by the U.S. Department of the Interior. In our discussions with the Senate Energy and Natural Resources Committee, we provided documentation to the committee staff that refutes Interior's claim. The United States District Court for Guam has previously ruled that all the submerged lands surrounding Guam belong to the Government of Guam -- this documentation will be provided to the Committee on Resources. Therefore, we object to any changes to S.210 that would imply Interior ownership of any submerged lands.

We object to the Administration's request to amend S.210 to grant the USFWS secondary jurisdiction over federal lands that are included in the overlay component of the Guam national Wildlife Refuge. The whole point of a two track process for these lands in S.210 -- a process that the Administration belatedly endorsed after Senate prodding -- is to encourage GovGuam and the USFWS to negotiate *in good faith* for the ultimate disposition of these refuge lands. Again, the USFWS seeks to enter these negotiations with a decided advantage over GovGuam. If the USFWS were to retain secondary jurisdiction, what incentive would they have to work cooperatively with GovGuam to resolve these difficult issues?

We agree with the Senate Energy Committee's formula on the ultimate resolution of these issues -- if GovGuam and the USFWS are both intractable, then bring these issues to Congress before Interior claims title to the excess lands. We would note that the land problems have been exacerbated not by any action of GovGuam, but by the blatant land grab that the Fish and Wildlife Service executed in February 1993. Up until that point, there were opportunities for a successful *mutual* solution to the refuge issues. Congress can bring us both back to the table again, but we must insist that the deck not be stacked against Guam in these future negotiations. We urge Congress to reject the Administration's proposed amendment for secondary jurisdiction for the Fish and Wildlife Service.

S.210: Progress Towards a Comprehensive Land Solution

It is necessary to state that while S.210 represents significant progress, this progress should not be interpreted to mean that Guam has accepted S.210 as the final solution to land issues. It is our view that S.210, by establishing important precedents, helps make a final solution to land problems possible in the Guam Commonwealth Act now under review by Congress. However, S.210 is not the comprehensive solution we seek to these land problems.

If Congress were to determine that S.210 is the last word on land legislation, and not a building block, then we would withdraw support for S.210 in favor of a more comprehensive overall solution. Certain issues, such as the ultimate fate of the National Wildlife Refuge, have been deferred in recognition of the ongoing Commonwealth process. Therefore, *we reject the Administration's assertion that land issues should not be revisited in the Commonwealth bill.* On the contrary, the Commonwealth land discussions would be well-served by the clarity on land issues that Congress, through S.210, brings to these issues.

Section 5: Clarification of Allotments for Territories

We support the clarification of allotments for the territories amendment to the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3791(a)(2)). We request that the Committee on Resources make a similar correction to allotments for the territories that is found in the Local Law Enforcement Block Grant Program authorized by Public Law 104-134. The amendment we request to PL 104-134 under section 108 Definitions, subsection (3) would read as follows (with the deleted language indicated by strike-out):

"(3) The term `state' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands,

**American Samoa, Guam, and the Northern Mariana Islands, except ~~that American Samoa, Guam, and the Northern Mariana Islands shall be considered as 1 State, and that, for purposes of section 104(a), 33 percent of the amounts allocated shall be allocated to American Samoa, 50 percent to Guam and 17 percent to the Northern Mariana Islands;"~~**

**This discrepancy in the definitions of the Local Law Enforcement Block Grant Program has resulted in Guam receiving less than half the funding under the block grant than the Virgin Islands receives, although both jurisdictions have nearly identical populations and crime statistics. We strongly urge the Committee to include this amendment to section 5 of S.210.**

**Section 8: Compact Impact Reports**

**The Committee may note that the Government of Guam is a party to a lawsuit in the federal District Court of Guam regarding the Department of the Interior's non-compliance with the Compact-impact reporting requirements of section 104(e)(2) of Public Law 99-239 (99 Stat.1770, 1788). The President has delegated the responsibility for this report to the Secretary of the Interior, and we have been repeatedly disappointed with the Department of the Interior's inability to assess the impact of the Compacts of Free Association on Guam.**

**The Government of Guam compiles data on an annual basis on the impact of the Compact on Guam's educational and social services. GovGuam is prepared to assume this reporting responsibility and is willing to do so if it would help Congress deal with the inadequate Compact-impact reimbursement issues that we have been raising every year.**

**We recommend that section 8 be amended to include a date certain for submission of the Compact-impact reports to Congress. We also recommend that the section's language be amended to ensure that the Compact-impact reports are specific to each territory or U.S. jurisdiction, so that reports may be forwarded to Congress in a timely manner as the U.S. jurisdictions complete them. In the past DoI has delayed issuing the Compact-impact reports due to the territories not having "comparable" data.**

**We wish to remind the Committee that Guam has no control over the in-migration of citizens of the Freely Associated States (FAS) to our island, nor were we a party to the negotiations that resulted in this federal immigration policy.**

**We, therefore, request that the Committee include report language on section 8 that indicates the Committee's concerns about the impact of the Compact, including**

the financial impact, on the U.S. territories closest to the FAS states and that provides Committee guidance to the Secretary of the Interior regarding the priority that he should assign to Compact-impact reimbursement as he prepares his annual budget submissions to Congress. With this Committee report language and the recommended amendments noted above, we support section 8.

Section 9: Eligibility for Housing Assistance

Section 9 of S.210 restores the eligibility for housing assistance to citizens of the Freely Associated States (FAS) who are habitual residents in Guam and other U.S. jurisdictions by virtue of section 141 of Public Law 99-239. Section 9 would resolve a problem that has resulted from a June 19, 1995 final rule issued by the U.S. Department of Housing and Urban Development which declared FAS citizens ineligible for section 8 housing and other federal housing assistance programs.

Both GovGuam and the federal interests would be served by a comprehensive federal-local review of the problems resulting from the federal immigration policy. This review can be accomplished through the Compact-impact reporting process. Congress recently directed the U.S. Immigration and Naturalization Service, under section 643 of Public Law 104-208, to issue regulations governing the rights of "habitual residents" by March 31, 1997 – INS has not issued these regulations yet.

The Government of Guam requests that Congress use S.210 to further clarify, rather than blur, the FAS citizens' status. We request Committee report language that gives the Committee interpretation of this status. We further request that other federal assistance programs be reviewed by the Committee in the months to come to assess whether FAS participation is consistent with the Congress' view of the FAS citizens' status.

While S.210 states that "such alien [FAS citizen] shall not be entitled to a preference in receiving assistance under this Act over any United States citizen", we are not convinced that such language will solve the problem on Guam that results from displacement of local residents due to the FAS citizen eligibility. This issue should be addressed in the Compact-impact reimbursement mechanism of PL 99-239. GovGuam's concerns about the insufficiency of the current reimbursement have been communicated to Congress.

Therefore, while we do not object to the goal of section 9 in restoring some eligibility for housing assistance to FAS citizens, we urge the Committee to carefully review our concerns regarding a consistent treatment of FAS citizens in federal programs, and to include commitments to address the Compact-impact reimbursement issue.

24TH GUAM LEGISLATURE

Office of the Speaker

Senator Antonio R. Unpingco
Speaker

155 Hesler Street, Agana, Guam 96910
Phones (671) 472-3455 / 56 / 57 • Fax (671) 472-3400

October 23, 1997

The Honorable Don Young
Chairman
Committee on Resources
U. S. House of Representatives
1324 Longworth House Office Building
Washington, D.C. 20515

Chairman Young and Members of the Committee on Resources:

I am Antonio R. Unpingco, Speaker of the Twenty-Fourth Guam Legislature and a Republican Senator for over twenty years. Over the course of this long political career, I have held offices as the Chairman of the Committee on Rules and the Committee on General Governmental Operations, Military and Veteran's Affairs. You and I had the pleasure of meeting together with the late Congressman Antonio B. Won Pat many years ago, during a Congressional visit to Guam in the late 1970s. I wish to thank you for affording me the opportunity to offer testimony in support of Guam's Commonwealth Act, H.R. 100.

If you recall, we presented this same case before Congress in 1989 during the Congressional subcommittee hearing in Hawaii. The issues are the same. The contents of the bill are the same. The only difference is the bill's number and a new Congress. Three administrations, several congresses, and millions of dollars later, nothing has changed except some of the faces.

I do not want to speculate on what may be said at this hearing or reiterate what was said during the 1989 hearing.

What I do want to stress is the question everyone wants answered. Is Guam's quest for commonwealth realistic or are we just spinning our wheels as usual before an unsympathetic United States government?

I think we all know the answer. No one is taking our quest for commonwealth seriously ... and unless there is a major change in attitude, Guam's political status will remain the same.

It is bureaucrats in Washington, D.C. that govern Guam, not Congress and the President. Perhaps this is because of the inherent nature of the system relative to protecting bureaucratic turf. The policy makers have little or no knowledge about the desires and sentiments of the people of Guam. They rely primarily on information provided by bureaucrats which is often inaccurate or incomplete. It is Congress and the President that decides Guam's future, not bureaucrats.

Mr. Chairman, after nearly a century of American colonialism and albeit the fact that the Chamorro people of Guam have become American citizens, the people of Guam have remained a colony subject to the whims of the federal bureaucracy. As citizens, we are not equal to other Americans because of our status as a colony. This was evident during the recent United Nations' Fourth Committee meeting which discussed the status of the remaining colonies of the world, which included Guam. It was clear during those discussions that the United States refuses to respect the rights of the Chamorro people.

We know that Guam's current political status was a creation of Congress through the Organic Act and that it could only be changed by Congress. After the 1989 Hawaii hearing, Congress directed that an Administration-led task force on Guam's Commonwealth Act and Guam's Commission on Self-Determination work out their differences. We have seen no progress of any significance made. Is this because we have been dealing with bureaucrats whose jobs would be eliminated if the political status of Guam is changed?

Such a task force was in place during President Reagan's Administration. Then, we dealt with another task force under President Bush's administration. This was followed by President Clinton's Administration. Ten years later, we have seen few results. If anything, we moved several steps backwards as a result of President Clinton's fundraising fiasco which tied in Guam's Commonwealth quest with illegal campaign contributions.

This is now history and we must move forward. Having seen the lack of progress in our political relationship with the United States, I am very pessimistic of any major political changes if decisions are left to the Washington bureaucrats.

Guam has emerged as an economic powerhouse in the Western Pacific and the United States has refused to release its political grip. Guam has already poised itself to be the hub of telecommunications, finance, and a captive insurance domicile that will rival Bermuda and Vermont. Guam's strategic location has also become America's bridge to the booming economies of Asia.

We have more than demonstrated our ability to be economically self-sufficient. We have weaned ourselves from military dependency. Our

economy is tourism based and we have made significant progress in diversifying it. Take, for example, the 1995 BRACC closures of the Naval Ship Repair Facility and the Fleet and Industrial Supply Center. The people of Guam were totally stunned to learn of those closures. We stood strong through the test, a test administered by the U.S. to see if we could withstand the wrath of American military power. We have found ways to rebound and build our island's future with the military assets we have received.

It must be acknowledged that because of Federal limitations imposed on Guam, we can only go so far in securing our future. If you can relate to how a child develops and outgrows its clothes, as well as its parents; so too, Guam has outgrown Federally imposed rules and restrictions. Guam is ready to cut the umbilical cord. We are not the children we were nearly a century ago. We have grown, matured and are ready to leave our mother's arms. It is strange how Federal laws aimed at protecting the economic interest of Corporate America have a profound negative impact on an unincorporated island 12,000 miles removed from Washington, D.C.. It is obvious that the Federal Government and Corporate America are sleeping together.

Given Guam's booming economy, as compared to many places in the United States, it remains a mystery why the United States is reluctant to loosen its grip on Guam. Certainly, American taxpayers are concerned where and how their tax dollars are being spent. And I venture to guess that not too many Americans are aware about Guam, or even where Guam is located. So, after examining this and considering how Congress is tightening the Federal budget, why is the United States hesitant in cutting Guam loose from Federal control and spending? Only Congress can truthfully answer that question.

Surely, if Guam is making great strides in becoming self-sufficient, it would be logical that there is no better time than the present to give the people of Guam a new political status with less Federal red tape and Federal monies.

Autonomy for Guam seems to have changed or is being changed by the bureaucrats in Washington. The word political self-determination has scared a lot of people. They seem to be going in another direction which is still colonial rule. Rather than political colonialism, it is probably more appropriate to describe it as economic colonialism. These are strong words. But, there is no other way to describe how Guam has been treated for nearly a century. Each time we seem to make progress which would be extremely beneficial to our people and our economy, big brother, a.k.a. the United States, intervenes and places an obstacle in our way.

One prime example which immediately comes to mind is Guam's once viable garment industry. In the early 1980's, a private company, Sigallo-Pac Ltd., operated a garment factory, which produced sweaters for export. Several years later, lo and behold, the Federal Government stepped in, saw things

otherwise and changed its ruling on Guam as a domestic point of origin. In the end, the federal government placed quotas on this local industry, ultimately destroying it.

In this example, the rules of the game were set and all players had a clear understanding of how to play by the rules. Guam, as a player, was smart and used the rules to its economic advantage. Yet, the big bully, a.k.a. the United States, unilaterally decided that the rules placed the large political contributors, the mainland garment industry, at a major disadvantage and changed them in mid-stream. The result was the end of what could have been an economic success for this island. This experience served as a clear reminder of Washington's wishy-washy attitude towards the people of Guam. On some occasions, Guam is considered as foreign as the plague. On other days, we are as domestic as apple pie.

Economic colonialism has always existed. When the U.S. Naval government had control of Guam, restrictions were in place which halted any economic development. Federal acquisition of the most prime properties -- which over the past 20 years remained largely unused -- came under the guise of national defense, thereby placing a stranglehold on development. Guam always had the potential for a booming island economy. Yet, it wasn't until 1962 when President Kennedy lifted Guam's designation as a Defensive Sea Area and Airspace Reservation that Guam began its political, social and economic journey to where it is today.

This is part of the ugly American attitude that I described earlier. Whenever the people of Guam try to get ahead, the Federal Government kicks us in the stomach. We have been kicked around too many times. I say enough is enough! We are tired of being treated as second-class citizens. We have all the tools needed to advance our island and our people. We no longer need subsidies from the federal government to survive. What we need is Congress' vote of confidence by passing Guam's Commonwealth H.R. 100. We will then become a full and contributing member of the American family.

When all else fail and the people of Guam overcome all the obstacles and intrusions of the motherland, the Federal Government becomes desperate and strikes at the heart of the Chamorro people -- **Self-Determination**. Yes, Chamorro self-determination is the heart of the debate between the Administration and the Chamorro people. This is the last and only issue they can use to keep us from our quest for complete autonomy.

This control, which the federal government has struggled to keep, has infringed on the Chamorro people's right to self-determination. During the October 10, 1997, United Nations hearing, the United States' representative,

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 407 of 542

David Scott, made the following statements before the Special Political and Decolonization Committee (Fourth Committee):

> "It is the view of the United States, that the right to self-determination of the territory of Guam must be exercised by all of the people of Guam not just one portion of the population. The speakers you have heard today seem to seek to disenfranchise a majority of the population of Guam. It is hard to imagine the UN associating itself with an exercise in self-determination in which a majority of those to be covered by the result could not participate in the exercise based on their ethnicity (sic).
>
> The United States is a nation in which all persons are provide equal treatment under the law. Our constitution does not allow for elections in which a portion of the population is excluded based on their ethnicity (sic). The United States is a nation in which all persons are provided equal treatment under our law. Furthermore, we cannot endorse a process under which the rights of some groups are held to take precedence over the rights of others, again just based on ethnicity (sic)."

These statements made by the U.S. representative to the United Nations are another example of the ugly American attitude that has been displayed in the Western Pacific for almost a century. The arrogance that they are the supreme beings of this earth will no longer be tolerated by the Chamorro people.

Let's take the statement that all U.S. citizens are treated equally. You and I know that there is no truth to that. The Chamorro people are proud to be U.S. citizens. We are so proud that we have time and time again borne arms to serve the interest of the United States in perpetuating world peace and prosperity. But, we remain an unequal partner, and an alienated member of the American family. We do not have the right to vote for the President of the United States; Guam's Delegate to Congress, Robert Underwood, does not have the right to vote on the floor in Congress! Are the people of Guam truly Americans? The answer is a resounding NO!

There is concern that U.S. citizens who reside on Guam would be excluded from voting on self-determination. Sure, they are U.S. citizens. But they originally immigrated to the United States via our small island, which the U.S. so proudly claims as a possession. They came from other countries looking for a better way of life, the American way. These immigrants have had the opportunity to have self-determination in their own countries. They are again allowed to exercise self-determination a second time when they were allowed to migrate to Guam. It is only right and just that the Chamorro people be allowed to exercise the same right.

Slowly, the Federal Government has made Chamorros a minority in their native homeland. Maybe this has been the plan all along. This is a problem created entirely by the United States. Mr. Scott accuses the Chamorros of

disenfranchising the majority of Guam's population. Well, I ask that someone please tell Mr. Scott that the United States has disenfranchised the Chamorro people for almost a century, long before the so called majority ever came to Guam.

God forbid if we should ever infringe on the rights of our fellow U.S. citizens. Yet the basis for self-determination is embodied in Article 73 of the United Nations charter of which the United States is a party. It is the United States which placed Guam in the list of non-self-governing territories in the first place.

There has never been concern for the Chamorro people's interest. The only interest that has been protected here is that of the United States. America has shirked its responsibility and time has caught up on America. Now it is time for America to right the wrongs it has committed.

The U.N. Charter was ratified and adopted by the U.S. Senate. Well, the Federal Government does not even want to honor this, but expects all other member nations to do so. This is the same body which was created under the guidance of the United States. And, when all else fails, the United States has attempted to abolish the Special Political and Decolonization Committee (Fourth Committee) under the guise of U.N. financial constraints. If this attempt had been successful, it would have meant that colonialism had been eradicated, which couldn't be further from the truth. It is obvious that America will stoop to the lowest level possible to avoid the issue of Guam, Commonwealth and self-determination.

As Guam looks to our neighboring islands of Micronesia -- the Commonwealth of the Northern Marianas, the Federated States of Micronesia, and the Republic of Palau -- we recognize that all of these islands have had the opportunity to determine their political destiny with the United States. Yet, Guam has been completely avoided by Congress and numerous administrations. Let's be honest. Guam is just too valuable as a military outpost, despite the military's attempt to appear as if they are downsizing their operations in the Western Pacific. We are not stupid. The opening of Department of Defense schools on Guam was a clear sign of Guam's future as a military stronghold in the Pacific. We know just how important this small island is to American military might. It is unjustifiable to use this as an excuse to exploit the Chamorro people, their land and their inalienable right to self-determination.

We are just as concerned about global peace, as much as the United States. At the same time, however, we are concerned with the future of our Chamorro people and our culture. That is something that can never be replaced. When the United States negotiated new political status with our neighboring Micronesians, there were contingencies set aside in the interest of military

needs. We are open to negotiate similar provisions in our Commonwealth Act.

The people of the Unites States exercised their right to choose when they declared their independence. They chose to start a new nation. Those naturalized U.S. citizens on Guam chose to leave their country to find a better life, to live the American dream. In the same respect, Chamorros must and will exercise their right to choose.

These ideals which we have embraced are strikingly similar to the Republican movement that has swept the United States and Guam this past year. Consider the passage of this legislation as an affirmation of Republicanism and a fulfillment of the Contract with America.

It is our wish that we become a member of the American family through the Commonwealth Act. However, we will not wait forever. There are other options available to us and we will exercise those options if and when it becomes necessary. Next year will mark a long century of American colonialism on Guam. It is with God's help that I hope 1998 will be the start of a new relationship with the United States. If not, then we must part ways and continue this journey alone.

In closing, I ask for your support of H.R. 100, Guam's Commonwealth Act and request that Congress expeditiously pass this piece of legislation by next year as a symbol of the United States' commitment and promise to eradicate colonialism worldwide.

Respectfully,

Antonio R. Unpingco
Speaker and Senator (R)
Twenty-Fourth Guam Legislature

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 410 of 542

The Office of
**Senator Carlotta A. Leon Guerrero**
Suite 215, Union Bank Building
194 Hernan Cortez Avenue
Agana, Guam 96910
Telephones: (671) 472-3416 / 8
Facsimile: (671) 477-1523
Twenty-Third Guam Legislature

COMMITTEE MEMBERSHIPS:
Economic-Agricultural Development & Insurance
Federal & Foreign Affairs
General Governmental Operations & Micronesian Affairs
Health, Welfare & Senior Citizens
Community, Housing & Cultural Affairs
Tourism & Transportation
Youth, Labor, Parks & Recreation
Association of Pacific Island Legislatures

October 7, 1996 file

Honorable Don Young
Chairman
Committee Natural Resources
U.S. House of Representatives
Washington D.C. 20515

Dear Mr. Young,

I am writing to express my profound disappointment with the work of an office under your oversight umbrella. On September 25th the Interior Department's Office of Insular Affairs transmitted to you a copy of a report, "The Impact of the Compacts of Free Association on the United States Territories, Commonwealths and on the State of Hawaii."

U.S.PL 99-239 mandates the Federal Government to document the adverse impacts to these island entities caused by its policy allowing "unrestricted migration" out of Micronesia into the U.S., namely Guam, the Commonwealth of the Northern Marianas (CNMI) and Hawaii.

Mr. Young, I have never felt so strongly the distance between Washington D.C. and Guam as I do now. On paper and as a total stranger to you I need to convince you that the Director of O.I.A., Al Stayman, has not done his job in documenting adverse financial impacts to my government. These impacts are caused by a federal policy decision made over a decade ago, a policy that we had no voice in forming. If I were a private citizen I would beat around the bush for a page or two, but as a leader I trust that you, like me, appreciate frank talk.

For the past 10 years the Government of Guam has been trying to get the Office of Territorial and Insular Affairs, (now re-named Office of Insular Affairs) to comply with the documentation of impact clauses in PL 99-239. During this period, thousands of Micronesians have moved to our island overloading our schools, health care, public housing and welfare programs.

As you can see from the chronology of correspondence back and forth between Interior and the Government of Guam (copy enclosed), we have received vague commitments and less than stellar follow through on those commitments. The end result is the report copied to you by Al Stayman

which simply points out the obvious, that there has been adverse consequences to Guam. Stayman goes on to say in the final sentence of the report's introduction page that the job is too tough for his office to ever figure out!

"However, Guam and O.I.A. have not reached complete agreement on the methodology for estimating financial impact: such agreement is not likely to be reached, given the complexity of the undertaking."

I filed a lawsuit in District Court last year (copy enclosed) to require O.I.A to do its job and help us figure out how best to document the impact. Even with a lack of concrete approved upon guidelines from Interior, my government has done its best to document the impacts. However, without fail, our figures are disputed by Interior and our case for implementing the financial reimbursement section of 99-239 is weakened.

My fight is not a solitary one. The governments of Guam, the CNMI and the state of Hawaii have joined me as co-plaintiffs in this suit. The next action in the case will occur later this month when the defendants must respond to our amended complaint.

My purpose in writing is to give you an opportunity to hear first-hand that Guam is suffering under this U.S. policy of un-restricted migration. I also believe that the office responsible for helping us solve the problems resulting from this policy, O.I.A., is not doing its job.

Guam has been more than a good soldier these past 98 years under the American flag. We recently endured the toughest military down-sizing cuts of any other American jurisdiction. We are currently playing host to the Kurds who were recently evacuated because of their pro-American support.

Mr. Young, I am willing to provide your office with more background information on this issue if needed.

In closing, I want to tell you that I looked you up in the Congressional Register and was impressed with the mention of "riverboat captain"... probably an interesting story there! Perhaps our paths will cross one day and I will get to hear it.

With best wishes for your continued success, I remain

Sincerely,

Carlotta Leon-Guerrero

RECEIVED
8:30
MAR 07 1997
MOGAN & BRONZE, P.C.

FOR FILE
FILED
DISTRICT COURT OF GUAM
MAR - 6 1997
MARY L. M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

CARLOTTA LEON GUERRERO, et al.,

Plaintiffs,

vs.

WILLIAM CLINTON, et al.,

Defendants.

Civil Case No. 95-00135

ORDER

This case came before the Court on January 23, 1997, on the plaintiffs' Motion for Summary Judgment.

__Factual Background:__

The Compacts[1] of Free Association were adopted by the United States Congress by the Compact of Free Association Act of 1985, P.L. 99-239, 99 Stat. 1770 __et seq.__, 48 U.S.C. §1901 __et seq.__ Section 1904(e) of the Act is entitled, "Impact of Compact on U.S. Area." Subsection (e)(1) of the Act provides that "[i]n

[1] 48 U.S.C. §1901 __et seq.__ adopts two Compacts of Free Association, the Compact of Free Association between the United States and the Government of the Federated States of Micronesia (48 U.S.C. §1901(a)), and the Compact of Free Association between the United States and the Government of the Marshall Islands (48 U.S.C. §1901(b)).

approving the Compact, it is not the intent of the Congress to cause any adverse consequences for the United States territories and commonwealths and the State of Hawaii." Section 1904(e)(2) requires the President of the United States to "report to the Congress with respect to the impact of the Compact on the United States territories and commonwealths and on the State of Hawaii." Subsection (e)(3) requires the President to request the views of "the Government of the state of Hawaii and the governments each of the United States territories and commonwealths,... and shall transmit the full text of any such views to the Congress as part of such reports." Under §1904(e)(1), the first report was due January 14, 1987, and on January 14 of every year thereafter.

The first report was prepared in 1989, and had not been prepared since then. This lawsuit was filed in November of 1995. On September, 1996, the Office of Insular Affairs of the Department of the Interior prepared the second-ever report. The fifteen-page report was entitled "The Impact of the Compacts of Free Association on the United States Territories and Commonwealths and on the State of Hawaii."

<u>The Motion:</u>

Plaintiffs Government of Guam, Government of the Northern Mariana Islands, and the State of Hawaii, jointly seek a decree of the Court directing the U.S. Department of the Interior to do the following:

1. On or before a date certain each year, the U.S. must report to the Congress with respect to the impact of the Compacts.[2]

2. The report shall identify any adverse consequences resulting from the Compacts and shall make corrective action to eliminate those consequences.[3]

3. The report shall pay particular attention to matters relating to trade, taxation, immigration, labor laws, minimum wages, social systems and infrastructure, and environmental regulation.[4]

4. The report shall include statistics concerning the number of persons availing themselves of the rights described in Section 141(a) of the Compact each year covered by the report.[5]

5. In preparing the reports, the U.S. shall request the views of the government of Hawaii and each of the territories and commonwealths, FSM, Marshall Islands, and Palau, and shall transmit the full text of any such views to the Congress as part of such reports.[6]

6. In addition to the matters stated in ¶s 1-4, in recognition of Congress' commitment to address any consequences adverse to the Territory of Guam, CNMI or the state of Hawaii, and Congress' authorization to appropriate funds to address those adverse consequences, the report shall address the financial impact on Guam, the CNMI and Hawaii of the compacts.[7]

7. The report shall set forth the sources of all date relied upon by the Respondents, identify the methodology and analysis

---

[2] First sentence of §1904(e)(2).

[3] Second sentence of §1904(e)(2).

[4] Third sentence of §19104(e)(2).

[5] Fourth sentence of §1904(e)(2).

[6] From text of §1904(e)(3).

[7] _See_ §1904(e)(4):
"the Congress hereby declares that, if any adverse consequences to the United States territories and commonwealths or the State of Hawaii result from the implementation of the Compact of Free Association, the Congress will act sympathetically and expeditiously to redress those adverse consequences.

used in identifying the adverse consequences, and shall identify any assumptions made in reaching those conclusions.

All of the items in the Proposed Judgment come directly from the Compacts of Free Association Act of 1985, except the latter, addressed infra.

In determining whether summary judgment is appropriate, the only issue is whether the current report was a reasonable exercise of agency discretion. The review being conducted by the Court is conducted pursuant to §706 of the APA, which states,

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall --
>
> (1) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be --
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.
> (B) contrary to constitutional right, power, privilege or immunity
> (C) in excess of statutory jurisdiction, authority, or limitations or short of statutory right;
> (D) without observance of procedure required by the law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title....
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In its review, this Court may consider whether the agency action was based on a consideration of the relevant factors. Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Ins.

Co., 463 U.S. 29 (1983).

The plaintiffs jointly argue that the report is inadequate, and therefore is not in compliance with the mandate of Congress to assess the impact on the affected areas. Hawaii argues that the report fails to take Hawaii into account at all, thus abusing the mandate of Congress in preparing the report. The CNMI further argues that the report fails entirely in assessing the financial impact on the affected areas.

The U.S. cautions the court not to undertake review beyond the bounds of the case law. This Court agrees that it cannot substitute its judgment for that of the statisticians. Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir.) cert. denied 462 U.S. 953 (1976). However, this prohibition is not encroached by a finding that the September 1996 Report shows none of its sources for its sweeping comments and conclusions. This is not a substitution for judgment of statisticians -- it is an observation that the sources are not identified.

Second, the U.S. cautions that this Court cannot impose its own interpretation on a statute. The court can only determine whether the agency's interpretation of a statute is permissible, resting on a rational basis. The Court agrees with this premise. However, the 1996 Report appears to be based on no basis whatsoever except the author's subjective impressions. This cannot be said to be resting upon a rational basis.

A review of the Report indicates that it is a hastily-

compiled last-minute report which merely glosses over the areas directed to be analyzed by Congress. It makes sweeping statements without regard to data, for example: "Extrapolating [from the 1990 census] to 1996 would give about 1200 arrivals [to Hawaii] since the Compact. These numbers are probably too low and should be improved through a census of Micronesians."[8] The Court suggests that a report assessing the impact of Micronesian migration should have before it the numbers involved in that migration. "No provisions of the Compacts addressed labor laws in the freely associated state or in the U.S. insular areas. No impact of the compact on labor laws has been brought to our attention."[9] The Court questions how a report of this nature can be thorough if it does not address the kinds of jobs held by Micronesians, and any potential displacement of local or foreign workers, and does not address allegations of job discrimination against Micronesians in the affected areas. "No impact on environmental regulation resulting from the Compact has been brought to our attention by Guam or the CNMI."[10] The Court questions how a report can be thorough when it reports no environmental consequences to the impacted areas. There are families of Micronesians living on the beaches of Guam. There

[8] September 1996 Report p. 11.

[9] September 1996 Report page 14.

[10] September 1996 Report page 14.

are wastewater and other infrastructure issues created by the migration. Where are the sources from which OIA makes the statement that there is "no impact"?

Another example of the superficial nature of the report is found in the recommendations that OIA makes after the 15 page "cumulative" report. OIA recommends four things: (1) "initiation of a federal-insular analysis" of the impact of legislation. Does this mean preparation of a report? Isn't OIA already supposed to prepare a report? (2) limit migration to Guam; (3) limit migration to CNMI; and (4) continue support for Congressional funding. These conclusions are meaningless. OIA proposes that Guam limit migration, but Guam does not control immigration to its shores. The Immigration and Naturalization Service controls immigration on Guam. OIA argues that CNMI limit migration to its shores. The CNMI has the power to control immigration, but this suggestion belies another sensitive issue in CNMI-US relations, beyond the purview of this case. Finally, OIA recommends that it study the problem further and support funding, which is OIA's statutory duty under the law in any event.

Further evidence of the OIA's inappropriate nonchalance is found in a declaration of Allen Stayman, Deputy Assistant Secretary, Office of Territorial and International Affairs, Department of the Interior. In it, he lists the actions he has taken in keeping Congress notified of all territorial affairs.

Most communications with Congress have been oral, in the form of testimony to Congress. However, he also discusses his duties under §1904(e). Without committing to any course of action, he states that he needs to "decide how best to devote scarce resources to securing this information." He also states that he does not believe that "an annual survey or census would be an appropriate use of our limited resources," but in the next sentence, "we also plan to fund a survey of Micronesian populations in Hawaii." Though the U.S. argues that Congress has never appropriated funds for OIA to conduct an analysis of the financial impact, the Court questions what OIA's yearly budget is supposed to be spent on. Can it not accommodate the cost of OIA staff obtaining statistics from Immigration and Naturalization and from Guam Public Health and Social Services, etc? Special funding should not be required. Yet, in the next sentence, the U.S. argues that negotiations are underway to fund a study that will allow Guam to assess compact-impact.

Finally, the U.S. argues that §1904 does not impose an affirmative obligation to include a financial quantification of the impact. This defies common sense; if Congress is going to "act sympathetically and expeditiously to redress those adverse consequences" how is Congress to do so without numbers?

The Court concludes that the Report that is at issue in this lawsuit is inadequate as a matter of law. The agency action at issue in this case was not based on a consideration of the

relevant factors. Summary Judgment is GRANTED and judgment will be entered in the form proposed by the movants in this case.

SO ORDERED this 6th day of March, 1997.

JOHN S. UNPINGCO
District Judge

**ATTACHMENTS TO**

**STATEMENT FOR THE RECORD**

**GUAM COMMISSION ON SELF-DETERMINATION**

**HOUSE RESOURCES COMMITTEE**
**(105th CONGRESS)**

**HEARING ON H.R. 100**
**THE DRAFT GUAM COMMONWEALTH ACT**

**October 29, 1997**

A. Self-Government Through Mutual Consent, Guam Commonwealth - February 11, 1993

B. Memorandum for the Special Representative for Guam Commonwealth - July 28, 1994

C. Memorandum to I. Michael Heyman, Special Representative for Guam Commonwealth - August 26, 1994

D. Self-Determination for the People of Guam: A Legal Analysis Guam Commonwealth - August 3, 1993

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 422 of 542

ATTACHMENT A

**SELF-GOVERNMENT THROUGH MUTUAL CONSENT**

**GUAM COMMONWEALTH**

**Presented By:**

**Washington Counsel To
The Guam Commission on
Self-Determination**

**February 11, 1993**

## I. INTRODUCTION TO MUTUAL CONSENT

"Mortimer Adler, writing in "We the People" describes American citizens as "American citizen-sovereigns". Ross Perot says "We own the country". The citizens of the U.S. territories are not part of the "we" of either Dr. Adler or Ross Perot. The citizens of Guam and the other territories are unable to participate in the national government through voting representation, voting for president or for constitutional amendments. The U.S. citizens of the territories and Commonwealths are, therefore, "American citizen-subjects", just as the British were "subjects" of the crown in 1775.

### A. A Government Acting without the Consent of the Governed Is Inconsistent with America's Founding Principles

Is there any doubt among us, that a founding principle of this country was the rejection of government acting without the consent of the governed? The United States exists today because our founding fathers rose up against colonial rulers who, while exercising control from a distant land, refused the people in the colonies any meaningful role in the governance process. The failure to provide for meaningful participation in the process of government ultimately weighed so heavily on the people of the colonies that they were forced to cast it off through armed rebellion. As Thomas Jefferson wrote in the Declaration of Independence:

> Governments are instituted among Men, deriving their just Powers from the Consent of the Governed, that whenever any Form of Government becomes destructive of these Ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its Foundation on such Principles...

Nevertheless, the early American democracy was an imperfect model with many excluded from the democratic process. Americans with vision and a commitment to democratic principles have struggled for the last two hundred years toward bringing more American citizens within the political process. The Constitution, for instance, has been amended three times to ensure that more of our citizens could vote.[1] Even these Amendments were not enough. Congress has found it necessary to adopt innumerable pieces of legislation to promote and protect civil and voting rights, all with the overriding goal of enabling all the people to participate in the democratic process. While for many of us progress has been painfully slow, I have little question that we have moved inexorably toward our founding fathers' original goal of establishing a truly representative government which exists with the consent of those it governs.

### B. Voting for Members of the House and Senate and for the President Provides the People of the States with Full Participation in the Democratic Process

Having the consent of the people, of course, does not mean that all of the people must agree with each action of government. Rather, ours is a republican form of government in which the people elect their representatives who sit in the House of Representatives, the Senate and the Presidency and act on their behalf. The American people participate in our democracy through

---

[1]. The Fifteenth Amendment eliminated voting restrictions based on race. The Nineteenth Amendment eliminated voting restrictions based on sex. The Twenty-Third Amendment gave the people of the District of Columbia a presidential vote.

these representatives who are directly answerable to them in regular elections. As last November's elections demonstrated so clearly, when our representatives become too distant from the interests of the people they represent, they are replaced. In our system, therefore, truly meaningful participation in the democratic process means that we are able to vote for these representatives who adopt legislation and oversee its implementation on our behalf. If this fundamental right to elect representatives were not to exist, we would be forced to rely largely upon the largess of leaders who others select on our behalf, or who select themselves as in a dictatorship, and over whom we have no control. Such a system, however, would be an anathema to us. It directly contradicts the intentions of our founding fathers and is utterly inconsistent with the principles of democracy. In fact, the United States has throughout its history lead the fight against just this sort of tyranny, most recently in the Soviet Union and Eastern Europe, and, as a result, we have all witnessed in awe the destruction of the Soviet dictatorship.

### C. Today the United States Actively Supports These Democratic Principles Throughout the World - But Inconsistently in the Territories

During the 1980's promotion of democratic principles increasingly became a theme of foreign policy or, at the very least, an often debated issue over the role it ought to play. Ultimately, it became a campaign issue. During his campaign, President Clinton focused on it as a fundamental tenet of his foreign policy. His commitment to encourage the establishment of

democracies around the world is of such import that, in early January, Secretary of State-designate Warren Christopher sought a special meeting with proponents of the democracy movement within the Democratic Party to reaffirm the campaign pledge to make the promotion of democracy a key component of the new Administration's foreign policy.[2]

By now, some may be asking why the basic civics lecture? Is this American commitment to democracy not self evident? But for others this discussion, raised at a conference on territories with a theme of "A Time for Change," is not surprising at all.

America today remains a colonial power with distant possessions, the inhabitants of which, many of whom are citizens of the United States, do not have the same rights to participate in our representative democracy enjoyed by the citizens of the several States.[3] If the citizens of the territories maintain their residence in the territories, they do not elect voting members of either the House and Senate and cannot vote for the President. They are effectively excluded from the most fundamental aspect of our democratic system. As a result, laws are adopted for them and implemented by persons appointed and consented to by a President and Congress they did not elect.

---

[2]. See Washington Post, January 9, 1993, at A9.

[3]. The principal territories of the United States include: American Samoa, Guam, the Northern Mariana Islands, Puerto Rico and the Virgin Islands. Qualifying residents of each of these except American Samoa hold U.S. citizenship. American Samoans are nationals of the United States.

The circumstance of the people of Guam today is the direct consequence of almost 100 years of colonialism supported by court precedent which holds that Guam is subject to the unfettered will of a government in which it does not participate. The fundamental question which the people of Guam and, indeed, all territories must ask today is similar to that question asked by the leaders of the civil rights movement in the 1960's: can a nation founded on the principle that all its people are created equal continue to deny basic human rights to some of them solely because they live in the territories?

## II. THE PEOPLE OF THE TERRITORIES ARE EXCLUDED FROM THE DEMOCRATIC PROCESS AT THE NATIONAL LEVEL BY THE CONSTITUTION

### A. The Beginning of Guam's Quest for Self-Determination

Set against this background of exclusion from rather than inclusion in the democratic process, the people of Guam now seek to restructure their relationship with the United States. In 1987, Guam, in two plebiscites, approved a draft Commonwealth Act designed to begin the self-determination process. A fundamental objective of the quest for Commonwealth is to extricate Guam from a system under which those who the people of Guam do not elect act on their behalf.

Ironically, it is the United States Constitution itself which has been used to bar the people of Guam and of all the territories from full participation in the democratic process, and has been used to lock them in a dependency on those they do not elect. In fact, absent the agreement of Congress, the people of the

territories have no right to participate in the political process at all. The source of the dilemma is Congress' power under Article IV, Section 3, Clause 2 of the Constitution, the Territorial Clause, which states that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."

### B. The Supreme Court Has Broadly Interpreted the Constitution as Giving the Congress Plenary Control over the Territories

The Supreme Court has consistently interpreted Congress' power under the Territorial Clause broadly and long ago concluded that "Congress, in the government of the Territories...has plenary power, save as controlled by the provisions of the Constitution." Binns v. United States, 194 U.S. 486, 491 (1904). Justice White in his opinion in Downes v. Bidwell, 182 U.S. 244 (1901), generally viewed as the seminal opinion on the status of territories, described the breadth of Congress' power over the territories under the Territorial Clause.

> The Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States...to give to the inhabitants as respects the local governments such degree of representation as may be conducive to the public well-being, to deprive such territory of representative government if it is considered just to do so and to change such local governments at discretion...

Downes v. Bidwell, 182 U.S. at 289-290.

The Supreme Court explained further its view that Congress has the broadest possible authority over the territories in Dorr v. United States, 195 U.S. 138 (1904).

> Congress has unquestionably full power to govern it (the territories), and the people, except as Congress shall provide for, are not of right entitled to participate in political authority, until the Territory becomes a State. Meantime they are in a condition of temporary pupilage and dependence; and while Congress will be expected to recognize the principle of self-government to such extent as may seem wise, its discretion alone can constitute the measure by which the participation of the people can be determined.

Dorr v. United States, 195 U.S. at 148.

C. **Guam Marches Squarely to the Beat of the Federal Drummer**

Perhaps no expression describes more starkly the plight of the American territories than that given by the United States Court of Appeals for the Ninth Circuit in three separate rulings dealing with the political status of Guam. Beginning in 1982, the Ninth Circuit stated in People v. Okada, 694 F.2d 565, 568 (9th Cir. 1982) that

> Congress has the power to legislate directly for Guam, or to establish a government for Guam subject to congressional control. Except as Congress may determine, Guam has no inherent right to govern itself. (Emphasis added.)

Three years later, the Ninth Circuit expanded on this theme in Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285, 1286 (9th Cir. 1985) holding that Guam "enjoy[s] only such powers as may be delegated to it by Congress...." As such, "the government of Guam is an instrumentality of the federal government over which the

federal government exercises plenary control." Sakamoto, 764 F.2d at 1289.

The Ninth Circuit's most recent and starkest declaration on this theme came in Ngiraingas v. Sanchez, 858 F.2d 1368, 1370-71 (9th Cir. 1988) when Guam was analogized to a Federal agency.

> Admittedly the analogy between Guam and an administrative agency such as the Federal Trade Commission is counterintuitive. Guam seems more like a state or municipality than run-of-the-mill federal agency. After all, Guam elects government officials, its citizens participate politically...But there are also very significant differences, differences we deem conclusive.... Guam marches squarely to the beat of the federal drummer: the federal government bestows on Guam its powers and, unlike the states, which retain their sovereignty by virtue of the Constitution, Guam's sovereignty is entirely a creation of federal statute.

Ngiraingas, 858 F.2d at 1370-71 (emphasis added).

**D. The People of Guam Do Not Participate Equally with the People of the States in Congressional Decision-Making**

The impediment to self-government, of course, is that the people of the territories do not participate as equal players in the Congress which has this plenary power. While several of the territories have representation in the House of Representatives, Puerto Rico through its locally elected Resident Commissioner and Guam, American Samoa and the Virgin Islands through their delegates, they are barred from sending voting Members to Congress. As a result, the citizens of the territories, unlike all others in the States, do not participate in the democratic process in the way that our system has determined most meaningful -- electing their

own voting representatives to the House and Senate and voting for the President.

Through the draft Act, the people of Guam seek for the first time to overcome their constitutional disability which bars direct participation in the democratic process by taking control of their own affairs through a partnership with the United States which recognizes a local government established pursuant to a local constitution. Within a Commonwealth relationship, Guam seeks to move forward under a government which rules with the consent of those who are governed, not with the consent of those who the people of Guam did not elect, who govern from a distance and who are not directly responsible to them.

**E. The Territories Limited Role in the House of Representatives**

In early January, the importance of a vote in Congress was brought home all too clearly when we witnessed an epic confrontation in the House of Representatives over the role of the territorial delegates which highlighted the extent to which the people of the territories are excluded from effective participation in the decision-making process. In December of 1992, the House Democratic Caucus proposed to amend Rule XII of the House to permit the Resident Commissioner of Puerto Rico and the Delegates from Guam, the Virgin Islands and American Samoa to vote in the Committee of the Whole. The idea was to bring the territories a small step closer to actual participation in the legislative process.

Prior to this proposal, the Resident Commissioner and the Delegates had privileges of floor debate and a vote in standing committees. The participation of territories in Congress dates back to the 1st Congress, which, acting pursuant to its Article IV, § 2 powers "to dispose of and make all needful Rules and Regulations respecting the Territor[ies]," established the office of delegate for the Northwest Territory "with a right of debating but not of voting." 1 Stat. 50, 52 (Aug. 7, 1789).[4]

In 1900, Congress created the office of Resident Commissioner for Puerto Rico. 48 U.S.C. § 891 (1988). The Commissioner is elected to a four-year term and enjoys the privileges accorded territorial delegates. Until 1970, the Resident Commissioner served as a nonvoting "additional" member of the House Agriculture, Armed Services and Interior and Insular Affairs Committees.

In 1970, the Resident Commissioner proposed that the responsibilities of his office be expanded under House Rule XII to include the right to vote in standing committees of the House. An amendment permitting this vote was enacted into law as part of the Legislative Reorganization Act of 1970, Pub. L. No. 91-150, October 26, 1970.

Also in 1970, Congress created the office of Delegate for the District of Columbia pursuant to its powers under Article I, § 8 of

---

[4]. The history of the Resident Commissioner's and territorial Delegates' role in Congress is taken from the Complaint filed by Congressman Michel and eleven other Members against the Resident Commissioner and Delegates in the United States District Court for the District of Columbia. See Michel et al., v. Anderson et al., Civ. Action No. __ (D.D.C. January 7, 1993).



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 433 of 542

the Constitution to "exercise exclusive Legislation over the District of Columbia. 2 U.S.C. § 25a(a) (1988). The House then extended the privilege to vote in standing committees to the District's delegate.

In 1972, Congress created delegate offices for the territories of Guam and the Virgin Islands. These Delegates were extended the same privileges and immunities as the Resident Commissioner, except that the right to vote in standing committees was not authorized unless the rules of the House were amended. 48 U.S.C. §§ 1711 and 1715 (1988). The rules were later amended.

While the House through these actions provided limited rights of participation in the legislative process, the critical right, a vote on the floor for the adoption or defeat of legislation, was unavailable.[5] While it is true that some of the most meaningful work of the House is accomplished in Committee, the ability to vote on the floor brings with it the ultimate power of a full participating Member. Without this vote, a delegate is never in a position to cast the deciding vote. Without this power, a delegate has nothing to trade when that delegate's own legislative initiatives require the support of others in a close vote.

---

[5]. Under Article I, §§ 2 and 3 of the Constitution, as amended by the Fourteenth Amendment, members of the House may only be selected from the States, thereby precluding full representation for the territories in the House and Senate. Article I, § 5 provides the basis for permitting the delegates to vote in the committees. It authorizes the House to determine its own rules of proceedings.

### F. The House Takes a Step Forward

On January 5, 1993, the House of Representatives attempted to take a significant step toward bringing the territories closer to the democratic process when it adopted a rule change giving the Resident Commissioner and Delegates a vote in the Committee of the Whole.[6] The resolution, however, had one significant difference from the proposal originally recommended by the Democratic Caucus. While the Resident Commissioner and Delegates could vote in the Committee of the Whole, if theirs were the deciding votes, the entire House would vote again -- this time without the delegates' vote.

Practically, this vote moves the people of the territories only inches closer to full participation in the system. Symbolically, however, the territories moved miles. While effectively they remain without the same fundamental powers available to those in the States, the fact that large numbers of American citizens have no meaningful participation in the democratic process was brought squarely before the Congress and the American people and must now be addressed.[7]

---

[6]. D.C. Delegate, Eleanor Holmes Norton, anticipating the challenge to the vote wrote in defense that "[t]he Republican leadership and some Democrats who resolutely insist on democracy abroad are a lot more resistant to small doses of it here at home. See E. Norton, Law, Politics, and Voting By Delegates, Legal Times, January 4, 1993, at 22.

[7]. When he introduced his proposed Insular Areas Policy Act, H.R. 6117, Delegate DeLugo's accompanying Statement of October 4, 1992, justified the proposed reorganization in part on the grounds that while the territories must relate to the Federal government as do the States, they "lack the States' power in Federal decision-making processes...."

G. **The Territories Are Excluded From the Senate Entirely**

The territories have no role whatsoever in the Senate. It is in the Senate where the small States were given their ultimate protection against the will of the majority. Two Senators from each State provide the small States with an enormous equalizer and bring the people of these States most directly into the political process. With a majority of only 51, the importance of having two Senators is obvious. For instance, the Senate recognizes a Senator's privilege to delay or block consideration of Legislation or nominations by placing a "hold" on the matter.[8]

The privilege to place a hold on a bill is not provided for in the Senate's rules but is an informal product of custom and courtesy. Essentially, a senator "asks" the leadership of his party to put a hold on a bill, in other words, to object to consideration of it until the Senator's concerns are addressed. See Bach, supra at 6, n.8. In practice Senators often place holds on bills for reasons that have nothing to do with the bills themselves. Senators may be seeking concessions on other bills or they may object to a particular appointment.

This privilege is recognized because under Senate rules any Senator may object on the floor to consideration of a bill or nomination thereby requiring a vote of the full Senate to bring the bill up for consideration. Id. To avoid the necessity of a vote,

---

[8]. See Stanley Back, Congressional Research Serv., The Legislative Process on the Senate Floor: An Introduction, at 6 (Mar. 31, 1986, revised July 1, 1991).

the Majority Leader customarily asks for unanimous consent.[9] If there is even one objection the bill may not be considered under this procedure. If the Majority Leader cannot secure unanimous consent, he must call for a vote on the motion to proceed to consider the bill. A simple majority may approve the motion, but debate on the motion is unlimited. This is the point at which a filibuster is possible. Id. Because Senate rules permit senators to retain the floor for as long as they have anything to say and are present to say it, Senators may engage in endless filibuster to prevent a vote on the motion to proceed. The Senate may only close debate (cloture) with the support of three-fifths of the Senators, or 60 votes.

The hold serves as a behind-the-scenes mechanism for working out objections before the bill comes to the floor. Id. The holding privilege does not mean every Senator has an absolute veto over all legislation or nominations, but it does mean each Senator has some bargaining leverage before the legislation or nomination is brought to the floor. See Tiefer, supra note 9, at 563.[10]

[9]. According to a Congressional Research Service study, 98% of the matters laid before the Senate proceed for consideration by unanimous consent. This fact suggests that the Majority Leader probably honors almost all holds. See Charles Tiefer, Congressional Practice and Procedure: A Reference, Research and Legislative Guide, at 562-63 (1989).

[10]. Another opportunity for delay is the "layover rule." Tiefer, supra, at 566. When a Committee approves legislation or a nomination for floor consideration, the bill is accompanied by a Committee Report. Id. at 550. Under Senate rules, all reports "shall lie over one day for consideration," unless the Senate waives the requirement by mutual consent. In addition, there is a layover requirement of three calendar days to give Senators time to review reports. Id. at 566. Both layover rules can only be waived

III. **THE POLITICAL DILEMMA FACING THE TERRITORIES**

Clearly, the people of the territories are substantially disadvantage by their exclusion from the political system. Without effective participation in the political process, can the people of Guam, or any other territory seeking a change in political status short of Statehood or independence, ensure that the relationship they ultimately agree to will be honored by the United States? The Commonwealth of the Northern Mariana Islands (CNMI) and the United States have been locked in battle for several years now over exactly this issue. The CNMI believes it established certain principles of self-government which were unalterable. The United States disagrees and cites to the plenary power of the Territorial Clause and 90 years of court precedent holding that there are few inhibitions on Congress' discretion toward the territories.

The dilemma facing Guam and the other territories seeking political status changes short of Statehood or independence is how to prevent the legislation authorizing the change from being treated as simply another Organic Act, subject to the unfettered discretion of a Congress in which they do not vote or to unintended interpretation by an Executive Branch over which they have no real political influence. In Guam's case, its transition to Commonwealth will result from legislation adopted by Congress and approved by the people of Guam. The problem, of course, is that, under generally accepted legislative and legal principles,

---

with unanimous consent and offer a Senator another procedural opportunity to attack legislation.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 438 of 542

legislation is binding only on the Congress which adopts it. If, then, the people of Guam agree to a Commonwealth relationship based on an Act of Congress, can they be sure that a future Congress, reacting perhaps to the politics of the moment or new domestic or international political pressures, would not reach into the legislation and alter it unilaterally?

Over the last two and one half years, Guam's Commission on Self-Determination, at the request of Congress, engaged in negotiations with the Bush Administration on the terms of the draft Commonwealth Act. During these negotiations, the Commission's Chairman, Governor Joseph Ada, repeatedly raised his concern that the rules frequently seem to change toward Guam and that Guam had little leverage to stop a change once proposed. He explained how Guam, in the past, has had the rules applicable to it unilaterally altered to suit the political and economic interests of others with greater influence in the Congress or Administration. He argued, therefore, for a form of guarantee which protects whatever agreement is ultimately reached. To this end, he asked that there be no changes in the partnership without the mutual consent of the people of Guam. He explained that this was the only workable option for a people permanently precluded from participating in the political system.

The Bush Administration resisted this proposal. The Governor was told to trust and have faith in the Government, and that once agreements were reached significant changes would be difficult to get through the political process. In essence the Bush

Administration was reassuring the Commission that Guam would not again be subject to the politics of the moment.

## IV. MUTUAL CONSENT IS THE ONLY REASONABLE ALTERNATIVE FOR THE PEOPLE OF GUAM WHO ARE BARRED FROM THE DECISION-MAKING PROCESS

### A. Changes to the Terms of Commonwealth Require Mutual Consent

Borrowing from precedent established in the CNMI's Covenant,[11] the draft Guam Commonwealth Act seeks agreement from the United States Congress that the terms of the Act will not be altered without the mutual consent of Guam. Section 103 of the Act reads as follows:

> In order to respect the self-government granted to the Commonwealth of Guam under this Act, the United States agrees to limit the exercise of its authority so that the provisions of this Act may be modified only with the mutual consent of the government of the United States and the government of the Commonwealth of Guam.

The Mutual Consent provisions of the draft Commonwealth Act are essential to Guam's self-government goals, and without it, the draft Act would be little more than another Organic Act. The draft Act is intended to redefine completely the political relationship between Guam and the United States. It is not an extension or

---

[11]. Section 105 of the Covenant to Establish Commonwealth of the Northern Mariana Islands in Political Union with United States of America, Pub. L. 94-241, Mar. 24, 1976, provides only for a limited application of mutual consent. It states, "[i]n order to respect the right of self-government guaranteed by this Covenant the United States agrees to limit the exercise of that authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands."

continuation of the past Federal/territorial relationship. In order to redefine the relationship and meet the self-government objective, the fundamental legal and political framework must also be completely redefined.

**B. The Bush Administration Offered Limited Mutual Consent and Then Snatched It Away**

In response to Guam's proposal, the Bush Administration's Task Force organized to work with the Commission on Self-Determination initially argued that "the mutual consent provision...should, however, be confined to its (the draft Act) 'fundamental provisions'."[12] The only provisions which the Task Force believed should be covered by mutual consent were Section 101 (the creation of the Commonwealth itself and establishment of the supremacy of the U.S. Constitution), Section 103 (the Mutual Consent provision itself), section 201 (applicability of the U.S. Constitution) and section 301 (U.S. authority over defense and foreign affairs). Not surprisingly, each was a provision which ensured continuation of the United States' unilateral control over Guam.

Guam, however, seeks certainty of treatment in all fundamental provisions of the relationship. The draft Act contains 12 Titles, each of which deals with a fundamental element of the past, present and future relationship with the United States. Each of these Titles is interrelated and each is equally critical to the Commonwealth relationship. Each is designed to give the same

---

[12]. The Task Force released its first report on the Commonwealth proposal to Congress on August 1, 1989. It recommended consent essentially on the same provisions the United States had accepted in the Mariana's Covenant.

measure of certainty to Guam that the Task Force initially sought for the United States when it proposed that only a few sections be subject to mutual consent. Certainty on immigration, trade, taxation, land and natural resources, Chamorro rights and the scope of self-government are as critical to Guam as the applicability of the Constitution and continued authority over defense and foreign affairs are to the United States.

The Mutual Consent provision seeks Congress' agreement that the relationship established through this Act can be altered only with the mutual consent of the people of Guam. While the principle is a simple one, it is a cornerstone of Commonwealth. It is the only "equalizer", and the only aspect of the draft Act which ensures a true partnership. Because the people of Guam cannot participate in the political process in the same way available to others, to deny mutual consent is to deny self-government to the people of Guam and subjects them for the future to potentially arbitrary decisions made by those over whom Guam has no control.[13]

---

[13]. Guam's concerns were not speculative or fantasy. During its discussions with the Task Force on the trade relationship between Guam and the United States, the Commission on Self-Determination argued for a new approach to the traditional trading relationship the United States has maintained with its territories. The essence of the proposal was to achieve a level of certainty for Guam-based manufacturers within a framework of free trade by locking in rules of origin which would not be subject to change after a manufacturer began to operate on Guam. Under § 603(c) of the Northern Mariana Islands' Covenant with the United States, any rules applied by the United States to Guam would also apply to the Northern Mariana Islands. The Task Force apparently did not believe it was bound by § 603(c) and insisted upon adding a provision to the draft Commonwealth Act which would result in the new Guam rules not applying to the Northern Mariana Islands.

As long as Guam remains subject to the discretion of a Congress in which it does not have full voting representation in both the House and Senate, it has no meaningful political power to protect itself against detrimental changes in the relationship. Without equal rights in the political process, Guam's only protection is a "contract"; the terms of which are protected, like all contracts, by mutual consent. The twelve Titles of the draft Commonwealth Act are this contract.

C. **The Task Force Makes the Case for Mutual Consent**

After the Task Force released its initial report on the draft Act in 1988, Guam's Commission on Self-Determination commenced negotiations with the Task Force on the draft Act's terms. These negotiations lead to the Chairperson of the Task Force, Assistant Secretary Stella Guerrera and the Chairman of the Commission, Governor Joseph Ada, signing a series of qualified agreements on language which each found acceptable. These negotiations concluded on August 13, 1992, with the signing of a document listing those provisions of the draft Act on which the Task Force and Commission on Self-Determination were unable to agree. After that date there were no further meetings between the Task Force and Commission concerning the provisions of the draft Act. Rather, the Task Force undertook to draft its report on the negotiations for submission to Congress. As the Guam Commission understood it, this report was for the purpose of setting forth the areas of agreement and explaining the disagreements.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 443 of 542

The Task Force apparently saw it differently and forgot its admonition to the Commission to trust it. On January 19, 1993, just hours before departing Washington, the Bush Administration released a report which unilaterally altered its prior agreement to many critical provisions of the draft Act. Without consulting with Guam or giving any warning whatsoever, the Bush Administration reneged on many of its commitments or recommended to Congress alterations to agreed language. These included the following agreements:

1. Section 102(f), signed December 12, 1991 as § 1002 (Chamorro Land Trust).

2. Section 102(g), signed October 2, 1991 (altering language relating to residency requirements).

3. Section 202-A, signed December 12, 1991 (establishing a fast track legislative review process for legislation that Guam determines is being inappropriately applied to it).

4. Section 202-B, signed December 12, 1991 (agreement to disagree on proposal to deal with applicability of rules, and regulations to Guam).

5. Section 203, signed December 12, 1991 (establishing a Joint Consultative Group to work on problems in the relationship).

6. Section 701, signed March 25, 1992 (establishing a restrictive immigration system for Guam).

Furthermore, the Task Force backed away from its 1989 offer in the initial report to apply mutual consent at least to those provisions of the draft Act which it considered essential. According to the January 19th report, "the Task Force cannot agree to a proposal that the modification of every part of the Commonwealth Act would require the consent of the people of Guam." January 19, 1993 Second Federal Inter-Agency Task Force Report on



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 444 of 542

H.R. 98, the Guam Commonwealth Bill, at 97. "The Task Force, therefore, objects to Section 103 and any other type of mutual consent provision." Id. at 24.

Thee statements are remarkably revealing. The Task Force concluded that the people of Guam ultimately are to have no voice in their political future. Their consent is not required. The United States will make the decisions unilaterally. This is not government with the consent of the governed and is impossible to reconcile with the world-wide self-determination movement.

This change in its mutual consent position is not surprising. While the Task Force Report attempts to lay blame for its changed position at Guam's door step because of a Commission proposal to guarantee the viability of its mutual consent proposal, the Task Force obviously abandoned mutual consent because it wanted to maintain the flexibility to do what it did after the completion of negotiations with Guam - change positions unilaterally. As Governor Ada concluded after the report's release, clearly, a mutual consent provision is Guam's only alternative, if Commonwealth is to have any meaning.

### D. Congress Can Bind Future Congresses Through Mutual Consent

The concept of a binding agreement which establishes the boundaries of the relationship fits well within the United States' legal and political system. Although the mutual consent provision is designed to accommodate Guam's desire for self-government, it also recognizes and accepts Congress' continuing and unique powers under the Territorial Clause and applies these powers to establish

the mutual consent obligation. To reconcile mutual consent with Congress' broad powers under the Territories Clause, the Commission on Self-Determination has proposed that a new provision be added to the draft Act setting forth explicitly the Congress' obligations under the mutual consent provision. The proposed provision which would be added to Title Twelve reads as follows:

> Section 1202. Establishment of Covenant and Granting of Fifth Amendment Property Rights
>
> The Congress, acting pursuant to its powers under Article IV, Section 3, Clause 2, by adopting this Act establishes a covenant between the people of Guam and the United States Congress for internal self-government by the people of Guam, the terms of which shall not be altered without the mutual consent of the people of Guam. To give effect to this covenant, the Congress of the United States hereby agrees that none of the terms of this Act shall be altered by this or any future Congress without the agreement of the people of Guam and that this right to mutual consent shall be deemed as giving the people of Guam and the Government of the Commonwealth of Guam a constitutionally protected property right in self-government under the Fifth Amendment of the Constitution of the United States which is enforceable in the courts of the United States.

The essence of the proposal is that the people of Guam and the Congress are agreeing to enter into a binding contract, a covenant, with the Congress explicitly agreeing that the rights being afforded to the people of Guam are in the nature of property rights protected by the Due Process Clause of the Constitution.

This proposal was so threatening to the Task Force that, in an extraordinary departure from the procedure agreed to for the

negotiations on virtually every other proposal, its members were directed not even to discuss it. Although there were no discussions, the Task Force did comment on the proposal in the January 19th Report. According to the Task Force, only contract rights or property rights give rise to Fifth Amendment protections, not regulatory programs, "or as in Guam's proposal, essentially political rights that cannot be reduced to money judgments." Second Task Force Report at 97. The Report relies on Bowen v. Agencies Opposed to Social Security Entrapment, 477 U.S. 40 (1986).

The Task Force apparently viewed the proposal as a threOPat to the United States' sovereignty in Guam. In fact, the government's entering into a binding agreement has nothing whatsoever to do with sovereignty. If sovereignty were construed to mean that the Federal Government could never enter into any kind of binding agreement then no treaty is valid, no government bond could be redeemed and no contract enforced. Similarly, the Federal Government's sovereignty over the States is limited by the Tenth Amendment to the Constitution,[14] resulting in what is often referred to as dual sovereignty. There is no inconsistency between the Federal Government's sovereignty and the concept of the Federal Government limiting its own authority voluntarily.

Ultimately, the question is whether Congress can irrevocably limit its broad territorial clause authority. There is no direct

[14]. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Supreme Court precedent which answers the question. The Task Force's reliance on Bowen, however, is clearly misplaced. The law in question in Bowen contained a provision expressly reserving to Congress itself "[t]he right to alter, amend or repeal any provision" of the Act. Bowen, 477 U.S. at 50. The decision merely reiterated a 110 year old rule that whenever Congress reserves on to itself the right to amend legislation it may do so. The Court stated:

> we have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."

Bowen, 477 U.S. at 54 (emphasis added).

Guam's proposal sets forth in "unmistakable terms" the limits Congress is accepting. In fact, the Supreme Court has repeatedly upheld agreements which bind the government.

> the right to make binding obligations is a competence attaching to sovereignty.... The Congress cannot invoke the sovereign power of the people to override their will as thus declared. The powers conferred upon the Congress are harmonious.... Having this power to authorize the issue of definite obligations for the payment of money borrowed, the Congress has not been vested with authority to alter or destroy those obligations.

Perry v. United States, 294 U.S. 330 (1935).[15]

---

[15]. See also United States v. Bekins, 304 U.S. 27 (1938):

> It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power. This is constantly illustrated in treaties and

While a distinction obviously exists between the Government's rights to abrogate property rights and the issue of its authority to exercise political power in the territories, the Supreme Court's frequent statements that the Government can bind itself do not appear to be limited to commercial-type contracts. The Court has, for instance, upheld limitations on federal political powers in areas ceded to the federal government by the states pursuant to the Territorial Clause. In Fort Leavenworth R.R. v. Lowe, 114 U.S. 525 (1885), the Court upheld an agreement between the Federal Government and Kansas dividing taxing authority. The Court stated:

> Though the jurisdiction and authority of the general government are essentially different from those of a State, they are not those of a different country; and the two, the State and the general government, may deal with each other in any way they may deem best to carry out the purposes of the Constitution....

Fort Leavenworth, 114 U.S. at 541.[16]

The Congress clearly also has authority to dispose of property under the Territorial Clause. This power includes both the

---

> conventions in the international field by which governments yield their freedom of action in particular matters in order to gain the benefits which accrue from international accord.

[16]. Similarly, in Collins v. Yosemite Park & Curry Co., 304 U.S. 518 (1938), the Court upheld an agreement between California and the Federal Government which reserved certain rights to California when it ceded Yosemite Park. The Court concluded that the Federal Government and the states could enter into agreements concerning jurisdiction over property within their borders, and the courts should "recognize and respect" the agreements. 304 U.S. at 527-30.

absolute right to dispose of property in its entirety or to dispose of part of the governments rights in property.[17]

> Of course, a significant difference may exist between the disposition of property and the disposition of sovereign authority. Nevertheless, the conclusion that Congress can partially dispose of matters over which it has the power of total disposition has considerable logical appeal. If Congress could totally dispose of its power over the Philippines by granting them independence, it seems logical that it could also partially dispose of its powers by granting them something less than complete independence. Whether Congress could later change its mind as to the partial disposition is not clear, but some kinds of dispositions are by nature final. For example, if Congress disposes of its powers over territory by admitting it as a state, that would seem a final disposition of its territorial powers; Congress cannot change later the status of a state. Similarly, when Congress granted independence to the Philippines, it disposed of its territorial power over them for all time.

<u>Inventive Statesmanship vs. The Territorial Clause: The Constitutionality of Agreements Limiting Territorial Powers</u>, 60 Va. L. Rev. 1041, 1060-61 (1974).

---

[17]. For instance, the Supreme Court has approved of the Government's rights to lease mineral rights. <u>See</u> <u>United States v. Gratiot</u>, 39 U.S. (14 Pet.) 526, 536 (1840)("it lies in the discretion of Congress, acting in the public interest to determine of how much of the property it shall dispose."). In <u>Ashwander v. T.V.A.</u>, 297 U.S. 288 (1936), the Court approved a contract for the sale of electricity rejecting an argument that the Government lacked constitutional authority to dispose partially of its property by contract relying on Congress' authority under the Territorial Clause. <u>Id</u>, at 330-36. The Court has also found that in the context of Congress' powers, "the greater includes the less". <u>The Late Corporation of Church of Jesus Christ of Latter Day Saints v. United States</u>, 136 U.S. 1, 45 (1890).

## IV. CONCLUSION

Under the Territorial Clause, the Congress has broad authority to carve out a unique relationship with the people of Guam. The Supreme Court has traditionally given Congress broad latitude to deal with the political rights of the people of the Territories. It is also apparent that the Court is prepared to find that the Congress can enter into binding agreements dealing with property and certain political rights. While the issue now being presented by Guam has never been directly confronted by any court, the courts have traditionally been quite solicitous of congressional action in the territories. As the Ninth Circuit recently stated, "we must be cautious in restricting Congress' power" in the territories. Wabol v. Villacrusis, 958 F.2d 1450, 1460 (9th Cir. 1992).

In the end, the decision whether to agree to a mutual consent provision should be viewed as a policy decision not a legal one. Is the United States prepared to recognize that because it has no present intention of granting Statehood to Guam, basic requirements of fairness and democracy demand that an alternative be found to the state of pupilage in which the people of the territories now find themselves? Mutual consent is that alternative.

**ATTACHMENT B**

U. S. Department of Justice

Office of Legal Counsel

Office of the
Deputy Assistant Attorney General

Washington, D.C.

July 28, 1994

**MEMORANDUM FOR
THE SPECIAL REPRESENTATIVE
FOR GUAM COMMONWEALTH**

From: Teresa Wynn Roseborough
Deputy Assistant Attorney General

Re: Mutual Consent Provisions in
The Guam Commonwealth Legislation

The Guam Commonwealth Bill, H.R. 1521, 103d Cong., 1st Sess. (1993) contains two sections requiring the mutual consent of the Government of the United States and the Government of Guam. Section 103 provides that the Commonwealth Act could be amended only with mutual consent of the two governments. Section 202 provides that no Federal laws, rules, and regulations passed after the enactment of the Commonwealth Act would apply to Guam without the mutual consent of the two governments. The Representatives of Guam insist that these two sections are crucial for the autonomy and economy of Guam. The former views of this Office on the validity or efficacy of mutual consent requirements included in legislation governing the relationship between the federal government and non-state areas, i.e. areas under the sovereignty of the United States that are not States,[1] have

[1] Territories that have developed from the stage of a classical territory to that of a Commonwealth with a constitution of their own adoption and an elective governor, resent being called Territories and claim that that legal term and its implications are not applicable to them. We therefore shall refer to all Territories and Commonwealths as non-state areas under the sovereignty of the United States or briefly as non-state areas.

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 452 of 542

not been consistent.[2] We therefore have carefully reexamined this issue. Our conclusion is that these clauses raise serious constitutional issues and are legally unenforceable.[3]

In our view, it is important that the text of the Guam Commonwealth Act not create any illusory expectations that might to mislead the electorate of Guam about the consequences of the legislation. We must therefore oppose the inclusion in the Commonwealth Act of any provisions, such as mutual consent clauses, that are legally unenforceable, unless their unenforceability (or precatory nature) is clearly stated in the document itself.

I.

The Power of Congress to Govern the Non-State Areas under the Sovereignty of the United States is Plenary within Constitutional Limitations

All territory under the sovereignty of the United States falls into two groups: the States and the areas that are not States. The latter, whether called territories, possessions, or commonwealths, are governed by and under the authority of Congress. As to those areas, Congress exercises the combined powers of the federal and of a state government. These basic considerations were set out in the leading case of National Bank v. County of Yankton, 101 U.S. 129, 132-33 (1880). There the Court held:

[2] To our knowledge the first consideration of the validity of mutual consent clauses occurred in 1959 in connection with proposals to amend the Puerto Rico Federal Relations Act. At that time the Department took the position that the answer to this question was doubtful but that such clauses should not be opposed on the ground that they go beyond the constitutional power of Congress. In 1963 the Department of Justice opined that such clauses were legally effective because Congress could create vested rights in the status of a territory that could not be revoked unilaterally. The Department adhered to this position in 1973 in connection with then pending Micronesian status negotiations in a memorandum approved by then Assistant Attorney General Rehnquist. On the basis of this advice, a mutual consent clause was inserted in Section 105 of the Covenant with the Northern Mariana Islands. The Department continued to support the validity of mutual consent clauses in connection with the First 1989 Task Force Report on the Guam Commonwealth Bill. The Department revisited this issue in the early 1990's in connection with the Puerto Rico Status Referendum Bill in light of Bowen v. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 55 (1986), and concluded that there could not be an enforceable vested right in a political status; hence that mutual consent clauses were ineffective because they would not bind a subsequent Congress. We took the same position in the Second Guam Task Force Report issued during the last days of the Bush Administration in January 1993.

[3] Mutual consent clauses are not a novel phenomenon; indeed they antedate the Constitution. Section 14 of the Northwest Ordinance contained six "articles of compact, between the original States and the people and States in the said territory, and [shall] forever remain unalterable, unless by common consent." These articles were incorporated either expressly or by reference into many early territorial organic acts. Clinton v. Englebrecht, 80 U.S. (13 Wall.) 434, 442 (1872). The copious litigation under these "unalterable articles" focussed largely on the question whether the territories' obligations under them were superseded by the Constitution, or when the territory became a State, as the result of the equal footing doctrine. We have, however, not found many cases dealing with the question whether the Congress had the power to modify any duty imposed on the United States by those articles.

It is certainly now too late to doubt the power of Congress to govern the Territories. There have been some differences of opinion as to the particular clause of the Constitution from which the power is derived, but that it exists has always been conceded.[4]

* * *

All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations. The organic law of a Territory takes the place of a constitution as the fundamental law of the local government. It is obligatory on and binds the territorial authorities; but Congress is supreme, and for the purposes of this department of its governmental authority has all the powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution.

Yankton was anticipated in Chief Justice Marshall's seminal opinion in American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 542-43, 546 (1828). The Chief Justice explained:

In the mean time [i.e. the interval between acquisition and statehood], Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress "to make all needful rules and regulations, respecting the territory, or other property belonging to the United States."

Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a state, acquired the means of self-

---

[4] Some derived that power from the authority of the United States to acquire territory, others from the mere fact of sovereignty, others from the Territory Clause of the Constitution of the United States (Art. IV, Sec. 3, Cl. 2) pursuant to which Congress has "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States". See e.g. American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 542 (1828); Mormon Church v. United States, 136 U.S. 1, 42-44 (1890); Downes v. Bidwell, 182 U.S. 244, 290 (1901).

At present, the Territory Clause of the Constitution is generally considered to be the source of the power of Congress to govern the non-state areas. Hooven & Allison Co. v. Evatt, 324 U.S. 652, 673-674 (1945); Examining Board v. Flores de Otero, 426 U.S. 572, 586 (1976); Harris v. Rosario, 446 U.S. 651 (1980); see also Wabol v. Villacrusis, 958 F.2d 1450, 1459 (9th Cir. 1992), cert. denied sub nom. Philippine Goods, Inc. v. Wabol, ____ U.S. ____, 113 S.Ct. 675 (1992). (Footnote supplied.)

government, may result necessarily from the facts, that it is not within the jurisdiction of any particular state, and is within the power and jurisdiction of the United States.

* * *

"In legislating for them [the Territories], Congress exercises the combined powers of the general, and of a state government."

Id. at 542-43, 546.

The power of Congress to govern the non-state areas is plenary like every other legislative power of Congress but it is nevertheless subject to the applicable provisions of the Constitution. As Chief Justice Marshall stated in Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 196 (1824), with respect to the Commerce Power:

> This power [the Commerce Power], like all others vested in Congress is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. (Emphasis added.)

This limitation on the plenary legislative power of Congress is self-evident. It necessarily follows from the supremacy of the Constitution. See e.g., Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264, 276 (1981). That the power of Congress under the Territory Clause is subject to constitutional limitations has been recognized in County of Yankton, 101 U.S. at 133; Downes v. Bidwell, 182 U.S. 244, 290-91 (1901); District of Columbia v. Thompson Co., 346 U.S. 100, 109 (1953).

Finally, the power of Congress over the non-state areas persists "so long as they remain in a territorial condition." Shively v. Bowlby, 152 U.S. 1, 48 (1894). See also, Hooven & Allison Co. v. Evatt, 324 U.S. 652, 675 (1945) (recognizing that during the intermediary period between the establishment of the Commonwealth of the Philippine Islands and the final withdrawal of United States sovereignty from those islands "Congress retains plenary power over the territorial government").

The plenary Congressional authority over a non-state area thus lasts as long as the area retains that status. It terminates when the area loses that status either by virtue of its admission as a State, or by the termination of the sovereignty of the United States over the area by the grant of independence, or by its surrender to the sovereignty of another country.

II.

<u>The Revocable Nature of Congressional Legislation Relating to the Government of Non-State Areas</u>

While Congress has the power to govern the non-state areas it need not exercise that power itself. Congress can delegate to the inhabitants of non-state areas full powers of self-government and an autonomy similar to that of States and has done so since the beginning of the Republic. Such delegation, however, must be "consistent with the supremacy and supervision of National authority". <u>Clinton</u> v. <u>Englebrecht</u>, 80 U.S. (13 Wall.) 434, 441 (1872); <u>Puerto Rico</u> v. <u>Shell Co.</u>, 302 U.S. 253, 260, 261-62 (1937). The requirement that the delegation of governmental authority to the non-state areas be subject to federal supremacy and federal supervision means that such delegation is necessarily subject to the right of Congress to revise, alter, or revoke the authority granted. <u>District of Columbia</u> v. <u>Thompson Co.</u>, 346 U.S. 100, 106, 109 (1953).[5] <u>See also</u>, <u>United States</u> v. <u>Sharpnack</u>, 355 U.S. 286, 296 (1958), <u>Harris</u> v. <u>Boreham</u>, 233 F.2d 110, 113 (3rd Cir. 1956), <u>Firemen's Insurance Co.</u> v. <u>Washington</u>, 483 F.2d 1323, 1327 (D.C. Cir. 1973). The power of Congress to delegate governmental powers to non-state areas thus is contingent on the retention by Congress of its power to revise, alter, and revoke that legislation.[6] Congress therefore cannot subject the amendment or repeal of such legislation to the consent of the non-state area.

This consideration also disposes of the argument that the power of Congress under the Territory Clause to give up its sovereignty over a non-state area includes the power to make a partial disposition of that authority, hence that Congress could give up its power to amend or repeal statutes relating to the governance of non-state areas. But, as shown above, the retention of the power to amend or repeal legislation delegating governmental powers to a non-state area is an integral element of the delegation power. Congress therefore has no

---

[5] <u>Thompson</u> dealt with the District of Columbia's government which is provided for by Art. I, Sec. 8, Cl. 17 of the Constitution, rather than with the non-state areas as to whom the Congressional power is derived from the Territory Clause. The Court, however, held that in this area the rules relating to the Congressional power to govern the District of Columbia and the non-state areas are identical. Indeed, the Court relied on cases dealing with non-state areas, <u>e.g.</u>, <u>Hornbuckle</u> v. <u>Toombs</u>, 85 U.S. (18 Wall.) 648, 655 (1874), and <u>Christianson</u> v. <u>King County</u>, 239 U.S. 365 (1915), where it held that Congress can delegate its legislative authority under Art. I, Sec. 8, Cl. 17 of the Constitution to the District, subject to the power of Congress at any time to revise, alter, or revoke that authority.

[6] Congress has exercised this power with respect to the District of Columbia. The Act of February 21, 1871, 16 Stat. 419 gave the District of Columbia virtual territorial status with a governor appointed by the President, a legislative assembly that included an elected house of delegates and a delegate in Congress. The 1871 Act was repealed by the Act of June 20, 1874, 18 Stat. 116, which abrogated among others the provisions for the legislative assembly and a delegate in Congress, and established a government by a Commission appointed by the President.

authority to enact legislation under the Territory Clause that would limit the unfettered exercise of its power to amend or repeal.

The same result flows from the consideration that all non-state areas are subject to the authority of Congress, which, as shown above, is plenary. This basic rule does not permit the creation of non-state areas that are only partially subject to Congressional authority. The plenary power of Congress over a non-state area persists as long as the area remains in that condition and terminates only when the area becomes a State or ceases to be under United States sovereignty. There is no intermediary status as far as the Congressional power is concerned.

The two mutual consent clauses contained in the proposed Commonwealth Act therefore are subject to Congressional modification and repeal.

III.

The rule that legislation delegating governmental powers to a non-state area must be subject to amendment and repeal is but a manifestation of the general rule that one Congress cannot bind a subsequent Congress, except where it creates vested rights enforceable under the Due Process Clause of the Fifth Amendment.

The rule that Congress cannot surrender its power to amend or repeal legislation relating to the government of non-state areas is but a specific application of the maxim that one Congress cannot bind a subsequent Congress and the case law developed under it.

The rationale underlying that principle is the consideration that if one Congress could prevent the subsequent amendment or repeal of legislation enacted by it, such legislation would be frozen permanently and would acquire virtually constitutional status. Justice Brennan expressed this thought in his dissenting opinion in United States Trust Co. v. New Jersey, 431 U.S. 1, 45 (1977), a case involving the Impairment of the Obligation of Contracts Clause of the Constitution (Art. I, Sec 10, Cl. 1):

> One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent. Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days.... The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

Nonetheless, the maxim that one Congress cannot bind future Congress, like every legal rule, has its limits. As early as 1810, Chief Justice Marshall explained in Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 135 (1810):

> The principle asserted is that one legislature is competent to repeal any act which a former legislature was competent to pass, and that one legislature cannot abridge the powers of a succeeding legislature.
>
> The correctness of this principle, so far as respects general legislation, can never be controverted. But, if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power. Conveyances have been made, those conveyances have vested legal estates, and if those estates may be seized by the sovereign authority, still, that they originally vested is a fact, and cannot cease to be a fact.
>
> When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest (sic) those rights.

The powers of one legislature to repeal or amend the acts of the preceding one are limited in the case of States by the Obligation of Contracts Clause (Art. I, Sec. 10, Cl. 1) of the Constitution and the Due Process Clause of the Fourteenth Amendment, and in the case of Congressional legislation by the Due Process Clause of the Fifth Amendment. This principle was recognized in the Sinking-Fund Cases, 98 U.S. 700, 718-19 (1879):

> The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. (emphasis supplied.)

See also Bowen v. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 54-56 (1986).

IV

The Due Process Clause does not Preclude Congress from Amending or Repealing the two Mutual Consent Clauses

The question therefore is whether the Due Process Clause of the Fifth Amendment precludes a subsequent Congress from repealing legislation for the governance of non-state areas enacted by an earlier Congress under the Territory Clause. This question must be answered in the negative.

The Due Process Clause of the Fifth Amendment provides:

> No person shall . . . be deprived of life, liberty, or property without due process of law. (emphasis supplied.)

This Clause is inapplicable to the repeal or amendment of the two mutual consent clauses here involved for two reasons. First, a non-state area is not a "person" within the meaning of the Fifth Amendment, and, second, such repeal or amendment would not deprive the non-state area of a property right within the meaning of the Fifth Amendment.

A.

A non-state area is not a person in the meaning of the Due Process Clause of the Fifth Amendment.

In South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966), the Court held that a State is not a person within the meaning of the Due Process Clause of the Fifth Amendment. See also, Alabama v. EPA, 871 F.2d 1548, 1554 (11th Cir.), cert. denied, 493 U.S. 991 (1989) ("The State of Alabama is not included among the entities protected by the due process clause of the fifth amendment"); and State of Oklahoma v. Federal Energy Regulatory Comm., 494 F.Supp. 636, 661 (W.D. Okl. 1980), aff'd, 661 F.2d 832 (10th Cir. 1981), cert. denied, sub. nom. Texas v. Federal Energy Regulatory Comm., 457 U.S. 1105 (1982).

Similarly it has been held that creatures or instrumentalities of a State, such as cities or water improvement districts, are not persons within the meaning of the Due Process Clause of the Fifth Amendment. City of Sault Ste. Marie, Mich. v. Andrus, 532 F. Supp. 157, 167 (D.D.C. 1980); El Paso, County Water Improvement District v. IBWC/US, 701 F. Supp. 121, 123-24 (W.D. Tex 1988).

The non-state areas, concededly, are not States or instrumentalities of States, and we have not found any case holding directly that they are not persons within the meaning of the Due Process Clause of the Fifth Amendment. They are, however, governmental bodies, and

the rationale of South Carolina v. Katzenbach, 383 U.S. at 301, appears to be that such bodies are not protected by the Due Process Clause of the Fifth Amendment. Moreover, it is well established that the political subdivisions of a State are not considered persons protected as against the State by the provisions of the Fourteenth Amendment. See, e.g., Newark v. New Jersey, 262 U.S. 192, 196 (1923); Williams v. Mayor of Baltimore, 289 U.S. 36, 40 (1933); South Macomb Disposal Authority v. Township of Washington, 790 F.2d 500, 505, 507 (6th Cir. 1986) and the authorities there cited. The relationship of the non-state areas to the Federal Government has been analogized to that of a city or county to a State. As stated, supra, the Court held in National Bank v. County of Yankton, 101 U.S. 129, 133 (1880):

> The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States ...

More recently, the Court explained that a non-state area is entirely the creation of Congress and compared the relationship between the Nation and a non-state area to that between a State and a city. United States v. Wheeler, 435 U.S. 313, 321 (1978). It follows that, since States are not persons within the meaning of the Fifth Amendment and since the political subdivisions of States are not persons within the meaning of the Fourteenth Amendment, the non-state areas are not persons within the meaning of the Due Process Clause of the Fifth Amendment.

B.

Legislation relating to the governance of non-state areas does not create any rights or status protected by the Due Process Clause against repeal or amendment by subsequent legislation.

As explained earlier, a subsequent Congress cannot amend or repeal earlier legislation if such repeal or amendment would violate the Due Process Clause of the Fifth Amendment, i.e., if such amending or repealing legislation would deprive a person of property without due process of law. It has been shown in the preceding part of this memorandum, that a non-state area is not a person with the meaning of the Due Process Clause. Here it will be shown that mutual consent provisions in legislation, such as the ones envisaged in the Guam Commonwealth Act, would not create property rights within the meaning of that Clause.

Legislation concerning the governance of a non-state area, whether called organic act, federal relations act, or commonwealth act, that does not contain a mutual consent clause is clearly subject to amendment or repeal by subsequent legislation. A non-state area does not acquire a vested interest in a particular stage of self government that subsequent legislation could not diminish or abrogate. While such legislation has not been frequent, it has occurred in connection with the District of Columbia. See District of Columbia v. Thompson Co., 346 U.S. 100, 104-05 (1953); supra n.6. Hence, in the absence of a mutual consent clause,



46-318 98 - 15

Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 460 of 542

legislation concerning the government of a non-state area is subject to amendment or repeal by subsequent legislation.

This leads to the question whether the addition of a mutual consent clause. i.e. of a provision that the legislation shall not be modified or or repealed without the consent of the Government of the United States and the Government of the non-state area. has the effect of creating in the non-state areas a specific status amounting to a property right within the meaning of the Due Process Clause. It is our conclusion that this question must be answered in the negative because (1) sovereign governmental powers cannot be contracted away. and (2) because a specific political relationship does not constitute "property" within the meaning of the Fifth Amendment. ✓

1. As a body politic the Government of the United States has the general capacity to enter into contracts. United States v. Tingey, 30 U.S. (5 Pet.) 115, 128 (1831). This power, however, is generally limited to those types of contracts in which private persons or corporations can engage. By contrast [sovereign] " "governmental powers cannot be contracted away," North American Coml. Co. v. United States, 171 U.S. 110, 137 (1898). More recently the Supreme Court held in connection with legislation arising under the Contract Clause (Art. I, Sec. 10, Cl. 1) of the Constitution that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." United States Trust Co. v. New Jersey, 431 U.S. 1, 23 (1977).[*] In a similar context Mr. Justice Holmes stated:

> One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. Hudson Water Co. v. McCarter, 209 U.S. 349, 357 (1908).[*]

Agreements or compacts to the effect that the Congress may not amend legislation relating to the government of a non-state area without the consent of the latter, or that federal legislation shall not apply to Guam unless consented to by the Government of Guam would unquestionably purport to surrender essential powers of the federal government. They are

---

[*] Cases arising under the Contract Clause holding that a. a State cannot contract away a sovereign power are also applicable to the contracts made by the federal government because the Contract Clause imposes more rigorous restrictions on the States than the Fifth Amendment imposes on the federal government. Pension Benefit Guaranty Corp. v. R.A. Gray Co., 467 U.S. 717, 733 (1984); National Railroad Passenger Corp. v. A.T. & S.F. R., 470 U.S. 451, 472-73 n.25 (1985). Hence, when state legislation does not violate the Contract Clause, analogous federal legislation is all the more permissible under the Due Process Clause of the Fifth Amendment.

[*] Cited with approval with respect to federal legislation in Norman v. B. & O.R., 294 U.S. 240, 308 (1935).

therefore not binding on the United States and cannot confer a property interest protected by the Fifth Amendment.[9]

More generally, the Supreme Court held in Bowen v. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 55 (1986), that the contractual property rights protected by the Due Process Clause of the Fifth Amendment are the traditional private contractual rights, such as those arising from bonds or insurance contracts, but not arrangements that are part of a regulatory program such as a State's privilege to withdraw its participation in the Social Security system with respect to its employees. Specifically, the Court stated:

> But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, see Perry v. United States, supra, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, see Lynch v. United States, supra. The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

Agreements that the Guam Commonwealth Act may not be amended without the consent of the Government of Guam, or that future federal statutes and regulations shall not apply to Guam without the consent of the Government of Guam clearly do not constitute conventional private contracts: they are elements of a regulatory system.

In the past the Department of Justice at times has concluded that a non-State area may have a vested interest in a specific status which would be immune from unilateral Congressional amendment or repeal.[10] We cannot continue to adhere to that position in

---

[9] Cases such as Lynch v. United States, 292 U.S. 571 (1934), and Perry v. United States, 294 U.S. 330 (1935), are not contrary to this conclusion. Both cases involved commercial agreements (Lynch: insurance; Perry: Government bonds) In Lynch the Court held that Congress could not amend the contract merely to save money "unless, indeed the action falls within the federal police police power or some other paramount power." 292 U.S. at 579. Perry involved bonds issued by the United States under the authority of Art. I, Sec. 8, Cl. 2 of the Constitution, to borrow money on the credit of the United States. The Court held that Congress did not have the power to destroy the credit of the United States or to render it illusory by unilaterally abrogating one of the pivotal terms of the bonds to save money. While the Court held that the United States had broken the agreement, it nevertheless held that plaintiff could not recover because, as the result of regulations validly issued by the United States, he had not suffered any monetary damages.

[10] Cf. n.2.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 462 of 542

view of the rulings of the Supreme Court that legislation concerning the governance of a non-state area is necessarily subject to Congressional amendment and repeal; that governmental bodies are not persons within the meaning of the Due Process Clause; that governmental powers cannot be contracted away, and especially the exposition in the recent <u>Bowen</u> case, that the property rights protected by the Due Process Clause are those arising from private law or commercial contracts and not those arising from governmental relations.[11]

Sections 103 and 202 therefore do not create vested property rights protected by the Due Process Clause of the Fifth Amendment.[12] Congress thus retains the power to amend the Guam Commonwealth Act unilaterally or to provide that its legislation shall apply to Guam without the consent of the government of the Commonwealth. The inclusion of such provisions, therefore, in the Commonwealth Act would be misleading. Honesty and fair dealing forbid the inclusion of such illusory and deceptive provisions in the Guam Commonwealth Act.[13]

Finally, the Department of Justice has indicated that it would honor past commitments with respect to the mutual consent issue, such as Section 105 of the Covenant with the Northern Mariana Islands, in spite of its reevaluation of this problem. The question whether the 1989 Task force proposal to amend Section 103 of the Guam Commonwealth Act so as to limit the mutual consent requirement to Sections 101, 103, 201, and 301 constitutes such prior commitment appears to have been rendered moot by the rejection of that proposal by the Guam Commission.

---

[11] It is significant that the circumstances in which Congress can effectively agree not to repeal or amend legislation were discussed in the context of <u>commercial</u> contracts. <u>Bowen</u>, 477 U.S. at 52.

[12] <u>Bowen</u>, it is true, dealt with legislation that expressly reserved the right of Congress to amend, while the proposed Guam Commonwealth Act would expressly preclude the right of Congress to amend without the consent of the Government of Guam. The underlying agreements, however, are not of a private contractual nature, and, hence, are not property within the meaning of the Due Process Clause. We cannot perceive how they can be converted into "property" by the addition of a provision that Congress foregoes the right of amendment.

[13] The conclusion that Section 202 of the Guam Commonwealth Act (inapplicability of future federal legislation to Guam without the consent of Guam) would not bind a future Congress obviates the need to examine the constitutionality of Section 202. In <u>Currin</u> v. <u>Wallace</u>, 306 U.S. 1, 15-16 (1939), and <u>United States</u> v. <u>Rock Royal Co-op</u>, 307 U.S. 533, 577-78 (1939), the Court upheld legislation that made the effectiveness of regulations dependent on the approval of tobacco farmers or milk producers affected by them. The Court held that this approval was a legitimate condition for making the legislation applicable. Similarly, it could be argued that the approval of federal legislation by the Government of Guam is a legitimate condition for making that legislation applicable to Guam. Since, as stated above, a future Congress would not be bound by Section 202, we need not decide the question whether the requirement of approval by the Government of Guam for <u>every</u> future federal statute and regulation is excessive and inconsistent with the federal sovereignty over Guam.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 463 of 542

ATTACHMENT C

LAW OFFICES OF
STROOCK & STROOCK & LAVAN
1150 SEVENTEENTH STREET, N.W.
WASHINGTON, D.C. 20036-4652
(202) 452-9250
MEMORANDUM

August 26, 1994

MEMORANDUM

TO: I. Michael Heyman
Special Representative for Guam Commonwealth

FROM: Barry J. Israel
Howard L. Hills

RE: DOJ Memorandum on Mutual Consent

We have had an opportunity to review the July 28, 1994 memorandum initialed by Deputy Assistant Attorney General Roseborough and addressed to the Special Representative for Guam Commonwealth (hereinafter the "Memorandum"). That Memorandum argues DOJ should reverse its position of at least thirty years that mutual consent clauses are constitutional and enforceable in accordance with their terms as part of legislation providing internal self-government in the territories.[1] The Memorandum

[1] DOJ is on record supporting Congressional passage of mutual consent clauses in U.S. statutes implementing political status agreements with at least one of the U.S. territories and the Freely Associated States, and DOJ apparently continues to support the constitutionality and enforceability of these provisions. Memorandum at 12 ("Finally, the Department has indicated that it would honor past commitments with respect to the mutual consent issue"). But an Act of Congress either is constitutional and enforceable or it is not. If the Memorandum is the last word, and on that basis DOJ is unwilling to work with Guam to craft an acceptable mutual consent clause, this could have profound legal and political implications for all of the insular jurisdictions. Guam's mutual consent proposal is based, in part, upon that territory's unique historical relationship to the U.S., and an across-the-board repudiation of mutual consent could create an anomalous linkage between Guam's political status process and U.S. relations with the other insular areas -- including not only those

suggests mutual consent clauses are unenforceable because (1) Supreme Court rulings require that the "governance of a non-state area is necessarily subject to Congressional amendment and repeal"; (2) "governmental bodies are not persons within the meaning of the Due Process Clause"; and (3) "governmental powers cannot be contracted away" relying on the recent decision in Bowen v. Public Agencies Opposed to Social Sec. 477 U.S. 41 (1986) (popularly referred to as the "POSSE" decision) supposedly because the Court held that the only "property rights protected by the Due Process Clause are those arising from private law or commercial contracts and not those arising from government relations". Memorandum at 12.

**The POSSE Decision Does Not Bar A Mutual Consent Clause - If Congress Has Stated Its Intention in Unmistakable Terms.**

Not one of the reasons given for rejecting a mutual consent clause in the Guam Commonwealth legislation can be justified relying on the POSSE decision or any other decision discussed in the Memorandum.[2] The Memorandum is misleading and disturbingly inaccurate. It quotes parts of judicial decisions out of context,

---

to which the existing federal mutual consent statutes apply, but also insular areas which have not yet defined internally or proposed to the U.S. specific desired changes to existing political status arrangements. Appendix A suggests some -- but certainly not all-- possible effects if, even after issues raised in the Memorandum of July 28 have been clarified, DOJ seeks to foreclose consideration of an acceptable mutual consent provision for the reasons set forth in the DOJ document.

[2] Interestingly while the Memorandum asserts that its position must change as a result of POSSE, the next most recent decision relied upon is United States Trust Co. v. New Jersey, 431 U.S. 1, decided in 1977. Virtually all of the other key cases were decided in the 19th Century and early 20th Century, none of which would justify the change. If the POSSE decision has been wrongly interpreted in the Memorandum, then no justification exists for the changed position.

relies on decisions which have nothing whatsoever to do with whether Congress has the power to bind itself when entering into a political status arrangement with a territory, misstates holdings in cases cited, mistakes dicta for holdings in others and relies upon a web of circular reasoning which quite simply does not justify the Department's changed position.

Perhaps of most concern is that the Memorandum reaches an absolute conclusion concerning Congress' authority to enter into a binding mutual consent arrangement with a territory, even though this question has never been put directly before the Supreme Court or any other court. This is all the more disturbing because the only court which has ever even approached the question apparently assumed that Congress could indeed bind itself, notwithstanding its plenary power under the Territorial Clause. See, e.g., U.S. Ex Rel. Richards v. De Leon Guerrero, 4 F.3d 749, 754 (9th Cir. 1993). This case is not even mentioned in the Memorandum.[3] More importantly, both the Supreme Court and D.C. Circuit Court of Appeals have indicated in dicta that Congress can limit the ability of future Congresses to change laws which grant vested rights if Congress expresses its intention in "unmistakable terms". See, e.g. POSSE, 477 U.S. at 52; Merrion v. Jicarilla Apache Tribe, 455

[3] Our standards for legal advocacy properly allow attorneys to present the facts and law in the light most favorable to the proposition being espoused. Generally accepted ethical standards, however, obligate an attorney to undertake a reasonable inquiry and to ensure that the arguments put forward are accurate and fairly reflect existing law, even if asserting a nonfrivolous proposition that the law should change. In our view the Memorandum was not prepared in a manner consistent standards of advocacy required in proposing such an important change in policy, and it should not have been presented for approval by departmental management as an official position without further deliberation between all concerned agencies and even comment by the insular areas affected.

U.S. 130, 148 (1982); Transohio Savings Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 621 (D.C. Cir. 1992) ("Transohio"). Incredibly, this "unmistakable terms" doctrine (which served as the basis for the holding in POSSE) is also not addressed.

A section-by-section analysis of the Memorandum is attached as Appendix B. This analysis demonstrates that no certain precedent exists for the proposed change in policy. To summarize the contents of this analysis: (1) none of the cases cited for the proposition that Congress must retain the right to alter, amend or repeal territorial legislation dealt with the question placed before the Department by the mutual consent proposal; (2) the issue of the Commonwealth of Guam not being a person for purposes of the Due Process Clause is a red herring because the proposal being discussed by Guam and the Administration contemplates an agreement between the Congress and the people of Guam based in part on the Commonwealth Of The Northern Mariana Islands and Freely Associated States political status precedents; and (3) the holding in the POSSE decision provides utterly no support for the proposition set forth in the Memorandum.

Perhaps no part of the Memorandum is as disturbing as is the analysis of the Supreme Court's decision in POSSE which is put forward as requiring the Department's change of its thirty-year position on the constitutionality and enforceability of mutual consent clauses. The Memorandum claims the change is required because the Supreme Court held in POSSE "that the [only] contractual property rights protected by the Due Process Clause of the Fifth Amendment are the traditional private contractual rights, such as those arising from bonds or insurance contracts, but not

arrangements that are part of a regulatory program...." Memorandum at 11.

The POSSE decision, however, did not turn on the subject matter of the contract in question, and the Court's reference to the bond and insurance cases had no direct bearing on the Court's holding. Those cases were cited in POSSE for the limited purpose of contrasting contracts where Congress clearly evidenced its intent to bind itself from the facts in the POSSE case where "Congress expressly reserved to itself '[t]he right to alter, amend, or repeal any provision of' the Act which authorized the contracts at issue. 477 U.S. at 42. The Court relied upon this contrast because its holding in POSSE was that the Congress could amend the legislation in question, even if that amendment interfered with contractual rights, because it had not unmistakably indicated its intent to bind itself -- the standard the Court has established for determining whether Congress has imposed limits on the exercise of its sovereign powers.

The actual holding in POSSE --that Congress had not surrendered its sovereign power to alter Social Security laws -- has been thoroughly analyzed by the D.C. Court of Appeals in Transohio. The Transohio decision demonstrates conclusively that the Memorandum's analysis of the holding in POSSE is so fundamentally wrong that one wonders how it could be relied upon by the nation's Department of Justice to justify a proposed reversal in such an important area of Administration policy. In that decision, the D.C. Circuit makes clear that "[t]he Supreme Court reached [its] conclusion by analyzing the governing statute, the Social Security Act" and focused on the fact critical to its decision -- "[t]he Social Security Act contained an express



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 468 of 542

reservation of Congress' power to amend the law...", 967 F.2d at 621, not by establishing the *per se* "private rights" test asserted in the Memorandum.

According to the D.C. Circuit

> The "principles form[ing] the backdrop" of the Supreme Court's analysis of the Social Security Act in POSSE were those comprising the unmistakability doctrine--the doctrine that "'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.

Id. at 622 (emphasis added).

The D.C. Circuit also discussed the history of the unmistakability doctrine.

> "The 'unmistakability' doctrine is a special rule of contract interpretation that applies to contracts with the government. The doctrine dates back to the early 19th century, when Chief Justice Marshall provided its justification. The government, Chief Justice Marshall wrote for the Court in a case concerning the government's taxing power, may enter binding contracts when it finds "a consideration sufficiently valuable to induce a partial release" of its sovereign powers.

Id. at 618.

Both the POSSE and Transohio cases dealt with the application of the "unmistakable terms" test to a determination of whether Congress has limited its right to exercise its regulatory jurisdiction. This test has nothing whatsoever to do with a standard based on "traditional private contractual rights" which the Memorandum would have us believe is the standard. If it were the test, the Supreme Court and D.C. Court of Appeals could easily have disposed of the contracts in POSSE and Transohio by adopting the test advocated in the Memorandum with a simple finding that alleged contractual rights associated with the regulatory programs

at issue in the cases are not traditional private contractual rights. They did not, of course, because the Supreme Court applies the "unmistakable terms" test which requires an analysis of Congress' intent, not the *per se* standard proposed in the Memorandum. See, e.g., 477 U.S. at 54.

We find it inconceivable that the Department would decide to reverse a thirty-year old policy based on a decision which has been universally interpreted as suggesting exactly the opposite of what the Memorandum asserts is the holding -- that Congress can limit the exercise of its regulatory authority if it makes clear its intent to do so. [4] Instead of dealing accurately with the Court's actual analysis, the Memorandum at page 11 relies upon a quote, claimed to set forth the holding, which is taken completely out of context and has nothing whatsoever to do with the holding.

The quote, taken from 477 U.S. 55, fails to include the entirety of the paragraph, the remaining text from which puts back into context the relationship of the bond and insurance cases to the basis of the decision. The following quote picks up the rest

---

[4] The import of the POSSE decision has been recognized even by its critics. An article in the Columbia Law Review by David Toscano entitled "Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty" analyzed the POSSE decision in great detail. It concluded that "[t]he power to waive sovereignty was recognized" in POSSE. 92 Col. L. Rev. 426, 451. It goes on "[i]n POSSE, the Court relied entirely on Merrion v. Jicarilla Apache Tribe for the proposition that the federal government can surrender sovereign power. Jicarilla in turn relied upon cases involving primarily the taxation powers of state governments... Instead of endorsing the rule applying to the police powers -- such powers cannot be surrendered -- it adopted the rule applying to taxation powers -- such powers can only be surrendered if done so unmistakably. This move should not be followed automatically: if the Court wants to enforce contracts that surrender the federal government's regulatory authority, it should do so on the basis of policy arguments, not on the basis of POSSE." Id. at 460.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 470 of 542

of this language beginning with the last sentence of the quote from page 11 of the Memorandum. This language makes absolutely clear that what the Court focused on was the fact that instead of Congress having stated in unequivocal terms its intention to limit the exercise of its regulatory authority, it explicitly retained it.

> Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare. Under these circumstances, we conclude that the termination provision ... did not rise to the level of "property." The provision simply cannot be viewed as conferring any sort of "vested right" in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation.

477 U.S. at 55 (emphasis added).

Congress Can Utilize Its Plenary Authority to Limit Its Future Power -- The Greater Includes the Lesser.

In part, the Memorandum goes astray in its interpretation of Congress' plenary authority over the territories. According to the Memorandum, Congress' plenary authority is infinite in time or at least until one of three things happen: (1) Guam becomes a State; (2) Guam achieves independence; or (3) the United States transfers its sovereignty over Guam to another country. Memorandum at 4.

Thus, the Memorandum seems to suggest that Congress is estopped from exercising its authority with respect to Guam if that exercise of authority results in some form of meaningful consent to the form of government under which the Guamanian people live. But Congress is not the prisoner of its plenary authority over the territories -- it is the master. The fact that Congress has

plenary authority does not mean that Congress cannot exercise this authority to limit its rights in the future in the context of a political status change. Plenary authority means that Congress can take whatever action it decides is in the best interest of the U.S. and the territories, including a decision that it can limit its own exercise of future authority, if its intentions are stated in unmistakable terms. To assert otherwise stands the meaning of plenary on its head. Plenary means full power. It does not mean full power, except when Congress attempts to exercise it.

Under the Territorial Clause, Congress has the power to dispose of a territory or to make all needful rules and regulations. The broad power of Congress under the territorial clause is grounded in the need for the federal government to be able to govern and/or dispose of territory which is not part of a state. In this context, it is clear that if Congress has the power to dispose of a territory in its entirety, it also has the power to dispose of some of its control by exercising its power to make all needful rules and regulations. It is an elementary principle of statutory interpretation that the "greater includes the less". See, Late Corp. of the Church of Jesus Christ of Later-Day Saints v. Romney, 136 U.S. 1, 45 (1889).

The issue of Congress being able to restrict its authority over territory of the United States has been long decided. While at first blush it may seem counter-intuitive, Congressional authority over the people of the territories and their political rights emanates from Congress' authority over Guam as property brought within Congress' control by the Territorial Clause. In Edward v. Carter, the Court clarified Congress' power under the property clause, stating:

> Thus, it appears that in referring to Congress' power "without limitation", the Court was holding that Congress' authority under Article IV §3 cl. 2 embraces <u>any</u> disposition of property of the United States chosen by Congress.

580 F.2d 1055, 1061 n. 18 (1978) (citations omitted) (emphasis added).

Further definition was provided in <u>U.S. v. Gratiot</u>, 39 U.S. 526 (1840) where the Court considered Congress' power to impact a lease of federal lands through legislation. The Court's approach to the question is quite interesting and seems to analogize the power over land with the power over territorial governments.

First, it finds that the mines in question lie within territory of the United States are, therefore, its property.

Second, it recites the Territorial Clause and concludes that the term territory refers is a descriptive word referring to one kind of property.

Third, the Court concludes that "Congress has the same power over [the mine] as over any other property belonging to the United States; and this power is vested in Congress without limitation; and has been considered the foundation upon which the territorial governments rest". <u>Id</u>. at 537.

Fourth, the Court then references cases involving Congress' authority over the territories, including Florida, including the right of Congress "to make all needful rules and regulations respecting the territory or property of the United States". <u>Id</u>. at 538.

Finally, the Court concludes "[i]f such are the powers of Congress over the lands belonging to the United States, the words 'dispose of,' cannot receive the construction contended for at the

bar; that they vest in Congress the power only to sell, and not to lease such lands". Id.

The Court's concept which forms the basis of these opinions is that the greater includes the lesser. The Court reached its decision building on Congress' authority over the territories. If Congress has the power to dispose of territories or to make all needful rules and regulations, it must then also have the power to limit its political control over the people of the territory just like it has the right to limit its authority over territory by leasing it.

**The Result of the Department's Opinion is to Leaves the People of Guam with a Hobson's Choice -- Remain in a Perpetual State of Colonialism or Seek Independence.**

The result of this reversal in position would have extraordinarily serious policy implications for United States security interests in Guam and the Pacific Region, not to mention the United States' moral leadership on the issue of granting democracy to non-self-governing people around the world. The Memorandum begins by defining Guam as a "non-state area, a catchy pseudonym for what Guam really is -- a territory, and U.S. citizen population, which the U.N. officially classifies as not yet having been decolonized, and which has no realistic prospect of achieving statehood -- the traditional path by which U.S. territories ceased being colonies and became self-governing in our constitutional system.

Fortunately, the Territorial Clause gives Congress the constitutional power to address this problem. In the Insular Cases the Supreme Court recognized that Congress must have flexibility to adapt federal law and policy for island territories



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 474 of 542

which remain "unincorporated" for an extended period of time, and which remain subject to federal power without being integrated into the system of constitutional federalism -- leaving the U.S. citizens concerned without equal legal and political rights when compared to citizens resident in the states.

The moral imperative of ending Guam's neo-colonial status is fundamental to the Administration's decision to pursue a mutual consent provision. Mutual consent brings to the people of Guam democracy by giving them a direct role in their own internal self-government which would not otherwise be available.[5]

By rejecting absolutely any possibility that the Supreme Court may uphold a mutual consent clause in a political status arrangement, the Department of Justice is putting this Administration in the untenable position of saying to the U.S. citizens of Guam that they cannot have meaningful self-government within the framework of the U.S. Constitution. We do not think this is a position which this Administration ought to be taking,

[5] The American-citizen residents of Guam do not have the same rights to participate in the representative democracy enjoyed by the citizens of the several States. Without voting representation in Congress or a vote in national elections, there is no means by which they meaningfully can consent to the laws and form of government under which they live. This colonial status was awkward even in its first fifty years, but has become intolerable since the U.N. Charter was adopted and the era of decolonization began. Guam is not seeking decolonization outside the U.S. system, and it would be perverse to suggest that decolonization is not available to U.S. citizens within the U.S. political system. Thus, the question facing the Administration is whether a nation founded on the principle of consent of the governed can adapt its law and policy to end denial of this basic right and establish an appropriate alternative means of consent for loyal citizens in the territories.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 475 of 542

especially when the Supreme Court has not spoken directly to the question and the most that can be said about the precedent is that arguments exist on both sides of the question.

The effect of the Department's changed position is to leave the people in a perpetual state of colonialism or force them into independence. The Clinton Administration has been the first to state with candor and honesty on the record what all those who have dealt with Guam have known for years -- Statehood is not an option for Guam. It is simply too small and remote. Similarly, given Guam's strategic importance to the United States, it is inconceivable that sovereignty would be voluntarily transferred to another sovereign power, nor do we believe that the people of Guam would accept it. The clear implication of the Department's position, therefore, is that the American citizen residents of Guam, if they desire to possess a truly democratic government, will have no choice but to seek independence from the United States.

The notion that independence is the only political status outcome through which the injustice of Guam's colonial past can be remedied is not only counter to the robust common sense with which Americans have implemented their Constitution, it is a dangerous, fatalistic and cold-hearted idea that will have a chilling effect on the spirits of the Guamanian people.

Leaving independence as the only alternative also raises serious national security policy questions. Policy coordination for Guam Commonwealth negotiations is exercised by the National Security Council because Guam is an important military and strategic location for the United States. A decision has been made by the White House that an agreement should be reached with the

people of Guam which achieves two fundamental goals. First, the people of Guam should be permitted to achieve meaningful internal self-government free from unnecessary interference. Second, United States long-term security interests must be protected. Offering the people of Guam the opportunity to achieve meaningful participation in a democracy only by forcing them to seek independence is inconsistent with the second of these goals. We do not believe that this Hobson's Choice ought to be forced upon the United States or people of Guam based on conclusions of anyone other than the Supreme Court.

This is a policy issue which is best left to the courts, if a challenge ever arises. In this regard, the Department's concern that no one should be misled concerning the certain viability of a mutual consent provision is consistent with our position. We have consistently taken the position in the negotiations that no one can be sure how the issue will be decided. The best we can do is to meet the requirements the Supreme Court has set out as being necessary for Congress to bind itself (a statement in "unmistakable terms") and state forthrightly in the political education process that we cannot be sure of the outcome until the Supreme Court has acted. It is well established, however, that when the intent of Congress with respect to the precise question at issue is clear, the courts must give it effect. See, Chevron, U.S.A. v. NRDC, 467 U.S. 837, 842-43 (1984). It is equally clear that the courts give great deference to Congress when it is exercising its Territorial Clause authority. See, Wabol v. Villacrusis, 958 F.2d at 460, citing Torres v. Puerto Rico, 442 U.S.465, 460-70. In fact, we

know of no decision of the Supreme Court reversing any action by the Congress taken with regard to the governance of a territory when the Congress has acted pursuant to its Territorial Clause authority.

Attachments

LAW OFFICES OF
STROOCK & STROOCK & LAVAN
1150 SEVENTEENTH STREET, N.W.
WASHINGTON, D.C. 20036-4652
(202) 452-9250
MEMORANDUM

**APPENDIX A**

**U.S. PRACTICE WITH RESPECT TO MUTUAL CONSENT ARRANGEMENTS FOR INSULAR AREAS NOT INCORPORATED INTO THE U.S. CONSTITUTIONAL PROCESS FOR DEMOCRATIC SELF-GOVERNMENT BUT IN WHICH THE U.S. RETAINS AND EXERCISES SOVEREIGNTY AND/OR SIGNIFICANT POWERS OF GOVERNMENT**

**BACKGROUND**

Under a succession of treaties with other nations and international organizations including the U.N., the U.S. has acquired and exercised actual sovereignty and/or the full powers and jurisdiction of government over insular areas (islands) which have not been incorporated as territories or states to which the U.S. Constitution applies in full. Thus, these areas are not fully self-governing and have no power to give consent to U.S. laws made applicable to them.

As each of these territories has moved toward greater self-government the U.S. has agreed to various political, legal and budgetary measures which accommodate U.S. interests in retaining certain powers of government, while at the same time redeeming in some greater degree the principle that free people must be enabled to give some meaningful form of consent to the laws and form of government under which they live.

In the case of U.S. territories over which the U.S. exercises full sovereignty, but which have not been incorporated fully into the system of federalism, measures aimed at enhanced self-government have attempted to address the fact that the U.S. citizens concerned do not have voting representation in Congress,

enfranchisement in national elections or general legal or political equality with their fellow citizens in the states.

For example, in the case of the Commonwealth of the Northern Mariana Islands (CNMI), as discussed below, the Executive Branch of the federal government and Congress entered a "Covenant," or agreement with the people of the territory, under which the U.S. exercises sovereignty, but which defines a political relationship the central elements of which are not subject to modification without mutual consent of the people of the territory and the federal government.

This mutual consent arrangement constitutes a substitute set of political rights intended to give the people of the CNMI a greater measure of democratic self-government by granting them a political power of consent to federal law not granted to U.S. citizens in the states, who instead are able to give their consent to federal law through representation in Congress and voting in national elections. This type of mutual consent arrangement has been promulgated by Congress pursuant to the Territorial Clause of the Constitution (Article IV, Section 3, Clause 2), which empowers Congress to provide for areas not yet fully within the constitutional system but subject to U.S. federal law and sovereign powers.

For insular areas over which the U.S. exercised powers of government but not sovereignty under agreements with the U.N., the federal government promulgated mutual consent provisions through a combined statutory and treaty-making process. Under these arrangements the U.S. retains plenary authority over broad areas of government power in the concerned insular areas, i.e., full defense authority, while the separate citizenship, sovereignty and national

independence of those insular areas have been recognized. This arrangement is known as "free association."

The compact agreements establishing the free association relationships between the U.S. and certain insular areas have been approved by the U.S. Congress in the form of joint resolutions passed by both houses and signed by the President. Like the CNMI covenant and the proposed Guam Commonwealth Act, the U.S. federal statute approving the free association compact was intended to create a unique and mutually agreed political status for insular areas not incorporated into the U.S., but with special close political, legal and security ties to this nation.

The fact that Guam and the CNMI are unincorporated territories, while the freely associated states under the compacts are sovereign, does not change the legal or constitutional analysis. These acts of Congress which bind the federal government and limit the exercise of constitutional powers either are constitutional and enforceable or they are not.

There is no valid constitutional distinction between the mutual consent provisions in the free association compact and the CNMI covenant or proposed Guam Commonwealth Act simply because the power of Congress which is being limited involves foreign policy and national defense powers arising from Article I or Article II of the Constitution, or if the subject matter gives rise to Article IV territorial powers.

The general concept that Congress can alter, amend or repeal the laws of purely domestic application has its parallel with respect to laws and treaties which create obligations between the U.S. and other nations. Specifically, an element of sovereignty is the power to abrogate treaties, and in the U.S. constitutional

system the President and Congress have the power to make treaties and terminate treaties. Goldwater v. Carter, 617 F.2d 697 (D.C. Cir. 1979). As discussed below, in addition to formal renunciation of a treaty by the President, Congress can terminate or prevent performance of treaties requiring appropriations simply decline to appropriate funding to meet international obligations. This has the effect of superseding the prior act of the Congress ratifying the treaty.

Thus, the question before us is whether Congress can limit its power to amend, alter or repeal a prior act so that commitments intended to be binding are set aside, and that question is relevant to any act of Congress which purports to make such binding commitments, including the statute making the free association compacts U.S. law.

We believe the test under POSSE for answering that question turns on whether Congress makes its intent to do so unmistakably clear. If the position set forth in DOJ Memorandum stands and the Department of Justice reverses prior legal policy by adopting the view that binding commitments such as the mutual consent provisions in the CNMI covenant, the free association compacts and the proposed Guam Commonwealth Act are unenforceable and unconstitutional, then the effect of that could reach far beyond the Guam mutual consent proposal.

For example, the mutual consent provisions relating to the political and legal relationships created by the free association compacts are linked to unprecedented multi-year funding authorizations that bind successive Congress to enact appropriate laws providing funding for specified grants to the governments of the free associated insular areas. These provisions are



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 482 of 542

enforceable in the federal courts, and give the free associated state governments concerned access to domestic U.S. legal remedies that foreign governments do not have under conventional U.S. laws and treaties.

To illustrate the point, as a general rule if Congress refuses to fund U.S. performance of a treaty, it is extremely unlikely that without an explicit statutory basis for jurisdiction the federal courts would be inclined to reach beyond the political question doctrine and interfere in the foreign policy domain of the political branches by entertaining an action by a foreign government seeking a court order to compel payment of funding for U.S. obligations under a treaty abrogated by the President or Congress. Yet, under the free association compacts, that is exactly what Congress has explicitly authorized and directed the federal courts to do. See, Section 236, P.L. 99-239, discussed below.

Similarly, in Section 101(d)(2)(B) of P.C. 99-239, the statute approving the compacts, Congress required that amendments to the compact and certain related agreements made pursuant to the applicable mutual consent provisions would require congressional approval. Thus, Congress by statute explicitly agreed to the mutual consent provisions in the agreements identified in Section 101(d)(2)(B) and established a role for Congress in the procedure for U.S. consent to an amendment.

Thus, just as the mutual consent provisions of the CNMI agreement limit the exercise of Article IV territorial clause powers by Congress, the mutual consent and related funding provisions of the free association compacts limit the exercise of Article I and Article II foreign policy and defense powers by the

President and Congress. These unprecedented arrangements are intended to enable the U.S. to sustain its authority over areas in which it has significant national interests, but in which the people do not enjoy the full rights and benefits of incorporation into the U.S. federal political and legal system.

To understand the gravity of the problems that will be created if the Department of Justice persists in what we believe is a misinterpretation of the POSSE decision, it is important to examine the existing mutual consent precedents very closely.

**EXISTING MUTUAL CONSENT PRECEDENTS**

The first of the existing mutual consent precedents is found at Section 105 in the Covenant to Establish the Commonwealth of the Northern Mariana Islands, U.S. Public Law 94-241, 90 Stat. 263 (1976), *reprinted* at 48 U.S.C. 1681, note. The additional important insular area mutual consent precedents are given the force and effect of U.S. law pursuant to the agreements referred to in Section 101(d)(2)(B) of the U.S. statute approving the Compact of Free Association between the U.S., the Republic of the Marshall Islands (RMI) and the Federated States of Micronesia (FSM), U.S. Public Law 99-239, 99 Stat. 1770, 48 U.S.C. 1681, note. The CNMI, FSM and RMI mutual consent provisions became effective under Presidential Proclamation No. 5564 of October 3, 1986, Federal Register Vol. 51, Number 216, November 7, 1986.

As already stated, the RMI and FSM compacts also bind successive Congresses through a pledge of the full faith and credit of the U.S. for economic assistance grants which are central elements of the political relationship defined in the compact as an agreement between the U.S. and the peoples of the RMI and FSM

exercising their sovereignty by approving the agreement in a plebiscite. See, Preamble and Section 236, Compact of Free Association, P.L. 99-239.

These multi-year funding obligations are not "subject to appropriation by Congress," the typical treaty formulation, but are enforceable in the U.S. courts, which are expressly granted jurisdiction to enforce the payment obligations in the compact. Thus, Congress has restricted its ability to alter, amend or repeal those statutory obligations of its own making.

**THE CASE OF PALAU**

A fourth mutual consent precedent is scheduled to enter into force on October 1, 1994 under the terms of a Compact of Free Association between the U.S. and Palau.

The Palau compact implementation agreement is terminable unilaterally by Palau or the U.S., but once the Compact enters into force, under Section 453(a) of U.S. Public Law 99-658, 100 Stat. 3700, 48 U.S.C. 1681, note, the Palau compact mutual consent provision and all the related rights and obligations under the agreement will be binding upon both Palau and the United States. If the DOJ Memorandum of July 28 is applied to the Palauan compact mutual consent provision implementation of that agreement could become very complicated.

The U.S. currently is under no legal obligation to implement the Palau Compact, and even though the Palauans have approved the Compact the government of that insular area has no rights under the agreement until it enters into force by mutual agreement, and Palau has no right to an arrangement with the U.S. which is enforceable or unconstitutional -- even if that arrangement achieves important



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 485 of 542

U.S. goals such as granting Palau self-government and ending the U.N. trusteeship under which the U.S. has the ultimate powers of government in Palau.

Thus, implementing the Compact for Palau is not a case of honoring a previous commitment on mutual consent, but of creating a new one. If mutual consent clauses are unenforceable and unconstitutional, the U.S. should unilaterally terminate the implementation agreement as provided for in Article II, Section 4 of that agreement, and seek to renegotiate an arrangement with Palau which is acceptable to DOJ.

It would be bad faith to implement the Palau Compact knowing that a key provision is unenforceable and unconstitutional under U.S. law. Under the Vienna Convention on the Law of Treaties, to do so could give rise to international legal issues affecting enforceability of the compact. For if it is the final word the DOJ Memorandum of July 28 effectively puts Palau on notice that the mutual consent agreement contained in Section 453(a) is viewed by the U.S. legal authorities as unenforceable.

Yet, the Section 453(a) mutual consent arrangement with Palau -- which gives the U.S. "strategic denial" rights (i.e., exclusion of third country military forces) in perpetuity -- is the single most significant provision which justified to Congress the huge economic grants contained in the funding sections of the Palau compact. As in the case of the FSM and RMI, those funding grants are backed by the full faith and credit of the U.S. and enforceable in the federal courts.

If the Palau compact takes effect and the mutual consent provision in Section 453(a) is unenforceable, it would appear that the massive U.S. funding obligations under Title Two of the compact

for Palau would survive under the terms of Section 452(a), even if the U.S. followed the procedure under Section 442 to terminate the free association relationship due to loss of the strategic denial defense rights which were to extend beyond the initial period of the compact.

Perpetual strategic denial is what the U.S. would be able to retain under continuation of the U.N. trusteeship, and so strategic denial that last beyond the agreed period of free association under the compact is what Congress demanded in order to justify over $450 million in grants to a community of 14,000. If the Department of Justice wants the Administration to give away what Congress approved in P.L. 99-658 just to win a debate over mutual consent for Guam, shouldn't Congress be informed?

Of course, a Department of Justice memo does not change the statutes involved, but if the DOJ memo at issue here is the last word, it could have legal consequences that affect much more than Guam. The most immediate impact may be on Palau.

Again, the Department of Justice may not have the authority or ability simply to choose to honor what must be viewed under its theory as an unconstitutional and inchoate mutual consent commitment between the U.S. and Palau. Indeed, the notion that individuals in the federal government have that degree of discretion in fundamental matters such as this itself raises constitutional issues.

But even if the Department of Justice is as generous with respect to honoring a mutual consent commitment to Palau as it appears ready to be, a question may arise as to whether the U.S. will be able to enforce its rights or meet its obligations under the Palau mutual consent provision. On the face of it, Section

**453(a) and the related provisions of Section 311 seem to be a benefit to the U.S. which it simply can enjoy by deciding to honor it.**

**That view may be wrong. If the same litigious parties in the U.S. or Palau who have mounted legal challenges to the military provisions of the compact tirelessly for the last fifteen years establish jurisdiction to challenge the validity of the Section 453(a) mutual consent provision in our own courts, and prevail with the aid of the DOJ Memorandum, it appears that U.S. taxpayers could end up paying Palau for defense authority tied to a mutual consent provision in Section 453(a) rendered null and void.**

**Having been seized with what Palau and the U.S. prudentially must view presumptively as a serious DOJ argument that there is a substantive legal infirmity in a provision that is fundamental to the purpose of the agreement prior to its entry into force, will the parties be able to rely upon and enforce the reciprocal and interdependent rights and obligations set forth in the agreement? If not, are the U.S. funding obligations linked to the defense authority and mutual consent provisions severable so that the U.S. would be able to extricate itself from the full faith and credit payment requirements if the defense rights proved unenforceable?**

**The answer to both those questions arguably would be in the negative.**

**We raise these issues not because we believe that the Palau mutual consent provisions are either unenforceable or unconstitutional. Rather, we use them to show the basic problem inherent in the Justice Department's proposed approach. When the CNMI covenant and the compacts were negotiated, Justice supported the mutual consent clauses. Nothing has changed since then. Only**

the POSSE case has caused a rethinking of this support and POSSE merely explains the test that must be employed to determine whether Congress itself validly imposed a limitation on the exercise of its power. It did not establish a *per se* rule to the contrary.

To avoid the perverse result that could come about by applying the position set forth in the Memorandum to Palau's mutual consent compact, the position set forth in the DOJ Memorandum of July 28 should be viewed as raising important issues that must be addressed as we negotiate an acceptable mutual consent clause for Guam. That would allow the Palau compact to be implemented and enable the parties to the Guam commonwealth negotiations to move forward with the process of defining an acceptable mutual consent relationship as endorsed by Secretary Babbit during his trip to Guam.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 489 of 542

LAW OFFICES OF
STROOCK & STROOCK & LAVAN
1150 SEVENTEENTH STREET, N.W.
WASHINGTON, D.C. 20036-4652
(202) 452-9250
MEMORANDUM

APPENDIX B

SECTION-BY-SECTION ANALYSIS OF THE
MEMORANDUM FOR THE SPECIAL REPRESENTATIVE
FOR GUAM COMMONWEALTH DATED JULY 28, 1994
RE: MUTUAL CONSENT PROVISIONS IN THE
GUAM COMMONWEALTH LEGISLATION
FROM THE DEPUTY ASSISTANT ATTORNEY GENERAL

Introductory Paragraphs - pp 1-2.

The Department's Memorandum correctly recognizes that the inclusion of mutual consent clauses in the Commonwealth legislation is crucial to the people of Guam, referencing as the reasons autonomy and economics. While economic development is clearly a consideration, the reference to autonomy is misleading. It is true Guam seeks control over its internal affairs. But autonomy is less the goal than democracy. The American-citizen residents of Guam do not have the same rights to participate in the representative democracy enjoyed by the citizens of the several States. If the citizens of the Guam maintain their residence there, they elect voting members of neither the House nor the Senate, nor can they vote in presidential elections. They are effectively excluded from the most fundamental aspect of our democratic system -- the right of U.S. citizens to give some form of meaningful consent to the laws and form of government under which they live.

The circumstances of the people of Guam today are the direct consequence of almost 100 years of American rule, a period during which the U.S. has exercised sovereignty over Guam without incorporating it into the U.S. system of constitutional federalism. No level of economic development can sustain perpetual second-class citizenship. A process must be created which will lead to

resolution of Guam's status as a non-self-governing area under the U.N. Charter. Until Guam is decolonized it will be a living contradiction of U.S. moral opposition to colonialism.

Thus, the fundamental question which the people of Guam and, indeed, which this Administration must ask today is similar to that question asked by the leaders of the American revolution -- can a nation, founded on the principle that government acts only with the consent of its people continue to deny basic rights of self-government to some of its citizens solely because they live in a territory?[1/]

The DOJ Memorandum recognizes that for the past thirty years, the Department has supported the constitutionality and enforceability of mutual consent clauses.[2/] Appendix A accompanying this document reviews the legal and political nature of relevant prior mutual consent precedents, as well as the pending entry into force of another mutual consent arrangement. We do not understand how the mutual consent provisions in these other acts of Congress will be "honored" by the Department while a similar provision proposed for Guam is unenforceable. Memorandum at 12. See Appendix A.

---

[1/] In footnote 1, the Memorandum chooses to define Guam as a "non-state area", a catchy pseudonym for what Guam really is -- a colony of the United States. This is why people in the territories object to their territorial status. As a territory they are precluded from the democratic system. The Guam Commission on Self-Determination, however, does not claim that the legal implications of being a territory do not apply to them. It is because they recognize that being a territory leaves them out of the democratic process that they seek mutual consent.

[2/] Unfortunately, the Department has refused to provide us with any of the prior opinions supporting mutual consent clauses.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 491 of 542

Neither the relevant provisions of the Constitution nor applicable cases support different standards for the kind of mutual consent arrangements involved in these insular political status relationships. Nor can it be argued that an Act of Congress in connection with the CNMI covenant or Compacts of Free Association is any different or more binding on Congress than an Act adopting the Guam Commonwealth would be. An Act of Congress is either constitutional and enforceable or it is not. If the Department intends to support the mutual consent provisions in these other Acts and does not intend to interfere with implementation of the Palau Compact, it must apply the same policy to Guam. To quote the Memorandum at p. 2 -- "[i]n our view, it is important that the text of the...Act not create any illusory expectations that might to (sic) mislead the electorate...about the consequences of the legislation".

In the end, note 2 makes clear that the foundation for the proposed change in position on mutual consent clauses is the Supreme Court's decision in Bowen v. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41 (1986) (popularly referred to as "*POSSE*"). As discussed in great detail infra, *POSSE* does not bar Congress from limiting its right to exercise sovereign power by entering into a binding contract, nor does it establish a *per se* test that Congress can only bind itself when entering into contracts dealing with traditional private rights. In fact, *POSSE* dealt with the exercise of a regulatory right, and turned, not on the nature of the contractual right at issue, but on a determination of whether Congress had expressed an intention to bind itself in "unmistakable terms".

The following section-by-section analysis demonstrates that none of the cases cited in the Memorandum leads to a certain conclusion that the Supreme Court would restrict Congress' ability to enter into a political status arrangement with Guam based on mutual consent.

**Section I. - "The Power of Congress to Govern the Non-State Areas under the Sovereignty of the United States is Plenary with Constitutional Limitations -- pp 2-4.**

The DOJ Memorandum would lead us to believe that the Supreme Court has already decided that Congress cannot limit its exercise of authority over the territories because its authority is plenary. In this regard, the Memorandum seems to argue that this plenary authority is infinite and must remain unencumbered in perpetuity -- or at least until the U.S. alters Guam's status.. Memorandum at 4.

Thus, the Memorandum argues that Congress actually is estopped from exercising its authority with respect to Guam if that exercise of authority results in some form of meaningful consent to the form of government under which the Guamanian people live. But Congress is the master, not the prisoner of its plenary authority over the territories. If Congress has plenary authority, it follows that Congress can exercise this authority to limit the types of measures it will take pursuant to that authority if that is in the best interests of the U.S. and the territory. To assert otherwise stands the meaning of plenary on its head. Plenary means full power. It does not mean full power, except when Congress attempts to exercise it.

Under the Territorial Clause, Congress has the power to dispose of a territory or to make all needful rules and regulations. If Congress has the power to dispose of a territory



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 493 of 542

in its entirety, it also has the power to dispose of some of its control by exercising its power to make all needful rules and regulations. It is an elementary principle of statutory interpretation that the "greater includes the less". See, Morman Church v. U.S, 136 U.S. 1, 45 (1889).[3] Similarly, in Collins v. Yosemite Park & Curry Co., 304 U.S. 518 (1938), the Court upheld an agreement between California and the Federal Government which reserved certain rights to California when it ceded Yosemite Park. The Court concluded that the Federal Government and the states could enter into agreements concerning jurisdiction over property within their borders, and the courts should "recognize and respect" the agreements. 304 U.S. at 527-30.[4] For instance, the Supreme Court has approved of the Government's right to lease mineral rights. See United States v. Gratiot, 39 U.S. (14 Pet.) 526, 536 (1840)("it lies in the discretion of Congress, acting in the public

---

[3] While a distinction obviously exists between the Government's rights to abrogate property rights and the issue of its authority to exercise political power in the territories, the Supreme Court's frequent statements that the Government can bind itself do not appear to be limited to commercial-type contracts. The Court has, for instance, upheld limitations on federal political powers in areas ceded to the federal government by the states pursuant to the Territorial Clause. In Fort Leavenworth R.R. v. Lowe, 114 U.S. 525 (1885), the Court upheld an agreement between the Federal Government and Kansas dividing taxing authority.

[4] The Court stated:

> Though the jurisdiction and authority of the general government are essentially different from those of a State, they are not those of a different country; and the two, the State and the general government, may deal with each other in any way they may deem best to carry out the purposes of the Constitution.

Fort Leavenworth, 114 U.S. at 541.

interest to determine how much of the property it shall dispose."). In Ashwander v. T.V.A., 297 U.S. 288 (1936), the Court approved a contract for the sale of electricity, rejecting an argument that the Government lacked constitutional authority to dispose partially of its property by contract and relying on Congress' authority under the Territorial Clause. Id. at 330-36. [3]

None of the cases cited in the Memorandum are to the contrary. Each of them sets forth the general proposition that in regard to the territories, the Congress is supreme. In part, the earlier cases were required to make this point because the Territorial Clause was included to make clear that it was the Federal Government and not the States that would exercise control over the Territories. See, e.g., A. Leibowitz, Defining Statute (1989) at

---

[3] The Congress also has authority to dispose of property under the Territorial Clause. This power includes both the absolute right to dispose of property in its entirety or to dispose of part of the governments rights in property:

> Of course, a significant difference may exist between the disposition of property and the disposition of sovereign authority. Nevertheless, the conclusion that Congress can partially dispose of matters over which it has the power of total disposition has considerable logical appeal. If Congress could totally dispose of its power over the Philippines by granting them independence, it seems logical that it could also partially dispose of its powers by granting them something less than complete independence. Whether Congress could later change its mind as to the partial disposition is not clear, but some kinds of dispositions are by nature final. For example, if Congress disposes of its powers over territory by admitting it as a state, that would seem a final disposition of its territorial powers; Congress cannot change later the status of a state. Similarly, when Congress granted independence to the Philippines, it disposed of its territorial power over them for all time.

Inventive Statesmanship vs. The Territorial Clause: The Constitutionality of Agreements Limiting Territorial Powers, 60 Va. L. Rev. 1041, 1060-61 (1974).



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 495 of 542

10-11; See also, District of Columbia v. Thompson Co., 346 U.S. 100, 109 (1953). But, none of the cases cited in this section address directly the question of whether Congress could exercise its plenary authority by restricting its ability to act in the future.

The Memorandum bases its assertions about Congress' plenary authority on Gibbons v. Ogden, 22 U.S. (9 Wheat) 1 (1824). That case, of course, is the seminal decision establishing Congress' power under the Commerce Clause. It has nothing whatsoever to do with the Congress' Territorial Clause authority. It is apparently cited to establish the proposition that in some express areas Congress' power "acknowledges no limitations, other than are prescribed in the Constitution". We think it should be obvious that the Department's proposed changed opinion on mutual consent is entirely inconsistent with this principle. Rather than recognizing the scope of Congress' powers, the Department is claiming that a limitation exists on Congress' power -- that Congress is imprisoned by its plenary power and cannot exercise it to limit itself. In fact, several of the other cases cited in the Memorandum to support the breadth of Congress' power are inconsistent with this limitation.

The very first case cited in the section is National Bank v. County of Yankton, 101 U.S. 129 (1880). The Memorandum utilizes a quote to establish that Congress is supreme in the territories. But this quote has nothing whatsoever to do with whether Congress can act to limit its authority. Unfortunately, what has been left out from the quote are the next two sentences which bear directly on the issue presented by the mutual consent clause and the analysis the Supreme Court adopted in *POSSE* whether Congress has

limited its right to exercise sovereign power. The Court apparently addressing the issue that Congress had not expressly reserved the right to amend acts of a territory stated:

> In the organic act of Dakota there was not an express reservation of power in Congress to amend the acts of the territorial legislature, nor was it necessary. Such power is an incident of sovereignty, and continues until granted away.

101 U.S. at 133 (emphasis added).

Clearly, the implication of this decision is that while Congress has full power it has the right to grant it away.[6]

While the next case cited, Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264, 276 (1981), like Gibbons v. Ogden, does not deal with the Territorial Clause, it does describe accurately the standard the Court applies when determining whether Congress has acted within the scope of its power. This is the same test the Court would apply if it were presented with the question of whether Congress had acted appropriately in agreeing to a mutual consent clause.

> The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding...if there is any rational basis for such a finding...This established, the only remaining question for judicial inquiry is whether "the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution."...The judicial task is at an end once the court determines that Congress acted rationally in adopting a particular regulatory scheme.

452 U.S. at 276 (emphasis added).

---

[6] Similarly, American Insurance Co. v. Canter, 26 U.S. 511 (1828) and Downes v. Bidwell, 182 U.S. 244 (1901), cited in the memorandum to establish the extent of Congress' power, do not address the issue of whether Congress can act to limit its authority.

This test recognizes the great deference the Court gives to an exercise of power by Congress. If Congress were to conclude that a mutual consent clause is within its power and that such a clause is necessary to achieve Congress' purpose of granting greater self-government to Guam, can anyone say with certainty that the Court will not believe that a sufficient rational basis exists. If it does, not even the Memorandum asserts that anything in the Constitution specifically bars a mutual consent clause.

It is well established that when the intent of Congress with respect to the precise question at issue is clear, the courts must give it effect. See, Chevron, U.S.A. v. NRDC, 467 U.S. 837, 842-43 (1984). It is equally clear that the courts give great deference to Congress when it exercises its Territorial Clause authority. See, Wabol v. Villacrusis, 958 F.2d 145, 1460 (9th Cir. 1992) ("The incorporation analysis thus must be undertaken with an eye toward preserving Congress' ability to accommodate the unique social and cultural conditions and values of the particular territory. More over, we must be cautious in restricting Congress' power in this area."), citing Torres v. Puerto Rico, 442 U.S.465, 460-70 (emphasis added). In fact, we know of no decision of the Supreme Court reversing any action by the Congress taken with regard to the governance of a territory when the Congress has acted pursuant to its Territorial Clause authority.

None of the rest of the cases cited for the proposition that Congress' power continues indefinitely address the question of whether Congress can limit its ability to act in regard to the territories without their consent. Shively v. Bowlby, 152 U.S. 1 (1894) can be cited only for the proposition that it is the Federal Government and not the states which exercises control over the

territory of the United States. It did not address in any way whether the Congress can limit its authority to act over this territory. Similarly, Hooven & Allison Co. vl Evatt., 324 U.S. 652 (1945), can be cited only for the self-evident proposition that Congress retained its authority until the Philippines achieved independence. The question of whether Congress could have agreed with the Philippines that certain Congressional powers would not be exercised during the transition was not addressed.

Congressional authority over the people of the territories and their political rights is derived from Congress' authority over Guam as property brought within Congress' control by the Territorial Clause. In Edward v. Carter, the Court clarified Congress' power under the property clause, stating:

> Thus, it appears that in referring to Congress' power "without limitation", the Court was holding that Congress' authority under Article IV §3 cl. 2 embraces any disposition of property of the United States chosen by Congress.

580 F.2d 1055, 1061 n. 18 (1978) (citations omitted) (emphasis added).

Further definition was provided in U.S. v. Gratiot, 39 U.S. 526 (1840) where the Court considered Congress' power to impact a lease of federal lands through legislation. The Court's approach to the question is quite interesting and seems to analogize the power over land with the power over territorial governments.

First, it finds that the mines in question lie with territory of the United States are, therefore, its property. Second, it recites the Territorial Clause and concludes that the term territory refers is a descriptive word referring to one kind of property. Third, the Court concludes that "Congress has the same

power over [the mine] as over any other property belonging to the United States; and this power is vested in Congress without limitation; and has been considered the foundation upon which the territorial governments rest". Id. at 537. Fourth, the Court then references cases involving Congress' authority over the territories, including Florida, including the right of Congress "to make all needful rules and regulations respecting the territory or property of the United States". Id. at 538. Finally, the Court concludes "[i]f such are the powers of Congress over the lands belonging to the United States, the words "dispose of," cannot receive the construction contended for at the bar; that they vest in Congress the power only to sell, and not to lease such lands". Id.

The Court's concept which forms the basis of these opinions is that the greater includes the lesser. The Court reached its decision building on Congress' authority over the territories. If Congress has the power to dispose of territories or to make all needful rules and regulations, it must then also have the power to limit its political control over the people of the territory just like it has the right to limit its authority over territory by leasing it.

**Section II - "The Revocable Nature of Congressional Legislation Relating to the Government of Non-State Areas-- pp 5-6.**

This section of the Memorandum offers nothing more than a restatement of the "principle" asserted in Section I -- that Congress' plenary authority does not include the right to limit the exercise of this authority in the future by way of a mutual consent clause. As with Section I, the cases relied upon in this section

do not deal with the issue of Congress exercising its plenary authority in this way.

Clinton v. Englebrecht, 80 U.S. (13 Wall) 434 (1872) does not establish a rule that any delegations of authority to a territory "must be 'consistent with the supremacy and supervision of National authority'" as asserted in the Memorandum at p. 5. The case did not address whether Congress could irrevocably limit its right to alter a law because of a mutual consent clause, nor did it use the word "must". The quote is dicta and deals with how Congress had approached local government up to that time. The actual quote is as follows:

> The theory upon which the various governments for portions of the territory of the United States have been organized, has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of National authority, and with certain fundamental principles established by Congress.

80 U.S. at 441 (emphasis added).

This quote establishes nothing more than the historical fact that Congress in its approach to self-government for the Territories had not agreed to limit its power in any way.

Similarly Puerto Rico v. Shell Co., 302 U.S. 260 (1937) adds nothing to the debate. The Court recites the quote set forth above from Clinton v. Englebrecht but uses it to affirm a broad grant of power to territorial legislatures, not to bar Congress from entering into an agreement not to exercise its authority. In fact, the holding in Puerto Rico was to affirm the validity of Puerto Rico's anti-trust law which had been challenged as conflicting with the Sherman Act.

District of Columbia v. Thompson Co., 346 U.S. 100 (1963) provides even less support for the Memorandum's assertions. As with the other cases, the Court was merely referring to the same precedent regarding the general authority of Congress to alter its legislation relating to a territory, but, here again, this discussion was not in the context of an expression by Congress of an intent to limit itself.[7] More importantly, the laws in question contained specific reservations permitting Congress to make such amendments. 346 U.S. at 195.

What is missing from this section, is a discussion of two important decisions more closely on point. The first is Currin v. Wallace, 306 U.S. 1 (1939) which is mentioned in footnote 13 of the Memorandum but summarily dismissed as being inconsistent with the Department's new theory that Congress cannot bind itself. This is a decision which we suggest is more appropriately left to the Supreme Court. Currin is significant because the Supreme Court approved an Act of Congress implementation of which required the approval of those affected by it, the essence of the Guam mutual consent clause. The Act, passed pursuant to the Commerce Clause which the Memorandum asserts gives Congress the same plenary power as the Territorial Clause, was challenged as an unconstitutional

---

[7] The memorandum attempts to bolster the Department's theory that Congress must retain the authority to revise, alter or revoke any authority it grants to the territories by citing United States v. Sharpnack, 355 U.S. 286 (1958); Harris v. Boreham, 233 F.2d 110 (3rd Cir. 1956); Firemen's Insurance Co. v. Washington, 483 F.2d 1323 (D.C. Cir. 1973); Hornbuckle v. Toombs, 85 U.S. 648 (1874) and Christianson v. King County, 239 U.S. 365 (1915). The cases cited, similar to D.C. v. Thompson, 346 U.S. 100 (1953) do not discuss an express intent by Congress to limit the exercise of its authority, rather they are limited to situations whereby Congress clearly reserved the exercise of its authority to revise, alter or revoke through enacted legislation.

delegation of authority. The Court disagreed finding that rather than a delegation of legislative authority, the Congress "has merely placed a restriction upon its own regulation by withholding its operation...'unless two-thirds of the [voters] voting favor it. Similar conditions are frequently found in police regulations." 306 U.S. at 15. The Court went on:

> Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions..."Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions...it may leave the determination of such time to...a popular vote of the residents of a district to be effected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the legislature on the expression of the voters of a certain district."

306 U.S. at 16 (citing Hampton & Co. v. United States, 276 U.S., 394, 407 (1928).

If the Court agrees Congress has the authority to make implementation of its legislation subject to ratification by the affected voters, it is inconceivable that the Court would find that Congress could not agree to limit its ability to change that same law without the consent of those same voters, if Congress has expressed its intention unmistakably.

The most troublesome oversight in this section of the Memorandum, however, is the failure to discuss the Ninth Circuit's decision in United States v. De Leon Guerrero, 4 F.3d 749 (9th Cir. 1993). De Leon Guerrero is the only decision of which we are aware



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 503 of 542

that deals with the applicability of a mutual consent provision in territorial legislation. The case arose under the Covenant for the Commonwealth of the Northern Mariana Islands. The Covenant was ratified by an Act of the Congress. 48 U.S.C. § 1681b. The case involved an ongoing debate about whether the Commonwealth's right of local self-government as defined in the Covenant under Section 103 substantially limits Congress' legislative powers over the Commonwealth under Section 105". 4 F.3d at 752. The specific issue was whether the audit provisions of the Inspector General Act of 1978 "conflicts with the self-government provisions of the Covenant". 4 F.3d at 753.

In order to reach the question, the court first had to deal with arguments put forward by the Department of Justice which are identical to those in the Memorandum. Arguing on behalf of the Inspector General, the Department asserted that Congress had the right to pass the Act under the Territorial Clause arguing "that because the CNMI is governed through Congress' power under the Territorial Clause, Congress has plenary legislative authority over the CNMI". 4 F.3d at 754.[8] The court found this argument "unpersuasive". According to the Ninth Circuit

> 'the authority of the United States towards the CNMI arises solely under the Covenant.' The Covenant has created a 'unique' relationship between the United States and the CNMI, and <u>its provisions alone</u> define the

---

[8] The court referred to <u>Simms v. Simms</u>, 175 U.S. 162, 168 (1899) a case which explained that under the Territorial Clause, Congress "has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative over all subjects upon which the legislature of a state might legislate within the state". This is the same principle upon which the Justice Department again relies.

> boundaries of those relations...The applicability of the Territorial Clause to the CNMI, however, is not dispositive of this dispute. Even if the Territorial Clause provides the constitutional basis for Congress' legislative authority in the Commonwealth, it is solely by the Covenant that we measure the limits of Congress' legislative authority.

4 F.3d at 754.

Ultimately, the Ninth Circuit approved application of the law not because Congress had plenary authority under the Territorial Clause but because the Covenant specifically gave Congress the right to enact legislation applicable to the Commonwealth. The only limit on this right is a mutual consent provision stating that a few limited sections of the Commonwealth Act could not be modified without the mutual consent of the Commonwealth. Covenant Section 105.[2] The Court found that this mutual consent provision as drafted did not bar the Congress from passing laws affecting the Commonwealth where the U.S. had a sufficiently significant interest to justify it.

The holding in <u>De Leon Guerrero</u> contradicts directly the conclusion paragraph to this section. This paragraph reasserts that the "non-state areas are subject to the authority of Congress, which, as shown above, is plenary...[and] persists [until] the area becomes a State or ceases to be under United States sovereignty". Memorandum at 6. Rather, that decision makes clear that Congress' authority, after a political status change agreed to between Congress and the people of the territory, is defined solely by the terms of that agreement.

[2] Without explanation and despite the inconsistency with its newly proposed position, this is one of the mutual consent provisions which the Memorandum states the Department will continue to support. Memorandum at 12.

**Section III -- The Rule that Legislation Delegating Governmental Powers to a Non-State Area Must Be Subject to Amendment and Repeal Is but A Manifestation of the General Rule That One Congress Cannot Bind A Subsequent Congress, Except Where It Creates Vested Rights Enforceable Under the Due Process Clause of the Fifth Amendment -- pp 6-7.**

This entire subsection is premised on a fallacy. There is no rule expressed in any decision of any court that governmental powers to a non-state area must be subject to amendment and repeal. As described above, the most that can be said is that there is dicta in a series of cases, not addressing the issue of whether Congress can bind itself, that Congress' actions in the territories are subject to later amendment or repeal. What is accurate in the section is that these statements are nothing more than "a specific application of the maxim that one Congress cannot bind another...." Memorandum at 6.

The analysis does not end here, however, because it is simply not true that one Congress cannot bind another, as the Memorandum recognizes but then attempts to explain away. As described above, the most that can be said is that there is dicta in a series of cases, which do not address the issue of whether Congress can bind itself. They stand only for the proposition that when express statutory language exists or when language is not provided and it is clear Congress originally had the power, then in those situations Congress retains its authority and its actions in the territories may be subject to later amendment or repeal. In the end, the section misrepresents as conclusive and inflexible "the maxim that one Congress cannot bind another." First, the law must create vested rights as Justice Marshall explained in Fletcher v. Peck, 19 U.S. (6 Cranch) 87, 135 (1810) ("When, then, a law is in its nature a contract, when absolute rights have vested under that



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 506 of 542

contract, a repeal of the law cannot devest (sic [illegible] rights.")[10] This, too, the Memorandum recognizes but go[illegible] to utilize a quote from the Sinking Fund Cases as part of its effort to build a case that only contractual rights of a private nature are protected from change.[11]

The analysis provided is incomplete. The test actually established by the Supreme Court to determine whether Congress has bound itself turns not on the nature of the contract (private right vs public) but on whether Congress has expressed its intention to protect the vested right in "unmistakable terms". The "unmistakable terms" doctrine is not even addressed in the Memorandum. Infra at p. 25.

---

[10] Although the Department in its memorandum focus' on the dissenting opinion in U.S. Trust Co. v. New Jersey, 431 U.S. 1 (1977) the actual holding was that impairment of contract by the State was in violation of the Contract clause and neither necessary nor reasonable in light of the circumstances. Although the Contract clause applies to States and not the federal government, the "United States are as much bound by their contracts as are individuals." Sinking-Fund Casess, 98 U.S. 700, 719 (1879). The Court in Barcellos and Wolfsen v. Westlands Water District, 899 F.2d 814, 821 (9th Cir. 1990) quoting Lynch v. United States, 292 U.S. 571, 579 (1934), stated "the Supreme Court held that "[r]ights against the United States arising out of a contract with it" are property rights protected from deprevation or impairment by the 5th Amendment." See also Madera Irr. Dist. v. Hancock, 985 F.2d 1397, 1401 (9th Cir. 1993). Moreover the Court, in U.S. Trust Co. noted that "a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." 431 U.S. at 17, fn 14 (1977).

[11] What is not disclosed about the Sinking Fund Cases is that the "statutes in question expressly reserved Congress' authority to repeal, alter, or amend them, and Congress exercised that power..." POSSE, 477 U.S. at 53.

**Section IV -- The Due Process Clause Does Not Preclude Congress from Amending or Repealing the Two Mutual Consent Clauses - p. 8.**

The Memorandum presents two bases for its conclusion that the Due Process Clause does not bar a repeal of a mutual consent clause. First it points out that a territory is not a person within the meaning of the Due Process Clause. This is a red herring. Secondly, it asserts that a repeal would not deprive a territory of property within the meaning of the Fifth Amendment. This is not the test the Supreme Court has established. It is not the nature of the vested right that controls. Rather, the test involves a combination of a vested right coupled with an "unmistakable" commitment by the Congress not to interfere with the right.

**Subsection IV, B -- "A Non-State Area Is Not A Person in the Meaning of the Due Process Clause of the Fifth Amendment." pp.8-9.**

We do not need to debate the merits of the legal arguments presented in this subsection because this is a non-existent issue. The mutual consent clause being discussed between the President's designated negotiator and representatives of the Guam Commission on Self-Determination runs between the Government of the United States and the People of Guam, not the political entity of the Commonwealth of Guam as the Memorandum assumes. The People of Guam clearly qualify as persons under the Due Process Clause.

We have attached the current configuration of the proposal for your review. The reference to the People of Guam is appropriate because elsewhere in the Act we intend to require that after adoption by Congress the People of Guam hold a plebiscite to approve what Congress has enacted before it becomes applicable to Guam. In this regard, we also intend to change the nature of the



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 508 of 542

Guam Commonwealth Act. Rather than an Act of Congress approved by the people before implementation, it will become a Covenant between the United States and the people of Guam. This Covenant will create vested and binding rights protecting both the interests of the United States and of the People of Guam.

**Subsection IV, B -- Legislation Relating to the Government of Non-State Areas Does Not Create Any Rights Or Status Protected By the Due Process Clause Against Repeal Or Amendment By Subsequent Legislation. - pp. 9-12.**

While recognizing that the Government may enter into contracts, the Memorandum asserts that only contracts similar to those entered into by private individuals are enforceable, and "governmental powers cannot be contracted away", citing North American Coml. Co. v. United States, 171 U.S. 110, 137 (1898).[12] To bolster its position, the Memorandum relies on the POSSE decision.[13]

---

[12] The comment by the Court relied upon by the Memorandum is dicta. It came in a case involving Congress' right to alter the terms of a lease through regulation. The decision did not turn on the rule that sovereign regulatory authority could not be waived. It turned on the fact that an express reservation of authority had been included in the contract. As the Court noted, this was a lease "expressly subjected from the beginning, to whatever regulations of the business the United States might make". 171 U.S. at 137.

[13] The Memorandum lacks examples that give support to the Memorandum's theory that Congress does not have the ability to limit the exercise of its authority under the plenary power of the Territorial Clause. Rather, the cases cited involve situations whereby the Congress through legislation, or the lack of legislation, retained its authority. For example, the memorandum indicates Hudson Water Co. v. McCarter, 209 U.S. 349 (1908) has a much broader interpretation than the actual case decision provides for. In fact, Hudson concerns an action involving a water rights contract between the State and an individual where the State did not include provisions limiting its powers, therefore allowing (continued...)

The POSSE decision, however, did not turn on the subject matter of the contract in question. The actual foundation of the Court's holding was that if Congress was to surrender any of its sovereign power in a contract, it must do so in "unmistakable terms". The "unmistakable terms" analysis would not be necessary if the Court did not assume that Congress could indeed surrender sovereign powers, even in the realm of traditional regulatory authority as was presented in the POSSE case. This is exactly the opposite of what the Memorandum asserts.

Indeed, the Court's reference to the bond and insurance cases had no direct bearing on the Court's holding. The cases were cited for the limited purpose of contrasting circumstances where Congress clearly evidenced its intent to bind itself from the facts in the POSSE case where "Congress expressly reserved to itself "[t]he right to alter, amend, or repeal any provision of" the Act which lead to the contracts at issue. 477 U.S. at 42. The Court relied upon this contrast because its holding in POSSE was that the Congress could amend the legislation in question, even if that amendment interfered with contractual rights, because it had not unmistakably indicated its intent to bind itself -- the standard the Court has established for determining whether Congress has waived its sovereign power.

The actual holding in POSSE -- that Congress had not surrendered its sovereign power to alter Social Security laws --

---

13/(...continued)
subsequent legislation by the State and a resulting ineffective contract. It is not about the State's incapability to limit its power by contract, rather it's about the authority of a State to retain its power when not granted away.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 510 of 542

**has been thoroughly analyzed by the D.C. Court of Appeals in <u>Transohio Savings Bank v. Director, Office of Thrift Supervision</u>, 967 F.2d 598, 621 (D.C. Dir. 1992). The <u>Transohio</u> decision demonstrates conclusively that the Memorandum's analysis of the holding in <u>POSSE</u> is so flawed that one wonders how it could be used to justify a proposed reversal in such an important area of Administration policy. In that decision, the D.C. Circuit makes clear that "[t]he Supreme Court reached [its] conclusion by analyzing the governing statute, the Social Security Act" and focused on the fact critical to its decision -- "[t]he Social Security Act contained an express reservation of Congress' power to amend the law...", 967 F.2d at 621, not by establishing the *per se* "private rights" test asserted in the Memorandum.**

**According to the D.C. Circuit**

> **The "principles form[ing] the backdrop" of the Supreme Court's analysis of the Social Security Act in <u>POSSE</u> were those comprising the <u>unmistakability doctrine</u>--the doctrine that " 'sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact <u>unless surrendered in unmistakable terms</u>.' " <u>Id</u>. at 622 (emphasis added).[15]**

---

**[15] If the Court had actually established a *per se* rule which depended on the nature of the contract, then why did the Court continue after stating the unmistakable terms principle and the general rule that "contractual arrangement, including those to which a sovereign itself is party, remain subject to subsequent legislation by the sovereign" state that "[t]hese principles form the backdrop against we <u>must</u> consider the District Court's decision effectively to forbid Congress to amend a provision of the Social Security Act". 477 U.S. at 52. By use of the "must consider" terminology, the Court made clear what the test is. It would have been much more direct and ultimately clearer simply to have ruled that the contract between the Social Security Administration and the State of California was not a traditional private contract. It did not, of course, because that is not the test the Supreme Court (continued...)**



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 511 of 542

The D.C. Circuit also discussed the history of the unmistakability doctrine.

> "The "unmistakability" doctrine is a special rule of contract interpretation that applies to contracts with the government. The doctrine dates back to the early 19th century, when Chief Justice Marshall provided its justification. The government, Chief Justice Marshall wrote for the Court in a case concerning the government's taxing power, may enter binding contracts when it finds "a consideration sufficiently valuable to induce a partial release" of its sovereign powers.

Id. at 618.

Both the POSSE and Transohio cases dealt with the application of the "unmistakable terms" test to a determination of whether Congress has limited its right to exercise its regulatory jurisdiction. This test has nothing whatsoever to do with a standard based on "traditional private contractual rights" which the Memorandum would have us believe is the standard. If it were the test, the Supreme Court and D.C. Court of Appeals could easily have disposed of the contracts in POSSE and Transohio by adopting the "traditional private contractual rights" test advocated in the Memorandum with a simple finding that alleged contractual rights associated with the regulatory programs at issue in the cases are not traditional private contractual rights. They did not, of course, because the Supreme Court applies the "unmistakable terms" test which requires an analysis of Congress' intent, not the *per se* standard proposed in the Memorandum. See, e.g., 477 U.S. at 54.

We find it inconceivable that the Department would decide to reverse a thirty-year old policy based on a decision which has been

---

[15](...continued) ever applies. The test is whether Congress has stated its intentions in unmistakable terms.

the Memorandum asserts is the holding -- that Congress can contract away sovereign rights to exercise its regulatory authority when its says so unmistakably.[13] Instead of dealing accurately with the Court's actual analysis, the Memorandum at page 11 relies upon a quote, claimed to set forth the holding, which is taken completely out of context and has nothing whatsoever to do with the holding.

The quote, taken from 477 U.S. 55, fails to include the entirety of the paragraph, the remaining text from which puts back into context the relationship of the bond and insurance cases to the basis of the decision. The following quote picks up the rest of this language beginning with the last sentence of the quote from page 11 of the Memorandum. This language makes absolutely clear that what the Court focused on was the fact that instead of Congress have stated in unequivocal terms its intention to limit the exercise of its regulatory authority, it explicitly retained it. After stating that the contract claimed by the State of

---

[13] The POSSE decision has even been criticized because it appears to open the door wider than some commentators believe advisable. In an article by David Toscano entitled "Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty analyzed the POSSE decision in great detail. It concluded that "[t]he power to waive sovereignty was recognized" in POSSE. 92 Colum. L. Rev. 426, 451. It goes on "[i]n POSSE, the Court relied entirely on Merrion v. Jicarilla Apache Tribe for the proposition that the federal government can surrender sovereign power. Jicarilla in turn relied upon cases involving primarily the taxation powers of state governments... Instead of endorsing the rule applying to the police powers -- such powers cannot be surrendered -- it adopted the rule applying to taxation powers -- such powers can only be surrendered if done so unmistakably. This move should not be followed automatically: if the Court wants to enforce contracts that surrender the federal government's regulatory authority, it should do so on the basis of policy arguments, not on the basis of POSSE." Id. at 460. Obviously the author did not like the test used by the Court. Nevertheless his criticism makes clear what the test is.

California "bears little resemblance to rights held to constitute 'property' and citing to the insurance and bond cases as examples, the Court went on to explain their relevance.

> Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare. Under these circumstances, we conclude that the termination provision ... did not rise to the level of "property." The provision simply cannot be viewed as conferring any sort of "vested right" in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation.

477 U.S. at 55 (emphasis added).

Indeed, the Memorandum is unable to cite any cases holding that Congress is barred from contracting away its right to adopt legislation, because the "Court has never held that the United States cannot surrender regulatory powers through contract..." 92 Colum. L. Rev at 458. But the Court has approved Congress making effectiveness of its legislation subject to approval by the voters who are impacted by the legislation, see, Currin v. Wallace, 306 U.S. at 15-16. It defies the rational of the POSSE decision to argue that the Court would approve Congress adopting legislation making effected-voters approval a requirement and then pass subsequent legislation authorizing it to ignore the vote of approval, if it has stated in unmistakable terms that it would not take such action.

After spending eleven and one-half pages arguing that mutual consent clauses are unenforceable and unconstitutional, the Memorandum comes to an astounding conclusion. It states that the "Department of Justice...would honor past commitments with respect to the mutual consent issue", including Section 105 of the Covenant

with the Northern Marianas Islands. But the Department cannot have it both ways. An Act of Congress is either constitutional and enforceable or it is not. If a mutual consent provision for Guam is unenforceable, then the Department must reach the same conclusion for all other mutual consent provisions. This includes the mutual consent provisions in the Compact of Free Association with Palau' scheduled to go into effect on October 1, 1994. The Department's Memorandum offers no solid basis for such a significant reversal in policy. All of the cases upon which it relies, except POSSE, were available to it when its earlier positions supporting mutual consent were made. POSSE does not change any rule with regard to Congress binding itself. It merely lays out clearly a test adopted in 1981 in Merrian v. Jecarilla Apache Tribe, 455 U.S. 130, which in turn carried forward a principle which the D.C. Circuit states "dates back to the early 19th century." 967 F.2d at 618.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 515 of 542

**ATTACHMENT D**

**SELF-DETERMINATION FOR THE PEOPLE OF GUAM:**

**A LEGAL ANALYSIS**

**GUAM COMMONWEALTH**

PRESENTED IN CONJUNCTION WITH THE STATEMENT OF
THE HONORABLE PILAR C. LUJAN
MEMBER OF
THE 22ND GUAM LEGISLATURE

&

THE TERRITORY OF GUAM'S
COMMISSION ON SELF-DETERMINATION

Before

THE SUBCOMMITTEE ON INSULAR
AND
INTERNATIONAL AFFAIRS
COMMITTEE OF NATURAL RESOURCES
U.S. HOUSE OF REPRESENTATIVES

Regarding

HOUSE CONCURRENT RESOLUTION 94

August 3, 1993

I. INTRODUCTION

This paper discusses existing United States policy towards the territories in general and the native people of Guam in particular. To date, United States policy has refused to accept the possibility that the native people of Guam could be the beneficiaries of rights uniquely applied to them. In both its first and second reports, the interagency Task Force on Guam Commonwealth took the position that any provision of the draft Commonwealth Act which singles out native people for unique rights and privileges must be rejected as an infringement upon one or more of the Fifth, Fourteenth or Fifteenth Amendments.

The Task Force's constitutional analysis may have appeal on the surface, but it fails to take into account an uncontradicted series of Supreme Court and Courts of Appeals decisions concerning the Congress' power over the unincorporated territories. Most critically of all, the Task Force's approach gratuitously restricts the policy options of the political leadership in the Executive Branch and Congress, and seeks primarily to justify the status quo at the expense of constructive change and reform.[1]

The policy positions expressed in the two Task Force reports have been driven primarily by opposition of the Justice Department in the past toward the concept of group rights and affirmative action programs which depend, in part, upon the recognition of group rights. We disagree fundamentally with the basic proposition that the rights of racially or culturally diverse groups cannot be specially recognized, particularly in unincorporated territories, and in the context of measures which will

---

[1] The doctrine of unincorporated versus incorporated territories was established in the early 1900s in a line of cases now referred to as the Insular Cases. Downes v. Bidwell, 182 U.S. 244 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Dooley v. United States, 182 U.S. 222 (1901); DeLima v. Bidwell, 182 U.S. 1 (1901). This doctrine was developed judicially to deal specifically with the territories taken by the United States from Spain after the Spanish-American War. Those territories were the Philippines, Puerto Rico, the Virgin Islands and Guam. In the absence of executive or legislative policy dispositive of their political status, the unincorporated territory doctrine was created judicially to deal with these territories, which were not viewed as automatically destined for Statehood as were the territories in the western half of the North American continent. The ethnic composition and cultural heritage of the territorial inhabitants made settlement and incorporation of these areas in the same manner as the continental territories impractical and politically awkward. Since the "Manifest Destiny" model of territorial incorporation, involving removal of the native peoples to reservations to make way for Euro-American settlement, apparently was not deemed politically correct at the turn of the century, the Court simply created a legal "reservation" for the territories by inventing the doctrine of unincorporated territories. While we no longer may be motivated by the same cultural views of native peoples, the Insular Cases remain good law today, Torres v. Puerto Rico, 442 U.S. 465 (1979), and we need to recognize that this constitutional doctrine which has survived into our times provides flexibility to institute positive political change.

resolve Guam's political status and ultimately end Guam's status as a non-self-governing territory under U.S. administration. Moreover, we believe that the analytical approach reflected in the Task Force reports is one which is applicable to States or municipalities when acting on their own initiative and has nothing whatsoever to do with congressional action in the unincorporated territories. Again, this is particularly true in the context of Guam's political status process.

We are convinced that fundamental change in United States policy toward its territories is impossible without first reassessing the powers, rights and obligations of the United States toward the unincorporated territories. The Constitution and applicable treaty obligations have been interpreted in the past to inhibit a greater voice by the people of the territories in their own self-government. Meaningful self-government is an illusion if existing policies do not change.

We believe that the policy of the United States regarding its powers, rights and obligations in the territories has become internally inconsistent. The basis for United States administration of all its territory (whether a national park in California or the island of Guam) is the Territorial Clause (also called the Territories Clause) found in Article IV, Section 3, Clause 2 of the United States Constitution. Under Clause 2, "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Application of the Territorial Clause to the territories has, again and again, been defended and justified as providing the constitutional basis for the unique treatment given to the territories in many respects. At the same time, however, it is argued that the discretion Congress has under the Territorial Clause is of no avail in overcoming constitutional questions which have been raised relating to the unique treatment Guam seeks in its Commonwealth proposal.

The Issue analyzed in the paper is whether United States law (including the Constitution, laws and treaty obligations) permits Congress to treat the people of the unincorporated territories specially, both in the context of their unique political status as defined by the Insular Cases, and in light of U.S. obligations with respect to its non-self-governing areas. While this question can be raised in connection with virtually every section of the draft Commonwealth Act, we intend to focus the discussion on the heart of the Commonwealth proposal, Chamorro Self-Determination, set forth in Title I, Section 102 of the draft Act, and Mutual Consent set forth in Title I, Section 103.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 518 of 542

## II. CONGRESS' POWER OVER THE TERRITORIES

The analysis begins with reference to a well-established constitutional legal principle -- Congress has extraordinary powers to deal with the territories. The Supreme Court has consistently interpreted Congress' power under the Territorial Clause broadly and long ago concluded that "Congress, in the government of the Territories . . . has plenary power, save as controlled by the provisions of the Constitution." Binns v. United States, 194 U.S. 486, 491 (1904). Justice White, in Downes v. Bidwell, 182 U.S. 244 (1901) (generally viewed as the seminal opinion on the status of territories) described the breadth of Congress' power over unincorporated territories:

> The Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States . . . and to change such local governments at its discretion.

Downes, 182 U.S. at 289-290.

The Supreme Court explained further its view that Congress has the broadest possible authority over the territories in Dorr v. United States, 195 U.S. 138 (1904):

> Congress has unquestionably full power to govern it [the territories], . . . and while Congress will be expected to recognize the principle of self-government to such extent as may seem wise, its discretion alone can constitute the measure by which the participation of the people can be determined.

Dorr, 195 U.S. at 148 (emphasis added).

The Courts, therefore, have been exceedingly hesitant to interfere with Congress' power over the territories. As the Ninth Circuit has said, courts "must be cautious in restricting Congress' power" in the territories. Wabol v. Villacrusis, 958 F.2d 1450, 1460 (9th Cir. 1992).[3]

---

[3] The Congressional Research Service agrees that Congress has broad powers toward the territories, limited only by those constitutional restrictions which are applicable to it. In an opinion prepared at the request of former Congressman, the Honorable Robert Lagomarsino, dated December 4, 1991, concerning Puerto Rico's political status, CRS concluded that in the political status area "Congress has discretion to act. It may, subject only to constitutional constraints that may inhibit its actions, choose to accord recognition to a wide variety of rights that Puerto Rico or others may seek. It may creatively provide for new and different relationships between the United States and any territory. And it may treat bilaterally with the Government or the people of Puerto Rico in the establishment of governmental institutions and forms."



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 519 of 542

The starkest description of the scope of Congress' authority over the unincorporated territories is found in three separate rulings by the United States Court of Appeals for the Ninth Circuit addressing the political status of Guam. Beginning in 1982, the Ninth Circuit stated in People v. Okada, 694 F.2d 565 (9th Cir. 1982) that

> Congress has the power to legislate directly for Guam, or to establish a government for Guam subject to congressional control. Except as Congress may determine, Guam has no inherent right to govern itself.

Okada, 694 F.2d at 568 (emphasis added.)

Three years later, the Ninth Circuit expanded on this theme in Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285, 1286 (9th Cir. 1985), holding that Guam "enjoy[s] only such powers as may be delegated to it by Congress." As such, "the government of Guam is an instrumentality of the federal government over which the federal government exercises plenary control." Id. at 1289.

The Ninth Circuit's most recent and clearest declaration on this theme came in Ngiraingas v. Sanchez, 858 F.2d 1368, 1370-71 (9th Cir. 1988) when Guam was analogized to a Federal agency:

> Admittedly the analogy between Guam and an administrative agency such as the Federal Trade Commission is counter intuitive. Guam seems more like a state or municipality than a run-of-the-mill federal agency. After all, Guam elects government officials, its citizens participate politically. . . But there are also very significant differences, differences we deem conclusive. . . . Guam marches squarely to the beat of the federal drummer; the federal government bestows on Guam its powers and, unlike the states, which retain their sovereignty by virtue of the Constitution, Guam's sovereignty is entirely a creation of federal statute.

Ngiraingas, 858 F.2d at 1370-71 (emphasis added).

The threshold question quite obviously is, what limitations exist on Congress' power? As the Court stated in Binns, 194 U.S. at 491, the Congress has "plenary power, save as controlled by the provisions of the Constitution" (emphasis added). What are these limitations? The Territorial Clause gives to Congress discretionary power to provide to the people of an unincorporated territory or Commonwealth whatever individual rights or degree of self-government Congress determines appropriate. If Congress determines that the native people of Guam are entitled to extraordinary rights or that the Commonwealth Government is to have broad, internal self-governing powers, the Territorial Clause permits this. As set forth below, the only certain limitations on Congress are those prohibitions set forth in the Constitution which specifically limit Congress' power, such as the bar against ex post facto laws and bills of attainder.

III. SELF-DETERMINATION FOR THE NATIVE PEOPLE OF GUAM

Section 102(a) of the draft Commonwealth Act provides the mechanism for the people of Guam to exercise their inherent right of self-determination. As set forth in a bracketed agreement signed on October 2, 1991, the Congress directs that the Commonwealth Constitution shall establish a procedure for a plebiscite on future political status. Those who will be eligible to vote are those who Congress decided were eligible for citizenship in 1950 -- those who were born on Guam prior to the granting of citizenship and their descendants.[3]

Section 102(c) provides for a recognition by the United States that the Chamorro culture is endangered as a result of the 500-year history of colonialism in Guam and the unfettered immigration permitted over the last 30 years. In recognition, the Congress directs the adoption of programs (1) to revitalize the Chamorro culture and (2) enhance the economic, social, educational and job opportunities of the Chamorro people. In addition, it authorizes Guam to implement similar programs. This provision recognizes Congress' budget limitations and transfers some of the burden to Guam to assist in remedying past discriminatory practices.

A. UNITED STATES HISTORICAL AND INTERNATIONAL TREATY OBLIGATIONS TOWARD THE NATIVE PEOPLE OF GUAM

A compelling historical basis exists for this right to exercise self-determination. In its First Report on H.R. 98 released in August of 1989, the Task Force recognized that

> others among Guam's current residents have had a choice [of self-determination]: Statesiders, Asians, Micronesians from the former Trust Territory, and other residents have acted voluntarily to come to Guam knowing of Guam's status. Guam's neighbors in the Pacific -- the people of the Freely Associated States, and the people of the Northern Marianas -- were afforded a chance to vote on whether they approve the terms of their relationship with the United States. But the Chamorro people of Guam have been given no such opportunity -- not in 1899 when Guam was ceded to the United States by Spain, not in 1950 when the Organic

[3] 8 U.S.C. 1407(a). This self-determination vote by the Native People of Guam should not be confused with the ratification process planned for Commonwealth or for the Commonwealth Constitution. Under procedures proposed in Title XII, all eligible voters on Guam will be entitled to vote to approve or disapprove the Commonwealth Act as passed by Congress. Thereafter all these same eligible voters will be entitled to vote for electors to a constitutional convention. They will also be entitled to vote for the Constitution which may contain a procedure for the vote.

> Act was passed and the people of Guam became citizens of the United States, nor at any other time.

First Report at 9 (emphasis added).

With this compelling statement, the Task Force sounded a clarion call for self-determination, recognizing that the native people of Guam have had no meaningful role in their own governance since they were colonized in the 1500s. First, they lived under three centuries of Spanish rule, during which time their population was reduced from 100,000 to 5,000 by the turn of the 18th century. In 1898, Spain ceded the island of Guam to the United States in the Treaty of Paris, which ended the Spanish-American War. With the island came responsibility for the native people of Guam. As a part of its obligations under the Treaty of Paris, the United States agreed that "[t]he civil and political status of native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." 30 Stat. 1759.[4] The United States, therefore, undertook as a treaty obligation responsibility for the political status of the native people of Guam, the Chamorros.

After 1898, Guam was ruled by a military Governor and largely left alone, giving the native population the opportunity to reestablish itself. By 1940, the Chamorro population had risen to approximately 20,000, out of a total island population of 22,290, or over 90% of the local population. The other 9% was made up of Statesiders (referred to as "whites" in census documents) (3.5%), Filipinos (2.6%), and others (3.4%).

In 1941, Guam was attacked by Japan and occupied by yet another colonial power, until liberated by American forces in July 1944.

After the cessation of hostilities, the people of Guam -- while liberated from Japanese tyranny -- remained under what was recognized by international law as a colonial arrangement. Thus, when the U.N. Charter was implemented in the post-war era, the U.S. accepted inclusion of Guam on the U.N. list of non-self-governing areas. Although the Congress adopted an Organic Act for Guam which served in place of a local constitution, 48 U.S.C.A. §§1421 et seq., the native Guamanians (then numbering approximately 27,000, see, note following 48 U.S.C.A. §1421) were offered no meaningful role in their political affairs.[5] The Organic Act did provide for a locally

---

[4] See Examining Board v. Flores de Otero, 426 U.S. 572, 586 n. 16 (noting the "broad" powers vested in Congress by the Territorial Clause, and pointing specifically to the authority granted Congress by the Treaty of Paris).

[5] At the same time, Congress also granted citizenship to the residents of Guam. 8 U.S.C. 1407 (a). This citizenship, however, was limited to a class of residents which generally were those persons and their descendants who were inhabitants of Guam on April 11, 1899 -- in other words, the Chamorro people. This is essentially the same (continued...)

elected legislature and local court system, but the Executive was a governor appointed by the United States, and Congress reserved the power to override any legislation adopted by the locally elected legislature. 48 U.S.C.A. §1423i. Furthermore, the United States District Court for Guam served as an appellate court for appeals from the local court system.

Perhaps the most onerous example of the ongoing colonial regime was a restriction on travel to and from Guam. The United States established a military security zone encompassing the entirety of Guam. No person, whether Chamorro or non-Chamorro, was permitted to enter or exit Guam without military approval. Families were divided and the people of Guam became prisoners on their own island, or exiles from it -- if circumstances found them elsewhere. Importantly, however, these travel restrictions did provide some limitation on immigration into Guam, except for temporary military, United States Government personnel, and contract laborers. The local Chamorro population was not diluted significantly during this period. These restrictions were finally lifted by President Kennedy in 1962 as part of a review of United States policy toward Guam and the Trust Territories of the Pacific Islands.

At the time of liberation, the vast majority of Guam's permanent population was native Guamanian. By 1946 the Navy reported a native population of 22,689, with a total island population of 23,136, excluding military. By 1950, however, the total population of Guam was permitted to expand to 59,498, with 27,124 Chamorros (45.6%), 7,258 Filipinos (12.2%) and 22,290 "whites" (38.5%). It is believed that the vast majority of Filipinos and Statesiders on the island during the late 1940s and 1950s were brought there by the United States Government as a part of Guam's development as a military facility.[6] This population was transient and offered no immediate threat to the native population's ultimate ability to control internal island affairs.

By the mid-1960s, however, a new kind of immigration pattern was beginning to emerge.[7] After travel restrictions were lifted by the military and especially after the

---

[5](...continued)
class of persons named in Section 102(a) of the draft Act as those who would be eligible to participate in a future and final act of self-determination.

[6] 84.2% of those immigrating to Guam between reoccupation (1944) and 1950 were males who came either for military assignments or as part of the imported labor force.

[7] In 1952, the Immigration and Nationality Act designated Guam as a part of the United States for immigration purposes. Immigration and Nationality Act of 1952, sec. 403, 66 Stat. 280. In addition, the U.S. Board of Immigration Appeals held that certain nonimmigrant alien workers admitted prior to December, 1952, were entitled to permanent U.S. residency under the 1917 Immigration Act. As a result, by February, (continued...)

end of the Vietnam war, United States law and policy encouraged massive immigration, principally from Southeast Asia. As United States law on immigration changed to a country-quota system, Asians had unprecedented access to the United States. Because Congress had designated Guam as a part of the United States for permanent residency purposes, Guam, with its close proximity to Asia, became a magnet for immigrants, especially from the troubled Philippines. These immigrants are far less transient than their U.S. mainland predecessors, as the following Table demonstrates.

---

[7](...continued)
1962, 1,700 Filipino workers were able to obtain permanent residency on Guam. Another 200 nonresident aliens were also admitted by 1962 and an additional 1,458 aliens were admitted by 1967, all of whom had entered Guam with military permission.

# Guam Population Ethnicity Mix 1940-1990‡

## Numerical Distribution




| Year | 1940 | 1950 | 1960 | 1980 | 1990 |
|---|---|---|---|---|---|
| Chamorro | 20,173 | 27,124 | 34,726 | 47,825 | 57,641 |
| White | 780 | 22,920 | 20,724 | 26,901 | 19,160 |
| Other* | 1,337 | 9,454 | 11,558 | 31,253 | 56,306 |
| TOTAL | 22,290 | 59,498 | 67,008 | 105,979 | 133,107 |

## Percentage Distribution




| Year | 1940 | 1950 | 1960 | 1980 | 1990 |
|---|---|---|---|---|---|
| Chamorro | 90.5% | 46.1% | 51.8% | 45.1% | 43.3% |
| White | 3.5% | 37.9% | 30.9% | 25.4% | 14.4% |
| Other* | 6.0% | 16.1% | 17.2% | 29.5% | 42.3% |

*‡Source: U.S. Bureau of Census Decennial Reports, 1990.*
**Philippino and other immigrants primarily from Asia.*

This Table shows conclusively that the transient population from the mainland United States decreased in real numbers during this period, and more importantly, as a total percentage of the population. But the Filipino and "Other" populations grew from 15.9% of the population in 1950 to 42.3% of the population by the 1990 census, or only 1% less than the native population -- which had been diluted a further 2.3% in this same period.

The policy which permitted this significant influx of immigrants is directly responsible for the Chamorro self-determination proposal. If the United States had not treated Guam as a destination at which U.S. citizenship could be attained by aliens, the proposal would be unnecessary. Because we cannot roll back this history, the United States has an obligation to provide the native people of Guam with an opportunity to exercise self-determination, undiluted by the voice of those who have been permitted to immigrate.

B. The International Legal Framework

This responsibility to allow for true self-determination stems from the ratification of the Treaty of Paris, whereby Congress accepted responsibility for the political rights of the native inhabitants of Guam. This responsibility was later amplified in the ratification of the United Nations Charter.[8] Specifically, Article 73 of the Charter states:

> Members of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of these territories are paramount, and accept as a sacred trust the obligation to promote to the utmost . . . the well-being of the inhabitants of these territories, and, to this end . . . to develop self-government, to take due account of the political aspirations of the peoples, and to assist them in the progressive development of their free political institutions, according to the particular circumstances of each territory . . . .

[8] The political branches of the U.S. Government exercised their plenary authority under the treaty making power by entering into the United Nations Charter in 1945. It is important to keep in mind that the Charter is a treaty obligation, and thus has the force of Federal law under the Constitution. In this context, the political branches decided to make international standards applicable to the territories, including Guam. That exercise of authority now constitutes part of the framework, under the Insular Cases, within which the U.S. administers Guam, and is perfectly consistent with the Territorial Clause. Thus, the U.N. Charter and the Insular Cases can be seen, not at odds with one another, but as fully consistent within overall constitutional and statutory framework.

U.N. Charter, Article 73 (emphasis added).

Guam is included on the United Nation's list of non-self-govering territories. By accepting Guam's inclusion on the United Nations list of non-self-governing territories, and by reporting annually to the United Nations under Article 73(e) of the U.N. Charter, the United States accepts that it considers Guam to be a non-self-governing territory, thus recognizing its obligations under the Charter.[9]

To whom does self-determination apply? The first serious effort to enunciate the applicable principles was undertaken by the fifteenth General Assembly in the annex to Resolution 1541 of December 15, 1960. It attempts to sit forth the test for determining whether a territory is non-self governing within the meaning of Article 73(e) of the Charter. Under Principle IV of the resolution, non-self governing status exists prima facie "in respect of a territory which is geographically separate and is distinct ethnically and/or culturally from the country administering it." Once that test has been met, Principle V states, "other elements may then be brought into consideration," including those "of an administrative, political, juridical, economic or historical nature. If they affect the relationship between the metropolitan State and the territory concerned in a manner which arbitrarily places the latter in a position or status of subordination, they support the presumption" that the territory is non-self-governing.[10] It further declared that all Members should take immediate steps "to transfer all powers to the peoples of those territories, without any conditions or reservations, in accordance with their freely expressed will and desire . . . ."[11]

The 1970 Declaration on Friendly Relations elaborated the Charter "principle of equal rights and self-determination of people" by reiterating the duty to end colonialism and to permit each colonial territory to assume a "political status freely determined by" the inhabitants. More broadly, the declaration attributes to "all peoples" -- not merely the inhabitants of colonies -- "the right freely to determine, without external interference, their political status."[12]

---

[9] Article 73(e) states, in pertinent part, that Nations administering non-self-governing territories must "transmit regularly to the Secretary-General for information purposes . . . statistical and other information . . . relating to the . . . conditions in the territories for which they are responsible."

[10] GA Res. 1541, 15 UN FAOR Supp. (No. 16), supra note 31, at 29.

[11] Id. at para. 5.

[12] Annex to GA Res. 2625, supra note 31, principle 4.

The broad concept of a universal right to self-determination is further enunciated in Article I of the International Covenant on Civil and Political Rights.[13] This treaty, ratified or acceded to by 113 states as of November 1991, and approved by the United States Senate on April 2, 1992, states categorically: "All people have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development."

To implement further the decolonization process, in 1980, the General Assembly adopted a resolution entitled "Plan of Action for the Full Implementation of the Declaration on the Granting of Independence to Colonial Countries and Peoples." U.N.G.A. Res. 35/118 (1980). This resolution was overwhelmingly approved by a vote of 120-6, with 20 abstentions. As a part of this plan, colonial powers were directed to

> adopt the necessary measures to discourage or prevent the systematic influx of outside immigrants and settlers into Territories under colonial domination, which disrupts the demographic composition of those Territories and may constitute a major obstacle to the genuine exercise of the right to self-determination . . . by the people of those Territories.

Id., Annex, para. 8.

The United States never implemented measures designed to prevent the dilution of the native Guamanian population through immigration. In fact the opposite happened, and United States immigration policies applicable to the mainland were extended to Guam, permitting the massive influx of new Guam residents. This immigration policy is inconsistent with the United States' obligations to a non-self-governing unincorporated territory, and provides all the basis Congress needs under every relevant decision to establish a rational basis for the authorization of self-determination for the native people of Guam.[14]

---

13/ International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 UNITS 171, reprinted in 6 ILM 368 (1967) (entered into force Mar. 23, 1976) [hereinafter ICCPR]. The same principle is stated in Article 1 of the International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, 993 UNITS 3, reprinted in 6 ILM 360 (1967) (entered into force Jan. 3, 1976).

14/ Califano v. Torres, 435 U.S. 1 (1978), and Harris v. Rosario, 446 U.S. 651 (1980), support the proposition that Congress need only demonstrate a rational basis for its actions affecting an unincorporated territory: "Congress . . . may treat [an unincorporated territory] differently from States so long as there is a rational basis for its actions." Rosario at 651, 652.

## IV. THE CONSTITUTIONALITY OF THE DRAFT COMMONWEALTH ACT

### A. HISTORY OF PAST POLITICAL/LEGAL ANALYSES

For the last 500 years, decisions such as those which permitted massive immigration into Guam, diluting the native Guamanian population, have been made for the people of Guam by colonial administrators whose decisions were directed from distant capitals. More often than not these were political decisions made for the good of the colonial power, with only nominal reference to the political rights of the native people. Significantly, no Chamorro, while resident on Guam, has ever cast a vote for any of these decision-makers, for the persons who appoint them, or for those who approve their appointments.

The draft Commonwealth Act seeks to remedy the harmful effects of massive immigration through a variety of Congressional mandates directing that the native people of Guam be provided with a series of self-determination choices, as though their population had never been diluted.

The Task Force responded, not by assessing what powers the courts have said Congress has, nor by analyzing the United States' international treaty obligations toward Guam, but by characterizing Guam's proposal as a racially discriminatory voting scheme which violates the Fourteenth and Fifteenth Amendments to the Constitution. According to the Task Force, the limitation on voter eligibility to those born prior to August 1, 1950, and their descendants is merely a code word for a racial class because, although those eligible to vote could include some "born on Guam before August 1, 1950, who are not of Chamorro descent . . . their numbers, if any, would be so few as to be de minimis."[15]

The Task Force's analysis is overly simplistic. The focus should not be on the racial classification, which in any event clearly is not invidious race-based discrimination. Rather, the focus should be on the positive, restorative function of the classification, and democratic reform in U.S. Insular policy pursuant to the Territorial Clause. In addition, the Task Force has ignored the actual origin of this classification (Congress itself), and its purpose -- to give meaning to the obligations Congress accepted in the Treaty of Paris and the United Nations Charter.

---

15/ Significantly, the Task Force is unable to offer any evidence that the voter qualification provision would in fact result in an exclusively Chamorro vote. It is described as "Chamorro Self-Determination" for ease of reference. In fact, the Task Force does not deny that non-Chamorros might qualify under the provision. Quite clearly non-Chamorros would qualify, thereby undermining the argument that this is solely a race-based classification.



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 529 of 542

Most importantly, the Task Force's constitutional analysis demonstrates a fundamental misunderstanding of the draft Act, Congress' power over the unincorporated territories derived from the Territorial Clause, and the Supreme Court's deference to the Congress when it exercises its Territorial Clause authority. The Task Force's analytical problem originates with its treatment of Section 102(a) as if it were an action being taken by a State to deprive one of its citizens a right or a vote based solely on racial considerations. If adopted, however, the section would be a directive by the Congress pursuant to the Territorial Clause made in the context of Guam's political status process. It would not be racially based. It would be based on the United States' commitment in the Treaty of Paris and the United Nations Charter to the native inhabitants of an unincorporated territory. It is also based on Congress' own action in 1950, defining who would be qualified for citizenship. No court has ever ruled that an act of Congress is barred either by the Fourteenth or Fifteenth Amendments when the Congress is acting pursuant to its Territorial Clause authority to determine the political rights of the native inhabitants of a territory.[16]

In substantial part, the Task Force's objection to Chamorro self-determination is based on its view that a Chamorro-only vote constitutes a per se violation of the Fifteenth Amendment.[17] According to the Task Force, "the Fifteenth Amendment specifically and absolutely prohibits limitations on the right to vote based on race or color." Second Report at 13. First, as explained below, this is the wrong threshold

---

16/ In fact, the Supreme Court has been totally consistent in this regard. In both Rosario and Torres (note 10, supra) the Court upheld Congressional action despite clear equal protection issues, based on the broad authority given Congress under the Territorial Clause.

17/ The Supreme Court has not rejected all voting criteria involving racial considerations:

> In addition, many of our voting rights cases operate on the assumption that minorities have particular viewpoints and interests worthy of protection. We have held, for example, that in safeguarding the "'effective exercise of the electoral franchise'" by racial minorities, "[t]he permissible use of racial criteria is not confined to eliminating the effects of past discriminatory districting or apportionment." Rather, a State . . . may "deliberately creat[e] or preserv[e] black majorities in particular districts in order to ensure that its reapportionment plan complies with §5"; "neither the Fourteenth nor the Fifteenth Amendment mandates any per se rule against using racial factors in districting and apportionment."

Metro Broadcasting v. FCC, 497 U.S. 547, 583-84 (1990)(citations omitted).



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 530 of 542

issue. When the constitutionality of an Act of Congress is in question, whether in connection with the territories or anything else, the threshold question is always, does Congress have the power to take the action and, if so, is there a compelling state interest involved or does a rational basis exist for the decision?

The Task Force's restrictive analysis, which raises only the possibility that the provisions suffer from constitutional infirmities, is, in our view, erroneous. The Guam Commission on Self-Determination ("CSD") proposed that Congress explicitly authorize the Commonwealth to adopt these programs because the Supreme Court in Richmond v. Croson Co., 488 U.S. 469 (1989), has concluded that a political entity such as the city of Richmond could not employ racially-based, remedial programs, unless that entity had itself participated in the racial discrimination to be remedied. In the CSD's view, however, the Supreme Court has made it clear beyond debate that Congress itself could authorize a State or territory to undertake remedial action programs.

According to the Task Force, the Supreme Court has only authorized Congress itself "to enact tailored programs that use racially or ethnically discriminatory tests for remedial purposes" and only to direct "Federal agencies to adopt such programs." Second Report at 15. As a result, the Task Force concludes that these rulings do "not necessarily mean that the Congress may authorize any other entity to adopt such programs or that such programs would not be subject to the strict scrutiny review generally applicable to programs that use racial tests." Id.

B. THE APPROPRIATE CONSTITUTIONAL ANALYSIS

The constitutional analyses offered by the Task Force throughout its First and Second Reports generally suffer from a common analytical problem. In order to justify its reluctance to accept Guam's proposal for self-determination for the native people of Guam, the Task Force employs an analysis which must result in a finding of unconstitutionality. Whenever the Task Force finds that a proposal possibly discriminates between Chamorros and non-Chamorros, it looks solely to the Fourteenth or Fifteenth Amendments and concludes that if Guam were to take this action an equal protection or voting rights problem would arise.

In essence, what the Task Force does is apply an analysis that is used in connection with determining whether state-originated actions are constitutional. The Supreme Court has greatly restricted the ability of states to remedy past acts of discrimination. But the Court has been extremely reluctant to restrict Congress' authority, and it is for this reason that the CSD seeks language under which Congress authorizes the Commonwealth Government to take the remedial action.

The analytical approach the Supreme Court applies when assessing whether remedial measures adopted by the Congress are constitutionally acceptable is significantly different from that used by the Task Force. The Court does not employ a simplistic analysis of whether the Fourteenth or Fifteenth Amendments on their face prohibit the questioned action, but first asks, "are the objectives of the legislation within

the power of Congress?" and second, whether "the limited use of racial and ethnic criteria [is] a permissible means for Congress to carry out its objectives within the constraints of the Due Process Clause." Croson, 488 U.S. at 487; see also Wabol v. Villacrusis, 958 F.2d 1450 (9th Cir. 1992), cert. denied, 1992 U.S. LEXIS 7798 (1992).[18]

On March 16, 1992, ten months prior to the release of the Second Report, the Ninth Circuit employed exactly this analysis in Wabol v. Villacrusis, supra, 958 F.2d 1450. The Supreme Court denied a writ of certiorari on December 7, 1992. In Wabol, the Court was examining land ownership restrictions mandated by Congress in another unincorporated territory pursuant to the Covenant to Establish the Commonwealth of the Northern Mariana Islands (CNMI) in Political Union With the United States. Congress' directive, limiting the right to own property to native people, was implemented in the CNMI's Constitution. Section 805 of the CNMI Covenant directed the CNMI to impose restrictions limiting land ownership to "persons of Northern Marianas descent." Article XII, Section 4 of the CNMI Constitution defined "a person of Northern Marianas descent" as one

> who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Mariana Carolinian blood or combined thereof . . . For purposes of determining Northern Marianas descent, a person shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 . . .

To determine whether this obviously racially-based classification violated the Constitution, the Ninth Circuit adopted the same analysis employed by the Supreme Court in Fullilove, Croson and Metro Broadcasting. The threshold inquiry was whether Congress had the power to exclude particular provisions of the Constitution from application in the territories. To answer this question, the Ninth Circuit looked to Congress' Territorial Clause authority, and followed the Supreme Court's mandate that "the entire Constitution applies to a United States territory ex proprio vigore -- of its own force -- only if that territory is incorporated. Elsewhere, absent congressional

---

18/ The court applies exactly this same kind of analysis when dealing with Congress' power over the territories. In cases involving the territories, the courts look first at the Territorial Clause to determine whether Congress has the power it seeks to exercise, and then conducts an Insular Cases analysis to determine whether the territory is incorporated or unincorporated, since, if a territory is unincorporated the Constitution does not automatically apply. See Wabol, 958 F.2d at 1460 ("[W]e must be cautious in restricting Congress' power" in the territories.).

extension, only 'fundamental' constitutional rights apply in the territory." 958 F.2d at 1459.[19]

According to the Ninth Circuit, the question further reduces to this: Is the right of equal access to long-term interests in Commonwealth real estate, resident in the equal protection clause, a fundamental one which is beyond Congress' power to exclude from operation in the territory under Article IV, section 3?

Id. at 1460.

The Ninth Circuit then reiterated its view that rights incorporated within the Fourteenth Amendment and applicable to the States were not necessarily incorporated into the Territorial Clause for application in the territories:

> What is fundamental for purposes of Fourteenth Amendment incorporation is that which "is necessary to an Anglo-American regime of ordered liberty." In contrast, "fundamental" within the territory clause are "'those . . . limitations in favor of personal rights' which are 'the basis of all free government.'"
>
> * * *
>
> In Atalig, we distinguished Fourteenth Amendment and territorial incorporation by reference to their distinct purposes. Whereas the former "serves to fix our basic federal structure[,] the latter is designed to limit the power of Congress to administer territories under Article IV of the Constitution." The incorporation analysis thus must be undertaken with an eye toward preserving Congress' ability to accommodate the unique social and cultural conditions and values of the particular territory. Moreover, we must be cautious in restricting Congress' power in this area.

Id. (Citations omitted, emphasis added).

The Ninth Circuit then reaffirmed its previous adoption of the standard used by Justice Harlan in his concurring opinion in Reid v. Covert, 354 U.S. 1, 75 (1955), "whether in [the territory] circumstances are such that [application of the constitutional provision] would be impractical and anomalous."

After finding that land is a scarce and precious resource and essential to the culture through its role in "creating family identity and contributing to the economic well-being of family members," 958 F.2d at 1461, the Ninth Circuit concluded that

---

[19] At times the Task Force seems to be arguing that once a provision of the Constitution is applied to Guam it cannot be withdrawn by Congress. There is no legal foundation for any such assertion.

application of equal protection principles would indeed be impractical and anomalous. The factual predicate for this conclusion was that the provision was essential to the political status agreement between the United States and the CNMI, and its application would undermine the cultural and social identity of the people which the U.S. had agreed to protect under the U.N. Charter. The Ninth Circuit concluded, therefore, that "[t]he Bill of Rights was not intended to interfere with the performance of our international obligations. Nor was it intended to operate as a genocide pact for diverse native cultures. Its bold purpose was to protect minority rights, not to enforce homogeneity. Where land is so scarce, so precious, and so vulnerable to economic predation, it is understandable that the islanders' vision does not precisely coincide with mainland attitudes toward property and our commitment to the ideal of equal opportunity in its acquisition. We cannot say that this particular aspect of equality is fundamental in the international sense. It therefore does not apply ex proprio vigore."

Id. at 1462 (citation omitted).

The Task Force apparently did not assess whether Congress has the power Section 102(a) of the draft Commonwealth Act seeks to extend to it, or whether application of either the Fourteenth or Fifteenth Amendments would be "impractical or anomalous." What could be more anomalous than to use either of these two Amendments to take away for all time the native people's rights to self-determination, simply because United States' policy has permitted unfettered immigration into Guam, thereby diluting its native population?
Rather, the Task Force simply assumes that Congress does not have this power, or perhaps chooses to ignore Congress' powers under the Territorial Clause. If the Task Force had simply read the two decisions upon which it relies,[20] and also read the Croson decision, it would have concluded, as has the CSD, that the Supreme Court, indeed, has explicitly authorized Congress to mandate states and municipalities to take racially or ethnically-based remedial actions.

In Croson, the Supreme Court, relying on its decision in Fullilove, stated unequivocally that "Congress could mandate state and local government compliance with the set-aside program under its §5 power to enforce the Fourteenth Amendment." 488 U.S. at 487.[21]

Indeed, in Fullilove, the Court examined the breadth of Congress' powers and found explicitly that

---

[20] Fullilove v. Klutznick, 448 U.S. 448 (1980), and Metro Broadcasting, 497 U.S. 547.

[21] The Court even cited with favor to a law journal article which concluded that "Congress may authorize, pursuant to section 5, state action that would be foreclosed to the states acting alone." Croson, 488 U.S. at 491.

> [i]t is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees.

Fullilove, 448 U.S. at 483.

The Court expanded on this theme in Croson:

> Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.

Croson, 488 U.S. at 490.[22/]

Finally, the Court's decision in Metro Broadcasting gives utterly no support for the Task Force's reasoning that somehow the Court limited its decision to Congress authorizing only federal agencies. The Court's language is bold and direct. In assessing whether a remedial program employed by the FCC was constitutional, the Court stated flatly that "[i]t is of overriding significance in these cases that the FCC's minority ownership programs have been specifically approved -- indeed, mandated -- by Congress." Metro Broadcasting, 497 U.S. at 563. The Court went on to analyze its Fullilove and Croson decisions and nowhere indicated that its rule would have any less validity when it is Congress directing the states rather than the agencies.[23/]

## V. CONGRESS HAS UNIQUELY BROAD POWERS TO DETERMINE THE POLITICAL RIGHTS OF THE PEOPLE RESIDING IN THE TERRITORIES

The Supreme Court has repeatedly held that determinations on the political rights of territorial inhabitants are within the absolute discretion of the Congress, including the right to vote. According to the Court, "it is clear that the Constitution was held not to extend ex proprio vigore to the inhabitants of [unincorporated territories]." Examining Board v. Flores, 426 U.S. 572, 600 n.30 (1976). Rather, only "fundamental" constitutional rights are guaranteed. The decision on which rights are

22/ Interestingly, the Court followed this statement with a reference to South Carolina v. Katzenback, 383 U.S. 301, 326 (1966), a case in which the Court had applied a similar interpretation of congressional power under the Fifteenth Amendment.

23/ Even if this were not the case, the Ninth Circuit has essentially labeled Guam "an administrative agency," Ngiraingas, 858 F.2d at 1370, and thus Congress' power to authorize Guam to conduct a Chamorro-only vote cannot be seriously questioned.

fundamental has been made on a case by case basis, and the Supreme Court has been hesitant to list those rights which must be considered fundamental.[24]

Moreover, the Court appears to have established a separate standard for those fundamental rights which limit Congress' powers and those rights which apply to the people of a territory for all other purposes. Justice White in Downes v. Bidwell made this distinction on fundamental rights when he referred in his opinion to a dissenting opinion in the Dred Scott case:

> To this [what is fundamental] I answer that, in common with all the other legislative powers of Congress, it finds limits in the express prohibitions on Congress not to do certain things; that, in the exercise of the legislative power, Congress cannot pass an ex post facto law or bill of attainder; and so in respect to each of the other prohibitions in the Constitution.

Downes, 182 U.S. at 292.

The fundamental rights he was referring to were those direct limits on Congress explicitly set forth in the Constitution. When the Supreme Court's decisions on how and when the Constitution applies in the territories are reviewed carefully, the Supreme Court has applied no per se standard and, instead, has adopted what is essentially a situational test:

> [T]he Insular Cases do stand for an important proposition, one which seems to me a wise and necessary gloss on our Constitution. The proposition is . . . not that the Constitution "does not apply" overseas, but that there are provisions in the Constitution which do not necessarily apply in all circumstances in every foreign place. . . . [T]here is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and considerations are that would make adherence to a specific guarantee altogether impracticable and anomalous.

Reid, 354 U.S. at 74 (Harlan, J., concurring)(emphasis added).

Returning again to Justice White in Downes v. Bidwell,

---

[24] While it often surprises many, voting is not a fundamental right in our political system. It did not exist for much of the population prior to the Fifteenth, Nineteenth, Twenty-Fourth and Twenty-Sixth Amendments. As recently as 1982, the Supreme Court reaffirmed that voting per se is not a fundamental right in our system. Rivera-Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9 (1982).

> [i]n the case of the territories . . . when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, but whether the provision relied on is applicable . . . . And the determination of what particular provision of the Constitution is applicable, generally speaking, in all cases, involves an inquiry into the situation of the territory and its relations to the United States.

Downes, 182 U.S. at 293 (emphasis added).

Most importantly, the Supreme Court has repeatedly deferred to Congress' special powers in regard to the political and voting rights of the people in the territories. Justice White concluded that

> [t]he Constitution has undoubtedly conferred on Congress the right to create such municipal organizations as it may deem best for all the territories of the United States . . . to give to the inhabitants as respects the local governments such degree of representation as may be conducive to the public well-being, to deprive such territory of representative government if it is considered just to do so, and to change such local governments at its discretion.
>
> * * *
>
> There can also be no controversy as to the right of Congress to locally govern the island . . . and in so doing to accord only such degree of representative government as may be determined by that body.

Downes, 182 U.S. at 289-91, 298-99 (emphasis added).

The Supreme Court explained further its views on Congress' power to limit the political rights of the people of a territory in Dorr v. United States, 195 U.S. 138:

> Congress has unquestionably full power to govern [the territories], and the people, except as Congress shall provide for, are not of right entitled to participate in political authority, until the Territory becomes a State. Meantime they are in a condition of temporary pupilage and dependence; and while Congress will be expected to recognize the principle of self-government to such extent as may seem wise, its discretion alone can constitute the measure by which the participation of the people can be determined.

Dorr, 195 U.S. at 148 (emphasis added).[25]

---

[25] The Supreme Court's view that Congress can forge unique relationships with its (continued...)

The Supreme Court's most compelling discussion of the power of Congress vis-a-vis the political rights of the inhabitants of a territory is found in Murphy v. Ramsey, 114 U.S. 15 (1885). In that decision, the Court reviewed an Act of Congress which withdrew the right to vote in the territory of Utah from those who practiced polygamy. A challenge was made to the constitutional power of Congress to abridge the right of a class of voters. According to the Court,

> that question is, we think, no longer open to discussion. It has passed beyond the stage of controversy into final judgment . . . . [I]n ordaining government for the Territories, and the people who inhabit them, all the discretion which belongs to legislative power is vested in Congress; and that extends, beyond all controversy, to determining by law, from time to time, the form of the local government in a particular Territory, and the qualification of those who shall administer it. It rests with Congress to say whether, in a given case, any of the people, resident in the Territory, shall participate in the election of its officers or the making of its laws; and it may, therefore, take from them any right of suffrage it may previously have conferred, or at any time modify or abridge it, as it may deem expedient. . . . [The] political rights [of the people] are franchises which they hold as privileges in the legislative discretion of the Congress of the United States.

Murphy, 114 U.S. at 44-45 (emphasis added).[26]

---

[25](...continued)
territories has not changed since the Insular Cases. In Examining Board v. Flores de Otero, 426 U.S. 572, 596 (1978), the Supreme Court, commenting on the nature of Puerto Rico's political status after its Commonwealth relationship was established, referred to the relationship between Puerto Rico and the United States as one that has "no parallel in our history." Similarly in Rodriquez v. Popular Democratic Party, 457 U.S. 1, 8 (1982), the Supreme Court declared that Puerto Rico, "like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution.'"

[26] This case was decided 17 years after the Fourteenth and Fifteenth Amendments were adopted. During discussions with the Justice Department representatives to the Task Force, the Ramsey decision was criticized as somehow no longer being valid. It remains good law, however, and has been cited by the Supreme Court, without criticism, as recently as 1977 in United States v. Wheeler, 435 U.S. 313, 319 (1977) ("It is true that Territories are subject to the ultimate control of Congress"). Moreover, the United States District Court for the District of Columbia in its opinion in Michel v. Anderson, 817 F.Supp. 126 (D.D.C. 1993), the case dealing with the challenge to the territories' delegates vote in the Committee of the Whole, cited to a portion of this same quotation from Ramsey as demonstrative of the scope of the Congress' power over the territories.

Moreover, in Downes, the Court specifically distinguished the voting right from other fundamental rights:

> We suggest, without intending to decide, that there may be a distinction between certain natural rights, enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinions and to a public expression of them . . . the right to personal liberty and to individual property; to freedom of speech and of the press; to free access to courts of justice, to due process of law and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are indispensable to a free government. Of the latter class are the rights to citizenship, to suffrage . . . and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence.

Downes, 182 U.S. at 282-83 (emphasis added).

Sound legal and political reasons exist for the Court's giving the Congress this broad authority. If this kind of flexibility were not to exist, Congress would never be able to make political status changes in the territories. If for instance, a territory were to seek independence, as did the Philippines, and Congress could not limit application of the Constitution, American citizens living in that territory would be able to block any change in government which impacted their rights under the United States Constitution.[22] As the Court stated in Torres, 442 U.S. at 470.

---

[22] The Task Force's view of the limitations on Congress power to effect political status changes is also inconsistent with what some in the Senate itself believe. In 1990, the Senate Energy and Natural Resources Committee reported out S. 712, dealing with future political status for Puerto Rico. Under this bill, if an island-wide plebiscite had resulted in a preference for independence Puerto Rico was directed to organize a constitutional convention. The constitution which would result from this convention was required in the bill to preserve fundamental rights such as equal protection and due process. The bill also, however, restricted the vote on the convention delegates and actual constitution to a defined class of persons. They were: (1) persons born and residing in Puerto Rico; (2) all persons residing in Puerto Rico and one of whose parents was born in Puerto Rico; (3) all persons who at the time of the adoption of the Act had resided in Puerto Rico for a period of twenty years or more; (4) all persons who established their residence in Puerto Rico prior to attaining voting age and still reside in Puerto Rico; and (5) spouses of (1)-(4).



Case 1:26-cv-00017 Document 21 Filed 08/24/26 Page 539 of 542

because the limitation on the application of the Constitution in unincorporated territories is based in part on the need to preserve Congress' ability to govern such possessions, and may be overruled by Congress, a legislative determination . . . is entitled to great weight.

VI. CONCLUSION

Congress accepted an obligation in the Treaty of Paris, and later the United Nations Charter, to protect the political rights of the native inhabitants of Guam. The Task Force in its First Report found that the Chamorro people, unlike all others on Guam, had been given no opportunity to exercise self-determination. The Chamorro population has been greatly diluted by the immigration policies of the United States, inconsistent with the United Nations policy relating to decolonization. The Chamorro people as a group are clearly disadvantaged on Guam and have had their social, political, educational and economic interests subordinated to those of others with greater political and financial influence. One-third of their land has been taken from them for military purposes. They do not vote for those in Washington making decisions on their behalf. They are United States citizens but do not have the same political rights as do other United States citizens. In fact, they are not even eligible for the same level of benefits under a variety of federal programs as are citizen-residents of the States. The list goes on.

The self-determination rights set forth in §102 are justified and Congress has the power not only to adopt remedial measures, but also to authorize the Commonwealth of Guam to do so in its place as part of a federal remedial program. The provision of these rights by the Congress is not barred by the Constitution. As the Ninth Circuit Court of Appeals stated in 1992, "the equal protection clause . . . was [not] intended to operate as a genocide pact for diverse cultures." Wabol, 958 F.2d at 1462.

Superior Court of Guam
Judicial Center
120 West O'Brien Drive
Agana, Guam 96910
Telephone: (671) 475-3323 • Fax: (671) 477-1500

Chambers of
Frances Tydingco-Gatewood
Judge

October 24, 1997

HONORABLE CHAIRMAN DON YOUNG
RESOURCES COMMITTEE
C/O HONORABLE CONGRESSMAN ROBERT UNDERWOOD
424 CANNON HOB
WASHINGTON, D.C. 20515-5301

SUBJECT: WRITTEN TESTIMONY RE H.R.2370 - THE GUAM JUDICIAL EMPOWERMENT ACT OF 1997

DEAR CHAIRMAN YOUNG AND MEMBERS OF THE RESOURCES COMMITTEE:

Through many years of public service I have come to value and appreciate the importance of an independent judiciary to a free and democratic society. My experience covers a broad range of activities including: most recently, three years as a trial judge in the Superior Court of Guam and a designated Guam federal district court judge, and prior to that, Guam's Chief Prosecutor for a period of four years, and six years as an assistant prosecuting attorney with either the Jackson County, Missouri Prosecutor's Office or the Guam Prosecution Division of the Attorney General's Office. I would like to emphasize the profound importance of H.R. 2370 in ensuring the independence and integrity of Guam's judiciary. The specific provisions contained in the bill are essential to protecting our courts from erosive acts on the part of other branches of government, and to insure that Guam's government remains accountable under law.

Moreover, the establishment of the Supreme Court of Guam must be grounded in the Organic Act of Guam. While some individuals may suggest that the structuring of Guam's Judiciary should be left to local legislation, this is not feasible now or in the foreseeable future. The superstructure of Guam's judiciary must be defined on a level that is NOT subject to being diluted or diminished through the acts of Guam's legislature or the authority of Guam's Governor, regardless of who the incumbent officials may be in those two branches.

The Supreme Court of Guam does not exist in a vacuum. It is the head of Guam's Judiciary, a co-equal branch of Guam's government as mandated by 48 U.S.C. §1421a. While this provision reflects the fundamental design of American federalism, the template was not extended to Guam without careful consideration. In fact, the legislative history of the 1950 Organic Act of Guam indicates that the Senate version of the proposal, S.1892, was amended in committee to provide for greater separation of powers across Guam's government. 1950 United States Code Congressional Service 2844. To suggest that Guam's

Legislature and Governor should be permitted to define the structure and powers of the Judiciary would reflect an understanding of government that is uninformed to say the least. The principle of separating governmental powers through a system of checks and balances is so much accepted that it has become a conceptual cliche. But it has become so because it is based on common sense and hundreds of years of experience.

In Federalist Paper No. 47, which has been attributed to James Madison, the author notes the following about the objectionable nature of a system of government that "exposes essential parts of the edifice to the danger of being crushed by the disproportionate weight of other parts": "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than that on which this objection is founded." ALEXANDER HAMILTON, JAMES MADISON & JOHN JAY, THE FEDERALIST PAPERS, New American Library (1962), p. 301.

The Chairperson of Guam's Legislative Committee having jurisdiction over the Judiciary, Sen. Elizabeth Barrett-Anderson, has stated that in the absence of an Organic or Constitutional provision empowering Guam's Supreme Court that it could be written out of existence by an act of the Guam Legislature. No branch of government should be able to define the structure and authority of a co-equal branch, much less determine its ongoing existence.

Guam does not have a Constitution at this time and there are no indications that such is imminent. In the absence of an Organic Act provision specifically establishing the Supreme Court of Guam as the head of Guam's judiciary and guaranteeing its survival and vitality, that body remains institutionally vulnerable to ongoing threats to its existence, from the other branches of government and from within the judiciary as well. This is not a climate that supports the judicial independence and integrity that will sustain, in the long run, the advancement of Guam's own society.

In the brief history of the Supreme Court, there have been repeated efforts to emasculate it. Since the appointment of its first Justices, a number of bills have been introduced that reduced its authority and jurisdiction. Several have passed, including one that prevented the Supreme Court of Guam from determining whether the Guam Legislature has been acting in violation of 48 U.S.C. §1423b, the Organic Act provision which dictates how many legislators are necessary to enact local law. These efforts have not been limited to forces outside the judicial branch. During the past thirteen years of government service I have observed the destructive and demoralizing effects of the Organic Act's omission of specific definition of Guam's judiciary.

In closing, I would note that H.R. 2370 is essential remedial legislation and should be enacted without amendment with all deliberate speed. I am certain that if this legislation is passed by Congress, our judiciary would finally be insulated from political influence.

Very truly yours,

Frances Tydingco-Gatewood

Frances M. Tydingco-Gatewood
Judge, Superior Court of Guam